**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELIZABETH CHAN, TAMARA HOFFMAN & DOES 1 through 200, <div align="center">Plaintiffs,</div> v. <br> UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, SHAILEN BHATT, in his official capacity as Administrator of the Federal Highway Administration, RICHARD J. MARQUIS, in his official capacity as Division Administrator of the New York Division of the Federal Highway Administration,  LISA GARCIA in her official capacity, STEPHEN GOODMAN in his official capacity, ALLISON L.C. de CERRENO Ph.D. in her official capacity, NICHOLAS A. CHOUBAH, P.E. in his official capacity, WILLIAM J. CARRY  in his official capacity, and DOES 1 through 10. <div align="center">Defendants.</div> | Civil Case No._____ <br><br><br> **COMPLAINT** |

Plaintiffs Elizabeth Chan, Tamara Hoffman and DOES 1 through 200 hereby files this Complaint against the United States Department of Transportation ("USDOT"), the Federal Highway Administration ("FHWA"), Shailen Bhatt, in his official capacity as Administrator of the FHWA, and Richard J. Marquis, in his official capacity as Division Administrator of the New York Division of the FHWA.  The Defendants have proposed a congestion pricing plan that will seismically shift traffic within Manhattan and do not want to conduct an Environmental Impact Study ("EIS"), likely because doing so would jeopardize the tremendous income that the plan will provide to the financially challenged Metropolitan Transportation Authority.  This approach is contrary to federal law, and the decision to forego the EIS reflects arbitrary and capricious decision making.

<div align="center">

I.  **NATURE OF THE CASE**

</div>

1.  In May 2023, the FHWA approved New York's Central Business Tolling Program without requiring an Environmental Impact Statement ("EIS").  The FHWA stated that an EIS was not required because the "Proposed Action . . . will have no significant impact on the human or

natural environment."

2.      This finding of no significant impact ("FONSI") violates the National Environmental Policy Act ("NEPA") because it is "arbitrary and capricious."  The NEPA requires a federal agency to conduct a comprehensive review and prepare a complete EIS whenever a proposed action will, as here, "significantly affect[] the quality of the human environment."  42 U.S.C. § 4332(2)(C).

3.      While all New Yorkers recognize that congestion is a serious problem in New York City as a whole, any plan should not alleviate congestion in one part of New York City to the detriment of other parts of New York City and the residents that live there. The plan at issue, to reduce congestion in the central business district (CBD),[1] appears to move the traffic patterns from within the CBD to the exempted thoroughfares around the CBD, specifically the West Side Highway, the FDR Drive, the Battery Park Underpass, and any surface roadway portions of the Hugh L Carey Tunnel connecting to West Street.   As discussed herein, the effects of this re-routing of traffic were not sufficiently analyzed.

4.      Given lower Manhattan's width is very narrow, this diversion of traffic from the narrow area of the CBD in lower Manhattan to the exempted thoroughfares bordering the CBD does not alleviate the congestion problem or improve air quality.  Contrary to what the MTA states, this will not improve the quality of life, improve the air quality, or result in safer streets in lower Manhattan.  Quite to the contrary.  There will be more congestion, destruction of the air quality, and unsafe streets for pedestrians (including children) trying to cross exempted thoroughfares in lower

---

[1]   The Manhattan CBD is "the geographic area in the borough of Manhattan south of and inclusive of sixtieth street to the extent practicable but shall not include the FDR Drive, and New York state route 9A otherwise known as the 'West Side Highway' including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connecting West St.  The boundaries of the central business district shall not be modified, expanded, or reduced and shall incorporate the outer bounds of the aforementioned district to the extent practicable."  N.Y. Veh. & Traf. Law § 1704(2).

Manhattan such as Battery Park City ("BPC") residents crossing the exempted thoroughfare, West Street, to access the rest of Manhattan.

5.      Plaintiffs are residents of BPC, a 92-acre neighborhood located at the southwest corner of the CBD.  Any of the various CBD options will have a heavy impact on BPC.  First, the Hugh L. Carey Tunnel, a major entry point into the CBD at its Southern tip, is at the base of BPC. Second, the eastern boundary of BPC is the West Side Highway, which is an exempt highway under the plan.  This means that the West Side Highway will not be tolled, and will, as a result of this exclusion, experience a sharp increase of vehicles seeking to avoid tolls.  As anyone who has ever driven in this area is painfully aware — and apparently this number does not include any decision maker in the congestion planning — there is already significant traffic in the area.

6.      Plaintiffs do not agree that this proposal has taken the proper environmental assessment, or has taken into consideration the community's economic needs, and therefore will require further due diligence, as the Value Pricing Pilot Program ("VPPP") plan causes environmental and economic injustices that impact the neighborhood.

7.      The largest issue with the Environmental Assessment ("EA") is that BPC was omitted, in entirety, in the analysis and Plaintiffs seek a full EIS that considers and addresses the issues BPC has with the EA.

8.      The finding that no EIS is required is arbitrary and capricious for several reasons in regard to BPC.

9.      A review of the FONSI shows that the area of BPC is not even considered, despite the fact that a major entrance point to the CBD, and an excepted thoroughfare, are essentially located in BPC.

10.      Residents and schools that are alongside this exempted thoroughfare were not included in the document or acknowledged despite direct proximity to West Street/Route 9A.  This

includes multiple schools, to include PS 89, PS 276, PS 150, Leman Manhattan, and The Learning Experience.

11.     The MTA acknowledges that children and families that live and work near the exempted thoroughfares will see an increase in asthma rates and other illnesses.  In response, the MTA allocated $20 million in asthma remediation for Bronx residents.  Because BPC and other lower Manhattan neighborhoods were not properly analyzed, the residents and children in BPC did not receive fair consideration.

12.     The decision is exposed as even more arbitrary and capricious when the history of other projects in New York State is taken into account.  Projects of far less impact than the Congestion Pricing Plan required an EIS.

13.     The Congestion Pricing Plan has an enormous revenue producing component for New York's MTA, which has faced significant financial challenges over the past several years.[2]  It appears that in a rush to generate income for the MTA, shortcuts violating the NEPA were taken.

14.     It is also inexplicable how the exact plan to be enacted has not been selected - seven potential scenarios remain – yet a FONSI was still issued.

15.     An EIS must fully and fairly discuss significant environmental impacts, inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment, assess all reasonable alternatives that are consistent with the identified purpose and need, and evaluate a no-action alternative and all reasonably available measures to mitigate adverse environmental impacts.  40 C.F.R. §§ 1502.1, 1502.13, 1502.14(a), 1502.14(c).

16.     Plaintiffs respectfully requests this Court to: (1) issue preliminary and permanent injunctions vacating and setting aside Defendants' FONSI and Final EA, and compelling

---

[2] DiNapoli: Debt Adding to MTA's Financial Pressures With Riders and Fare Revenue Slow to Return | Office of the New York State Comptroller (ny.gov)

Defendants to conduct a full and proper EIS for the Manhattan CBD; (2) declare that the FHWA's failure to prepare an EIS for the Manhattan CBD congestion pricing scheme, or to adequately explain why an EIS is unnecessary, violates NEPA, its implementing regulations, and the APA; and (3) declare that Defendants violated the APA, and that the transportation conformity determination for congestion pricing in the Manhattan CBD was incomplete and provided no lawful basis for granting any approval.

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it presents a federal question under the laws of the United States, including NEPA and the APA.  Because the United States is a defendant, jurisdiction is also proper under 28 U.S.C. § 1346.

18.     Plaintiffs participated in the comments process, and thus have standing to proceed.

19.     Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(B), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Venue is also proper under 28 U.S.C. § 1391(e)(1)(C), because no real property is involved in the action and Plaintiffs live within this District.

20.     A substantial part of the events or omissions which give rise to the claims herein occurred in the Southern District of New York, as the congestion pricing scheme will directly and heavily impact BPC, most significantly as traffic enters the area through the Hugh Carey Tunnel, located at the southern tip of Manhattan.

## III.     PARTIES

21.     Plaintiffs Elizabeth Chan and Tamara Hoffman reside in Battery Park City.  BPC is a 92-acre neighborhood, with a population of approximately 10,000 people, located at the Southwestern corner of the CBD.  BPC residents, including Plaintiffs, have serious concerns regarding the congestion pricing scheme's impacts on the air quality, noise pollution, health of its

residents, and traffic congestion, among other harms. These impacts will directly harm BPC, its residents, businesses, and commuters.

22.     DOES 1 through 200 are also parties that live in BPC and participated in the NEPA process.

23.     Defendant USDOT is the federal government department responsible for oversight of the transportation planning process, including implementing NEPA requirements.

24.     Defendant FHWA is a federal agency within the USDOT that supports state and local governments in the design, construction, and maintenance of the Nation's highway system, including provisioning of financial and technical assistance.  The FHWA must ensure that the activities it authorizes comply with governing federal environmental statutes, including NEPA. The FHWA authorizes States to toll on federal roads and highways under the VPPP. 23 U.S.C. § 129. The FHWA issued the Final EA and FONSI for the congestion pricing scheme and must approve it under the VPPP; it was therefore required to perform a NEPA review pursuant to its regulations.  23 C.F.R. Part 771.

25.     Defendant Shailen Bhatt is the Administrator of the FHWA, and he is responsible for the Final EA and FONSI.  He is named herein and at all times mentioned herein in his official capacity.

26.     Defendant Richard J. Marquis is the Division Administrator for the New York Division of the FHWA.  In his official capacity, Marquis is also responsible for the Final EA and FONSI at issue and signed both documents.

27.     Defendant Lisa Garcia is assigned at the Main Regional Office at the United States Environmental Protection Agency and received a copy of Plaintiff's response to the EA.

28.     Defendant Stephen Goodman is the Region 2 Regional Administrator of the Federal Transit Administration  and received a copy of Plaintiff's response to the EA.

29.     Defendant Allison L.C de Cerreno, Ph.D. is the Deputy Chief Operating Officer at the Metropolitan Transportation Authority and received a copy of the Plaintiff's response to the EA.

30.     Defendant Nicholas A. Choubah, P.E. is the Chief Engineer at the New York State Department of Transportation and received a copy of the Plaintiff's response to the EA.

31.     Defendant William J. Carry is the Assistant Commissioner for Policy at the New York City Department of Transportation and received a copy of the Plaintiff's response to the E.A.

32.     DOES 1 through 10 are those state or federal agencies, entities or organizations whose involvement has impacted or affected the outcome of the EA and FONSI.

## IV.     FACTS

### A.     Applicable National Environmental Policy Act Provisions

33.     In 1970, Congress passed the National Environmental Policy Act, which is "intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process."  40 C.F.R. § 1500.1(a).  NEPA requires that (1) agencies take a hard look at the environmental impacts of an action before it occurs; and (2) the public has a "role in both the decision-making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989).

34.     Under NEPA, the lead agency funding, authorizing, or implementing a proposed action must conduct and prepare an EA analyzing the proposed action's direct, indirect, and cumulative impacts to determine whether or not the action would "significantly affect[] the quality of the human environment."  42 U.S.C. § 4332(2)(c).  The EA is prepared by a federal agency to aid an agency's compliance with NEPA and support its determination of whether to prepare an EIS or a FONSI.  40 C.F.R. § 1501.4.

35.     First, agencies must consider an action's "[d]irect effects," which are "caused by the

action and occur at the same time and place." *Id.* § 1508.1(g)(1).  Second, they must consider "indirect effects," which may be "later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.1(g)(2).  "Indirect effects may include . . . related effects on air and water and other natural systems." *Id.*  Third, they must consider an action's "cumulative effects," which "result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions," regardless of who undertakes those actions.  *Id.* § 1508.1(g)(3).  Fourth, agencies must assess an action's potential "effects on natural resources and on the components, structures and functioning of affected ecosystems," as well as any "aesthetic, historic, cultural, economic, social, or health" impacts.  *Id.* § 1508.1(g)(4).

36.     If the lead agency finds that the action will significantly affect the quality of the human environment, the agency must prepare an EIS.  40 C.F.R. § 1501.5(c)(1); 23 C.F.R. § 771.119(i).  An EIS requires a detailed and rigorous assessment of the proposed action.

37.     If the lead agency finds that the proposed action will have no significant impact on the environment, it may issue a Finding of No Significant Impact ("FONSI").  *Id.* § 1501.6.

**B.     Previous FHWA Decisions in New York**

38.     A look at the recent history of FHWA decisions in New York in regard to EIS's indicates one was likely required here.  The failure to require one was made on an arbitrary and capricious basis.

39.     The FHWA has required a full EIS for at least eight projects in New York State over the past ten years.  These projects are significantly less complex, and far-reaching, than the congestion pricing plan at issue here, and Plaintiffs respectfully request that the Court provide the proper weight to this comparison.

40.     For example, in 2014, the FHWA required an EIS to assess a project that would modify the I-87 Exit 4 area in the Town of Colonie, New York by constructing new exit ramps, an

intersection and bridge, and widening surrounding pavement.  FHWA also mandated EISs for a proposal to re-route existing I-81 to connect with existing I-481 and replace signage in Syracuse, for a proposal to construct two new ramps and replace a bridge near Buffalo, and for the addition of a 4.3-mile vehicular travel lane near JFK Airport in 2019.

41.     In October 2017, then-Governor Cuomo convened a "Fix NYC Advisory Panel" and tasked that group with developing recommendations to address congestion in Manhattan and identify sources of revenue to fund the ailing New York City subway system.  In January 2018, this panel issued a report recommending that "the MTA must first invest in public transportation alternatives and make improvements in the subway system before implementing a zone pricing plan to reduce congestion."   The report also stated that this would require "completion of an Environmental Impact Statement (EIS)." [3]

42.     The EPA has also expressed concerns about the Draft EA.  After reviewing it, the EPA found that "[d]ue to the insufficiency of data in the Draft EA around localized and disproportionate air quality impacts in the surrounding area, EPA is unable to confirm that impacts are less than significant without appropriate mitigation. EPA remains concerned about the potential for adverse air quality impacts on communities outside the CBD," "where the analysis in the Draft EA projects that traffic congestion will likely worsen due to the Project implementation."

43.     It defies logic and common sense to assert that an EIS was not necessary here.  The studies are routinely completed for far less complicated projects; the governor acknowledged that one would be necessary; and the EPA stated that one should be completed.  Instead, the MTA's precarious financial situation and political pressure to fix this problem have led to shortcuts.

### C.     The Congestion Pricing Plan

44.     In April 2019, the New York State Legislature passed the MTA Reform and Traffic Mobility Act (the "Traffic Mobility Act"), "to create a dedicated revenue stream that "at

---

[3] *See* Fix NYC Report - HNTB

minimum, ensure[s] annual revenues and fees collected under such program . . . fund fifteen billion dollars [] for . . . the 2020 to 2024 MTA capital program" as well as any successor programs while reducing traffic congestion within the Manhattan CBD. N.Y. Veh. & Traf. Law § 1704-a(1).

45.     The Traffic Mobility Act authorized the Triborough Bridge and Tunnel Authority ("TBTA"), an affiliate of the MTA, to "establish and charge variable tolls and fees." *Id.* It also directed the TBTA to establish a plan to toll vehicles entering or remaining in the Manhattan CBD. *Id.* §§ 1704-a(3)(a), 1705. The Manhattan CBD will generally include the entirety of Manhattan south of 60th Street, with a few key exceptions, including the FDR Drive and the West Side Highway.[4]  As noted, the West Side Highway is the eastern boundary of Battery Park City, running the entire length of the community.



46.     Shortly thereafter, the New York State Legislature passed the 2019-2020 budget, authorizing the congestion pricing scheme and mandating that it be implemented no earlier than December 31, 2020.

47.     For admission to the VPPP, the Project Sponsors must receive federal approval before the final congestion pricing scheme can be implemented.  Following enactment of the

---

[4]   MTA, Map, Central Business District Tolling Program (Jan. 22, 2020), https://new.mta.info/map/6726.

Traffic Mobility Act, the Project Sponsors submitted an Expression of Interest to the FHWA, seeking tolling authority under the VPPP to implement its congestion pricing scheme. To date, the FHWA has not approved the congestion pricing scheme for admission to the VPPP.

48.     In February 2021, the MTA's then-chief development officer (now Chair and CEO), Janno Lieber, stated, "[i]n recent weeks," the MTA "heard from the Federal Highway Administration that they are going to fast-track our environmental process." In March, Lieber confirmed that "the MTA has heard from the Federal Highway Administration that they will be fast tracking the MTA's environmental process, which will certainly get the MTA moving forward towards being able to realize this source of funds and instituting [congestion pricing]."

49.     A few days later, the FHWA authorized the MTA and New York transportation agencies to proceed with a NEPA Class III EA action under 23 C.F.R. § 771. The FHWA emphasized that it would "expedite its efforts wherever possible."

50.     In Spring of 2021, the Project Sponsors began preparing the Draft EA, even though the details of the congestion pricing scheme were far from settled — and indeed would *not* be settled before the FHWA purportedly completed its NEPA review. It is unclear, for example, how much the toll will be, when and at what times the toll will be in effect, who would have to pay it, and whether there would be exemptions. Despite the obviousness that each of those decisions can substantially affect whether and how the scheme impacts surrounding communities, the "fast tracking" continued.

51.     On August 10, 2022, the Project Sponsors made the completed Draft EA available to the public. The Draft EA reflected their determination that an EIS was not required for the congestion pricing scheme.

52.     The FHWA's fellow federal agency, the EPA, raised significant concerns about the plan's impacts. On September 22, 2022, the EPA sent a letter to the FHWA and the Project

Sponsors.  The EPA found that "[d]ue to the insufficiency of data in the Draft EA around localized and disproportionate air quality impacts in the surrounding area, EPA is unable to confirm that impacts are less than significant without appropriate mitigation.

53.     The EPA remains concerned about the potential for adverse air quality impacts on communities outside the CBD," where "the analysis in the Draft EA projects that traffic congestion will likely worsen due to the Project implementation."

54.     The EPA recommended that the FHWA "improve[]" its analysis "of these sensitive areas" and identify "appropriate mitigation . . . to ensure adverse impacts are less than significant, especially given the historical environmental justice (EJ) concerns and cumulative impacts to the affected communities."

55.     Overall, the EPA pressed the FHWA to engage in "additional analysis" to "clarify and expand" on several topics in the Final EA and "provide mitigation measures in accordance with EPA's . . . detailed comments to better address: the alternatives analysis; direct, indirect, and cumulative impacts; impacts on communities with [environmental justice] concerns; and mitigation commitments to address significant adverse impacts during and after implementation of the proposed action."

56.     In early May 2023, the FHWA published its Final EA.

57.     The FHWA also published a Draft FONSI.  In the Draft FONSI, the FHWA stated that it had "independently evaluated the Final EA and determined it to adequately and accurately document the purpose and need, environmental issues, and impact of the Proposed Action and appropriate mitigation measures."   The FHWA thus concluded that the Final EA "provide[d] sufficient evidence and analysis" to determine that an EIS was "not required."

58.     The Draft FONSI summarized the potential effects of congestion pricing and New York-based mitigation measures that would allegedly prevent any significant impacts. *Id.* at 3

(Table 1). The FHWA recognized that congestion pricing could increase traffic diversions, and thus emissions, in the Bronx, and in New York under all seven tolling scenarios.

59.     Nevertheless, the FHWA determined there was "no mitigation needed" and "no adverse effects." However, it did recommend that the TBTA—an MTA affiliate—work with New York City Department of Health and Mental Hygiene, as well as the New York State Department of Environmental Conservation to monitor PM2.5 (a measure of fine inhalable particles) to determine whether changes in air pollution occur as a result of the changes in traffic patterns in New York.

60.     The Draft FONSI was made available for public review for 30 days, after which time the FHWA would make its final determination on whether to prepare an EIS.

61.     Plaintiffs responded during this time frame.  However, just a few weeks later, without even responding to Plaintiff's letter, the FHWA published its Final FONSI without notable changes. In many respects, the Final EA and FONSI reflected a deficient and inadequate assessment of the seven or more tolling scenarios and their possible effects on BPC, a failure to require necessary mitigation measures, particularly in all communities with environmental justice concerns, and a failure to consider alternatives—all culminating in an unjustified finding of no significant impact.

62.     To this date, none of the Defendants have provided any data pertaining to measurements of the existing air quality (PM1, PM2.5, PM10, VOCs) along the densely populated thoroughfares in question and therefore are not able to provide either proxy or statistically extrapolated post-congestion pricing impact considerations.  This is gross negligence.

**D.     Battery Park City**

63.     BPC is a mainly residential, 92-acre neighborhood on the west side of the southern tip of the island of Manhattan in New York City.  Its boundaries are the Hudson River on the west,

the Hudson River shoreline on the north and south, and the West Side Highway on the east.  The neighborhood is named for the Battery, formerly known as Battery Park, located directly to the south.

64.     Following the devastating impact of the 9/11 terrorist attacks on BPC and lower Manhattan, there has been considerable public and private efforts to revitalize the area through considerable investment.  The proposed plan will likely adversely impact these efforts due to the likely change in traffic patterns due to the exempted thoroughfares.

65.     There are many residential buildings that are along lower West Street and the Hugh L. Carey Tunnel as well as schools and parks.  Further, along West Street, there are several schools, playgrounds, and residential areas that families call their home.

66.     Following the devastating impact of the 9/11 terrorist attacks on BPC and lower Manhattan, there has been consider public and private efforts to revitalize the area through considerable investment.  The proposed plan will likely adversely impact these efforts due to the likely change in traffic patterns due to the exempted thoroughfares.

67.     The environmental and safety issues for BPC's children have not been reviewed. The likely increased congestion due to this exempted thoroughfare will result in an increase of environmental and noise pollution.

68.     The decision to exclude West Side Highway, the FDR Drive, the Battery Park Underpass along with any surface roadway portions of the Hugh L Carey Tunnel connecting to West Street from the CBD is arbitrary and there has not been appropriate analysis on the impact for the communities that abut the exempted thoroughfares.  To date, there has been no basis as to how this decision was reached by government leaders other than that without these exempted thoroughfares, the proposed congestion plan pricing cannot work.

69.     BPC has limited access points to enter and exit the neighborhood.  It requires all residents to cross by foot or vehicle, the West Side Highway.  Further, there is no subway access in BPC and limited bus options.  BPC residents are being held hostage, locked in their corner of the CBD zone in a way that no other neighborhood in Manhattan is.

70.     The Environmental Impact Statement is important to answer the questions that Plaintiffs and other concerned families and residents have concerning their quality of life and safety in BPC.

71.     It is concerning that there were issues flagged for similar communities such as in the Bronx which are in close proximity to thoroughfares impacted by the CBD.  As a remedy, they are offered millions of dollars in studies and plans in terms of asthma related programs and HVAC-based filtration for schools - but the BPC neighborhood, of which the population is composed 25 percent of children, has not been reviewed whatsoever.

72.     Battery Park City was omitted from the analysis of any studies conducted.  As West Street is an exempted thoroughfare, it is likely that the FDR Drive and West Street will experience increases in traffic congestion as drivers look to avoid the CBD, whether from New Jersey or Queens and Brooklyn.  Along West Street, there are residential buildings, offices, playgrounds, schools, parks, and a bike path.  Increased congestion would substantially impair the livability of the Battery Park City area.  It is astounding that in a climate-sensitive era, the proposed models would significantly increase regional VMT (vehicular miles traveled).

73.     The environmental assessment is insufficient for many reasons.  First, the analysis did not address the impact of increased congestion on the exempted thoroughfares on neighborhoods like Battery Park City.

74.     Second, the data utilized for the analysis is incomplete.  The data does not take into account the physical, economic and demographic changes to New York City post-COVID.  This

includes outdated income analysis, outdated cost-of-living analysis and outdated demographics and absolutely zero air quality data collection nor analysis. Public transportation use is also invalid because the model uses pre-COVID statistics, especially when the report itself calls out an actual decrease in autos. Further, this does not take into consideration the loss of thoroughfare square footage for traffic due to the construction of sheds and delayed street construction projects post-COVID.

75.     The result of the proposed CBD is to shift traffic from within the CBD to outside of the CBD at the expense of the adjacent communities. This contradicts the stated intention behind the congestion pricing and the CBD.

76.     The increased congestion along these exempted thoroughfares will result in poor air quality for residents as well as increased pedestrian injury and death, by crossing exempted thoroughfares to enter and exit BPC confines. Although the MTA flags, for asthma risk, similarly burdened congestion points in New York City, BPC is not evaluated.

77.     However, the most important item to address is that the Federal Highway Administration, Triborough Bridge and Tunnel Authority, NYS Department of Transportation, and the NYC Department of Transportation should be required to further re-evaluate, and conduct and complete the required process to conduct an Environmental Impact Statement.

78.     BPC has a high population of families with school children. Some of these residents rely on private transportation to and from school. There are various reasons that parents may need to transport children in this manner, including lack of proximity to public transportation and disabilities that may prevent a child from taking public transportation. BPC needs the same accommodations as other areas which are also burdened with the proposed congestion traffic.

79.     This plan also unduly puts a financial burden on BPC families when the MTA plan admits that the increase in traffic will cause health and safety issues. The cost of treating

childrens' medical bills if they are faced with daily vehicular exhaust at their local zoned schools would be a huge financial burden in health and medical bills in the community. The fact that BPC residents do not know this answer, and an answer was not presented, is also why an Environmental Impact Statement is needed.

80.    Congestion pricing will impact local businesses in the congestion zone due to a loss of customer traffic and an increased cost of delivered goods and services. This will create financial hardship for local businesses.

**E.    The Final EA and FONSI Failed to Comply with NEPA.**

81.    The Final EA, which FHWA adopted, and FONSI failed to comply with NEPA for at least four reasons: (1) the FHWA failed to consider, propose, or commit to mitigation of the increased air and noise pollution in Battery Park City; (2) the FHWA erroneously did not consider alternatives besides a no-action alternative; and (3) the FHWA failed to take a hard look at each of the proposed congestion pricing schemes, as it is required to do so under NEPA.

i.    The Final EA and FONSI Failed to Consider or Propose Mitigation of the Increased Air and Noise Pollution that the Congestion Pricing Scheme Will Have Due to Traffic Pattern Shifts.

82.    Contrary to the requirements of NEPA, the FHWA's Final EA fails to consider fully the effects that congestion pricing will have on air pollution. While the Final EA acknowledged that congestion pricing *will* cause increased air pollution, it mischaracterized those impacts as insignificant, and failed to adequately assess the localized nature of those impacts.

83.    The EPA urged the inclusion of a "more expansive microscale screening analysis of intersections," and encouraged the FHWA to consider "[a]ll potential adverse impacts . . . irrespective of benefits to other areas," and prepare a "comprehensive mitigation package" accordingly.

84.    The Final EA noted several mitigation measures. These, however, do not

adequately affect the issues facing Battery Park City.  These measures include replacing transport refrigeration units at Hunts Point Produce Market, implementing electric truck charging infrastructure in New York, and establishing an asthma case management program and asthma center in the Bronx. The remaining four measures—installing roadside vegetation to improve air quality, renovating parks and greenspace in environmental justice communities, installing air filtration units in schools near highways, and tolling certain vehicles traveling on the FDR Drive—are to be implemented by the TBTA, a New York entity affiliated with the MTA.

<div align="center">

ii.   <u>The Final EA and FONSI Failed to Consider Any Alternatives Besides a No Action Alternative.</u>

</div>

85.    In the Final EA, the FHWA nominally determined that the purpose and need of congestion pricing was to "reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements" to the MTA and "establish a tolling program consistent with the purposes underlying the [Traffic Mobility Act]."  But the FHWA did not consider a reasonable range of alternatives to the proposed congestion pricing scheme in its NEPA review, as required by law.

86.    Instead, the FHWA considered only one alternative—the No Action Alternative. All other potential alternatives were rejected at the outset because they would not achieve the $15 billion revenue goal set forth by the Traffic Mobility Act—notwithstanding the fact that they would have reduced VMT (one of the goals of the Act) and thus traffic congestion.

87.    Among other reasonable alternatives, the FHWA failed to meaningfully consider rationing license plates, incorporating mandatory carpooling, or creating tolls on the East and Harlem River Bridges.  For instance, though the FHWA acknowledged that tolling the East and Harlem River Bridges would adequately reduce traffic congestion, it did not meaningfully consider this alternative because a single study found otherwise and there was no agreement in place to direct funds from the bridge tolls to the MTA so it wouldn't meet its $15 billion threshold.

88.     The FHWA also failed to meaningfully consider its own recommended congestion pricing strategies, including parking pricing, priced vehicle sharing, and dynamic ridesharing. The FHWA knew these alternatives, yet the Final EA barely mentioned—let alone seriously considered—these possibilities, notwithstanding that some might better serve the policy objectives of congestion pricing and comport with New York laws.  For example, the FHWA determined that high-occupancy toll lanes are not a reasonable alternative despite their "effective revenue generat[ion] . . . due to the availability of free lanes on the same highway."

89.     The Final EA also did not try to consider cumulative alternatives that could have met the MTA's $15 billion revenue threshold.  For instance, the FHWA failed to consider whether carpooling, license plate rationing, and bridge tolls together would have reduced VMT and the number of vehicles in the Manhattan CBD.

90.     Thus leaving itself with only the No Action Alternative, the FHWA ensured from the start that the congestion pricing scheme would receive NEPA clearance.

        iii.     <u>The Final EA and FONSI Failed to Take a Hard Look at Each of the MTA's Proposed Congestion Pricing Schemes.</u>

91.     The FHWA considered seven proposed tolling "scenarios" in its assessment of congestion pricing.  These scenarios greatly vary based on, for example, "the amount of the toll for different types of vehicles, the times tolls would be imposed, exemptions from tolling, crossing credits for tolls paid on other toll tunnels or bridges, and discounts in the form of 'caps' on the number of tolls per 24-hour period to be applied to different types of vehicles."  The FHWA summarized the seven scenarios in the Final EA:

Table 2-3.   Tolling Scenarios Evaluated for the CBD Tolling Alternative

| PARAMETER[1] | SCENARIO A — Base Plan | SCENARIO B — Base Plan with Caps and Exemptions | SCENARIO C — Low Crossing Credits for Vehicles Using Tunnels to Access the CBD, with Some Caps and Exemptions | SCENARIO D — High Crossing Credits for Vehicles Using Tunnels to Access the CBD | SCENARIO E — High Crossing Credits for Vehicles Using Tunnels to Access the CBD, with Some Caps and Exemptions | SCENARIO F — High Crossing Credits for Vehicles Using Manhattan Bridges and Tunnels to Access the CBD, with Some Caps and Exemptions | SCENARIO G — Base Plan with Same Tolls for All Vehicle Classes |
|---|---|---|---|---|---|---|---|
| **Time Periods[2]** | | | | | | | |
| Peak: Weekdays | 6 a.m. to 8 p.m. | 6 a.m. to 8 p.m. | 6 a.m. to 8 p.m. | 6 a.m. to 8 p.m. | 6 a.m. to 8 p.m. | 6 a.m. to 10 a.m.; 4 p.m. to 8 p.m. | 6 a.m. to 8 p.m. |
| Peak: Weekends | 10 a.m. to 10 p.m. | 10 a.m. to 10 p.m. | 10 a.m. to 10 p.m. | 10 a.m. to 10 p.m. | 10 a.m. to 10 p.m. | 10 a.m. to 10 p.m. | 10 a.m. to 10 p.m. |
| Off Peak: Weekdays | 8 p.m. to 10 p.m. | 8 p.m. to 10 p.m. | 8 p.m. to 10 p.m. | 8 p.m. to 10 p.m. | 8 p.m. to 10 p.m. | 10 a.m. to 4 p.m. | 8 p.m. to 10 p.m. |
| Overnight: Weekdays | 10 p.m. to 6 a.m. | 10 p.m. to 6 a.m. | 10 p.m. to 6 a.m. | 10 p.m. to 6 a.m. | 10 p.m. to 6 a.m. | 8 p.m. to 6 a.m. | 10 p.m. to 6 a.m. |
| Overnight: Weekends | 10 p.m. to 10 a.m. | 10 p.m. to 10 a.m. | 10 p.m. to 10 a.m. | 10 p.m. to 10 a.m. | 10 p.m. to 10 a.m. | 10 p.m. to 10 a.m. | 10 p.m. to 10 a.m. |
| **Potential Crossing Credits** | | | | | | | |
| Credit Toward CBD Toll for Tolls Paid at the Queens-Midtown, Hugh L. Carey, Lincoln, Holland Tunnels | No | No | Yes | Yes | Yes | Yes | No |
| Credit Toward CBD Toll for Tolls Paid at the Robert F. Kennedy, Henry Hudson, George Washington Bridges | No | No | No | No | No | Yes | No |
| **Potential Exemptions and Limits (Caps) on Number of Tolls per Day** | | | | | | | |
| Autos, motorcycles, and commercial vans | Once per day | Once per day | Once per day | Once per day | Once per day | Once per day | Once per day |
| Taxis | No cap | Once per day | Exempt | No cap | Exempt | Once per day | No cap |
| FHVs | No cap | Once per day | Three times per day | No cap | Three times per day | Once per day | No cap |
| Small and large trucks | No cap | Twice per day | No cap | No cap | No cap | Once per day | No cap |
| Buses | No cap | Exempt | No cap | No cap | Transit buses – Exempt No cap on other buses | Exempt | No cap |
| **Approximate Toll Rate Assumed[3]** | | | | | | | |
| Peak | $9 | $10 | $14 | $19 | $23 | $23 | $12 |
| Off Peak | $7 | $8 | $11 | $14 | $17 | $17 | $9 |
| Overnight | $5 | $5 | $7 | $10 | $12 | $12 | $7 |

92.     Throughout the Final EA and FONSI, the FHWA does not effectively distinguish the relative impacts of each scenario.  For example, the FHWA assumed that every scenario would have the same degree of effect on parking conditions, pedestrian traffic, and noise levels— despite the scenarios' significantly different toll fees, hours, and exemptions.  And, even where the FHWA did disaggregate potential impacts, it did not explain how such impacts were calculated.

93.     Moreover, the Final EA even contemplated that the TBTA could "adopt[] a toll schedule structure that has substantially different attribu*tes* from those examined in this EA" and if that happens, "the Project Sponsors would review those changes with FHWA" to "identify a course of action to assess and document the changes in accordance with NEPA prior to implementation of the Project."

94.     That the FHWA leaves open the possibility that there could be a congestion pricing scheme that is "substantially different" than the ones proposed in the Final EA underscores that it did not take a hard look at the environmental impacts of the proposed project.

95.     Indeed, the FHWA presented summary findings unsupported by evidence that it

then applied to each scenario as if there were no differences among them.

**FIRST CAUSE OF ACTION**

**Violation of National Environmental Policy Act and Administrative Procedure Act**
(42 U.S.C. §§ 4321 *et seq.*; 5 U.S.C. §§ 701-706)

96.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

97.     The FHWA's Final EA and FONSI are a final action under NEPA and the APA.

98.     The FHWA has failed to prepare an adequate environmental review of congestion pricing in the Manhattan CBD that would satisfy its duty to consider all environmental impacts of a proposed action, and to provide for public comment and participation in the public review process, in violation of NEPA and its implementing regulations.  42 U.S.C. § 4321 *et seq.*; 40 C.F.R. § 1500.1 *et seq.*

99.     As a result, the FHWA's Final EA and FONSI are arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with the law, in violation of NEPA and its implementing regulations, and are subject to judicial review under the APA. 5 U.S.C. §§ 701-706.

100.     These deficiencies include, without limitation, the following:

**Failure to Prepare an EIS**

101.     Prior to taking a major federal action, the FHWA must issue an EIS when the proposed action is likely to have significant environmental effects. 40 C.F.R. § 1501.3(a)(3). In assessing whether the effects of a proposed action are significant, the FHWA is required to analyze the potentially affected environment and degree of the effects of the action. *Id.* § 1501.3(b).

102.     In considering the degree of the effects, the FHWA must consider, *inter alia*, (i) effects on public health and safety, (ii) both short- and long-term effects, and (iii) both beneficial and adverse effects. *Id.* § 1501.3(b)(2).

103.     The FHWA may issue a FONSI only where it has demonstrated that the proposed

action "will not have a significant effect on the human environment." *Id.* § 1501.16.

104.    Pursuant to the APA, 5 U.S.C. §§ 701–706, courts will set aside a FONSI and require preparation of an EIS if the FONSI is determined to be arbitrary and capricious.

105.    The FHWA violated NEPA by failing to prepare an EIS even though the congestion pricing scheme will cause significant and unmitigated environmental impacts on Battery Park City and its residents, such as adverse air quality, public health, and pollution.

106.    The FHWA erred in issuing a FONSI despite evidence in the record showing the likelihood of significant adverse environmental effects (direct, indirect, and cumulative) and findings that the congestion pricing scheme, as is, will have significant and unavoidable impacts on Battery Park City.

107.    The FHWA further erred in recognizing these adverse environmental effects, but then failing to propose "enforceable mitigation requirements or commitments . . . to avoid significant impacts" or stating them within the FONSI as required under 40 C.F.R. § 1501.6(c).

108.    The FHWA's FONSI was conclusory and did not reflect adequate consideration of relevant factors necessary to understand the environmental effects of the congestion pricing scheme, nor did it consider adequate mitigation measures.

109.    The FHWA failed to consider the full extent of direct, indirect, and cumulative effects in Battery Park City of congestion pricing in the Manhattan CBD.

110.    The Final EA deficiencies, include, without limitation, the following:

### Failure to Mitigate Air and Noise Pollution Impacts

111.    Under NEPA and its applicable regulations, an agency preparing an EA has an obligation to take a hard look at the direct, indirect, and cumulative effects or impacts of the proposed action and its alternatives, resulting from all past, present, and reasonably foreseeable future actions.

112.    Direct effects are those "caused by the action and occur at the same time and place." 40 C.F.R. § 1508.1(g)(1). Indirect effects are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.1(g)(2). Cumulative effects are those "that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions." *Id*. § 1508.1(g)(3).

113.    Here, the FHWA violated NEPA by failing to take the required hard look at direct, indirect, and cumulative impacts that the seven (or more) potential congestion pricing schemes will have on air pollution in Battery Park City due to traffic pattern shifts and therefore failing to propose or commit to mitigation efforts.

114.    *First*, the FHWA overlooked the impacts of traffic pattern shifts in Battery Park City. The FHWA failed to consider the impact these traffic pattern shifts would wreak on the surrounding communities and the corresponding changes in traffic patterns that would occur to avoid tolls.   The FHWA acted arbitrarily and capriciously in failing to consider the changes in traffic patterns in Battery Park City.

115.    *Second*, the FHWA further violated NEPA by failing to take the required hard look at direct and indirect impacts that the congestion pricing scheme will have on increased noise pollution in Battery Park City due to traffic pattern shifts, and therefore failed to propose mitigation efforts.   Despite recognizing that the scheme will result in "noise exposure" and "increase[s] in traffic volumes," it did not expand its assessment to areas where traffic will be diverted as a result of the congestion pricing schemes proposed by the Project Sponsors.

### Failure to Consider a Reasonable Range of Alternatives

116.    NEPA requires agencies to study a reasonable range of alternatives to their proposed actions. 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E), 4332(2)(H); *see also* 40 C.F.R. §§ 1501.5(c)(2), 1502.14.

117.    The FHWA's statement of purpose and need—to generate revenue for the MTA's transportation projects—is arbitrary, capricious, and an abuse of discretion. As such, the FHWA did not consider a reasonable range of alternatives prior to the issuance of its Final EA and FONSI. Instead, the FHWA considered only one alternative—No Action Alternative.

118.    The FHWA arbitrarily and erroneously dismissed other alternatives submitted in comments, including rationing license plates, incorporating mandatory carpooling, and creating tolls on the East and Harlem River Bridges.  The FHWA further acted arbitrarily and capriciously by failing to consider alternatives that it itself expressly recommends in its own guidance, such as parking pricing, priced vehicle sharing and dynamic ridesharing, pay-as-you-drive fees, and high-occupancy toll lanes.

119.    The FHWA's failure to analyze these reasonable alternatives adversely affected its informed decision-making process and the ability of the public to meaningfully participate in its decision.

### Failure to Take a Hard Look at Direct, Indirect, and Cumulative Impacts of Congestion Pricing

120.    Pursuant to NEPA and its implementing regulations, the FHWA is required to take a hard look at the direct, indirect, and cumulative environmental impacts of any proposed action and each of its alternatives, including each of the proposed tolling scenarios. 42 U.S.C. §§ 4332(2)(C); 40 C.F.R. §§ 1501.5(c)(2), 1502.14(a), 1502.16.  Here, the FHWA failed to satisfy this mandate.

121.    *First*, the FHWA failed to take a hard look at the congestion pricing scheme because it made the decision to "fast track" its environmental approval. The FHWA acted arbitrarily and capriciously in its decision to "fast track" its approval of the undefined congestion pricing scheme without preparing a full EIS.

122.    *Second*, the FHWA acted arbitrarily and capriciously by failing to take a hard look at each of the seven "scenarios" envisioned as the final congestion pricing scheme. Instead, the

FHWA appears to have assumed that each scenario—despite differing toll rates, hours, and exemptions—would have the same effects on traffic, parking conditions, pedestrian movement, air pollution, traffic patterns, health impacts, and noise levels. The Final EA and FONSI provided no data or analysis for the FHWA's arbitrary conclusion that all seven scenarios—or a possible undefined scenario—will have the same effect, rendering the NEPA hard look requirement utterly moot.

123.    *Third*, the FHWA failed entirely to take a hard look at impacts affecting Battery Park City and its residents, including increased traffic, increased air emissions, and environmental justice issues.  Instead, the FHWA improperly limited its consideration of certain impacts by selectively and inconsistently establishing what portions of the 28-county study area were relevant to certain impact issues. As a result, the environmental impacts affecting Battery Park City have not been adequately identified, analyzed, considered, or mitigated.

124.    As a result of the FHWA's above failures, the FHWA's decision to issue the Final EA and FONSI in place of an EIS was arbitrary, capricious, unreasonable, an abuse of discretion, and not in accordance with law, and without observance of procedures required by law, in violation of NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2)(A), (D).

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court grant the following relief:

i.      Issue preliminary and permanent injunctions vacating and setting aside Defendants' FONSI and Final EA and compelling Defendants to complete a full and proper EIS for the Manhattan CBD;

ii.     Declare that the FHWA's failure to prepare an EIS for the Manhattan CBD congestion pricing scheme, or to adequately explain why an EIS is unnecessary, violates NEPA, its implementing regulations, and the APA;

iii.    Issue preliminary and permanent injunctions vacating and setting aside

Defendants' FONSI and Final EA until a proper transportation

conformity analysis under the CAA is completed;

iv.    Declare that Defendants' actions, including their FONSI and Final EA, are

invalid as a matter of law;

v.    Order the FHWA to prepare a full and proper EIS for the Manhattan CBD

Tolling Program;

vi.    Award Plaintiffs its costs for the action; and

vii.    Grant such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all claims.


DATED:    New York, New York
          November 22, 2023



/s/ Elizabeth Chan
Elizabeth Chan
P.O. Box 1277
Bowling Green Station
New York, NY 10274
(917) 338-7806
elizabeth.chan@gmail.com



/s/ Tamara Hoffman
Tamara Hoffman
200 Rector Place
Apt. 6B
New York, NY 10280
(609) 774-2630
renberg88@gmail.com