**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ELIZABETH CHAN, TAMARA HOFFMAN, RACHEL
EHRENPREIS, CHAIM KATZ, WINNIE CHEUNG, MEIR
EHRENPREIS, JOHN BAILEY, SEAN CARNEY, LUIS
DIAZ AND FAMILIES FOR A BETTER PLAN FOR
CONGESTION,

                    Plaintiffs,

                v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, FEDERAL HIGHWAY
ADMINISTRATION, THE METROPOLITAN
TRANSPORATION AUTHORITY, THE TRIBOROUGH
BRIDGE AND TUNNEL AUTHORITY, SHAILEN
BHATT, in his official capacity as Administrator of the
Federal Highway Administration, RICHARD J. MARQUIS,
in his official capacity as Division Administrator of the
New York Division of the Federal Highway Administration,
NICHOLAS A. CHOUBAH, P.E. in his official capacity as
Chief Engineer for the New York State Department of
Transportation, WILLIAM J. CARRY in his official
capacity as Assistant Commissioner for Policy for the New
York City Department of Transportation,

                  Defendants.

Case No. 23-cv-10365

**AMENDED COMPLAINT**

---

      Plaintiffs Elizabeth Chan, Tamara Hoffman, Rachel Ehrenpreis, Chaim Katz, Winnie

Cheung, Meir Ehrenpreis, John Bailey, Sean Carney, Luiz Diaz, and Families for a Better Plan for

Congestion, by and through their undersigned attorneys, Steptoe LLC, hereby file this Amended

Complaint against the United States Department of Transportation ("USDOT"), the Federal

Highway Administration ("FHWA"), the Metropolitan Transportation Authority ("MTA"), the

Triborough Bridge and Tunnel Authority ("TBTA"), Shailen Bhatt, in his official capacity as

Administrator of the FHWA, Richard J. Marquis, in his official capacity as Division Administrator

of the New York Division of the FHWA, Nicholas A. Choubah, P.E. in his official capacity as

Chief Engineer for the New York State Department of Transportation ("NYSDOT"), and William

J. Carry in his official capacity as Assistant Commissioner for Policy for the New York City

Department of Transportation ("NYCDOT"), and allege as follows:

## I.      NATURE OF THE CASE

1.      This is an action to challenge the process by which Defendants have hurriedly sought to implement congestion pricing in New York City—the first in United States history— without taking a sufficiently "hard look" at the profound impact the far-reaching program will have on Plaintiffs and their families and the everyday lives of millions in the New York region, and without sufficiently involving Plaintiffs in an environmental review process that mandates it.

2.      Defendants attempt to implement a congestion pricing plan (the "Congestion Pricing Plan" or "Plan") that will seismically shift traffic and inflict significant environmental damage on New York City for years to come.  Yet, Defendants did not first conduct an Environmental Impact Statement ("EIS"), because doing so would likely have jeopardized the Plan and risked losing the $1 billion in annual income and $15 billion in total income expected to inure to the benefit of the financially-challenged MTA.  Defendants seem to have worked backwards to achieve a pre-determined approval of the project and a pre-ordained revenue target, disregarding the significant adverse impact on Plaintiffs and New York City.  This approach is contrary to federal law, and the decision to forego an EIS reflects arbitrary and capricious decision-making. The ultimate tolling structure recommended by the MTA and TBTA following the superficial federal environmental review process violates both the United States and New York Constitutions.

3.      The National Environmental Policy Act ("NEPA") is intended to ensure that "Federal Agencies consider the environmental impact of their actions in the decision-making process."  40 C.F.R. § 1500.1.  Accordingly, NEPA requires agencies to: (1) closely examine the environmental impact of an action before it occurs; and (2) provide the public with a meaningful role in both the decision-making and implementation of that decision.  On both fronts, the NEPA process for the Congestion Pricing Plan failed.

4.      Since 2022, when the draft Environmental Assessment ("EA") was first made available, Plaintiffs have continued to voice their concerns about the impact of the Congestion Pricing Plan on Battery Park City ("BPC") and its surrounding environs.  Given the narrow width of all of Lower Manhattan, and its close proximity to exempted thoroughfares, tolling all of Manhattan south of 60th Street (the "Manhattan Central Business District" or "CBD"),[1] as acknowledged by Defendants, will lead to the diversion of traffic to BPC and its neighboring communities; it will not alleviate the congestion problem or improve air quality there.  The Congestion Pricing Plan will not improve the quality of life or result in safer streets in Lower Manhattan.  Quite to the contrary, there will be more congestion, destruction of air quality, and unsafe streets for pedestrians (including children) trying to cross busy, exempted thoroughfares in an area densely populated with public, private, and nursery schools.  To a family-centric BPC community, in particular, who is all too familiar with the importance of air quality in the years since the devastation of 9/11 and the pollution and public health issues that followed, ensuring clean air and a healthful, safe environment is of paramount importance.

5.      The Congestion Pricing Plan will have a heavy impact on BPC and all of Lower Manhattan.  First, the Hugh L. Carey Tunnel, a major entry point into the CBD lies at its Southern tip and is at the base of the BPC.  Second, the eastern boundary of the BPC is West Street (the West Side Highway)[2], an exempted thoroughfare that, as a result of the exclusion, will experience a sharp increase of vehicles seeking to avoid tolls.  Interior roads will likely experience additional traffic as well.  BPC residents do not have contiguous access to the CBD, as every entrance to and

---

[1] The CBD is "the geographic area in the borough of Manhattan south of and inclusive of sixtieth street to the extent practicable but shall not include the FDR Drive, and New York state route 9A otherwise known as the 'West Side Highway' including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connecting West St.  The boundaries of the central business district shall not be modified, expanded, or reduced and shall incorporate the outer bounds of the aforementioned district to the extent practicable."  N.Y. Veh. & Traf. Law § 1704(2).

[2] The West Side Highway begins in BPC as West Street, close to the mouth of the Brooklyn-Battery Tunnel, where it also accepts traffic from the southern terminus of the FDR Drive.

exit from the neighborhood requires using West Street.  BPC only has one interior, segmented avenue (comprised of North End Avenue, South End Avenue and Little West Street) in which people coming east can travel freely from the CBD without a toll, in a way that many residents cannot.  And as anyone who has driven on the West Side Highway area is painfully aware, there is already significant traffic there.  For residents of BPC, some 25% of whom own and park their cars downtown, nearly every trip away from home will result in $15 in increased tolls.  The MTA acknowledges that for residents who live on the boundary of the CBD and exempted thoroughfares, the Congestion Pricing Plan would "add complexity to certain activities for those individual residents, such as dropping off purchases at a residence after a shopping trip," but has dismissed the concern out-of-hand, summarily concluding (of the 60th Street vicinity) that "most residents do not have vehicles."  Whether true or not there, that is not so for Lower Manhattan.

6.       BPC also stands in close proximity to a number of environmental justice communities in downtown Manhattan, including the Lower East Side, Chinatown, and the residential neighborhoods along the FDR Drive (including Stuyvesant Town, Peter Cooper Village, Waterside Plaza, among others) which are also likely to be significantly impacted by the tolls, traffic diversion, and pollution from Congestion Pricing.  By the MTA's own estimation, traffic on the lower FDR Drive near these communities could increase by some 26% under the Congestion Pricing Plan.

7.       Under NEPA, environmental justice communities in Lower Manhattan and around New York must receive specific treatment and close consideration to mitigate any potential "adverse human health or environmental effects."  Though Defendants were forced to conduct a supplemental analysis of environmental justice communities based on the significant number of public comments received after the Draft EA, the studied area for much of the additional analysis was based on an ill-fitting 10-county "Local Study" that aggregated results for vast geographic

portions of New York City (*i.e.* New York County, Queens County); more detailed analysis was conducted based on self-selected traffic criteria (eliminating, for example, the need to conduct more thorough air quality testing in places like the FDR Drive); and much of the analysis was left to "post-implementation monitoring" and a vague and inadequate "package of mitigation measures."

8.      Even with the cursory review, Defendants conceded in the Final EA that the Congestion Pricing Plan would have a "potentially adverse effect from increased air pollution due to traffic increases near environmental justice communities that are already overburdened by pre-existing air pollution and chronic diseases."

9.      Throughout the federally mandated environmental review process, Plaintiffs attempted, time and time again to access local decision-makers and the federal environmental review process in order to emphasize the impact the Congestion Pricing Plan would have on their particular communities and the City at-large.  Plaintiffs followed directions from elected officials throughout the comment period and NEPA process, but were repeatedly met with resistance, willful indifference, or simply ignored.

10.     In public comments, Defendants have repeatedly stressed the "4,000-page" EA performed by the FHWA along with the MTA, NYSDOT, and NYCDOT (hereinafter, the "Project Sponsors") as evidence that a sufficient environmental review was conducted.  Yet, even if the total number of pages was 4,000 (the number is actually closer to 838 pages without appendices) and even if the quantity of pages of an EA were a fair proxy for the quality of environmental analysis—and, of course, it is not—one would look in vain in the EA for any analysis of the impact of the Congestion Pricing Plan on the BPC.  BPC was omitted completely from any meaningful analysis or consideration.

11.     Defendants had no intention of ever deviating from the Draft EA.  The 838-page document was announced and placed on the MTA's website and the public was provided a 30-day review and comment period, all without the benefit of a notice published in the Federal Register or docket to facilitate the review of material.  The comment period (and it was unclear from public websites whether the process was a public "review" period or comment period) was extended by only 14-days, despite requests for substantially longer extensions.  The public was further hindered from participating in the process by a compressed series of hearings scheduled right before the 2022 Labor Day holiday.

12.     During the 44-day comment period, the FHWA and the Project Sponsors received more than 69,000 submissions, including from Plaintiffs, outlining significant opposition to the Congestion Pricing Plan.  Despite the outpouring of concern, protest, and request for further analysis from the EPA and others, few material changes were made from the Draft EA to the Final EA.

13.     In May 2023, the FHWA approved New York's Central Business Tolling Program without first requiring an EIS.  The FHWA stated that an EIS was not required because the "Proposed Action . . . will have no significant impact on the human or natural environment."  The conclusion of "no significant impact" was reached without knowing any of the core elements of the ultimate tolling structure—the toll price, exemptions, credits, and discounts for drivers.

14.     This finding of no significant impact ("FONSI") violates NEPA because it is "arbitrary and capricious."  NEPA requires a federal agency to conduct a comprehensive review and prepare a complete EIS whenever a proposed action will, as here, "significantly affect[] the quality of the human environment."  42 U.S.C. § 4332(2)(C).

15.     As in the EA, a review of the FONSI demonstrates that the area of BPC was not even considered, despite its adjacency to a major entrance point to the CBD and a major exempted

thoroughfare.  Residents, businesses, schools, and public recreational areas and playgrounds that sit along the exempted West Side Highway thoroughfare were not included in the document or even acknowledged.  This includes multiple schools, among them, PS/IS 89, PS/IS 276, PS 150, Leman Manhattan Preparatory School, Stuyvesant High School, and The Learning Experience.

16.     The decision to "issue a finding of no significant impact" and refusal to conduct an EIS is even more arbitrary and capricious when compared with the recent history of other projects in New York State.  At least eight federal transportation projects in the past 10 years, all of far less environmental impact than the sprawling the Congestion Pricing Plan, have required an EIS.  The first congestion pricing program ever implemented in the United States—unlike these other more ordinary and less impactful transportation projects—should be subjected to a full environmental review.

17.     While New Yorkers generally recognize that congestion is a serious problem in New York City as a whole, any congestion pricing program should not alleviate congestion in one part of New York City to the significant detriment of the residents of other parts of New York City, including a neighborhood like BPC, whose residents will be penalized to even access their homes. The Congestion Pricing Plan, an attempt to reduce congestion in the CBD, appears to move the traffic patterns from within the CBD to the exempted thoroughfares around the CBD, specifically the West Side Highway, the FDR Drive, the Battery Park Underpass, and any surface roadway portions of the Hugh L. Carey Tunnel connecting to West Street.  As discussed herein, the effects of this re-routing of traffic, among other things, were not sufficiently analyzed.

18.     Plaintiffs have families that are living, working, and going to school in Lower Manhattan.  The MTA acknowledges that children and families that live and work near the exempted thoroughfares, like the West Side Highway and the FDR Drive, will see an increase in asthma rates and other illnesses.  The MTA and FHWA have also admitted that there will be

diversions of traffic and increases in air pollutants throughout the five boroughs of New York City and New Jersey, in some cases for the next 20 years.  The Congestion Pricing Plan would have particular adverse impacts on communities with environmental justice concerns, communities that have some of the highest preexisting pollution and chronic disease burdens.

19.     The FHWA considered only one alternative to the Congestion Pricing Plan—the "No Action Alternative."  All other potential revenue raising alternatives were rejected at the outset in large part because they would not achieve the $15 billion revenue goal set forth by the Traffic Mobility Act—notwithstanding that they would have reduced traffic congestion.  The FHWA also did not consider whether a combination of these alternatives could meet its goals—all due to a primary concern, not to consider the environmental needs of the affected communities, but to raise money for the MTA.

20.     Yet, as contrasted with the $1 billion in annual revenue and estimated $15 billion to the MTA capital program, the Project Sponsors of the Congestion Pricing Plan committed a paltry *$155 million over 5 years* for mitigation measures to alleviate these impacts.  None of the air pollution and traffic mitigations efforts and additional testing that the EPA and others recommended were included in the EA or FONSI, and, as with its overall analysis, BPC and the surrounding environmental justice communities in Lower Manhattan were largely left out of any of the proposed mitigation programs.[3]

21.     Plaintiffs seek a full EIS.  An EIS must fully and fairly discuss significant environmental impacts, inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment, assess all

---

[3] There is one "Place-Based Mitigation" measure in the EA that would toll vehicles traveling northbound on the FDR Drive that exist at East Houston Street and then travel southbound on the FDR Drive.  First, that mitigation effort, even if successful, would only reduce a quarter of the *estimated 26% increase* in traffic under certain tolling scenarios on the lower FDR Drive under the Congestion Pricing Plan.  Second, that mitigation measure would do nothing to alleviate the significant financial burden on environmental justice Lower East Side families, including Plaintiffs, who would have to pay the staggering $15 toll each day they leave and enter the Manhattan CBD.

reasonable alternatives that are consistent with the identified purpose and need, and evaluate a no-action alternative and all reasonably available measures to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.1, 1502.13, 1502.14(a), 1502.14(c).

22.     By the time the Final EA and FONSI decision reached New York's TBTA and Traffic Mobility Review Board ("TMRB"), the Congestion Pricing Plan was a foregone conclusion.  Under the TMRB's proposal, adopted by the MTA on December 6, 2023, the Congestion Pricing Plan will cost those traveling into the congestion zone a staggering $15 as a base toll, with other classes of vehicles, including large trucks, paying up to $36 per day to drive into Manhattan.  This fee is on top of the already sizable amounts charged for virtually all of the river crossings into Manhattan and creates certain off-sets and discounts depending on crossing, driver, and time.

23.     At the time the FHWA found that the Congestion Pricing Plan in New York City would have "no significant impact on the human or natural environment," the ultimate structure of the tolls was unknown.  The MTA presented a series of different possible pricing scenarios for the Congestion Pricing Plan to the FHWA, and the FONSI issued a "finding of no significant impact" for *any* of the scenarios to proceed.  The scenarios varied as to the toll rate, the timing of different rates, who would be entitled to exemptions and under what circumstances, which river crossings would receive a credit towards the toll, how much that credit would be, and even the number of times per day vehicles would be charged.

24.     It is hard to imagine how the FHWA could have conducted an accurate or comprehensive review of the environmental impact, burden on other transportation systems, likely change in traffic patterns, necessary mitigation measures, or potential harm to outer-borough and out-of-State residents, without knowing the actual "price" and structure of the Congestion Pricing Plan and its impact on driving behavior.  Indeed, *none of the scenarios* in the EA modeled the

impact of the recommended toll structure.  At the very least, the FHWA must take a "hard look" at the Congestion Pricing Plan in a supplemental NEPA environmental review process that closely analyzes the *actual* tolling scheme recommended by the MTA and TBTA.

25.     Plaintiffs respectfully request this Court to: (1) vacate and set aside Defendants' FONSI and EA and compel Defendants to conduct a full and proper EIS for the CBD; (2) declare that the FHWA's failure to prepare an EIS for the Congestion Pricing Plan, or to adequately explain why an EIS is unnecessary, violates NEPA, its implementing regulations, and the APA; (3) declare that Defendants violated the APA, and that the transportation conformity determination for congestion pricing in the CBD was incomplete and provided no lawful basis for granting any approval; (4) alternatively, order a supplemental NEPA review in light of changed circumstances; and (5) declare that the actions of the MTA and TBTA in implementing the Congestion Pricing Plan violate both the United States and New York State Constitutions.

## II.     <u>JURISDICTION AND VENUE</u>

26.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it presents a federal question under the laws of the United States, including NEPA and the APA, and the dormant Commerce Clause of the United States Constitution.  Because the United States is a defendant, jurisdiction is also proper under 28 U.S.C. § 1346.  The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a).

27.     Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(B), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Venue is also proper under 28 U.S.C. § 1391(e)(1)(C), because no real property is involved in the action and Plaintiffs live within this District.

## III.     <u>PARTIES</u>

28.     Plaintiff Elizabeth Chan is a lifelong resident of New York City and has lived her

entire life in BPC, since the 1980s.  She has grown up as one of the first families with children in

in the area and continues to raise her own two young children in BPC today.  Ms. Chan's children

attend grade and nursery school in Lower Manhattan and they walk across West Street every day.

One of her children has special needs and suffers from an autoimmune and neurological condition

that causes frequent febrile seizures, often needing to go to the emergency room via ambulance.

Over the past 12 months, Ms. Chan has gone with her child to urgent care or the hospital

emergency room approximately 50 times.  The estimated ambulance time to the nearest hospital in

her area is five minutes.  However, following the Congestion Pricing Plan, the estimated

ambulance response time is expected to increase up to 2 to 3 times the current response rate.  The

resulting delay could have life and death consequences for all residents that require emergency

health care, including Ms. Chan's child, and other children in BPC and Lower Manhattan with

special needs.  Ms. Chan also frequently visits family who lives within the CBD and outside the

CBD.  The only realistic way to transport her children (including to medical appointments)—

especially her youngest child who has fine and gross motor deficits—is by car, and Ms. Chan will

be immediately charged the $15 toll each time she leaves the CBD.  Because of her concerns for

her community and families, Ms. Chan has tried repeatedly to navigate and engage in the NEPA

process.  Despite voicing her considerable and legitimate concerns, Ms. Chan has been repeatedly

met with indifference or worse by local elected officials and entirely ignored in the environmental

review process.

29.     Plaintiff Tamara Hoffman resides in BPC.  Ms. Hoffman has been living and

working in NYC for over 19 years, working in Lower Manhattan all of that time.  In 2017, Ms.

Hoffman and her family moved to Lower Manhattan.  Ms. Hoffman has a young, special needs

daughter with a sensory processing disorder, ADHD, and autism.  She attended The Learning

Experience School and then went to PS 276 Battery Park City School and often plays in the park

that is adjacent to West Street.  Ms. Hoffman's daughter's school is one block from West Street and she is concerned for the health impact of changes in traffic patterns of the exempted thoroughfares and air quality for her and her family.  Because of this concern, going back to 2019, Ms. Hoffman has tried repeatedly to get information about the Congestion Pricing Plan and participate in the public environmental process to no avail.

30.     Plaintiff Rachel Ehrenpreis resides on the Lower East Side, where she has lived with her family for nearly 20 years.  With an FDR Drive address, and located between two environmental justice neighborhoods, the windows to Ms. Ehrenpreis' apartment face the precise highway location that has been identified in the EA and FONSI as facing significant increased diverted traffic (and likely attendant health impacts) resulting from the Congestion Pricing Plan. Ms. Ehrenpreis' children attend religious school uptown, as there are no Orthodox Jewish girls' high schools in her neighborhood.  She drives her children to school and will be forced to pay the Congestion Pricing Plan toll every day, a significant financial burden.  Because of her concerns about air and noise pollution, increased traffic, and the cost, Ms. Ehrenpreis has attended meetings and has repeatedly voiced her concerns, which have been largely ignored.

31.     Plaintiff Chaim Katz is a resident of the Lower East Side, where his family has lived for generations in a historic Jewish Community, dating back to the late 1800s.  He has six children and his parents and grandparents live in the community as well.  Mr. Katz lives in an environmental justice community directly adjacent to the FDR Drive.  Like Ms. Ehrenpreis, by the Defendants' own analysis, the Congestion Pricing Plan will increase traffic, noise, and air pollution right where Mr. Katz lives with his family.  Mr. Katz's grandparents, who are in their 90s, live in the community, as they have for their entire lives.  Like many others, the Congestion Pricing Plan will impact the ability of Mr. Katz's family to travel to see his elderly grandparents.  Mr. Katz has attempted to speak with local officials about the impact of the Congestion Pricing Plan on his

family and the greater Lower East Side Community and the likelihood that the Plan will hasten an exodus from the historical and largely residential neighborhood.  His concerns and protests have been met with indifference.

32.    Winnie Cheung is a resident of BPC, where she lives with her two young daughters, both of whom attend a gifted and talented school (which is unavailable in BPC), PS 124 in Chinatown, an environmental justice community.  Ms. Cheung drives every morning and every afternoon to school under the Battery Underpass, onto the FDR Drive, and back off the Brooklyn Bridge exit.  For that short distance on the FDR Drive and back into Lower Manhattan, Ms. Cheung will be charged $15.  She also has family living in Chinatown as well as doctors' appointments, grocery shopping, and her children's extracurricular activities in Chinatown.  All of these daily activities will now require Ms. Cheung to pay the Congestion Pricing Plan toll, significantly burdening her finances.

33.    Plaintiff Meir Ehrenpreis is a resident of Flushing, New York and has been a New York City resident for the past 26 years.  Mr. Ehrenpreis lives near the Van Wyck Expressway in a "transit desert" that requires him to take and transfer on 3 buses and trains to get anywhere in New York City on public transit.  Because of this, Mr. Ehreinpreis commutes to the City on a regular basis and also travels with his young children who require car seats.  The environmental, financial, and traffic congestion impact of the Congestion Pricing Plan will alter Mr. Ehrenpreis' way of life and ability to drive in New York City and he will not benefit from most, if any, improvements the MTA plans to make.

34.    Plaintiff John Bailey is a resident of Pennsylvania and is the owner of Bailey Coach, Inc. a private busing company headquartered in Spring Grove, Pennsylvania, approximately 156 miles from New York City.  Mr. Bailey and his company travel regularly with passengers from South Central Pennsylvania and elsewhere including school groups, tourists, and

lower income passengers traveling to New York City.  The Congestion Pricing Plan will have a significant impact not only on Mr. Bailey's business, as it will place an additional cost on each trip, but also the passengers he transports, who will be forced to pay a higher price to travel to New York City to offset the additional tolls.  Mr. Bailey informed officials of his concern during the public commenting period, but he was ignored.

35.     Plaintiff Sean Carney is a resident of Norwood, New Jersey, located in northeast Bergen County.  Mr. Carney is a violinist whose main source of income is working on Broadway shows in mid-town Manhattan.  Because of the lack of mass transit and his late working hours, driving to New York City has been Mr. Carney's only means of transportation into and out of New York City for the past 35 years.  He already pays $17 a day, six days a week to cross the George Washington Bridge and, under the Congestion Pricing Plan, would be forced to pay an additional $15-dollar toll.  The Congestion Pricing Plan will impose a significant financial burden on Mr. Carney, who cannot afford this daily additional charge while commuting and continuing to support his family, including his 23-year old special needs child.

36.     Plaintiff Luis Diaz is a resident of Bardonia, New York in Rockland County.  He commutes to Manhattan most days and works as an entertainer, DJ, and stand-up comedian which requires travel very late at night and early in the morning.  He commutes by car, as he lives far from public transit and must transport his heavy DJ equipment.  The Congestion Pricing Plan will impose a significant financial burden on Mr. Diaz.

37.     Families for a Better Plan for Congestion is an unincorporated association, founded by Elizabeth Chan, with its principal place of business in the City and County of New York. Families for a Better Plan for Congestion is comprised of close to 200 families from BPC and the Lower Manhattan area, including Plaintiffs, who are concerned with the financial and environmental impact that the Congestion Pricing Plan tolls and increased congestion will have on

their community.  Because of these concerns, members of Families for a Better Plan for

Congestion submitted comments during the environmental review process, tried to speak with

elected officials about the harm from the Congestion Pricing Plan, the lack of attention and

analysis being paid to the community, and the paucity of mitigation programs aimed at their

neighborhood.  These efforts were ignored.

38.     Defendant USDOT is the federal government department responsible for oversight

of the transportation planning process, including implementing NEPA requirements.

39.     Defendant FHWA is a federal agency within the USDOT that supports state and

local governments in the design, construction, and maintenance of the Nation's highway system,

including provisioning of financial and technical assistance.  The FHWA must ensure that the

activities it authorizes comply with governing federal environmental statutes, including NEPA.

The FHWA authorizes states to toll on federal roads and highways under the VPPP.  23 U.S.C.

§ 129.  The FHWA issued the Final EA and FONSI for the Congestion Pricing Plan and must

approve it under the VPPP; it was therefore required to perform a NEPA review pursuant to its

regulations.  23 C.F.R. Part 771.

40.     Defendant MTA is a public benefit corporation chartered by the New York State

Legislature in 1968 under the Metropolitan Transportation Authority Act, N.Y. Pub. Auth. Law

§ 1260 *et seq.*  Defendant is a program sponsor for the Congestion Pricing Plan.

41.     Defendant TBTA is a public benefit corporation organized and existing under the

Public Authorities Law of the State of New York, empowered to acquire, design, construct,

maintain, operate, improve, and reconstruct toll bridges and toll tunnels that connect the five

boroughs of New York City.  The Traffic Mobility Act provides that TBTA design, develop, build,

and run the Congestion Pricing Plan.  The Act also authorizes the TBTA Board to establish the

TMRB, which was tasked with issuing the final tolling structure for the Congestion Pricing Plan.

42.     Defendant Shailen Bhatt is the Administrator of the FHWA, and he is responsible for the Final EA and FONSI.  He is named herein and at all times mentioned herein in his official capacity.

43.     Defendant Richard J. Marquis is the Division Administrator for the New York Division of the FHWA.  Named in his official capacity, Marquis is also responsible for the EA and FONSI at issue and signed both documents.

44.     Defendant Nicholas A. Choubah, P.E. is the Chief Engineer at the New York State Department of Transportation.[4]  Named in his official capacity, Choubah is also responsible for the EA and FONSI at issue and signed both documents.  Mr. Choubah, as Chief Engineer for the Congestion Pricing Plan, is closely connected with the enforcement and implementation of the acts at issue.

45.     Defendant William J. Carry is the Assistant Commissioner for Policy at the New York City Department of Transportation.  Named in his official capacity, Carry was the project lead for the New York City Department of Transportation, listed as the City contact for information on the EA, and received a copy of the Plaintiff's response to the EA.

## IV.     FACTS

### A.  Applicable National Environmental Policy Act Provisions

46.     In 1970, Congress passed the National Environmental Policy Act ("NEPA"), which is "intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process."  40 C.F.R. § 1500.1(a).  NEPA requires that (1) agencies take a hard look at the environmental impacts of an action before it occurs; and (2) the public has a "role in both the decision-making process and the implementation of that decision."

47.     Under NEPA, the lead agency funding, authorizing, or implementing a proposed

---

[4] Upon information and belief, Chief Engineer Nicholas A. Choubah has been replaced by Stephanie Winkelhake, who currently acts as Chief Engineer for the New York State Department of Transportation.

action must conduct and prepare an EA analyzing the proposed action's direct, indirect, and cumulative impacts to determine whether or not the action would "significantly affect[] the quality of the human environment."  42 U.S.C. § 4332(2)(c).  The EA is prepared by a federal agency to aid an agency's compliance with NEPA and support its determination of whether to prepare an EIS or a FONSI.  40 C.F.R. § 1501.4.

48.     First, agencies must consider an action's "[d]irect effects," which are "caused by the action and occur at the same time and place."  *Id.* § 1508.1(g)(1).  Second, they must consider "indirect effects," which may be "later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.* § 1508.1(g)(2).  "Indirect effects may include . . . related effects on air and water and other natural systems."  *Id.*  Third, they must consider an action's "cumulative effects," which "result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions," regardless of who undertakes those actions.  *Id.* § 1508.1(g)(3).  Fourth, agencies must assess an action's potential "effects on natural resources and on the components, structures and functioning of affected ecosystems," as well as any "aesthetic, historic, cultural, economic, social, or health" impacts.  *Id.* § 1508.1(g)(4).

49.     If the lead agency finds that the action will significantly affect the quality of the human environment, the agency must prepare an EIS.  40 C.F.R. § 1501.5(c)(1); 23 C.F.R. § 771.119(i).  An EIS requires a detailed and rigorous assessment of the proposed action.

50.     If the lead agency finds that the proposed action will have no significant impact on the environment, it may issue a Finding of No Significant Impact ("FONSI").  *Id.* § 1501.6.

### B. Executive Orders

51.     In addition to the requirements of NEPA and its implementing regulations, Executive Order 12898, Executive Order 14008, and the Council on Environmental Quality ("CEQ")'s NEPA Environmental Justice guidance require federal agencies to study and address

environmental justice issues when conducing a NEPA review.  Executive Order 12898 directs agencies to "make achieving environmental justice part of [their] mission by identifying and addressing, as appropriate, disproportionately high, and adverse human health or environmental effects of [their] programs, policies, and activities."  Exec. Order No. 12,898, 59 Fed. Reg. 7,629, 7,629 (Feb. 11, 1994).

52.    The Order also requires agencies to develop and implement an "environmental justice strategy" that "promote[s] enforcement of all health and environmental statutes," "ensure[s] greater public participation," and "improve[s] research and data collection relating to the health of and environment of minority and low-income populations."  *Id*. at 7,630.

53.    The CEQ provides NEPA Environmental Justice Guidance "to further assist Federal agencies with their NEPA procedures so that environmental justice concerns are effectively identified and addressed."[5]  CEQ highlights that "[m]itigation measures identified as part of an environmental assessment (EA), a finding of no significant impact (FONSI), an environmental impact statement (EIS), or a record of decision (ROD), should, whenever feasible, address significant and adverse environmental effects of proposed federal actions on minority populations, low income populations, and Indian tribes."[6]  The guidance states that "[e]nvironmental justice issues may arise at any step of the NEPA process and agencies should consider these issues *at each and every step of the process*, as appropriate."[7]

54.    Agencies should specifically consider at least: "the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in

---

[5] Council on Env't Quality, *Environmental Justice: Guidance Under the National Environmental Policy Act* 1 (1997), https://www.epa.gov/sites/default/files/2015- 02/documents/ej_guidance_nepa_ceq1297.pdf [hereinafter "CEQ NEPA Guidance"].

[6] *Id.* at 4.

[7] *Id.* at 8 (emphasis added).

the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on [them]";[8] "relevant public health data and industry data concerning the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population";[9] "the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the [action, including the communities'] physical sensitivity [and] the effect of any disruption on the community structure associated with the proposed action."[10]   Finally, to comply with NEPA, agencies "should seek input from [environmental justice communities] as early in the process as information becomes available."[11]

### C.  Previous FHWA Decisions in New York

55.     Recent history of FHWA decisions in New York in regard to EIS's indicates one should have been performed here.  The failure to require an EIS was arbitrary and capricious.

56.     The FHWA has required a full EIS for at least eight projects in New York State over the past ten years.  These projects are significantly less complex and far-reaching than the Congestion Pricing plan at issue here.

57.      In 2014, the FHWA required an EIS to assess a project that would modify the I-87 Exit 4 area in the Town of Colonie, New York by constructing new exit ramps, an intersection and bridge, and widening surrounding pavement.  The FHWA also mandated EIS's for a proposal to re-route existing I-81 to connect with existing I-481 and replace signage in Syracuse; for a proposal to construct two new ramps and replace a bridge near Buffalo; and for the addition of a 4.3-mile

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at 11.

vehicular travel lane near JFK Airport in 2019.  BPC, too, has had a number of projects, including the Battery Park Resilience Project in 2022 and adding ferry service in 2020, requiring a full EIS.

58.     The impact of these projects pales in comparison to the impact the Congestion Pricing Plan will have on the City of New York.  The Congestion Pricing Plan will foist a $15 daily toll on millions of New Yorkers, systematically change traffic patterns, and increase air pollution and congestion throughout certain communities in New York City, including environmental justice communities, for up to 20 years.  The Congestion Pricing Plan required a comprehensive EIS assessment.

59.     In October 2017, then-Governor Cuomo convened a "Fix NYC Advisory Panel" and tasked that group with developing recommendations to address congestion in Manhattan and identify sources of revenue to fund the ailing New York City subway system.  In January 2018, this panel issued a report recommending that "the MTA must first invest in public transportation alternatives and make improvements in the subway system before implementing a zone pricing plan to reduce congestion."  The report also stated that this would require "completion of an Environmental Impact Statement (EIS)."[12]

60.     It defies logic and common sense to assert that an EIS was not necessary here.  Such studies are routinely completed for far less complicated projects; the governor acknowledged that one would be necessary; and the EPA stated that one should be completed.  Instead, the MTA's precarious financial situation and political pressure to fix this problem have led to shortcuts and a process that, to date, is being rushed to completion.

### D.  The Congestion Pricing Plan

61.     In April 2019, the New York State Legislature passed the MTA Reform and Traffic Mobility Act (the "Traffic Mobility Act"), "to create a dedicated revenue stream that "at minimum,

---

[12] *See Fix NYC Advisory Panel Report* (January 2018), https://www.hntb.com/fix-nyc-report/.

ensure[s] annual revenues and fees collected under such program . . . fund fifteen billion dollars []

for . . . the 2020 to 2024 MTA capital program" as well as any successor programs while reducing

traffic congestion within the CBD.  N.Y. Veh. & Traf. Law § 1704-a(1).

62.     The Traffic Mobility Act authorized the TBTA, an affiliate of the MTA, to

"establish and charge variable tolls and fees."  *Id.*  It also directed the TBTA to establish a plan to

toll vehicles entering or remaining in the CBD.  *Id.* §§ 1704-a(3)(a), 1705. The CBD will generally

include the entirety of Manhattan south of 60th Street, with a few key exceptions, including the

FDR Drive and the West Side Highway.[13]



63.     Shortly thereafter, the New York State Legislature passed the 2019-2020 budget,

authorizing the Congestion Pricing Plan and mandating that it be implemented no earlier than

December 31, 2020.

64.     Between April 2019 and early 2020, the Project Sponsors met with the prior federal

administration more than a dozen times to discuss its assessment.  Little progress was made and by

July 2020, the government had not yet informed the MTA as to whether it needed to undertake an

---

[13]   MTA, Map, *Central Business District Tolling Program* (Jan. 22, 2020), https://new.mta.info/map/6726.

EA or EIS.[14]

65.     In February 2021, the MTA's then-chief development officer (now Chair and CEO), Janno Lieber, stated, "[i]n recent weeks," the MTA "heard from the Federal Highway Administration that they are going to fast-track our environmental process."  In March, Lieber confirmed that "the MTA has heard from the Federal Highway Administration that they will be *fast tracking* the MTA's environmental process, which will certainly get the MTA moving forward towards being able to realize this source of funds and instituting [congestion pricing]."  (Emphasis added.)

66.     A few days later, the FHWA authorized the MTA and New York transportation agencies to proceed with a NEPA Class III EA action under 23 C.F.R. § 771.  The FHWA emphasized that it would "expedite its efforts wherever possible."

67.     In Spring 2021, the Project Sponsors began preparing the Draft EA, even though the details of the Congestion Pricing Plan were far from settled—and indeed would *not* be settled before the FHWA purportedly completed its NEPA review.  It was unclear, for example, how much the toll would be, when and at what times the toll would be in effect, who would have to pay it, and whether there would be exemptions.  Despite the obviousness that each of those decisions can substantially affect whether and how the scheme impacts surrounding communities, the "fast tracking" continued.  To complete the Draft EA, the Project Sponsors used data from 2019, before the pandemic, estimating that traffic and behavior had been returned unchanged to pre-pandemic patterns and made no attempt to update the underlying information.

68.     On August 10, 2022, the Project Sponsors made the completed Draft EA available to the public.  The Draft EA reflected their determination that an EIS was not required for the Congestion Pricing Plan.  Plaintiffs responded to the Draft EA during this time.

---

[14] *Id.*

69.     The FHWA's fellow federal agency, the EPA, raised significant concerns about the plan's impacts.  On September 22, 2022, the EPA sent a letter to the FHWA and the Project Sponsors.  The EPA found that "[d]ue to the insufficiency of data in the Draft EA around localized and disproportionate air quality impacts in the surrounding area, EPA is unable to confirm that impacts are less than significant without appropriate mitigation."

70.     The EPA remained concerned about the potential for adverse air quality impacts on communities, where "the analysis in the Draft EA projects that traffic congestion will likely worsen due to the Project implementation."

71.     The EPA recommended that the FHWA "improve[]" its analysis "of these sensitive areas" and identify "appropriate mitigation . . . to ensure adverse impacts are less than significant, especially given the historical environmental justice (EJ) concerns and cumulative impacts to the affected communities."

72.     Overall, the EPA pressed the FHWA to engage in "additional analysis" to "clarify and expand" on several topics in the EA and "provide mitigation measures in accordance with EPA's . . . detailed comments to better address: the alternatives analysis; direct, indirect, and cumulative impacts; impacts on communities with [environmental justice] concerns; and mitigation commitments to address significant adverse impacts during and after implementation of the proposed action."[15]

73.     In early May 2023, the FHWA published its Final EA.

74.     The FHWA also published a Draft FONSI.  In the Draft FONSI, the FHWA stated

---

[15] In March 2023, the MTA reportedly submitted a "secret memo" to the FHWA indicating that it would commit additional dollars towards mitigation measures for New York environmental justice communities.  The memo was not made publicly available.  Recent news reports also suggest that there was subsequent communication after the issuance of the FONSI between the EPA and the FHWA regarding the adequacy of the proposed mitigation efforts.  That communication was also not made publicly available.  These type of outside-the-record, intra-agency communications were never subject to public scrutiny or interested stakeholder comment, and serve to underscore the lack of transparency in the NEPA process.

that it had "independently evaluated the Final EA and determined it to adequately and accurately document the purpose and need, environmental issues, and impact of the Proposed Action and appropriate mitigation measures."  The FHWA thus concluded that the Final EA "provide[d] sufficient evidence and analysis" to determine that an EIS was "not required."

75.     The Draft FONSI summarized the potential effects of congestion pricing and New York-based mitigation measures that would allegedly prevent any significant impacts.  The FHWA recognized that the Congestion Pricing Plan could increase traffic diversions, and thus emissions, in the Bronx, and in New York under all seven tolling scenarios.

76.     Nevertheless, the FHWA determined there was "no mitigation needed" and "no adverse effects."  However, it did recommend, but did not require, that the TBTA work with the New York City Department of Health and Mental Hygiene, as well as the New York State Department of Environmental Conservation to monitor PM2.5 (a measure of fine inhalable particles) to determine whether changes in air pollution occur as a result of the changes in traffic patterns in New York.

77.     The Draft FONSI was made available for public review for 30 days, after which time the FHWA would make its final determination on whether to prepare an EIS.

78.     Plaintiffs responded during this time frame.

79.     However, just a few weeks later, without ever responding to Plaintiffs' letters, the FHWA published its Final FONSI without notable changes.  In many respects, the Final EA and FONSI reflected a deficient and inadequate assessment of the seven or more tolling scenarios and their possible effects on BPC and Lower Manhattan, a failure to require necessary mitigation measures, particularly in all communities with environmental justice concerns, and a failure to consider alternatives—all culminating in an unjustified finding of no significant impact.

80.     To this date, none of the Defendants have provided any data pertaining to

measurements of the existing air quality (PM1, PM2.5, PM10, VOCs) along the densely-populated exempted thoroughfares in question and therefore cannot provide either proxy or statistically extrapolated post-congestion pricing impact considerations.

### E.   Battery Park City and Lower Manhattan

81.     BPC is a mainly residential, 92-acre neighborhood on the west side of the southern tip of the island of Manhattan in New York City.  Its boundaries are the Hudson River on the west, the Hudson River shoreline on the north and south, and the West Side Highway on the east.  The neighborhood is named for the Battery, formerly known as Battery Park, located directly to the south.

82.     Following the devastating impact of the 9/11 terrorist attacks on BPC and Lower Manhattan, there has been considerable public and private efforts to revitalize the area through considerable investment, including a commitment to green initiatives.  Despite the EA summary statement that the Congestion Pricing Plan "would not result in adverse effects to parks or open spaces," it failed to acknowledge BPC's approximately 36 acres of parks gardens and public space, an urban farm, significant water life and bird life, and natural flora/fauna that were never examined. The proposed plan will likely adversely impact these areas, in part, due to increased traffic on exempted thoroughfares.

83.     There are many residential buildings that are along lower West Street and the Hugh L. Carey Tunnel as well as schools and parks.  Further, along West Street, there are several schools, playgrounds, and residential areas that families call their home.

84.     The environmental and safety issues for BPC's children and Lower Manhattan, more broadly, have not been sufficiently reviewed. The likely increased congestion due to this exempted thoroughfare will result in an increase of air, noise, and other environmental pollution.

85.     The decision to exclude West Side Highway, the FDR Drive, the Battery Park Underpass, along with any surface roadway portions of the Hugh L Carey Tunnel connecting to West Street from the CBD is arbitrary and there has not been appropriate analysis on the impact for the communities that abut the exempted thoroughfares.  To date, there has been no basis as to how this decision was reached by government leaders other than that without these exempted thoroughfares, the proposed congestion plan pricing cannot work.

86.     BPC and Lower Manhattan has limited access points to enter and exit the neighborhood.  Unless entering at the very southern tip of Lower Manhattan at Battery Park, all residents must enter by crossing West Side Highway by foot or vehicle.  Further, there is no subway access in BPC and there are limited bus options.  BPC residents are being held hostage, locked in their corner of the CBD zone in a way that no other neighborhood in Manhattan is.  BPC, with its unique geographical issues, will generate significant revenue for the MTA under the Congestion Pricing Plan.

87.     The EIS is necessary to answer the questions that Plaintiffs and other concerned families and residents have regarding their quality of life and safety in BPC and Lower Manhattan.

88.     In contrast to the treatment of BPC and Lower Manhattan environmental justice communities, similar issues for economic justice communities in close proximity to thoroughfares impacted by the CBD were at least mentioned in mitigation proposals, such as asthma-related programs, though such efforts were wholly inadequate.  But the BPC neighborhood, of which the population is composed 25 percent of children, has not been reviewed at all.

89.     BPC was omitted from the analysis of any studies conducted.  As West Street is an exempted thoroughfare, it is likely that the FDR Drive and West Street will experience increases in traffic congestion as drivers look to avoid the CBD, whether from New Jersey, Queens, or Brooklyn.  Along West Street, there are residential buildings, offices, playgrounds, schools, parks,

and a bike path.  Increased congestion would substantially impair the livability of the BPC area.  It is astounding that in a climate-sensitive era, the proposed models would significantly increase regional VMT (vehicular miles traveled).

90.     The EA is insufficient for many reasons.

91.     First, the EA did not address the impact of increased congestion on the exempted thoroughfares on neighborhoods like BPC and the Lower East Side.

92.     Second, the 2019 data utilized for the EA is incomplete.  The data does not consider the physical, economic, and demographic changes to New York City post-COVID.  This includes outdated income analysis, outdated cost-of-living analysis, and outdated demographics and absolutely zero air quality data collection nor analysis.  Public transportation use is also invalid because the model uses outdated statistics.  Further, the EA does not take into consideration the loss of thoroughfare square footage for traffic due to the construction of sheds and delayed street construction projects post-COVID.  Nor does the EA even consider phasing in the toll over a period of years, while improvements are made to mass transit to accommodate increased use.

93.     The result of the proposed CBD and Plan is to shift traffic from within the CBD to the borders of the CBD at the expense of the adjacent communities along the exempted thoroughfares.  This contradicts the stated intention behind the Congestion Pricing Plan and the CBD.

94.     The increased congestion along these exempted thoroughfares will result in poor air quality for residents as well as increased pedestrian injury and death, by crossing exempted thoroughfares to enter and exit BPC confines.  Although the MTA flags, for asthma risk, similarly burdened congestion points in New York City, BPC is not independently evaluated.

95.      Moreover, the FHWA failed to consider the impact of Congestion Pricing on certain historic places in BPC that are listed or eligible for listing in the New York State and

National Register of Historic Places, including the Bowery Historic District and Hudson River Bulkhead, and completely failed to analyze the impact of traffic patterns, congestion and environmental changes on these historic properties, limiting its analysis to a superficial review of whether tolling scanners would impact the façade or exteriors of these buildings.  Moreover, no review at all was conducted as to whether the Congestion Pricing Plan and the resulting traffic would have an adverse impact on Route 9A and the land beneath it, which has been identified and reviewed for archeological considerations in numerous transportations projects, including EIS reviews, impacting Lower Manhattan and BPC.

96.     As such, Defendants should be required to further re-evaluate, and conduct and complete the required process to conduct an EIS.

97.     BPC has a high population of families with school children.  Many of these residents rely on private transportation to and from school.  There are various reasons that parents may need to transport children in this manner, including lack of proximity to public transportation and disabilities that may prevent a child from taking public transportation.

98.     The Congestion Pricing Plan also unduly puts a financial burden on BPC families when the MTA plan admits that the increase in traffic will cause health and safety issues.  The cost of treating children's medical bills if they are faced with daily vehicular exhaust at their local zoned schools would be a huge financial burden in health and medical bills in the community.  The fact that BPC residents do not know the exact cost, and an answer was not presented, is also why an EIS is needed.

99.     The Congestion Pricing Plan will impact local businesses in the congestion zone due to a loss of customer traffic and an increased cost of delivered goods and services.  This will create financial hardship for local businesses and the families that patronize them.

**F.  Plaintiffs' Efforts to Engage in the NEPA Process**

100.    Under NEPA, agencies are required to provide *meaningful opportunities* for public

participation.  The FHWA regulations state that public involvement is a "essential part of the

development process for proposed actions."  23 C.F.R. § 771.105(d).  Since the Draft EA was

issued in August 2022, Plaintiffs have attempted to voice their concerns and participate in the

NEPA process, but have been thwarted at every turn.

101.    Starting in August 2022, BPC and Lower Manhattan residents voiced concerns to

the MTA that the exempted thoroughfares would significantly impact Lower Manhattan, including

the imposition of a substantial financial and environmental burden on families, the elderly, those

suffering from 9/11-related cancers, and other illnesses who need travel to doctors outside the

CBD, and others taxed by virtue of being "trapped" within the Lower Manhattan CBD.   Many

commenters stated that they generally supported the Congestion Pricing Plan but that high tolls

would cause more traffic diverted to exempted highways and that streets such as West Side

Highway—already a dangerous pedestrian crossing for children and others—would become even

more dangerous.

102.    With the issuance of the Final EA and draft FONSI and commencement of the 30-

day comment period, Plaintiffs and others attempted to navigate the NEPA process, but were met

with resistance.  Despite the commencement of the comment period, Plaintiffs were repeatedly

told by local officials at Community Board meetings and in conversations that it was "too late to

fight congestion pricing" because the Congestion Pricing Plan had the federal approval it needed

and that they were "out of luck" on their ability to make a public comment.  Other officials were

indifferent, at best, in helping Plaintiffs to navigate the confusing NEPA process.

103.    Nevertheless, on June 12, 2023, Plaintiffs sent a comment package to the Final EA

and Draft FONSI to the Defendants.  In addition to their letter outlining the significant

deficiencies in the EA and FONSI and need for an EIS, Plaintiffs presented testimony,

questionnaires, and letters from local schools in the area explaining the myriad concerns with the

Congestion Pricing Plan.  Among others, Plaintiffs' submissions raised the following issues:

    i.    BPC completely was omitted from the analysis or any studies conducted.

    ii.    The BPC Community, with a quarter of its population under 17 years of age (and also includes a large population of elderly residents) directly abuts an exempted thoroughfare, West Street, which has schools, parks, playgrounds, residences, offices stores, and a bike path directly adjacent to it.  The Congestion Pricing Plan would undoubtedly increase traffic congestion on West Street as well as the FDR Drive, which poses serious traffic, public safety, and health concerns.

    iii.    No environmental analysis was conducted as to the impact of increased traffic on the exempted thoroughfares on the Lower Manhattan community.

    iv.    No analysis was done to consider the significant financial hardship on those living in BPC, with 25% of its residents having vehicles, that does not have a single subway in its 92-acres and whose only roadways in and out are via the West Side High Way crossing.  The financial burden would likely lead to displacement.

    v.    No analysis was done with respect to the many schools in Lower Manhattan, including the environmental impact as well as the financial impact on the many BPC and Lower Manhattan families who rely on private transportation to transport children to and from school.

104.    After Plaintiffs successfully navigated the complex federal regulatory NEPA process

(without help from local officials), their submission was met with complete silence.  Nothing was

changed from the Draft FONSI to the Final FONSI to address Plaintiffs' concerns.

**G. The Final EA and FONSI Failed to Comply with NEPA**

105.    Defendants are in continued violation of federal law.  The Final EA and FONSI,

which FHWA adopted, failed to comply with NEPA for at least four reasons: (1) the FHWA

failed to consider, propose, or commit to mitigation of the increased pollution in BPC and Lower

Manhattan; (2) the FHWA erroneously did not consider alternatives besides a no-action

alternative; (3) the FHWA failed to take a hard look at each of the proposed congestion pricing

schemes, or the recommended tolling scheme, as is required; and (4) despite the differences

between the EA's tolling scenarios and the actual TMRB recommendation, the FHWA does not

intend to supplement the NEPA process.

   i. <u>The Final EA and FONSI Failed to Consider or Propose Mitigation of
the Pollution that the Congestion Pricing Plan Will Have Due to Traffic
Pattern Shifts.</u>

106. Contrary to the requirements of NEPA, the FHWA's Final EA fails to consider

fully the effects that the Congestion Pricing Plan will have on air pollution.  While the Final EA

acknowledged that congestion pricing *will* cause increased air pollution, it mischaracterized those

impacts as insignificant (without adequately studying them), and failed to adequately assess the

localized nature of those impacts.

107. The EPA urged the inclusion of a "more expansive microscale screening analysis of

intersections," and encouraged the FHWA to consider "[a]ll potential adverse impacts . . .

irrespective of benefits to other areas," and prepare a "comprehensive mitigation package"

accordingly.

108. The Final EA noted several mitigation measures.  These, however, were not

adequately analyzed and do not adequately affect the issues facing BPC and Lower Manhattan and

other communities in New York with likely adverse environmental impacts.  These measures

include replacing transport refrigeration units at Hunts Point Produce Market, implementing

electric truck charging infrastructure in New York (though the ultimate tolling structure provides

no incentives to using electric vehicles), and establishing an asthma case management program and

asthma center in the Bronx.  Putting aside the question whether these efforts are in any way

meaningful to those communities, they offer nothing specific to BPC and Lower Manhattan

communities.  The remaining measures—installing roadside vegetation to improve air quality,

renovating parks and greenspace in environmental justice communities, installing air filtration

units in schools near highways, and tolling certain vehicles traveling on the FDR Drive are

inadequate and vague, doing little to alleviate the significant impact of the Congestion Pricing Plan on the BPC and Lower Manhattan.

109.    The total amount to be spent on these few mitigation efforts is $155 million over five years, a sum that pales in comparison to the needs of these communities, much less the $15 billion the MTA is expected to receive from the Congestion Pricing Plan.

ii.    The Final EA and FONSI Failed to Consider Any Alternatives Besides a No Action Alternative.

110.    In the Final EA, the FHWA nominally determined that the purpose and need of congestion pricing was to "reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements" to the MTA and "establish a tolling program consistent with the purposes underlying the [Traffic Mobility Act]."  But the FHWA did not consider a reasonable range of alternatives to the proposed Congestion Pricing Plan in its NEPA review, as required by law.

111.    Instead, the FHWA considered only one alternative—the No Action Alternative. All other potential alternatives were rejected at the outset because they would not achieve the $15 billion revenue goal set forth by the Traffic Mobility Act—notwithstanding the fact that they would have reduced vehicle-miles traveled (one of the goals of the Act) and thus traffic congestion.

112.    Among other reasonable alternatives, the FHWA failed to meaningfully consider rationing license plates, incorporating mandatory carpooling, or creating tolls on the East and Harlem River Bridges.  For instance, though the FHWA acknowledged that tolling the East and Harlem River Bridges would adequately reduce traffic congestion, it did not meaningfully consider this alternative because a single study found otherwise and there was no agreement in place to direct funds from the bridge tolls to the MTA, so it would not meet its $15 billion threshold.

113.    The FHWA also failed to meaningfully consider its own recommended congestion

pricing strategies, including parking pricing, priced vehicle sharing, and dynamic ridesharing. The FHWA knew these alternatives, yet the Final EA barely mentioned—let alone seriously considered—these possibilities, notwithstanding that some might better serve the policy objectives of congestion pricing and comport with New York laws. For example, the FHWA determined that high-occupancy toll lanes are not a reasonable alternative despite their "effective revenue generat[ion] . . . due to the availability of free lanes on the same highway."

114.    The Final EA also did not try to consider cumulative alternatives that could have met the MTA's $15 billion revenue threshold. For instance, the FHWA failed to consider whether carpooling, license plate rationing, and bridge tolls individually or in some combination would have reduced VMT and the number of vehicles in Manhattan. FHWA also failed to consider a phased-in toll program, which would allow the MTA to make improvements to public transit over time to improve its reliability and accommodate increased ridership.

115.    With only one true alternative, the No Action Alternative, the FHWA all but ensured from the start that the Congestion Pricing Plan would receive NEPA clearance.

   iii. <u>The Final EA and FONSI Failed to Take a Hard Look at Each of the MTA's Hypothetical Congestion Pricing Plan Scenarios.</u>

116.    The FHWA considered seven proposed tolling "scenarios" in its assessment of congestion pricing. These scenarios greatly vary based on, for example, "the amount of the toll for different types of vehicles, the times tolls would be imposed, exemptions from tolling, crossing credits for tolls paid on other toll tunnels or bridges, and discounts in the form of 'caps' on the number of tolls per 24-hour period to be applied to different types of vehicles."

117.    Throughout the Final EA and FONSI, the FHWA does not effectively distinguish the relative impacts of each scenario. For example, the FHWA assumed that every scenario would have the same degree of effect on parking conditions, pedestrian traffic, and noise levels—despite

the scenarios' significantly different toll fees, hours, and exemptions.  And, even where the FHWA did disaggregate potential impacts, it did not explain how such impacts were calculated.

118.    Moreover, the Final EA even contemplated that the TBTA could "adopt[] a toll schedule structure that has substantially different attributes from those examined in this EA" and if that happens, "the Project Sponsors would review those changes with FHWA" to "identify a course of action to assess and document the changes in accordance with NEPA prior to implementation of the Project."

119.    That the FHWA left open the possibility that there could be a Congestion Pricing Plan that is "substantially different" than the ones proposed in the Final EA underscores that it did not take a hard look at the environmental impacts of the proposed project.

120.    Indeed, the FHWA presented summary findings unsupported by evidence that it then applied to each scenario as if there were no differences among them and has not committed to a full environmental assessment once the final scenario is adopted.

iv.    The FHWA Did Not Take the Requisite "Hard Look" at the Actual Congestion Pricing Scheme.

121.    NEPA directs that if a statement, such as an EA, is "so inadequate as to preclude meaningful analysis," an agency "shall prepare and circulate a revised draft," or a supplement to the statement.  40 C.F.R. § 1502.9(a), (d).

122.    Agencies are required to prepare supplements to either draft or final statements if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns," or there is "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  *Id.* § 1502.9(d)(1)(i), (ii).

123.    While there is much to consider when evaluating a congestion pricing program, this ill-conceived plan essentially consists of three components: (i) a geographic zone, (ii) a tolling scheme, and (iii) the technology to charge the tolls.  Of these, the most consequential component,

of course, is the tolling scheme, for that will motivate driver behavior and the resultant environmental impact.

124.    That is also the component that the FHWA acknowledged in its FONSI would only be known well *after* its finding.  The FHWA further admitted that the actual tolling structure and intended mitigation measures would, ultimately, need be re-evaluated after the TMRB recommendation.  But that re-evaluation will be relegated to a less rigorous and less public process, depriving impacted communities of a meaningful right to participate in the administrative process and failing to take the required hard look at the actual Plan.

125.    FHWA did not take the requisite "hard look" at the ultimate tolling structure, which differs from any of the seven tolling scenarios identified in the EA or FONSI.  As set forth below, among other things, the TMRB recommendation (i) extends peak-hour pricing from 5:00am to 9:00pm on weekdays, even though each of the EA's scenarios analyzed peak hours of 6:00am to 8pm; (ii) sets the base toll at $15 even though none of the seven tolling scenarios analyzed a $15 toll; (iii) includes a $5 crossing credit for those traveling through the Lincoln and Holland Tunnels, but no credit for the George Washington Bridge, even though the EA considered higher crossing credits; and (iv) exempts licensed taxis and for-hire vehicles ("FHVs") from the daily toll and recommends a per-ride toll for each passenger trip, even though the EA never evaluated the impact of a per-ride toll.

### H. The TMRB's Recommendation

126.    On November 30, 2023, well after the FHWA published its "final" finding of "no significant impact," the TMRB released its recommended toll structure.[16]  The recommended toll price and structure did not match any of the scenarios analyzed in the Final EA or FONSI.

---

[16] *Congestion Pricing in New York: A toll structure recommendation from the Traffic Mobility Review Board* (Nov. 2023), https://new.mta.info/document/127761.

127.    The recommended daytime toll rate applies from 5:00 AM to 9:00 PM on weekdays and 9:00 AM to 9:00 PM on weekends (longer periods capturing many more drivers and causing diversion of traffic from an earlier hour to surrounding areas).  It includes the following tolls for vehicles entering the CBD:

    a.   $15 for passenger vehicles and passenger-type vehicles

    b.   $24 for small trucks and intercity buses

    c.   $36 for large trucks and tour buses

    d.   $7.50 for motorcycles

128.    In addition, the Report recommended that passengers of taxis be charged $1.25 per ride and for-hire-vehicles (*e.g.*, Uber) be charged $2.50 per-ride.[17]

129.    To put the $15 toll in context, an individual resident in BPC or lower Manhattan traveling five times per week out of the CBD would face $75 per week, and over $3,000 per year in additional costs, a significant amount of after-tax dollars (on top of existing tolls and mileage costs).  And BPC residents are already some of the most highly taxed residents in New York State.

130.    Finally, the Report recommended that a credit against the daytime CBD toll rate be provided only to vehicles entering through the four tolled entries that lead directly into the CBD:

    i.   The Queens-Midtown,

    ii.   Hugh L. Carey,

    iii.   Holland,

    iv.   Lincoln

131.    The recommended credit against daytime tolls was:

    i.   $5 for passenger vehicles and passenger-type vehicles,

    ii.   $2.50 for motorcycles,

    iii.   $12 for small trucks and intercity buses,

    iv.   $20 for large trucks and tour buses

---

[17] Unlike for other tolls in the proposed action that only apply up to once per day, these tolls are charged per ride.

These toll credits would not apply at night.

132.    The TMRB Report provided no locational credit or exemption for drivers who live in the Lower Manhattan area.

133.    The TMRB also considered but rejected calls to exempt electric vehicles and to exempt individuals with serious medical conditions who cannot take public transportation.  For disabled individuals, the TMRB stated in conclusory fashion that London, a city that reimburses disabled commuters for the Congestion Pricing Plan tolls, has a national health insurance program, and the United States does not have a comparable entity.  This is despite the fact that approximately one out of 15 New Yorkers has an ambulatory disability, and only 27% of the MTA's 472 subway stations are considered accessible under the Americans with Disabilities Act (and none are in close proximity to BPC).[18]

134.    In a telling response to one of the EPA's suggestions regarding low-income exemptions, the Project Sponsors stated: "One of the four objectives of the Project is to create a funding source for capital improvements and generate sufficient annual net revenues to fund $15 billion for capital projects…the more vehicles that are given cross credits, exemptions, etc., the higher the toll must be to ensure sufficient revenues are generated."

135.    The Project Sponsors and the TMRB have maintained a myopic focus on Manhattan traffic and MTA revenue to the detriment of all else, including the environmental impact and individual financial burden on Lower Manhattan residents.

136.    That focus is contrary to the stated environmental goals of New York State and City. The City Council passed Local Laws 60 and 64, which mandate that a City interagency working group produce an Environmental Justice Plan for New York that will, among other things, mandate that City agencies incorporate environmental justice concerns into agency decision-making and

---

[18] Asmaa Elkeurti and Ana Ley, *Elevators at Most Subway Stations?  'I'll Believe It When I See It.'*, N.Y. Times (Aug. 31, 2023), https://www.nytimes.com/2023/08/31/nyregion/nyc-subway-accessible-disabled.html.

promote public participation and transparency in decisions that raise environmental justice issues. The Environmental Justice Plan is scheduled to be issued in 2024. The TBTA and TMRB's fast-tracked process ensures that the City can elide these important new requirements.

137.    While the TMRB's recommendation summarily states that the Board has "paid particular attention to the impact of the program on environmental justice communities," the only evidence of any analysis is a conclusory statement that it relied upon a "Best Practice Model" of travel forecasting "and the analysis methodology approved by federal authorities for this Project." The recommendation acknowledges that the "environmental impact of Congestion Pricing . . . is not uniform across the region" and that "traffic diversions can be a concern, particularly when they occur in communities already burdened by comparatively high pre-existing air pollution and/or chronic diseases." Besides this acknowledgment, the TMRB took no further action beyond rubber-stamping the EA and FONSI limited mitigation measures.

138.    On December 6, 2023, the TBTA approved the TMRB's recommendation to go forward with its tolling program.[19]

139.    The TMRB and MTA's recommendation will almost certainly not substantively change after the public hearing process due to all the public comments already provided but largely ignored following the Final EA and because the TBTA has openly expressed its conclusive approval of the TMRB recommendation.[20]

---

[19] Press Release, *MTA Board Votes to Begin Public Review Process for Central Business District Tolling Rate Schedule*, MTA (Dec. 6, 2023, 9:30 PM), https://new.mta.info/press-release/mta-board-votes-begin-public-review-process-central-business-district-tolling-rate.

[20] *See* MTA, *MTA Board Meeting - 12/6/2023*, YOUTUBE (Dec. 6, 2023), https://www.youtube.com/watch?v=0pfJ-S9myBk at 1:43:00–2:38:00 (depicting several TBTA members expressing their support for the TMRB's proposed tolling plan). For example, Neal Zuckerman, MTA Board Member and Chair of Finance, stated to the TMRB, "I trust that you've done it right, and listening to what you've reported to us, you have a balanced approach, a limited approach, and frankly one that I think is very fair to all constituents. . . . I'm ready to get started and vote on this." *Id.* at 1:45:55–1:47:02.

140.    On December 26, 2023, the TBTA also announced that it will have but four hearings, on February 29, 2024, March 1, 2024, and two on March 4, 2024,[21] before the vote on the TMRB's recommendation takes place in the Spring of 2024.

141.    The expectation of the MTA is that the tolling scheme will "go[] live in late Spring."[22]

142.    To achieve this expedited and preordained result, MTA Chief Operating Officer, Allison C. de Cerreño, stated that concurrently with the public comment period and hearings, her team is performing "the final analysis and re-evaluation to ensure that the effects of the actual toll schedule remain consistent with the [FHWA's] finding of no significant impact."[23]

143.    Sixty percent of the infrastructure for the Congestion Pricing Plan has already been built as of December 2023, and the MTA has already indicated that the recommendation will not substantively change because "[i]f you change one aspect…the whole thing starts to unravel or fall apart."[24]

**FIRST CLAIM FOR RELIEF**
(Violation of National Environmental Policy Act and Administrative Procedure Act)
(42 U.S.C. §§ 4321 *et seq.*; 5 U.S.C. §§ 701-706)

144.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

145.    The FHWA has failed to prepare an adequate environmental review of congestion

---

[21] Press Release, *MTA Announces Details of Congestion Pricing Public Comment Period*, MTA (Dec. 26, 2023, 9:30 PM), https://new.mta.info/press-release/mta-announces-details-of-congestion-pricing-publiccomment-period.

[22] *See* MTA, *MTA Board Meeting - 12/6/2023*, YOUTUBE (Dec. 6, 2023), https://www.youtube.com/live/0pfJ-S9myBk?si=4BnXippfzAml3OoC&t=6022 at 1:40:22 (Allison C. de Cerreño (MTA Chief Operating Officer): "We're looking forward to going live in late Spring.").

[23] *Id.* at 1:39:42.

[24] Stephen Nessen and Clayton Guse, *Don't Expect Changes to MTA's Congestion Pricing Even After Final Public Review*, GOTHAMIST (Dec. 8, 2023), https://gothamist.com/news/changes-to-mtas-congestion-pricing-nyc-nj.

pricing in the CBD that would satisfy its duty to consider all environmental impacts of a proposed action, and to provide for public comment and participation in the public review process, in violation of NEPA and its implementing regulations.  42 U.S.C. § 4321 *et seq.*; 40 C.F.R. § 1500.1 *et seq.*

146.    As a result, the FHWA's Final EA and FONSI are arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with the law, in violation of NEPA and its implementing regulations, and are subject to judicial review under the APA. 5 U.S.C. §§ 701-706.

147.    These deficiencies include, without limitation, the following:

### **Failure to Prepare an EIS**

148.    Prior to taking a major federal action, the FHWA must issue an EIS when the proposed action is likely to have significant environmental effects.  40 C.F.R. § 1501.3(a)(3).  In assessing whether the effects of a proposed action are significant, the FHWA is required to analyze the potentially affected environment and degree of the effects of the action.  *Id.* § 1501.3(b).

149.    In considering the degree of the effects, the FHWA must consider, *inter alia*, (i) effects on public health and safety, (ii) both short- and long-term effects, and (iii) both beneficial and adverse effects.  *Id.* § 1501.3(b)(2).

150.    The FHWA may issue a FONSI only where it has demonstrated that the proposed action "will not have a significant effect on the human environment."  *Id.* § 1501.16.

151.    Pursuant to the APA, 5 U.S.C. §§ 701–706, courts will set aside a FONSI and require preparation of an EIS if the FONSI is determined to be arbitrary and capricious.

152.    The FHWA violated NEPA by failing to prepare an EIS even though the Congestion Pricing Plan will cause significant and unmitigated environmental impacts on BPC and its residents, such as adverse air quality, public health, and pollution.

153.    The FHWA erred in issuing a FONSI despite evidence in the record showing the

likelihood of significant adverse environmental effects (direct, indirect, and cumulative) and findings that the Congestion Pricing Plan, as is, will have significant and unavoidable impacts on BPC and the greater Lower Manhattan area, including environmental justice communities.

154.    The FHWA further erred in recognizing these adverse environmental effects, but then failing to propose or analyze sufficient "enforceable mitigation requirements or commitments . . . to avoid significant impacts" or stating them within the FONSI as required under 40 C.F.R. § 1501.6(c).

155.    The FHWA's FONSI was conclusory and did not reflect adequate consideration of relevant factors necessary to understand the environmental effects of the Congestion Pricing Plan, nor did it consider adequate mitigation measures.

156.    The FHWA failed to consider the full extent of direct, indirect, and cumulative effects in BPC and its surrounding area of congestion pricing in the CBD.

157.    The Final EA deficiencies, include, without limitation, the following:

### Failure to Mitigate

158.    Under NEPA and its applicable regulations, an agency preparing an EA has an obligation to take a hard look at the direct, indirect, and cumulative effects or impacts of the proposed action and its alternatives, resulting from all past, present, and reasonably foreseeable future actions.

159.    Direct effects are those "caused by the action and occur at the same time and place." 40 C.F.R. § 1508.1(g)(1).  Indirect effects are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id*. § 1508.1(g)(2).  Cumulative effects are those "that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions."  *Id*. § 1508.1(g)(3).

160.    Here, the FHWA violated NEPA by failing to take the required hard look at direct,

indirect, and cumulative impacts that the seven (or more) potential congestion pricing schemes will have on air pollution in BPC and its surrounding areas due to traffic pattern shifts and therefore failing to propose or commit to mitigation efforts.

161.    *First*, the FHWA overlooked the impacts of traffic pattern shifts in BPC and Lower Manhattan.  The FHWA failed to consider the impact these traffic pattern shifts would wreak on the surrounding communities and the corresponding changes in traffic patterns that would occur to avoid tolls.  The FHWA acted arbitrarily and capriciously in failing to consider the changes in traffic patterns in BPC and its surrounding areas.

162.    *Second*, the FHWA further violated NEPA by failing to take the required hard look at direct and indirect impacts that the Congestion Pricing Plan will have on increased noise pollution in BPC and Lower Manhattan due to traffic pattern shifts, and therefore failed to propose mitigation efforts.  Despite recognizing that the Plan will result in "noise exposure" and "increase[s] in traffic volumes," it did not expand its assessment to areas where traffic will be diverted as a result of the scenarios proposed by the Project Sponsors.

**Failure to Consider a Reasonable Range of Alternatives**

163.    NEPA requires agencies to study a reasonable range of alternatives to their proposed actions.  42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E), 4332(2)(H); *see also* 40 C.F.R. §§ 1501.5(c)(2), 1502.14.

164.    The FHWA's statement of purpose and need—to generate revenue for the MTA's transportation projects—is arbitrary, capricious, and an abuse of discretion.  As such, the FHWA did not consider a reasonable range of alternatives prior to the issuance of its Final EA and FONSI. Instead, the FHWA considered only one alternative—No Action Alternative.

165.    The FHWA arbitrarily and erroneously dismissed other alternatives submitted in comments, including rationing license plates, incorporating mandatory carpooling, and creating

tolls on the East and Harlem River Bridges.  The FHWA further acted arbitrarily and capriciously by failing to consider alternatives that it itself expressly recommends in its own guidance, such as parking pricing, priced vehicle sharing and dynamic ridesharing, pay-as-you-drive fees, and high-occupancy toll lanes.

166.    The FHWA's failure to analyze these reasonable alternatives adversely affected its informed decision-making process and the ability of the public to meaningfully participate in its decision.

**Failure to Take a Hard Look at Direct, Indirect, and Cumulative Impacts
of the Congestion Pricing Plan**

167.    Pursuant to NEPA and its implementing regulations, the FHWA is required to take a hard look at the direct, indirect, and cumulative environmental impacts of any proposed action and each of its alternatives, including each of the proposed tolling scenarios.  42 U.S.C. §§ 4332(2)(C); 40 C.F.R. §§ 1501.5(c)(2), 1502.14(a), 1502.16.  Here, the FHWA failed to satisfy this mandate.

168.    *First*, the FHWA failed to take a hard look at the Congestion Pricing Plan because it made the decision to "fast track" its environmental approval.  The FHWA acted arbitrarily and capriciously in its decision to "fast track" its approval of the undefined Plan without preparing a full EIS.

169.    *Second*, the FHWA acted arbitrarily and capriciously by failing to take a hard look at each of the seven, now inapplicable "scenarios" envisioned as the final congestion pricing scheme.  Instead, the FHWA appears to have assumed that each scenario—despite differing toll rates, hours, and exemptions—would have the same effects on traffic, parking conditions, pedestrian movement, air pollution, traffic patterns, health impacts, and noise levels.  The Final EA and FONSI provided no data or analysis for the FHWA's arbitrary conclusion that all seven scenarios, or a possible undefined scenario, would have the same effect—"no significant

impact"—rendering the NEPA hard look requirement utterly moot.

170.     *Third*, the FHWA failed entirely to take a hard look at impacts affecting BPC and Lower Manhattan and its residents, including increased traffic, increased air emissions, and environmental justice issues.  Instead, the FHWA improperly limited its consideration of certain impacts by selectively and inconsistently establishing what portions of the 28-county study area were relevant to certain impact issues.  As a result, the environmental impacts affecting BPC have not been adequately identified, analyzed, considered, or mitigated.

171.     As a result of the FHWA's above failures, the FHWA's decision to issue the Final EA and FONSI in place of an EIS was arbitrary, capricious, unreasonable, an abuse of discretion, and not in accordance with law, and without observance of procedures required by law, in violation of NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2)(A), (D).

172.     Defendants are in continued violation of federal law.

## SECOND CLAIM FOR RELIEF
(Violation of NEPA – Failure to Supplement)

173.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

174.     NEPA directs that if a statement, such as an EA, is "so inadequate as to preclude meaningful analysis," an agency "shall prepare and circulate a revised draft," or a supplement to the statement.  40 C.F.R. § 1502.9(a), (d).

175.     Agencies are required to prepare supplements to either draft or final statements if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns," or there is "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  *Id.* § 1502.9(d)(1)(i), (ii).

176.     On November 30, 2023, the TMRB issued its recommendation regarding the toll rates by vehicle, time of day, credits, discounts, and exemptions.

177.    Most of these recommendations—including the toll price recommended—were not adequately analyzed, modeled, or discussed in the Final EA or FONSI and require a hard look at the potential financial and environmental consequences.

178.    The FHWA did not take the requisite "hard look" at the ultimate tolling structure, which differs from any of the seven tolling scenarios identified in the EA or FONSI.  Among other things, the TMRB recommendation (i) extends peak-hour pricing from 5:00am to 9:00pm on weekdays, even though each of the EA's scenarios analyzed peak hours of 6:00am to 8pm; (ii) sets the base toll at $15 even though none of the seven tolling scenarios analyzed a $15 toll; (iii) includes a $5 crossing credit for those traveling through the Lincoln and Holland Tunnels, but no credit for the George Washington Bridge, even though the EA considered higher crossing credits; and (iv) exempts licensed taxis and for-hire vehicles ("FHVs") from the daily toll and recommends a per-ride toll for each passenger trip, even though the EA never evaluated the impact of a per-ride toll.

179.    The TMRB's recommendation constitutes significant new circumstances or information relevant to environmental concerns and bears on the proposed action and its impact, rendering the FONSI inadequate and devoid of meaningful analysis.

180.    Defendants acknowledge that a further analysis need now be taken and, in light of the gross deficiencies in their prior examination, they should be directed to fully supplement their analysis.

181.    Despite the acknowledgment of required further analysis, the MTA has already publicly stated that it intends to ensure that its "re-evaluation" remains consistent with the FHWA's finding of "No Significant Impact" and that it will "go-live" with the Congestion Pricing Plan in the Spring, after the four public hearings have just concluded in mid-March.

182.    The MTA intends to have a quick "re-evaluation" process in a shortened timeframe, rather than a full analysis.

183.    Accordingly, FHWA's current determination that it will re-evaluate rather than supplement the FONSI or Final EA to address this new information—without taking the hard look required by law—violates NEPA and its implementing regulations, and the Court should order a full supplementation.  *See, e.g.*, 40 C.F.R. §§ 1502.9(a) and (d)(1)(i), (ii).

184.    Defendants are in continued violation of federal law.

### THIRD CLAIM FOR RELIEF

(Violation of the Dormant Commerce Clause – As Against Non-Federal Defendants)

185.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

186.    The Commerce Clause empowers Congress to regulate commerce among the States, but also directly limits the power of the States to discriminate against interstate commerce.

187.    State law or policy violates the dormant commerce clause when it "clearly discriminates against interstate commerce in favor of intrastate commerce" or "if it imposes a burden on interstate commerce incommensurate with the local benefits secured."

188.    The dormant Commerce Clause's principles apply to the MTA and TBTA given their status as public benefit corporations.

189.    Defendants, under color of state law, deprived Plaintiffs of their constitutional rights, including their rights under the Commerce Clause by burdening them economically and environmentally in an unreasonable and excessive manner incommensurate with the identified benefits, imposing an impermissible burden on interstate commerce.

190.    The significant burden on Plaintiffs—who drive and enter Manhattan each day and from their residence and will bear the burden of redirected congestion and pollution—far outweighs

the regional benefit to traffic in Manhattan.  The toll also discriminates, among other ways, by excluding the George Washington Bridge and New Jersey commuters from the proposed discounts.

191.    The discriminatory features of the Congestion Pricing Plan do not serve a legitimate purpose that could not be served by nondiscriminatory alternatives.

192.    The implementation of the toll (i) is not based on a fair approximation of the use of the facilities; (ii) is excessive in relation to the local benefits conferred; and (iii) discriminates against interstate commerce in violation of the United States Constitution.

193.    Defendants are in continued violation of federal law.

### FOURTH CLAIM FOR RELIEF
(Violation of the Right to Travel – As Against Non-Federal Defendants)

194.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

195.    The United States Constitution protects the fundamental right to travel within the United States.

196.    State laws or policies implicate this fundamental constitutional right when impeding travel is its primary objective.

197.    Impeding certain travel is the primary objective of the Congestion Pricing Plan.

198.    The Congestion Pricing Plan includes tolls that were designed to, and will, deter the interstate and intrastate travel of Plaintiffs and/or the Plan penalizes their exercise of the right to travel.

199.    The Congestion Pricing Plan is not narrowly tailored to meet a significant governmental interest.

200.    The implementation of the toll (i) is not based on a fair approximation of the use of the facilities; (ii) is excessive in relation to the local benefits conferred; and (iii) discriminates against interstate commerce in violation of the United States Constitution.

201.    Defendants are in continued violation of federal law.

**FIFTH CLAIM FOR RELIEF**

(Violation of the New York State Constitution (Green Amendment) – As Against Non-Federal Defendants)

202.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

203.    Article 1, Section 19 of the New York State Constitution protects every New Yorker's right to "clean air and water, and a healthful environment."

204.    These inherent and inalienable rights reflect the basic societal contract between citizens and the government of New York.

205.    The State, and in particular, public benefit corporations such as the MTA, TBTA, and its TMRB, have an affirmative duty to all citizens of New York to protect the environment.

206.    The combined acts and omissions of the MTA, TBTA, and TMRB, including but not limited to, going forward with the Congestion Pricing Plan without further study or mitigation, which will cause increases in air pollutants along the exempted thoroughfares and violate Plaintiffs' right to clean air and a healthful environment.

207.    In issuing its toll recommendation, the TMRB and TBTA ignored the clear environmental concerns regarding air quality raised by the EPA regarding the Congestion Pricing Plan, particularly to environmental justice communities.

208.    Despite acknowledging that many New Yorkers will see an increase in traffic and air pollution under the Congestion Pricing Plan, including those living in environmental justice communities already burdened by comparatively high pre-existing air pollution and/or chronic diseases, the TMRB and TBTA nevertheless conducted no further analysis of the likely pollution and failed to provide any additional mitigation efforts beyond those already recommended by the FHWA in the FONSI.

209.   The purposefully fast-tracked Congestion Pricing Plan review ensures, among other things, that the relevant agencies will not have to comply with local laws, which mandate that agency programs, policies, and processes promote environmental justice, encourage public participation and transparency, and factor environmental justice and environmental justice community concerns in agency-decision making.

210.   The TMRB recommendation and TBTA adoption and plan to implement the Congestion Pricing Plan within a few months and without adequate environmental safeguards reflects a wholesale abrogation of their obligations to ensure a habitable climate and healthful environment for Plaintiffs.  The recommended tolling plan (1) violates applicable state and federal law and (2) violates Plaintiffs "right to clean air and water, and a healthful environment."


**WHEREFORE**, Plaintiffs respectfully request that this Court grant the following relief:

i.   Issue a permanent injunction vacating and setting aside Defendants' FONSI and Final EA and compelling Defendants to complete a full and proper EIS for the Congestion Pricing Plan;

ii.   Declare that the FHWA's failure to prepare an EIS for the Congestion Pricing Plan, or to adequately explain why an EIS is unnecessary, violates NEPA, its implementing regulations, and the APA;

iii.   Declare that Defendants' actions, including their FONSI and Final EA, are invalid as a matter of law;

iv.   In the alternative, declare that Defendants must conduct a full supplemental review and take the requisite hard look at the Congestion Pricing Plan's impact, as is required, and that the proposed action may not move forward absent such review;

v.   Declare that Congestion Pricing violates Plaintiffs' constitutional rights under the United States Constitution;

vi.   Declare that the Congestion Pricing Plan's tolling recommendation and adoption violates Plaintiffs' constitutional rights under the New York State Constitution;

vii.   Order the FHWA to prepare a full and proper EIS for the Congestion Pricing Plan;

viii.     Award Plaintiff its costs for the action, including reasonable attorneys' fees; and

ix.     Grant such other relief as this Court deems just and proper.

Dated: New York, New York                    **STEPTOE LLP**
        February 20, 2024

                          By:

                                  _/s/ Alan M. Klinger_
                                  Alan M. Klinger
                                  Dina Kolker
                                  David Kahne
                                  1114 Avenue of the Americas
                                  New York, New York 10036
                                  (212) 506-3900
                                  aklinger@steptoe.com

                                  _Counsel for Plaintiffs_