**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELIZABETH CHAN, TAMARA HOFFMAN,
RACHEL EHRENPREIS, CHAIM KATZ, WINNIE
CHEUNG, MEIR EHRENPREIS, JOHN BAILEY,
SEAN CARNEY, LUIS DIAZ AND FAMILIES FOR
A BETTER PLAN FOR CONGESTION,

                Plaintiffs,

              v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, FEDERAL HIGHWAY
ADMINISTRATION, THE METROPOLITAN
TRANSPORATION AUTHORITY, THE
TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY, SHAILEN BHATT, in his official
capacity as Administrator of the Federal Highway
Administration, RICHARD J. MARQUIS, in his
official capacity as Division Administrator of the New
York Division of the Federal Highway Administration,
NICHOLAS A. CHOUBAH, P.E. in his official
capacity as Chief Engineer for the New York State
Department of Transportation, WILLIAM J. CARRY
in his official capacity as Assistant Commissioner for
Policy for the New York City Department of
Transportation,

              Defendants.

Case No. 23-cv-10365-LJL
[rel. 1:24-cv-01644-LJL]
[rel. 1:23-cv-10365-LJL]

**Oral argument requested**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 10

    A.    New York Attempts To Implement Congestion Pricing—The First Of Its Kind In U.S. History ................................................................................. 10

    B.    NEPA's Role In Ensuring Federal Agencies Give Proper Weight To Environmental Consequences Of Proposed Actions .......................................... 13

    C.    The "Fast Track" Approval Of Congestion Pricing ............................................. 14

    D.    The Draft EA – A Process Driven By Revenue And Rush ................................... 15

    E.    The Preordained Result—The FHWA Issues The EA And FONSI Without Requiring The Project Sponsors To Prepare An EIS ........................................... 18

    F.    The TMRB Issues Its Recommended Toll Price And Structure ......................... 21

ARGUMENT ........................................................................................................................... 23

I.    DEFENDANTS' DECISION TO ISSUE A FONSI WAS ARBITRARY AND CAPRICIOUS ............................................................................................................ 24

II.    THE EA AND FONSI FAILED TO TAKE A HARD LOOK AT CONGESTION PRICING ..................................................................................................................... 26

    A.    Defendants' Issuance Of A FONSI Was Arbitrary And Capricious Because It Failed To Take A Hard Look At The Impacts Of Congestion Pricing On Battery Park City .......................................................................................................... 27

    B.    The EA And FONSI Failed To Consider Adverse Impacts On Communities With Environmental Justice Concerns ...................................................................... 31

        1.    FHWA's Flawed Methodological Choices For Analyzing Environmental Justice Communities Were Arbitrary And Capricious ............................ 34

        2.    The EA And FONSI Ignore The Adverse Impact Of Congestion Pricing On Battery Park City And Environment Justice Communities ............... 37

    C.    The EA And FONSI Failed To Sufficiently Identify And Analyze Reasonable Alternatives To Congestion Pricing ................................................................. 41

    D.    The Final EA And FONSI's Proposed Mitigation Measures Are Wholly Inadequate And Were Not Sufficiently Analyzed ................................................ 45

    E.    The EA And FONSI Must Be Vacated Because They Did Not Analyze The Actual Congestion Pricing Tolling Structure ....................................................... 48

    F.    Defendants' Failure To Provide Adequate Participation Renders The EA And FONSI Arbitrary And Capricious ..................................................................... 50

III.    The FONSI Should Be Set Aside Pending A Supplemental Environmental Review ....... 53

CONCLUSION ........................................................................................................................ 55

## <u>TABLE OF AUTHORITIES</u>

**Cases**............................................................................................................... **Page(s)**

*Anderson v. Evans,*
    371 F.3d 475 (9th Cir. 2004) ...................................................................24, 25, 51

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
    462 U.S. 87 (1983)...................................................................................................26

*California v. Bernhardt,*
    472 F.Supp.3d 573 (N.D. Cal. 2020) .....................................................................38

*California. v. Block,*
    690 F.2d 753 (9th Cir.1982) ......................................................................49, 52, 55

*Ctr. for Bio. Diversity v. Nat'l Highway Traffic Safety Admin,*
    538 F.3d 1172 (9th Cir. 2008) ................................................................................26

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004)................................................................................................23

*Dubois v. U.S. Dep't of Agric.,*
    102 F.3d 1273 (1st Cir. 1996)..........................................................................52, 55

*el Bienestar de la Comunidad Costera v. FERC,*
    6 F.4th 1321 (D.C. Cir. 2021)...........................................................................32, 35

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.,*
    603 F. Supp. 2d 1176 (E.D. Wis. 2009)..................................................................41

*Hanly v. Kleindienst,*
    471 F.2d 823 (2d Cir. 1972)....................................................................................51

*Highway J Citizens Grp. v. Mineta,*
    349 F.3d 938 (7th Cir. 2003) ..................................................................................53

*Idaho Sporting Cong. Inc. v. Rittenhouse,*
    305 F.3d 957 (9th Cir. 2002) ..................................................................................27

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.,*
    373 F. Supp. 2d 1069 (E.D. Cal. 2004)...................................................................41

*League Wildness Defs./Blue Mtns. Biodiversity Proj. v. Forsgren,*
    309 F.3d 1181 (9th Cir. 2002) ................................................................................47

*Magellan Tech., Inc. v. USDA,*
    70 F.4th 622 (2d Cir. 2023) ..............................................................................48, 49

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989)......................................................................................26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..................................................................27, 29, 32, 49

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
177 F.3d 800 (9th Cir. 1999) ......................................................................44

*N. Cascasdes Conservation Council v. U.S. Forest Serv.*,
98 F. Supp. 2d 1193 (W.D. Wash. 1999).....................................................27

*Nat'l Audubon Soc. v. Hoffman*,
132 F.3d 7 (2d Cir. 1997) .......................................................................13, 21

*Nat'l Audubon Soc'y v. Dep't of Navy*,
422 F.3d 174 (4th Cir. 2005) .......................................................................31

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
241 F.3d 722 (9th Cir. 2001) .......................................................................24

*Native Ecosys. Council v. Judice*,
No. CV 18-55-BLG-SPW, 2019 WL 1131231 (D. Mont. Mar. 12, 2019)............................50

*Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*,
137 F.3d 1372 (9th Cir. 1998) .....................................................................47

*New York v. Nuclear Regul. Comm'n*,
681 F.3d 471 (D.C. Cir. 2012)................................................................25, 26

*Nio v. United States Dep't of Homeland Sec.*,
385 F. Supp. 3d 44 (D.D.C. 2019) ...............................................................21

*O'Reilly v. All State Financial Co.*,
No. 22-30608, 2023 WL 6635070 (5th Cir. Oct. 12, 2023) .......................32

*O'Reilly v. U.S. Army Corps of Eng'rs*,
477 F.3d 225 (5th Cir. 2007) .......................................................................45

*Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*,
113 F.3d 1505 (9th Cir.1997) ......................................................................54

*Protect Key West, Inc. v. Cheney*,
795 F. Supp. 1552 (S.D. Fla. 1992) .............................................................50

*N.M. ex rel. Richardson v. Bureau of Land Mgm't*,
565 F.3d 683 (10th Cir. 2009) ...............................................................47, 54

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ......................................................................................13

*San Luis Valley Ecosys. Council v. U.S. Fish & Wildlife Serv.*,
   657 F. Supp. 2d 1233 (D. Colo. 2009) ..........................................................46

*Seattle Audubon Soc. v. Moseley*,
   80 F.3d 1401 (9th Cir. 1996) ........................................................................43

*Sierra Club v. Mainella*,
   459 F. Supp. 2d 76 (D.D.C. 2006) ...........................................................28, 30

*Simmons v. U.S. Army Corps of Eng'rs*,
   120 F.3d 664 (7th Cir. 1997) ....................................................................41, 42

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   255 F. Supp. 3d 101 (D.D.C. 2017) ..........................................................32, 37

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   985 F.3d 1032 (D.C. Cir. 2021) ....................................................................27

*Suffolk Cnty. v. Sec'y of Interior*,
   562 F.2d 1368 (2d Cir. 1977) .......................................................................21

*Town of Cave Creek v. FAA*,
   325 F.3d 320 (D.C. Cir. 2003) ..................................................................25, 45

*United Steel v. Mine Safety & Health Admin.*,
   925 F.3d 1279 (D.C. Cir. 2019) ....................................................................26

*W. N. Carolina All. v. N. Carolina Dep't of Transp.*,
   312 F. Supp. 2d 765 (E.D.N.C. 2003) ...........................................................50

*Wetlands Action Network v. U.S. Army Corps. Of Eng'rs*,
   222 F.3d 1105 (9th Cir. 2000) ......................................................................45

**Statutes**

5 U.S.C. § 706 .......................................................................................................23

42 U.S.C. § 4332(2)(C) ................................................................................. *passim*

N.Y. Tax L. § 606(jjj) (2014) ...............................................................................12

N.Y. Veh. & Traf. L. §§ 1701–1706 ............................................................. *passim*

**Other Authorities**

23 C.F.R. §§ 771 *et sec.* ............................................................................... *passim*

40 C.F.R. § 1500–1508...........................................................................................................*Passim*

Exec. Order No. 14,008, 3 C.F.R. 489............................................................................................31

Exec. Order No. 12,898, 3 C.F.R. 859............................................................................................31

## PRELIMINARY STATEMENT

While the concept of reducing traffic in certain areas of New York City may bring with it some environmental and transportation benefits, those goals cannot be accomplished with a blind eye toward the environmental burdens the plan will shift onto other communities.  Yet, this is precisely what the Defendants have done with the Central Business District Tolling Program ("Congestion Pricing").  In refusing to engage in the Environmental Impact Statement ("EIS") process, Congestion Pricing is hurtling toward implementation with insufficient consideration of the impacts it will have on many communities, including environmental justice neighborhoods. Despite acknowledging significant environmental impacts will occur in those neighborhoods, Defendants give little thought and even fewer details about mitigation measures to ameliorate those results.  This City has a sordid history, most notoriously in the era of Robert Moses, of laying the burdens of transportation "progress" on the backs of communities that lack the power or influence to fight back.  Congestion Pricing echoes that history, and the Court should order a closer examination of the environmental harms by requiring an EIS.

Under the National Environmental Policy Act ("NEPA"), federal agencies must prepare an EIS if a proposed action's direct, indirect, and cumulative impact will "significantly affect[] the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An EIS is a more detailed, thorough, and rigorous regulatory process than an Environmental Assessment ("EA") and involves greater public participation.  When a federal agency prepares an EIS, the public is involved in an initial, collaborative scoping process with federal agencies in which the issues to be analyzed and the range of potential alternatives to be reviewed are decided.  In an EIS, the comment period for community feedback allows for a greater consideration of issues and requires waiting periods before a final agency decision can be rendered to facilitate their consideration.  On average, an EIS takes four to five years for a federal agency to complete not because delay is desired, but because

1

when concrete impacts of a proposed federal action exist, a closer, more deliberative and comprehensive analysis is demanded.  In the past, changes to tolling procedures, widening highways, and adjustments to exit ramps approved by the Federal Highway Administration ("FHWA")—the agency responsible for conducting the environmental review—have required an EIS.  Even when it is a "close call" whether there will be a significant impact from a proposed action, under well-settled law an EIS must be prepared.

The federal action at issue here, Congestion Pricing, is not a "close call."  The program is not a single toll or the extension of a highway exit ramp.  Congestion Pricing is a radical change to the urban planning and infrastructure of the City and is the first ever such program in our nation's history.  It will have profound environmental impacts on communities and it will forever alter the daily experience of living and working in New York City and its surrounding environs for Plaintiffs and for millions of New York and New Jersey residents who will be obliged to pay a hefty $15 each time they enter the City at any point south of Manhattan's 60th Street.  By the FHWA's own admission, air pollution will rise in parts of New York City, in some cases *for 20 years* in vulnerable communities with pre-existing public health issues; traffic diverted to avoid the $15 toll will make certain congested and dangerous roads for New York City residents and their children even more dangerous and congested; small businesses, already struggling to recover from the COVID-19 pandemic and the cost of operating in New York City on razor-thin margins, will invariably suffer; and residents within the CBD, many of whom are working class and already grappling with the huge increase in the cost of City living, will be burdened.  Indeed, the United States Environmental Protection Agency ("EPA"), the federal agency responsible for implementation and enforcement of the vast majority of environmental statutes for the nation, raised substantial concerns with the EA conducted here and in particular Congestion Pricing's

impact on environmental justice communities.  While the EPA may have briefly emailed and "acknowledged the improvements" in the Final EA—in a curious process devoid of the required public scrutiny—that missive cannot cure the lack of sufficient review conducted and the inadequate mitigation measures committed.  There is no doubt that Congestion Pricing will have a significant and lasting impact on the quality of the human environment.

To put the scale of Congestion Pricing in its proper context, on a single average weekday in 2019, according to Defendants' own statistics, 1,856,000 cars enter the Manhattan Central Business District ("CBD") and 7,665,000 total people enter and exit the CBD.  AR 29 at 1-13.[1] Congestion Pricing affects all of these individuals, not to mention the millions residing or working in areas that will be impacted by the noise and air pollution from inevitable traffic diversion. Perhaps recognizing this, in early 2018 then-Governor Andrew Cuomo's "Fix NYC Advisory Panel" considered implementing congestion pricing and concluded that a comprehensive program would require the "completion of an Environmental Impact Statement."[2]  Yet, Defendants, straining credulity, just several years later somehow self-servingly characterized Congestion Pricing not as having a "significant impact on the human environment," but instead as "primarily [] operational changes" with "very little physical effect on the existing environment."  AR 29 at ES-4.  Defendants therefore posited that an EA—a "rough cut, low budget EIS" on a much shorter timeframe—was the appropriate analytical tool to review Congestion Pricing.  Such a seismic shift to City travel and its communities cannot be so readily and cavalierly minimized.

---

[1] "AR" cites are to the Administrative Record filed in this action on February 27, 2024 (ECF 41-1).

[2] *See* HNTB, *Fix NYC Advisory Panel Report*, at 5 (Jan. 19, 2018), https://www.hntb.com/fix-nyc-report/.  (A copy of the "Fix NYC Advisory Panel Report" is annexed to the Declaration of Alan M. Klinger ("Klinger Decl."), dated March 18, 2024, as Exhibit "2".)

The result of the EA was, predictably, consistent with Defendants' reason for avoiding an EIS: the expeditious review and implementation of the preordained Congestion Pricing construct. Defendants did not want to wait the years an EIS would require to begin socking away revenue for a budget-strapped Metropolitan Transportation Authority ("MTA"), an agency long criticized for its financial mismanagement.[3]    Following the script, the FHWA, in coordination with the MTA, the New York State Department of Transportation ("NYSDOT"), and the New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors"), issued a "Finding of No Significant Impact" ("FONSI") for Congestion Pricing, contending after a short 10-month EA review that the program would not significantly impact the human environment, absolving the FHWA of the responsibility to undertake a more comprehensive study.  The decision was reached after a process that the FHWA and MTA readily acknowledge was "fast-tracked" and on an "extraordinarily expedited and aggressive environmental review timeframe."[4]   The hurried and truncated decision-making is reflected in an EA that failed to take the requisite "hard look" that federal law mandates.

The reason the FHWA and the Project Sponsors sought to avoid a more intensive EIS study is not difficult to discern.  In summarily eschewing any analysis of the limited alternatives identified in the EA other than a "no action" alternative, and failing to even consider options publicly discussed for years (*i.e.,* a phased-in program and dynamic pricing), Defendants made plain that their overriding concern is raising revenue, not in minimizing congestion or protecting the environment.  An expensive, across-the-board toll results in faster and more cash for the MTA,

---

[3]    *E.g.,* James Barron, *The M.T.A.'s Money Woes*, N.Y. Times, August 17, 2022, https://www.nytimes.com/2022/08/17/nyregion/the-mtas-money-woes.html.

[4] Press Release, MTA, "Fed. Approval Granted to Kick of the Env't Assessment & Publ. Outreach Process for Nation's First Cent. Bu. Dis. Tolling Program (Aug. 20, 2021), https://new.mta.info/press-release/federal-approval-granted-kick-environmental-assessment-and-public-outreach-process.

an agency coveting an influx of revenue.  As the then-Chief Development Officer (now Chair and CEO), Janno Lieber stated, the "fast-tracked" environmental process would "get the MTA moving forward towards being able to realize this source of funds."[5]  More recently, when Congestion Pricing was delayed, Lieber admitted hoping to collect revenue earlier than the current June 2024 anticipated implementation date, stating flatly, "[w]e need that money."[6]  Under Congestion Pricing, the MTA and TBTA stand to collect $1 billion in annual revenue and $15 billion towards the MTA's 2020-2024 Capital Plan.[7]

Defendants will undoubtedly assert, as they have publicly, that one of the objectives of the MTA Reform and Traffic Mobility Act (the "Traffic Mobility Act"), the enabling statute creating the Congestion Pricing program, is to generate sufficient annual net revenues to fund the MTA capital program.  That may be so, but the challenged EA at issue in this litigation is an *environmental* assessment, not a *revenue* assessment.  Because of the desire to get to a revenue-rich finish line, Defendants worked backwards to ensure approval, disregarding significant impacts of Congestion Pricing that would have required a lengthier EIS process: (i) certain areas, such as Battery Park City, were omitted from meaningful discussion and study; (ii) credible alternatives in the EA were not analyzed; (iii) inadequate environmental testing was done, particularly in communities with environmental justice concerns that already have some of the highest pollution and chronic disease burdens; (iv) old and unreliable pre-COVID data that fails to account for

---

[5] "MTA Board Meeting Minutes," Master page 15 of 89, Mar. 17, 2021, https://new.mta.info/document/33901.

[6] Erik Bascome, *NYC Congestion Pricing Pushed Back to 2024, Costing $250M in Revenue, MTA Says*, New York City Council (Feb. 27, 2023), https://council.nyc.gov/joseph-borelli/2023/02/27/nyc-congestion-pricing-pushed-back-to-2024-costing-250m-in-revenue-mta-says/.

[7] Recent estimates suggest that annual number to be collected by the MTA is likely closer to *$3.4* billion in the first year alone (making a phased-in option, granting additional exemptions and discounts, or a more limited initial program even more feasible).  Josh Gottheimer, *The Impact of MTA's Congestion Tax on NJ Families* at 2, 3, 7 (2024), https://d12t4t5x3vyizu.cloudfront.net/gottheimer.house.gov/uploads/2024/01/Congestion-Tax-Report-The-Impact-of-MTAs-Congestion-Tax-on-NJ-Families-Gottheimer.pdf.

changes in working and commuting was used to analyze the program's impact, despite the availability of more recent data demonstrating such changes; (v) mitigation measures proposed to alleviate adverse environmental impacts were hurriedly included without analysis; and (vi) the public was denied meaningful engagement in the process.

Moreover, in the haste to approve the project, the EA assessed a range of seven widely varying schemes, none of which were recommended as the final tolling construct by the Traffic Mobility Review Board ("TMRB") and approved by the MTA. The Executive Summary of the EA instructs that the "*most important factor* in the magnitude and distribution of effects from the Project is the toll rate." AR 29 at ES-13 (emphasis added). Yet, that toll rate was unknown to the FHWA at the time of its analysis, and the TMRB recommendation contains many additional components—hours, exemptions, credits, and discounts—that have never been subject to environmental review or public comment, either individually or as a comprehensive tolling plan. In a proposal of this magnitude, getting to the finish line without an EIS in order to begin collecting revenue betrays the core purpose of NEPA—to ensure deliberate consideration is given prior to undertaking major federal action.

Relieving congestion, the original rationale for congestion pricing, should have been the primary goal. Yet, the regressive—and, for many, draconian—$15 tax on New York City residents and commuters (which may increase over time) is a wholly ill-fitting solution to solving New York City's congestion. Recent estimates suggest—and the MTA has confirmed—that between 40-50% of all midtown traffic comes from Uber and Lyft vehicles, vehicles that will be charged far less ($2.50) under the TMRB tolling program. MTA could have focused on these app-based services (not to mention better fiscal management or millions lost in fare evasions), rather than burdening

families, like Plaintiffs, who need to travel to New York City for work, school, medical appointments, and to see families and friends.

The lack of serious analysis in the EA or FONSI of the geographic areas in which many of the Plaintiffs live, Battery Park City and the residential Lower East Side, is a microcosm of Defendants' failure to take a true "hard look" at the significant impact of Congestion Pricing. Battery Park City is a family-laden community in New York City that stands to suffer considerably from Congestion Pricing. While included within the definition of the "Central Business District" under the program, Battery Park City and the Lower East Side are not commercial business districts; they are primarily residential neighborhoods. Given the narrow width of all of Lower Manhattan, and its proximity to critical exempted thoroughfares, specifically the West Street/West Side Highway and FDR Drive, Congestion Pricing will likely lead to a significant diversion of traffic to Battery Park City and its neighboring Lower East Side communities. Battery Park City is cabined in from the rest of New York City by the West Side Highway; residents cannot leave the neighborhood without using or crossing the exempted thoroughfare. For residents of Battery Park City, some 25% of whom own and park their cars downtown, trips away from home could result in $15 in increased tolls.[8] There will likely be more congestion, reduced air quality, and unsafe streets for pedestrians in the area, which is densely populated with public, private, and nursery schools. Yet, aside from the cursory and inconsistent modeling of a few intersections along West Street, Battery Park City was virtually ignored.

---

[8] There remains unresolved confusion as to whether *every* trip outside of Battery Park City will require residents to pay the $15 toll. The Congestion Pricing toll is charged when entering and exiting the CBD and the CBD does not include "the West Side Highway/Route 9A, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Cary Tunnel connected to West Street." It therefore stands to reason that Battery Park City residents would be charged each time they use the exempted thoroughfare. That said, the FAQs to the EA suggest that a vehicle would not be charged a toll for remaining in the CBD if it uses one of the "excluded roadways," such as the West Side Highway, "before re-entering South of 60th Street in Manhattan." But the explanation comes in the specific context of parking a vehicle in the CBD, and the language is hardly a model of clarity. Plaintiffs have sought clarification from MTA counsel on this point.

Battery Park City also stands in close proximity to a number of environmental justice communities in downtown Manhattan, including the Lower East Side, Chinatown, and residential neighborhoods alongside the FDR Drive (including Stuyvesant Town, Peter Cooper Village, and Waterside Plaza), that will suffer considerably from the inevitable environmental consequences of an estimated 26% increase in traffic under Congestion Pricing on the highway.  The EA acknowledges that Congestion Pricing will have disproportionately adverse impacts on environmental justice communities, including where Plaintiffs live in the Lower East Side, and in Staten Island, the Bronx, and New Jersey, but does not sufficiently analyze them and includes precious few measures to mitigate the impacts.  Without any details of these measures, it is unclear how Defendants could have concluded that Congestion Pricing will have no significant environmental impact.  If the Project Sponsors did not even know what the specific mitigation measures would be—let alone their efficacy— the impacts cannot be said to have been mitigated.

Defendants have stressed the "4,000-page" EA performed by the Program Sponsors as evidence that a sufficient environmental review was conducted.  Yet, even if the total number of pages was 4,000 (and the number is thousands less without appendices) and even if the quantity of pages were a fair proxy for the quality of environmental analysis—and, of course, it is not— one would look in vain in the EA for any meaningful analysis of the impact of Congestion Pricing on the residents of Battery Park City.  Simply, Defendants did not take a "hard look" at the impact on the neighborhood of Battery Park City.  That failure reflects an arbitrary and capricious decision, subject to reversal and remand for a full EIS.

Two final points merit mentioning at the outset.  First, for years, Defendants and other supporters of Congestion Pricing have heralded London's congestion program as evidence that New York City need implement a similar project.  Yet, by most accounts, London is more

congested now than ever, in large part because of the significant rise of ride-share vehicles such as Uber and Lyft and expansion of bus and bike lanes (as is precisely the case in New York City).[9]

Second, even if London's program were an effective model to emulate (and, unlike Defendants' program, London allows congestion zone residents a 90% discount), London and other cities made sure to implement public transit improvements *before* congestion pricing went into effect to ensure that the system could accommodate a major shift in travel behavior. That was the original plan in New York City. Indeed, the very first recommendation in the 2018 "Fix NYC Advisory Panel Report," the most recent comprehensive analysis that studied congestion in New York immediately before the Legislature's Traffic Mobility Act, was that the project must have a "phased approach." The Panel explained that it had "learned lessons from international examples that strongly support first investing in public transportation alternatives before implementing a zero-pricing plan to reduce congestion" in order "to accommodate those who may choose to leave their vehicles at home."[10] Yet, no material investing or improvements have been made to mass transit in advance of Congestion Pricing. Quite the opposite, as the City attempts to recover from the COVID-19 pandemic, the public transit system in New York City, already inefficient and unreliable, now calls for National Guard and State Police Officers to ensure basic public safety (recent shootings and violence in the subways have further eroded confidence in mass transit). Without the proper initial investment in transit, drivers will be unable or unwilling to change their behavior and Congestion Pricing is likely to just shift congestion to the outer-boroughs and Lower Manhattan communities, rather than eliminate it.

---

[9] Joe Borelli, *London Isn't a Winning Example of Congestion Pricing – It's a Warning*, N.Y. Post (Feb. 14, 2024), https://nypost.com/2024/02/14/opinion/london-isnt-a-winning-example-of-congestion-pricing-its-a-warning/

[10] HNTB, Fix NYC Advisory Panel Rep., *supra* n. 2, at 4.

Congestion Pricing has been contemplated for decades.  After all this time, it is hard to imagine that this current half-baked iteration, imposing, for many, crippling daily fees and increased air pollution in New York's and New Jersey's most economically vulnerable communities, failed to make necessary improvements to mass transit before implementation and neglected to fully evaluate the best way to accomplish the supposed premise of the program – reducing congestion.  That is the inevitable result of a process far more focused on MTA revenue than on reducing congestion and improving the lives of *all* New Yorkers.

## **FACTUAL BACKGROUND**

**A.    New York Attempts To Implement Congestion Pricing—The First Of Its Kind In U.S. History**

In 1991, Congress established the Value Pricing Pilot Program ("VPPP") as a pilot program for congestion pricing.  The VPPP, by supporting programs throughout the country, was intended to demonstrate whether, and to what extent, roadway congestion could be reduced through congestion pricing strategies.  While the VPPP no longer actively solicits projects or dispenses federal funds, FHWA must still approve tolling schemes proposed by state and local governments that would toll existing federal-aid highway lanes before they can be implemented.[11]

In recent years, New York City has attempted multiple times, without success, to implement congestion pricing.  In 2007, then-Mayor Michael Bloomberg attempted to implement congestion pricing in New York through a program called "PlaNYC: A Greener, Greater New York."[12]  PlaNYC sought to implement an $8 toll for cars traveling to Manhattan between 6:00

---

[11] *Id.*; FHWA, U.S. Dep't of Transp., Value Pricing Program (Aug. 22, 2022), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/index.htm; FHWA, U.S. Dep't of Transp., Frequently Asked Questions (Feb. 11, 2022), https://ops.fhwa.dot.gov/congestionpricing/faq/index.htm#faq_05_08.

[12] Jen Chung, *Mayor Bloomberg Says Congestion Pricing and Likes It*, Gothamist (Apr. 23. 2007), https://gothamist.com/news/mayor-bloomberg-says-congestion-pricing-and-likes-it.

A.M. and 6:00 P.M. on weekdays to reduce congestion.[13]  However, the program was heavily criticized based on its faulty assumption that more riders could simply switch to public transit to avoid paying the toll.[14]  Due to the lack of public support, state assembly leaders blocked the project in 2008.[15]

In October 2017, then-Governor Andrew Cuomo tasked a "Fix NYC Advisory Panel" with developing recommendations to address congestion in Manhattan and identify sources of revenue to fix the ailing subway system.[16]  In January 2018, this panel recommended a phased-in approach, concluding that, as was the case in London, "the MTA must first invest in public transportation alternatives and make improvements in the subway system before implementing a zone pricing plan to reduce congestion."[17]  The report explicitly contemplated that this would require the "completion of an Environmental Impact Statement (EIS)."[18]  (The failure to produce an EIS, changed conditions post-pandemic, and the lack of investment and public confidence in today's mass transit system have led Governor Cuomo to now call on the MTA to "hit the brakes" on Congestion Pricing, despite originally signing it into law).[19]

Fix NYC's sensible approach to congestion pricing was disrupted when, in April 2019, the New York State Legislature passed the Traffic Mobility Act.  The Traffic Mobility Act authorized

---

[13] *Id.*; Laura Bliss, *New York City Could Finally Try Congestion Pricing*, Bloomberg (Aug. 16, 2017, 7:00 AM), https://www.bloomberg.com/news/articles/2017-08-16/new-york-city-has-a-new-congestion-pricing-plan.

[14] *See* William Neuman, *Some Subways Found Packed Past Capacity*, N.Y. Times, June 26, 2007, https://www.nytimes.com/2007/06/26/nyregion/26mta.html.

[15] Nicholas Confessore, *$8 Traffic Fee for Manhattan Gets Nowhere*, N.Y. Times, Apr. 8, 2008, https://www.nytimes.com/2008/04/08/nyregion/08congest.html.

[16] *See* HNTB, Fix NYC Advisory Panel Rep., *supra* n. 2.

[17] *Id.* at 3 (emphasis added).

[18] *Id.* at 5.

[19] Andrew Cuomo, *Yes, I approved congestion pricing but it's time to hit the brakes*, N.Y. Post (March 11, 2024, 10:21 PM), https://nypost.com/2024/03/11/opinion/andrew-cuomo-yes-i-approved-congestion-pricing-but-its-time-to-hit-the-brakes/.

the Triborough Bridge and Tunnel Authority ("TBTA") to charge vehicles entering or remaining in Manhattan's CBD a toll that "at minimum, ensure[s] annual revenues and fees collected under such program . . . fund fifteen billion dollars for . . . the 2020 to 2024 MTA capital program," as well as any successor programs, while reducing traffic congestion within the CBD.  N.Y. Veh. & Traf. L. § 1704-a(1) (2021).  The CBD generally includes the entirety of Manhattan south of and inclusive of 60th Street, with a few key exceptions, including the FDR Drive, the West Side Highway (in the CBD, much of it is West Street), and the Battery Park Underpass, which all lead to or surround Battery Park City.  N.Y. Veh. & Traf. L. § 1704(2).

The Traffic Mobility Act imposed just two requirements: (1) an exemption for qualifying vehicles transporting persons with disabilities and authorized emergency vehicles; and (2) tolling passenger vehicles no more than once per day.  N.Y. Veh. & Traf. L. § 1704-a(1), (2).  In addition, residents of the CBD earning less than $60,000 would receive a tax credit equal to the number of tolls paid.  N.Y. Tax L. § 606(jjj) (2014).  The remaining details of the congestion pricing program were completely relegated to the TBTA and its appointed TMRB.  N.Y. Veh. & Traf. L. § 1704-a(3), (4).  Based on the TMRB's recommendations, the TBTA would set the toll price for different types of vehicles, the time period when the toll would be operative, credits to cars that access the CBD through bridges and tunnels and already pay a toll, discounts to applicable vehicles and drivers, how to address for-hire vehicles (*i.e.*, taxis and ride-share vehicles), and exemptions from the toll.  *See id.*; AR 29 at 2-30 to 2-34.

Following the Traffic Mobility Act's enactment, the Project Sponsors began developing proposals for Congestion Pricing and submitted an Expression of Interest to the FHWA, seeking tolling authority under the VPPP to implement the program.  AR 29 at 0-1.  To approve the

program under the VPPP, FHWA had to perform an environmental review under NEPA.[20]   23
C.F.R. § 771.109 (2023).

### B.    NEPA's Role In Ensuring Federal Agencies Give Proper Weight To Environmental Consequences Of Proposed Actions

In 1970, Congress passed NEPA "to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process."  40 C.F.R. § 1500.1(a) (2023).  NEPA fulfills this purpose by: (1) requiring agencies to take a hard look at the environmental impacts of an action before it occurs; and (2) providing the public with a "role in both the decision-making process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989).

Under NEPA, the lead agency funding, authorizing, or implementing a proposed action— here, the FHWA—must conduct and prepare an EA analyzing the proposed action's direct, indirect, and cumulative impacts to determine whether or not the action would "significantly affect[] the quality of the human environment."  42 U.S.C. § 4332(2)(C).  If the lead agency finds that the action will significantly affect the quality of the human environment, the agency must prepare an EIS.  40 C.F.R. § 1501.5(c)(1); 23 C.F.R. § 771.119(i).  An EIS requires a detailed and rigorous assessment of the proposed action, and takes an average of four to five years to complete.[21]  *See* 42 U.S.C. § 4332(2)(C).  If the lead agency finds that the proposed action will have no significant impact on the environment, it may issue a Finding of No Significant Impact ("FONSI").  40 C.F.R. § 1501.6.  If the decision is a "close call," the agency should prepare an EIS.  *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 13 (2d Cir. 1997).  Only after a determination

---

[20] To date, FHWA has not approved the congestion pricing scheme pursuant to the VPPP.

[21] Exec. Off. of the Pres. Council on Env't Quality, *EIS Timelines (2010-2018)*, June 12, 2020, available at https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timeline_Report_2020-6-12.pdf.

that none of a proposed action's direct, indirect, or cumulative effects has a substantial possibility to significantly affect the quality of the human environment—accounting for planned mitigation—may a federal agency be relieved of its duty to prepare an in-depth EIS and instead issue a FONSI.

Since January 1, 2020, the FHWA has been required to prepare more than 20 EISs.[22] Examples include the FHWA preparing an EIS for the Chesapeake Bay Crossing Study—which sought to decrease congestion at the Bay Bridge in Maryland by utilizing existing roadway infrastructure[23]—and the Hood River-White Salmon Interstate Bridge Replacement Project, which involved replacing an old bridge and funding it through installation of electric tolling.[24]   The FHWA has also required a full EIS for at least eight projects in New York State over the past ten years, each significantly less complex or far reaching than the Congestion Pricing plan at issue here.[25]   To widen the Van Wyck Expressway in 2019 *by one lane in each direction*, FHWA required an EIS.[26]   The impact of these projects pale in comparison to the impact Congestion Pricing would have on New York and the broader tri-state area.

### C.        The "Fast Track" Approval Of Congestion Pricing

Uncertainty over the scope of Congestion Pricing, the proper process for review, and changes in political leadership defined a project characterized by fits and starts from 2019 to 2021.

---

[22] *See* EPA, *NEPA: Environmental Impact Statement (EIS) Database*, https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/search/ (last visited Feb. 28, 2024). Data were filtered by Agency ("FHWA") and Federal Registration Publication Date (Jan. 1, 2020 to Jan. 1, 2024). Repeating EIS records and supplements were discarded from the count, as well as any projects that consulted the FHWA but did not list the FHWA as the lead agency.

[23] EPA, *EIS Database*, FHWA, Final EIS, Chesapeake Bay Crossing Study:  Tier 1 NEPA at 6-11 (Mar. 2021), https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=323312.

[24] EPA, *EIS Database*, FHWA, Suppl. Draft EIS, Hood River – White Salmon Interstate Bridge Replacement Project at 4-11 (Nov. 2020), https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=314171.

[25] *See* EPA, *EIS Database*, https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/search/ (last visited Mar. 11, 2024). Data were filtered by Agency ("FHWA") and Federal Registration Publication Date (Jan. 1, 2014 to Jan. 1, 2024). Repeating EIS records and supplements were discarded from the count, as well as any projects that consulted the FHWA but did not list the FHWA as the lead agency.

[26] *See* EPA, *EIS Database*, FHWA, Final EIS, Van Wyck Expressway Capacity and Access Improvements to JFK Airport Project (Aug. 30, 2019), https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=279281.

Despite the MTA participating in over a dozen meetings with the FHWA under the previous administration since the Traffic Mobility Act passed in April 2019, the program's implementation was continually delayed because the FHWA "repeatedly failed to provide the MTA with guidance as to" whether an environmental assessment or an EIS was required.[27]  *See* 23 C.F.R. § 771.115. Nearly two years later, in February 2021, CEO Janno Lieber indicated that the FHWA is "going to fast-track our environmental process."[28]  The next month, Lieber again confirmed the "good news" that the FHWA "will be fast tracking the MTA's environmental process, which will certainly get the MTA moving forward towards being able to realize this source of funds and instituting [congestion pricing]."[29]  On March 30, 2021, the FHWA authorized the Project Sponsors to proceed with a NEPA Class III action, which called for the creation of an EA to determine whether the congestion pricing plan would have a significant environmental affect.[30] AR 1031; *see also* 23 C.F.R. § 771.115(c).  In its authorization letter, the FHWA emphasized it would "expedite its efforts wherever possible." AR 1031 at 2.

### D.      The Draft EA – A Process Driven By Revenue And Rush

On August 10, 2022, the Project Sponsors published the Draft EA.  The Draft EA made clear that the Project Sponsors' primary goal was to generate $15 billion for the MTA.  *See* AR 36.  The stated purpose of the project in the Draft EA was to "reduce traffic congestion in the Manhattan CBD *in a manner that will generate revenue for future transportation improvements*."

---

[27] Erik Bascome, *NYC Congestion Pricing May Be Pushed Forward Under Biden*, Silive (Feb. 26, 2021, 1:09 PM), https://www.silive.com/news/2021/02/nyc-congestion-pricing-may-be-pushed-forward-under-biden.html.

[28] Alissa Walker, *Sec'y Pete Is Already Coming Through for New York City on Congestion Pricing* Curbed (Feb. 23, 2021), https://www.curbed.com/2021/02/congestion-pricing-nyc-approval-pete-buttigieg.html.

[29] MTA, MTA Board Meeting on March 17, 2021 Minutes, in MTA Board Action Items, at 15 (Mar. 17, 2021), http://new.mta.info/document/33901.

[30] If the FHWA concluded that the congestion pricing program significantly affected the environment, it would have to prepare a more in-depth EIS.  *See* 23 C.F.R. § 771.115(a).

AR 36 at ES-5 (emphasis added).  It specified that the MTA's Congestion Pricing was intended to: (1) reduce daily vehicle miles traveled ("VMT") in the CBD by at least 5%; (2) reduce the number of vehicles entering the CBD by at least 10%; (3) create a funding source capable of raising $15 billion for the MTA Capital Project; and (4) establish a tolling program consistent with the Traffic Mobility Act.[31]  AR 36 at ES-6.

However, the Draft EA did not analyze the environmental impact of any particular congestion pricing program with a specific price, credits, discounts, and exemptions.  Instead, the Draft EA purported to analyze the environmental effect of a number of tolling scenarios—which all differed in price, structure, and credits/exemptions—in comparison to a single "no-action" alternative (*i.e.*, not implementing the program).  *See* AR 36 at ES-7, ES-11.  Other alternative programs to comply with the Traffic Mobility Act were largely taken from a 2008 New York City traffic congestion study, and proposals such as high occupancy toll lanes, mandatory carpooling, and parking pricing strategies were eliminated solely because they could not individually solve one of the Program's goals—funding $15 billion to the MTA, despite the fact that they would have reduced traffic congestion.  *See* AR 36 at ES-8 to ES-9.  The FHWA also failed to consider whether a combination of any of the alternatives could meet its goals.  *See id.*

Based on the scenarios, the FHWA determined that although the congestion pricing program would decrease harmful emissions as a whole in Manhattan, the redirected traffic from drivers attempting to avoid the toll would result in added congestion and increases in every category of pollutant (six categories of mesoscale pollutants and nine categories of MSAT pollutants) in the Bronx, Staten Island, and Bergen County, in some cases for the next 20 years.

---

[31] The EA did not include the fourth Project goal as one of these objectives—"Establish a tolling program consistent with the purposes underlying the New York State legislation."  AR 29 at 2-5.

*See* AR 36 at 10-21 to 10-35.  Moreover, Battery Park City received scant mention or analysis throughout the EA, and, aside from a few intersections analyzed (four of 102 intersections reviewed), its metrics were alternatively grouped with all of Manhattan and Lower Manhattan despite the fact that the FDR Drive and West Street are both exempted thoroughfares bordering Battery Park City, likely bringing diverted traffic and resulting pollution similar to economic justice communities in Queens and the Lower East Side, where several Plaintiffs reside.  *See generally* AR 36.  Moreover, the FHWA provided but 30 days to comment on this highly complex document, which was subsequently extended by a mere 14 days despite requests for substantially longer extensions.  *See* ECF 40 ¶ 11.  Despite the tight timeframe, the FHWA and the Project Sponsors received more 69,000 letters, largely in opposition to the program.  *See* ECF 49 ¶ 12.

One of the main criticisms of the Draft EA came from sister federal agency, the EPA, which undoubtedly has more experience and expertise in environmental impacts than any of the Project Sponsors.  The EPA criticized the Draft EA for insufficient data surrounding disproportionate air quality impacts.  AR 20 at 18C-467.  The EPA "remain[ed] concerned" about the potential for adverse air quality impacts in locations such as the Bronx, Staten Island, and Bergen County, where traffic congestion will likely worsen due to Congestion Pricing and concluded that benefits and burdens of Congestion Pricing are unevenly distributed, "with some costs falling disproportionately on overburdened communities."  AR 20 at 18C-467, 18C-471.  In 12 detailed pages, the EPA recommended additional measures for the Project Sponsors to take prior to finalizing the EA.  The actions included (i) a "more expansive microscale screening analysis" for all counties studied; (ii) an analysis of the air quality impact on environmental justice communities near traffic diversion areas (particularly since air quality was evaluated only at a county level); (iii) consideration of existing health disparities in New York City, including asthma in

17

communities with environmental justice concerns; (iv) a partnership with internal or external partners with expertise on the socioeconomic impacts of tolling; and (v) using standardized data to reflect the impact of the COVID-19 pandemic because the EPA was "concerned that the Draft EA relies on potentially dated and inaccurate data."  AR 20 at 18C-469 to 18C-472.  Without these (and other) additional analyses performed, the EPA was "unable to confirm" that the environmental impacts would be "less than significant without appropriate mitigation" and suggested concrete mitigation should be identified "rather than rely[ing] on post-implementation monitoring to inform mitigation decisions."  AR 20 at 18C-467.

**E.    The Preordained Result—The FHWA Issues The EA And FONSI Without Requiring The Project Sponsors To Prepare An EIS.**

On May 12, 2023, the FHWA published the EA, along with a Draft FONSI.  ECF 49 ¶ 74. In line with the promised fast tracking of NEPA's environmental review process, the Draft FONSI summarily concluded that the "Proposed Action . . . will have no significant impact on the human or natural environment," AR 865 at DOT_0040590, absolving the Project Sponsors of their duty under NEPA to prepare an EIS to fully analyze possible environmental harms associated with the program.  23 C.F.R. § 771.119(i).  The conclusion of "no significant impact" was reached in the face of significant adverse impacts and without knowing any of the core elements of the ultimate tolling structure—the toll price, peak hours, exemptions, credits, and discounts for drivers.

The EA remained largely unchanged from the Draft EA.  AR 29 at 0-2 to 0-4 (listing changes and stating that "[m]ost of the text in the Final EA remains unchanged from the August 2022 EA").  Although the Project Sponsors added some mitigation measures, they did not include any meaningful mitigation for Battery Park City, Staten Island, or New Jersey, nor any individualized analysis of the listed mitigation.  Indeed, despite adding analysis, the EA did not add even a single mention of Battery Park City.  The lack of significant change to the EA, in the

face of clear and detailed concerns raised by the EPA and despite the 69,000 comment letters submitted, is telling.  While a brief email from the EPA to the Project Sponsors indicating that the agency acknowledged certain "improvements" in the EA was sent—coming only after critics of Congestion Pricing cited to the EPA's earlier devastating critique—the email reflects no analysis of the deficiencies the EPA had previously raised (*supra* at 17-18) nor, significantly, was the email subject to public information or scrutiny, key aspects of the NEPA process.  *See* AR 1229.

In an added section titled "Regional and Place-Based Mitigation Measures," the EA committed to limited mitigation measures, including establishing an asthma center in the Bronx, installing roadside vegetation, implementing electric truck charging infrastructure (though no discount is provided for the use of electric vehicles), replacing transport refrigeration units at Hunts Point Produce Market, and tolling vehicles traveling northbound on the FDR Drive that exit at East Houston Street and then travel southbound on the FDR Drive.  AR 29 at 17-65; AR 361 at 15. Reflecting the sparse nature of these actions was the paltry amount of funding set aside for these mitigation measures: $155 million was committed over five years from the $15 billion expected to be received by the MTA from Congestion Pricing.  AR 29 at 17-65.

Many of these mitigation measures were utterly vague and open-ended; for example, the "plan" to install park greenspace and roadside vegetation each stated that "[t]he Project Sponsors will work with relevant local and state agencies to assess the" availability of potential locations for these mitigation measures.  AR 29 at 17-66.[32]  And the only mitigation measure arguably aiding Battery Park City involved tolling some additional vehicles on the FDR Drive, which might reduce some of the added congestion, was entirely unsupported by any data or analysis as to how or to

---

[32] The EA failed to account for the fact that in a parallel project that did require an EIS, the "Coastal Resiliency Project," the City uprooted nearly 1,000 healthy trees along the FDR Drive and is installing large concrete walls, "de-greening" the entire area.

what extent this would mitigate the disproportionate impacts in that area.  Indeed, it is entirely unclear how the hastily prepared, vague and unsupported "mitigation" measures could be said to mitigate environmental impacts at all given that no specifics, let alone analysis, was conducted as to their efficacy.

The Draft FONSI was made available for public review for only 30 days.  On June 12, 2023, Plaintiff Elizabeth Chan, on behalf of her then-named organization, Families for Battery Park City, sent a comment letter raising the following issues, among others:

- Battery Park City was omitted from meaningful analysis.  The Battery Park City Community, with a quarter of its population under 17 years of age (and also a large population of elderly residents) directly abuts West Street, which has schools, parks, playgrounds, residences, offices, stores, and a bike path directly adjacent to it. Congestion Pricing would increase traffic congestion on West Street as well as the FDR Drive, which poses serious traffic, public safety, and health concerns.

- No environmental analysis was conducted as to the impact of increased traffic on the exempted thoroughfares on the Lower Manhattan community.

- No analysis was done to consider the significant financial hardship on those living in Battery Park City, that does not have a subway in its 92-acres and whose only roadways in and out are via the West Side Highway crossing.

- No analysis was done with respect to the many schools in Lower Manhattan, including the environmental impact as well as the financial impact on the many Battery Park City and Lower Manhattan families who drive their children to and from school.

Plaintiffs' letter was met with silence.[33]

The FHWA published the FONSI without any notable changes on June 23, 2023.  *See* ECF 49 ¶ 79.  While recognizing "potential adverse effect[s]" for air quality, subway ridership, increased congestion due to traffic diversions on exempted thoroughfares, and that "some [environmental justice] communities that are already overburdened by pre-existing air pollution

---

[33] The letter was both emailed and mailed to officials at the FHWA, the EPA, the Federal Transit Administration, the MTA, the NYSDOT, and the NYCDOT.  For some reason, the submission was not included in the Administrative Record though it should have been and is annexed as Exhibit "1" to the Declaration of Elizabeth Chan, dated March 18, 2024 ("Chan Decl."), submitted alongside this Memorandum of Law.  The Declaration also details the impact of Congestion Pricing on Plaintiffs and their stymied attempts to engage in the NEPA process.

and chronic diseases could see an adverse effect as a result of increased traffic," the FONSI somehow concluded that Congestion Pricing would have "no significant impact on the human or natural environment." AR 361 at DOT_0000363, 4, 6-7, 12-14. It left as "Next Steps" the need to "define the CBD Tolling Program," by which the TMRB "will recommend to the TBTA Board the toll amounts and toll structure, such as crossing credits, discounts, and/or exemptions for existing tolls paid on bridges and tunnels." AR 361 at 25. It further left open how the "pricing structure could vary by time of day, day of week, and day of year and could be different for different types of vehicles." AR 361 at 25. Because the EA did not commit to any particular tolling price or structure, the FHWA indicated it would need to still "re-evaluate" the chosen rates and tolling structure in the future to determine whether a FONSI is still appropriate. AR 361 at 26.

F.     **The TMRB Issues Its Recommended Toll Price And Structure[34]**

On November 30, 2023, the TMRB released its recommended toll price and structure for the congestion pricing program ("TMRB Recommendation"). Of course, the recommended toll price and structure did not match any of the scenarios analyzed in the EA or FONSI, and had several considerable changes from any of the analyzed tolls. Despite these changes, the Project

---

[34] Defendants did not include the TMRB Recommendation in the Administrative Record. However, in NEPA cases, courts routinely look to critical evidence outside of the record because "NEPA imposes a duty on federal agencies to compile a comprehensive analysis of the potential environmental impacts of its proposed action, and review of whether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record." *Nat'l Audubon Soc.*, 132 F.3d at 14-15; *see also Suffolk Cnty. v. Sec'y of Interior*, 562 F.2d 1368, 1384 (2d Cir. 1977) (citations omitted) ("[I]n NEPA cases, by contrast, a primary function of the court is to ensure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored."). This includes information such as "events that transpired after the challenged action [that] 'bear upon the issues before [the court],'" particularly when such evidence "illuminates the original decision or shows 'that the Agency proceeded upon assumptions that were entirely fictional'" or without support. *Nio v. United States Dep't of Homeland Sec.*, 385 F. Supp. 3d 44, 61- 62 (D.D.C. 2019) (citations omitted). The TMRB Recommendation, which transpired after the challenged action, plainly illuminates the FHWA decision, bears squarely on the issues before the Court and shows that the agency proceeded upon faulty assumptions. It is attached to the Klinger Decl. as Exhibit "1".

21

Sponsors did not attempt to reevaluate the assumed environmental impacts, mitigation measures, or any other conclusions in the EA or the FONSI.

First, the recommended "peak" daytime toll rate applied for an extra two hours each day compared to the scenarios—from 5:00 AM to 9:00 PM on weekdays and 9:00 AM to 9:00 PM on weekends—capturing many more drivers and causing further diversion of traffic to surrounding areas.[35]  *See* TMRB Recommendation at 8.  In fact, the proposed peak hours exceed the peak hour schedules of the transit systems, like the Long Island Railroad and Metro-North, meant to accommodate these drivers.  Second, the TMRB applied a $15 toll for passenger vehicles and passenger-type vehicles, even though none of the scenarios analyzed that toll price.[36]  *Id.*  Third, the Recommendation provided a $5 crossing credit for those traveling through the Queens-Midtown, Hugh L. Carey, Lincoln, and Holland Tunnels, but declined to offer a similar credit to the George Washington and Verrazano Bridges.[37]  *Id.*  Fourth, the Recommendation charges for-hire-vehicles (*e.g.*, taxis and Ubers) per ride,[38] even though the EA never contemplated a per-ride toll.  *Id.*  The amount, times, locations of the toll pricing, and structure doubtless would impact the volume and location of traffic affected by the plan, especially on the exempted roadways surrounding areas like Battery Park City.  None of this has been analyzed or even acknowledged by the Project Sponsors, and yet the plan moves forward.

The recommendation of the TMRB was adopted by the MTA and TBTA on December 6, 2023.  ECF 49 ¶ 138.  Though the State Administrative Procedure Act requires the MTA and

---

[35] All other hours are considered "off-peak" and are priced 75% lower than the peak toll.

[36] To put the $15 toll in context, an individual resident in BPC or lower Manhattan traveling five times per week out of the CBD would face $75 per week, and over $3,000 per year in additional costs, a significant amount of after-tax dollars (on top of existing tolls and mileage costs).  And BPC residents are already some of the most highly taxed residents in New York State.

[37] These crossing credits only apply during peak toll hours.

[38] Taxis will be charged $1.25 per ride, while Ubers will be charged $2.50 per ride.

TBTA to conduct a public hearing and comment process before implementation, the process was a formality.    Hearings were limited to four days, including three consecutive business days, speakers were limited to two minutes of time to make their case, and the MTA publicly stated that the recommendation will largely remain the same (despite widespread public opposition).    The MTA has said that it expects congestion pricing to "go[] live in late spring,"[39] giving little credence to the various litigations brought against the program.    Ninety-five percent of the infrastructure for Congestion Pricing has been built as of last month,[40] and the MTA has already indicated—despite not having any of the components in place at the time of the EA analysis—that the recommendation cannot materially change because "[i]f you change one aspect . . . the whole thing starts to unravel or fall apart."[41]    While the MTA/TBTA hearing process, much like the NEPA process, pays lip service to public input and participation, in reality, the process was focused on expeditious approval of Congestion Pricing.

## **ARGUMENT**[42]

When reviewing the substance of an Agency's action under the APA (*i.e.*, the decision of whether to prepare an EIS), the Court should hold unlawful and set aside actions that are "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law."    5 U.S.C. § 706(2)(A); *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004).

---

[39] *See* MTA, MTA Board Meeting - 12/6/2023, YouTube (Dec. 6, 2023), https://www.youtube.com/live/0pfJ-S9myBk?si=4BnXippfzAml3OoC&t=6022 at, 1:40:22 (Allison C. de Cerreño (MTA Chief Operating Officer): "We're looking forward to going live in late spring.").

[40] Andrew Siff, *MTA Gives Congestion Pricing Update Ahead of First Public Hearing*, NBC (Feb. 28, 2024, 3:02 PM), https://www.nbcnewyork.com/traffic/transit-traffic/congestion-pricing-nyc-manhattan-how-it-works/5177568/.

[41] Stephen Nessen &Clayton Guse, *Don't Expect Changes to MTA's Congestion Pricing Even After Final Pub. Review*, Gothamist (Dec. 8, 2023), https://gothamist.com/news/changes-to-mtas-congestion-pricing-nyc-nj (quoting MTA Chair and CEO Janno Lieber).    Despite this proclamation, in the middle of the 60-day comment period on the TMRB recommendation, the MTA announced a limited program for individuals with disabilities to apply for a toll exemption, evidencing the inadequacy of the EA analysis, one of, Plaintiffs submit, many.

[42] Plaintiffs' Motion for Summary Judgment and accompanying Memorandum of Law is limited to Plaintiffs' NEPA claims.    *See* ECF 31 at 2 (deferring state and federal constitutional claims).

I.      **DEFENDANTS' DECISION TO ISSUE A FONSI WAS ARBITRARY AND CAPRICIOUS**

NEPA requires an agency to prepare an EIS if it will be undertaking a "major Federal action[]" that "significantly affect[s] the quality of the human environment."  42 U.S.C. § 4332(2)(C).   Regulations interpreting NEPA direct the agency to determine whether the proposed action is "significant" by analyzing both the potentially affected environment and degree of the effects of the action.  *See* 40 C.F.R. § 1501.3; *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001) (citations omitted) ("Whether there may be a significant effect on the environment requires consideration of two broad factors: 'context and intensity.')  Where the effects of a project are "likely to be highly controversial" and where the "possible effects on the human environment are highly uncertain or involve unique or unknown risks" the action is "significant" and an EIS is required.  40 C.F.R. §§ 1508.27(b)(4), (5).  A proposed action is "highly controversial" when there is a "substantial dispute [about] the size, nature, or effect" of the project. *Anderson v. Evans*, 371 F.3d 475, 489 (9th Cir. 2004) (citation omitted).

In *National Parks & Conservation Ass'n v. Babbit*, 241 F.3d at 731, the Park Service received *450* comments after publication of the Draft EA, 85% of which were in opposition, to a plan increasing cruise ships entering Glacier Bay National Park.  The Ninth Circuit found that this "outpouring of public protest," including comments that the EA's analysis was incomplete and mitigation uncertain, was sufficiently "controversial" to require an EIS.  Here, the outpouring of far more opposition—*69,000* public letters, largely in opposition—including comments about the completeness of the EA, the scope of the impact of Congestion Pricing, and the sufficiency of mitigation counsels for the same result.

An agency can avoid preparing an EIS only if it conducts an EA and makes a Finding of No Significant Impact that sufficiently explains why the proposed action will not have a significant

environmental impact.  40 C.F.R. § 1501.6(a); *New York v. Nuclear Regul. Comm'n,* 681 F.3d 471, 476 (D.C. Cir. 2012).  Importantly here, "to prevail on the claim that federal agencies were required to prepare an EIS, the plaintiffs need not demonstrate that significant effects *will* occur.  A showing that there are 'substantial questions whether a project may have a significant effect on the environment is sufficient.'" *Anderson*, 371 F.3d at 488 (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 2002)).  Moreover, as discussed in greater detail in Section II.D, where, as here, an agency finds significant effects but purports to avoid preparing an EIS by mitigation measures, those measures can only be sufficient "if the agency finds that the changes or safeguards in the project sufficiently reduce the [significant] impact to a minimum." *Town of Cave Creek v. FAA*, 325 F.3d 320, 327 (D.C. Cir. 2003) (citations omitted).

The implementation of Congestion Pricing in New York is a major, highly controversial action where the risks are highly uncertain.  At the very least, there is a substantial dispute about the effect of the tolling.  The EA and FONSI acknowledge that Congestion Pricing will: (1) increase congestion on highway segments, exempted thoroughfares, and intersections, resulting in increased delays and queues, AR 361 at 4; (2) increase ridership affected passenger flows with the potential for adverse effects at transit locations, *id.* at 6-7; (3) financially burden working class New Yorkers, *id*. at 8-9; (4) adversely impact air quality and significantly increase air pollution from traffic diversion in the outer-boroughs and Lower Manhattan, AR 361 at 10; AR 29 at 10-23 to 10-24; (5) disproportionately affect low income drivers in environmental justice areas who do not have a reasonable transit alternative, AR 361 at 12-13; and (6) disproportionately pollute certain environmental justice communities already overburdened by pre-existing air quality and chronic diseases, *id*. at 14.  There is not a "substantial question" as to whether Congestion Pricing will have a significant effect; it is a near certainty.  The fact that it took 868-pages to

describe the impact of Congestion Pricing in the Draft EA proves the point.  An EIS should have been conducted for a project of this magnitude.  Because FHWA's FONSI is "based primarily on its conclusory assertion—contradicted by the evidence in the record—that [congestion pricing] will have no significant environmental impact" the Court should grant summary judgment to Plaintiffs finding that an EIS should have been undertaken and vacate the EA and FONSI.  *Ctr. for Bio. Diversity v. Nat'l Highway Traffic Safety Admin*, 538 F.3d 1172, 1178, 1220 (9th Cir. 2008).

## II.   THE EA AND FONSI FAILED TO TAKE A HARD LOOK AT CONGESTION PRICING

Under NEPA, the agency is required to take a "hard look" at the environmental consequences before taking any major action, including the decision not to issue an EIS.  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).  The role of the reviewing court in determining whether the agency fulfilled its duty to take a "hard look" is to ensure that the "agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Id*; *see also Nat'l Audubon Soc.*, 132 F.3d, at 14.

In determining whether the agency took the requisite "hard look" at the proposed action, the court's inquiry "must 'be searching and careful.'"  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374, 378 (1989).  Though the court affords deference to an agency's decision regarding whether to prepare an EIS, to survive judicial review, the agency must: (1) "accurately identif[y] the relevant environmental concern," (2) take a "hard look at the problem in preparing its EA," (3) make a "convincing case for its finding of no significant impact," and (4) show that even if a significant impact will occur, "changes or safeguards in the project sufficiently reduce the impact to a minimum."  *Nuclear Regul. Comm'n*, 681 F.3d at 477 (citation omitted).  "The ordinary practice is to vacate unlawful agency action," *United Steel v. Mine Safety & Health Admin.*, 925

F.3d 1279, 1287 (D.C. Cir. 2019), and courts "routinely vacate agency actions taken in violation of NEPA." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021).

    **A.    Defendants' Issuance Of A FONSI Was Arbitrary And Capricious Because It Failed To Take A Hard Look At The Impacts Of Congestion Pricing On <u>Battery Park City</u>**

        The FHWA's issuance of a FONSI should be set aside as arbitrary and capricious because it failed to take a "hard look" at the impacts of Congestion Pricing on a crucial region of the Manhattan CBD: Battery Park City.  Courts should find agency action arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency's failure to analyze the "entire [] system" of a project and study traffic in particular geographic areas likely to be impacted violates NEPA.  *See N. Cascasdes Conservation Council v. U.S. Forest Serv.*, 98 F. Supp. 2d 1193, 1198 (W.D. Wash. 1999).  In *Northern Cascades Conservation Council*, 98 F. Supp. 3d at 1196, 1198, an EA was ruled "arbitrary and capricious" because it failed to consider the impact of increased off-road vehicle use on wildlife on adjacent trails likely to see an increase in traffic outside the project area.

        Here, it is obvious that the FHWA failed to adequately consider the impact of its proposed Congestion Pricing scheme on Battery Park City.  This conclusion is underscored by the fact that "Battery Park City" is only mentioned in the 958-page Final EA a total of *12 times*, and not once in the FONSI.  The FHWA paid scant attention to Battery Park City, despite the fact that it sits adjacent to two of the three exempted thoroughfares and holds the unique status of being entirely penned in and separated from the rest of Manhattan.  This dubious characteristic argues for a significant increase in traffic under Congestion Pricing.  *See* AR 29 at 17-79 to 17-80 (listing locations "already overburdened by pre-existing air pollution and chronic diseases" that will see

increased traffic diversions, including along the FDR Drive); *id.* at 4B-6; *see also id.* at ES-13 ("Higher toll rates would increase traffic diversions as drivers avoid the toll."). Recognizing the impact of excluded thoroughfares, the FHWA included a separate "highways" analysis and studied 10 separate highway corridors, including the lower FDR Drive. AR 29 at 4B-18-19. Indeed, the EA concluded that eight of the 10 highway corridors analyzed would experience higher traffic volumes, and concluded that the lower FDR Drive would require mitigation measures to decrease truck congestion. While the EA was particularly concerned with increased truck traffic and the attendant environmental impact on the FDR Drive, the lower West Street/West Side Highway did not receive the same treatment. The EA thus ignored this "important aspect" of Congestion Pricing. *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006).

One portion of the EA where Battery Park City is briefly mentioned is Chapter 5B, which analyzes the effects of implementing the CBD Tolling Alternative on neighborhood character based on the "traffic, transit, pedestrians and bicyclists, economic considerations, parklands, historic and cultural resources, visual resources, air quality, and noise analyses." AR 29 at 5B-1. At the outset, Chapter 5B readily acknowledges that "[c]hanges in travel patterns can affect neighborhood character by resulting in a notable change in vehicular and/or pedestrian traffic in an area or a related change in vehicle noise or air quality, if that change in turn affects a defining feature of the area's neighborhood character." *Id*. Chapter 5B details the "Affected Environment," describing the Manhattan CBD study area as consisting of three geographic regions: Lower Manhattan, Canal Street to 14th Street, and Midtown Manhattan north of 14th Street. *Id.* at 5B-3. "Lower Manhattan" is described as including the Battery Park City neighborhood. *Id.*

Even within this limited area where Battery Park City is discussed in the EA, the FHWA's characterization of Lower Manhattan demonstrates that the agency failed to take the "hard look"

required under NEPA.  Though the FHWA acknowledges that "[t]he area of Lower Manhattan south of Chambers Street has experienced a notable increase in residential use in recent decades, including conversion of prior office space into residential apartments," it states that "[l]and uses in the area include predominantly commercial and civic/government uses in the southernmost portions of Lower Manhattan."  AR 29 at 5B-4 to 5B-5.  However, Battery Park City is zoned for residential use and is widely regarded as a neighborhood enclave for families, replete with parks and schools.  This overly broad mischaracterization of Lower Manhattan supports the finding that that the FHWA failed to take a hard look at Battery Park City (and its surrounding communities).

Chapter 5B of the EA also concludes that Congestion Pricing would have no adverse effects on the entire Manhattan CBD.  *Id.* at 5B-17.  The FHWA goes on to provide a series of "explanation[s] for its decision that runs counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43, including that Congestion Pricing "would decrease vehicular trips within ***most parts*** of the Manhattan CBD," and that "[p]edestrian traffic in this area would likely increase due to mode shift away from automobiles."  AR 29 at 5B-17 (emphasis added).  That may be true as an aggregate statistic, but it defies logic to expect a decrease in traffic accumulation in Lower Manhattan along the exempted West Street, where drivers can get from the west side of Manhattan to the east side without a toll by driving "around the horn."[43]  While the EA cites a decrease in overall vehicle miles traveled under Congestion Pricing for the *entire* West Side Highway south of 60th Street, AR 29 at 4A-35, the review of that overly expansive area does not reflect a sufficiently hard look at residential Lower Manhattan.

---

[43] The phrase refers to a route down the FDR Drive and up the West Side Highway and vice-versa, used to avoid the narrow and often confusing combination of streets in Lower Manhattan—a route likely to see increased congestion as drivers seek to avoid the new toll.

The environmental and safety issues for Battery Park City and Lower Manhattan, more broadly, have been insufficiently reviewed.  The EA acknowledges that for certain tolling scenarios, Tolling Scenarios A and B, "volume increases would result from increased demand to West Street and the FDR Drive via the Battery Park Underpass." AR 29 at 4A-32.  By publicly stating that drivers can fully avoid tolls by driving on West Side Highway/9A, FDR Drive, Hugh L Carey, and Battery Underpass, drivers will be incentivized to avoid the CBD, in part by utilizing the "around the horn" option.  As the EA recognizes, diversions around the Manhattan CBD will increase traffic volumes.  *Id*. at ES-13.

Yet, when analyzing the environmental impact and air quality of Congestion Pricing on Lower Manhattan, the EA inexplicably analyzes intersections using Tolling Scenarios C and D, without any explanation for why the scenarios causing the most traffic volume were not utilized. AR 10-15.[44]  The EA summarily concludes that the project would not "substantially change" or "noticeably affect" the Manhattan CBD study area, AR 29 at 5B-17, a conclusion plainly counter to the evidence before the agency of extensive changes to driving behavior, traffic patterns, and economic activity.  Such "a bare conclusion without explanation as to the significance of an impact" is impermissible under the hard look standard of NEPA and should be declared unlawful. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 108 (D.D.C. 2006).  The FHWA readily could have more closely studied the air quality, traffic congestion, and financial impact of Congestion Pricing for Battery Park City, and certainly under the higher volume tolling scenarios.  Battery Park City is a community already burdened with post 9/11 air pollution and severe health consequences.  As the EPA stressed, the EA is sorely lacking cumulative data surrounding disproportionate air quality impacts and the fact that "some costs [will be] falling disproportionately on overburdened

---

[44] In any event, as set forth in Section II.E, *infra*, none of the analysis considered the actual tolling structure adopted by the MTA.

communities."   AR 20 at 18C-467, 18C-471. Its failure to address these issues through the improper expedient of lumping severely impacted neighborhoods in with the Manhattan CBD as a whole (*e.g.*, Battery Park City, Chinatown, the Lower East Side) was arbitrary and capricious. *See Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 194 (4th Cir. 2005) ("An agency's hard look should include neither researching in a cursory manner nor sweeping negative evidence under the rug.").

### B.      The EA And FONSI Failed To Consider Adverse Impacts On Communities With Environmental Justice Concerns

FHWA not only failed to take a hard look at significant impacts on Battery Park City; it failed to sufficiently study Congestion Pricing's inevitable impact on the most economically and environmentally vulnerable communities in New York.  NEPA requires more.

Because environmental pollution typically has a disparate impact on low-income and minority populations, Executive Order 14008 directs that all agencies "shall make achieving environmental justice part of their mission" and provides that agencies shall attempt to "secure environmental justice and spur economic opportunity to disadvantaged communities that have been historically marginalized and overburdened by pollution."  Exec. Order No. 14,008, 3 C.F.R. 489 (2021) (order amended 2022).  A recent Executive Order builds on the requirements set out in Executive Order 12898, mandating that agencies "to the greatest extent practicable and permitted by law . . . identify[] and address[] . . . disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations . . . ."  Exec. Order No. 12,898, 3 C.F.R. 859 (1994) (order amended 2022).

The requirements apply to actions of the FHWA, an agency that has issued its own environmental justice guidance, specifically for the agency's NEPA environmental review

process.  To ensure that "environmental justice concerns are effectively identified and addressed"[45] during the NEPA process, agencies "should seek input from [environmental justice communities] as early in the process as information becomes available,"[46] and consider the "composition of the affected area" and "relevant public health data and industry data concerning the potential for multiple or cumulative exposure."[47]  NEPA guidelines emphasize that "[m]itigation measures . . . should, whenever feasible, address significant and adverse environmental effects of proposed federal actions on minority populations, low-income populations, and Indian tribes."[48]

Courts recognize the importance of taking a particularly "hard look" at the impact of federal action on environmental justice communities.  Under NEPA, the "purpose of an environmental justice analysis is to determine whether a project will have a disproportionately adverse effect" on environmental justice communities.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,* 255 F. Supp. 3d 101, 140 (D.D.C. 2017) (citing *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 541 (8th Cir. 2003).  An agency must "consider how the incremental effects of the project might compound . . . preexisting environmental concerns." *O'Reilly v. All State Financial Co.*, No. 22-30608, 2023 WL 6635070, at *7 (5th Cir. Oct. 12, 2023).  NEPA analysis of environmental justice communities cannot be "cursory" or "bare bones," it cannot "fail to consider an important part of the problem," *Motor Vehicle Mfrs. Ass'n v. of U.S., Inc.,* 463 at 43, and the agency must establish a connection between the facts found with respect to these communities and the decision ultimately made.  *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021).

---

[45] Env't Justice: Guidance Under the National Env't Policy Act, Council on Env't Quality, at 1 (Dec. 10, 1997), https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf.

[46] *Id.* at 11.

[47] *Id.* at 9.

[48] *Id.* at 4.

Plaintiffs live in economic justice communities in the Lower East Side of Manhattan and Chinatown, where in certain areas, such as Community District 3, approximately 24% of all residents and one-third of children and seniors live below the poverty line.[49]  Nearly 50% of households in the area are rent-burdened (paying more than 30% of their income for housing) and many have difficulty affording food, clothing, transportation and health care.[50]  Air pollution is a significant environmental threat, as air pollutants in this area are among the highest in New York City.[51]  Pollutants such as $PM_{2.5}$, $NO_2$, $NO$, and BC are of particular areas of concern because they are highest in areas in close proximity to traffic thoroughfares, like the FDR Drive.[52]  The economic justice communities on the Lower East Side are far from public transit, with at least 15% of all residents living more than half a mile from a subway stop.

Other environmental justice communities share similar issues and stand to suffer considerably under Congestion Pricing.  As the EPA noted in its comments to the EA, Bronx, Richmond, and Bergen counties are all already heavily overburdened with traffic and unsafe environmental conditions that create public health issues that will be significantly exacerbated by Congestion Pricing.  AR 20 at 18C-467 to 472; *see also* AR 18 at 17D-25.  In fact, the counties rank above the 95 percentiles in $PM_{2.5}$ pollution, diesel PM pollution, air toxics cancer risk, air toxic respiratory hazard risk, and proximity to traffic.  AR 20 at 18C-471.  Significant health

---

[49] Statements of Community District Needs and Community Board Budget Requests: Manhattan Cmty. Dist. 3 at 10, 14, 21 (Nov. 2023), https://www.nyc.gov/assets/manhattancb3/downloads/pdf/FY25_MN03_Preliminary.pdf.

[50] Community Health Profiles 2018, NYC Health, "Lower East Side and Chinatown: Manhattan Cmty. Dist. 3  at 7 (2018), https://www.nyc.gov/assets/doh/downloads/pdf/data/2018chp-mn3.pdf.

[51] New York City Cmty. Air Survey (NYCCAS) - Neighborhood Air Quality 2008-2018, Appendix 3, https://a816-dohbesp.nyc.gov/IndicatorPublic/key-topics/airquality/nyccas/Appendix3.pdf  (Lower East Side and Chinatown (CD3)) (last visited Mar. 12, 2024).

[52] *See* NYCCAS - Neighborhood Air Quality 2008-2021, https://a816-dohbesp.nyc.gov/IndicatorPublic/key-topics/airquality/nyccas/ (last visited Mar. 12, 2024).

disparities, including asthma rates and hospitalization, are among the highest in the City in these communities, who stand to be the most impacted by traffic diversion from Congestion Pricing.

### 1.      FHWA's Flawed Methodological Choices For Analyzing Environmental Justice Communities Were Arbitrary And Capricious

The Draft EA's analysis of environmental justice communities was flawed from conception.  Rather than using precise mapping tools to identify particularly impacted areas, such as the Mayor's Office of Environmental Justice map (a map developed by the City's Environmental Justice Advisory Board studying environmental justice), or data that identifies geographic areas within New York with high levels of existing pollution and associated health risks, Defendants used ill-fitting federal census data from 2015-2019 to identify low-income and minority populations in New York City.  *See* AR 29 at 17-3.  The FHWA limited its environmental justice assessment to communities in which (1) at least 50% of the census tract's population identified as a racial minority, or the percentage of residents identifying as a racial minority exceeded the minority share in the county; and (2) the percentage of individuals with household incomes up to twice the federal poverty threshold was higher than the percentage for the 28-county region.  AR 29 at 17-8.  That definition unjustifiably and unreasonably excluded numerous census block groups with existing health issues, including environmental justice communities in north Staten Island and parts of the Lower East Side, that will experience significant increases in traffic volumes, with already extremely high rates of pollution and pollution related health issues.  *See* AR 18 at 17D-25; AR 29 at 10-23.

Even if the initial method of identifying environmental justice communities by income and minority status alone was sound—and it was not—the EA unreasonably analyzes environmental justice communities, in its "Local Study Area," on a *county-wide basis*, a wholly inadequate way to review the precise impact of Congestion Pricing.  The EA analyzes 10 counties in its Local Area

Study—Bronx, Kings, New York, Queens, Richmond, Nassau, Bergen, Essex, Hudson, and Union Counties.  AR 29 at 17-5.  But New York County, for example, encompasses the entire borough of Manhattan, and has exceedingly diverse population and geography.  The impact of Congestion Pricing on individuals or businesses in midtown Manhattan is vastly different than the impact Congestion Pricing would have on individuals living in subsidized housing along the FDR Drive. Yet, when analyzing the effects of CBD tolling on economic justice communities, the EA concludes that New York County will see a decrease in all pollutants.  *Id.* at 17-30.  The aggregate analysis, however, masks the particular cumulative impact on already burdened environmental justice neighborhoods within the county and makes it difficult for residents of well-established neighborhoods to understand how the analysis applies to them.   Perhaps recognizing the deficiency, the EA referenced more detailed analysis for four highway segments near environmental justice neighborhoods. *See Id.* at 17-31.  But the review of four highway segments in all of New York City cannot substitute for the "hard look" necessary to ensure that environmental justice communities are not adversely and disproportionately impacted.

*Vecinos Para el Bienestar de la Communidad Costera v. FERC* ("*Vecinos*"), 6 F.4th 1321 (D.C. Cir. 2021), illustrates the need for appropriate parameters to closely analyze impacted environmental justice communities.  There, petitioners brought suit challenging a decision by the Federal Energy Commission ("FERC") to authorize the construction and operation of three liquified gas expert terminals on the shores of a channel in Cameron County, Texas.  Petitioners argued that FERC's environmental justice analysis of the project's impact failed NEPA requirements because it only analyzed the project's impact on qualifying census blocks within two miles of the project site.  The court agreed that the chosen parameters of the economic justice analysis were "arbitrary and capricious," particularly because elsewhere in the analysis FERC had

determined that air quality would be negatively impacted by the project as far as 31 miles away. *Id.* at 1331. The agency was required to take a harder look at the disproportionate impact on more environmental justice communities.

As in *Vecinos,* in light of FHWA's conclusion that the air quality in particular communities in Staten Island, Bergen County, the Bronx, and the Lower East Side would be significantly adversely impacted by Congestion Pricing, a closer look, more specific than a county-wide analysis, was required into the environmental justice neighborhoods. An EIS, rather than an EA, would have provided the needed comprehensive study, as recent examples in New York make clear. In the EIS performed for the East Coast Resiliency Project, the environmental justice analysis considered—first on a census tract and then on a block-by-block basis—how the project would impact environmental justice communities.[53] In the area of Lower Manhattan, the phased study closely reviewed the neighborhoods of the East Village, Chinatown, the Lower East Side, and residential developments such as Stuyvesant Town, Peter Cooper Village, Co-Op Village, and 27 New York City Housing Authority ("NYCHA") developments.[54] Community outreach during the development of the EIS allowed for a Community Engagement Plan to inform interested parties and seek input on a wide range of issues.[55] And the EIS identified adverse effects from construction at specific intersections, noise pollution at specific blocks and even buildings, and adverse effects to urban design from levees blocking the view of certain NYCHA developments.[56]

---

[53]    EIS, E. Side Costal Resiliency Project, Chapter 5.11, "Env't Justice," https://www.nyc.gov/assets/escr/downloads/pdf/DEIS/ESCR-EIS-Chapter-5_11-Environmental-Justice.pdf.    (last visited Mar. 12, 2024).

[54] *Id.*

[55] *Id.*

[56] *Id.*

Contrast that with the EA analysis here, where ill-fitting tables regarding travel modes in Manhattan, demographics, and income levels on a region-wide and county-wide basis pervade the EA analysis.  But the study of 10 counties neglected to include a localized assessment of air quality impacts on communities with environmental justice concerns.  *Id.*  Instead, FHWA only assessed potential truck and non-truck highway traffic increases in a subset of environmental justice communities.  The entire structure of Congestion Pricing is to effectively drive traffic to the exempted roadways, like those bordering Battery Park City and abutting the Lower East Side.  The "reduction" in pollution in the Manhattan CBD as a whole is accomplished expressly by concentrating the pollution in communities, many of which are environmental justice communities, surrounding the exempted roadways throughout the City.  The failure to examine these specific areas and the inadequacy of this environmental justice review, as a whole, failed to satisfy the "hard look standard."  *See Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 137-38 (gerrymandered geographic analysis of economic justice communities required vacatur).

## 2.     The EA And FONSI Ignore The Adverse Impact Of Congestion Pricing On Battery Park City And Environment Justice Communities

Even with this superficial look at vulnerable populations, the environmental justice section of the Draft EA concludes that there will be "potential adverse effect to environmental justice populations as a result of traffic diversions in communities already potentially vulnerable due to pre-existing air pollution and chronic diseases."  AR 29 at 17-61.  It recognizes that 50% of environmental justice communities would experience increases in truck traffic that "would not be completely alleviated by the overall beneficial effects of the Project."  *Id.* at ES-19.  Under Congestion Pricing, all six air pollutants—volatile organic compound (VOC), nitrogen oxides (NOx), carbon monoxide (CO), particular matter ($PM_{10}$), particular matter ($PM_{2.5}$), and carbon dioxide equivalents (CO2e)—and all nine mobile source air toxics (MSATs) will immediately

37

increase in Bronx County, Staten Island, Nassau County, and Bergen County. *Id.* at 10-23, 10-37. Indeed, the EA concluded that Congestion Pricing would potentially result in disproportionately high and adverse effects on environmental justice populations: (1) a potential adverse effect from increased air pollution due to traffic increases near communities already overburdened by pre-existing air pollution and chronic diseases, relative to national percentile; and (2) a potential adverse effect on minority and low-income drivers.[57] *Id.* at 17-63.

*California v. Bernhardt*, 472 F.Supp.3d 573 (N.D. Cal. 2020), is instructive. There, the Bureau of Land Management's ("BLM") EA acknowledged increases in specific types of emissions and air quality consequences to economic justice communities that would harm public health, resulting from BLM's partial rescission of a rule governing prevention of methane in oil and gas lessee operations. Yet, despite the acknowledgement and record evidence of pollution, BLM conducted no further or specific localized analysis of the potential problem and promised to further analyze environmental impact a later stage. *Id.* at 622. The court held that BLM could not "discount the localized impacts to people for whom public health impacts are of clear significance," *id.*, and that delaying the analysis until later stages, put the "proverbial cart before the horse," *id.* at 620. The court determined that BLM had not satisfied a "hard look" of the environmental justice communities in the EA and erred in not preparing an EIS.

As in *Bernhardt*, FHWA has found significant air quality and public health impacts that would result from Congestion Pricing to areas likely to experience traffic diversions. Defendants cannot discount the impact on these communities, like the Lower East Side and the outer-boroughs

---

[57] A recent study by the Community Service Society found that approximately 20% of New Yorkers struggle to afford mass transit. Notably, 30% of low-income New Yorkers reported that "they often struggled to pay subway or bus fares." Press Release, *CSS Report: New Yorkers Struggle to Afford Mass Transit; Expanding Fair Fares Can Help* (Mar. 14, 2024), https://www.cssny.org/news/entry/css-report-new-yorkers-struggle-to-afford-mass-transit-expanding-fair-fares. Imagine, then, the impact of a $15 toll on similarly situated New Yorkers.

in which environmental public health is of clear significance.  Defendants have not satisfied the "hard look" in the EA and an EIS is required.

Indeed, the EPA found the Draft EA's analysis of environmental justice communities insufficient.  In its comments to the FHWA, the EPA indicated that it could not confirm that an EIS was not necessary "[d]ue to the insufficiency of data in the Draft EA around localized and disproportionate air quality impacts."  AR 20 at 18C-467.  Where traffic would "likely worsen" under Congestion Pricing, the "EPA recommend[ed] that the analysis of the areas be improved, especially given the environmental justice concerns and cumulative impacts to the affected communities." *Id.*  The Draft EA (i) used outdated statistics and models (that did not reflect the impact of the COVID-19 pandemic, despite such data being available);[58] (ii) did not identify the disproportionate impact of traffic diversions to roadways with environmental justice concerns and its impact on air quality; (iii) failed to identify adverse economic and environmental impacts of each scenario to economic justice communities; and (iv) failed to analyze the cumulative impacts of Congestion Pricing throughout the EA.  The EPA recognized that "air quality evaluation was only conducted at a county level" and that a closer look was required because "all tolling scenarios suggest a potential increase in vehicle and truck traffic" in many economic justice areas. *Id.*, 18C-470.  The EPA also recommended that the Project Sponsors consider comparative air quality impacts on existing health disparities in these communities and recognized that given the existing toxic air pollutant levels and information from environmental justice data, the impacts may be

---

[58] At various points in the EA, the FHWA asserts that pre-pandemic data was used because traffic is returning to pre-pandemic levels, despite the fact that mass transit remains roughly 35 to 45% lower than pre-COVID pandemic levels. AR 1-13.  First, even if true, it is hard to imagine how this unnuanced look at aggregate traffic data can fully digest the impact of the pandemic.  It seems evident, for example, that the time and day of travel has shifted in the post-pandemic work week (far fewer workers commuting on Mondays and Fridays).  And if the ridership on mass transit has been reduced by 45%, the $15 billion figure that was once necessary for MTA capital projects in 2019 may have changed.  In sum, more study is needed.

disproportionate. *Id.* at 18C-471. At bottom, while the Project Sponsors described the benefits of Congestion Pricing as outweighing the impacts, the "benefits and costs are unevenly distributed, with some costs falling disproportionately on overburdened communities." *Id.*

Very little changed from the Draft EA to the EA released to the public 10 months later. AR 29 at 0-2 to 0-4 (listing changes and stating that "[m]ost of the text in the Final EA remains unchanged from the August 2022 EA"). A "Technical Memorandum" was included in the August 2023 EA that purports to address additional considerations for environmental communities with existing health burdens. *Id.* at 0-3. But while more precise maps were included from the EJ Screening and Mapping Tool (tools that should have been utilized from the start) and information about air pollutants' general impact on health and additional health data was gathered (largely still on a county-wide basis), Defendants failed to conduct the more specific air quality and closer look at economic justice communities and traffic diversion areas. Nor was the Technical Memorandum subject to public review and comment. While the EPA may have corresponded privately, outside public review, with the Project Sponsors, and "acknowledge[d] the improvements . . . specifically to address potential impacts of the proposed action on communities with environmental justice concerns," AR 1229, the communication can neither obscure nor cure the dispositive fact that the EA failed to sufficiently treat the detailed concerns found in the initial EPA assessment. AR 20 at 18C-469 to 18C-472. The same outdated, pre-COVID statistics and models were used, no closer analysis was performed of all potential economic and environmental impacts on low-income and minority communities, and no comparative analysis was performed between the general population and minority communities to measure disproportionate impact. Even if it was an "improvement" on the inadequate Draft EA, the EA still does satisfy NEPA's environmental justice requirements.

**C.**     **The EA And FONSI Failed To Sufficiently Identify And Analyze Reasonable Alternatives To Congestion Pricing**

Beyond the necessary analysis of Battery Park City and economic justice communities, the EA was insufficient because it failed to consider credible and realistic options short of the draconian toll ultimately imposed.  The EA and FONSI should be held unlawful as arbitrary and capricious because the FHWA failed to identify and analyze reasonable alternatives to the Congestion Pricing scheme.

To sufficiently articulate why it has settled on a particular course of action, NEPA mandates that the agency "consider and discuss the range of all reasonable alternatives to the proposed action, to 'provid[e] a clear basis for choice among options by the decisionmaker and the public.'" *Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069, 1088 (E.D. Cal. 2004).  When evaluating alternatives to a proposed action, an agency must consider three questions: "First, what is the purpose of the proposed project?  Second, given that purpose, what are the reasonable alternatives to the project?  And third, to what extent should the agency explore each particular alternative?"  *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 603 F. Supp. 2d 1176, 1184 (E.D. Wis. 2009) (citing *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 668 (7th Cir. 1997)).  In undertaking this analysis, "[n]o decision is more important than delimiting what these 'reasonable alternatives' are." *Simmons*, 120 F.3d at 666.

The lack of discussion and analysis of alternatives to the Congestion Pricing scheme render the FHWA's action arbitrary and capricious for two key reasons: (1) the FHWA only identified patently unreasonable alternative options that were intended to fail; and (2) the limited alternatives that were identified were not sufficiently analyzed.

As part of their NEPA review process, the FHWA and the Project Sponsors defined the Project purpose to "reduce traffic congestion in the Manhattan CBD in a manner that will generate

41

revenue for future transportation improvements, pursuant to acceptance into FHWA's VPPP." AR 29 at 1-10.  To further refine the Project purpose, the FHWA also defined the following three project objectives: (1) to reduce daily VMT within the CBD by at least 5%; (2) to reduce the number of vehicles entering the CBD daily by at least 10%; and, critically, (3) to generate sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program.  *Id.* at 2-5.  As part of the mandatory alternatives screening evaluation, if the FHWA determined that a preliminary alternative would not meet one or more of the three identified objectives used for screening, the FHWA summarily "dismissed that alternative from further consideration as an alternative that is not reasonable."  *Id.*  Further violative of NEPA requirements was the failure to consider whether a combination of alternatives could meet the project goals.

"One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)," precisely what occurred here.  *Simmons*, 120 F.3d at 666.  Of the eleven alternatives to Congestion Pricing considered, several alternatives meet the criteria of Objectives 1 and 2, but, as seen in the EA's Table 2-2 (Results of Preliminary Alternatives Screening) copied below, all fail to meet the criteria of Objective 3, generating $15 billion in revenue.  *See* AR 29 at 2-7. Therefore, FHWA dismissed from further consideration all eleven remaining options.

Table 2-2.    Results of Preliminary Alternatives Screening[1]

| ALTERNATIVE | PURPOSE AND NEED: Reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements | OBJECTIVE 1: Reduce daily VMT within the Manhattan CBD — Criterion: Reduce by 8% (relative to No Action) | OBJECTIVE 2: Reduce the number of vehicles entering the Manhattan CBD daily — Criterion: Reduce by 10% (relative to No Action) | OBJECTIVE 3: Create a funding source for capital improvements and generate sufficient annual net revenues to fund $15 billion for capital projects for MTA's Capital Program |
|---|---|---|---|---|
| NA-1: No Action | Does not meet | Does not meet | Does not meet | Does not meet |
| NTP-1: Parking pricing strategies | Does not meet | Does not meet (see note 2) | Does not meet | Does not meet (see note 2) |
| T-1: Pricing on full roadways: Raise tolls or implement variable tolls on existing toll facilities | Does not meet | Does not meet (see note 3) | Does not meet (see note 3) | Does not meet |
| T-2: Pricing on full roadways: Toll East and Harlem River bridges | Does not meet (see note 4) | Meets | Meets | Does not meet (see note 4) |
| T-3: High-occupancy toll (HOT) lanes | Does not meet (see note 5) | Does not meet | Does not meet | Does not meet (see note 5) |
| T-4: Zone-based pricing: CBD Tolling Program | Meets | Meets | Meets | Meets |
| O-1: Parking pricing: Reduce government-issued parking permits | Does not meet | *[Does not meet (see note 6)]* | *[Does not meet (see note 6)]* | Does not meet |
| O-2: Provide additional taxi stands to reduce cruising | Does not meet | Does not meet (see note [7]) | Does not meet | Does not meet |
| O-3: Create incentives for teleworking | Does not meet | Does not meet | Does not meet (see note [8]) | Does not meet |
| O-4: Ration license plates | Does not meet | Meets | Meets | Does not meet |
| O-5: Mandatory carpooling | Does not meet | Meets | Meets | Does not meet |
| O-6: Truck time-of-day delivery restrictions | Does not meet | Does not meet (see note [9]) | Does not meet (see note [9]) | Does not meet |

Options such as "mandatory carpooling," "creating incentives for teleworking" and rationing license plates (perhaps for share-ride vehicles)—often discussed as a way to reduce congestion—stood little chance of raising revenue for the MTA.  While "[a]n agency is under no obligation to consider every possible alternative to a proposed action," *Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996), the FHWA *only* considered alternatives unlikely to be implemented because they would not raise billions of dollars in revenue, itself not an environmental goal.  Therefore, the agency failed to analyze *any* reasonable alternatives.

Of the limited alternative options that the agency put forward, it quickly dismissed them with little to no explanation.  A series of footnotes listed below Table 2-2 with no analysis and containing studies from 2007 and 2008 is the sum total of the analysis.  *See* AR 29 at 2-7.  As seen above, several of the alternatives listed did not include any note explaining why the option was dismissed, such as O-4 (Ration license plates) and O-5 (Mandatory carpooling).  *Id.*  Many of the notes that were given did not provide any meaningful analysis for dismissing them, such as T-3 (High-occupancy toll (HOT) lanes), which was reduced to a single sentence citing no data: "HOT Lanes can be effective revenue generators, but their ability to reduce congestion and raise enough revenue to meet the target is limited due to the availability of free lanes on the same highway."  *Id.*

Even with the objective of revenue generation in mind, Plaintiffs can readily identify two reasonable alternative *tolling* options that would meet the purpose and objectives identified above. First, the agency could have considered a phased-in implementation of Congestion Pricing, where certain vehicles are tolled first for a defined period of time.  Such implementation of a scaled-back initial program, made all the more plausible by recent estimates of far greater than $1 billion to be raised in the first year, *supra* note 7, would allow Defendants to make improvements to transit capacity and reliability before asking commuters to abandon their cars and would allow for more

effective study and monitoring in real-time.  The improvements would lead to greater behavior changes, leading to less congestion.

Second, FHWA could have considered a dynamic tolling structure.  To borrow from the DOT's own explanation of this system:

> With dynamic pricing, tolls are continually adjusted according to traffic conditions to maintain a free-flowing level of traffic.  Under this system, prices increase when the tolled lane(s) get relatively full and decrease when the tolled lane(s) get less full.  The current price is displayed on electronic signs prior to the beginning of the tolled section.  This system is more complex and less predictable than using a fixed-price table, but its flexibility helps to consistently maintain the optimal traffic flow. Motorists are usually guaranteed that they will not be charged more than a pre-set maximum price under any circumstances.[59]

FHWA is familiar with this alternative, as dynamic tolling schemes are active throughout the United States.[60]  Variable and dynamic pricing was also urged by the Fix NYC Advisory Panel Report as part of its proposed phased approach to implementing congestion pricing, "in order to maximize congestion reduction."[61]

Both of these alternative options have the potential to reduce daily VMT within the CBD by at least 5%, to reduce the number of vehicles entering the CBD daily by at least 10%, and to generate sufficient significant revenue for capital projects for the MTA.  Nevertheless, the FHWA "failed to consider an alternative that was more consistent with its basic policy objectives than the alternatives that were the subject of final consideration."  *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999).

---

[59] U.S. Department of Transportation, Federal Highway Administration, *Congestion Pricing — A Primer: Overview*, available at: https://ops.fhwa.dot.gov/publications/fhwahop08039/cp_prim1_08.htm#faq2 (last visited Mar. 8, 2024).

[60] *See, e.g.*, Bart Jansen, *'Dynamic tolls': How highways can charge $40 for driving just 10 miles*, USA Today, Dec. 8, 2017: https://www.usatoday.com/story/news/2017/12/07/states-governments-increasingly-turn-tolls-manage-highway-traffic-jams/930900001/.

[61] *See* HNTB, Fix NYC Advisory Panel Rep., *supra* n. 2, at 6.  Dynamic pricing is defined by the Report as "A pricing system where rates are continually adjusted according to traffic conditions to maintain a free-flowing level of traffic. Rates are determined in real-time throughout the day." *Id.* at 5.

**D.     The Final EA And FONSI's Proposed Mitigation Measures Are Wholly
        Underline Inadequate And Were Not Sufficiently Analyzed**

The FHWA acknowledges that Congestion Pricing will have a potentially significant

adverse impact on certain areas of New York City and its surrounding communities and therefore

found it necessary to include mitigation measures.  Where, as here, a project will have significant

environmental impact, reliance upon mitigation measures may eliminate the need to prepare an

EIS, but "only if the agency finds that the changes or safeguards in the project sufficiently reduce

the [significant] impact to a minimum."  *Town of Cave Creek*, 325 F.3d at 327 (citations omitted).

In decisional agency documents, while "proposed mitigation measures need not be laid out in the

finest detail" the measures may not be predicated on "mere perfunctory or conclusory language."

*O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 231 (5th Cir. 2007).  The simple labeling of

mitigation items does not create a sufficient record to support an agency's decision not to prepare

an EIS.  *Id.* (citing *Citizen Advocates for Responsible Expansion, Inc. (I-Care) v. Dole*, 770 F.2d

423, 434 (5th Cir. 1985).  Instead, the agency must "sufficiently demonstrate [that] the mitigation

measures adequately address and remediate the adverse impacts so that they will not significantly

affect the environment."  *Id.* at 234.  A FONSI's reliance on mitigation is justified only when there

are adequate assurances that the mitigation measures will be successful and "constitute an adequate

buffer against the impacts that result from the authorized activity to render such impacts so minor

as to not warrant an EIS."  *Wetlands Action Network v. U.S. Army Corps. Of Eng'rs*, 222 F.3d

1105, 1121 (9th Cir. 2000).  Mitigation must be supported by sufficient evidence, such as studies

by the agency.  *Id.*

*O'Reilly v. U.S. Army Corps of Engineers*, *supra*, is illustrative.  There, the U.S. Army

Corps of Engineers prepared an EA and a FONSI for a dredging and filling of wetlands in

Louisiana and determined that, in light of the proposed mitigation measures, the project would

45

have no significant impact on the environment.  While the project was predicted to have adverse long-term impacts on project soil, reducing its flood control function, the agency incorporated a drainage plan into the development site, including a "vegetated buffer zone for flood water storage" and then asserted "without data or analysis" that the project as mitigated would have minimal impact on flooding.  *Id.* at 232.  The Fifth Circuit found the description of the mitigation measures insufficient.  While the court recognized that an EA was meant to be a 'rough-cut, low budget" preliminary look at the impact of a project, the agency still needed to conduct a "serious and thorough" evaluation of mitigation options.  *Id.* at 231, 234.  But the EA "fail[ed] to sufficiently demonstrate that the mitigation measures adequately address and remediate the adverse impacts" because it simply "list[ed] the potentially significant adverse impacts" and "provide[d] only cursory detail as to what those measure are and how they serve to reduce those impacts to a less-than significant level."  *Id.* at 234.

The similarities here (including a similar mitigation measure centered on vegetation) are self-evident.  The FONSI simply lists a few mitigation measures without any analysis as to how these measures will reduce the impact on Plaintiffs and the rest of New York.  AR 361 at 15; *see also San Luis Valley Ecosys. Council v. U.S. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233, 1245-46 (D. Colo. 2009) (finding FONSI arbitrary and capricious where "significant mitigation measures . . . were not even developed, much less evaluated" and it was "unclear from the record whether the agency really evaluated the efficacy of the proposed mitigation").  Mitigation was not included in the Draft EA and was only included after the outpouring of criticism, including from the EPA, on the likely impact of Congestion Pricing on certain communities in New York, including environmental justice communities.  Months after the comment period for the Draft EA had closed, the FHWA and MTA presented a hodgepodge of mitigation measures, never subject

to public scrutiny, totaling $155 million over five years.  AR 361 at 15.  A listing or a perfunctory description of mitigation measure is not enough in a FONSI.  *See League Wildness Defs./Blue Mtns. Biodiversity Proj. v. Forsgren*, 309 F.3d 1181, 1192 (9th Cir. 2002); *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).  Yet despite the MTA's public emphasis on extensive analysis and lengthy EA, the mitigation measures can be found in the FONSI in one concise list with barebones descriptions.

Table 2.    Regional and Place-Based Mitigation Measures

| MITIGATION MEASURES | BENEFIT AND RESULT OF MITIGATION | 5-YEAR FUNDING | RELEVANT LOCATION(S) | FUNDING SOURCE | IMPLEMENTATION LEAD |
|---|---|---|---|---|---|
| **Regional Mitigation** | | | | | |
| Further reduced overnight toll | Minimize/avoid truck diversions | $30 million | | CBD Tolling Program | TBTA |
| Expand NYC Clean Trucks Program | NOx and PM2.5 reductions from ~500 new clean trucks | $20 million | 10-county environmental justice study area | CBD Tolling Program | NYCDOT |
| Expand NYCDOT Off-Hours Delivery Program | Safety and emissions reduction benefits resulting from reduced truck traffic during the day | $5 million | | CBD Tolling Program | NYCDOT |
| **Place-Based Mitigation** | | | | | |
| Toll vehicles traveling northbound on the FDR Drive that exit at East Houston Street and then travel southbound on FDR Drive | 25 to 35 percent of the non-truck traffic increases on the FDR Drive could be mitigated | N/A | FDR Drive between the Brooklyn Bridge and East Houston Street | N/A | TBTA |
| Replacement of Transport Refrigeration Units (TRUs) at Hunts Point Produce Market | Major NOx and PM2.5 reductions from the replacement of up to 1,000 TRUs | $15 million[2] | Hunts Point | CBD Tolling Program | NYCDOT |
| Implement Electric Truck Charging Infrastructure | NOx and PM2.5 reductions from electric vehicles using 35 new chargers (at seven stations) | $20 million | | $10 million Federal CRP + $10 million CBD Tolling Program | MTA CMAQ Program |
| Install Roadside Vegetation to Improve Near-Road Air Quality | Improve near-road air quality by pollutant capture from ~4,000 trees and ~40,000 shrubs | $10 million | After toll rates are set, a process that includes both additional analyses and community input will take place to determine specific locations | CBD Tolling Program | TBTA with Relevant State and Local Agencies |
| Renovate Parks and Greenspace in Environmental Justice Communities | Increases overall community asset through ~3 park/ greenspace renovations depending on size and complexity | $25 million | | CBD Tolling Program | TBTA with Relevant State and Local Agencies |
| Install Air Filtration Units in Schools Near Highways | Removes air pollutants from classrooms. 25-40 schools depending on school size and complexity of existing HVAC system | $10 million | | CBD Tolling Program | TBTA with Relevant State and Local Agencies |
| Establish Asthma Case Management Program and Bronx Center | Reduces hospitalizations and doctor visits, decreases days and nights with symptoms and missed school days – program expansion up to 25 schools | $20 million | | CBD Tolling Program | NYC DOHMH |

1. An additional $5 million has been allocated for mitigation and enhancement measures related to monitoring across other topics, along with $47.5 million for the low-income toll discount discussed above. Enhancement measures include air quality monitoring that will expand NYC's existing monitoring network. Locations will be selected in consideration of the traffic and air quality analyses in the EA and in coordination with environmental justice stakeholders and relevant state and local agencies. This will complement the regional and place-based mitigation measures related to traffic diversions outlined in Table ES-5 (see Final EA Chapter 10, "Air Quality," for details).
2. After three years, any remaining funds designated for TRU replacements may also be used for clean truck replacement vouchers through the NYC Clean Trucks Program.

Other than a description of how trucks are particularly impactful on the environment and a brief suggestion that the "regional mitigation" may decrease some truck traffic, little to no analysis was done of the mitigation measures that, according to the FHWA and MTA, will minimize the adverse impacts of Congestion Pricing to such an extent that it no longer has a significant impact on the quality of human environment.  AR 361 at 15.  Not only did the Project Sponsors fail to demonstrate any analysis of the mitigation measures, the public was similarly deprived of that opportunity.  Plaintiffs and other stakeholders had no opportunity to evaluate whether potential mitigation measures would or could actually mitigate the potential adverse effects identified in the EA. *N.M. ex rel. Richardson v. Bureau of Land Mgm't,* 565 F.3d 683, 708 (10th Cir. 2009) ("A public comment period is beneficial only to the extent the public has meaningful information on which to comment.").

In fact, all but two of the "place-based" mitigation measures do not have a "place." The FONSI leaves that for after the tolling structure is established to create a process for implementing the location of these measures. *Id.* The recommended implementation of electric truck charging infrastructure, renovation of parks and greenspace in environmental justice communities, and the installation of air filtration units in schools near highways have no specific time, place or manner in which they will be implemented. Putting aside, for example, how *increasing roadside vegetation* to improve near-road air quality by using $10 million over five years would mitigate the significant impact of the first Congestion Pricing program in our nation's history, there is absolutely no detail given as to where or when this mitigation will occur or how much can reasonably be installed and maintained for such sum. Leaving undeveloped and inadequately reviewed mitigation measures for after the EA and FONSI period turns NEPA on its head and neuters the requirement that the mitigation analysis and its impact on agency action be serious and thorough. The Project Sponsors simply had no basis for determining that the mitigation measures would reduce the significant impacts "so minor as to not warrant an EIS," *Wetlands Action Network*, 222 F.3d at 1121, rendering the EA and FONSI arbitrary and capricious.

E. **The EA And FONSI Must Be Vacated Because They Did Not Analyze The Actual Congestion Pricing Tolling Structure**

The EA and FONSI should be set aside because they did not analyze the actual tolling structure that the TBTA will adopt based on the TMRB's recommendation and left for a further "re-evaluation"—outside the EA or EIS process—necessary components of the plan. Under NEPA, an agency must analyze the direct, indirect, and cumulative impacts of an actual plan so that it can determine whether the action would significantly affect the quality of the human environment. 40 C.F.R. § 1508.1(g); 42 U.S.C. § 4332(2)(C). Agency action is arbitrary and capricious when the decision does not include "a consideration of the relevant factors." *Magellan*

*Tech., Inc. v. USDA*, 70 F.4th 622, 630-31 (2d Cir. 2023) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43).  The agency decision here was deficient, for it was not based on a proposed plan, but on a hypothetical series of potential plans, none of which came to fruition.  *See California. v. Block*, 690 F.2d 753, 770 (9th Cir.1982) (NEPA does not allow an agency to wait until after a final EIS to announce the proposed action it intends to adopt).

The Executive Summary of the EA makes clear that the "most important factor in the magnitude and distribution of effects from the Project is the toll rate."  AR 29 at ES-13.  Yet that factor was not part of the analysis.  The FHWA concluded that the tolling scenarios analyzed in the EA "will have no significant impact on the human or natural environment," despite none of them being chosen for the Congestion Pricing plan.  AR 361 at DOT_0000363.  Instead, the TMRB settled on an entirely new, unstudied scenario defining a new toll price, peak hours, bridge crossing credits and exemptions, discounts to low-income individuals, and toll structure for taxis and for-hire vehicles.  In the EA and FONSI, the FHWA and Project Sponsors entirely failed to consider many factors that would have direct, indirect, and cumulative impacts, including (i) a $15 toll on passenger vehicles; (ii) two additional hours of peak tolling each day; (iii) a $5 crossing credit on particular crossings while providing no crossing credit to those traveling on other routes; (iv) a 50% discount to low-income drivers after the first ten trips in a calendar month; and (v) taxis and for-hire vehicles charging passengers a $1.25 and $2.50 toll "per trip."  AR 29 at ES-12.

These are not "small details" to be determined later.  They make up the primary components of the Project—components that will drive behavior.  As just one example, extending the peak toll by two additional hours, not analyzed in the EA, amounts to some 520 additional hours of tolling per year.  This will affect approximately 60,000 vehicles entering the CBD each weekday.  TMRB Recommendation at 19.  In total, the change will affect 15.6 million cars in a

given year,[62] not including the 104 hours of added peak tolls on weekends.  Neither the EA or

FONSI studied the environmental effects associated with millions of additional vehicles being

diverted each year.  Moreover, critical bridge-crossing credits, such as credits at the George

Washington and the Verrazano-Narrows Bridge were not included, impacting thousands of

commuters and undoubtedly impacting traffic patterns.  The combination of all of these changes

render the previous analysis contained in the EA and FONSI inadequate.  *See W. N. Carolina All.

v. N. Carolina Dep't of Transp.*, 312 F. Supp. 2d 765, 773 (E.D.N.C. 2003) (agency acted

arbitrarily and capriciously in issuing its EA and FONSI because it did not assess or acknowledge

the potential for projects' cumulative impacts); *Native Ecosys. Council v. Judice*, No. CV 18-55-

BLG-SPW, 2019 WL 1131231, at *8 (D. Mont. Mar. 12, 2019) (same).  The EA contemplated

that TBTA could "adopt[] a toll schedule structure that has substantially different attributes from

those examined in this EA" and that if that happened, the Project Sponsors would "identify a course

of action to assess and document the changes in accordance with NEPA prior to implementation

of the project."  AR 29 at 2-29.  That the FHWA left open the possibility that there could a

congestion pricing scheme "substantially different" than the hypothetical scenarios in the EA

underscores that FHWA did not take a "hard look."  *See, e.g., Protect Key West, Inc. v. Cheney*,

795 F. Supp. 1552, 1564, 1569-70 (S.D. Fla. 1992) (enjoining project because the agency failed to

review environmental consequence of the actual project in the EA).

### F.    Defendants' Failure To Provide Adequate Participation Renders The EA And FONSI Arbitrary And Capricious

NEPA requires federal agencies to meaningfully consult with the public throughout the

review process.  40 C.F.R. § 1506.6; *Robertson*, 490 U.S. at 349 (one major purpose of preparing

---

[62] This figure is based on multiplying 60,000 vehicles by 260 weekdays in a year.

agency reports is to guarantee that the public may "play a role in both the decision-making process and the implementation of that decision").  The process to comment on the EA and FONSI was inadequate, rendering them arbitrary and capricious.

First, the Project Sponsors provided only a measly 44 days to comment on the highly complex 868-page Draft EA.  As an initial matter, under 40 C.F.R. § 1501.5(f), an EA cannot span more than 75 pages without written approval by a senior agency official.  Although there is no set minimum number of days required to comment on a draft EA, the public must be given sufficient opportunity to comment.  *Anderson v. Evans*, 371 F.3d 475, 487 (9th Cir. 2004) (citing 40 C.F.R §§ 1503.1, 1506.6); *see also Hanly v. Kleindienst*, 471 F.2d 823, 836 (2d Cir. 1972) ("[B]efore a preliminary or threshold determination of significance is made the responsible agency must give notice to the public of the proposed major federal action and an opportunity to submit relevant facts which might bear upon the agency's threshold decision.").  As a baseline, agencies are required to provide a minimum of 45 days to comment on a Draft EIS, which is, on average, more than 250 pages shorter than Defendants' Draft EA.[63]  40 C.F.R. § 1506.11(d).  Here, providing 44 days to review, analyze, and submit a comment letter on this highly-complex 868-page environmental assessment was insufficient.  Defendants were unreasonable in not extending this comment period further, as requested by many members of the public.

Second, Defendants were provided but 30 days to comment on the 958-page EA, with thousands of hard to understand appendices and 41-page FONSI.  Plaintiffs, as likely many others, tried repeatedly to navigate and engage in the NEPA process during this timeframe.  *See* Chan Decl. ¶ 10.  When seeking guidance from elected officials, Plaintiffs were given incorrect advice

---

[63] *See* Exec. Off. of the Pres. Council on Env't. Quality, *Length of EIS (2013-2018)*, June 12, 2020, at 1, available at https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Length_Report_2020-6-12.pdf.

on the ability to make a public comment regarding the Draft FONSI and were erroneously told that "it's too late to fight congestion pricing." *Id.* ¶ 13. Despite the complexity of these procedures and erroneous information provided, Plaintiffs managed to submit a comment letter to Defendants within the comment period via both email and certified mail. *Id.* ¶ 17. Yet, this comment letter did not appear in the public record and does not seem to have been considered by Defendants. *Id.* ¶ 24.

Third, the FONSI specifically contemplates a "re-evaluation" outside of public comment after the tolling structure is determined. AR 361 at 26. Defendants created a comment period process that occurred before deciding on the actual Congestion Pricing project, completely disenfranchising the public by requiring individuals to comment in a vacuum based on hypothetical scenarios, none of which was ever adopted. As the Ninth Circuit found, "refusing to disclose its Proposed Action until after all opportunity for comment has passed, an agency insulates its decision-making from public scrutiny" rendering "NEPA's procedures meaningless." *Block*, 690 F.2d at 771. The public viewpoint could not be adequately represented without being able to determine whether the Plan would affect them, and if so, to what degree. The fact that the TMRB recommended a unique tolling structure not otherwise considered in the EA or FONSI—and then gave the public two minutes per person as part of the TMRB process over a four-day period to comment—renders these comment periods meaningless. *See Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1293 (1st Cir. 1996) (public commenters did not have the opportunity to consider the "wholly new problems posed by the new" plan); *Block*, 690 F.2d at 772 (final proposal "differed substantially . . ., seriously diluting the relevance of public comment on the draft EIS alternatives"). Nothing in the Traffic Mobility Act required this backwards approach. *See generally* N.Y. Veh. & Traf. Law § 1704-a(1).

**III.    The FONSI Should Be Set Aside Pending A Supplemental Environmental Review**

Although FHWA has indicated that it intends to "re-evaluate" the FONSI in light of the new TMRB recommendation, a more formal, in-depth "hard look"—one with extensive documentation, environmental studies, and inter-agency coordination—is required.[64]  This Court should declare that a re-evaluation alone—which would not necessarily require any public involvement or a written report—is insufficient based on the array of changes to the Plan.  Instead, a full supplemental report need be conducted.  The project scope, impact, and mitigation requirements have materially changed, and the FHWA cannot simply rubber-stamp the program in March or April to ensure that it is implemented by the June date that the MTA has publicly identified.

An agency must supplement its analysis through a supplemental EA or an EIS if the agency makes substantial changes to the proposed action that are relevant to environmental concerns.  40 C.F.R. § 1502.9(d); *see also* 23 C.F.R. 771.130(a).  If the agency is not certain of the significance of new impacts, it must develop appropriate environmental studies or a supplemental EA.  23 C.F.R. 771.130(c).  "NEPA and its regulations require agencies to take a 'hard look' at the 'significance' of the consequences of their actions before issuing an EA/FONSI . . . but also contemplate the reality that, after the formal issuance of an EIS or EA/FONSI, it is often the case that new information comes to light or the project changes."  *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 959 (7th Cir. 2003).[65]

---

[64] A re-evaluation based on a change in conditions should (1) "[c]learly document the change that triggers the re-evaluation"; (2) [d]ocument the changes in environmental impacts or mitigation . . . and describe how the impact will be different from what was previously described"; and (3) "[d]etermine whether the original environmental decision remains valid after comprehensively considering the changes."  FHWA, *NEPA Re-Evaluation Joint Guidance for FHWA, Fed. R.R. Admin. (FRA), & Fed. Transit Admin. (FTA)* (Aug. 14, 2019), https://www.environment.fhwa.dot.gov/legislation/nepa/Reevaluation_guidance_08142019.aspx.

[65] Although the CEQ regulations do not explain if or when an EA must be supplemented to reflect new information, they do define when an agency must supplement an EIS. *See* 40 C.F.R. § 1502.9(c) (d)(i), (ii) (requiring agencies to supplement EISs if "[t]he agency makes substantial changes in the proposed action," or if "[t]here are significant new

The agency here did not simply change the Congestion Program, it *created* the actual tolling program after the requisite environmental review.  The EA and FONSI were based on hypothetical tolling scenarios, none of which reflected the tolling structure recommended by the TMRB.  The recommendation differed in price, toll credits for certain bridges, peak hours of the toll, discounts to low-income individuals, and the toll structure for taxis and for-hire vehicles.  *See supra* Section F.  Nothing in the EA "so much as hinted at" these new elements, and "there is no direct or reliable way to compare the [environmental] effects of these changes" to those elements previously analyzed.  *N.M. ex rel. Richardson*, 565 F.3d at 707. In keeping with Defendants' myopic focus on completion without the inconvenience of meaningful public engagement, a limited, four-day comment period was allowed for the recommendation, with speakers given a sum total of two minutes each to speak.

These core components recommended by the TMRB will have significant effects on the environment due to redirected traffic, which the FONSI could not have considered.  Basic logic dictates the following: (1) a higher toll price means more people will seek to avoid the toll by re-routing their trip; (2) providing crossing credits on certain bridges will result in more traffic over those bridges; (3) longer peak hours will result in additional redirected traffic; and (4) tolling passengers of taxis and for-hire vehicles a marginal increase per trip instead at the full peak toll rate (which will likely be passed on to the passenger) will not meaningfully deter these vehicles from driving throughout the CBD.[66]  All of these changes will significantly impact Plaintiffs.  Giving rideshare and taxis a near pass on the toll will do little to alleviate congestion; longer peak

---

circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts").  Courts have found these regulations and associated case law instructive when deciding whether an agency should have updated an EA.  *See, e.g., Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509-10 (9th Cir.1997) (holding that the standard for supplementing an EA is the same as for an EIS).

[66] Taxis and app-based for-hire vehicles already make up 52% of congestion in the CBD and are only expected to be charged $1.25 and $2.50 per ride, respectively.  TMRB Recommendation at 11.

hours will mean longer days of diverted traffic and increased congestion on exempted thoroughfares; and there remains no discount for residing in Battery Park City, or any residents in the CBD.  Any simple "re-evaluation" by the FHWA does not cure the failure to carry out a proper evaluation of the actual tolling structure in the first place.  A simple re-evaluation will not suffice.

*Dubois v. U.S. Department of Agriculture.*, 102 F.3d 1273 (1st Cir. 1996), is illustrative. In *Dubois*, the First Circuit held that the relevant agency should have conducted a supplemental EIS where the final proposal for a ski resort's trails and location was "configured differently" than the previously-analyzed alternatives.  *Id.* at 1293.  The agency argued that the facet of the plan not studied in the initial EIS was "merely a scaled-down modification" and the environmental effects of the earlier approved plan would have been "far larger and far more intrusive on the environment than the new preferred [Plan]."  *Id.* at 1292.  But the court held that the agency failed to take a hard look at the actual plan, and required a supplemental EIS.  *Id.*

As in *Dubois*, the TMRB Recommendation contains myriad changes—in fact, a whole new toll price and structure—necessitating the need for a supplemental report.  *Id.* at 1292-93; *see also Block*, 690 F.2d at 772 (requiring supplemental review where substantial changes in final project proposal "could not be fairly anticipated").

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment.

Dated: New York, New York
      March 18, 2024

**STEPTOE LLP**

By:

    */s/ Alan M. Klinger*
    Alan M. Klinger
    Dina Kolker
    David Kahne
    1114 Avenue of the Americas
    New York, New York 10036
    (212) 506-3900
    aklinger@steptoe.com

    *Counsel for Plaintiffs*