**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x
                                                             :
ELIZABETH CHAN, *et al.*,                                    :
                                                             :
                          Plaintiffs,                        :
            -against-                                        :     Case No. 23 Civ. 10365 (LJL)
                                                             :
UNITED STATES DEPARTMENT OF                                  :
TRANSPORTATION, et al.,                                      :
                                                             :
                          Defendants.                        :
------------------------------------------------------------ X


**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT AND**
**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2728
Email:  zachary.bannon@usdoj.gov


ZACHARY BANNON
DOMINIKA TARCZYNSKA
Assistant United States Attorney
– Of Counsel –

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

LEGAL AND FACTUAL BACKGROUND .................................................................... 3

    I.     The National Environmental Policy Act .................................................. 3

    II.    Factual Background ................................................................................. 6

          A.    Passage of the Traffic Mobility Act ........................................... 6

          B.    Development of the Final EA ..................................................... 7

          C.    The Final Environmental Assessment ....................................... 9

          D.    The Final FONSI.................................................................... 22

          E.    Re-Evaluation Based on the Final Tolling Schedule ................ 23

STANDARD OF REVIEW .......................................................................................... 24

ARGUMENT ............................................................................................................. 26

    I.     The FHWA's Decision to Issue a FONSI Was Not Arbitrary and Capricious..... 26

    II.    The FHWA Thoroughly Analyzed the Project's Anticipated Effects on Battery Park City......................................................................... 29

    III.   The FHWA Conducted a Thorough Analysis of Potential Effects on Environmental Justice Communities ................................................... 35

    IV.   FHWA Reasonably Confined its Review of Alternatives to Those Options That Could be Enacted by the TBTA .................................. 39

    V.    The Final EA Appropriately Describes the Mitigation Applicable to the Project ........................................................................................... 42

    VI.   The FHWA Provided Ample Opportunities for Public Participation.................. 45

    VII.  The Anticipated Re-Evaluation Does Not Render the Final EA Inadequate........ 50

CONCLUSION.......................................................................................................... 53

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*API v. EPA,*
  683 F.3d 382 (D.C. Cir. 2012) ................................................................................. 44

*AT&T Corp v. FCC,*
  349 F.3d 692 (D.C. Cir. 2003) ................................................................................. 25

*Audubon Soc'y v. Salazar,*
  829 F. Supp. 2d 273 (D. Del. 2011) ......................................................................... 40

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council,*
  462 U.S. 87 (1983) .............................................................................................. 25, 47

*Becker v. Federal Railroad Admin.,*
  999 F. Supp. 240 (D. Conn. 1996) ....................................................................... 32, 33

*Bergen Cnty. v. Dole,*
  620 F. Supp. 1009 (D.N.J. 1985) ............................................................................. 44

*Bering Straight Citizens v. U.S. Army Corps of Engineers,*
  524 F.3d 938 .......................................................................................................... 45, 47

*Brodsky v. U.S. Nuclear Reg. Comm'n,*
  704 F.3d 113 (2d Cir. 2013) ................................................................................... 4, 47

*California v. Bernhardt,*
  472 F. Supp. 3d 573 (N.D. Cal. 2020) ...................................................................... 38

*Cellular Phone Taskforce v. FCC,*
  205 F.3d 82 (2d Cir. 2000) ......................................................................................... 5

*Citizens Against Burlington, Inc. v. Busey.,*
  938 F.2d 190 (D.C. Cir. 1991) .................................................................................. 40

*Citizens for Balanced Env't and Transp., Inc. v. Volpe,*
  650 F.2d 455 (2d Cir. 1981) ...................................................................................... 34

*City of Crossgate v. U.S. Dep't of Veterans,*
  *Affs.*, 526 F. Supp. 3d 239 (W.D. Ky. 2021) ........................................................... 52

*City of New York v. Slater,*
    145 F.3d 568 (2d Cir. 1998) ........................................................................... 28

*Cmtys. Against Runway Expansion, Inc. v. F.A.A.,*
    355 F.3d 678 (D.C. Cir. 2004) ....................................................................... 36

*Coal. for Healthy Ports v. United States Coast Guard,*
    No. 13 Civ. 5347 (RA), 2015 WL 7460018 (S.D.N.Y. Nov. 24, 2015) ................... 47

*Coal. for Responsible Growth & Res. Conservation v. U.S. F.E.R.C.,*
    485 Fed. Appx. 472 (2d Cir. 2012) ................................................................. 29

*Comite de Apoyo a Los Trabajadores Agricolas v. Perez,*
    46 F. Supp. 3d 550 (E.D. Pa. 2014) ................................................................ 44

*Concerned Citizens All. v. Slater,*
    176 F.3d 686 (3d. Cir. 1999) .......................................................................... 40

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
    72 F.4th 1166 (10th Cir. 2023) ...................................................................... 28

*Ctr. for Law and Educ. v. Dep't of Educ.,*
    396 F.3d 1152 (D.C. Cir. 2005) ...................................................................... 36

*Cuckic v. Jaddou,*
    No. 21 Civ. 8395 (JPO), 2023 WL 2586031 (S.D.N.Y. Mar. 21, 2023) ................. 26

*Dep't of Transp. v. Public Citizen,*
    541 U.S. 752 (2004) ..................................................................................... 41

*Dubois v. U.S. Dep't of Agriculture,*
    102 F.3d 1273 (1st Cir. 1996) ........................................................................ 37

*Duncan's Point Lot Owners Ass'n Inc. v. FERC,*
    522 F.3d 371 (D.C. Cir. 2008) ................................................................... 31, 32

*Earth Island Inst. v. Muldoon,*
    630 F. Supp. 3d 1312 (E.D. Cal. 2022) ............................................................ 52

*Earth Island Inst. v. U. S. Forest Serv.,*
    87 F.4th 1054 (9th Cir. 2023) ............................................................... 41, 49, 50

*Eastern Queens Alliance, Inc. v. FAA,*
    589 F. App'x 19 (2d Cir. 2014) .............................................................. 30, 41

*Erlbaum v. New Jersey Dep't of Env't Prot.*,
  No. 16 Civ. 8198 (RMB), 2017 WL 465466 (D.N.J. Feb. 3, 2017) ....................................... 30

*Friends of Animals v. Romero*,
  948 F.3d 579 (2d Cir. 2020) ......................................................................................................... 3

*Friends of Ompompanoosuc v. FERC*,
  968 F.2d 1549 (2d Cir. 1992) ....................................................................................... 27, 28, 47

*Gunpowder Riverkeeper v. FERC*,
  807 F.3d 267 (D.C. Cir. 2015) .............................................................................................. 6, 7, 28

*Hanly v. Kleindienst*,
  471 F.2d 823 (2d Cir. 1972) ....................................................................................................... 27

*Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Engineers*,
  702 F.3d 1156 (10th Cir. 2012) ................................................................................................. 27

*Knowles v. U.S. Coast Guard*,
  924 F. Supp. 593 (S.D.N.Y. 1996) ........................................................................................ 6, 35

*Latin Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*,
  858 F. Supp. 2d 839 (E.D. Mich. 2012) .................................................................................... 34

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .................................................................................................................... 35

*Marsh v. Or. Natural Res. Council*,
  490 U.S. 360 (1989) ...................................................................................................................... 4

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
  783 F.3d 1301 (D.C. Cir. 2015) ................................................................................................. 25

*NAACP Erie Unit 2262 v. Fed. Highway Admin.*,
  648 F. Supp. 3d 576 (W.D. Pa. 2022) ....................................................................................... 45

*Nat'l Audubon Soc., Inc. v. U.S. Fish & Wildlife Serv.*,
  55 F. Supp. 3d 316 (E.D.N.Y. 2014) .......................................................................................... 28

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
  241 F.3d 722 (9th Cir. 2001) ..................................................................................................... 26

*Norton v. Fed. Highway Admin.*,
  No. 01 Civ. 891, 2002 WL 31017416 (W.D.N.Y. Aug. 8, 2002) ............................................. 53

*NRDC v. FAA*,
564 F.3d 549 (2d Cir. 2009) ............................................................... 25, 40

*NRDC v. FDA*,
598 F. Supp. 3d 98 (S.D.N.Y. 2022) ........................................................ 25

*NRDC v. NPS*,
250 F. Supp. 3d 1260 (M.D. Fla. 2017) .................................................... 41

*O'Reilly v. U.S. Army Corps of Engineers*
477 F.3d 225 (5th Cir. 2007) ................................................................ 43

*Olmstead Citizens for a Better Community v. United States*,
793 F.2d 201 (8th Cir. 1986) ................................................................. 41

*Pogliani v. U.S. Army Corps of Eng'rs*,
306 F.3d 1235 (2d Cir. 2002) ............................................................... 47

*Potomac Heritage Trail Ass'n, Inc. v. U.S. Dep't of Transp.*,
No. 22 Civ. 02482 (DLB), 2022 WL 7051160 (D. Md. Oct. 11, 2022) ................ 51

*Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*,
113 F.3d 1505 (9th Cir. 1997) ............................................................... 51

*Prisons, Inc. v. U.S. Dep't of Just.*,
197 F. Supp. 2d 226 (W.D. Penn. 2001) .................................................... 5

*Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*,
636 F. Supp. 3d 33 (D.D.C. 2022) .......................................... 36, 38, 42, 51

*Riverkeeper, Inc. v. EPA*,
358 F.3d 174 (2d Cir. 2004) ................................................................. 25

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ................................................................ 3, 25, 38

*Roosevelt Campobello Int'l Park Comm. V. EPA*,
684 F.2d 1041 (1st Cir.1982) ............................................................... 41

*Rucker v. Willis*,
484 F.2d 158 (4th Cir. 1973) ............................................................... 28

*Sierra Club v. Fed. Energy Reg. Comm'n*,
867 F.3d 1357 (D.C. Cir. 2017) ............................................................ 31

*Sierra Club v. U.S. Dep't of Transp.*,
    753 F.2d 120 (D.C. Cir. 1985) ............................................................ 42

*Sierra Club, Inc. v. Bostick*,
    787 F.3d 1043 (10th Cir. 2015) .......................................................... 29

*South Trenton Residents Against 29 v. Fed. Highway Admin.*,
    176 F.3d 658 (3d Cir. 1999) .......................................................... 5, 53

*Spiller v. White*,
    352 F.3d 235 (5th Cir. 2003) .......................................................... 5, 29

*Stewart Park & Reserve Coal., Inc. v. Slater*,
    352 F.3d 545 (2d Cir. 2003) ............................................................ 42

*Suburban Trails, Inc. v. New Jersey Transit Corp.*,
    800 F.2d 361 (3d Cir. 1986) ............................................................ 44

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    616 F.3d 497 (D.C. Cir. 2010) .......................................................... 47

*Tinicum Twp., Pa. v. U.S. Dep't of Transp.*,
    685 F.3d 288 (3d Cir. 2012) ............................................................ 39

*TOMAC, Taxpayers of Michigan Against Casinos v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006) ..................................................... 28, 29

*Town of Orangetown v. Gorsuch*,
    718 F.2d 29 (2d Cir. 1983) ......................................................... 27, 35

*Trenton Threatened Skies, Inc. v. FAA*,
    90 F.4th 122 (3d Cir. 2024) ............................................................. 36

*U.S. Army Corp. of Engineers*,
    685 F.3d 259 (3d Cir. 2012) ............................................................ 47

*Vecinos v. FERC*
    6 F.4th 1321 (D.C. Cir. 2021) .......................................................... 37

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978) ..................................................................... 3, 44

*Wellness Community-National v. Wellness House*,
    70 F.3d 46 (7th Cir. 1995) ................................................................. 1

*WildEarth Guardians v. Conner*,
   920 F.3d 1245 (10th Cir. 2019) ........................................................ 52

*Wilderness Soc., Inc. v. Rey*,
   622 F.3d 1251 (9th Cir. 2010) ......................................................... 36

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................. 29

**Statutes**

5 U.S.C. § 706 ...................................................................................... 24

23 U.S.C. § 129 .................................................................................... 7

23 U.S.C. § 149 .................................................................................... 7

23 U.S.C. § 301 .................................................................................... 7

42 U.S.C. § 4332 .................................................................................. 4

**Rules**

Fed. R. Civ. P. 56 ................................................................................ 35

**Regulations**

23 C.F.R. § 771, *et seq.* ............................................................ *passim*

40 C.F.R. 1500, *et seq.* ............................................................ *passim*

## PRELIMINARY STATEMENT

Last summer, the Federal Highway Administration ("FHWA") issued a Final Environmental Assessment (the "Final EA") with respect to the State of New York's proposed congestion pricing program for the Manhattan Central Business District ("CBD") ("the Project"). The Final EA, consisting of hundreds of pages of analysis and thousands of pages of additional exhibits, was a comprehensive and thorough assessment of the potential environmental effects of the Project, including its potential effects on the areas in which Plaintiffs live and work. Thereafter, and accounting for the analysis in the Final EA as well as the mitigation measures that had been proposed by the Project Sponsors,[1] the FHWA issued a Finding of No Significant Impact ("FONSI"), concluding that the Project would have "no significant impact on the human or natural environment." Measured against this record, Plaintiffs' environmental claims against the Federal Defendants[2] fail.

At bottom, Plaintiffs' summary judgment brief focuses on policy disagreement with the Project rather than concern about the thoroughness of FHWA's environmental analysis in the Final EA and FONSI. Plaintiffs' actual arguments about the sufficiency of the environmental review are divorced from the record. For example, Plaintiffs contend that "[t]he FHWA paid scant attention to Battery Park City," the home of several of the Plaintiffs, despite their belief that the

---

[1] The Project Sponsors are the MTA, the New York State Department of Transportation, and the New York City Department of Transportation.

[2] The Federal Defendants are the U.S. Department of Transportation ("DOT"), the FHWA, Shailen Bhatt, in his official capacity as Administrator of FHWA, and Richard J. Marquis, in his official capacity as Division Administrator of the New York Division of FHWA.

Plaintiffs' original complaint also included Lisa Garcia, Region Administrator for the U.S. Environmental Protection Agency's Region 2, as a defendant. Because the Region Administrator was not named in the Amended Complaint, the Federal Defendants respectfully request that she be removed from the caption of the case. *See, e.g., Wellness Community-National v. Wellness House*, 70 F.3d 46, 49 (7th Cir. 1995) ("Once an amended pleading is interposed, the original pleading no longer performs any function in the case." (quotation marks omitted)).

neighborhood will see "a significant increase in traffic under Congestion Pricing."  But the FHWA's Final EA expressly studied traffic patterns at four intersections along lower West Street (the eastern border of Battery Park City) in its analysis of traffic in Lower Manhattan and concluded that congestion would be reduced in the area.  Thus, not only are Plaintiffs wrong about the Final EA's treatment of traffic in Battery Park City, the FHWA determined that the Project would not adversely impact that area.

Plaintiffs' other arguments similarly ignore the record and do not constitute the type of violations that NEPA—a statute that demands environmental *analysis* but does not require particular substantive *outcomes*—provides a remedy for.  Specifically, Plaintiffs takes issue with the FHWA's: (1) issuance of a FONSI for the Project; (2) analysis of the Project's impacts on Battery Park City; (3) consideration of environmental justice communities in that same area; (4) assessment of alternatives; (5) scope of mitigation; (6) public participation process; and (7) choice to issue the Final EA before the Triborough Bridge and Tunnel Authority ("TBTA") issued a final tolling schedule.  Each allegation is belied by the record.

First, the FHWA reasonably determined that, after implementation of specified mitigation measures, the Project would have no significant environmental impact.  As to the second and third, the FHWA's air quality, traffic, and environmental justice analyses were based on reasonable methodologies that are entitled to deference, and the scope of those analyses was comprehensive.  Particularly as to environmental justice, the FHWA responded to community concerns by preparing an additional in-depth analysis of the anticipated effects of the Project on communities that might experience increased traffic due to the Project and proposing targeted mitigation for those locations.  Fourth, the Final EA looked at reasonable alternatives, accounting for the fact that the Project was initiated by a New York State statute that required any congestion pricing proposal

2

ultimately achieve targeted revenue-generating goals.  Fifth, the FHWA more than adequately described the scope of mitigation and the anticipated effectiveness of such measures.  Sixth, Plaintiffs fail to provide a basis for their argument that the timing of FHWA's review violated NEPA, particularly given that the agency has committed to a forthcoming re-evaluation based on the final tolling schedule that is adopted.  Finally, the FHWA conducted extensive coordination and outreach that more than met NEPA's requirements for an environmental assessment.

In sum, the FHWA arrived at an informed and well-considered decision that more than met the applicable statutory and regulatory requirements.  Although Plaintiffs disagree with the outcome, mere disagreement is not a basis upon which to grant relief under NEPA. The Court should accordingly grant summary judgment to the Federal Defendants on all counts.

## LEGAL AND FACTUAL BACKGROUND

### I.     The National Environmental Policy Act

Congress enacted NEPA to ensure that federal agencies consider the environmental consequences of projects before committing resources and to facilitate agencies' communication with the public about their environmental analyses.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-52 (1989).  As the Supreme Court has recognized, NEPA is a procedural statute that does not mandate substantive results.  *Robertson*, 490 U.S. at 350-51.  Rather, it is designed "to insure a fully informed and well-considered decision" in the examination of potential environmental impacts of a proposed agency action.  *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978); *see also Robertson*, 490 U.S. at 351 ("NEPA merely prohibits uninformed—rather than unwise—agency action."); *Friends of Animals v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020) (discussing NEPA's procedural aims).

To meet these goals, NEPA requires federal agencies to assess the effects of proposed major federal actions on the human environment. *See* 42 U.S.C. § 4332(C); Executive Order No. 11,514, 35 Fed. Reg. 4247 (Mar. 7, 1970). NEPA requires that one of three classes of review be conducted, depending upon, in part, the expected extent of the environmental impact. *See Brodsky v. U.S. Nuclear Reg. Comm'n*, 704 F.3d 113, 119-20 (2d Cir. 2013). First, the agency may provide that actions that do not individually or cumulatively have a significant environmental receive a Categorical Exclusion from further environmental analysis. 23 C.F.R. § 771.115.[3] Second, where an action may have a significant impact on the environment, an agency must prepare an EA to determine whether preparation of a further EIS is necessary. 23 C.F.R. § 771.115. The EA is a concise document intended to help the agency "[d]etermine which aspects of the proposed action have potential for social, economic, or environmental impact; identify alternatives and measures that might mitigate adverse environmental impacts; and identify other environmental review and consultation requirements that should be performed concurrently with the EA." 23 C.F.R. § 771.119(b). If an agency determines that an EA is sufficient (and, therefore, that an EIS is not required), the agency must set forth its reasons in a FONSI. 23 C.F.R. § 771.119(g)-(h); *see also* 40 C.F.R. § 1501.6(c)[4] (noting a FONSI may rely on mitigation measures to find "no significant impacts"). Alternatively, if the project will "significantly affect the environment," the agency must prepare an EIS. 23 C.F.R. § 771.115(a).

NEPA's requirements, however, do not elevate form over substance. If "requiring the preparation of an EIS [] would be a waste of time and resources" an EA can be treated as

---

[3] Agencies have promulgated their own NEPA regulations tailored to the agency functions at issue. The regulations cited here are the FHWA's implementing NEPA regulations. *See* 23 C.F.R. § 771, *et seq*.

[4] NEPA created the Council of Environmental Quality ("CEQ") within the Executive Office of the President and granted CEQ the authority to issue regulations effectuating NEPA. CEQ regulations are "mandatory" for all federal agencies to follow and CEQ's interpretation of NEPA is entitled to "substantial deference." *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 372 (1989); *see also* 40 C.F.R. § 1500, *et seq*.

"function[ally]" an EIS. *Spiller v. White*, 352 F.3d 235, 245 n.6 (5th Cir. 2003). This is particularly true where an:

> EA [] has all the hallmarks of an EIS: there were public hearings and costly, extensive, and comprehensive environmental studies which produced reams of material data . . . [such that] . . . it is unclear whether the time and expense required to prepare an EIS after an EA will result in any incremental benefits.

*Id.*; *cf. Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 94-95 (2d Cir. 2000) (finding that FCC's rulemaking satisfied the "functional compliance test" because its orders "functionally satisf[ied] the CEQ's requirements for an EA and a FONSI both in form and substance").

The FHWA's NEPA regulations also explicitly provide for re-evaluations of prior NEPA determinations when there are remaining federal approvals for a project. *See* 23 C.F.R. § 771.129; *see also* NEPA Re-Evaluation Joint Guidance (Aug. 14, 2019).[5] The agency must "determine, prior to granting any new approval related to an action or amending any previously approved aspect of an action, including mitigation commitments, whether an approved environmental document remains valid." 23 C.F.R. § 771.129. In other words, "the purpose of [a] Reevaluation [is] to determine whether . . . a [s]upplemental [NEPA review is] necessary." *South Trenton Residents Against 29 v. Fed. Highway Admin.*, 176 F.3d 658, 661 (3d Cir. 1999); s*ee also Citizens Advisory Comm. on Priv. Prisons, Inc. v. U.S. Dep't of Just.*, 197 F. Supp. 2d 226, 249 (W.D. Penn. 2001) (NEPA provisions "allowing supplemental documentation demonstrate that neither agencies nor information are perfect and, at times, corrections and reevaluations are needed."). A re-evaluation can occur at any point before the final federal approval for the project is issued, and the agency can consider new information or circumstances that occurred after the NEPA document was finalized. *See* NEPA Re-Evaluation Joint Guidance at 2-3.

---

[5] *Available at* https://www.environment.fhwa.dot.gov/legislation/nepa/reevaluation_guidance_08142019.pdf.

Finally, economic concerns are not within the scope of NEPA.  *See Knowles v. U.S. Coast Guard*, 924 F. Supp. 593, 599 (S.D.N.Y. 1996) (explaining that, because "NEPA was enacted 'to promote efforts that will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man[,]' . . . [e]conomic injury . . . does not fall within NEPA's zone of interest." (citation omitted)); *see also Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015) ("The zone of interests protected by the NEPA is, as its name implies, environmental; economic interests simply do not fall within that zone.").

## II.    Factual Background

### A.  Passage of the Traffic Mobility Act

The genesis of the Project was the passage of the MTA Reform and Traffic Mobility Act ("the Traffic Mobility Act" or "the Act") in April 2019, DOT_2400.[6]  The New York State legislature found that "traffic congestion in the city of New York ranks second worst among cities in the United States and third worst among cities in the world."  DOT_2403.  As a result, the legislature determined that creation of a "program to establish tolls for vehicles entering or remaining in the most congested area of the state" was "necessary and a [] matter of substantial state concern."  *Id*.  The Act authorized the TBTA to establish a tolling program in the Manhattan CBD,[7] with the goals of "reducing traffic congestion within the CBD and funding capital projects," with tolls set to, at a minimum, "provide for sufficient revenues . . . to fund [15] billion dollars for capital projects for the 2020 to 2024 MTA capital program . . . ."  DOT_2407.  The Act also sets forth exemptions that must be included in the tolling program, such as that passenger vehicles may

---

[6] Citations formatted as DOT_XXXX refer to the Administrative Record lodged in this case.

[7] The CBD is defined as: "the geographic area in the borough of Manhattan south of and inclusive of sixtieth street to the extent practicable but shall not include the FDR Drive, and New York state route 9A otherwise known as the 'West Side highway' including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West St."  DOT_2405.

not be charged more than once per day, that authorized emergency vehicles are exempt, and that the TBTA implement a plan for credits and exemptions for for-hire vehicles. *Id*.

The Act also established the Traffic Mobility Review Board ("TMRB"), which was to "make a recommendation regarding the [CBD] toll amounts to be established," to be "submitted to the [TBTA] for consideration . . . ." DOT_2415. The TMRB's recommendation was required to account for factors such as traffic patterns, traffic mitigation measures, operating costs, public impact, public safety, hardships, vehicle type, discounts for motorcycles, peak and off-peak rates and environmental impacts, including but not limited to air quality and emissions trends. *Id*.; *see also* DOT_36272. "Informed by the TMRB's recommendation, the TBTA Board [would] approve and adopt a final toll structure following a public hearing in accordance with the State Administrative Procedure Act." *Id*.

### B.  Development of the Final EA

Based on passage of the Act, on June 17, 2019, the Project Sponsors submitted an expression of interest to the FHWA seeking approval of the Project under the federal Value Pricing Pilot Program ("VPPP"), DOT_38307.[8] The VPPP is a means by which the FHWA can "provide tolling authority to state, regional, or local governments to implement congestion pricing programs." DOT_36154; *see also* 23 U.S.C. § 149 note; Transportation Equity Act for the 21st Century, Pub. L. 105-178, § 1216(a), 112 Stat. 211 (Jun. 9, 1998). Review under NEPA is a precondition to finalizing a VPPP tolling agreement, DOT_36243, and no tolls may be imposed until the VPPP agreement is finalized. *See* SAFETEA-LU Act, Pub. L. 109-59 § 1604(b)(3)(C), 119 Stat. at 1250.

---

[8] Title 23, United States Code, generally prohibits the imposition of tolls on Federal-aid highways. *See* 23 U.S.C. § 301. However, Congress has enacted tolling exceptions under various pilot programs. *See, e.g.,* 23 U.S.C. § 129. The VPPP is one such program. *See* SAFETEA-LU Act, Pub. L. 109-59 § 1604 (a), 119 Stat. 1249 (Aug. 10, 2005).

From there, the FHWA and the Project Sponsors worked to review information relevant to consideration of the VPPP proposal, such as the choice of traffic modeling methodology, DOT_38886, determination of the appropriate class of NEPA review (here, an EA), DOT_40972, a plan for conducting the NEPA review, DOT_41006, and development the draft EA.  *See, e.g.*, DOT_40190 (FHWA comments on pre-draft EA).  Development of the draft EA also included coordination with, and input from, numerous federal and state agencies.  DOT_37043.  During the NEPA process, the FHWA held numerous meetings with those agencies on a variety of topics, including the appropriate mechanism to conduct particulate matter hot-spot analyses on affected highway segments.  DOT_37044.  In addition, the Project Sponsors formed an Air Quality Interagency Consultation Group, which was consulted on the methodology for completing both the regional and local aspects of the conformity analysis, including approving the hot-spot screening protocol.  DOT_41604-5; *see also* DOT_1177-80.

The FHWA also engaged in robust public outreach throughout the NEPA environmental review process, including through its public website, social media, stakeholder email lists, and by publishing in local media outlets.  *See* DOT_37405.  FHWA also conducted several "early outreach webinars to obtain public input for consideration," DOT_37046, and engaged an Environmental Justice Technical Advisory Group and an Environmental Justice Stakeholder Working Group.  DOT_37048.  That engagement resulted in at least eleven meetings among those groups, DOT_37048-49.[9]  Further, FHWA considered 7,338 public comments received during early outreach activities, DOT_37049-56.

---

[9] The Technical Advisory Group was made up of 16 groups.  DOT_37037.  The Group held seven different meetings on a variety of topics.  DOT_37037-39.  The Stakeholder Working Group included 27 interested individuals and held three meetings.  DOT_37039-40.  The FHWA also hosted nine environmental justice webinars.  DOT_37035-37.

The draft EA was published on July 29, 2022, DOT_37149, and the FHWA provided for public comment on the draft EA between August 10, 2022, and September 23, 2022. DOT_37057.[10]  During the public comment period, the FHWA hosted six virtual public hearings in August 2022.  DOT_37062.  In preparing the Final EA, the FHWA considered the "nearly 70,000 public input submissions on the [draft] EA," including "more than 14,000 individual submissions," "oral testimony at the public hearings, letters, e-mails, voicemails, and submissions via an electronic comment form."  DOT_37063; *see also* DOT_37063-64 (describing Appendix 18C as containing "the full set of comment submissions with responses to each comment").

### C.  The Final Environmental Assessment

The Final EA was published on May 5, 2023, DOT_36150, *et seq*., and totals 958 pages, with thousands of pages of appendices.  The Project's purpose is described as "reduc[ing] traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements, pursuant to acceptance into FHWA's VPPP," DOT_36251, and the need for the Project is to address "increased traffic congestion and delays, slowing travel and jeopardizing the vitality of the area."  DOT_36253.[11]  Based on that purpose, the Final EA identified the following objectives for the Project: (1) "[r]educe daily vehicle-miles traveled (VMT) within the Manhattan CBD"; (2) "[r]educe the number of vehicles entering the Manhattan CBD daily"; (3) "[c]reate a funding source for capital improvements and generate sufficient annual net revenues to fund $15

---

[10] The only Plaintiff who claims to have submitted a comment during the comment period is Plaintiff John Bailey, who is a resident of Pennsylvania and the owner of a private busing company that brings passengers to New York City.  *See* Am. Compl. ¶ 34; *see also* DOT_ 9184.  In this comment he expressed only concerns about the financial impact of the additional tolls on his business and the costs incurred by the passengers that he transports.  *Id.*  He did not assert any environmental interests that are within NEPA's zone of interests.

[11] One group estimated congestion costs the region $100 billion over five years.  *Id.*  This is because "[t]he low travel speeds and unreliable travel times to, from, and within the Manhattan CBD increase auto commute times, erode worker productivity, reduce bus and paratransit service quality, raise the cost of deliveries and the overall cost of doing business, and delay emergency vehicles."  DOT_36257.

billion for capital projects for the MTA capital program"; and (4) "[e]stablish a tolling program consistent with the purposes underlying the [Act]."  DOT_36259.  In implementing the Project, the "TBTA would toll vehicles entering or remaining in the Manhattan CBD via a cashless tolling system."  DOT_36270.

Before analyzing the Project in detail, the Final EA analyzed a range of Project alternatives to see whether other programs could meet the Project's objectives.  *See generally* DOT_36262-301.  The FHWA began by assessing a variety of "[c]ongestion pricing strategies . . . that use tolls to manage congestion as well as projects that do not involve tolls," including parking pricing, vehicle sharing, and creation of incentives to telework.  DOT_36264-65 (discussing strategies previously identified by the FHWA).  Among twelve alternatives assessed, only the Project was found to meet the purpose and needs identified by the FHWA:

| Table 2-2.    Results of Preliminary Alternatives Screening[1] | | | | |
|---|---|---|---|---|
| **ALTERNATIVE** | **PURPOSE AND NEED:** Reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements | **OBJECTIVE 1:** Reduce daily VMT within the Manhattan CBD Criterion: Reduce by 5% (relative to No Action) | **OBJECTIVE 2:** Reduce the number of vehicles entering the Manhattan CBD daily Criterion: Reduce by 10% (relative to No Action) | **OBJECTIVE 3:** Create a funding source for capital improvements and generate sufficient annual net revenues to fund $15 billion for capital projects for MTA's Capital Program |
| NA-1: No Action | Does not meet | Does not meet | Does not meet | Does not meet |
| NTP-1: Parking pricing strategies | Does not meet | Does not meet (see note 2) | Does not meet | Does not meet (see note 2) |
| T-1: Pricing on full roadways: Raise tolls or implement variable tolls on existing toll facilities | Does not meet | Does not meet (see note 3) | Does not meet (see note 3) | Does not meet |
| T-2: Pricing on full roadways: Toll East and Harlem River bridges | Does not meet (see note 4) | Meets | Meets | Does not meet (see note 4) |
| T-3: High-occupancy toll (HOT) lanes | Does not meet (see note 5) | Does not meet | Does not meet | Does not meet (see note 5) |
| T-4: Zone-based pricing: CBD Tolling Program | Meets | Meets | Meets | Meets |
| O-1: Parking pricing: Reduce government-issued parking permits | Does not meet | [Does not meet (see note 6)] | [Does not meet (see note 6)] | Does not meet |
| O-2: Provide additional taxi stands to reduce cruising | Does not meet | Does not meet (see note 7) | Does not meet | Does not meet |
| O-3: Create incentives for teleworking | Does not meet | Does not meet | Does not meet (see note 8) | Does not meet |
| O-4: Ration license plates | Does not meet | Meets | Meets | Does not meet |
| O-5: Mandatory carpooling | Does not meet | Meets | Meets | Does not meet |
| O-6: Truck time-of-day delivery restrictions | Does not meet | Does not meet (see note 9) | Does not meet (see note 9) | Does not meet |

DOT_36367.  As such, and because "NEPA regulations require that the No Action Alternative be evaluated and serve as the baseline condition against which the potential effects of the build alternative are assessed," the No Action Alternative and the Project were selected for further analysis.  DOT_36269.

Because at the time the Final EA was published there remained a range of potential scenarios that could result from the ultimate tolling plan adopted by the TBTA, the Final EA "considers a range of tolling scenarios with different attributes to identify the range of effects that may occur." DOT_36272. All scenarios have common features, but they "vary in their assumptions about other factors, such as the amount of the toll for different types of vehicles, the times tolls would be imposed, exemptions from tolling, crossing credits for tolls paid on other toll tunnels and bridges, and discounts in the form of 'caps' on the number of tolls per 24-hour period to be applied to different types of vehicles." DOT_36291; *see also* DOT_36291-95 (charting and describing seven separate scenarios, lettered "A" through "G"); DOT_36301 (summarizing scenarios).[12]

The Final EA analyzes the potential effects of the Project using regional and local study areas. For the regional study area, the Final EA applies a 28-county area "incorporated in the Best Practice Model (BPM), which is the New York City region's primary long-range travel forecasting model []." DOT_36304. Second, the Final EA uses "multiple local study areas" to assess a variety of different potential effects of the project, with areas selected depending on the analysis in question. DOT_36304. Within that structure, the Final EA discusses potential effects covering two time periods: 2023 (when the Project was initially estimated to be fully operational) and 2045 (a long-term planning horizon date). DOT_36306.

In that framework, the Final EA analyzes numerous topics, across several regional and local study areas. DOT_36304. Because the Final EA addresses several different tolling scenarios

---

[12] "By examining multiple tolling scenarios, the Project Sponsors aim[ed] to give the [TMRB] flexibility in identifying the toll schedule that it will recommend to the TBTA Board, while ensuring that this EA identifies effects and addresses mitigation to minimize or eliminate potential adverse effects associated with certain tolling scenarios." DOT_36940.

to account for the fact the TBTA had not yet finalized a tolling schedule at the time the EA was published, "[f]or each of [the topics of analysis], th[e] EA describes the effects of the tolling scenario that would result in the greatest potential negative effects for that particular topic of analysis." DOT_36306. "For example, the analysis of potential impacts on traffic intersection operations is based on the tolling scenario that would result in the greatest increase in vehicle volumes at the intersections in the study area." *Id.* "This methodology results in [analysis of] the most potential negative effects of the CBD Tolling Alternative,[13] and other tolling scenarios would result in lesser or fewer negative effects." *Id*. Relevant topics of analysis (traffic, neighborhood character, air quality, and environmental justice) are discussed in detail below.

i.     *Traffic*

The Final EA's analysis of the reasonably expected effects of the Project on regional transportation relies on the "Best Practices Model," or "BPM," which "is the primary tool used to analyze the effects of large-scale regional transportation projects," and which "is the Federally recognized transportation forecasting tool for the region." DOT_36340. The BPM is an "activity-based model that simulates the number and types of journeys made on an average weekday in the region by each resident." DOT_36342.[14]   The model uses a Vehicle Miles Traveled ("VMT")

---

[13] "CBP Tolling Alternative" is the phrase used throughout the Final EA to refer to the implementation of the Project. *See, e.g.*, DOT_36270 ("The CBD Tolling Alternative would implement a vehicular tolling program to reduce traffic congestion in the Manhattan CBD, consistent with the Traffic Mobility Act.  After covering Project-related capital and operating expenses, the revenue collected would fund projects in the MTA 2020-2024 Capital Program and successor capital programs.").

[14] "The [Model] is a complex transportation model, created by [NYMTC], used to predict future conditions . . . Metropolitan planning organizations [ ] are responsible for modeling and documenting their region's compliance with the [CAA], and they use transportation models for that purpose.  NYMTC's transportation planning model is based on data from the 2010 Census, traffic and transit ridership data, household surveys, and comprehensive projects of social and economic trends for the regional study area to project travel behavior in future years." DOT_36308-09. The BPM roadway model contains "more than 61,000 links that include local streets, interstates, and freeways." DOT_36342.  It is intended to "create[] a realistic analysis that is based on the various decisions (e.g. mode, purpose, destination, frequency, location of intermediate stops, and time of day) made by travelers between these locations informed by employment and demographic data from NYMTC." *Id.*

metric to "convey[] the change in the aggregate level of driving or traffic that would occur within the BPM's modeled area," DOT_36345, and assess changes in daily vehicular traffic that would result from the implementation of the different tolling scenarios studied in the Final EA. DOT_36344-46; *see also* DOT_36394 (noting focus on "regional highways at points where they would experience the greatest potential effect of shifts in travel and roadways near Manhattan CBD access points and circumferential routes that avoid the Manhattan CBD."); DOT_36413-16 (describing methodology for determining adverse highway effects).

Overall, the traffic analysis showed the Project—both in the short and long term—would significantly decrease the number of vehicles entering the Manhattan CBD.  DOT_36351, 36358. The traffic analysis also showed overall short- and long-term decreases in VMT in the rest of Manhattan, DOT_36354, 36360; limited effects on VMT in the outer boroughs, *id.*; and negligible effects on VMT in the regions surrounding New York City, *id.*[15]  All tolling scenarios analyzed would consequently "result in traffic pattern changes that would support congestion relief." DOT_36363; *see also* DOT_36372 (under all scenarios "daily VMT would decline across the 28-county region"); DOT_36391-92 (summarizing traffic effects).

Relevant here, the Final EA assessed the impact of different tolling scenarios on highways running through Lower Manhattan and on numerous intersections in the same area.  *See* DOT_36452-53 (FDR Drive/Lower East Side);[16] DOT_36481, 36489-90 (intersections near/in

---

[15] In the few regions where VMT is expected to increase in a region under a tolling scenario (never in an amount greater than 0.1% by 2045, *see* DOT_36360), the tolling scenarios still reflect a marked *decrease* in VMT when compared with the no-action alternative (i.e., not implementing the Project).  *See* DOT_36349 (anticipating 8.8% increase in VMTs regionally by 2045).

[16] The FDR Drive near the Brooklyn Bridge was assessed as one of the "key roadways and highways that lead directly to the Manhattan CBD."  DOT_36405. It was selected for comprehensive analysis because "the BPM[] . . . showed traffic volume increases along [it] for some tolling scenarios."  DOT_36411 n.9.  By contrast, other highways and roadways—like the Lincoln Tunnel and Holland Tunnel entries into Manhattan (which provide ingress into West Street and the West Side Highway)—were found to have "reduced traffic volumes under all tolling scenarios," such that they "were not analyzed further."  DOT_36397.

Battery Park City); DOT_36487, 36494 (intersections near/in the Lower East Side).   As to highways, and with respect to the FDR Drive, the Final EA notes that while "the FDR Drive would experience a net decline in traffic at 60th Street," the portion of the FDR Drive "between East 10th Street and the Brooklyn Bridge would experience a net increase in traffic," because it "would become a more competitive route for some origin-destination pairs."  DOT_36452.  Under the tolling scenarios with the "highest tolls that would result in the greatest levels of diversions and changes in travel patterns," this portion of the FDR Drive "showed a potential 5 percent to 9 percent increase in daily traffic volumes along the northbound FDR Drive and a 19 percent to 26 percent increase in daily traffic volumes along the southbound FDR Drive in the section between East 10th Street and the Brooklyn Bridge."  *Id.*

However, the Final EA notes that these "[a]dverse effects . . . will be minimized" by measures "such as ramp metering, motorist information, signage, and/or targeted toll policy modifications to reduce diversions" (known as "Transportation Demand Management" measures). DOT_36455.  As such, the Project Sponsors committed to "undertake monitoring of traffic patterns specifically tailored to the adopted tolling scenario . . . to determine whether the predicted adverse effects are occurring and to determine the appropriate Transportation Demand Management measures . . . to be implemented," so that any adverse effects can be mitigated.  *Id.*  The Project Sponsors also committed to other measures, discussed below, to mitigate these effects.

The Final EA also assessed multiple intersection areas relevant here "[t]o evaluate the potential localized traffic effects of the Project," DOT_36475, including the area of Lower Manhattan between the Hugh Carey Tunnel, the Holland Tunnel, the Brooklyn Bridge, and Manhattan Bridge, as well as the Lower East Side, as shown on this map:



DOT_36476.   The intersections that were selected for analysis were a combination of areas "identified through the public outreach process at locations where communities expressed concerns regarding the potential impacts of more local traffic changes," and the "locations that would most likely experience increases in traffic under the various tolling scenarios, as identified by the BPM."  DOT_36475.   Under the tolling scenario that would result in the greatest "number of intersection locations with a potential increase of 50 or more vehicles," DOT_36488, only one of the fifteen intersections assessed in Lower Manhattan had the potential to experience adverse traffic effects, although those effects could be corrected by signal-timing improvements. DOT_36489.   None of the six intersections along West Street would experience adverse traffic effects.   *Id.*; *see also* DOT_4675-5750 (mapping potential intersection effects).[17]   Finally, assessment of the Lower East Side led to the conclusion that "there would not be an adverse traffic impact in the Lower East Side study area."  DOT_36494.

In sum, the FHWA determined that "the overall effects of the CBD Tolling Alternative along highways used to access the Manhattan CBD would be beneficial for all tolling scenarios," DOT_36502, and that "[m]ost intersections would experience a decrease in traffic volumes and

---

[17] None of the intersections assessed along the West Side Highway were expected to experience adverse traffic effects. *See* DOT_36490, 36494.

delays under all tolling scenarios." DOT_36503. However, the FHWA acknowledged that "[t]he CBD Tolling Alternative could cause localized increases in traffic on highway segments and at local intersections because some drivers would alter their trip or divert around the Manhattan CBD to avoid the toll." DOT_36916. However, the Final EA notes that "[t]he Project Sponsors will . . . implement mitigation measures to alleviate the adverse effects on traffic operations." *Id.*

## ii.    Social Conditions

The Final EA also includes an analysis of "potential environmental consequences related to population characteristics and community cohesion, neighborhood character, and current public policy." DOT_36608; *see also* DOT 36658 (describing "neighborhood character" as "an amalgam of various character-defining features of an area," including "the various elements that give neighborhoods their distinct personality, context, and feeling."). One of the areas studied in the Final EA was the Manhattan CBD as a whole, described as "a heterogenous mix of neighborhoods [that] serves as the economic hub of the New York City region." DOT_36660. One of the three distinct segments of the Manhattan CBD is Lower Manhattan, which the Final EA describes as:

> The defining features of neighborhood character for the Lower Manhattan portion of the Manhattan CBD study area include its wide mix of street configurations and building forms; its dominant patterns of commercial, civic/government, *and residential uses*; the presence of numerous large-scale transportation facilities linking the area to other parts of the city and region; high levels of vehicular and pedestrian traffic; and the high density of development and intensity of use that characterize its neighborhoods.

DOT_36662 (emphasis added).

In assessing the impact of the Project on the character of the Manhattan CBD, the Final EA notes that "although VMT reductions would not be evenly spread across the Manhattan CBD," those reductions "would reduce associated pollutant emissions and improve travel times and travel-time reliability." DOT_36668. And "[e]ven in locations where traffic would increase, the

Project would not adversely affect air quality . . . or noise . . ."  DOT_36668.  "Therefore, there would be no potential for charges in air quality or noise to adversely affect defining features of neighborhood character."  DOT_36668.  The Final EA also notes that "pedestrian traffic in [the Manhattan CBD] would likely increase due to mode shift away from automobiles," which "would reinforce established patterns of land use, heavy mixing of uses, and the very high density of development and intensity of use that are defining features of neighborhood character in the Manhattan CBD."  DOT_36669.

The neighborhood character section of the Final EA also specifically discusses the highways and intersections that were studied as part of the traffic analysis.  DOT_36673.  Because the traffic analysis (including the analysis of areas around Battery Park City) concluded that "there would be no substantial change to the overall operation or character of local streets or highways," the Project accordingly "does not have the potential to alter neighborhood character near neighborhood streets or highways experiencing increases in traffic."  *Id.*

### iii.   *Air Quality*

Chapter 10 of the Final EA "assesses the potential effect of implementing the [Project] on air quality, air pollution, and greenhouse gas (GHG) emissions."  DOT_36818.  The chapter's analysis of air quality effects results directly from its analysis of traffic effects, given that "changes in regional air quality emissions burden are directly related to changes in VMT."  DOT_36828; *see also* DOT_36345 ("Changes in VMT are correlated with changes in level of service, air quality, and noise . . . .").

The Final EA examines three major air quality effects: (1) the six "criteria pollutants" covered under the National Ambient Air Quality Standards ("NAAQS"), DOT_36819-20[18]; (2) hazardous air pollutants, particularly those compounds designated as "priority mobile source air toxics (MSAT), which account for substantial contributions from mobile sources and are among the national- and regional-scale cancer risk drivers or contributions and non-cancer hazard contributors," DOT_36822; and (3) greenhouse gas ("GHG") emissions.  DOT_36826.

The Final EA includes both a "mesoscale" analysis "to determine how the Project would affect total mobile source emissions" and a "microscale" analysis "to evaluate potential CO and PM impacts" at the local level.  DOT_36827.  For the local analysis, "[a]n initial review of all the tolling scenarios was conducted to determine the tolling scenario that demonstrates the highest traffic volume increases on the local streets."  DOT_36831.  Thereafter, the 102 intersections "expected to demonstrate the largest changes in traffic due to the Project" (including four intersections along Battery Park City and three in the Lower East Side, *see* DOT_36861-62) were screened for both CO and $PM_{2.5}/PM_{10}$ (the NAAQS pollutants that are of concern on a localized level, *see* DOT_36820, 32).  Each location passed the screening analysis, so no further analysis was warranted.  DOT_36859-60.  Indeed, the Manhattan CBD is expected to experience significant decreases in these pollutants by 2045.  *See* DOT_36849-51.

Further, the FHWA conducted a "highway link analysis" to respond to concerns from communities based on potential air quality impacts from "increases in truck traffic" due to the Project.  DOT_36833.  Although "[d]uring early outreach, concerns were raised related to a specific location at FDR Drive and 10th Street" (along the Lower East Side)" DOT_36863,

---

[18] All counties in the 28-county area were in attainment for Lead and Nitrogen Dioxide, but most of the region is classified as "nonattainment for the 2008 and 2015 [ozone] NAAQS" and as "maintenance areas" for carbon monoxide and $PM_{2.5}$.  *Id.*

"[a]ccording to the traffic analysis, approach volumes on FDR Drive at 10th Street" would not approach the volume at which adverse effects would occur. *Id.* As such, "the Project would not increase traffic volumes or change other existing conditions to such a degree as to jeopardize attainment of the NAAQS for CO." *Id.*

In sum, the FHWA found that "for all tolling scenarios, the changes in traffic volumes, including changes in truck trips, would not result in regional or localized exceedances of [NAAQS], and there would be no adverse effects on air quality . . . ." DOT_36942; DOT_36838 ("[I]n all analysis years, the overall regional VMT and emission burdens would be lower under the CBD Tolling Alternative than the no Action Alternative.").

                    *iv.*     *Environmental Justice*

The Final EA also contains a discussion of potential environmental justice effects resulting from the Project, including a separate "Technical Memorandum" to address concerns raised by commentors during the NEPA process. DOT_36954; *see also* DOT_36989-96 (summarizing Technical Memorandum); DOT_7243-7440 (Technical Memorandum); DOT_7249 (the Memorandum "more completely address[es] comments from the [EPA] and from members of the public relating to effects of traffic diversions . . . on environmental justice communities that are already burdened by pre-existing air pollution and associated health risks."). The purpose of this assessment was to "analy[ze] whether the Project would result in disproportionately high and adverse effects on low-income and minority populations." DOT_36954.

The Final EA's discussion of environmental justice includes detailed assessment of environmental justice communities in the Lower East Side,[19] as identified in the following map:

---

[19] FHWA identified environmental justice populations using U.S. Census Bureau data, DOT_36956, applied against the definitions in USDOT Order 5610.C and FHWA Order 6640.23A. DOT_36961; *see also* DOT_1292-95 (methodology); DOT_6974 (describing low-income threshold).



DOT_36964.  In that area and others, the FHWA discusses several topics—like congestion on highways and local intersections and traffic-related effects on air quality and noise—"based on the issues identified in other chapters of th[e] EA and as a result of environmental justice outreach for the Project."  DOT_36877-78.

As to highway segments (as discussed above in Section II.C.i), the Final EA acknowledges that adverse effects on traffic conditions could result on the FDR Drive between East 10th Street and the Brooklyn Bridge.  DOT_36979.  However, the Final EA notes that "[w]ith implementation of the [Project], a robust post-implementation traffic monitoring program will be implemented to identify and quantify actual traffic effects associated with the adopted tolling scenario and to inform the development of appropriate mitigation measures."  DOT_36979.  As to local intersections (as also discussed above in Section II.C.i), the Final EA notes that the majority of studied intersections (included all four in the Lower East Side) would experience a "reduction[] in delay under all tolling scenarios," resulting in no "adverse effects on local air quality." DOT_36981-82.  "To address concerns related to the potential effects on local air quality from . . . traffic diversions," the Project Sponsors also "conducted additional evaluation of the potential Project-related effects on CO" along the FDR Drive.  DOT_36984.  As discussed in the

Final EA's section on air quality, this analysis "concluded that the [Project] would not result in adverse effects on air quality" on highways abutting the Lower East Side.  DOT_36984.

During the public comment period on the Draft EA, the U.S. Environmental Protection Agency ("EPA") submitted a comment recommending several changes to the EA's analysis of air quality impacts to environmental justice communities.  DOT_7920-25.  In response to these recommendations, "[t]o supplement the air quality analyses presented in the EA, and in coordination with FHWA and EPA, additional research was undertaken to broaden the analysis, and additional commitments [were] included," principally through the EA's new Technical Memorandum.  DOT_7926 (response to EPA comment).  That Memorandum "considers changes in traffic that would occur as a result of the CBD Tolling Alternative, and where these changes would occur relative to environmental justice populations that already have high levels, compared to national norms, of pre-existing pollutant or chronic disease burdens."  DOT_36990.  Much of the analysis of the Technical Memorandum focuses on the effects of "[i]ncreases in truck traffic in currently overburdened environmental justice communities."  DOT_36993.  Because trucks are not permitted on the FDR Drive, DOT_36984, this additional analysis was not pertinent to the environmental justice communities within the Lower East Side.

Nevertheless, the analysis of the Technical Memorandum reiterated that the FDR Drive along the Lower East Side could experience modest increases to non-truck traffic under certain tolling scenarios.  DOT_7310.  And so—"in addition to the traffic monitoring plan for this area related to potential adverse effects on traffic," (discussed above in Section II.C.i), the Project Sponsors committed to additional mitigation in the Lower East Side.  DOT_7323.  Specifically, the Project Sponsors committed to tolling vehicles that traveled across the Brooklyn Bridge, drove north to Houston Street, then turned around to head south down the FDR Drive, a maneuver that,

if tolled, would reduce "traffic increases on the FDR Drive" by "25 to 35 percent."  DOT_7323.
The Project Sponsors also committed to other place-based mitigation measures to mitigate
potential adverse effects on other environmental justice populations.  DOT_37017-20.  Following
the addition of the Technical Memorandum, including its further commitments from the Project
Sponsors to mitigate potential adverse effects to environmental justice communities, the EPA
"acknowledge[d] the improvements throughout the NEPA process."  DOT_45366.

In sum, the Final EA "identifies locations where . . . [the Project] could increase traffic,
thus adding to pre-existing burdens on potentially vulnerable communities" and "identifies a
package of mitigation measures to address potential traffic diversions and associated pollutant
emissions or health effects resulting from the Project, to avoid creating a disproportionately high
and adverse effect."  DOT_7250.

### D.  The Final FONSI

Along with the Final EA, the FHWA published a draft FONSI on May 8, 2023,
DOT_36142, with feedback open from May 12, 2023 to June 12, 2023.  DOT_393.  Prior to
publication of the Final FONSI, the FHWA held meetings with Federal and New York State
agencies, regional transportation agencies, and the environmental justice Stakeholder Working
Group and Technical Advisory Group.  DOT_401.  "The public availability period differed from
the early outreach and formal public comment periods in that comments were not solicited."
DOT_393.   Nevertheless, the FHWA "considered information received during the public
availability period" and issued the Final FONSI on June 23, 2023, after determining that "no new
substantive issues" were raised by any public submissions.  DOT_393.

The Final FONSI "summarizes the potential effects of the Project as identified in the Final
EA and the monitoring and mitigation commitments made by the Project Sponsors that FHWA

has determined will result in no significant impacts." DOT_370. It includes summaries of the effects analyzed in each section of the Final EA—identifying where the Project will have beneficial effects, no effects, and adverse effects requiring mitigation. DOT_371-82. For example, one the "effects" analyzed in Chapter 4A of the Final EA was an "[o]verall decrease in vehicle-miles traveled (VMT) in the Manhattan CBD and region overall in all tolling scenarios and some shift from vehicle to transit mode." DOT_371. Because this is a "beneficial effect," the FONSI notes that "[n]o mitigation [is] needed" to offset it. *Id.* Under Chapter 5B of the Final EA, the FONSI notes "[n]o notable change in neighborhood character" in the Manhattan CBD. DOT_376. Because there are "[n]o adverse effects," the FONSI also notes that "[n]o mitigation [is] needed" for this effect, either. *Id.*

In the few circumstances where the Final EA did note potential adverse effects—like the changes to traffic patterns along the FDR Drive near the Brooklyn Bridge—the FONSI sets forth the actions needed to mitigate the potential effects. DOT_372. With respect to traffic on the FDR, the FONSI notes that "[t]he Project Sponsors will implement a monitoring plan . . . after the start of tolling operations and including thresholds" above which adverse effects will be recognized. *Id.* "[I]f the thresholds are reached or crossed, the Project Sponsors will implement Transportation Demand Management (TDM) measures . . . at all identified highway locations with adverse effects upon implementation of the Project." *Id.*

### E.  Re-Evaluation Based on the Final Tolling Schedule

Consistent with the Traffic Mobility Act, on November 30, 2023, the TMRB released its recommendation for a final tolling structure.[20]  Subsequently, the TBTA began a state

---

[20] *Available at* https://new.mta.info/document/127761.  The TMRB held three public meetings prior to releasing its recommendation.  *See* https://new.mta.info/project/CBDTP/traffic-mobility-review-board.

administrative procedure to establish and adopt a toll schedule; that process included the opportunity for the public to submit written comments as well as public hearings. *See* MTA, *How to Comment on the Proposed CBDTP Tolling Schedule* (Mar. 1, 2024), *available at* https://new.mta.info/agency/bridges-and-tunnels/cbd-tolling-hearing. The public comment period ran from December 27, 2023 to March 11, 2024, and four public hearings were held between February 29 and March 4, 2024. *Id.* The MTA voted to approve a final tolling structure on March 27, 2024. *See* MTA, *Central Business District Tolling Program*, *available at* https://new.mta.info/project/CBDTP. The tolling schedule is similar to that proposed by the TMRB in November, apart from some minor changes to the schedule's exemptions. *See* MTA, *Congestion Relief Zone: Toll information*, *available at* https://congestionreliefzone.mta.info/tolling.

After adoption of a final tolling schedule, the FONSI expressly contemplates that the Final EA and FONSI "will have to be re-evaluated to determine if the decision made in the FONSI is still valid." DOT_394. "This requires that the TBTA demonstrate to FHWA that the effects of the final tolling rates and structure are consistent with the effects disclosed in the Final EA and that the mitigation is still valid." *Id.* Again, tolls may not be charged under the Project until the Project Sponsors and the DOT sign a VPPP agreement. *See* SAFETEA-LU Act, Pub. L. 109-59 § 1604(b)(3)(C), 119 Stat. at 1251. That agreement will not be signed until a tolling structure is finalized and any supplemental NEPA review by FHWA is complete.

## STANDARD OF REVIEW

Under the APA, a court must uphold an agency action unless the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). APA review "is narrow, limited to examining the administrative record to determine

whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Riverkeeper, Inc. v. EPA*, 358 F.3d 174, 184 (2d Cir. 2004) (quotation marks omitted). "Under this deferential standard of review, [the court] cannot substitute [its] judgment for that of the agency," *Nat. Res. Def. Council, Inc. v. FAA*, 564 F.3d 549, 555 (2d Cir. 2009), and "presumes the validity of agency action." *AT&T Corp v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003) (quotation marks omitted).

Courts apply a "rule of reason" to consider the sufficiency of an EA or an agency's decision to issue a FONSI. *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322-23 (D.C. Cir. 2015). Under that review standard, courts have "repeatedly refused to 'flyspeck' the agency's findings in search of any deficiency . . . ." *Id.* Rather, the court need only "ensure that the environmental assessment contains the type of reasoned elaboration required to support the agency's determination of no significant impact." *Landmark West! v. U.S.P.S.*, 840 F. Supp. 994, 1003 (S.D.N.Y. 1993) (quotation marks omitted). In addition, a court must be at its "most deferential" when the challenged action is "within [the agency's] area of special expertise." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983). Further, "it is . . . well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350. "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.*

"When a party seeks review of agency action under the APA, the entire case on review is a question of law such that judicial review of agency action is often accomplished by filing cross-motions for summary judgment." *NRDC v. FDA*, 598 F. Supp. 3d 98, 106 (S.D.N.Y. 2022) (quotation marks omitted). "A court must . . . grant summary judgment to the Government unless

25

it determines by a preponderance of the evidence that the agency has *not* consider the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action including whether there is a rational connection between the facts found and the choice made." *Cuckic v. Jaddou*, No. 21 Civ. 8395 (JPO), 2023 WL 2586031, at *4 (S.D.N.Y. Mar. 21, 2023) (quotation marks omitted) (emphasis in original).

## ARGUMENT

Plaintiffs' arguments only facially engage with the Final EA, selectively picking unconnected language from different sections of that document in service of arguments that fail to acknowledge the exhaustive analysis of the environmental effects conducted by the FHWA. As set forth below, their arguments are meritless, particularly given the deferential standard of review applicable here and NEPA's procedural nature.

## I.    The FHWA's Decision to Issue a FONSI Was Not Arbitrary and Capricious

First, and despite Plaintiffs' interpretation to the contrary, any supposed "public controversy" regarding the Project did not require the FHWA to prepare an EIS.  Pls. Br. at 24-26. Instead, the FHWA's decision to issue an EA and FONSI was within its discretion, particularly given that the documents were so thorough as to be the functional equivalent of an EIS.

Plaintiffs' argument relies on a mistaken understanding of when "controversy" has been found to be relevant in determining whether an agency's decision not to issue an EIS was arbitrary and capricious.  The case on which Plaintiffs rely involve controversy regarding the *impacts* of the proposed action, not simply public opposition to the project.  *See, e.g., Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001) (explaining that "controversial" in the context of an agency determination whether to issue an EIS, means "substantial questions are raised as to

whether a project ... may cause significant degradation of some human environmental factor").[21] As the Second Circuit has explained, "[o]pposition and a high degree of controversy . . . are not synonymous." *Town of Orangetown v. Gorsuch*, 718 F.2d 29, 39 (2d Cir. 1983); *see also Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549 (2d Cir. 1992) (holding that opposition from local residents, governors and senators and "arguable . . . controversy" about project's "aesthetic impact" did not compel preparation of EIS); *Hanly v. Kleindienst*, 471 F.2d 823, 830 (2d Cir. 1972) ("The suggestion that 'controversial' must be equated with neighborhood opposition has also been rejected by others."). Rather, "[t]he term 'highly controversial' refers to instances in which 'a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use.'" *Friends of Ompompanoosuc*, 968 F.2d at 1557 (quoting *Town of Orangetown*, 718 F.2d 29 at 39).

"When analyzing whether a proposal is controversial, [the court] consider[s] the substance of the comments, not the number for or against the project." *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Engineers,* 702 F.3d 1156, 1181 (10th Cir. 2012). "To hold otherwise 'would . . . surrender the determination to opponents of a federal action, no matter whether [the project is] major or not, nor how insignificant its environmental effects might be." *Town of*

---

[21] The case law regarding "controversy" in the context of determining whether an action will have a significant impacts and requires an EA arises out of a provision of the CEQ regulations that was removed in the 2020 NEPA amendment that provided that "'significantly' as used in NEPA requires considerations of both context and intensity" and further identified ten factors that "should be considered in evaluating intensity" including "(iv) The degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. 1508.27 (1979). While 40 C.F.R. 1508.27 was removed in the 2020 amendments to the NEPA regulations, CEQ nonetheless explained that "courts have interpreted controversy to mean scientific controversy, which the final rule addresses within the definition of effects, as the strength of the science informs whether an effect is reasonably foreseeable. The controversial nature of a project is not relevant to assessing its significance." Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,322 (July 16, 2020). Similarly, in its 2023 proposed amendments to its regulations, CEQ explained that "the uncertainty of an effect is the appropriate consideration, and not whether an action is controversial. While a legitimate disagreement on technical grounds may relate to uncertainty, this approach would make clear that public controversy over an activity or effect is not a factor for determining significance." National Environmental Policy Act Implementing Regulations Revisions Phase 2, 88 Fed. Reg. 49,924-01, 49,936 (July 31, 2023).

*Orangetown*, 718 F.2d at 39 (quoting *Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir. 1973); *see also*

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1188 (10th Cir. 2023)

(otherwise, "[t]he outcome would be governed by a 'heckler's veto.'").

     Here, Plaintiffs have not pointed to any comments that raise "'a substantial dispute . . . as

to the size, nature, or effect" of the Project. *Friends of Ompompanoosuc*, 968 F.2d at 1557.

Instead, the FHWA reasonably concluded that, with the mitigation measures committed to by the

Project Sponsors, *see infra* at 42-45, the Project would not have significant impacts. DOT_370.

As discussed in detail above, the FHWA's conclusion was well supported by its analyses of all the

potential impacts for the Project mentioned in Plaintiffs' brief. *See infra* at 12-16 (discussing

traffic effects); *infra* at 17-19 (discussing air quality effects); *infra at* 19-22 (discussing

environmental justice effects).[22]  Indeed, even if Plaintiffs had identified contrary positions in the

record, "[t]he decision not to prepare an EIS is left to the informed discretion of the agency

proposing the action." *City of New York v. Slater*, 145 F.3d 568, 571 (2d Cir. 1998).  Given that

standard, Plaintiffs have not met their burden to show that the FHWA's conclusion was arbitrary

or capricious. *Nat'l Audubon Soc., Inc. v. U.S. Fish & Wildlife Serv.*, 55 F. Supp. 3d 316, 362

(E.D.N.Y. 2014) (placing this burden on the plaintiff).

     Further, Plaintiffs are wrong that the thoroughness of the Final EA proves that the FHWA

should have prepared an EIS.  Pls. Br. at 25-26.  "[T]he significant time and effort [an agency] has

spent preparing its EA does not alone prove that an EIS is obligatory."  *TOMAC, Taxpayers of*

*Michigan Against Casinos v. Norton*, 433 F.3d 852, 862 (D.C. Cir. 2006).  "The opposite regime

---

[22] Plaintiffs' discussion of the *financial* impacts of the Project on New Yorkers who drive, *see* Pls. Br. at 25, falls outside the ambit of NEPA.  *See Gunpowder Riverkeeper*, 807 F.3d at 274 ("[t]he zone of interests protected by the NEPA is, as its name implies, environmental; economic interests simply do not fall within that zone.").

would create perverse incentives for agencies, as it would only serve to "encourage agencies to produce bare-bones EA's." *Id.*

In fact, and contrary to Plaintiffs' assertion, courts routinely look to the length and depth of analysis in an EA to determine whether an agency appropriately considered the issues. *See, e.g., Coal. for Responsible Growth & Res. Conservation v. U.S. F.E.R.C.,* 485 Fed. Appx. 472, 474 (2d Cir. 2012) ("We conclude, based on our review of the administrative record, that FERC took a 'hard look' at the possible effects of the Project and that its decision that an EIS was not required was not arbitrary or capricious. Its 296–page EA thoroughly considered the issues."); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008) ("[T]he defendant took a 'hard look at environmental consequences,' as evidenced by the issuance of a detailed, 293–page EA."). To that end, courts have deemed an EA the "functional equivalent" of an EIS when an "EA [] has all the hallmarks of an EIS: there were public hearings and costly, extensive, and comprehensive environmental studies which produced reams of material data . . . [such that] . . . it is unclear whether the time and expense required to prepare an EIS after an EA will result in any incremental benefits." *Spiller*, 352 F.3d at 245 n.6. As set forth below, the examination of environmental issues in the Final EA was exhaustive, *see infra* at 29-39, and the EA was subject to public scrutiny akin to an EIS, *see infra* at 45-50. The comprehensive nature of the FHWA's Final EA further bolsters the conclusion that the agency did not act arbitrarily or capriciously in issuing a FONSI.

## II. The FHWA Thoroughly Analyzed the Project's Anticipated Effects on Battery Park City

Plaintiffs' second challenge takes issue with the Final EA's treatment of Battery Park City,[23] arguing that the FHWA: (1) ignored potential traffic effects on the lower West Side

---

[23] Plaintiffs did not raise *any* of the issues identified in their summary judgment papers during the public comment period on the EA. Their failure to do so results in waiver of their arguments in this litigation. *See, e.g., Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1048 (10th Cir. 2015) ("[P]arties challenging an agency's compliance with NEPA must

Highway and West Street, Pls. Br. at 27-28; (2) arbitrarily assessed Battery Park City as part of Lower Manhattan when assessing neighborhood character, Pls. Br. at 28-29; and (3) applied an inappropriate methodology in assessing air quality in Battery Park City, Pls. Br. at 30-31. However, each of Plaintiffs' challenges is belied by the record.

To begin, Plaintiffs argue that the Final EA ignored what they believe will be "a significant increase in traffic under [the Project]" along West Street and the West Side Highway. Pls. Br. at 27-28. But the Final EA includes specific analysis of the anticipated effects of the Project on six intersections along West Street, including four adjacent to Battery Park City. DOT_36476. Even though these intersections were among the "locations that would most likely experience increases in traffic under the various tolling scenarios, as identified by the BPM," DOT_36475, none were anticipated to experience adverse traffic effects under the tolling scenario that would result in the largest "number of intersection locations with a potential increase of 50 or more vehicles." DOT_36488.[24] In other words, Plaintiffs' suggestion that the FHWA "ignored" traffic effects on West Street and the West Side Highway is simply incorrect. *See* Pls. Br. 28.

West Street was *not* selected as a thoroughfare for a separate highway analysis. *See generally* DOT_36411-74. But Plaintiffs' intimation that it should have been, *see* Pls. Br. at 28,

---

raise relevant objections during the comment period. These objections must specifically raise the issue presented on appeal; if the objections do not raise the issue, it is waived."); *see also Eastern Queens Alliance, Inc. v. FAA*, 589 F. App'x 19, 20 (2d Cir. 2014) (finding that challenge was "forfeited because it was not brought to the agency's attention during the public comment period"); *see also Erlbaum v. New Jersey Dep't of Env't Prot.*, No. 16 Civ. 8198 (RMB), 2017 WL 465466, at *14 (D.N.J. Feb. 3, 2017) ("By failing to submit their concerns about the Project's impact . . . during the public review and comment process, Plaintiffs have not met their burden of proof that they did not waive their objections to the Corps' compliance with NEPA and, therefore, cannot seek judicial review on this basis.").

[24] Twenty intersections were assessed along the West Side Highway and none were expected to experience adverse traffic effects. *See* DOT_36490, 36494. In addition, the "Regional Transportation Effects and Modeling" section of the Final EA (Chapter 4A) projects significant decreases to vehicular traffic on the West Side Highway south of 60th Street. *See* DOT_36374.

is unfounded.  Unlike the lower FDR Drive,[25] neither West Street nor the West Side Highway were identified as likely to experience "traffic volume increases" during the FHWA's initial screening using the BPM, which "is the Federally recognized transportation forecasting tool for the region." DOT_36340, 36411; *see also* DOT_4653 ("BPM outputs will be screened to identify any highways and roadways in the region with high volume-to-capacity (v/c) ratios and significant percentage changes to traffic volumes during the four time periods of analysis for the BPM").[26] Plaintiffs do not even mention, let alone challenge, the BPM forecasting that led to the selection of highway segments for further analysis.  *See* Pls. Br. at 28-29.  Not could they—an "agency's choice among reasonable analytical methodologies is entitled to deference."  *Sierra Club v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357, 1368 (D.C. Cir. 2017) (quotation marks omitted); *see also Duncan's Point Lot Owners Ass'n Inc. v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008) ("The NEPA process involves an almost endless series of judgment calls, and the line-drawing decisions necessitated by the NEPA process are vested in the agencies, not the courts." (quotation marks and alterations omitted)).

Next, Plaintiffs argue that the FHWA applied an "overly broad mischaracterization of Lower Manhattan" by including Battery Park City as part of that area in its assessment of "neighborhood character."  Pls. Br. at 29.  Again, this argument ignores crucial context in the record.  While the Final EA discusses "predominantly commercial and civic/government uses" in parts of Lower Manhattan, DOT_36660, it characterizes Lower Manhattan consistent with Plaintiffs' own description of the area as including residential use, *see* Pls. Br. at 29:

---

[25] Plaintiffs' contention that the Final EA "was particularly concerned with increased truck traffic and the attendant environmental impact on the FDR Drive," Pls. Br. at 28, is again simply wrong.  "Truck traffic is not permitted on the FDR Drive," as the Final EA clearly states.  DOT_36982.

[26] Indeed, the "Holland Tunnel approaches" (which include West Street) were forecasted to have "a small net decrease in traffic volumes . . . since the traffic reduction due to CBD tolling was greater than diverted traffic to the facility." DOT_36412

> The defining features of neighborhood character for the Lower Manhattan portion of the Manhattan CBD study area include its wide mix of street configurations and building forms; its dominant patterns of commercial, civic/government, and residential uses; the presence of numerous large-scale transportation facilities linking the area to other parts of the city and region; high levels of vehicular and pedestrian traffic; and the high density of development and intensity of use that characterize its neighborhoods.

DOT_36662. Indeed, in its broader discussion of the neighborhood character, the Final EA acknowledges that the Manhattan CBD is "a heterogenous mix of neighborhoods [that] serves as the economic hub of the New York City region." DOT_36660.

Plaintiffs' further argument that it was unreasonable for "Chapter 5B of the EA" to conclude that the Project "would have no adverse effects on the entire Manhattan CBD," Pls. Br. at 29, is also unavailing. For one, Plaintiffs' argument inaccurately describes what this section says. Section 5B only discusses the effects of the Project on *neighborhood character*, concluding that "changes in traffic patterns on local streets are unlikely to change the defining elements of the neighborhood character of the Manhattan CBD." DOT_36674. More specifically, the Final EA concluded that the shift away from vehicle use to pedestrian traffic "would reinforce the established patterns of land use, heavy mixing of uses, and the very high density of development and intensity of use that are defining features of neighborhood character in the Manhattan CBD study area." *Id.* These conclusions, in turn, drew on traffic patterns supported by Chapter 4 of the Final EA, which documents either reduced traffic, or no adverse effects to traffic, both in the entire Manhattan CBD, *see* DOT_36354, and in the intersections around Battery Park City specifically, *see* DOT_36489-90. As such, Plaintiffs' speculation that traffic will increase Battery Park City, *see* Pls. Br. at 29, is unsupported by the record and in any event provides no grounds to hold the FHWA's assessment of neighborhood character unreasonable. *See, e.g.*, *Becker v. Federal*

*Railroad Admin.*, 999 F. Supp. 240, 246 (D. Conn. 1996) ("A reasonable inquiry compliant with NEPA is not defeated by disagreement with the determinations based on that inquiry.").

Plaintiffs also challenge the FHWA's methodology for assessing air quality around Battery Park City, claiming the agency erred in applying Tolling Scenarios C and D to assess air quality and for failing to conduct a Battery Park City-specific air quality assessment.  *See* Pls. Br. at 30-31.  Again, Plaintiffs' arguments reflect a fundamental misreading of the record.

To begin, Plaintiffs' perception that Tolling Scenarios A and B would result in greater traffic increases around Battery Park City than under Tolling Scenarios C and D is incorrect.  For this argument, Plaintiffs cite Chapter 4A, which discusses increased traffic volume to *the Hugh L. Carey Tunnel* (not West Street) resulting from Tolling Scenarios A and B.  Pls. Br. at 30 (citing DOT_36370).  But that same analysis notes "[f]or Tolling Scenarios C, D, E and F, use of the tunnel would also increase."  DOT_36370.  The accompanying chart shows *greater* increases to traffic in the tunnel resulting from Scenarios C and D.  DOT_36371 (showing 722 vehicle increase to daily tunnel traffic under Scenario A, 998 under Scenario B, 10,059 under Scenario C, and 20,025 under Scenario D).

Thus, the FHWA's use of Tolling Scenarios C and D is thus far from "inexplicabl[e]."  Pls. Br. at 30.  Rather, these scenarios were selected after "[a]n initial review of all the tolling scenarios . . . to determine the tolling scenario that demonstrates the highest traffic volume increases on the local streets."  DOT_36831.  The review projected that Tolling Scenario D "would have the highest traffic volume increases on the local streets" for every area, at all times of day, with the "only exception" being "the midday period in Downtown Brooklyn, which has the highest traffic volume increases on the local streets under Tolling Scenario C."  *Id.*  Because "[c]hanges in VMT are correlated with changes in level of service, air quality, and noise," DOT_36345, the

FHWA's use of Tolling Scenarios C and D to assess air quality was appropriate. *See Latin Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 858 F. Supp. 2d 839, 855 (E.D. Mich. 2012) ("[T]he FHWA's technical methodologies, including its traffic projections, are entitled to substantial deference and are subject only to a reasonableness review.").

Finally, Plaintiffs challenge the FHWA's decision not to "more closely stud[y]" Battery Park City, given that it "is a community already burdened with post 9/11 air pollution and severe health consequences." Pls. Br. at 30. As an initial matter, Plaintiffs are again factually wrong to suggest that the EA failed to thoroughly study Battery Park City. The Final EA includes a microscale analysis of CO and $PM_{2.5}$/$PM_{10}$ impacts on multiple intersections bordering Battery Park City and found no adverse effects. *See* DOT_36861. But even setting that aside, Plaintiffs suggestion that Battery Park City should have been included in the supplemental analysis conducted by the FHWA to respond to the EPA's comments is unavailing. Responding to these comments, the FHWA issued a Technical Memorandum including supplemental air quality analyses for regions with pre-existing pollutant burdens. DOT_7284. Battery Park City was not included in the additional analysis in the Technical Memorandum because it did not meet the pollutant and health burden screening criteria used by the FHWA. *See* DOT_7284-87. Again, the FHWA employed reasonable criteria to select specific areas for additional analysis. *See Citizens for Balanced Env't and Transp., Inc. v. Volpe*, 650 F.2d 455, 462 (2d Cir. 1981) (noting that a court is not "required, equipped nor inclined to resolve the fervid disagreements between the parties over technical analyses forming the basis for the Highway Department's recommendation [that the project] is the most viable solution to projected traffic needs in the future.").

In sum, Battery Park City is treated appropriately and reasonably throughout the Final EA.

III.    **The FHWA Conducted a Thorough Analysis of Potential Effects on
        Environmental Justice Communities**

Plaintiffs also challenge the sufficiency of the discussion of the Project's potential effects
on environmental justice communities in the Final EA.  *See* Pls. Br. at 34-40.  More specifically,
they challenge: (1) the FHWA's methodology for defining environmental justice communities, *see
id.* at 34; (2) the FHWA's assessment of environmental justice communities on a county-wide
basis, *see id.* at 34-35; and (3) the sufficiency of the FHWA's analysis of air pollution and costs to
low-income and minority drivers in environmental justice communities, *see id.* at 37-40.  Each of
these challenges is without merit.

As a preliminary matter, Plaintiffs have not established standing to challenge the Final
EA's treatment of environmental justice communities, because they cannot show that the Final
EA's treatment of those communities *caused* their claimed injuries.  At the summary judgment
stage, a plaintiff cannot establish standing by "mere allegations."  *Lujan v. Defenders of Wildlife*,
504 U.S. 555, 561 (1992).[27]  Instead, they "must 'set forth' by affidavit or other evidence 'specific
facts,' which for purposes of the summary judgment motion will be taken as true."  *Id.* (quoting
Fed. R. Civ. P. 56(e)).  Plaintiffs' only evidence in support of their standing to challenge the Final
EA and FONSI is the Declaration of Elizabeth Chan.  While she avers that she has concerns about
the Project's effects on Battery Park City, West Street, and the West Side Highway, Chan Decl.
¶¶ 1-7, she does not claim that she lives in an environmental justice community, nor does she aver
that she is a member of an allegedly injured class.  Thus, with respect to Plaintiffs' environmental
justice challenges, "[t]he lack of any linkage between the project and the claimed injury

---

[27] In fact, the only environmental justice community where a Plaintiff *alleges* harms within NEPA's zone of interest
is the Lower East Side.  *See* Dkt. No. 39 ¶ 31 (allegations about the impact of the Project on a resident of the Lower
East Side).  Another Plaintiff lives in an environmental justice community in Bergen County, but alleges only that the
Project "will impose a significant financial burden on [him]."  *Id.* ¶ 35. Economic concerns are not within the scope
of NEPA.  *Knowles*, 924 F. Supp. at 599 ("[e]conomic injury . . . does not fall within NEPA's zone of interests").

undermines the effort to establish standing." *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1257 (9th Cir. 2010). In other words, there are not allegations of "a causal relationship between" the Final EA's analysis of the Project's effects on environmental justice communities and "the alleged injuries" claimed by Ms. Chan. *Ctr. for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005).

On the merits, Plaintiffs' challenge to the FHWA's choice of environmental justice mapping tools is meritless. Pls. Br. at 34. The FHWA defined the relevant environmental justice communities using census data, DOT_6968-69, in accordance with guidance from the Council on Environmental Quality ("CEQ"), which provides that: "[m]inority populations should be identified where either: (a) the minority population of the affected area exceeds 50 percent or (b) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis." *Environmental Justice: Guidance Under the Nat'l Env't Pol'y Act* at 25-26 (Dec. 10, 1997). Reliance on census data to map environmental justice communities has been found to satisfy NEPA. *See Trenton Threatened Skies, Inc. v. FAA*, 90 F.4th 122, 139 (3d Cir. 2024) ("The FAA's decision to use census tract data, corroborated by the EPA's modeling tool, was reasonable."). Indeed, multiple courts have affirmed the exact CEQ criteria used by the FHWA here. *See id.*; *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 60 (D.D.C. 2022). While Plaintiffs may have preferred that the FHWA use a different environmental justice map, *see* Pls. Br. at 34, an agency's "choice among reasonable analytical methodologies is entitled to deference." *Cmtys. Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004) (deferring to agency's environmental justice analysis).

Second, Plaintiffs challenge the FHWA's assessment of environmental justice impacts on a county-wide basis. Pls.' Br. at 34-36. Plaintiffs do not contend that the FHWA's chosen methodology caused it to overlook any environmental justice communities, as was the issue in the sole authority they cite, *Vecinos v. FERC*. *See* 6 F.4th 1321 (D.C. Cir. 2021). *See id.* at 1330 (noting that environmental justice analysis was limited to a two-mile radius, where the project could impact air quality within 31 miles). Instead, Plaintiffs argue that the county-wide assessment did not allow for "a closer look" into impacted areas. Pls. Br. at 37. But Plaintiffs once again ignore the record. The specific features that they believe were needed to constitute a thorough environmental justice review—neighborhood level analysis, community outreach, and identification of adverse effects at the intersections level—are all present in the Final EA. *See* DOT_36964-66 (mapping environmental justice communities on a neighborhood-level basis); DOT_36978-79, 82 (discussion of air quality impacts along highway segments); DOT_36979-82 (conclusion that the Project "would not result in adverse effects on [local] air quality" at dozens of intersections in environmental justice neighborhoods); DOT_36984-89 (discussion of changes in traffic volumes in environmental justice neighborhoods); DOT_36989-96 (summary of Technical Memorandum, addressing particularized effects of truck traffic and non-truck traffic in environmental justice communities overburdened with pre-existing pollutants); DOT_37034-41 (summarizing robust community engagement). Indeed, the FHWA's discussion of environmental justice impacts spans an 87-page section of the Final EA, with an additional 509-pages of analysis included in appendices. *See* DOT_36954-37041; DOT_6961-7450. These discussions "explicate[d] fully [the FHWA's] course of inquiry, its analysis and its reasoning." *Dubois v. U.S. Dep't of Agriculture*, 102 F.3d 1273, 1287 (1st Cir. 1996).

Finally, Plaintiffs argue that the FHWA "discount[ed] the impact" of the Project on environmental justice communities. Pls. Br. at 38. But in making this argument, Plaintiffs tacitly acknowledge that the FHWA satisfied NEPA by *studying* these impacts and reaching reasonable conclusions. *See id.* at 37-38 (discussing impacts *identified in the Final EA*). That what NEPA requires. *Robertson*, 490 U.S. at 351 ("Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise— agency action."). Moreover, the FHWA's treatment of environmental justice communities is not comparable to the agency action at issue in *California v. Bernhardt*, 472 F. Supp. 3d 573 (N.D. Cal. 2020), on which Plaintiffs rely. Pls. Br. at 38-39. In that case, commentors raised concerns that "the environmental impacts disproportionately affected Native Americans living in low-income communities," but the "EA d[id] not mention, much less address, these specific impacts." *Id.* at 621. Here, by contract, the Final EA addresses each of the concerns mentioned by the Plaintiffs in detail. *See, e.g.*, DOT_36978-96 (discussing air quality impacts on environmental justice communities); DOT_37020-25 (discussion of impacts on low-income and minority drivers). Moreover, where the Final EA identified adverse impacts on environmental justice communities (and most impacts were not adverse), the Project Sponsors committed to implementation of a slate of mitigation measures, ranging from changes to the tolling structure to decrease traffic diversions, *see* DOT_7323, to monitoring of traffic patterns, *see* DOT_36455, and implementing place-based mitigation, *see* DOT_37017-20.

The EPA's comment on the draft EA provides no reason to question the sufficiency of the FHWA's analysis. In response to that comment, the FHWA undertook additional research to "broaden the analysis," DOT_7926, producing a Technical Memorandum, *see* DOT_7243-7440, that includes additional highway truck traffic emissions studies and commitments to additional

mitigation, including on the Lower East Side, DOT_ 7323.  Thereafter, the EPA "acknowledge[d] the improvements throughout the NEPA process."  DOT_45366.  The FHWA thus more than satisfied the requirement that it take cooperating agency comments "seriously," *Tinicum Twp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 295 (3d Cir. 2012).  The FHWA "gave serious consideration and reasonable responses to each of the EPA's concerns," particularly given "the lead agency . . . has some latitude to determine the level of analytical detail necessary to support an informed decision and to adequately disclose air quality impacts to the public."  *Id.*

IV.   **FHWA Reasonably Confined its Review of Alternatives to Those Options That Could be Enacted by the TBTA**

Next, Plaintiffs raise two challenges to the FHWA's consideration of alternatives to the implementation of the Project, arguing that the FHWA: (1) did not give proper consideration to Project alternatives that would not generate sufficient revenue, *see* Pls. Br. at 41-43; and (2) failed to analyze whether the Project's goals could be met by a phased-in implementation of the Project or by a dynamic tolling structure, *see* Pls. Br. at 43-44.  Neither argument renders the FHWA's consideration of alternatives arbitrary or capricious.

With respect to the FHWA's treatment of the eleven scenarios initially evaluated as potential alternatives to the Project, *see* DOT_36267, the FHWA determined that none would meet the MTA's statutory requirement that the Project generate $15 billion to fund MTA capital projects.  DOT_36259; *see also* DOT_2407 (noting that this criterion was required under the state law authorizing the Project).  Plaintiffs argue that this revenue-generating motive was not a proper consideration for the FHWA.  *See* Pls. Br. at 42-43.  But this criterion was *required* by the state law authorizing the Project such that no scenario that failed to generate sufficient revenue could be enacted by the TBTA.  DOT_2407 ("For purposes of establishing a central business district toll or tolls the board shall, at minimum, . . . provide for sufficient revenues . . . to fund fifteen billion

dollars for capital projects for the 2020 to 2024 MTA capital program").  NEPA does not require the FHWA to second-guess the stated aims of the Project Sponsors.  *See Citizens Against Burlington, Inc. v. Busey.*, 938 F.2d 190, 199 (D.C. Cir. 1991) ("Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be.").  Nor does it require the FHWA to assess alternatives that would not meet the project goals.  *Concerned Citizens All. v. Slater*, 176 F.3d 686, 706 (3d. Cir. 1999) ("[W]here the agency has examined a breadth of alternatives but has excluded from consideration alternatives that would not meet the goals of the project, the agency has satisfied NEPA"); *see also Nat. Res. Def. Council v. F.A.A.*, 564 F.3d 549, 557 (2d Cir. 2009) ("FAA reasonably concluded that projects . . . did not present workable alternatives because they were unlikely to secure permit approval from [state agency].").  The FHWA acted well within the "considerable discretion" given to agencies "to define the purpose and need of a project." *Del. Audubon Soc'y v. Salazar*, 829 F. Supp. 2d 273, 281 (D. Del. 2011) (quotation omitted).

Plaintiffs also challenge the analysis that led to the dismissal of these alternatives, *see* Pls. Br. at 43, but alternatives that are not fully studied require only "brief[] discuss[ion]," 40 C.F.R. § 1502.14(a).  The FHWA's analysis was sufficient to show that the alternatives would not meet the Project's revenue-generating goals.  Some were self-evident.  For example, no explanation is required to show that creating incentives for teleworking will not generate $1 billion per year.  *See* DOT_36267.  And for those that required more discussion, the FHWA provided it.  For example, while increasing the price to park in Manhattan would generate revenue, the agency explained that "there is no law or agreement in place between the City of New York and MTA that would direct the revenue generated . . . to MTA to support the Capital Program."  DOT_36268.  These explanations were bolstered by citations to "a variety of prior studies and documents," set forth in

40

—

the Final EA, which was the basis for the screening.  *Id.* "[T]here is nothing demonstrating that [the FHWA's] choice to exclude an in-depth analysis of the rejected alternatives was inappropriate, as a brief discussion is all that NEPA requires."  *NRDC v. NPS*, 250 F. Supp. 3d 1260, 1292 (M.D. Fla. 2017).

Finally, Plaintiffs argue that the FHWA should have considered as alternatives either: (1) phased-in implementation of the Project; or (2) a dynamic tolling structure.  Pls.' Br. at 43-44. But, as a threshold matter, Plaintiffs provide no evidence that they presented these alternatives for the FHWA's consideration.  Where a party fails to "identif[y] in their comments any . . . alternatives beyond those evaluated in the EA," they "forfeit[] any objection to the EA on the ground that it failed to adequately discuss potential alternatives to the proposed action."  *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764-65 (2004); *see also Earth Island Inst. v. U. S. Forest Serv.*, 87 F.4th 1054, 1064–65 (9th Cir. 2023) ("Because [plaintiff] failed to raise its proposed alternatives during the comment period, it failed to exhaust its argument, and we need not reach the merits of the suggested alternatives."); *Eastern Queens Alliance*, 589 Fed. App'x at 20 (affirming denial of review of EA and FONSI where, *inter alia*, grounds for objection were not "brought to the agency's attention during the public comment period").

In any event, Plaintiffs brief provides no support for their contention that their proposed options "have the potential" to meet the Project's goals.  *See* Pls. Br. At 44.  Plaintiffs cannot succeed in their claim without "some showing that feasible alternatives exist."  *Olmstead Citizens for a Better Community v. United States*, 793 F.2d 201, 209 (8th Cir. 1986); *see also Roosevelt Campobello Int'l Park Comm. V. EPA*, 684 F.2d 1041, 1047 (1st Cir.1982) ("In order to preserve an alternatives issue for review, it is not enough simply to make a facially plausible suggestion; rather, an intervenor must offer tangible evidence that an alternative site might offer 'a substantial

measure of superiority' as a site.").  Plaintiffs have not shown the feasibility of their proposed alternatives.

V.       **The Final EA Appropriately Describes the Mitigation Applicable to the Project**

Next, Plaintiffs challenge the Final EA and FONSI's description of the measures that will be undertaken to mitigate any adverse effects projected to result from the Project,[28] as well as the degree to which those mitigation measures were subject to public scrutiny.  Pls. Br. at 45-47.  As an initial matter, none of the mitigation proposed in the Final EA and FONSI is necessary to mitigate effects in Battery Park City, because no adverse effects are expected for that area of Manhattan.  DOT_36489 (describing traffic effects near Battery Park City).  As such, none of the Plaintiffs have even established that they have standing to challenge the scope of proposed mitigation.  *See supra* at 35-36.  Moreover, on the merits, Plaintiffs' challenges rest on a fundamental misreading of the record.

Specifically, Plaintiffs challenge rests on the incorrect premise that "the mitigation measures can be found in the FONSI in one concise list with barebones descriptions."  Pls. Br. at 47 (citing DOT_383).  But the list in the FONSI cross-references the thorough analysis contained throughout the Final EA.  For example, the FONSI mentions implementation of a toll on the FDR Drive for vehicles who exit on Houston Street and immediately head south.  *See* DOT_382.  The Technical Memorandum to the Final EA, in turn, explains that this measure has been "affirmatively commit[ed] to" by the Project Sponsors and that, as a result of "analysis of non-truck traffic effects" and "[a]dditional modeling," the FHWA expects "that 25 to 35 percent of the

---

[28] Mitigation of adverse impacts is *not* required as a matter of course under NEPA, which is "a procedural statute that mandates a process rather than a particular result." *Stewart Park & Reserve Coal., Inc. v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003).  However, because the FHWA approved an EA rather than an EIS, mitigation was relevant to the FHWA's conclusion that the Project would have no significant impact on human health or the environment.  *See Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 127 (D.C. Cir. 1985) ("if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum.").

traffic increases on the FDR Drive could be avoided by ensuring that any vehicle making this move is tolled, thereby disincentivizing the movement."   DOT_7323.   As another example, for intersections expected to see traffic increases, the FONSI notes that "NYCDOT will monitor those intersections . . . and implement appropriate signal timing adjustments to mitigate the effect." DOT_372.  Here too, the data, methodology, and timing of this mitigation measure is discussed at length in the Final EA.  DOT_36488-500.  As such, the FHWA's analysis bears no resemblance to the analysis in *O'Reilly v. U.S. Army Corps of Engineers*, upon which Plaintiffs rely, where the Army Corps' description of mitigation measures included "only cursory detail."  477 F.3d 225, 234 (5th Cir. 2007).

Further, although Plaintiffs allege the FHWA only made a "brief suggestion that the 'regional mitigation' may decrease some truck traffic," Pls. Br. at 47,  the Technical Memorandum explains in detail that "modeling for the EA," showed that changes to the overnight tolling structure would "decrease the incentive for trucks to bypass the Manhattan CBD," that expansions to "the NYC Clean Trucks Program . . . could yield reductions of roughly one ton of $PM_{2.5}$ and 30 tons of $NO_x$ per year," and that "expanding the NYCDOT Off-Hours Delivery Program . . . would result in air quality benefits by reducing truck travel times and truck traffic during peak periods," relying on a 2009 study.  DOT_7322-23.  Similarly, although Plaintiffs assert that "little to no analysis was done" of place-based mitigation, the Technical Memorandum includes an entire section on these measures. DOT_7323-28.  This analysis explains the efficacy of the proposed mitigation. *See, e.g.*, DOT_7325 ("Replacement of polluting transport refrigeration units (TRUs) at the Hunts Point Produce Market could lead to as much as 21 tons of $NO_x$ and 2.5 tons of $PM_{2.5}$ reduction per year for every 100 TRUs.").  And it explains the way the location of place-based mitigation will be selected.  *See, e.g.*, DOT_7328 ("After the toll rates are set, a process that include both

43

additional analyses and community input will take place to determine the sites of the place-based mitigation."); *see also* DOT_3674 & n.39 (discussing tools used to identify mitigation locations).[29]

Plaintiffs also inaccurately allege that stakeholders "had no opportunity to evaluate," the proposed mitigation.  Pls. Br. at 47.  Some mitigation (like the signal timing improvements) included in the Final EA was first presented in the Draft EA and was therefore subject to public comment.  *See* DOT_37461-67.[30]  Indeed, the mitigation measures in the final EA were "clarified and/or modified" and "additional mitigation measures" were included *because of the public comment process*.  DOT_7321.  Further, development of mitigation measures relied heavily on input from the Environmental Justice Technical Advisory Group, made up of a variety of environmental justice stakeholders.  *See* DOT_40514.  The FHWA and the Project Sponsors solicited suggestions for mitigation measures, DOT_41519-21, responded accordingly, DOT_41527-28, proposed new measures, DOT_41534, and finalized a mitigation package. DOT_41557-61; *see also* DOT_41571-73 (detailing final mitigation commitments).  This collaborative process further supports the appropriateness of the identified mitigation.  *See Bergen*

---

[29] Because the scope of the mitigation is contingent on the MTA's final tolling structure, the Court should find that arguments about place-based mitigation are not yet ripe for judicial review, given that the final tolling structure was only just finalized and the FHWA has not yet had the opportunity to conduct its intended re-evaluation.  *See Suburban Trails, Inc. v. New Jersey Transit Corp.*, 800 F.2d 361, 365, 367 (3d Cir. 1986) (noting "status of currently pending state and federal administrative proceedings is an important consideration" because the fact "that a contingency exists [] makes judicial review premature").  The ultimate tolling proposal will determine the effects of the Project, and, in turn, the mitigation necessary to ameliorate those effects.  DOT_36925; DOT_36929.  Given that, this issue is not ripe for review until the final tolling structure has re-evaluated for its consistency with the mitigation set forth in the Final EA and FONSI.  *See Comite de Apoyo a Los Trabajadores Agricolas v. Perez*, 46 F. Supp. 3d 550, 563 (E.D. Pa. 2014) (noting matter not ripe where agency had "not fully developed and formalized the policies and choices to be made"); *see also API v. EPA*, 683 F.3d 382, 389 (D.C. Cir. 2012) (noting court should wait to rule until agency's regulatory revision was complete).

[30] That Plaintiffs chose not to comment on the mitigation proposed in the Draft EA only highlights the infirmity of their challenge now.  *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978) ("[I]t is . . . incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions.")

*Cnty. v. Dole*, 620 F. Supp. 1009, 1061 (D.N.J. 1985) ("Mitigation measures and design features are frequently finalized, added or changed as a result of public input and agency comment.").

Moreover, the FHWA's decision to set out the basic parameters of the efficacy, timing, and placement of mitigation efforts, while leaving other details to be determined later, does not call into question the analysis in the Final EA.  "[C]ourts have determined that it is proper for agencies to approve projects even though conditioned on further development of mitigation measures." *NAACP Erie Unit 2262 v. Fed. Highway Admin.*, 648 F. Supp. 3d 576, 588 (W.D. Pa. 2022) (quotation marks omitted); *see also Bering Straight Citizens v. U.S. Army Corps of Engineers*, 524 F.3d 938, 955-56 ("[A]n agency is not required to develop a complete mitigation plan detailing the precise nature of the mitigation measures, so long as the measures are developed to a reasonable degree." (quotation marks and alterations omitted)).  "General commitments to future action suffice to meet mitigation requirements under NEPA."  *NAACP Erie Unit 2262*, 648 F. Supp. 3d at 588 (quotation marks omitted).  Thus, while the specific contours of mitigation for the Project remain fluid, the fixed and binding commitment for mitigation measures explained in the Final EA satisfied the FHWA's duties under NEPA.

## VI.    The FHWA Provided Ample Opportunities for Public Participation

The extensive opportunities for public participation and comment during the environmental review of the Project fully complied with the requirements imposed by NEPA and the FHWA's regulations.  Contrary to Plaintiffs' assertions, the FHWA did not act arbitrarily and capriciously when it: (1) accepted comments from the public on the draft EA for a 44-day comment period; (2) did not include Plaintiff Elizabeth Chan's comment on the draft FONSI (which was submitted outside the comment period) in the record; and (3) conducted the comment period on the draft EA before the final tolling structure was determined. *See* Pls' Br. at 51-52.

First, the amount of public participation allowed for during the NEPA process exceeded legal requirements.  The FHWA and the Project Sponsors provided an opportunity for public participation at every step in the process.  For example, during the scoping process the Project Sponsors conducted ten "Early Outreach webinars" to provide education about the Project and an opportunity for comment.  *See* DOT_37045-46.  In addition, the Project Sponsors conducted nine additional Environmental Justice Webinars. DOT_0037046.  Many of these meetings were place-bacsed, so they could more effectively target the local concerns of residents.  *See, e.g.*, DOT_37047. And when the draft EA was published, FHWA provided for electronic access, DOT_37056, and physical copies were made "available for public inspection," *see* 23 C.F.R. § 771.119, at various locations.  *See* DOT_37057-61.

After the draft EA was published on July 29, 2022, DOT_37149, the FHWA provided for public comment on the draft EA for 44 days, between August 10, 2022, and September 23, 2022. DOT_37057. The public also had the opportunity to comment on the draft EA during six virtual public hearings held between August 25 and 31, 2022.  *See* DOT_37062.  Notice of these public hearings was advertised online, through social media, through a database and email list, and through media outlets in the 28-county study area.  *See* DOT_37046.  Over 1,700 people attended, and 552 individuals made oral comments.  *See* DOT_42828; DOT_43124; DOT_43145; DOT_43276.  FHWA and Project Sponsors also received nearly 70,000 public input submissions during the formal public comment period, including 14,000 individual comments from oral testimony, letters, emails, voicemails, and submissions via an electronic comment form.  *See* DOT_37063.  The only Plaintiff who alleges that he commented during this period asserted solely economic injuries related to the Project.  *See* Am. Compl. ¶ 34; *see also* DOT_ 9184.

This extensive opportunity for comment more than satisfies NEPA's requirement that the agency "inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co.*, 462 U.S. at 97. "An agency preparing an EA is required to 'involve environmental agencies, applicants, and the public' only 'to the extent practicable,' 40 C.F.R. § 1501.4(b), and agencies are afforded 'considerable discretion to decide the extent to which such public involvement is practicable,'" *Coal. for Healthy Ports v. United States Coast Guard*, No. 13 Civ. 5347 (RA), 2015 WL 7460018, at *15 (S.D.N.Y. Nov. 24, 2015) (quoting *Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 121 (2d Cir. 2013)); *Pogliani v. U.S. Army Corps of Eng'rs*, 306 F.3d 1235, 1238-39 (2d Cir. 2002) (no public review requirement for EAs and FONSIs except in the limited circumstances of 40 C.F.R. § 1501.4(e)(2)). "When the exercise of that discretion is challenged on appeal, the reviewing court properly considers whether the lack of public input prevented the agency 'from weighing all the factors essential to exercising its judgment [under NEPA] in a reasonable manner.'" *Brodsky,* 704 F.3d 113, 121 (2d Cir. 2013) (quoting *Friends of Ompompanoosuc*, 968 F.2d at 1557). To that end, "[c]ourts in this Circuit have found public participation in the preparation of an EA insufficient only where an agency has failed to 'notify or solicit feedback from the public *at all.*'" *Coal. for Healthy Ports*, 2015 WL 7460018, at *15 (quoting *Brodsky*, 704 F.3d at 121 (emphasis in original).[31] That was plainly not the case with respect to the FHWA's environmental review here.

---

[31] Other Circuits have likewise acknowledged that, under the CEQ regulations, "there are no notice requirements, pre-circulation requirements, or instructions about the public comments process" applicable to EAs. *See DNREC v U.S. Army Corp. of Engineers*, 685 F.3d 259, 272 (3d Cir. 2012). In *DNREC*, the Third Circuit found that the agency was "transparent, clear, and inclusive" when it: (1) posted notice of an environmental review; (2) summarized changes to the project; and (3) offered a 30-day period for public comment after the Final EA was released. *See* 685 F.3d at 272. Other Circuits have echoed this holding. Similarly, in the Ninth Circuit, there is no "minimum level of public comment and participation required by the regulations governing the EA and FONSI process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 952 (9th Cir. 2008) (citation omitted). So too, the D.C. Circuit found that the agency "adequately fulfilled" its mandate to "make diligent efforts to involve the public in preparing and implementing their NEPA procedures" for an EA by posting notice in its offices and online. *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 518-520 (D.C. Cir. 2010).

The public participation opportunities provided in connection with the Project also exceeded what was required by the FHWA's regulations governing EAs, which require only a 30-day comment period on the draft EAs; here this period was extended to 44 days.  *See* 23 C.F.R. § 771.119.  Indeed, public participation regarding the Project met or exceeded nearly all of the FHWA's standards *for an EIS*.  The chart below summarizes the requirements for preparation of EAs and EISs compared with this Project:

| Legal Requirement | EA[32] | EIS[33] | Project |
|---|---|---|---|
| Circulate Draft Document for Comment | ✓[34] | ✓ | ✓ |
| Make Draft Document Available for Public Inspection | ✓ | ✓ | ✓ |
| Final Document Available 15 Days Before Public Hearing | ✓ | ✓ | ✓ |
| Public Hearing | X | ✓ | ✓ |
| Circulate Draft for Comment by Appropriate State and Local Agencies | X | ✓ | ✓ |
| Final document transmitted to any persons, organizations, or agencies that made substantive comments on the draft document (including through electronic means). | X | ✓ | ✓ |
| Public Comment Period on Draft Document | 30 days | 45 days | 44 days |

As this chart makes clear, the FHWA provided EIS-level participation, going well beyond what was legally required (*e.g.*, by holding 19 public hearings during the scoping process and by conducting meetings with state and local agency stakeholders at every stage of the process).

Second, Plaintiffs allege that FHWA ignored Ms. Chan's comment submitted on the draft FONSI on June 12, 2023, *see* Chan Decl. ¶¶ 17-18.  But that argument conflates comments on the

---

[32] Information in this column documents the public participation procedures required by FHWA's regulations for an EA.  *See* 23 C.F.R. § 771.119.

[33] Information in this column documents the public participation procedures required by FHWA's regulations an EIS.  *See* 23 C.F.R. §§ 771.123-125.

[34] This action is only required if the agency anticipates issuing a FONSI.  *See* 23 C.F.R. § 771.119(h).

draft EA (which were received during the August 10 to September 23, 2022 comment period) with the 30-day availability period (from May 12 through June 12, 2023) of the Final EA and opportunity to "review" the draft FONSI; public comments were only solicited during the former period.  DOT_393 ("The public availability period differed from the early outreach and formal public comment periods in that comments were not solicited.").  This is fully consistent with NEPA and FHWA regulations.  *Compare* 23 C.F.R. § 771.119(d) (public comment for EAs), *with* § 771.119(h) (agency *may* provide EA for public "review" prior to issuance of FONSI); *see also* 40 C.F.R. 1501.6(a)(2) (noting agency may make FONSI available for "public review"); DOT_36142 (notice of availability).[35]  Nevertheless, the FHWA "considered information received during the public availability period" and issued the Final FONSI on June 23, 2023, after determining that "no new substantive issues" were raised by any public submissions.  DOT_393. Indeed, Plaintiffs do not identify any portion of the concerns raised in Ms. Chan's belated comment letter that was not otherwise addressed in thorough responses to comments that the agency provided at Appendix 18C (Comments and Reponses) to the EA.  *See* DOT_7454-36141.  Notably, residents of Battery Park City submitted comments during the comment period and the agency responded to those comments.  *See, e.g.*, DOT_8933, 13212, 17031, 17776, 23636, 25537, 29498, 35364.

Third, Plaintiffs contend that the comment period was "meaningless" because the final tolling structure had not yet been finalized.  Pls' Br. at 52.  This argument is unfounded in numerous ways.  As an initial matter, the Draft and Final EA considered a range of tolling scenarios

---

[35] *See Earth Island Inst. v. United States Forest Serv.*, 87 F.4th 1054, 1067 (9th Cir. 2023) ("Public comments are intended to help agencies assess an action's environmental impact, so the agency can then modify its next draft or final EA to reflect that public input. If an agency had to file a supplemental draft EA and repeat the public comment process every time it makes any such modifications, the NEPA review process would never end, and agencies would balk at modifying their EAs. *Id.*  An agency is therefore not required to repeat the public comment process when the EA is only a slightly modified version of a draft EA." (internal citations omitted)).

(on which the public had the opportunity to comment) and the FHWA considered the impacts of the Project based on the scenarios where its impacts would be at their greatest for the resource area in question. *See* DOT_37263 (Draft EA tolling scenarios analyzed); DOT_36292 (Final EA tolling scenarios analyzed); DOT_36306 (describing the Final EA's worst-case scenario approach). The final tolling structure adopted by the MTA included parameters that fall comfortably within the Final EA's worst-case scenario analyses. *Compare, e.g.*, Pls. Br. at 49 (discussing the $15 toll on passenger vehicles adopted by the MTA), *with* DOT_36292 (assessing potential $9, $10, $12, $14, $19, and $23 tolls). Even if that were not the case, the FONSI expressly contemplates that the Final EA and FONSI will be re-evaluated after a final tolling structure is adopted to determine if the decision made in the FONSI is still valid. DOT_394. Any arguments regarding whether the final tolling structure is sufficiently different from the alternatives analyzed in the Final EA to require further analysis are thus premature.[36]

## VII.   The Anticipated Re-Evaluation Does Not Render the Final EA Inadequate

Finally, Plaintiffs argue that the FHWA's intention to re-evaluate the Final EA upon adoption of a final tolling schedule by the TBTA renders the Final EA inadequate. *See* Pls.' Mem. at 48-50, 52-55. That position runs contrary to the established manner in which agencies revisit environmental reviews based on project developments. Moreover, to the extent it seeks to have the Court pre-determine that the FHWA's re-evaluation will be presumptively insufficient, Plaintiffs' challenge is premature.

As an initial matter, CEQ and the FHWA's regulations and guidance expressly contemplate re-evaluations. *See* 23 C.F.R. § 771.29 ("The Administration must determine, prior to granting

---

[36] The Federal Defendants respectfully refer the Court to their brief in the companion case to this matter, *Mulgrew v. U.S. Dep't of Transp.*, No. 24 Civ. 1644 (LJL) (S.D.N.Y.), for a complete discussion of how Plaintiffs' claims regarding the final tolling structure are not yet ripe. *See id.*, Dkt. No. 48 at 13-16.

any new approval related to an action or amended any previously approved aspect of an action, including mitigation commitments, whether an approved environmental document remains valid.); NEPA Re-Evaluation Joint Guidance (Aug. 14, 2019); *see also* 40 C.F.R. § 1501.11 (describing tiering of EISs and EAs).  As courts have explained, "conducting an environmental reevaluation is an appropriate procedure for the FHWA to determine the significance of the impacts produced by the modified design and whether a supplemental EA is required."  *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509 (9th Cir. 1997); *see also Potomac Heritage Trail Ass'n, Inc. v. U.S. Dep't of Transp.*, No. 22 Civ. 02482 (DLB), 2022 WL 7051160, at *4 (D. Md. Oct. 11, 2022) (explaining that there was a re-evaluation "in light of the current updated bridge design" to determine if a previous Finding of No Significant Impact and Final Section 4(f) Evaluation "remained valid").  There is nothing unusual or erroneous about the FHWA's intention to re-evaluate its environmental assessment here.

Further, the plan to re-evaluate once the final tolling structure is proposed does not call into question the conclusions in the Final EA for two reasons.  First, the Final EA "describes the effects of the tolling scenario that would result in the greatest potential negative effects for that particular topic." DOT_36306.  By analyzing worst-case scenarios, the EA provided the public and the decisionmakers the ability to gauge the environmental effects of the Project irrespective of whether the final tolling structure perfectly mirrors any of the analyzed scenarios.  *See* 23 C.F.R. § 771.119 (EA must determine "which aspects of the proposed action have the potential for . . . environmental impact[s]").  Absent a final tolling structure that deviates materially from what was proposed by the MTA in December, the Final EA's analysis of Project effects will remain valid, as the proposed tolling structure included parameters that fell within the scenarios analyzed by the Final EA.  *See supra* at 51 (discussing price comparison); *compare also* Pls. Br. at 49 (discussing the

51

implementation of crossing credits at some, but not all, routes in the proposed tolling structure),
*with* DOT_36292 (analyzing scenarios using both no, low, and high crossing credits at different
routes).  As such, the FHWA's use of worst-case scenarios fulfils its NEPA obligations.  *See*
*WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019) (noting "that the [agency]
was not postponing the requisite environmental analysis until it picks the specific sites . . . rather,
it was saying that such future analysis would be unnecessary because, in its expert opinion,
whatever sites it ultimately chooses (within the constraints imposed by the Project), there would
not be a negative impact").

Second, agencies regularly "tier" NEPA documents by first assessing the general project
scope and then proceeding with further analysis addressing more specific aspects of a project. 40
C.F.R. § 1501.11 ("Agencies should tier their environmental impact statements and environmental
assessments when it would eliminate repetitive discussions of the same issues, focus on the actual
issues ripe for decision, and exclude from consideration issues already decided or not yet ripe at
each level of environmental review.").  "NEPA regulations allow agencies to 'tier' later NEPA
documents to earlier NEPA documents so that the agency can 'avoid some of the burdens of the
NEPA process.'"  *Earth Island Inst. v. Muldoon*, 630 F. Supp. 3d 1312, 1339 (E.D. Cal. 2022),
*aff'd* 82 F.4th 624 (9th Cir. 2023).  "The later NEPA documents 'concentrate on issues specific to
the current proposal' while the earlier NEPA documents are broader and 'cover matters more
general in nature.'"  *Id*. (citations omitted); *see also City of Crossgate v. U.S. Dep't of Veterans
Affs.*, 526 F. Supp. 3d 239, 250 (W.D. Ky. 2021) ("NEPA permits agencies [to] tier their NEPA
documents . . . An agency may tier by scope (*e.g.*, from a programmatic to a site-specific statement)
. . . or it may tier by stages (*e.g.*, from the 'need' or 'site selection' stage to later stages such as
mitigation[.]")).  Here, the FHWA's process of analyzing a broad range of possibilities within the

Final EA, only to re-evaluate its analysis once the tolling structure is finalized, was supported by the commonplace practice of tiering NEPA documents.

At base, Plaintiffs' argument that the Court must set aside the FHWA's environmental assessment because it was conducted before the TBTA adopted a final tolling schedule seeks to improperly prejudge the outcome of FHWA's re-evaluation.  "[T]he purpose of [a] Reevaluation [is] to determine whether . . . [s]upplemental [NEPA review is] necessary."  *South Trenton Residents Against 29 v. Fed. Highway Admin.*, 176 F.3d 658, 661 (3d Cir. 1999).  Plaintiffs' request that the Court order a supplemental evaluation *before* the FHWA conducts its anticipated re-evaluation, *see* Pls.' Mem. at 53-54, is unripe.  *See Norton v. Fed. Highway Admin.*, No. 01 Civ. 891, 2002 WL 31017416, at *2 (W.D.N.Y. Aug. 8, 2002) ("Although [a supplemental NEPA analysis] may be required – that determination is properly within the discretion of the FHWA rather than this Court."); *see also Mulgrew, et al. v. U.S. Dep't of Transp., et al.*, No. 24 Civ. 1644 (LJL), Dkt. No. 48 at 13-16 (S.D.N.Y.).

## CONCLUSION

In sum, the FHWA's Final EA and FONSI reflected reasoned judgments about the environmental impacts of the Project.  It was neither arbitrary, nor capricious.  For the foregoing reasons, the Court should grant the Federal Defendants' cross-motion for summary judgement and deny Plaintiffs' motion for summary judgment.

Dated: April 1, 2024
        New York, New York

                            DAMIAN WILLIAMS
                            United States Attorney

                    By:     /s/ Zachary Bannon
                            ZACHARY BANNON
                            DOMINIKA TARCZYNSKA
                            Assistant United States Attorneys
                            86 Chambers Street, Third Floor
                            New York, New York 10007