# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELIZABETH CHAN, TAMARA HOFFMAN, RACHEL EHRENPREIS, CHAIM KATZ, WINNIE CHEUNG, MEIR EHRENPREIS, JOHN BAILEY, SEAN CARNEY, LUIS DIAZ AND FAMILIES FOR A BETTER PLAN FOR CONGESTION, | Hon. Lewis J. Liman |
| *Plaintiffs,* | Civ. No. 23-cv-10365-LJL |
| v. | |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, THE METROPOLITAN TRANSPORTATION AUTHORITY, THE TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, SHAILEN BHATT, in his official capacity as Administrator of the Federal Highway Administration, RICHARD J. MARQUIS, in his official capacity as Division Administrator of the New York Division of the Federal Highway Administration, NICHOLAS A. CHOUBAH, P.E. in his official capacity as Chief Engineer for the New York State Department of Transportation, WILLIAM J. CARRY in his official capacity as Assistant Commissioner for Policy for the New York City Department of Transportation, | |
| *Defendants.* | |

**MEMORANDUM OF LAW IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT BY THE METROPOLITAN TRANSPORTATION AUTHORITY, THE TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, AND THE NEW YORK CITY DEPARTMENT OF TRANSPORTATION, AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 4

    A.    The Need for Congestion Pricing ............................................................ 4

    B.    Overview of the Four-Year Long NEPA Process ................................... 6

ARGUMENT ........................................................................................................ 14

    I.    The NEPA Claims Added to the Amended Complaint Are Time-Barred, and Plaintiffs Chan and Hoffman Otherwise Lack Standing................................................. 14

        A.    The New Claims are Time-Barred. ................................................... 14

        B.    The Newly Added Plaintiffs' Claims Do Not Relate Back to the Original Complaint. 15

        C.    Plaintiffs Chan and Hoffman Lack Standing to Assert NEPA Claims Alleging Environmental Harm, Both in BPC and Elsewhere. ......................................... 16

    II.    Standard of Review Under NEPA ..................................................... 18

    III.    Plaintiffs and Other Members of the Public Had Ample Opportunity to Participate in the NEPA Process. .......................................................................................... 20

    IV.    The EA Considered Reasonable Alternatives. ................................... 23

        A.    The EA Appropriately Defined the Purpose and Need for the Project. ........ 23

        B.    The EA Considered all Reasonable Alternatives. ............................. 25

    V.    FHWA's Issuance of a FONSI Was Not Arbitrary and Capricious. ............... 28

    VI.    FHWA Took a Hard Look at Potential Environmental Impacts from the Project............ 29

        A.    The EA Carefully Considered Potential Traffic Impacts................................ 29

        B.    The EA Thoroughly Analyzed Potential Air Quality Impacts...................... 32

        C.    Plaintiffs' Challenges to the EA's Traffic and Air Quality Analyses Lack Merit....... 35

    VII.    FHWA Took a Hard Look at Environmental Justice Concerns. ................... 38

        A.    The EA Thoroughly Evaluated Environmental Justice. ............................... 39

        B.    Plaintiffs' Environmental Justice Challenges Lack Merit. ........................... 44

    VIII.    FHWA Took a "Hard Look" at Mitigation to Address Potential Effects on Environmental Justice Communities. ........................................................................................ 48

    IX.    The Challenge to the Proposed Tolling Structure Is Premature. ..................... 52

CONCLUSION.................................................................................................... 56

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                                    **PAGE(S)**

*Brodsky v. U.S. Nuclear Regul. Comm'n*,
   704 F.3d 113 (2d Cir. 2013) .................................................................................18, 20

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*,
   889 F.3d 584 (9th Cir. 2018) .................................................................................24

*California v. Bernhardt*,
   472 F.Supp.3d 573 (N.D. Cal. 2020) ....................................................................47

*Citizens Against Burlington, Inc. v. Busey*,
   938 F.2d 190 (D.C. Cir. 1991) ....................................................................23, 24, 25

*Citizens for Balanced Env't & Transp., Inc. v. Volpe*,
   650 F.2d 455 (2d Cir. 1981) ..................................................................................38

*Citizens' Comm. to Save our Canyons v. U.S. Forest Serv.*,
   297 F.3d 1012, 1020 (10th Cir. 2002) ...............................................................23, 25

*City of Alexandria v. Slater*,
   198 F.3d 862 (D.C. Cir. 1999) ..............................................................................23

*City of N.Y. v. U.S. Dep't of Transp.*,
   715 F.2d 732 (2d Cir. 1983) .............................................................................26, 27

*City of Olmsted Falls v. FAA*,
   292 F.3d 261 (D.C. Cir. 2002) ..............................................................................17

*Coliseum Square Ass'n, Inc. v. Jackson*,
   465 F.3d 215 (5th Cir. 2006) .................................................................................39

*Communities Against Runway Expansion, Inc. v. F.A.A.*,
   355 F.3d 678 (D.C. Cir. 2004).........................................................................38, 39, 46

*Ctr. for Bio. Diversity v. FHWA*,
   No. 16 Civ. 133, 2017 WL 2375706 (C.D. Cal. May 11, 2017) ............................53

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ........................................................................... *passim*

*Do No Harm v. Pfizer Inc.*,
   No. 23-15, 2024 WL 949506 (2d Cir. Mar. 6, 2024) ............................................18

*Earth Island Inst. v. U.S. Forest Serv.*,
   87 F.4th 1054 (9th Cir. 2023) ...............................................................................48

*Espinosa v. The Delgado Travel Agency, Inc.*,
  No. 05 Civ. 6917, 2006 WL 2792689  (S.D.N.Y. Sept. 27, 2006)..........................................16

*Friends of Ompompanoosuc v. FERC*,
  968 F.2d 1549 (2d Cir. 1992) ......................................................................................26, 29, 49

*Fund for Animals v. Norton*,
  365 F. Supp. 2d 394 (S.D.N.Y. 2005) .......................................................................................17

*Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
  702 F.3d 1156 (10th Cir. 2012) ...............................................................................................29

*Hogan v. Fischer*,
  738 F.3d 509 (2d Cir. 2013) ......................................................................................................15

*Iseke v. City & Cnty. of Honolulu*,
  No. 15 Civ. 00193, 2017 WL 6803423 (D. Haw. Sept. 20, 2017) ...........................................39

*Jones v. Peters*,
  No. 06 Civ. 00084, 2007 WL 2783387 (D. Utah Sept. 21, 2007)............................................23

*Julian v. Metro. Life Ins. Co.*,
  No. 17 Civ. 00957, 2021 WL 4237047 (S.D.N.Y. Sept. 1, 2021)............................................15

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ......................................................................................................18, 19, 29

*Lat. Ams. for Soc. & Econ. Dev. v. FHWA*,
  756 F.3d 447 (6th Cir. 2014) ..............................................................................................38, 39

*Levy v. U.S. Gen. Acct. Off.*,
  175 F.3d 254 (2d Cir. 1999) ......................................................................................................15

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................................................17

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ......................................................................................................18, 29, 53

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
  345 F.3d 520 (8th Cir. 2003) .....................................................................................................46

*Mt. Lookout—Mt. Nebo Prop. Prot. Ass'n v. FERC*,
  143 F.3d 165 (4th Cir. 1998) .....................................................................................................26

*Nat. Res. Def. Council v. Morton*,
  458 F.2d 827 (D.C. Cir. 1972)...................................................................................................19

*Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*,
  55 F. Supp. 3d 316 (E.D.N.Y. 2014) .........................................................................................52

*Nat'l Indian Youth Council v. Andrus*,
   501 F. Supp. 649 (D.N.M. 1980) ................................................................18

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
   538 U.S. 803 (2003) ......................................................................52, 55

*Nat'l Post Off. Collaborate v. Donahoe*,
   No. 13 Civ. 1406, 2014 WL 6686691 (D. Conn. Nov. 26, 2014) ...........................25

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
   241 F.3d 722 (9th Cir. 2001) ................................................................29

*Native Ecosystems Council v. U.S. Forest Serv.*,
   428 F.3d 1233 (9th Cir. 2005) ...............................................................26

*Nevada v. Dep't of Energy*,
   457 F.3d 78 (D.C. Cir. 2006) ................................................................53

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ..........................................................................55

*Norwalk Harbor Keeper v. U.S. Dep't of Transp.*,
   No. 18 Civ. 0091, 2019 WL 2931641 (D. Conn. July 8, 2019) ........................23, 25

*O'Reilly v. U.S. Army Corps of Eng'rs*,
   477 F.3d 225 (5th Cir. 2007) .............................................................48, 52

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*,
   693 F.3d 1084 (9th Cir. 2012) ...............................................................52

*Protect Lake Pleasant, LLC v. Connor*,
   No. 07 Civ. 0454, 2010 WL 5638735 (D. Ariz. July 30, 2010) .......................24, 27

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) .........................................................................48

*San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*,
   657 F. Supp. 2d 1233 (D. Colo. 2009) .......................................................52

*Scottsdale v. FAA*,
   37 F.4th 678 (D.C. Cir. 2022)................................................................16

*Senville v. Peters*,
   327 F. Supp. 2d 335 (D. Vt. 2004) ..........................................................39

*Shenandoah Valley Network v. Capka*,
   669 F.3d 194 (4th Cir. 2012) ................................................................53

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017).......................................................18, 39, 45

*Sierra Club v. Mainella*,
  459 F. Supp. 2d 76 (D.D.C. 2006)................................................................36

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  772 F.2d 1043 (2d Cir. 1985)....................................................................18

*Sierra Club, Inc. v. Bostick*,
  787 F.3d 1043 (10th Cir. 2015) .................................................................19

*Slayton v. Am. Exp. Co.*,
  460 F.3d 215 (2d Cir. 2006) ......................................................................15

*Slockish v. FHWA*,
  No. 08 Civ 01169, 2020 WL 8617636 (D. Or. Apr. 1, 2020), *R. & R. adopted in relevant part*,
  2021 WL 683485 (D. Or. Feb. 21, 2021) ..................................................19

*Spiller v. White*,
  352 F.3d 235 (5th Cir. 2003) ....................................................................18

*Stand Up for Cal.! v. U.S. Dep't of Interior*,
  919 F. Supp. 2d 51 (D.D.C. 2013)............................................................24

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017)..........................................................46

*Stewart Park & Reserve Coal., Inc. v. Slater*,
  352 F.3d 545 (2d Cir. 2003) ......................................................................18

*Suffolk Cnty. v. Sec'y of Interior*,
  562 F.2d 1368 (2d Cir. 1977) ....................................................................37

*Texas v. United States*,
  523 U.S. 296 (1998) ...................................................................................52

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010)............................................................48, 51

*Town of Orangetown v. Gorsuch*,
  718 F.2d 29 (2d Cir. 1983) ........................................................................29

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ...................................................................................16

*Twp. of Belleville v. Fed. Transit Admin.*,
  30 F. Supp. 2d 782 (D.N.J. 1998)............................................................25

*Utah Env't Congress v. Bosworth*,
  439 F.3d 1184 (10th Cir. 2006) ................................................................23

*Vecinos Para el Bienestar de la Communidad Costera v. FERC*,
  6 F.4th 1321 (D.C. Cir. 2021)...................................................................46

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519  (1978) ............................................................................................19

*Vill. of Logan v. U.S. Dep't of Interior*,
   No. 12 Civ. 401, 2013 WL 12084730 (D.N.M. Jan. 14, 2013) ...............................19

*Vuksanovich v. Airbus Americas, Inc.*,
   608 F. Supp. 3d 92 (S.D.N.Y.) .................................................................................15

*Wilder v. News Corp.*,
   No. 11 Civ. 4947, 2015 WL 5853763 (S.D.N.Y. Oct. 7, 2015) ...............................15

*Yorkshire Towers, Co., L.P. v. U.S. Dep't of Transp.*,
   No. 11 Civ. 1058, 2011 WL 6003959 (S.D.N.Y. Dec. 1, 2011) ..............................14

*Zorilla v. Carlson Restaurants, Inc.*,
   255 F. Supp. 3d 465 (S.D.N.Y. 2017) .....................................................................15

## STATUTES

23 U.S.C. § 139(l)(1) ....................................................................................................14

42 U.S.C. § 4321 *et seq.* ................................................................................................6

42 U.S.C. § 4332(C)(iii) ................................................................................................25

5 U.S.C. § 706 ....................................................................................................4, 18, 55

## OTHER AUTHORITIES

23 C.F.R. §§ 771 *et seq.* ................................................................................. *passim*

40 C.F.R §§ 1501 *et seq.* ................................................................................ *passim*

40 C.F.R. §§ 1502 *et seq.* ............................................................................... *passim*

40 C.F.R. § 1503.4(a)(3) ...............................................................................................48

40 C.F.R. § 1508.1(z) ...................................................................................................25

40 C.F.R. § 1506.6(a) ...................................................................................................20

40 C.F.R. §§ 1508.27(b)(4), (5) ...................................................................................28

40 C.F.R. §§ 93.116, 123 .............................................................................................34

40 C.F.R. pt. 1500 ...........................................................................................................7

Fed. R. Civ. P. 56(a) .....................................................................................................20

Fed. R. Civ. P. 15(c)(1)(C) ...........................................................................................15

N.Y. Veh & Tr. Law § 1704-a(1) ...................................................................................6

## PRELIMINARY STATEMENT

New York's congestion pricing program is a long-overdue plan to reduce crippling traffic congestion in Manhattan's Central Business District ("CBD") for the benefit of millions of residents, visitors, and commuters; to cut emissions and improve regional air quality; and finally to secure a stable source of funding for critical investments in the nation's largest public transit system.  Once implemented, the CBD Tolling Program (the "Project") will reduce traffic and improve air quality throughout lower Manhattan, including Battery Park City ("BPC"), where the original Plaintiffs—the only two whose claims were timely filed—reside.  Despite the projected benefits to their neighborhood and after failing to take advantage of multiple opportunities to have their questions and concerns addressed, Plaintiffs have pursued a "see what sticks" approach in a last-ditch attempt to halt the Project.  However, once Plaintiffs' claims are stripped of their hyperbole, it becomes clear that their objections to the Project have no basis in the Record.

As lead federal agency under the National Environmental Policy Act ("NEPA"), the Federal Highway Administration ("FHWA") conducted a comprehensive environmental assessment ("EA") studying the potential environmental impacts of the Project, with assistance from the three Project Sponsors: the Triborough Bridge and Tunnel Authority ("TBTA"),[1] the New York State Department of Transportation ("NYSDOT"), and the New York City Department of Transportation ("NYCDOT").  Over four years, FHWA and the Project Sponsors consulted with federal, regional, state, and local agencies; held multiple public outreach meetings; and considered and responded to tens of thousands of public comments before issuing the 958-page EA with 32,543 pages of appendices.  FHWA independently reviewed the EA—including the Project

---

[1] TBTA is an affiliate agency of the Metropolitan Transportation Authority ("MTA").  The MTA is a public benefit corporation responsible for North America's largest transportation network, serving 15.3 million people across 5,000 square miles in New York City, Long Island, Southeastern New York, Northeastern New Jersey, and Southern Connecticut.

Sponsors' commitment to fund $155 million in mitigation to improve air quality and public health in environmental justice communities with preexisting pollution and health burdens throughout the region.  Applying NEPA's well-established legal standards, FHWA issued a Finding of No Significant Impact ("FONSI") determining that the Project, including mitigation, would not have a significant adverse impact on the environment and would not have a disproportionately high and adverse impact on environmental justice communities or populations.

Plaintiffs subsequently filed this lawsuit.  But their position fails at the threshold: The Amended Complaint adds NEPA claims that are time-barred (as they were filed nearly three months after the statute of limitations ran); the newly added Plaintiffs' claims do not relate back to the original Complaint (as their omission was not the result of any mistake); and the original Plaintiffs, Elizabeth Chan and Tamara Hoffman, lack standing to assert *any* NEPA claims alleging environmental harms, either to their own neighborhood of BPC (where environmental conditions are projected to *improve*) or elsewhere (where they do not even attempt to establish a connection).  Moreover, Plaintiffs failed to raise during the public comment period any of the issues that they now seek to litigate, forfeiting their claims.[2]  The Court should dismiss Plaintiffs' NEPA claims.

However, even if those claims were properly before the Court, they are refuted by the Record and/or unfounded in law.  To start, Plaintiffs' challenge to FHWA's decision to issue a FONSI (rather than preparing an Environmental Impact Assessment ("EIS")) demonstrates a basic misunderstanding of the law.  Contrary to Plaintiffs' overheated assertions, the degree of political controversy surrounding a project is irrelevant to the scientific determination under NEPA as to whether a project will have significant adverse impacts on the environment.

---

[2] Indeed, Plaintiffs apparently concede that one of their primary objections to the Project—their mistaken belief that BPC residents would be tolled every time they cross West Street into Lower Manhattan—was incorrect.  *See* Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgement ("Pls. Br.") 7 n.8.  Such movements will not be tolled because both BPC and Lower Manhattan are both in the CBD.

Plaintiffs' claims of inadequate opportunity for public participation are also unfounded. The Record shows that the Project Sponsors went above and beyond NEPA's public participation requirements, while, in contrast, only one of the ten Plaintiffs bothered to take advantage of multiple opportunities to provide timely comments. Plaintiffs' essential failure to participate when they had ample opportunity to do so (and, indeed, when over 70,000 comments were submitted by other members of the public, including by one Plaintiff) in no way demonstrates that FHWA or the Project Sponsors neglected their responsibilities under NEPA.

Plaintiffs demonstrate a similarly flawed interpretation of NEPA's mandate to consider alternatives. FHWA and the Project Sponsors were not obligated to consider alternatives that did not meet the statutorily required objective to raise a certain amount of funds for the MTA's Capital Program, which is critical to the region's economy and to providing reliable transit as an alternative to driving. As precedent makes clear, revenue generation is an appropriate purpose for projects analyzed under NEPA. Moreover, Plaintiffs ignore the deferential "rule of reason" treatment afforded to agencies when determining the scope of alternatives.

Plaintiffs' claims that the EA failed to take a hard look at potential traffic, air quality, and environmental justice ("EJ") impacts are all belied by the Record. The EA exhaustively analyzed these potential effects according to rigorous methodologies approved by FHWA and the U.S. Environmental Protection Agency ("EPA"), incorporating input and comments of various stakeholders to evaluate seven tolling scenarios—which reflect various elements of the tolling structure such as the amount of the toll and the types of credits, discounts, and/or exemptions—using the "worst-case" scenario to assess the Projects' potential impacts. Likewise, Plaintiffs' mischaracterization of the $155 million mitigation package to address potential effects on EJ communities as "paltry" and "sparse" ignores both the EA's lengthy discussion of these measures

and the fact that the FONSI made their implementation enforceable conditions of tolling authority.

Finally, Plaintiffs' challenge to the recommended tolling structure, an insubstantially revised version of which was adopted by the TBTA Board on March 27, 2024, and has yet to become effective or implemented, is outside the scope of this action and plainly unripe.  To the extent Plaintiffs are concerned that the effects of the final adopted tolling structure differ from those analyzed in the EA, FHWA's reevaluation process (which Plaintiffs seek to circumvent) is designed precisely to address those concerns.  Plaintiffs should not waste judicial resources in pursuit of a challenge to the hypothetical results of a process that has hardly begun.

In short, the Record demonstrates that FHWA and the Project Sponsors exceeded NEPA's mandate to take a "hard look" at the environmental effects of the Project and provide opportunities for public, agency, and stakeholder input.  Plaintiffs' belated and unfounded challenges to the EA are insufficient to demonstrate that FHWA's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Because Plaintiffs have failed to advance proper claims or to satisfy that deferential standard, the Court should grant summary judgment to Defendants on Plaintiffs' NEPA claims and deny Plaintiffs' motion.

## STATEMENT OF FACTS

### A.  The Need for Congestion Pricing

Traffic congestion has long plagued the New York metropolitan area.  For generations, congestion has stymied economic growth and harmed the environment, public health, and quality of life in the region.  Congestion increases travel times, eroding worker productivity, reducing bus and paratransit service, raising the cost of deliveries and the overall cost of doing business, and impeding the movement of emergency vehicles.  This takes a significant economic toll, causing over 100 hours of lost time at a cost of nearly $1,595 per year per driver in the region.  (DOT_0036197.)  A 2018 study estimated that "traffic congestion [would] be a $100 billion drag"

on the area economy over the next five years, and identified the CBD—where a quarter of the economic activity is concentrated and which contains BPC and Lower Manhattan—as the primary source of traffic congestion in the region.  (DOT_0036253.)  Yet despite multiple traffic-reduction initiatives and the nation's most extensive public transit network, the New York metro area remains the most congested urban area in the country.  (DOT_0036196.)

For over 50 years, state and local officials, policy experts, and advocacy groups studied various potential solutions to determine the most effective way to reduce congestion; they have formed a clear consensus that congestion pricing—charging a toll to drive a vehicle in a highly congested area—is the most effective tool to achieve that goal.  (DOT_0004515–22.)[3]  Traffic congestion and public transit are inextricably linked: to reduce traffic, the region needs to improve the reliability of its transit system, which is chronically underfunded and in need of investment.

In 2018, the New York State Legislature created the Metropolitan Transportation Sustainability Advisory Workgroup, focused on addressing congestion and identifying sources of sustainable funding for the region's transit system.  (DOT_0004518.)  The Workgroup recommended the implementation of a congestion pricing tolling program to reduce congestion and generate critical revenue to repair, improve, and modernize the MTA system.  (*Id.*)

On April 1, 2019, based on the Workgroup's recommendations, the legislature enacted the MTA Reform and Traffic Mobility Act (the "Traffic Mobility Act" or "Act") with the goal of reducing traffic congestion in the CBD and creating a dedicated funding source for the MTA's

---

[3] In 2007, New York City proposed congestion pricing for lower Manhattan as part of "PlaNYC," the City's long-term plan.  The State of New York created a commission to evaluate a wide range of approaches to reducing congestion and recommend a comprehensive congestion mitigation plan.  The commission identified five options to evaluate in detail—congestion pricing, bridge tolling, pricing of parking and taxis, and license plate rationing—and ultimately recommended a modified version of the City's congestion pricing proposal.  (DOT_0004515.)  However, at the time, the legislature did not enact a law authorizing the concept.

capital needs.[4]  The Act's findings recognized that "[t]he ongoing failures of the tracks, signals, switches, electrical power, and other transportation infrastructure throughout the subway system in the city of New York continue to have a significant deleterious impact on the health, safety, and livelihood of commuters, tourists, resident New Yorkers, as well as business and commerce in the metropolitan commuter transportation district[.]"   (DOT_0004527.)   The legislature also recognized that traffic congestion "results in significant cost to the New York metropolitan area economy" and "impacts the everyday lives of residents, commuters, taxi and for-hire vehicle traffic, bus transit and emergency services, and is a significant contributor to decreased air quality." (*Id.*)  Accordingly, the Act directed TBTA, an affiliate agency of the MTA, to establish a plan to toll vehicles entering or remaining in the CBD.  (*Id.*)[5]

## B.  Overview of the Four-Year Long NEPA Process

### 1.  *Early Outreach to Agencies and the Public*

In June 2019, shortly after passage of the Traffic Mobility Act, the Project Sponsors submitted an Expression of Interest for tolling authority under FHWA's Value Pricing Pilot Program ("VPPP"), a mechanism created by Congress under which FHWA may authorize tolling of federal aid highways to reduce roadway congestion through congestion pricing strategies.[6] (DOT_0038307–14.)  NEPA required FHWA to evaluate the potential environmental effects of the proposal before it could authorize the Project, 42 U.S.C. § 4321 *et seq.*, along with implementing regulations promulgated by the Council on Environmental Quality ("CEQ") (which

---

[4] The Act requires that the Project provide sufficient revenues to fund $15 billion for capital projects.  N.Y. Veh & Tr. Law § 1704-a(1).

[5] As defined in the Traffic Mobility Act, the CBD consists of the geographic area of Manhattan south and inclusive of 60th Street, but not including the FDR Drive, the West Side Highway/Route 9A, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street.  (DOT_0004529.)

[6] FHWA, Value Pricing Pilot Program, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/.

apply to all federal agencies), 40 C.F.R. pt. 1500, and FHWA, 23 C.F.R. pt. 771.  As part of the NEPA process, and in accordance with Executive Order ("EO") 12,898, FHWA also would analyze the potential impact of the proposal on minority and low-income (*i.e.*, EJ) populations.

FHWA sought, and TBTA provided, considerable information about the Project and its potential effects over the course of the following years.  (DOT_0038969, DOT_0040964–71.)  In March 2021, FHWA determined that the Project should be treated as a NEPA Class III (EA) action.  (DOT_0040972–73.)  Class III actions are those for which the significance of the environmental impact is not clearly established.  For Class III actions, project sponsors must prepare an EA to determine whether the action is likely to have a significant impact on the built and natural environment; if an unmitigated significant impact is found, an EIS must be prepared.  40 C.F.R. §§ 1501.3, 1501.5, 1501.6.  If no significant impact is found, or if any predicted impacts would be mitigated to less than significant levels, the federal agency may issue a FONSI, and the action may proceed.  40 C.F.R. § 1501.6.  FHWA stated that an EA would best serve the "mutual goals of producing needed traffic and air quality analysis and soliciting robust public input from all stakeholders."  FHWA also required "enhanced coordination and public involvement that engages stakeholders from throughout all three states (New York, New Jersey, and Connecticut) in the commuting area of the CBD."  (DOT_0040972–73.)

Accordingly, FHWA and the Project Sponsors implemented a robust outreach plan to solicit input from residents, businesses, and federal, state, and local agencies, focusing on a 28-county regional area where it was anticipated that the Project could change travel patterns.  (DOT_0036216, DOT_0039267–68, DOT_0039270.)  From September 2021 through the conclusion of the NEPA process, members of the public could ask questions and comment on the Project through a designated email address, phone number, and mailing address.  (DOT_0039267–

70.)  Additional outreach tools included: (1) a website; (2) Project Sponsor social media accounts; (3) a telephone hotline; (4) a contact list; and (5) media advertising.  (DOT_0037045.)  The MTA also posted digital ads and posters in nine languages in its facilities.  (DOT_0037046.)

FHWA and the Project Sponsors established two EJ working groups to allow for more in-depth discussion about EJ issues: the Environmental Justice Technical Advisory Group (the "EJTAG") and the Environmental Justice Stakeholder Working Group (the "EJSWG"). (DOT_0037048.)  Thirty-seven groups were invited to participate in the EJTAG.  (DOT_0036217, DOT_0037037.)  EJSWG membership was open to nominations and to individuals who expressed interest.  (DOT_0036217.)  All 27 people who were nominated or expressed interest were invited to join the EJSWG.  (*Id.*)

In 2021, FHWA and the Project Sponsors held 19 virtual early outreach meetings, of which nine were targeted to EJ community members.  (DOT_0037046–47.)  Several also directly addressed the Manhattan CBD, which includes Lower Manhattan and BPC.  (*Id.*)  All meetings included a public comment session and a digital Question & Answer function, which members of the public could use to ask questions and receive responses in real time.  (DOT_0037048.)  The meetings were held at different times of day and over multiple days to maximize participation. (*Id.*)  FHWA and the Project Sponsors also met with the EJTAG seven times and the EJSWG three times between 2021 and early 2023.  (DOT_0037048–49.)  In total, over 1,000 people attended early outreach meetings and nearly 400 people spoke.  (DOT_0037047.)

2.   *The Draft EA and Public Participation*

On August 10, 2022, FHWA and the Project Sponsors issued the Draft EA,[7] which had

---

[7] To the extent Plaintiffs claim FHWA violated 40 C.F.R. § 1501.5(f)'s requirement that a senior agency official must sign off on an EA exceeding 75 pages, Richard Marquis, the FHWA Division Administrator for New York, approved the Final EA on May 5, 2023.  (DOT_0036153.)

been informed by the early outreach and complex technical analyses conducted over the past years, for public review and comment. (DOT_0037149.) The Draft EA examined numerous categories of potential environmental effects, such as the visual effects of tolling infrastructure, the indirect air quality and noise effects of changes in traffic patterns, and the effects on transit systems of shifts in travel mode choice. (DOT_0037296–885.) All of these studies evaluated potential impacts on Lower Manhattan and BPC. (*Id.*) The Draft EA also studied potential effects on EJ communities, including the potential effects of traffic diversions on local air quality in the locations throughout the region most likely to experience diversions. (DOT_0037886–955.)

Because the tolling structure was not yet established,[8] and to allow TBTA to better assess potential impacts from the Project, the Draft EA analyzed seven tolling scenarios, each with different variables, using the EPA-approved traffic and air quality models to predict changes in regional travel demand and patterns for those scenarios, as compared to predicted conditions in 2023 and 2045. (DOT_0037361.) It then studied the scenarios that yielded the representative worst-case effects for different resource categories (*e.g.*, traffic, noise, etc.) to consider the full range of potential effects from the Project. (*Id.*) The Draft EA also identified measures to which the Project Sponsors committed to mitigate potential adverse environmental effects and potential effects on EJ populations that were identified in the analyses. (DOT_0037942–46.)

FHWA and the Project Sponsors held a 44-day public comment period, during which

---

[8] The Traffic Mobility Act required the TBTA Board to establish a Traffic Mobility Review Board ("TMRB") composed of regional representatives to recommend the toll amounts and toll structure, such as exemptions, discounts, and/or crossing credits for existing tolls paid on bridges and tunnels. The TMRB issued its recommendation report on November 30, 2023, and on December 6, 2023, the TBTA Board voted to authorize TBTA to commence the ratemaking process under the New York State Administrative Procedure Act ("SAPA") for the toll structure recommended by the TMRB. *See* Congestion Pricing in New York (Nov. 2023), https://new.mta.info/ document/127761; MTA, Press Release (Dec. 6, 2023), https://new.mta.info/press-release/mta-board-votes-begin-public-review-process-central-business-district-tolling-rate. Following public hearings and in accordance with SAPA, on March 27, 2024, the TBTA Board approved and adopted a schedule of toll rates for use in the CBD that had been informed by the TMRB's recommendation. *See* Central Business District Tolling Program, https://new.mta.info/project/CBDTP (last visited Mar. 31, 2024).

anyone could submit comments on the Draft EA.[9]  The Draft EA was made available for public viewing on the Project's website and at 62 repositories, several of which were in Lower Manhattan. (DOT_0037057–62.)  In late August 2022, FHWA and the Project Sponsors held six virtual public hearings, totaling over 38 hours, to discuss the Draft EA.  (DOT_0037062.)  These hearings were publicized using several public outreach methods, including the project website; Project Sponsor social media accounts; online, printed, and radio advertisements; digital ads and posters in all subway and commuter rail stations and along bus routes, translated in nine languages; and a Project telephone hotline.  (DOT_0037045–46.)  Notice was also sent to the Project's master contact list, which anyone could join via the Project website or directly by email.[10]  (*Id.*)  Hearings could be attended via computer or telephone and were recorded and posted online.  (DOT_0037062.)

Members of the public could comment on the Draft EA during the public hearings or via (1) the Project website; (2) the Project Sponsors' social media accounts on Facebook, Twitter, and Instagram, which each contained a link to the Project comment form; (3) mail; (4) email; (5) telephone; or (6) fax.  (DOT_0037045, DOT_0037056.)  Plaintiff John Bailey provided comments at the August 25, 2022, hearing.  His comments were limited to the potential economic impacts of the Project on his travel and transportation business and mass transportation, which is unrelated to Plaintiffs' NEPA claims.  (DOT_0009184–85.)  None of the other Plaintiffs commented during the public comment period.  In total, over 1,700 people attended the public hearings and over 500 people spoke.  (DOT_0037062.)

EPA also reviewed the Draft EA with respect to several subject matter areas, including environmental justice.  (DOT_0037957.)  In addition to commending improvements made to the

---

[9] The initially announced public comment period was extended by two weeks, from September 9 to September 23, 2022, after requests from members of the public.  (DOT_0036217.)

[10] Approximately 2,300 individuals signed up to the master contact list.  (DOT_37045.)

environmental analysis during early agency outreach, EPA's comments principally concerned the Draft EA's air quality and EJ analyses.  (DOT_0007920–25.)   EPA also recommended consideration of additional mitigation to address potential effects on EJ communities.  (*Id.*)

After the formal close of the Draft EA comment period, FHWA and the Project Sponsors continued to receive and consider new comments on the Draft EA up to the point when the Final EA was submitted.  In total, FHWA and the Project Sponsors received and responded to nearly 70,000 public comments, including many that were received following the formal comment period.  (DOT_0003688–4506, DOT_0007452–36141, DOT_0037063.)

### 3.   *The Final EA and FONSI*

Between August 2022 and April 2023, FHWA and the Project Sponsors reviewed and prepared responses to each of the thousands of comments and prepared a Final EA incorporating these responses and changes informed by the public input.  (DOT_0036150–37107.)  FHWA (with EPA's concurrence) approved the issuance of a Final EA in May 2023.  (DOT_0040579–80, DOT_0045366.)  In response to comments submitted by EPA and based on feedback from the EJTAG and EJSWG, FHWA and the Project Sponsors included in the Final EA an extensive supplemental analysis focused on EJ.  This analysis principally focused on the potential impact of the Project on traffic proximate to EJ communities and resulting emissions and potential associated health effects.  (DOT_0036989–96, DOT_0006963–82, DOT_0007243–440.)

The Project Sponsors also committed to a robust, $155 million mitigation package over five years to improve air quality and public health in EJ communities that face preexisting burdens because of historic transportation and land use planning.  This mitigation package is multifaceted.  For starters, the package contains regional measures, including: (1) reducing the overnight period toll to avoid and minimize overnight truck diversions; (2) spending $20 million to accelerate the replacement of approximately 500 older diesel trucks used in the region with newer electric,

11

hybrid, or clean diesel vehicles; and (3) spending $5 million to expand NYCDOT's off-hours delivery program, which facilitates deliveries at less congested times.  FHWA found that these measures would benefit areas throughout the region situated near highways.  (DOT_0007322–25.)

The mitigation package also includes localized, place-based mitigation, such as installing roadside vegetation to improve near-road air quality; renovating parks and greenspace; installing air filtration units in schools near highways; implementing electric truck charging infrastructure; replacing up to 1,000 transportation refrigeration units at Hunts Point Produce Market; and funding an Asthma Case Management Program and center in the Bronx.  (DOT_007322–28.)  The Project Sponsors also committed to modifying tolling locations on FDR Drive to eliminate a potential toll avoidance route that could otherwise divert non-truck traffic to the Lower East Side.  (DOT_0007323.)    The supplemental analysis identified EJ communities beset with high preexisting pollution and health burdens that could see *any* additional truck traffic as a result of the Project based on modeling for the tolling scenarios with the highest overall diversions; these particularly burdened areas were identified as warranting place-based mitigation.  (DOT_0007323–26.)  The Final EA also included additional mitigation commitments to address potential adverse effects on low-income frequent drivers to the CBD.  (DOT_0037025.)

Confirming that the substantial revisions addressed their prior comments on the Draft EA, EPA "acknowledge[d] the improvements [made] throughout the NEPA process," praised the supplemental EJ analysis and mitigation package, and, critically, did not request any further changes or analysis.  (DOT_0045366.)  In light of these and other mitigation commitments, the Final EA concluded that the Project would not have a disproportionately high and adverse effect on EJ communities or populations.  (DOT_0037026.)  Based on the Final EA, FHWA approved the issuance of a Draft FONSI, which determined that the Project would not have a significant

adverse impact on the human or natural environment.  (DOT_0000363.)  With respect to Lower Manhattan, the Final EA found that the Project would reduce congestion in the CBD and the region (DOT_0036354–60), reduce traffic on the West Side Highway and in Lower Manhattan streets (*id.*), and improve air quality in Lower Manhattan (DOT_0036838–41).

The Final EA and Draft FONSI were made available for public review for a period of 30 days, from May 12, 2023, to June 12, 2023.[11]  (DOT_0040580, DOT_0040683–84.)  On June 12, 2023, Families for Battery Park City submitted a letter commenting on the Final EA and Draft FONSI.[12]  Chan Decl., Ex. 1.  Although the public availability period was not a second public comment period, FHWA and the Project Sponsors reviewed the submissions received during this period and determined that they did not provide new information and therefore did not require changes to the EA.  (DOT_0000393.)  Accordingly, on June 23, 2023, FHWA's New York Division Administrator signed the FONSI, thus concluding FHWA's four-year long NEPA review of the Project.  (*Id.*)  On June 28, 2023, FHWA published notice of the final agency action in the Federal Register, which informed the public that the deadline to seek judicial review of its final determination was November 27, 2023.  88 Fed. Reg. 41998 (June 28, 2023).

On March 27, 2024, the TBTA Board adopted a toll rate schedule through a formal ratemaking process.  Before the Project can commence operation, FHWA and the Project Sponsors will evaluate the TBTA-adopted toll rate schedule to determine whether its effects are consistent with those in the EA and the FONSI remains valid, which may require additional technical analysis. (DOT_000393–94.)  Once the reevaluation is complete, the Project Sponsors and FHWA

---

[11]  As Plaintiffs concede, the Project Sponsors provided almost the same number of days for public comment as is required for an EIS.  Pls. Br. 51; 23 C.F.R. §§ 771.119(e), 771.123(k).

[12]  Exhibit 1 of Plaintiff Chan's affidavit includes the comment letter submitted by Families for Battery Park City, which she claims was submitted by Families for a Better Plan for Congestion.  Chan Decl. ¶¶ 17–18; Ex. 1.

must execute a tolling agreement under the VPPP.  (*Id.*)

## ARGUMENT

I.  **The NEPA Claims Added to the Amended Complaint Are Time-Barred, and Plaintiffs Chan and Hoffman Otherwise Lack Standing**.

Plaintiffs Chan and Hoffman filed this action on November 22, 2023, purportedly on behalf of themselves and a number of other, unnamed BPC residents.  (ECF No. 1.)  On February 20, 2024, three months after the statute of limitations on NEPA claims had run, Plaintiffs filed the Amended Complaint, which added eight new plaintiffs (the "Newly Added Plaintiffs") and new claims alleging environmental harm to other parts of New York City and beyond.[13]  (ECF No. 39.) However, these new claims were filed outside the statute of limitations and do not relate back to the original Complaint.  Therefore, they must be dismissed.  In addition, original Plaintiffs Chan and Hoffman lack standing to assert the new claims alleging environmental harm outside of BPC.

### A.  The New Claims are Time-Barred.

The new substantive NEPA claims were filed after the statute of limitations had run; accordingly, the Court should dismiss those claims.  23 U.S.C. § 139(l)(1) requires that a claim challenging certain transportation projects must be filed within 150 days of notice of a final agency action in the Federal Register.  Here, the deadline to file such a claim was November 27, 2023, 150 days after the Federal Register notice of the adoption of the FONSI.  88 Fed. Reg. 41998 (June 28, 2023) (advising the public of the statute of limitations); *see also Yorkshire Towers, Co., L.P. v. U.S. Dep't of Transp.*, No. 11 Civ. 1058, 2011 WL 6003959, at *5–6 (S.D.N.Y. Dec. 1, 2011).

---

[13] In addition to adding eight new Plaintiffs (ECF No. 39 ¶¶ 30–37), the Amended Complaint includes new allegations concerning purported impacts in the Lower East Side, Chinatown, residential neighborhoods near FDR Drive, and New Jersey (ECF No. 39 ¶¶ 6, 18, 20, 30, 31, 32, 35, 91).  Plaintiffs' Motion for Summary Judgment attempts to expand the case further still by seeking relief for alleged environmental impacts in the Bronx, Queens, and Staten Island (Pls. Br. 7–8, 16–18, 31, 33–40), none of which were even hinted at in the original Complaint.  These claims are time barred.

The new claims were not asserted until February 20, 2024.  Thus, they are untimely.

**B.  The Newly Added Plaintiffs' Claims Do Not Relate Back to the Original Complaint.**

The Newly Added Plaintiffs cannot circumvent the statute of limitations on a theory of "relation back" because their claims do not, in fact, relate back to the original complaint.  Federal Rule of Civil Procedure 15(c)(1)(C) defines a narrow set of circumstances in which claims from newly added parties relate back to the original pleading.[14]  *See Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013).  Specifically, to satisfy Rule 15(c)(1)(C), Plaintiffs must demonstrate that: (1) the new plaintiffs' claims arise out of the same transaction or occurrence advanced in the original pleading; (2) the defendants received adequate notice of the new claims so as not to be prejudiced in maintaining a defense on the merits; and (3) the defendants knew or should have known that, but for a mistake concerning the new plaintiffs' identities, the action would have been brought on those parties' behalf.  *See Vuksanovich v. Airbus Americas, Inc.*, 608 F. Supp. 3d 92, 110 n.4 (S.D.N.Y.).[15]  Here, the first and second requirements plainly are not met.  And as to the third, Plaintiffs cannot satisfy it because the Newly Added Plaintiffs—who seek to expand this action to include new geographic areas—were not excluded from the original Complaint "because of a mistake, as required."  *See, e.g.*, *Levy*, 175 F.3d at 255; *Wilder*, 2015 WL 5853763, at *16 (finding

---

[14] Although the text of Rule 15(c)(1)(C) refers to adding new defendants, this Court and the Second Circuit apply this standard to attempts to amend a pleading to add new plaintiffs.  *See Levy v. U.S. Gen. Acct. Off.*, 175 F.3d 254, 255 (2d Cir. 1999); *Wilder v. News Corp.*, No. 11 Civ. 4947, 2015 WL 5853763, at *15 (S.D.N.Y. Oct. 7, 2015); *see also Julian v. Metro. Life Ins. Co.*, No. 17 Civ. 00957, 2021 WL 4237047, at *6 (S.D.N.Y. Sept. 1, 2021).

[15] A minority of district court decisions in the Second Circuit have not required a showing of mistake and instead ask whether: (1) the amended complaint arises out of the same transaction or occurrence advanced in the original pleading; (2) there is sufficient identity of interest between the new plaintiffs, old plaintiffs, and the respective claims so defendants could be said to have been given fair notice of the latecomers' claims; and (3) there is an absence of undue prejudice.  *See, e.g.*, *Zorilla v. Carlson Restaurants, Inc.*, 255 F. Supp. 3d 465, 476 (S.D.N.Y. 2017).  Even if the minority rule did apply, the Newly Added Plaintiffs still fail because the Amended Complaint tracks the original complaint's legal theory but is "based on an entirely distinct set of factual allegations," focused on the Project's alleged impacts in neighborhoods not even discussed in the original complaint.  *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006) (internal quotation marks omitted).  Thus, the Newly Added Plaintiffs' NEPA claims fail the second element of the minority rule's test, and the claims therefore do not relate back.

no relation back where original plaintiffs had not shown that "the omission of the subsequently-added plaintiffs from the timely-f[iled] complaint was the result of a mistake"); *Espinosa v. The Delgado Travel Agency, Inc.*, No. 05 Civ. 6917, 2006 WL 2792689, at \*4 (S.D.N.Y. Sept. 27, 2006).  Rather, several months after the filing of the original action, plaintiffs Chan and Hoffman (originally pursuing their BPC concerns *pro se*) obtained counsel.  That counsel also represents another group of plaintiffs in a related action, *Mulgrew v. U.S. Department of Transportation*, No. 24 Civ. 1644 ("*Mulgrew*"), which also was untimely filed.  *See Mulgrew*, ECF. No. 53.  After obtaining that mutual counsel, the Newly Added Plaintiffs were added to the Chan Complaint in a transparent attempt to add on entirely new bases to challenge the FONSI unrelated to BPC.  The Court should dismiss the Newly Added Plaintiffs' NEPA claims.

### C. Plaintiffs Chan and Hoffman Lack Standing to Assert NEPA Claims Alleging Environmental Harm, Both in BPC and Elsewhere.

To establish standing to sue, plaintiffs must demonstrate that they have suffered a concrete and particularized injury, caused by the challenged agency action, that is redressable by the court. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  Plaintiffs Chan and Hoffman lack standing to assert NEPA claims relating to alleged environmental impacts in BPC, where no such impacts are predicted to occur from the Project, and they do not allege (much less prove) facts sufficient to demonstrate standing to assert environmental claims outside of Lower Manhattan.

First, Plaintiffs Chan and Hoffman cannot establish an injury-in-fact related to BPC or Lower Manhattan because the traffic and air quality analysis detailed in the EA shows that traffic and air quality in and around BPC and Lower Manhattan (defined in the EA generally as the area south of Canal Street) are projected to *improve* as a result of the Project.  *See* Point VI.A–B, *infra*. Plaintiffs have not even attempted to dispute the accuracy of those studies.  They therefore cannot establish a concrete injury-in-fact caused by the Project.  *See Scottsdale v. FAA*, 37 F.4th 678,

679–80 (D.C. Cir. 2022) (dismissing claim for lack of standing where plaintiff's "claim of injury is not only unsupported; it is also at least partly rebutted" by noise studies).

Beyond failing to dispute the accuracy of the studies in the EA, Plaintiffs Chan and Hoffman also do not demonstrate an injury-in-fact relating to other geographic regions referenced in the Amended Complaint, such as the Lower East Side, nor do they make any effort to establish a connection to those areas. *See Fund for Animals v. Norton*, 365 F. Supp. 2d 394, 406 (S.D.N.Y. 2005) (holding that to establish an injury at summary judgment, an environmental litigant "must offer specific facts sufficient to show that they are (or would be) directly affected by that action" (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992))). While Plaintiffs Chan and Hoffman allege a connection to Lower Manhattan, and particularly to BPC, their place of residence, neither one of those Plaintiffs alleges suffering any injury-in-fact related to any other geographic region outside of Lower Manhattan. (*See* ECF No. 39 ¶ 28 (alleging Plaintiff Chan's children attend grade and nursery school in "Lower Manhattan" which requires them to "walk across West Street," suggesting a location close to home in BPC), ¶ 29 (alleging Plaintiff Hoffman works in "Lower Manhattan" and that her child attends school in BPC)). Plaintiff Chan submitted an affidavit with Plaintiffs' motion for summary judgment, but the affidavit does not include any facts establishing a connection with areas outside of Lower Manhattan. *Chan*, ECF No. 54-8 ("Chan Decl."). No other Plaintiff submitted an affidavit with their motion for summary judgment.

In addition, Plaintiffs Chan and Hoffman have not established any causal connection between alleged deficiencies in the EA with respect to other geographic regions, such as the Lower East Side or the Bronx, and the injuries they allege. *See City of Olmsted Falls v. FAA*, 292 F.3d 261, 267 (D.C. Cir. 2002) (holding "a NEPA claim may not be raised by a party with no claimed or apparent environmental interest" or used "as a handy stick . . . to attack defendant" (internal

quotation marks omitted)); *Do No Harm v. Pfizer Inc.*, No. 23-15, 2024 WL 949506, at *7 (2d Cir. Mar. 6, 2024) (plaintiffs "cannot rest on . . . mere allegations, as would be appropriate at the pleading stage but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true" (internal quotation marks omitted)).

For all these reasons, the Court should deny Plaintiffs' motion for summary judgment and dismiss their NEPA claims as untimely and lacking standing.

## II.   Standard of Review Under NEPA

The Administrative Procedure Act ("APA") governs judicial review of an agency's compliance with NEPA.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1050 (2d Cir. 1985).  Under the APA, "[a]n agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"[16]  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004) (quoting 5 U.S.C. § 706(2)(A)); *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 375–76 (1989); *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

As the Second Circuit has explained, "NEPA is a procedural statute that mandates a process rather than a particular result."  *Stewart Park & Reserve Coal., Inc. v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003); *see also Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) ("[T]he statute is primarily information-forcing.")  Therefore, "judicial review of administrative choices under NEPA…focuses primarily on the procedural regularity of the decision, rather than on its substance."  *Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 118–19 (2d Cir. 2013) (internal quotation marks omitted).  "The only role for a court is to [ensure] that the agency has

---

[16] Courts have recognized that where an EA fulfills the function of an EIS, it can be considered the functional equivalent of an EIS. *Spiller v. White*, 352 F.3d 235, 245 n.6 (5th Cir. 2003) (holding that "[f]orcing the Lead Agencies to prepare an EIS would likely be unnecessarily duplicative and a waste of resources" where the EA "has all the hallmarks of an EIS"); *Nat'l Indian Youth Council v. Andrus*, 501 F. Supp. 649, 656–57 (D.N.M. 1980).

taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'"  *Kleppe*, 427 U.S. at 410 n.21 (quoting *Nat. Res. Def. Council v. Morton*, 458 F.2d 827, 838 (D.C. Cir. 1972)).

Before bringing a NEPA challenge in court, parties must "structure their participation [in the administrative process] so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration."  *Pub. Citizen*, 541 U.S. at 764 (cleaned up).  Accordingly, "[p]arties challenging an agency's compliance with NEPA must ordinarily raise relevant objections during the public comment period."  *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1048 (10th Cir. 2015); *see also Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553–54 (1978) ("Administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by…, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider [the matter].").

Consistent with this rule, objections not raised during a public comment period ordinarily may not be raised in litigation.  *See Bostick*, 787 F.3d at 1048; *Pub. Citizen*, 541 U.S. at 764.[17]  Thus, issues raised for the first time during a public availability period for a draft FONSI, which by regulation is not a public comment period, *see* 40 C.F.R. § 1501.6(a)(2), are not preserved for judicial review (DOT_0040836).

Summary judgment is proper where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

---

[17] There is an exception for objections to or based on information made available after the public comment period. *See, e.g.*, *Slockish v. FHWA*, No. 08 Civ 01169, 2020 WL 8617636, at *33 (D. Or. Apr. 1, 2020), *R. & R. adopted in relevant part*, 2021 WL 683485 (D. Or. Feb. 21, 2021); *Vill. of Logan v. U.S. Dep't of Interior*, No. 12 Civ. 401, 2013 WL 12084730, at *3 (D.N.M. Jan. 14, 2013).

Civ. P. 56(a).  Because the Court's review is limited to the Administrative Record, which supports

the rationality of FHWA's decision, Defendants are entitled to summary judgment.

### III.  Plaintiffs and Other Members of the Public Had Ample Opportunity to Participate in the NEPA Process.

Plaintiffs claim that FHWA and the Project Sponsors failed to adequately include members

of the public in the NEPA process and that they were discouraged from providing comments.  Pls.

Br. at 50–52.  Since these claims are clearly meritless, it is apparent they are being raised only to

try to overcome a forfeiture issue, as the Plaintiffs failed to comment or raise any concerns during

the public comment period that they seek to litigate here.  Contrary to Plaintiffs' claim, however,

the public, including Plaintiffs, had multiple opportunities to engage with FHWA and the Project

Sponsors and to share their concerns well before and after the publication of the Draft EA.

Under 40 C.F.R. §§ 1501.5(e) and 1506.6(a), agencies are to involve "the public, State,

Tribal, and local governments, [and] relevant agencies…*to the extent practicable*, in preparing

environmental assessments" and must "make diligent efforts" to involve the public in the NEPA

process.  (emphasis added).  These regulations grant the lead federal agency discretion to decide

how much involvement by the public, government entities, and relevant agencies is "practicable."

*Coal. for Healthy Ports v. U.S. Coast Guard*, No. 13 Civ. 5347, 2015 WL 7460018, at *15

(S.D.N.Y. Nov. 24, 2015) ("An agency preparing an EA is required to 'involve environmental

agencies, applicants, and the public' only 'to the extent practicable' …and agencies are afforded

'considerable discretion to decide the extent to which such public involvement is practicable….'"

(quoting *Brodsky*, 704 F.3d at 121)).[18]   Indeed, "Courts in this Circuit have found public

participation in the preparation of an EA insufficient only where an agency has failed to notify or

---

[18] A plaintiff's participation claims are actionable only to the extent the lack of participation prevented the lead agency from taking a "hard look" at the relevant areas of environmental concern.  *Coal. for Healthy Ports*, 2015 WL 7460018, at *15.  Because Plaintiffs' claims of deficiencies in the EA fail, Plaintiffs must lose on this claim as well.

solicit feedback from the public at all."  *Id*. (citations omitted).

Here, there is no question that FHWA and the Project Sponsors provided adequate opportunity for public involvement.  Members of the public were given the opportunity to provide comments through various means through the entire NEPA process.[19]  (DOT_0037056–57.)

Nothing prohibited Plaintiffs from participating in the NEPA process, yet only one of the ten Plaintiffs commented during the comment period, and that comment did not relate to the issues Plaintiffs now seek to litigate.  Plaintiff John Bailey commented during the August 25, 2022 public hearing, but his comments did not relate to the NEPA claims that Plaintiffs seek to litigate here. (DOT_0009184–85.)  None of the other Plaintiffs submitted comments until June 12, 2023— almost a year after the formal comment period ended and almost two years after early outreach had begun.[20]  Chan Decl., Ex. 1.  Plaintiffs' failure to participate, despite ample opportunity to do so, in no way demonstrates that FHWA or the Project Sponsors neglected their responsibilities under NEPA.[21]

Plaintiffs also claim that they were unable to locate information about the Project and could not discern from the public websites whether they were permitted to comment on the Draft EA— both of which claims defy logic.  Chan Decl. ¶¶ 10–11; ECF No.39 ¶¶ 12, 28–29.  First, over 70,000 comments were submitted during the formal review period (including by Plaintiff John

---

[19] *See* Statement of Facts, *supra*, for a description of the various ways members of the public could participate in the NEPA process.

[20] *See* Note 12, *supra*.  In addition to being submitted after the public comment period, Plaintiffs' comments focused on the alleged potential negative effects the Project could have on air quality and congestion in Battery Park City. However, the EA concluded that the Project would actually improve traffic and air quality in the CBD, including in Lower Manhattan, and would in fact reduce congestion on the West Side Highway.  Chan Decl., Ex. 1.

[21] Plaintiffs incorrectly state that "Defendants were provided but 30 days to comment on the 958-page EA…and 41-page FONSI."  Pls. Br. 51.  To the extent Plaintiffs are claiming that members of the public were only provided 30 days to comment on the Draft EA, such a claim is incorrect, as the public was given 44 days to comment on the Draft EA.  Additionally, contrary to Plaintiffs' claims (Pls. Br. at 51 n. 63; Chan Decl. ¶ 15), the public availability period for the Final EA and draft FONSI was not a public comment period.  *See* 40 C.F.R. § 1501.6(a)(2).

Bailey), not including the numerous other comments the Project Sponsors received and reviewed beginning in 2021.  This alone demonstrates that an enormous number of people were able to navigate the NEPA process and provide comments within the prescribed time period.

Second, there is no question that the Project Sponsors made diligent efforts to involve the public in the NEPA process.  In addition to the 19 early outreach meetings and 6 public hearings, the Project Sponsors had continuous communication with members of the public about the Project, dating back to 2021, through various public outreach tools, including: (1) a project website where members of the public could download documents, obtain information about upcoming virtual meetings, view recordings of public meetings, sign up to receive emails, and provide comments; (2) Project Sponsor social media accounts with information about public engagement opportunities and a link to the Project comment form; (3) a Project telephone hotline, where members of the public could learn about upcoming meetings; (4) a master contact list, which anyone could join and was used to share Project updates, notices of Project milestones, and information about upcoming public meetings; and (5) other forms of media advertising, including online, printed, and radio advertisements, to publicize Project participation opportunities. (DOT_0037045.)  The Project Sponsors also specifically targeted commuters, posting digital ads and posters in nine languages in all subway and commuter rail stations and along bus routes.  (DOT_0037046, DOT_0039268.)  Contrary to Plaintiffs' claim, these announcements and ads made clear that the public was invited to comment on the Draft EA.[22]

Finally, to the extent Plaintiffs claim they were discouraged by other local elected officials, including Community Board members, from participating in the NEPA process (Chan Decl.

---

[22] *See, e.g.*, August 4, 2022 Public Announcement, MTA, *available at* https://new.mta.info/press-release/reminder-mta-bridges-and-tunnels-nysdot-nycdot-and-fhwa-release-congestion-pricing (inviting public comment and notifying the public of six upcoming virtual public hearings).

¶¶ 13–15), such allegations do not bear on whether the public outreach complied with NEPA.

### IV.   The EA Considered Reasonable Alternatives.

### A.   The EA Appropriately Defined the Purpose and Need for the Project.

Plaintiffs claim, without any basis in legal authority, that the EA's focus on the MTA's revenue goals, in addition to congestion reduction, resulted in a purpose and need that was "arbitrary and capricious." Pls. Br. 41. Plaintiffs forfeited this objection by failing to raise it during the administrative process. *See Pub. Citizen*, 541 U.S. at 764. This claim is also meritless.

NEPA affords agencies "considerable deference" in defining a project's purpose and need based on their "expertise and policy-making role." *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999); *Norwalk Harbor Keeper v. U.S. Dep't of Transp.*, No. 18 Civ. 0091, 2019 WL 2931641, at *7 (D. Conn. July 8, 2019). When addressing a challenge to a project's stated purpose and need, courts review an agency's definition of a project's objectives under the "rule of reason." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195–96 (D.C. Cir. 1991). As long as the agency "look[s] hard at the factors relevant to the definition of purpose," courts will generally defer to the agency's definition of objectives. *Id.* at 196.

Where no other potential alternative would meet a project's stated objectives, it is reasonable for an EA to assess in detail only the no-action alternative and one practical alternative. *Citizens' Comm. to Save our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1020, 1031 (10th Cir. 2002) ("Alternatives that do not accomplish the purpose of an action are not reasonable and need not be studied in detail by the agency." (citations omitted)); *Utah Env't Congress v. Bosworth*, 439 F.3d 1184, 1195 (10th Cir. 2006); *see also Citizens Against Burlington, Inc.*, 938 F.2d at 197 (upholding decision in EIS "to evaluate only the preferred and do-nothing alternatives" after other alternatives were rejected as unreasonable); *Jones v. Peters*, No. 06 Civ. 00084, 2007 WL 2783387, at *18–19 (D. Utah Sept. 21, 2007) (holding that EA reasonably winnowed alternatives

to the preferred alternative and the no-build alternative).

Additionally, where a goal of a project is financial, courts have recognized that it is appropriate to include the revenue goal in the project's defined objectives and to reject alternatives that would not meet that goal. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 603 (9th Cir. 2018) ("FEIS's 'purpose and need' statement was [not] 'artificially limited'" where "[t]he FEIS explained that the objectives…were to…[i]mprove the socioeconomic status of the Tribe by providing a new revenue source…."); *Stand Up for Cal.! v. U.S. Dep't of Interior*, 919 F. Supp. 2d 51, 79 (D.D.C. 2013) ("[I]t was rational for the Secretary to reject potential alternatives if they would not, in the Secretary's informed judgment, allow for a large enough development to provide the North Fork Tribe with revenues that would meet the purpose and need of the proposed action"); *Protect Lake Pleasant, LLC v. Connor*, No. 07 Civ. 0454, 2010 WL 5638735, at *16, *31 (D. Ariz. July 30, 2010) (holding that it was reasonable to eliminate an alternative that would not involve the county where project purpose was to provide county parks department with percentage of project's annual revenue); *cf. also Citizens Against Burlington, Inc.*, 938 F.2d at 198–99 ("FAA defined the goal for its action as helping to launch a new cargo hub [and] helping to fuel the Toledo economy.  The agency then eliminated from detailed discussion the alternatives that would not accomplish this goal.").

Here, the Project's defined purpose "is to reduce traffic congestion in the [CBD] in a manner that will generate revenue for future transportation improvements."  (DOT_0036197.) FHWA and the Project Sponsors established specific objectives, which include: (1) reducing daily vehicle-miles traveled ("VMT") within the CBD by at least five percent; (2) reducing the number of vehicles entering the CBD daily by at least ten percent; (3) creating a funding source for capital improvements and generating sufficient annual net revenues to fund $15 billion for capital projects

for the MTA Capital Program; and (4) establishing a tolling program consistent with the purposes underlying the Traffic Mobility Act.  (DOT_0036198, DOT_0036259, DOT_0004525–46.) FHWA and the Project Sponsors reasonably included generation of revenue critically needed for transit improvements in the Project's purpose, need, and objectives, particularly as reliable transit service will reduce congestion more than tolling alone.  (DOT_0036200.)

## B.  The EA Considered all Reasonable Alternatives.

Plaintiffs make inconsistent and inaccurate statements regarding the EA's consideration of alternatives and ignore the deferential "rule of reason" treatment afforded to agencies when determining the scope of alternatives.[23] *Nat'l Post Off. Collaborate v. Donahoe*, No. 13 Civ. 1406, 2014 WL 6686691, at *23 (D. Conn. Nov. 26, 2014).

NEPA requires agencies to assess in detail only potential alternatives that are reasonable. 42 U.S.C. § 4332(C)(iii); *see also* 40 C.F.R. §§ 1501.5(c)(2), 1502.14.  An alternative is considered reasonable if it is "technically and economically feasible[] and meet[s] the purpose and need of the proposed action."  40 C.F.R. § 1508.1(z); *see Citizens Against Burlington, Inc.*, 938 F.2d at 195 ("The goals of an action delimit the universe of the action's reasonable alternatives."); *Twp. of Belleville v. Fed. Transit Admin.*, 30 F. Supp. 2d 782, 798–99 (D.N.J. 1998) ("Reasonableness is measured by whether it achieves the goals the [a]genc[y] set out to achieve."). NEPA does not require that agencies provide detailed information about alternatives they have "in good faith rejected as too remote, speculative, or impractical or ineffective," or to study "in detail" projects that only partially meet a project's goals.  *Citizens' Comm. to Save our Canyons*, 297 F.3d at 1020; *Donahoe*, 2014 WL 6686691, at *8; *Norwalk Harbor Keeper*, 2019 WL 2931641, at *10.

---

[23]  Plaintiffs also forfeited this claim by failing to raise it during the administrative process.  *See Pub. Citizen*, 541 U.S. at 764–65.

Furthermore, where a project aims to meet statutory objectives, a court will give substantial weight to the legislative grant of power when deciding whether an agency should have considered additional alternatives.  *City of N.Y. v. U.S. Dep't of Transp.*, 715 F.2d 732, 743 (2d Cir. 1983) ("Statutory objectives provide a sensible compromise between unduly narrow objectives an agency might choose to identify to limit consideration of alternatives and hopelessly broad societal objectives that would unduly expand the range of relevant alternatives.").

Under NEPA, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS."  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005); *see also Mt. Lookout—Mt. Nebo Prop. Prot. Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998) ("The rigor with which an agency must consider alternatives is greater when the agency determines that an EIS is required…."); *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1558 (2d Cir. 1992).  But here, the EA met even the heightened EIS standard by identifying and evaluating all potential reasonable alternatives and, where necessary, screening them based on their ability to meet the purpose, need, and objectives of the Project.

The EA began by assessing preliminary alternatives.  These included: (1) implementing parking pricing strategies ("NTP-1"); (2) raising tolls or implementing variable tolls on existing toll facilities ("T-1"); (3) tolling the East and Harlem River bridges ("T-2"); (4) creating high-occupancy toll ("HOT") lanes ("T-3"); (5) implementing zone-based pricing ("T-4"); (6) reducing government-issued parking permits ("O-1"); (7) providing additional taxi stands to reduce cruising ("O-2"); (8) creating incentives for teleworking ("O-3"); (9) rationing license plates ("O-4"); (10) implementing mandatory carpooling ("O-5"); and (11) establishing truck time- of-day delivery restrictions ("O-6").  (DOT_0036267, DOT_0036200.)

The EA dismissed from further consideration the preliminary alternatives that failed to

meet one or more of the three Project objectives.  (DOT_0036266–67.)   Alternative T-4 (CBD Tolling Program) was the only alternative that met the Project's purpose and need and all three objectives.  (*Id*.; DOT_0036299–300.)  Therefore, two alternatives were studied in further detail: (1) the No Action Alternative, which would not implement a vehicular tolling program in the CBD, and (2) the CBD Tolling Alternative (the Action Alternative).  (DOT_0036199.)[24]

Although many congestion reduction ideas were considered and rejected, largely based on the prior studies undertaken by policymakers in 2008 and prior to the enactment of the Traffic Mobility Act, Plaintiffs take issue with the rejection of alternatives O-4 (rationing license plates), O-5 (carpooling), and T-3 (creating HOT lanes), and claim that FWHA and the Project Sponsors failed to consider a "phased-in implementation of Congestion Pricing."  Pls. Br. 43.  But FHWA and the Project Sponsors had rational (indeed compelling) reasons to reject these alternatives. First, these alternatives and a "phased-in implementation" would not have created a funding source for MTA capital improvements.  (DOT_0036267–68.)   Given that revenue generation is a permissible objective, as well as a statutory objective of the Traffic Mobility Act,[25] the EA was not required to abandon that objective or evaluate alternatives that would not meet that objective or could do so only if other major actions were taken.  *See, e.g.*, *Protect Lake Pleasant, LLC*, 2010 WL 5638735, at *16, *31; *City of N.Y.*, 715 F.2d at 743.  Second, in addition to not reaching the Project's revenue goals, Alternative T-3 was not viable because it failed to meet the Project's purpose and need or either of the other Project objectives.  (DOT_0036200–01.)  As the EA explained, although HOT lanes can be effective revenue generators, their ability to reduce

---

[24] The No Action Alternative does not meet the Project purpose and objectives (DOT_0036269, DOT_0036300), but it must still be evaluated as the baseline condition against which the potential effects are evaluated, 40 C.F.R § 1502.14(c).

[25] *See* Note 4, *supra*.

congestion and raise enough revenue to meet the target is limited due to the availability of free lanes on the same highway.[26]  (DOT_0036201.)

Plaintiffs also incorrectly claim that the EA failed to consider a "[v]ariable and dynamic" tolling structure, where tolls are adjusted according to traffic conditions.  Pls. Br. 44.  In fact, the EA addressed both these options.  Alternative T-1 explicitly includes variable tolls as an option, and the chosen CBD Tolling Program incorporates variable tolling.[27]  (DOT_0036265; DOT_0010842, DOT_0011471.)  The EA also explained that variable tolling was chosen over dynamic tolling based on concerns raised during early outreach.[28]

In sum, the alternatives favored by Plaintiffs were all considered and found not to achieve basic Project purpose and need.

## V.  FHWA's Issuance of a FONSI Was Not Arbitrary and Capricious.

Plaintiffs next argue that FHWA was required by law to prepare an EIS because the effects of the Project are "highly controversial" or "highly uncertain."  Pls. Br. 24–25 (quoting 40 C.F.R. §§ 1508.27(b)(4), (5)).  Plaintiffs are mistaken.  First, the regulation that Plaintiffs cite *was repealed four years ago* because, as CEQ explained, "the extent to which effects may be controversial is subjective and . . . not relevant to assessing [a project's] significance."  85 Fed. Reg. 43304, 43322 (July 16, 2020).  Even if that regulation did apply, the Second Circuit has held that "[t]he term 'highly controversial' refers to instances in which a substantial dispute exists as to

---

[26] Contrary to Plaintiffs' claim, the T-3 analysis was not reduced to a "single sentence."  Pls. Br. 43.  Additional information was provided in Appendix 18-A, including an explanation that the existence of free lanes on the highway would limit revenue and congestion reductions.  (DOT_003613.)

[27] The Traffic Mobility Act requires the CBD Tolling Program to include variable tolling.  (DOT_0018172, DOT_003632.)

[28] (*See* DOT_0007498 ("Given the size and complexity of the CBD and the broader region, the concerns raised during early outreach and importance of people knowing the pricing before they decide to enter or remain, and the familiarity of many in the region with the concept of congestion pricing based on known history/trends (i.e., time of day), it was felt that variable pricing, rather than dynamic (or surge) pricing, was an appropriate method for the CBDTP."); DOT_0007944, DOT_0012909, DOT_0022164.)

the size, nature, or effect of the major federal action rather than to the existence of opposition to a use." *Friends of Ompompanoosuc*, 968 F.2d at 1557 (internal quotation marks omitted); *see also* 85 Fed. Reg. at 43322 (noting "courts have interpreted controversy to mean scientific controversy"). The large number of public comments on the Project demonstrates robust public participation, but it is irrelevant to the scientific question of "significance" under NEPA.[29]

Determinations of significance are a "classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh*, 490 U.S. at 376. A reviewing court may not "substitute its judgment for that of the agency as to the environmental consequences of its actions." *Kleppe*, 427 U.S. at 410 n.21; *Town of Orangetown v. Gorsuch*, 718 F.2d 29, 34 (2d Cir. 1983). For the reasons explained in greater detail below, FHWA took a "hard look" at the environmental consequences of the Project, and Plaintiffs provide no basis for disturbing FHWA's determination that the Project would not result in any significant adverse impacts. *See* Point VI–IX, *infra*. Finally, Plaintiffs conclude by arguing that the sheer length and diligence of the EA actually "proves" that the EA was insufficient, yet in the very same paragraph they deride the EA as "conclusory." Pls. Br. 25–26. Plaintiffs' logical inconsistency is fatal to their claims.

## VI.   **FHWA Took a Hard Look at Potential Environmental Impacts from the Project.**

Plaintiffs contend that FHWA failed to adequately evaluate potential traffic and air quality impacts resulting from the Project. As a factual and legal matter, Plaintiffs are mistaken.

### A. The EA Carefully Considered Potential Traffic Impacts.

---

[29] Plaintiffs mistakenly rely on *National Parks & Conservation Association v. Babbitt*, 241 F.3d 722 (9th Cir. 2001), for the proposition that an "outpouring of public protest" requires the preparation of an EIS. Pls. Br. 24. But as the Tenth Circuit has explained, "whether a proposal is controversial" depends on "the substance of the comments, not the number for or against the project." *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1181 (10th Cir. 2012). Indeed, *National Parks & Conservation Association* found the action controversial not because of the proportion of negative comments, but because the comments "cast substantial doubt on the adequacy of the [agency's] methodology and data." 241 F.3d at 736–37. No comment by Plaintiffs in this matter casts such doubt.

Recognizing that the Project could affect regional traffic patterns, the EA included an extensive analysis of potential traffic impacts under seven different tolling scenarios to capture the full range of potential effects from the Project.  (DOT_0036343.)  Chapter 4 of the EA included a detailed analysis of regional transportation effects (Chapter 4A), highways and local intersections (Chapter 4B), transit (Chapter 4C), parking (Chapter 4D), and pedestrians/bicycles (Chapter 4E). (DOT_0036328.)  This analysis was "based on a compilation of existing travel characteristics and forecasts of changes in travel demand" using the Best Practices Model ("BPM"), a federally approved "travel demand forecasting model" developed and maintained by the New York Metropolitan Transportation Council.  (DOT_0036340.)  Capable of simulating modes of travel, purpose, destination, frequency, location of intermediate stops, and time of day, the BPM "is the primary tool used to analyze the effects of large-scale regional transportation projects."  (*Id.*)

The BPM was used "to summarize and compare" forecasted travel patterns for the No Action Alternative and the seven different tolling scenarios using multiple metrics, including the number of daily vehicles entering the CBD; the share of journeys to the CBD that would be made by transit, auto, and nonmotorized travel modes; and daily VMT.  (DOT_0036344–45.)  Daily VMT estimates "the change in the aggregate level of driving or traffic that would occur" in an area.  (*Id.*)  The traffic modeling projected that the Project would reduce daily vehicles entering the CBD by between 15.4% and 19.9% in the first year of the Project, reduce the share of trips made to the CBD by car, and boost public transit ridership in the 1% to 2% range.  (DOT_0036351, DOT_0036355, DOT_0036358, DOT_0036361.)  The EA also projected that daily VMT within the CBD, which includes Lower Manhattan and BPC, would *decrease by as much as 9.2%.* (DOT_0036354, DOT_0036360; *see also* DOT_0036476 (showing geographic extent of Lower Manhattan Study Area).)  Particularly relevant here, modeling showed that daily VMT would

*decrease* on the West Side Highway/Route 9A, which runs adjacent to BPC, *by between 15.8% and 20.5%.*  (DOT_0036354, DOT_0036360.)  In sum, the "BPM assessment of regional travel demand and trip characteristics shows that implementing the CBD Tolling Alternative would reduce vehicular traffic within the Manhattan CBD, compared to the No Action Alternative in all tolling scenarios analyzed," and also would reduce "total regional VMT and vehicle-hours traveled." (DOT_0036417.)

The EA also analyzed the Project's potential impacts on the regional highway network and local intersections, focusing on the tolling scenario "with the highest potential to increase traffic along certain alternate routes and at local intersections"; *i.e.*, the representative worst-case scenario.  (DOT_0036394, DOT_0036397–404.)  To do so, the EA analyzed potential impacts on 10 highway corridors that directly connect to the Manhattan CBD or could be used to bypass the CBD, including the Hugh L. Carey Tunnel, which connects to Lower Manhattan.  (DOT_0036405, DOT_0036432, DOT_0036469–72.)  This technical analysis showed that the Project would reduce "travel times and delays within the CBD," reduce regional vehicular travel, and would not adversely affect traffic in the region.  (*Id.*)[30]

The EA also "identified and analyzed 102 local intersections within and outside the Manhattan CBD" that represented "the locations that would most likely experience increases in traffic under the various tolling scenarios, as identified by the BPM."  (DOT_0036395, DOT_0036475.)  Fifteen such intersections are located in Lower Manhattan, with several located along West Street, adjacent to BPC.  (DOT_0036476, DOT_0036489.)  Using the BPM and other traffic models, the EA concluded that all 102 intersections selected for detailed analysis—

---

[30] With respect to the Hugh L. Carey Tunnel in particular, traffic modeling demonstrated that "there would be minimal traffic effects" during morning, midday, and afternoon commuting periods.  (DOT_0036469–70.)

including those in Lower Manhattan—fell below the applicable traffic screening thresholds, demonstrating that the Project would not adversely affect traffic at local intersections.  (DOT_ 0036478–79; 0036494–96.)[31]   Indeed, the EA found that the majority of studied intersections in Lower Manhattan would experience a decrease in traffic.   (DOT_0036495; *see also* DOT_0005859–61.)

Finally, to ensure that real-world traffic conditions align with the modeling forecasts, the Project Sponsors committed "to monitor traffic conditions under all tolling scenarios" for the life of the project, "make appropriate signal-timing changes if necessary," and use monitoring data to "inform the development of appropriate mitigation measures, if needed."  (DOT_0036496.)

## B.  The EA Thoroughly Analyzed Potential Air Quality Impacts.

Building on the EA's exhaustive traffic analysis, Chapter 10 of the EA presented a detailed analysis of the Project's potential effects on air quality throughout a 12-county study area that included all five boroughs of New York City.  (DOT_0036838–57.)  The methodology was based on EPA's Clean Air Act regulations, 40 C.F.R. Parts 51 and 93, relevant guidance, and EPA-approved air quality models.  (DOT_0036818–19, DOT_0036823, DOT_0036832.)  Using these tools, the EA presented a regional "mesoscale" analysis to study effects on pollution loads throughout the study area, a local "microscale" hot-spot analysis centered on specific local intersections, and a "highway-link" hot-spot analysis to evaluate potential effects near highway segments projected to see the most pronounced traffic diversions or with the greatest overall truck volumes.[32]   Based on this multifaceted analysis, FHWA determined that the Project would not

---

[31] The EA identified potential intersection delays above the screening threshold at four intersections but found that standard signal-timing improvements would mitigate any adverse impacts.  (DOT_0036488.)

[32] The particulate matter hot-spot analysis focused on locations predicted to have truck diversions because "[a]lthough all motor vehicles produce air pollutants, emissions from trucks are of particular concern to near-road air quality because they are predominantly powered by diesel fuel," the exhaust from which contains "gases and solid particles" that "can be harmful to peoples' health."  (DOT_0007255; *see also* DOT_0036860.)

cause exceedances of National Ambient Air Quality Standards ("NAAQS") set by EPA, the leading federal agency responsible for air quality that also reviewed the air quality analyses in the EA. (DOT_0036818–19, DOT_0036868.)

Starting with the regional (mesoscale) analysis, the EA used an EPA-approved model with projections of VMT, speed, and vehicle mix to estimate the percent change in emissions for volatile organic compounds (VOCs), nitrogen oxides ($NO_x$), carbon monoxide (CO), particulate matter ($PM_{2.5}$ and $PM_{10}$), carbon dioxide equivalent, and Mobile Source Air Toxics. (DOT_0036838–59.) Evaluating the tolling scenario projected to have the smallest reduction in VMT region-wide, and therefore the smallest air pollution improvement, the EA projected total regional differences by comparing projected emissions with and without the Project. The analysis concluded that the Project would result in an *overall reduction in all types of emissions in the 12-county study area as a whole.* (DOT_0036839, DOT_0036852–53.) The results were also broken down by county. (DOT_0036840–41.) This sub-regional analysis showed that while certain counties could see small variations in county-wide emissions, the Project as a whole would lower "overall regional VMT and emission burdens," and "benefit regional air quality by reducing criteria pollutants in the 12-county study area." (DOT_0036838.)[33] For example, as Plaintiffs acknowledge, Pls. Br. 16, the regional analysis predicted that the Manhattan CBD (which includes BPC and Lower Manhattan) will see reductions in emissions for all the pollutants studied. (DOT_0036838–41.)[34]

The EA also included a local, microscale screening analysis to evaluate potential effects from CO and $PM_{2.5}/PM_{10}$ at particular intersections throughout the study area in accordance with

---

[33] Criteria pollutants are those for which EPA has established NAAQS: particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead. (DOT_0036819.)

[34] In the first year of the Project, the EA estimated that VOCs would decrease by 4.96%, nitrous oxides by 9.54%, CO by 7.58%, and particulate matter by 12.16% for $PM_{10}$ and 11.37% for $PM_{2.5}$ in the Manhattan CBD. (DOT_0036840.)

EPA's air quality regulations.  40 C.F.R. §§ 93.116, 123.  Developed through consultation with the Interagency Consultation Group, composed of representatives of NYSDOT, EPA, FHWA, the Federal Transit Administration, and New York Metropolitan Transportation Council,[35] the screening analysis evaluated 102 intersections throughout the study area—15 of which are located in Lower Manhattan, including several along West Street, adjacent to BPC.  (DOT_0036475–47.) These intersections were selected based on traffic modeling and community feedback as the intersections "expected to demonstrate the largest changes in traffic due to the Project." (DOT_0036859–60.)[36]  All the screening locations—including those in Lower Manhattan—fell below the applicable screening thresholds, demonstrating that the Project "would not create any new or worsen any existing violation" "or delay timely attainment" of air quality standards. (DOT_0036859–63, DOT_0036868.)  This is consistent with traffic modeling, which predicted that most intersections in Lower Manhattan would see less congestion.  (DOT_0036495.)

The EA also included a "highway link" analysis to evaluate potential effects of traffic diversions on local air quality near certain highway segments.  (DOT_0036863–64.)  "Since the tolling scenarios affect individual highway links differently, this screening analysis evaluated *every* highway link under *every* tolling scenario," including those adjacent to BPC, "and selected those sites that demonstrated the highest [annual average daily traffic] and the highest increase in heavy-duty diesel trucks" in any scenario.  (DOT_0036864 (emphasis added).)  Having identified the highway links most likely to be impacted—*i.e.*, the worst-case highway segments under the worst-case tolling scenario—the EA included a localized hot-spot analysis at three highways: I-95

---

[35] Established pursuant to federal transportation laws, the New York Metropolitan Transportation Council is the Metropolitan Planning Organization for New York City, the lower Hudson Valley, and Long Island.  (DOT_0036678.)

[36] The intersections "were aggregated into 15 study areas" "defined based on the key entry points to the CBD." (DOT_0036475.)  "[M]any of these study areas were identified through the public outreach process at locations where communities expressed concerns regarding the potential impacts of more local traffic changes."  (*Id.*)

West of the George Washington Bridge, the Cross Bronx Expressway at Macombs Road, and Robert F. Kennedy (Triborough) Bridge - Queens Approach; in each case, the EA evaluated the tolling scenario projected to have the greatest impact on traffic diversions. (DOT_0036865.)  Once again, the analysis demonstrated that the Project would not result in exceedances of NAAQS.  (*Id.*)

To ensure that actual impacts are consistent with projections, the Project Sponsors also committed to monitoring air quality for the life of the Project.  (*Id.*)  Monitoring locations will be selected in consultation with EJ stakeholders and relevant agencies.  (*Id.*)  Finally, the Project Sponsors also performed an extensive EJ analysis, described below, which further assessed potential effects relevant to air quality.

### C.  Plaintiffs' Challenges to the EA's Traffic and Air Quality Analyses Lack Merit.

The above analysis readily demonstrates that FHWA took a "hard look" at potential impacts on traffic and air quality, both regionally and in Lower Manhattan.  Initially, Plaintiffs failed to timely raise their air quality challenges during the administrative process and so have forfeited those arguments.  *Pub. Citizen*, 541 U.S. at 764.  But even if Plaintiffs had timely raised these arguments, their challenges to the EA's robust traffic and air quality analyses are meritless.

Plaintiffs devote several pages of their brief to the incorrect assertion that FHWA "omitted" BPC "from serious discussion and study" in its traffic and air quality analyses. Pls. Br. 5, 27–31. The exact opposite is true.  All of New York County (including Lower Manhattan and BPC) was included in every environmental study area, including regional transportation (DOT_0036340–92), local and highway traffic (DOT_0036394–505), air quality (DOT_0036827–28), environmental justice (DOT_0036958–59), and many other chapters.  Indeed, as detailed above, the EA also contains sophisticated analysis and findings with respect to Lower Manhattan and BPC *specifically*, in each case concluding that the Project would not adversely affect highway traffic, local intersection traffic, and air quality in the area.  *See* Point VI.A–B, *supra*.  There is no

factual basis to claim that BPC was excluded from the analysis.

Plaintiffs proclaim that it is "obvious" that BPC was not adequately studied because it is referenced by name only twelve times in the EA.  Pls. Br. 27–28.  This counting exercise ignores the fact that BPC was included in every traffic and air quality study, disregards the specific analysis of traffic on the West Side Highway and Hugh L. Carey Tunnel, and overlooks the meticulous analysis of traffic and air quality at local intersections along the West Side Highway and adjacent to BPC.  *See* Point VI.A–B, *supra*.  Plaintiffs' unsupported assertion that BPC was ignored is simply wrong.  Plaintiffs also complain that the EA contains additional analysis with respect to other highway corridors and that "lower West Street/West Side Highway did not receive the same treatment," Pls. Br. 28, but that is because *traffic is projected to decrease* on the West Side Highway and most adjacent local intersections.  *See* Point VI.A, *supra*.  Far from "ignoring an important aspect" of the Project, the EA reflects FHWA and the Project Sponsors' individualized consideration of potential impacts throughout the region, rather than using a one-size-fits-all approach.  Pls. Br. 28 (citing *Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006)).  BPC, which will see improved traffic and better air quality with the Project, has been more than adequately studied, and there is no need to conjure impacts when dedicated studies show none exist.

Having failed to demonstrate that BPC was ignored, Plaintiffs pivot to a narrower attack on Chapter 5B of the EA, which relies on the EA's traffic, air quality, noise, and other analyses to evaluate potential impacts on "neighborhood character."  (DOT_0036658–75.)  Here, however, Plaintiffs' arguments are self-defeating.  Plaintiffs complain that the description of Lower Manhattan's land uses as "includ[ing] predominantly commercial and civic/government uses" fails to account for BPC's residential character, Pls. Br. 29; apart from the fact that this description in the EA is entirely accurate, Plaintiffs ignore the very next sentence in the paragraph, which notes that the "area of Lower Manhattan south of Chambers Street has experienced a notable increase in residential use in recent

decades." (DOT_0036660–61.)  Plaintiffs then claim that the description of the Manhattan CBD does

not discuss traffic and air quality in Lower Manhattan, Pls. Br. 28–29, but those analyses are described

in detail in other chapters of the EA.  *See* Point VI.A–B, *supra*.  Far from "lumping several impacted

neighborhoods in with the Manhattan CBD," Pls. Br. 30–31, the EA reflects an exhaustive analysis of

potential impacts on traffic and air quality in communities throughout the Manhattan CBD, including

in Lower Manhattan and BPC.  *See Suffolk Cnty. v. Sec'y of Interior*, 562 F.2d 1368, 1375 (2d Cir.

1977) ("[A]n EIS need not be exhaustive . . . but will be upheld . . . if it has been compiled in good

faith and sets forth sufficient information to enable the decision-maker to consider fully the

environmental factors involved and to make a reasoned decision . . . .").

Plaintiffs incorrectly assert that FHWA should have modeled traffic and air quality in

Lower Manhattan using scenarios A or B, rather than scenario D.  Pls. Br. 30–31.  Initially,

Plaintiffs base this claim on a misreading of a single sentence in the EA.[37]  Moreover, the EA

modeled each tolling scenario to identify which had the highest potential to increase traffic at local

intersections; the highest-potential-impact scenarios were then used to study effects on highway

and local intersection traffic.  (DOT_0036402–04.)  As the EA explained, "Tolling Scenario D

was selected for detailed traffic analysis because it has a higher number of potentially affected

---

[37] Plaintiffs cite a sentence in the EA indicating that Tolling Scenarios A and B could yield increased Manhattan-bound crossings through the Hugh L. Carey Tunnel due to "increased demand to West Street and the FDR Drive via the Battery Park Underpass."  Pls. Br. 30 (citing DOT_0036370).  From this one line, Plaintiffs extrapolate that the use of Tolling Scenario D for certain aspects of the highway and local intersection traffic analyses was fatally flawed. First, this sentence refers to crossings through the Hugh L. Carey Tunnel, but the West Side Highway is also fed by other crossings like the Holland Tunnel.  There is nothing inconsistent about the EA's findings that Hugh L. Carey Tunnel crossings may slightly increase but that VMT on the West Side Highway would decrease in every tolling scenario and thus decrease overall.  (DOT_0036354–60.)  Moreover, the very same paragraph explained that other tolling scenarios, such as Tolling Scenario D, would result in larger increases in Manhattan-bound volume through the Hugh L. Carey Tunnel (although the minor changes fall below the applicable significance threshold). (DOT_0036370–71.)  This is because scenarios C, D, E, and F included crossing credits for the Tunnel that would make other crossings comparatively less attractive.  (*Id.*)

intersections *in the critical Lower Manhattan Study Area*." (DOT_0036404 (emphasis added).)[38]

FHWA's methodological choices were "reasonable and adequately explained." *Communities*

*Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004); *see also Citizens*

*for Balanced Env't & Transp., Inc. v. Volpe*, 650 F.2d 455, 462 (2d Cir. 1981) (holding that district

courts do not sit as a super-agency to review FHWA's expert agency judgements *de novo*); *see*

*also Lat. Ams. for Soc. & Econ. Dev. v. FHWA*, 756 F.3d 447 (6th Cir. 2014).

Finally, Plaintiffs repeatedly (and incorrectly) speculate that the Project will adversely

affect traffic and air quality in Lower Manhattan because the West Side Highway is an exempt

thoroughfare, asserting that any other conclusion "defies logic." Pls. Br. 7, 17, 29. The Record

refutes Plaintiffs' speculation. The EA's traffic analysis demonstrated that VMT on the West Side

Highway would decrease by between 13.2% and 22.8% and that traffic would decrease at the

majority of local intersections that were studied in Lower Manhattan. (DOT_0036363,

DOT_0036494–46.) Consistent with this traffic analysis, FHWA also found that traffic and air

quality in the CBD as a whole would improve (DOT_0036838–41), and with respect to Lower

Manhattan in particular, the Project would not adversely impact air quality, including in areas

adjacent to the West Side Highway near BPC (DOT_0036859–63, DOT_0036868). Apart from

unsupported conjecture, Plaintiffs have offered no evidence to the contrary. Pls. Br. 27–31.[39]

**VII.    FHWA Took a Hard Look at Environmental Justice Concerns.**

---

[38] The EA used other tolling scenarios for the traffic analysis where appropriate; specifically, the EA performed an additional analysis "in the Downtown Brooklyn study area for Tolling Scenario C, which was determined to have a higher potential for traffic effects." (DOT_0036404.)

[39] Plaintiffs also posit that the EA is flawed because it used "old and unreliable pre-COVID data," asserting without citation that "more recent data" is available. Pls. Br. 5–6, 18, 39–40. But as the EA specifically explained, traffic "volumes have nearly reached pre-pandemic levels" in the Manhattan CBD, as demonstrated by metrics like tunnel and bridge crossings and average vehicle speed in the CBD. (DOT_0036242, DOT_0003619–20.) FHWA chose to use pre-COVID data because it represents "normal, typical conditions, which are an appropriate baseline for the environmental analysis rather than the use of unusual conditions" created by COVID-19. Plaintiffs' speculation is no basis to upset the judgment of the expert federal agency tasked with analyzing and accurately modeling traffic. *Volpe*, 650 F.2d at 462.

"The principle of environmental justice encourages agencies to consider whether the projects they sanction will have a 'disproportionately high and adverse' impact on low-income and predominantly minority communities." *Sierra Club*, 867 F.3d at 1368 (quoting EO 12,898).  When included in a NEPA document,[40] "an environmental justice analysis is measured against the arbitrary-and-capricious standard." *Id.*   An EA's methodology must be "reasonable and adequately explained," but the agency's "choice among reasonable analytical methodologies is entitled to deference." *Communities Against Runway Expansion, Inc.*, 355 F.3d at 689; *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 233 (5th Cir. 2006).  "As always with NEPA, an agency is not required to select the course of action that best serves environmental justice, only to take a 'hard look' at environmental justice issues." *Sierra Club*, 867 F.3d at 1368.

## A.  The EA Thoroughly Evaluated Environmental Justice.

The EA rigorously followed guidance from the U.S. Department of Transportation ("USDOT") and FHWA outlining the methodology for evaluating potential EJ impacts in a NEPA document.  (DOT_0036954–55.)[41]  First, utilizing analysis from other chapters of the EA and community feedback, the EA identified potential effects from the Project that could affect minority or low-income (EJ) communities or populations, including traffic, air quality, noise, and travel costs for low-income drivers, and then defined a local and regional study area to evaluate those

---

[40] Because EO 12,898 does not create a private right of action, some courts have held that EJ claims of this kind are unreviewable. *See, e.g.*, *Iseke v. City & Cnty. of Honolulu*, No. 15 Civ. 00193, 2017 WL 6803423, at *11 (D. Haw. Sept. 20, 2017).  Other courts have held that if an agency evaluates EJ as part of NEPA, the claim "arises under NEPA and the APA" and so "is properly subject to 'arbitrary and capricious' review under the APA." *Communities Against Runway Expansion, Inc.*, 355 F.3d at 689 (affirming EJ analysis); *Coliseum Square Ass'n, Inc.*, 465 F.3d at 232–33 (same); *Lat. Ams. for Soc. & Econ. Dev.*, 756 F.3d at 476 (same).  Although the Second Circuit has not addressed the issue, district courts have reviewed EJ claims "under the APA's deferential 'arbitrary and capricious' standard." *Coal. for Healthy Ports*, 2015 WL 7460018, at *26; *see also Senville v. Peters*, 327 F. Supp. 2d 335, 362 (D. Vt. 2004).

[41] *See also* FHWA, Guidance on Environmental Justice and NEPA (Dec. 16, 2011), https://www.environment.fhwa.dot.gov/env_topics/ej/guidance_ejustice-nepa.aspx; USDOT Order 5610.2C (May 16, 2021), https://www.transportation.gov/sites/dot.gov/files/2021-08/Final-for-OST-C-210312-003-signed.pdf; FHWA Order 6640.23A (June 14, 2012), https://www.fhwa.dot.gov/legsregs/directives/orders/664023a.cfm.

potential impacts.  (DOT_0036956–58.)  The EA identified a "10-county local study area…where the greatest change in traffic volumes and vehicle-miles traveled are predicted to occur." (DOT_0036958.)  The local study area included the five boroughs of New York City and Nassau County, along with four New Jersey counties.  (DOT_0036959.)[42]

The EA next identified minority and low-income communities.  To do so, the EA considered USDOT and FHWA guidance, input from the community during early outreach, as well as the availability and granularity of data sources "to ensure that the approach reflects the local context for the Project and employs an appropriate methodological approach." (DOT_0006974–79.)  The EA also considered seven potential EJ screening tools to identify EJ communities, including EPA's EJSCREEN tool, various New York State and City guidance and poverty metrics, and the New Jersey Environmental Justice Screen.  (*Id.*)  Informed by these tools, a census tract was considered minority if at least 50% of the population identifies as minority *or* if the percentage identifying as minority exceeds the share of minority population in the county where the census tract is located.  (DOT_00036961, DOT_0006969–81.)  A census tract was considered low-income if the percentage of households with incomes up to *twice* the federal poverty level was higher than the percentage for the 28-county region.  (*Id.*)

These metrics are conservative.  Building on the definition of minority populations in USDOT and FHWA guidance, the EA incorporates both absolute and relative tests for identifying minority communities, resulting in a more inclusive identification of EJ communities. (DOT_0006970–72.)  Similarly, although USDOT and FHWA guidance generally "define low-income populations as people living below the [U.S. Department of Health and Human Services]

---

[42] Regionally, the EA used a 28-county study area to analyze "how implementation of the CBD Tolling Alternative would affect the regional population in terms of increased costs (tolls), changes in trip time, and changes in transit conditions."  (DOT_0036957, DOT_0036960, DOT_0006970.)

poverty guideline," FHWA and the Project Sponsors determined that using twice the federal poverty level would better account for the higher cost of living in the region.  (DOT_0006974.)

The EA then applied the above definitions to every census tract in the local and regional study areas.  In the local study area, the EA identified 2,193 of the 3,106 census tracts—over 70%—as EJ communities.  (DOT_0007251.)  None of the census tracts in the BPC-Lower Manhattan neighborhood were identified as EJ communities.  (DOT_0006988, DOT_0007007.)  In the regional study area, the EA estimated the number of low-income and minority commuters to the CBD to assess region-wide impacts of the Project under each scenario.  (DOT_0036971–75, DOT_0037001–08.)

Having identified EJ communities at the census tract level, the EA evaluated nine categories of potential effects in the 10-county local study area, including traffic congestion, traffic-related air quality, and noise in EJ areas.  (DOT_0036977–7001.)[43]  Regionally, the EA analyzed the potential increased cost of the Project on low-income and minority drivers, as well as potential impact on taxi and for-hire vehicles, who were identified as an EJ population based on data from the New York City Taxi and Limousine Commission.  (DOT_0036975–77, DOT_0037001–14.)

Applying this analysis, the EA found that the Project would not adversely affect EJ communities with respect to traffic, noise, transit ridership, displacement, and the costs of goods.  Based on the Project Sponsors' commitment to limit tolling of taxis and for-hire-vehicles, the EA also found that their drivers would not suffer a disproportionately high and adverse effect on their job security as a result of the Project.  (DOT_0037025.)

---

[43] The categories of potential effects were: (1) increased traffic congestion on highway segments; (2) changes in traffic conditions at local intersections; (3) effects on air quality; (4) effects on noise; (5) increases to transit ridership; (6) changes in passenger flows at transit stations; (7) changes in pedestrian circulation on sidewalks near transit hubs; (8) potential for indirect displacement; and (9) potential effects on the costs of goods.  (DOT_0036977–78.)

In response to comments from EPA and others on the Draft EA, and based on feedback from the EJTAG, the Final EA included a technical memorandum evaluating the potential impact of traffic diversions on local air quality and health in EJ communities.  (DOT_0036981–96, DOT_0006963–82, DOT_0007243–440.)  This analysis "identif[ied] and describe[d] the burdens experienced by EJ communities with pre-existing pollutants or chronic diseases" using "data from a number of sources," including EPA, CEQ, the Centers for Disease Control, the New York State Department of Health, the New York City Department of Health and Mental Hygiene, and two New Jersey agencies.  (DOT_0036990.)

The technical memorandum used this data to identify EJ census tracts within the local study area with high preexisting pollution and chronic disease burdens, compared to census tracts nationwide.  The analysis then identified which of those census tracts were predicted to have any increase in highway truck traffic, and, separately, non-truck traffic, as the result of the Project.  The technical memorandum did so by comparing the No Action condition with the Project using a "traffic proximity" metric: a distance-weighted measure that provides a way to describe a census tract's exposure to highway traffic from all directions.  (DOT_0007266–71, DOT_0007292.)  To be conservative, the EA used the scenarios modeled to have the largest potential impact on truck diversions (Scenario E) and, separately, non-truck diversions (Scenario G).  (DOT_0007292–312.)  Based on the metric used in the latest CEQ guidance for identifying disadvantaged communities to which benefits of federal programs should be directed, the EA identified EJ tracts with preexisting traffic-associated air pollution or health burdens at the 90th percentile or higher compared to national values, which tracts could also experience increases of any magnitude in traffic proximity as the result of the Project.  (DOT_0007283–312.)

The EA concluded that overall air quality in the local and regional study areas is projected

to improve due to the Project, and that "a larger number of census tracts identified as environmental justice tracts (56) would experience reduced truck traffic proximity when compared to non-environmental justice tracts (23)."  (DOT_0007303.)   However, the EA found that absent mitigation, traffic diversions in certain particularly overburdened EJ communities could constitute an adverse effect.

To address these potential impacts, the Project Sponsors committed to a $155 million package of regional and place-based mitigation to avoid and mitigate adverse effects on overburdened EJ populations.  The regional mitigation includes: (1) reducing the overnight period toll rates, which will minimize or avoid overnight truck diversions (when modeling showed many diversions would occur); (2) $20 million to accelerate the replacement of approximately 500 older diesel trucks used in the region with newer electric, hybrid, or clean diesel vehicles; and (3) $5 million to expand NYCDOT's off-hours delivery program.  These measures will benefit all EJ and non-EJ communities within the study area, including those in the CBD, regardless of their preexisting pollutant or chronic disease burden.  (DOT_0007322–23.)

The Project Sponsors have also committed to implementing $100 million worth of place-based mitigation throughout the local study area that "will provide direct emissions reductions and air quality improvements, and will address some of the pre-existing health burdens." (DOT_0007325.)  To implement this program, the EA identified census tracts with either high air pollution or health burdens with predicted traffic proximity increases as benefitting from regional mitigation measures, whereas those with high burdens in both categories were identified as meriting place-based mitigation.  (DOT_0007324–26.)  This was a highly conservative analysis— communities were identified for mitigation based on preexisting burdens possibly caused by proximity to existing highways constructed in the pre-EJ era, without consideration of the

magnitude of effects predicted from the Project as long as some increase was possible.

Because the "specific census tracts that would experience increased or decreased traffic change slightly depending on the tolling scenario," (DOT_0036994), now that the toll rate schedule has just been adopted, the Project Sponsors will proceed to determine the appropriate sites for place-based mitigation in consultation with an Environmental Justice Community Group recently established, relevant communities, elected officials, and local implementing agencies. Place-based mitigation measures include: (1) installing roadside vegetation to improve near-road air quality, focusing on sensitive sites (*e.g.*, schools, day cares, senior or community centers, etc.); (2) renovating parks and greenspace; (3) installing air filtration units in schools near highways; (4) replacing transportation refrigeration units at Hunts Point Produce Market; (5) implementing electric truck charging infrastructure; and (6) establishing an asthma case management program and center in the Bronx.  (DOT_0037018–20, DOT_0007324–26.)   In addition, the Project Sponsors committed to modifying tolling locations on the FDR to eliminate a potential toll avoidance route that could otherwise divert non-truck traffic into the Lower East Side. (DOT_0007323.)   Finally, the Project Sponsors will implement an "adaptive management" program that "will include monitoring the efficacy of mitigation, stakeholder consultation, and adjustments as warranted" to ensure successful implementation of regional and place-based mitigation.  (DOT_0037017.)

Accordingly, FHWA found that the Project "would not result in adverse effects on environmental justice populations in most of the topic areas reviewed, and that with the implementation of mitigation the Project would not result in any potentially disproportionately high and adverse effects on environmental justice populations."  (DOT_0037026.)

**B.  Plaintiffs' Environmental Justice Challenges Lack Merit.**

As explained in Part I, no Plaintiff with a timely cause of action has standing to assert EJ

claims: the EA mapped EJ areas at the census-tract level within a 10-county local study area, identifying 2,193 of the 3,106 census tracts as EJ communities, (DOT_0007251), and *none* of the census tracts in the BPC-Lower Manhattan neighborhood were so identified (DOT_0006988, DOT_0007007.)[44]  In addition, and alternatively, Plaintiffs forfeited their EJ arguments by failing to raise their methodological challenges during the public comment period (or in their June 2023 letter).  *See Pub. Citizen*, 541 U.S. at 764.  Regardless, Plaintiffs' claims fail on the merits: they reflect basic misunderstandings about how the EJ analysis was performed and do not provide a basis for upending the years of study and outreach to EJ communities reflected in the Final EA.

        1.    <u>Plaintiffs' Methodological Objections to the EJ Analysis Fall Flat.</u>

Plaintiffs first argue, citing no sources, that FHWA erred by classifying EJ communities based on the percentage of a census tract that identifies as a racial minority and the percentage of households with incomes up to twice the federal poverty level, rather than solely using preexisting pollution and health indicators.  Pls. Br. 34.  This would turn the EJ analysis on its head because the studied communities would not necessarily be those at which the relevant Executive Order is aimed.  As Plaintiffs acknowledge, the purpose of an EJ analysis is for agencies to "consider whether the projects they sanction will have a 'disproportionately high and adverse' impact on *low-income and predominantly minority communities*."  *Sierra Club*, 867 F.3d at 1368 (emphasis added) (quoting EO 12,898).  Moreover, the EA identified EJ communities in accordance with applicable federal agency guidance, including the CEQ guidance that Plaintiffs themselves cite.[45]

---

[44] Plaintiffs attempt to obscure this problem by stating without distinction that "Plaintiffs live in economic [sic] justice communities in the Lower East Side of Manhattan and Chinatown."  Pls. Br. 33.  Assuming Plaintiffs intend to refer to *environmental* justice communities, the only Plaintiffs who live in the Lower East Side are Rachel Ehrenpreis and Chaim Katz, whose NEPA claims were not timely filed.  None of the Plaintiffs allege that they live in Chinatown, although Plaintiff Winnie Cheung allegedly visits Chinatown regularly.  *See* Point I, *supra*.

[45] *See* Note 31, *supra*; CEQ, Environmental Justice Guidance Under NEPA at 9 (Dec. 10, 1997), https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf.  The existing chronic

Plaintiffs have not offered any basis to discard this standard methodology reflected in agency guidance and approved by multiple federal agencies. *See Communities Against Runway Expansion, Inc.*, 355 F.3d at 689.[46]

Next, Plaintiffs claim that the EA studied impacts on EJ communities "on a *county-wide basis*." Pls. Br. 34–37. This claim borders on frivolous and ignores hundreds of pages of analysis in the EA. As explained in greater detail above, Appendix 17D includes an extensive analysis of potential impacts on 3,106 census tracts area, 2,193 of which, over 70%, were identified as EJ communities. (DOT_0006967–81, DOT_0007251–53.) The EA then evaluated whether each individual census tract had high preexisting pollution and chronic disease burdens, and then assessed which of individual census tracts were predicted to see any increase in highway truck and non-truck traffic as the result of the Project. (DOT_0007266–71, DOT_0007292–312.) This data also informed which census tracts may warrant place-based mitigation. (DOT_0036994.) Indeed, Plaintiffs praise the EJ analysis and outreach performed for the East Coast Resiliency Project, yet the EJ analysis for the Project contains the very same features, including a localized analysis of potential impacts on EJ communities and early outreach to those communities. Pls. Br. 36.[47] The

---

health and pollution burdens faced by those communities were then evaluated at later phases of the analysis to assess potential impacts and to identify communities that may warrant mitigation. (DOT_0007269–328.)

[46] Plaintiffs also suggest that that the EA should have used a draft mapping tool developed by the Mayor's Office of Climate & Environmental Justice to identify EJ communities, but that mapping tool is in draft form and, in any event, it also uses income and minority status to identify EJ communities. Mayor's Office of Climate & Environmental Justice, https://climate.cityofnewyork.us/topic/environmental-justice/ (last visited Mar. 20, 2024). It also does not cover areas outside of New York City. FHWA reasonably decided to use a uniform EJ screening methodology to compare effects across the entire study area. *See Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 541 (8th Cir. 2003) (approving EJ methodology that allowed for uniform data collection and comparison).

[47] Plaintiffs' reliance on *Vecinos Para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021), is misplaced. First, the premise of Plaintiffs' argument—that the EA failed to consider localized impacts on EJ communities—is false. Second, the *Vecinos* court held that the commission had not adequately explained its decision to limit its EJ analysis to areas within two miles of the project site when the commission had acknowledged elsewhere in the environmental review that impacts on air quality would extend much further. *Id*. at 1330. Plaintiffs have not challenged the geographic scope or extent of the EJ analysis or the adequacy of that explanation. Plaintiffs' reliance on *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d 101, 138 (D.D.C. 2017), which similarly involved an artificially limited geographic scope of analysis, is misplaced for the same reasons.

notion that this analysis studied only "aggregate," "county-wide" impacts is false.  Pls. Br. 34–37.
(*See* DOT_0006967–81 (describing the method of identifying EJ communities); DOT_ 0006983–
7242 (presenting census-tract level data in map and table form); DOT_0007249–329 (describing
results of preexisting pollutant and chronic health analysis for census tracts).)

       2.    <u>Plaintiffs' Remaining EJ Arguments Lack Merit</u>.

      Plaintiffs next turn to a broad-brush argument that FHWA failed to take a "hard look" at
potential impacts on EJ communities, citing the EA's acknowledgement that, *absent mitigation*,
the Project could result in potential adverse impacts on EJ communities.  Pls. Br. 37–38.  However,
Plaintiffs omit and do not challenge FHWA's subsequent finding that "[w]ith implementation of…
mitigation measures, the [Project] would not result in adverse effects on environmental justice
populations."  (DOT_0037016–27.)[48]

      Plaintiffs also cite EPA's comments on the Draft EA, which suggested additional analysis
of localized effects on air quality.  Pls. Br. 32–33.  Plaintiffs' reliance on EPA's comments is
misplaced; the Project Sponsors thoroughly addressed them by "conduct[ing] an additional
assessment of the Project effects on traffic proximate to environmental justice communities and
resulting emissions and potential associated health effects," and committing to spend $155 million
in mitigation for communities with preexisting pollution and health burdens.  (DOT_0036989–96,
DOT_0006963–82, DOT_0007243–440.)  EPA subsequently "acknowledge[d] the improvements
[made] throughout the NEPA process," praised the supplemental analysis and mitigation package
aimed at potential impacts to EJ communities, and did not request any further analysis.

---

[48] Plaintiffs cite *California v. Bernhardt*, 472 F.Supp.3d 573 (N.D. Cal. 2020), but there, the agency previously
acknowledged that the partial recission of a rule designed to prevent waste of oil and gas in lease operations would
"disproportionately affect[] Native Americans living in low-income communities," yet "the EA [did] not mention,
much less address, these specific impacts."  *Id*. at 621.  Here, by contrast, the EA contains an expansive discussion of
potential impacts from the Project, and Project Sponsors have committed to a suite of mitigation measures that FHWA
has determined will mitigate potential adverse impacts of the Project on EJ communities.

(DOT_0045366.)  Plaintiffs assert that the supplemental analysis merely included "more precise maps," but that is simply false.  Pls. Br. 40.  The analysis reflected in Appendix 17D assessed localized impacts on over 3,000 census tracts in the study area, compared potential impacts to non-EJ communities to assess whether impacts would be disproportionate, and detailed a robust, $155 million mitigation package.  (DOT_0007303, DOT_0007313–29.)  Plaintiffs' suggestion that the Final EA did not reflect EPA's input (Pls. Br. 40) is demonstrably false; in fact, EPA approved the final EJ analysis.  (DOT_0045366.)  Collaboration of this kind between expert agencies and project sponsors is the hallmark of a successful NEPA process.[49]

## VIII.   FHWA Took a "Hard Look" at Mitigation to Address Potential Effects on Environmental Justice Communities.

Plaintiffs next attack the adequacy of the proposed mitigation measures.  But their attacks rest on legal error.  "[T]he Supreme Court has held that proposed mitigation measures need not be laid out to the finest detail."  *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 231 (5th Cir. 2007).  Rather, an agency simply must discuss mitigation "in sufficient detail to ensure that environmental consequences have been fairly evaluated."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989); *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010) ("The procedural requirements of NEPA do not force agencies to make detailed, unchangeable mitigation plans for long-term development projects.").  When an agency issues a FONSI with mitigation to avoid potentially significant impacts—a "mitigated FONSI"—NEPA regulations require the FONSI to "state any enforceable mitigation requirements or

---

[49] Citing no authority, Plaintiffs claim that the supplemental analysis is invalid because it was completed after the public comment period. Pls. Br. 40.  But improvements in environmental analysis are common when preparing a final EA or EIS; indeed, that is the purpose of accepting public comment in the first place.  *See, e.g.*, *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1067 (9th Cir. 2023) ("If an agency had to file a supplemental draft EA and repeat the public comment process every time it makes any such modifications, the NEPA review process would never end, and agencies would balk at modifying their EAs.").  Moreover, applicable regulations specifically contemplate that an agency may supplement, improve, or modify its analysis in response to comments. 40 C.F.R. § 1503.4(a)(3).

commitments." 40 C.F.R. § 1501.6(c). In such cases, some courts have held the adequacy of mitigation measures "must be supported by substantial evidence." *Coal. for Healthy Ports*, 2015 WL 7460018, at *21; *see also Friends of Ompompanoosuc*, 968 F.2d at 1557 (holding agency had "convincingly documented its finding of no significant impact").

Initially, Plaintiffs Chan and Hoffman—the only Plaintiffs who filed claims before the statute of limitations ran—do not live in census tracts identified as EJ communities (DOT_0007252) and so lack standing to challenge the mitigation package. *See* Point I, *supra*. But even if Plaintiffs' mitigation challenges were properly before the Court, they fail on the merits.

Citing no evidence, Plaintiffs challenge the efficacy of the $155 million mitigation package designed to address potential effects on EJ communities that face preexisting pollution and chronic health burdens due to historic development patterns long predating the Project.[50] Plaintiffs deride the mitigation as "paltry," "sparse," "utterly vague," "hastily prepared," and "bare-bones." Pls. Br. 19–20, 45–48. Plaintiffs base these characterizations solely on citations to a summary of mitigation measures in the FONSI, neglecting to mention or even cite the more extensive discussion in Chapter 17 and Appendix 17D. (DOT_0007318–28, DOT_0037016–27.) The Final EA contains a detailed description of the $155 million mitigation package. (*Id*.) The FONSI incorporates these measures and makes them enforceable conditions of tolling authority. (DOT_0000383–91.) More fundamentally, Plaintiffs' argument misses the point of the EJ analysis and mitigation program, which was to address concerns that certain communities already bear

---

[50] Plaintiffs' Amended Complaint did not dispute the efficacy of the robust mitigation package; instead, Plaintiffs alleged that the EA was inadequate because it failed to commit to mitigate "increased pollution" in Lower Manhattan or BPC in particular. (ECF No. 34 ¶ 105.) To the extent Plaintiffs maintain this challenge, it clearly fails. The EA's robust traffic and air quality modeling found that traffic and air quality are predicted to *improve*. *See* Point VI.A–B. Because the Project will not adversely impact air quality in Lower Manhattan, NEPA does not require that the Project Sponsors implement mitigation. *See, e.g.*, *Coal. for Healthy Ports*, 2015 WL 7460018, at *25. The EA did commit to mitigating potential adverse effects at individual intersections by making signal-timing improvements. (DOT_0036496.) Plaintiffs do not challenge the efficacy of these measures.

disproportionate pollution and chronic disease burdens due to preexisting development patterns. (DOT_0036982, DOT_0007249–51, DOT_0007262–87.)  Although the Project will not cause exceedances of health-based air quality standards set by EPA, the Project Sponsors committed to mitigation to address *preexisting* burdens where the Project could have even a minimal impact. (DOT_0037016–20, DOT_0007322–26.)

Contrary to Plaintiffs' unsupported claims, the EA explained how mitigation measures would benefit EJ communities.  (DOT_0007321–23, DOT_0037016–18.)  For example, concerning regional mitigation, traffic modeling showed that reducing overnight period toll rates would "avoid a substantial portion of projected truck diversions, as many of these diverted trucks are expected to occur during the overnight hours." (DOT_0037017.)  The EA also found that the conversion of 500 older, more polluting trucks "could yield reductions of roughly one ton of PM2.5 and 30 tons of NOx per year" throughout the region.  (DOT_0007322.)

As for place-based mitigation, modeling showed that modifying tolling locations on the FDR Drive to eliminate a potential toll avoidance route would eliminate "25 to 35 percent of the traffic increases on the FDR Drive." (DOT_0007323.)  The EA also found that replacing "polluting transport refrigeration units at the Hunts Point Produce Market could lead to as much as 21 tons of NOx and 2.5 tons of PM$_{2.5}$ reduction per year for every 100 units"; Project Sponsors plan to replace 1000 units.  (DOT_0007325.)  Although these benefits "would be geographically limited to the Hunts Point area," the benefits "are greater in magnitude than the potential air quality impacts of the Project in the Bronx." (*Id.*)  The EA found that "the installation of 35 new chargers for medium- and heavy-duty vehicles at three stations" could accelerate "the conversion to zero-emissions vehicles, leading to reductions in NOx and PM$_{2.5}$." (*Id*.)  And the EA found that the two greening measures could fund the planting of 4,000 trees and 40,000 shrubs, along with renovating

two to five community parks in EJ communities, which would improve air temperatures, prevent stormwater runoff, and improve near-road air quality.  (DOT_0007325–27.).  Funding to replace up to 40 air filtration units in "schools near highways with truck traffic increases would help to mitigate effects at schools, which are sensitive receptor sites."  (DOT_0007327–28.)  Finally, "funding for an Asthma Case Management Program and a new Bronx neighborhood asthma center" is modeled on a similar program in East Harlem, which "reported outcomes of 50 percent reduction in hospitalizations, a 56 percent decrease in emergency department visits, significant decreases in the number of days and nights with asthma symptoms, along with reductions in missed school days related to asthma."  (*Id*.)  FHWA determined that, with the identified mitigation, the Project would not have disproportionately high and adverse effects on EJ communities, and EPA agreed, praising the mitigation package.  (DOT_0037026, DOT_0045366.)  Plaintiffs have failed to demonstrate that this expert decision was arbitrary and capricious.

Finally, Plaintiffs complain that the specific locations for some of the place-based mitigation measures have not been determined.  Pls. Br. 48.  The EA explained that because the "specific census tracts that would experience increased or decreased traffic change slightly depending on the tolling scenario," (DOT_0036994), once the final tolling structure is adopted, the Project Sponsors will work with various stakeholders to select optimal sites for place-based mitigation, (DOT_0037017–20, DOT_0007328).   This process forms part of an "adaptive management" program recommended by EPA to monitor "the efficacy of mitigation [and] stakeholder consultation, and [make] adjustments as warranted."   (DOT_0037017, DOT_0045366.)  Courts regularly uphold adaptive management programs such as this one.  *See Theodore Roosevelt Conservation P'ship*, 616 F.3d at 517 ("[F]ixed mitigation measures and an adaptive management plan…amply fulfill[ed] NEPA's mandate to discuss mitigation measures.");

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1104 (9th Cir. 2012); *Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 55 F. Supp. 3d 316, 365 (E.D.N.Y. 2014).[51]

## IX.    **The Challenge to the Proposed Tolling Structure Is Premature**.

Finally, Plaintiffs raise an argument that is both premature and outside of the scope of this action: namely, that because the TMRB's recommended tolling structure does not exactly mirror one of the seven tolling scenarios analyzed in the EA and FONSI, the Court should "declare that a re-evaluation alone…is insufficient" and require a "full supplemental report [] be conducted." Pls. Br. 53.  (Based on the TMRB's recommendation, TBTA adopted a toll rate schedule on March 27, 2024, after Plaintiffs submitted their motion.)  Plaintiffs are putting the cart before the horse. The Project Sponsors and FHWA are currently preparing a reevaluation to determine whether the effects of the adopted toll rate schedule are consistent with those in the Final EA.  If they are not, then a supplemental environmental review would be necessary.  Plaintiffs' preemptive challenge to the results of a reevaluation that is not yet complete is plainly unripe.

Because a court should not issue premature judgments based on abstract disagreements, a case is not ripe for judicial intervention when the alleged injuries are too speculative or might never occur.  *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003); *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (internal quotation marks omitted)).  "[F]inal agency action pursuant to the [APA] is a crucial

---

[51] Plaintiffs' reliance on *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 231 (5th Cir. 2007), is mistaken. The Corps in that case approved the dredging and filling of wetlands that would significantly affect several resources. *Id.*  The Corps' mitigation discussion included no "data or analysis," relied on unspecified "Best Management Practices," and indicated that traffic impacts "may" be mitigated through changes in traffic control signs or signals. *Id.* at 231–34.  Plaintiffs also cite *San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Service*, 657 F. Supp. 2d 1233 (D. Colo. 2009), decided on a motion for a preliminary injunction, but the mitigation plans in that case "were not even developed, much less evaluated," and the developer was allowed to use more harmful drilling techniques if unspecified "unforeseen conditions are present."  *Id.* at 1245–46.  By contrast, the EA extensively discusses binding mitigation measures and includes a data-driven explanation of how they will reduce impacts.

prerequisite to ripeness." *Nevada v. Dep't of Energy*, 457 F.3d 78, 84-85 (D.C. Cir. 2006) (holding demand to supplement an EIS was unripe where "uncertainty makes it plainly premature for us to review an interim transportation plan that may never materialize").

FHWA's NEPA regulations specifically contemplate project changes between the issuance of environmental documents and final agency action because such changes are commonplace. Specifically, FHWA's regulations account for situations that may require a reevaluation to confirm that the environmental documents "remains valid" when the final agency decision is made. 23 C.F.R. § 771.129. If the document is no longer valid, supplemental environmental review is needed. 23 C.F.R. § 771.130; 40 C.F.R. § 1502.9(d)(4) (instructing that where a significant federal approval or action remains outstanding, agencies must evaluate whether there are *significant* "changes to the proposed action or new circumstances or information relevant to environmental concerns"); *see also Marsh*, 490 U.S. at 371 (1989); *Shenandoah Valley Network v. Capka*, 669 F.3d 194, 196 (4th Cir. 2012) (agencies may conduct a "tiered" or multiphase analysis "to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review"); *Ctr. for Bio. Diversity v. FHWA*, No. 16 Civ. 133, 2017 WL 2375706, at *27 (C.D. Cal. May 11, 2017) (holding FHWA may consider build alternatives that provided for the flexibility to include different design options in the future); 40 C.F.R. § 1502.4(b)(2). Indeed, FHWA guidance further provides that "[t]he project sponsor is responsible for providing the Agency with relevant information regarding project changes or new circumstances that could affect the validity of the environmental document or decision," and that "[f]ield reviews, additional environmental studies (as necessary), and coordination with other

agencies should be undertaken as appropriate to analyze any new impacts or issues."[52]

The EA and FONSI used this tiering/reevaluation model. Because the final tolling structure depends on all of the foregoing processes, in order to evaluate the full range of potential effects of the Project, and to inform the TMRB and TBTA Board, the EA considered seven tolling scenarios varying by toll rates, exemptions, crossing credits, and discounts. (DOT_0037263.) For each analysis area, the EA quantitatively analyzed representative worst-case scenarios. (DOT_0037262–66.) Consistent with this approach, the FONSI committed to reevaluate the tolling structure adopted by TBTA "to determine if the decision made in the FONSI is still valid. This requires that the TBTA demonstrate to FHWA that the effects of the final tolling rates and structure are consistent with the effects disclosed in the Final EA and that the mitigation is still valid." (DOT_0000394.) Only once the reevaluation—and any further NEPA review arising from it—has concluded will FHWA authorize tolling to commence. (DOT_0000393–94.)[53]

On March 27, 2024, the recommended tolling structure Plaintiffs challenge, after insubstantial revision, was adopted by the TBTA Board in accordance with the ratemaking process pursuant to SAPA, which included four public hearings and 76 days for public comment.[54] Although the TBTA Board ultimately adopted a toll rate schedule based on the TMRB's recommendation, any NEPA challenge to the final tolling structure will not ripen until after FHWA

---

[52] NEPA Reevaluation Joint Guidance for Federal Highway Administration (FHWA), Federal Railroad Administration (FRA), and Federal Transit Administration (FTA) 2–3 (Aug. 14, 2019), https://www.environment.fhwa.dot.gov/legislation/nepa/reevaluation_guidance_08142019.pdf.

[53] Plaintiffs also suggest, erroneously, that the ongoing installation of tolling infrastructure predetermines the final tolling structure. Id. at 23. The tolling infrastructure, the installation of which began in mid-2023, is the physical equipment necessary to detect vehicles entering the CBD; it has no determinant effect on the toll structure. See Erica Brosnan, *MTA Activates Contract to Install Congestion Pricing Tolls*, Spectrum News NY1 (June 28, 2023), https://ny1.com/nyc/manhattan/transit/2023/06/28/mta-activates-contract-to-install-congestion-pricing-tolls. The infrastructure installation is unrelated to TBTA's final tolling structure.

[54] See MTA Press Release, *MTA Board Adopts Central Business District Toll Rates* (Mar. 27, 2024), https://new.mta.info/press-release/mta-board-adopts-central-business-district-toll-rates.

54

completes its reevaluation.  Indeed, the reevaluation process will directly answer Plaintiffs' premature questions regarding the consistency of the final tolling structure with the environmental effect of the range of scenarios analyzed in the EA.  Plaintiffs complain that the TMRB recommendation, which essentially has now been adopted, differs from the seven scenarios analyzed in the EA, speculating (without evidence) that "the core components" of the recommendation "will have significant effects on the environment due to redirected traffic," and therefore a "re-evaluation will not suffice."  Pls. Br. 54–55.  But that is precisely what the reevaluation process is meant to determine—if a supplemental analysis is needed.

Plaintiffs demand that the Court declare that "a full supplemental report need be conducted" instead of allowing FHWA and the Project Sponsors to conduct the very reevaluation that the FONSI already requires.  Pls. Br. 53.  Not only do Plaintiffs ask the Court to skip a step, as a reevaluation is done to determine if supplementation is needed, but Section 706(1) of the APA only authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed"; *i.e.*, when an agency has failed to complete a discrete agency action that it is required to take.  5 U.S.C. § 706;  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–63 (2004).  To the extent Plaintiffs seek to challenge FHWA's *future* reevaluation or demand a supplemental analysis of a yet-to-be-finalized tolling structure, that would waste judicial resources in the pursuit of a "premature adjudication" of "abstract disagreement[s]."  *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807.  Moreover, the very premise of this argument ignores the backstop in the FONSI addressing exactly the concerns Plaintiffs are raising.[55]

[55] Because this argument is not ripe and the administrative record for the reevaluation of the adopted toll rate schedule has not been developed, Defendants do not address in detail the ways in which Plaintiffs assert the TMRB recommendation differs from the tolling scenarios evaluated in the Final EA.  However, to the extent any of the allegedly different elements are included in the adopted toll rate schedule, Defendants reserve the right to refute Plaintiffs' arguments in any subsequent litigation that might challenge tolling authority for the adopted toll rate schedule.

## CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' Motion for Summary Judgement and grant Defendants' Cross-Motion for Summary Judgment.


Dated: April 1, 2024                                          Respectfully submitted,

SYLVIA O. HINDS-RADIX                              /s/ Mark A. Chertok
Corporation counsel of the City of New York       Mark A. Chertok
By:   /s/ Nathan Taylor                            Elizabeth Knauer
        Nathan Taylor                               John F. Nelson
        Senior Counsel                              Amy Cassidy
        Environmental Law Division                  SIVE, PAGET & RIESEL, P.C.
        New York City Law Department                560 Lexington Avenue, 15th Floor
        100 Church Street                           New York, NY 10022
        New York, NY 10007                          (212) 421-2150
        (212) 356-2315                              mchertok@sprlaw.com
        ntaylor@law.nyc.gov                         eknauer@sprlaw.com
                                                    jnelson@sprlaw.com
*Counsel for Defendant the New York City*          acassidy@sprlaw.com
*Department of Transportation*
                                                    /s/ Roberta A. Kaplan
                                                    Roberta A. Kaplan
                                                    Gabrielle E. Tenzer
                                                    KAPLAN HECKER & FINK LLP
                                                    350 Fifth Avenue, 63rd Floor
                                                    New York, NY 10118
                                                    rkaplan@kaplanhecker.com
                                                    gtenzer@kaplanhecker.com

                                                    Joshua A. Matz
                                                    Kate Harris (*pro hac vice* forthcoming)
                                                    KAPLAN HECKER & FINK LLP
                                                    1050 K Street NW, Suite 1040
                                                    Washington, DC 20001
                                                    jmatz@kaplanhecker.com
                                                    kharris@kaplanhecker.com

                                                    *Counsel for Defendants the Metropolitan*
                                                    *Transportation Authority and the*
                                                    *Triborough Bridge and Tunnel Authority*