**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELIZABETH CHAN, *et al.*,

                Plaintiffs,

                v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                Defendants.

Case No. 23-cv-10365-LJL
[rel. 1:24-cv-01644-LJL]
[rel. 1:24-cv-000367-LJL]

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ADDITIONAL FACTS ......................................................................................................... 8

STANDARD OF REVIEW ................................................................................................... 8

ARGUMENT ....................................................................................................................... 9

I.    Plaintiffs, Including The Added Plaintiffs, Have Standing To Challenge All Aspects Of The EA And FONSI And Have Timely Brought And Preserved Their Claims ................................. 9

    A.    Plaintiffs Have Standing to Challenge the Entire EA and FONSI ................................... 9

    B.    Plaintiffs Did, But Need Not Submit Comment Letters So Long As the Issue Was Brought to the Agency's Attention ................................................................................. 13

    C.    The Claims and Plaintiffs in the Amended Complaint Relate Back to the Original Filing ...................................................................................................................... 15

II.    Congestion Pricing Will Have A Significant Impact, Requiring An EIS .......................... 18

III.    Defendants' Mitigation Measures Have Not Been Fully Developed Or Evaluated .......... 21

IV.    Defendants Failed To Sufficiently Identify And Analyze Reasonable Alternatives To Congestion Pricing ......................................................................................................... 26

V.    Defendants Failed to Consider And Mitigate Adverse Impacts On Communities With Environmental Justice Concerns ...................................................................................... 31

VI.    Defendants Failed To Adequately Analyze Battery Park City ........................................ 35

VII.    Plaintiffs' Claim That the Court Should Order A Supplemental Review Is Not Premature . ...................................................................................................................... 37

VIII.    Defendants Did Not Provide Sufficient Public Participation ....................................... 39

CONCLUSION ................................................................................................................... 41

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                    **Page(s)**

*Airport Impact Relief, Inc. v. Wykle*,
  192 F.3d 197 (1st Cir. 1999) ..................................................................................9

*Am Rivers v. FERC*,
  895 F.3d 32 (D.C. Cir. 2018) ................................................................................22

*Ass'n of Oil Pipe Lines v. FERC*,
  83 F.3d 1424 (D.C. Cir. 1996) ..............................................................................14

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
  524 F.3d 938 (9th Cir. 2008) ................................................................................40

*California v. Bernhardt*,
  472 F. Supp. 3d 573 (N.D. Cal. 2020) ....................................................................8

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ...........................................................................38, 39

*Cetacean Cmty. v. Bush*,
  386 F.3d 1169 (9th Cir. 2004) ..............................................................................11

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991) ..............................................................................27

*City of Tenakee Springs v. Clough*,
  915 F.3d 1308 (9th Cir. 2001) ..............................................................................22

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987) ..............................................................................................10

*Coal. for Healthy Ports v. U.S. Coast Guard*,
  No. 13 Civ. 5347, 2015 WL 7460018 (S.D.N.Y. Nov. 24, 2015) .........................40

*Coleman v. United States*,
  79 F.4th 822 (7th Cir. 2023) .................................................................................16

*Comm. to Save the Rio Hondo v. Lucero*,
  102 F.3d 445 (10th Cir. 1996) ..............................................................................11

*County of Suffolk v. Secretary of Interior*,
  562 F.2d 1375 (2d Cir. 1977) ................................................................................33

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008) ..............................................................................21

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
349 F.3d 1157 (9th Cir. 2003) ............................................................... 2

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004).............................................................................. 31

*Dine Citizens Against Ruining Our Env't v. Klein*,
676 F. Supp. 2d 1198 (D. Colo. 2009).................................................. 38

*Dubois v. U.S. Dep't of Agric.*,
102 F.2d 1273 (1st Cir. 1996)............................................................... 39

*E. Queens All., Inc. v. F.A.A.*,
589 F. App'x 19 (2d Cir. 2014) ............................................................ 14

*Earth Island Inst. v. U.S. Forest Serv.*,
87 F.4th 1054 (9th Cir. 2023) ............................................................... 31

*Ent'l Defense Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2002) ................................................................. 19

*Erlbaum v. N.J. Dep't of Env't Prot.*,
Civ. No. 16-8198 (RMB/JS), 2017 WL 465466 (D.N.J. Feb. 3, 2017)................................. 14

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000).............................................................................. 12

*Friends of Hamilton Grange v. Salazar*,
No. 08-Civ-5220(DLC), 2009 WL 650262 (S.D.N.Y. Mar. 12, 2009) ...................... 11, 24, 25

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*,
887 F.3d 906 (9th Cir. 2018) .......................................................... 10, 13

*Fund for Animals v. Norton*,
365 F. Supp. 2d 394 (S.D.N.Y. 2005).................................................. 11

*Hall v. U.S. EPA*,
273 F.3d 1146 (9th Cir. 2001) .............................................................. 13

*Hells Canyon Preservation Council v. Connaughton*,
No. 11-cv-00023-PK, 2012 WL 13047991 (D. Oregon 2012)............................... 24

*Hodges v. Abraham*,
300 F.3d 432 (4th Cir. 2002) ............................................................... 11

*Idaho Conservation League v. Lannom*,
200 F. Supp. 3d 1077 (D. Idaho 2016) ................................................. 28

*Kelley v. Selin*,
42 F.3d 1501 (6th Cir. 1995) ............................................................... 18

*Klamath-Siskiyou Wildlands Ctr. v. Forest Serv.*,
   373 F. Supp. 2d 1069 (E.D. Cal. 2004)............................................................26, 27

*LaFleur v. Whitman*,
   300 F.3d 256 (2d Cir. 2002)........................................................................11

*Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg.*
   *Funding, Inc.*,
   916 F.3d 116 (2d Cir. 2019)........................................................................16

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)..................................................................................12

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)..................................................................................10

*Mayle v. Felix*,
   545 U.S. 644 (2005)..................................................................................16

*Md.-Nat'l Capital Park & Plan Comm. v. U.S. Postal Serv.*,
   487 F.2d 1029 (D.C. Cir. 1973)....................................................................23

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999) ......................................................................30

*Mulgrew v. Dep't of Transp.*,
   No. 24-cv-1644 (S.D.N.Y. April 5, 2024) .......................................................38

*Mulgrew v. U.S. Dep't of Transp.*,
   No. 24 Civ. 1644 (LJL) (S.D.N.Y.) ...............................................................15

*N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*,
   983 F.3d 1077 (9th Cir. 2020) .....................................................................39

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*,
   397 F. Supp. 3d 430 (S.D.N.Y. 2019)............................................................18

*Nat. Res. Defense Council, Inc. v. Morton*,
   459 F.2d 827 (D.C. Cir. 1972).......................................................................5

*Nat'l Audubon Soc. v. Hoffman*,
   132 F.3d 7 (2d Cir. 1997)...........................................................................18

*NRDC v. Morton*,
   458 F.2d 827 (D.C. Cir. 1972)......................................................................29

*O'Reilly v. U.S. Army Corps of Eng'rs*,
   477 U.S. 225 (5th Cir. 2007)........................................................................23

*Ohio Valley Env'tl Coal. v. U.S. Army Corps of Eng'rs*,
   674 F. Supp. 2d 783 (S.D. W. Va. 2009) ................................................................40

*Ouachita Watch League v. Jacobs*,
   463 F.3d 1163 (11th Cir. 2006) ............................................................................38

*Pa. Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne*,
   497 F.3d 337 (3d Cir. 2007)....................................................................................8

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
   501 F.3d 1009 (9th Cir. 2007) ..............................................................................14

*Potomac Heritage Trail Association, Inc. v. U.S. Dep't of Transportation*,
   2022 WL 7051160 (D. Md. Oct. 11, 2022) ...........................................................38

*Price Road Neighborhood Ass'n, Inc. v. U.S Dep't of Transportation*,
   113 F.3d 1505 (9th Cir. 1997) ..............................................................................38

*Save Our Sound, OBX, Inc. v. N. C. Dep't of Transportation*,
   No. 2:17-CV-4-FL, 2017 WL 7048561 (E.D.N.C. Dec. 5, 2017), *aff'd*, 914
   F.3d 213 (4th Cir. 2019) ......................................................................................17

*Scottsdale v. FAA*,
   37 F.4th 678 (D.C. Cir. 2022) ...............................................................................12

*Sierra Club, Inc. v. Bostick*,
   787 F.3d 1043 (10th Cir. 2015) ............................................................................14

*Sierra Club v. Adams*,
   578 F.2d 389 (D.C. Cir. 1978) ..............................................................................10

*Sierra Club v. EPA*,
   972 F.3d 290 (3d Cir. 2020)....................................................................................9

*Sierra Club v. Peterson*,
   717 F (D.C. 1983) .................................................................................................18

*Sierra Club v. U.S. Army Corp. of Eng'rs*,
   990 F. Supp. 2d 9 (D.C. Cir. 2013) .........................................................................9

*Sierra Club v. U.S. Army Corps. of Eng'rs*,
   701 F.2d 1011 (1983) ..............................................................................................9

*Simmons v. U.S. Army Corps. of Eng'rs*,
   120 F.3d 664 (7th Cir. 1997) ................................................................................29

*Estate of Smith v. Bowen*,
   656 F. Supp. 1093 (D. Colo. 1987) .......................................................................40

*Solar Energy Indus. Ass'n v. FERC*,
    80 F.4th 956 (9th Cir. 2023) .................................................................10

*SSA Terminals v. Carrion*,
    821 F.3d 1168 (9th Cir. 2016) ...............................................................14

*Standing Rock Sioux Tribe v. U.S. Army Corp. of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ..............................................................21

*Standing Rock Sioux Tribe v. U.S Army Corps of Eng'rs*,
    255 F. Supp. 3d 101 (D.D.C 2017) .....................................................31, 32

*Stevelman v. Alias Rsch. Inc.*,
    174 F.3d 79 (2d Cir. 1999) .....................................................................17

*Theodore Roosevelt Conservation P'ship v. Salazer*,
    616 F.3d 497 (D.C. Cir. 2010) ...............................................................24

*Vt. Pub. Interest Rsch. Grp. v. U.S. Fish & Wildlife Serv.*,
    247 F. Supp. 2d 495 (D. Vt. 2002) .........................................................11

*W. Watersheds Project v. Abbey*,
    719 F.3d 1035 (9th Cir. 2013) ...............................................................30

*Watt v. Energy Action Educational Foundation*,
    454 U.S. 151 (1981) ..............................................................................10

*Wildearth Guardians v. U.S. Bureau of Land Mgmt.*,
    457 F. Supp. 3d 880 (D. Mont. 2020) .....................................................28

*Wilderness Soc'y, Ctr. For Native Ecosystems v. Wisely*,
    524 F. Supp. 2d 1285 (D. Colo. 2007) ....................................................26

*Zorrilla v. Carlson Restaurants Inc.*,
    255 F. Supp. 3d 465 (S.D.N.Y. 2017) ....................................................18

**Statutes**

23 U.S.C. § 139(l)(1) .................................................................................15

42 U.S.C. 4332(2)(C)(i) .............................................................................18

Clean Air Act Section 309 ..........................................................................19

MTA Traffic and Mobility Reform Act (2019) ........................................27, 28

NEPA ............................................................................................... *passim*

**Other Authorities**

23 C.F.R. 771.130 ................................................................................................38

(40 C.F.R. 1500-1508) .........................................................................................19

40 C.F.R. 1502 *et seq.* .......................................................................................21

40 C.F.R. § 1501.3(b) .........................................................................................20

40 C.F.R. § 1501.5(e) .........................................................................................40

40 C.F.R. § 1501.6(c) .........................................................................................23

40 C.F.R. § 1501.11 ..............................................................................................3

40 C.F.R. § 1506.6(a) .........................................................................................40

40 C.F.R. § 1508.1 ................................................................................................3

Exec. Order No. 12,898, 3 C.F.R. § 859 ..............................................................31

Exec. Order No. 14,008, 3 C.F.R. § 477 (2022) ..................................................31

Federal Rule of Civil Procedure 15(c)(1) ................................................15, 16, 17

## PRELIMINARY STATEMENT

Defendants' submissions in opposition to Plaintiffs' motion for summary judgment and in support of their cross-motions are consistent with their entire approach to the NEPA process, one which seeks to side-step opposing concerns, obscure major flaws in their analysis in an avalanche of cherry-picked data and then proclaim required deference.   Whether by attempting to procedurally avoid certain Plaintiffs (properly added in the Amended Complaint) or certain issues (lack of mitigation, consideration of reasonable alternatives and treatment of environmental justice communities), Defendants strain to rush this case to the finish line at whatever the environmental cost to Plaintiffs or New Yorkers.   Despite Defendants' attempts to avoid the inadequacy of the environmental review—one that should have been a more comprehensive Environmental Impact Statement ("EIS") —Plaintiffs plainly have standing to challenge the entire Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"), as the concerns raised in Plaintiffs' summary judgment motion were all exhaustively covered in public comments and well-known to Defendants.   Moreover, the added Plaintiffs' environmental claims relate back to the original pleading and were timely brought.   Defendants' transparent attempt to narrow the issues and pigeonhole Plaintiffs to arguments solely relating to Battery Park City ("BPC") is unsupported as a matter of law.

On the merits, Congestion Pricing in New York, the first of its kind in the nation, should be a model for such programs across the United States.   But because of Defendants' fixation on exalting revenue generation over traffic reduction, refusal to thoroughly examine or appropriately mitigate the acknowledged environmental impact, failure to consider viable alternatives, and failure to even analyze the actual tolling structure approved, the program instead illustrates the costs of inadequate review under NEPA.   Lost in their attempt to preclude consideration of these basic concerns is the cumulative and real-world consequences of this sprawling program.

1

Congestion Pricing will have a profound impact on Plaintiffs, who live and work in the CBD and in environmental justice communities throughout New York and New Jersey; it will alter their neighborhoods, change their daily commute, impact their schools and impose financial and environmental burdens on their families every day.  They cannot be cavalierly cast aside so that MTA can find $15 billion to fund its capital projects.

On March 27, 2024, MTA adopted the final tolling structure for Congestion Pricing.  That tolling structure is *not* one of the tolling scenarios evaluated in the EA or FONSI and, in fact, introduces new elements never subject to environmental review.  Defendants' repeated attempts to emphasize the length of the EA cannot obscure the essential truth that the review process here was conducted backwards— "approve first and analyze later" —and did not assess the actual Congestion Pricing tolling project.  Defendants acknowledge, as they must, that the review preceded the actual tolling construct, even recognizing that "the ultimate tolling proposal will determine the effects of the Project" (Fed. Opp. at 44 n.29), but assert that the failure to conduct a NEPA assessment of the toll is not fatal because the adopted regime will still be reviewed, mitigation measures remain "fluid," and the EA analyzed the "worst-case" scenario of Congestion Pricing.  FHWA, in particular, insists that it still intends to "re-evaluate" the adopted toll and that its revisiting of the FONSI reflects a commonplace "tiering" of the NEPA process.  Fed. Opp. at 53.  The arguments are without merit.

First, NEPA's overarching dual aims are to ensure (i) that federal agencies consider every significant aspect of the environmental impact of a proposed action, and (ii) that federal agencies inform and engage the public in its decision-making process. *Ctr. for Biological Diversity v. U.S. Forest Serv.,* 349 F.3d 1157, 1166 (9th Cir. 2003).  The "fast-tracked" and backward process here could not have taken a sufficiently "hard look" at the requisite aspects of environmental impact without knowing its full structure and Defendants' strategically timed procedure created a

comment period in which the public was obliged to comment on a series of tolling "hypotheticals" (that may or may not have impacted their interests).  Second, the later-in-time "re-evaluation" process relied upon is not a typical "tiered" NEPA process in which a decisional document incorporates another NEPA analysis, so as to "eliminate repetitive discussion of the same issues." 40 C.F.R. § 1501.11.  Here, FHWA's "re-evaluation" will analyze the actual tolling structure for the first time in an abbreviated, perfunctory step outside the public view and in a process left up to the discretion of the agency.  Reserving publication of the actual tolling structure until after the comment period and then conducting an environmental review of that construct only by way of a short-form "re-evaluation," is curious, at best, and betrays the core purposes of NEPA.  As Defendants' own cases demonstrate (*e.g.*, Fed. Opp. at 53), a "re-evaluation" may be appropriate for a slight modification of ramps to a freeway project or the updating of a bridge design, where the full scope, impacts and mitigations have already been studied and subject to public scrutiny. But it is decidedly not appropriate as the review for a project that has only now been finalized. Thus, despite Defendants' repeated protestations to the contrary, Plaintiffs *are* challenging the NEPA process, not the ultimate result.[1]

Nor is it any answer to suggest that the EA is sufficient because among the scenarios reviewed, it analyzed the "worst-case scenario" for each particular topic studied.  Fed. Opp. at 51; MTA Opp. at 3, 9.  First, looking at the "worst-case scenario" for certain factors individually (*i.e.*, air quality, traffic diversion, noise), ignores the true cumulative impact of the entire program, a requirement of NEPA.  40 C.F.R. § 1508.1.  Second, the argument is demonstrably untrue.  The EA did not, in fact, analyze the "worst-case" scenario of Congestion Pricing.  The actual tolling

---

[1] Defendants repeatedly stress that it has been "four years" of study, consultation and outreach, yet fail to explain why, with all of this time for the project, the publication of the actual tolling structure was (conveniently) left until after public comment period had run and the asserted limitations period had lapsed, leaving little time before its proposed implementation.

structure adopted by MTA, for example, extends peak-hour pricing by an additional two hours—*a 12.5% increase*—each day beyond what was analyzed in the EA.  That increase in time will ineluctably lead to the diversion of even more traffic and pollution out of the CBD onto exempted thoroughfares and into the surrounding communities.  Changes made in the final toll to crossing credits and for-hire vehicles will also affect traffic patterns and increase congestion and pollution in the areas newly adversely impacted.  Without environmental review of these even "worse-case scenarios," the impacts remain unknown.

Under NEPA, where a significant impact of a project is found, a FONSI can be issued only if there is sufficient mitigation of its adverse effects.  Aside from failing to analyze the actual tolling construct, among the principal deficiencies of the EA and FONSI is the inadequate evaluation of necessary mitigation measures.  In a revealing acknowledgment, tucked in a footnote, Federal Defendants argue that review of the "mitigation of adverse impacts" is unripe because the "scope of the mitigation is contingent on the MTA's final tolling structure."  Fed. Opp. at 44 n.29. Defendants further suggest that the mitigation measures are "fluid" and the Court should therefore find that arguments about place-based mitigation are premature.  *Id.*  Yet, the FONSI for Congestion Pricing and the decision not to prepare an EIS were expressly predicated on the implementation of the "appropriate mitigation measures" that Defendants admit are yet to be determined.  DOT_363.  Settled NEPA case law holds that mitigation must be evaluated in sufficient detail, supported by substantial evidence and must demonstrate that the measures lower the environmental impact from "significant" to below that threshold level.  Thus, it cannot be, as Federal Defendants suggest, that "the ultimate tolling proposal will determine the effects of the Project and, in turn, the mitigation necessary to mitigate those effects."  Fed. Opp. at 44 n.29.  The supposedly necessary "place-based" measures to mitigate pollution and adverse environmental impacts of Congestion Pricing do not have yet have a place, yet the FONSI somehow determined

that with this mitigation, an EIS is not required.  Putting aside the inadequacy of $155 million committed over five years (particularly given the substantial congestion and pollution to many areas), that determination was arbitrary and capricious.

Moreover, still left unanswered by Defendants is a satisfactory response to the EA's failure to consider reasonable alternatives.  In a telling passage, Federal Defendants argue that the summary dismissal of *eleven* alternatives in cursory fashion was purportedly reasonable because "none would meet the MTA's statutory requirement that the Project generate $15 billion to fund MTA capital projects."  Fed. Opp. at 39.  MTA, for its part, argues the analysis was sufficient because NEPA does not require that agencies provide detailed analysis about alternatives they have rejected.  MTA Opp. at 25.  But Defendants rejected *all of the alternatives*, except a "no-action" alternative.  Proposing eleven fiscally non-viable alternatives (at least individually) was unreasonable and the inevitable result of an agency process predetermined to reach its desired result.  It is inappropriate, under governing NEPA case law, to "disregard alternatives merely because they do not [individually] offer a complete solution to the problem."  *See Nat. Res. Def. Council, Inc. v. Morton,* 458 F.2d 827, 836 (D.C. Cir. 1972).

FHWA suggests that a $15 billion requirement was not improper, as it was required by state law, and NEPA does not require FHWA to "second-guess" the stated aims of the Project Sponsor.  Yet, none of Defendants have sufficiently responded to Plaintiffs' argument of the unreasonableness of a *Congestion* Pricing program so myopically focused on revenue, rather than congestion, and an *environmental* assessment that dismisses all potential alternatives that do not achieve the requisite funding, even if they met the twin objective of reducing congestion and raising real revenue (though perhaps not $15 billion).  New York's legislation setting out a $15 billion goal is not binding on FHWA, and does not, as a matter of law, outweigh conducting a proper NEPA alternatives analysis.  Dynamic pricing, for example, could have been analyzed

and, indeed, was an early possibility in the development of the program.  A phased-in approach, license plate rationing, carpooling or some *combination* of these alternatives could have been analyzed.  It may be appropriate for revenue to be included as a project's defined objective, but it cannot be the overriding one and cannot be used to excuse meaningful consideration of alternatives.

Several additional points are left insufficiently addressed in Defendants' submissions. First, Defendants have failed to adequately answer the EA's inexplicable and unreasonable reliance on pre-COVID data for its analysis.  MTA suggests that it used this data rather than that collected from the "unusual conditions" created by COVID-19.  MTA Opp. at 38 n.39.  The argument misses the point.  Plaintiffs do not suggest that COVID-19 data would be more appropriate, for that is plainly not representative of present-day circumstances, but do maintain that data from *after* the pandemic clearly should have been utilized.  Pls. Mot. at 5-6, 18, 39-40. In a post-pandemic world where commuting and working have dramatically changed in New York City, it was unreasonable for Defendants' review to rely entirely on pre-COVID data.

Second, since early 2022, the adequacy of the analysis of Congestion Pricing's impact on environmental justice communities has caused concern both for the Environmental Protection Agency ("EPA"), and, in fact, FHWA.  Yet, the Technical Memorandum that Defendants proffer to cure their deficient initial EA did not conduct the needed comprehensive review and, in fact, added a narrow analysis of increased truck traffic, primarily using one tolling scenario.  Even with that limited review, the analysis identified *38* environmental justice communities that Defendants acknowledge "may need mitigation" as a result of Congestion Pricing, DOT_7319-20, yet Defendants proposed only 13 areas that "could" "merit place-based mitigation."  DOT_7439-40. Moreover, environmental justice communities likely to be significantly harmed by Congestion Pricing, including many in New Jersey and Staten Island, are completely omitted from meaningful

review or any placed-based mitigation.  While MTA repeatedly overstates that EPA "praised the EJ supplemental analysis," (MTA Opp. 12, 46, 47), in reality, Federal Defendants accurately characterize the far more muted language of EPA—communicated in a private email entirely outside of public view or scrutiny—which simply "acknowledg[ed] the improvements throughout the NEPA process."  Fed. Opp. at 22, 39, citing DOT_45366.  This is far from an EPA "sign off" of the entire Congestion Pricing project.

Lastly, in seeking to defend their review of BPC, Defendants point mostly to the 102-intersection analysis, which included a handful of intersections along West Street and summarily conclude that because the output of their model yielded an overall decrease in vehicle miles traveled (VMT) for all of the West Side Highway, no further analysis was needed.  Yet, the EA itself recognizes the unique nature of "un-tolled" thoroughfares such as West Street, the likely diversion of traffic to roads around Manhattan to avoid the toll, the need to pay particular attention to communities with schools near highways (devoting a section of mitigation to such locations), and the financial burden of the toll for certain drivers.  BPC checks all of these boxes.  It is surrounded by these "un-tolled" thoroughfares, diversion will occur nearby, it is uniquely a neighborhood community with schools right by the highway, and its residents will be tolled $15[2] each time they leave the CBD (despite other congestion pricing models exempting congestion zone residents).  A "hard look" at the impacts to this area required Defendants to do more than study a handful of intersections adjacent to (not within) BPC and the entire West Side Highway.

---

[2] MTA's insinuation that Plaintiffs' have "conceded" the objection that BPC residents will be tolled each time they cross exempted West Street in Lower Manhattan is disingenuous, at best.  As explained in Plaintiffs' motion for summary judgment (Pls. Mot. at 7 n.8), because of the ambiguity of the EA—an ambiguity acknowledged by MTA counsel when brought to its attention—Plaintiffs sought clarification and a commitment in writing from MTA that BPC residents would not be tolled for every trip outside of BPC.  After Plaintiffs' counsel followed up again on the question, MTA counsel responded, acknowledging the nuanced distinction that was not initially understood.  The exchange between sophisticated counsel on the application of the toll underscores the continuing difficulty for the public in understanding the various permutations in Defendants' plan.  *See, e.g.,* Steven Nessen, "*Which drivers get tolled under congestion pricing on the Brooklyn and Queensboro bridge? It's complicated*, Gothamist, April 15, 2024.

## ADDITIONAL FACTS

On March 27, 2024, MTA voted 11-1 to approve the TMRB Recommendation at its monthly board meeting, with a number of key changes.[3]  The toll structure added exemptions for school buses, certain commuter vans and buses, and an unspecified number of additional government vehicles (to be agreed to by TMRB and the City), and also changed the credit on the Queens-Midtown and Hugh L. Carey Tunnel from $5 to $2.50 each time a vehicle enters or exits the CBD (leaving credits for other crossings unchanged from December).[4]  As such, the toll structure strayed even further from those considered in the EA and FONSI.  Following adoption of the toll, MTA updated its website to state, "In June 2024, New York City will implement the nation's first congestion pricing program."[5]

## STANDARD OF REVIEW

Throughout their submissions, Defendants predictably lean on the deference typically applied to agency decisions.  However, while the Administrative Procedure Act's standard of review is deferential, it does "not oblige[] [courts] to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."  *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne*, 497 F.3d 337, 347 (3d Cir. 2007).  Although "[d]ifferent policy choices are acceptable . . . [c]oercing [those choices] through the process without analysis is not."  *California v. Bernhardt*, 472 F. Supp. 3d 573, 624 (N.D. Cal. 2020).  Here, "deference need not be afforded where NEPA's basic requirements are not met."  *Id*.  Contrary to Defendants' assertions, Plaintiffs do not ask this

---

[3] Stephen Nessen, *MTA Gives Final Approval for Congestion Pricing in NYC*, Gothamist (Mar. 27, 2024), https://gothamist.com/news/mta-gives-final-approval-for-congestion-pricing-in-nyc.

[4] MTA, MTA Board Meeting on March 27, 2024 Minutes, in MTA Board Action Items, at 14-15 (Mar. 27, 2024), https://new.mta.info/document/135591.

[5] MTA, Central Business District Tolling Program, https://new.mta.info/project/CBDTP (last visited Mar. 28, 2024). On March 27, 2024, after Defendants submitted their Motions to Dismiss, MTA finalized its tolling schedule based on the TMRB Recommendation.

Court to "flyspeck" agency findings in search of any deficiency (Fed. Opp. at 25), but instead seek review of the deficiencies in Defendants' analysis of a consequential project.

In undertaking this review, courts review questions of law – including whether an agency's review process complied with NEPA—*de novo.  E.g., Sierra Club v. U.S. Army Corps. of Eng'rs,* 990 F. Supp. 2d 9, 22-23 (D.C. Cir. 2013).  The court must undertake a "thorough, probing, in-depth review and a searching and careful inquiry into the record," *Airport Impact Relief, Inc. v. Wykle,* 192 F.3d 197, 203 (1st Cir. 1999), and an agency "cannot reach [any] conclusion it likes and then defend it with vague allusions as to its own expertise; instead the agency must support its conclusion with demonstrable reasoning based on facts in the record." *Sierra Club v. EPA*, 972 F.3d 290, 298 (3d Cir. 2020).  As the landmark Westway decisions teach, no matter how highly touted the urban benefits of a large-scale transportation project may be (there, replacing significant parts of a deteriorating West Side Highway), the strictures of an independent environmental review must be followed.  *Sierra Club v. U.S. Army Corps. of Eng'rs*, 701 F.2d 1011 (1983).[6]

## ARGUMENT

I.     **Plaintiffs, Including The Added Plaintiffs, Have Standing To Challenge All Aspects Of The EA And FONSI And Have Timely Brought And Preserved Their Claims**

A.     *Plaintiffs Have Standing to Challenge the Entire EA and FONSI*

As an initial matter, Defendants attempt to artificially confine Plaintiffs to discrete geographic areas under some presumption that residents of the CBD are limited to only raise challenges to the NEPA process and lack of an EIS based on facts pertaining to the block they live on, rather than the NEPA process and the FONSI as a whole.  MTA Opp. at 16-18; Fed. Opp. at 35-36, 41-42.  That is not how standing operates, particularly in the NEPA context.  A showing

---

[6] Significant parallels exist between the Westway project and Congestion Pricing.  In both cases, the FHWA, as lead agency, gave short shift to EPA concerns and, as here, criticisms and problems were "swept under the rug."  *Sierra Club*, 701 F.3d at 1029.

that a plaintiff has standing is a question of whether the Court has jurisdiction to hear the dispute: Plaintiffs need not show separate standing for each factual and legal argument they raise regarding the deficiency of the overall NEPA process.  Once the Court establishes a plaintiff has standing to bring the action as a whole, it need not continue to analyze the question with respect to other plaintiffs, let alone with respect to each specific argument.  *See, e.g., Massachusetts v. EPA*, 549 U.S. 497 (2007) ("Only one of the petitioners needs to have standing to permit [the court] to consider [a] petition for review."); *see also Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160 (1981) ("Because we find [that one plaintiff] has standing, we do not consider the standing of the other plaintiffs.").

Plaintiffs plainly have standing here.  As residents of the zone and surrounding areas, Plaintiffs will be actually harmed by Congestion Pricing and have been procedurally harmed by the NEPA process.  Once that threshold standing is satisfied, Defendants cannot restrict what facts and arguments are raised in support of Plaintiffs' claims.

Further, to demonstrate an injury in fact under NEPA, Plaintiffs need only show that the challenged agency action—Congestion Pricing—will threaten their interests,[7] not that each alleged deficiency in each area referenced will separately threaten such interests.[8]  *See, e.g., Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 919 (9th Cir. 2018); *see also Sierra Club v. Adams*, 578 F.2d 389, 392 (D.C. Cir. 1978) (because plaintiffs "established standing to challenge adequacy of FEIS on at least one ground, they are entitled to raise other inadequacies in

---

[7] This harm must have some relation to the environment, even if it is also economic (or even primarily economic). *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 990–91 (9th Cir. 2023); *see also Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987) (stating that the "zone of interests" test is "not meant to be especially demanding," and a court should deny standing only "if the plaintiff's interests are so marginally related to or inconsistent with" NEPA "that it cannot reasonably be assumed that Congress intended to permit the suit").

[8] Federal Defendants do not allege that Chan and Hoffman do not have standing in BPC and Lower Manhattan, except to challenge the scope of proposed mitigation because "no adverse effects are expected for that area of Manhattan." Fed. Opp. at 42 (citing DOT_36489).

the FEIS based upon the 'public interest' in requiring government officials to discharge faithfully their statutory duties under NEPA"); *Vt. Pub. Interest Rsch. Grp. v. U.S. Fish & Wildlife Serv.*, 247 F. Supp. 2d 495, 513 (D. Vt. 2002) (though plaintiffs only showed that proposed release of lampricides would injure use of one creek, they had standing to challenge the entire program for which FWS prepared an EIS).[9]  Plaintiffs have done so.  Individuals like Plaintiffs, who live in the vicinity of a proposed federal project have Article III standing under NEPA, as they are within a geographic nexus of the location at risk of suffering an environmental impact.  *Hodges v. Abraham*, 300 F.3d 432, 444-45 (4th Cir. 2002).

Moreover, NEPA is a procedural rights statute and standing can be satisfied where "there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Friends of Hamilton Grange v. Salazar*, No. 08-Civ-5220(DLC), 2009 WL 650262, at *14 (S.D.N.Y. Mar. 12, 2009) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)); *see also LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002) ("The injury-in-fact necessary for standing 'need not be large, an identifiable trifle will suffice.'").  "An agency's failure to follow [NEPA's] prescribed procedures creates a risk that serious environmental consequences of the agency action will not be brought to the agency decisionmaker's attention," and is sufficient to establish procedural injury.  *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448–49 (10th Cir. 1996); *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004) ("Interpreting NEPA broadly, we have recognized standing for individuals and groups of individuals who sue to require preparation of an EIS, when they contend that a challenged federal action will adversely affect the environment.").

---

[9] MTA's cite to *Fund for Animals v. Norton*, 365 F. Supp. 2d 394 (S.D.N.Y. 2005) actually supports Plaintiffs' argument.  MTA. Opp. at 17.  *Norton* states that plaintiffs must show that they would be "directly affected by [the agency's] action," not that they need to establish an injury in each geographic region of Manhattan. *Norton*, 365 F. Supp. 2d at 406.

MTA mistakenly contends that Plaintiffs have not sufficiently articulated injury-in-fact in BPC and Lower Manhattan based on Defendants' own self-serving conclusion that air quality will improve in Lower Manhattan.  MTA Opp. at 16-17.[10]  Aside from Defendants attempting to defeat standing by presupposing Plaintiffs will not succeed on their claim that the EA and FONSI were inadequate—Defendants misunderstand that the relevant showing is not whether Defendants admit Plaintiffs were injured, but asserted injury to Plaintiffs.  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (rejecting argument that plaintiff lacked standing because there was "no demonstrated proof of harm to the environment," as it "raise[d] the standing hurdle higher than the necessary showing").

Defendants also contend that Plaintiffs need separate standing to raise facts and arguments about neighboring areas of Manhattan because they do not live there.  MTA Opp. at 16-18; Fed. Opp. at 35-36, 41-42. Defendants' argument rests in part on the incredible assumption that Plaintiffs are siloed from the rest of New York City and, as City residents, neither care about nor would experience adverse conditions in areas mere blocks from their homes.  Courts in this regard are concerned with plaintiffs who assert procedural injuries regarding a proposed action from across the country, not blocks away in the same city.  *Compare Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 (1992) (no standing where plaintiffs lived "at the other end of the country" from the project site), *with Friends of the Earth, Inc.*, 528 U.S. at 182 (finding standing for plaintiff who lived two miles away from the project site).  Because Plaintiffs have alleged that they will be harmed by Congestion Pricing as a result of Defendants' improper fast-tracking of their environmental review, there is no need to show that they were harmed by each procedural

---

[10] State Defendants' reference to *Scottsdale v. FAA*, 37 F.4th 678 (D.C. Cir. 2022) is not comparable because the plaintiff presented no evidence showing that he would suffer harm, nor did he include a declarant who heard any disruptive noises from a plane flying on the challenged flight path.  *Id.* at 679; MTA Opp. at 16-17.

deficiency. [11] *Friends of Santa Clara River*, 887 F.3d at 919.  To hold otherwise would require every case to have hundreds or even thousands of plaintiffs to cover every single geographic region and every single argument or factual point relied upon.  Providing an EIS and giving appropriate attention and mitigation regarding the environmental impacts of Congestion Pricing would adequately redress Plaintiffs' injury; that is all that is required for standing.

     B.     *Plaintiffs Did, But Need Not Submit Comment Letters So Long As the Issue Was Brought to the Agency's Attention*

In another attempt to avoid the merits, Defendants argue that Plaintiffs lack standing because only John Bailey submitted a comment letter on the Draft EA during the public comment period—allegedly solely discussing economic injury—and Plaintiffs Chan and Hoffman submitted a letter during the "public availability period."  MTA Opp. at 10-11, 13, 21; Fed. Opp. at 22, 29 n.23.[12]  The assertion is both factually wrong and legally without merits (the question, even if factually true, is one of exhaustion not standing).

Plaintiff Chan submitted a comment letter as well as extensive supporting materials on behalf of Families for Battery Park City.  *See* Chan Supplemental Declaration, dated April 15, 2025 ("Chan Decl."), at Ex. 1.[13]  Although an agency is only obligated to consider and respond to comments received during a public comment period, all that is required for exhaustion is that the agency considered the issue.  *Hall v. U.S. EPA*, 273 F.3d 1146, 1163 (9th Cir. 2001).  Defendants admit to reviewing and considering thousands of letters received during the public availability period prior to finalizing the FONSI.  DOT_393; MTA Opp. at 11, 13, 21; Fed. Opp. at 46, 49.  In

---

[11] Although largely ignored by Defendants, other Plaintiffs do reside outside of BPC precisely in the areas of Manhattan that Defendants attempt to prevent the Court from considering.  Those Plaintiffs also have standing.  *See* Declarations of Chaim Katz ("Katz Decl."), Rachel Ehrenpreis ("Ehrenpreis Decl."), Sean Carney ("Carney Decl."), and Winnie Cheung ("Cheung Decl."), all dated April 15, 2024.

[12] This argument only applies to Plaintiffs' first NEPA claim because all other claims are based on materials created after the public comment period—namely, the November 30, 2023 TMRB Recommendation and the March 27, 2024 adopted toll structure.

[13] This includes an in-depth 358-page mark-up of the EA and letters from other concerned New Yorkers.

fact, the record reflects that the Families for Battery Park City submission was received and forwarded among the Defendants.  DOT_ 0040922.  Defendants cite no authority to suggest that comment letters received, accepted, reviewed, and considered in finalizing the FONSI following a "public availability period" are insufficient.  *See* Fed. Opp. at 22, 29 n.23;[14] *see also SSA Terminals v. Carrion*, 821 F.3d 1168, 1174 (9th Cir. 2016) (exhaustion met despite not raising issue until post-hearing brief because agency had addressed the issue).

Even without the submissions, contrary to Defendants' contentions, NEPA does not require a plaintiff to submit a comment letter where the issue was already brought to the agency's attention by others.  *See, e.g.*, *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007) ("In general, we will not invoke the waiver rule in our review of a notice-and-comment proceeding if an agency has had an opportunity to consider the issue. . . . This is true even if the issue was considered sua sponte by the agency or was raised by someone other than the petitioning party."); *Bostick*, 787 F.3d at 1048 ("[A] commenter does not waive an issue if it is otherwise brought to the agency's attention."); *Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1435 n.23 (D.C. Cir. 1996) ("The exhaustion requirement does not apply when another party has raised the arguments at issue before the agency.").  The reasoning behind this rule is clear:  "If we required each participant in a notice-and-comment proceeding to raise every issue or be barred from seeking judicial review of the agency's action, we would be sanctioning the unnecessary multiplication of comments and proceedings before the administrative agency.  That would serve neither the agency nor the parties."  *Portland Gen. Elec. Co.*, 501 F.3d at 1024 n.13.  Defendants concede, as they must, that Plaintiffs have not raised any issue Defendants had not already

---

[14] For example, in *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043 (10th Cir. 2015), the court held that an issue was waived where no commenter discussed the issue, so the agency did not consider it.  *Id.* at 1051; *see also E. Queens All., Inc. v. F.A.A.*, 589 F. App'x 19, 20 (2d Cir. 2014) (same); *Erlbaum v. N.J. Dep't of Env't Prot.*, Civ. No. 16-8198 (RMB/JS), 2017 WL 465466, at *14 (D.N.J. Feb. 3, 2017) (same).  For a non-exhaustive list of issues raised and considered during the comment period related to this brief, see Suppl. Decl. of Alan Klinger, dated April 15, 2024, at Ex. 1.

considered after reviewing nearly 70,000 comment letters in finalizing the EA and FONSI. DOT_393; MTA Opp. at 11, 13, 21; Fed. Opp. at 46, 49.[15]  Therefore, Plaintiffs' claims have been properly preserved.[16]

>    C.    *The Claims and Plaintiffs in the Amended Complaint Relate Back to the Original Filing*

MTA further argues that the First Amended Complaints' ("FAC") added claims and Plaintiffs do not relate back to the original Complaint and therefore fall outside the statute of limitations provided in 23 U.S.C. § 139(l)(1).  MTA Opp. at 14-16.  As an initial matter, the FAC added a second NEPA claim based on Defendants' failure to supplement their analysis, FAC ¶¶ 173-84, as well as federal and state constitutional claims, *id.* ¶¶ 173-210, none of which need to "relate back" for statute of limitations purposes.  In fact, Defendants challenge Plaintiffs' second NEPA claim as unripe, MTA Opp. at 52, and the constitutional claims are not at issue in this phase of the litigation.[17]  Accordingly, only the added Plaintiffs' first NEPA claim is at issue in this argument.[18]  In any event, both the claim and the Plaintiffs relate back to the original Complaint.

Under Federal Rule of Civil Procedure 15(c)(1)(B), an amended complaint relates back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of

---

[15] Federal Defendants allege that Plaintiffs cannot challenge Defendants' failure to consider alternatives such as dynamic tolling and phased-in implementation of the toll because "Plaintiffs provide no evidence that they presented these alternatives for the FHWA's consideration."  Fed. Opp. at 41.  As discussed in this section, so long as at least one other individual presented these issues to the agency's attention—which multiple individuals did—Plaintiffs need not raise it themselves during the public comment period.  *See, e.g.*, DOT_7938-46 (raising dynamic tolling), DOT_8717 (same), DOT_11469-70 (same), DOT_11469-70 (raising phased-in implementation), DOT_31317 (same).

[16] Moreover, Bailey's comment letter, which no one argues was untimely, was not "limited to the potential economic impacts of the Project."  MTA Opp. at 10, 21; Fed. Opp. at 9 n.10.  Rather, Bailey raised concerns regarding (1) the scenarios in the EA, (2) the limited time to review the Draft EA and participate in the comment process, (3) the process moving too quickly, (4) motor coaches taking cars off the road (limiting congestion and emissions), (5) motor coaches being primarily used by low-income and underserved communities (environmental justice communities), and (6) motor coaches should be exempt from the toll.  DOT_9184.

[17] ECF 31 at 2 (deferring state and federal constitutional claims until after the environmental claims).

[18] Even if the NEPA claim and added Plaintiffs were not found to relate back, the claim would be timely.  Plaintiffs respectfully refer the Court to Plaintiffs' opposition to defendants' motions to dismiss in *Mulgrew v. U.S. Dep't of Transp.*, No. 24 Civ. 1644 (LJL) (S.D.N.Y. Apr. 5, 2024), for a complete discussion regarding timeliness.  ECF 62 at 17-28.

the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." *Id.*[19]  Although an amended complaint cannot be based on an "entirely distinct set of factual allegations," "the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 128 (2d Cir. 2019).  Even where an amendment "invoke[s] a legal theory not suggested by the original complaint and relie[s] on facts not originally asserted," relation back is in order "[s]o long as the original and amended petitions state claims that are tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 659, 664 (2005).  Indeed, "[e]ven 'significant' changes to a complaint … can relate back so long as the defendant had fair notice of the substance of the new allegations from the outset." *Coleman v. United States*, 79 F.4th 822, 829 (7th Cir. 2023) (citation omitted).

Plaintiffs' first NEPA claim in its original and Amended Complaint undoubtedly focus on the same conduct, transaction, or occurrence—the propriety of the FONSI.[20]  The original Complaint, filed pro se[21] by Plaintiffs Chan, Hoffman, and DOES 1-200 (members of Families for a Better Plan for Congestion) on November 22, 2023, asserted that Defendants violated NEPA (the sole cause of action) by *inter alia*: (1) failing to conduct an adequate environmental review; (2) failing to prepare an EIS; (3) failing to provide for adequate public comment, participation, and review; (4) issuing an EA and FONSI that were arbitrary, capricious, and not otherwise in accordance with law; (5) providing insufficient mitigation, especially in communities with

---

[19] Not a single one of State Defendants' cited cases or arguments is applicable to adding claims under Fed. R. Civ. P. 15(c)(1)(B).

[20] State Defendants assert without a shred of legal or factual support that the new plaintiffs' claims "plainly" do not arise out of the same transaction or occurrence advanced in the original pleading.  MTA Opp. at 15.

[21] A *pro se* plaintiff's complaint must be "liberally" construed.  *Coleman*, 79 F.4th at 829 (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

environmental justice concerns; (6) providing an insufficient range of alternatives to the proposed actions, and (7) not taking a hard look at the hypothetical scenarios in the EA.  ECF 1 ¶¶ 61, 96-124.  Although the original Complaint primarily focused on BPC and Lower Manhattan, it discussed other communities (*e.g.*, the Bronx, New Jersey, Queens, Brooklyn, and New York City broadly), and further highlighted EPA's criticisms of the Draft EA in neighboring communities, including regarding "the insufficiency of data in the Draft EA around localized and disproportionate air quality impacts *in the surrounding area*" and "the potential for adverse air quality impacts on *communities outside the CBD*," specifically in Bronx County, Bergen County, and Richmond County, "where the analysis in the Draft EA projects that traffic congestion will likely worsen due to Project implementation."  ECF 1 ¶¶ 52-55, 58, 71-72; DOT_7920 (EPA comment letter) (emphasis added).  Thus, expanded allegations concerning the Lower East Side, Chinatown, residential areas near the FDR Drive, New Jersey, MTA Opp. at 14 n.13, relate directly back to the original Complaint and challenged conduct by Defendants.

The Amended Complaint, filed on February 20, 2024 (ECF 34), reasserts its NEPA claim in a similar fashion, with nearly identical subsections highlighting Defendants' failure to prepare an EIS, failure to mitigate, failure to consider a reasonable range of alternatives, and failure to take a hard look at direct, indirect, and cumulative impacts of Congestion Pricing, while both seeking injunctive and declaratory relief.  FAC at 49 (Prayer for Relief), ¶¶ 144-172 (first NEPA claim); *see also Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 87 (2d Cir. 1999) ("Where no new cause of action is alleged, as here, this Court liberally grants relation back under Rule 15(c).").  Its added facts to support these claims are in no way based on an "entirely distinct set of factual allegations." In fact, they all center around information included in the very agency documents Plaintiffs challenge (namely, the EA and FONSI).  *See Save Our Sound, OBX, Inc. v. N. C. Dep't of Transp.*, No. 2:17-CV-4-FL, 2017 WL 7048561, at *3-4 (E.D.N.C. Dec. 5, 2017) (complaint related back

despite added NEPA claims that expanded focus of litigation to different area of administrative record already before the court), *aff'd*, 914 F.3d 213 (4th Cir. 2019).  Defendants clearly had notice of these issues.

MTA also challenges whether the added Plaintiffs' first claim relates back to the Complaint.  MTA Opp. at 15-16.  Given that the claim does relate back and seeks declaratory and injunctive relief (as opposed to monetary relief for each Plaintiff), *supra* § I.A.1, there is no need for the Court to reach the issue, as it in no way alters the case, the Court's jurisdiction, or the requested relief and would not affect the rights of the litigants.  *Nat'l. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*, 397 F. Supp. 3d 430, 438 (S.D.N.Y. 2019) ("It is well settled that where, as here, multiple parties seek the same relief, the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.") (citations omitted).[22]

## II.    Congestion Pricing Will Have A Significant Impact, Requiring An EIS

An agency's determination not to prepare an EIS must be "reasonable under the circumstances when viewed in light of the mandatory requirements and the standard set by NEPA." *Kelley v. Selin*, 42 F.3d 1501, 1519 (6th Cir. 1995) (quotations and citations omitted).  Under NEPA, an agency shall prepare an EIS "if *any* significant environmental impacts might result from the proposed agency action." *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. 1983); 42 U.S.C. 4332(2)(C)(i).  If there is uncertainty or questions raised regarding whether the proposed action *may* have a significant impact, an agency must prepare an EIS.  *Nat'l Audubon Soc. v. Hoffman*,

---

[22] Should the Court address the issue, the test set out in *Zorrilla v. Carlson Restaurants Inc.*, 255 F. Supp. 3d 465, 476 (S.D.N.Y. 2017), as adopted in the First and Ninth Circuits and other district courts, is appropriate.  Under this test, an amended complaint containing new plaintiffs relates back when (1) the complaint arises out of the same conduct transaction or occurrence; (2) there is a sufficient identity of interest between the new plaintiffs, the old plaintiffs, and their respective claims so that the defendants can be said to have been given fair notice of the latecomer's claim, and (3) undue prejudice must be absent.  *Id.*  All of the prongs of the test have been met.  As an equitable matter, Plaintiffs proceeded *pro se* in bringing their original Complaint, attempting to add additional John Doe Plaintiffs, but without naming the members Families for Better Congestion Pricing organization, many of whom were subsequently added.  Given these circumstances, the Court should apply Rule 15(c) liberally and find that the added parties relate back.

132 F.3d 7, 13 (2d Cir. 1997).  Importantly, while Defendants' attempt to shift the burden, (Fed. Opp. at 25-26), "in challenging an agency decision *not* to prepare an EIS, plaintiffs need not prove that significant environmental effects *will* occur; they need only raise a substantial question that they might," which presents a "low standard."  *Env't Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878-79 (9th Cir. 2002).  Where, as here, the project is "novel," "there is more need for an EIS."  *Id.* at 879.

By any reasonable construction of the term "significant," Congestion Pricing will have a significant impact on New York and its surrounding communities.  Defendants' own statistics suggest that New York City has a workforce of 4.7 million; over 600,000 live in the CBD and over 2 million workplaces exist in the CBD Zone.  DOT_38394.  On a typical workday 7.6 million people entered and existed the Manhattan CBD, nearly twice the population of Los Angeles, with 1.8 million trips being made by car, taxi, van or truck.  DOT_3550.  With the tolling of these vehicles and the resulting diversion of traffic to avoid the $15 toll, pollutants in environmentally burdened communities will increase in the Bronx, Richmond, Nassau and Bergan Counties when implemented, and in Richmond and Bergen counties until 2045.  The mere fact that MTA expects to collect *$1 billion* annually collecting $15 tolls from individual drivers illustrates the scope and significance of the program.  And the program is plainly novel, as it is the first Congestion Pricing program of its kind to be implemented in the United States.[23]

Rather than engage or refute the clear significance of Congestion Pricing, Defendants harp on the cited "highly controversial" prior regulatory guidance for determining "significance" and

---

[23] The coordinating agencies understood the significance of Congestion Pricing.  On March 22, 2022, EPA reviewed the pre-draft EA prepared by Defendants in accordance with NEPA, the Council on Environmental Quality (CEQ) regulations (40 C.F.R. 1500-1508), and Section 309 of the Clean Air Act, and expressed its concerns about the information presented in the EA (concerns that would be reiterated in EPA's September 22, 2022 formal comment). Among the concerns was that the draft EA did not provide a "clear connection" between the significance of the "facts as presented in the document and the conclusion drawn by the agency."  DOT_44938. EPA "[could] not concur with a finding of no significant impact for the proposed project."  *Id.*

suggest that Congestion Pricing is not highly controversial because it has not been disputed by scientific experts.  Fed. Opp. at 28; MTA Opp. at 28.  They emphasize that the requirement need not depend on the popularity of the program.  But the very same regulations to which they refer suggest that "significance" is dependent on considerations such as the "short-term and long-term effects" of a program, both the "beneficial and adverse effects," and effects on "public health." 40 C.F.R. § 1501.3(b).  By any of the regulatory factors refining the analysis, Congestion Pricing is "significant" and an EIS should have been prepared.  Though studiously avoiding the NEPA-determinative word, FHWA effectively concedes the "significance" of Congestion Pricing both in the FONSI (which relies on mitigation) and in its submission (which recognizes that "mitigation was *relevant* to the FHWA's conclusion that that the Project would have no significant impact." Fed. Opp. at 42 n.28.)  Mitigation being "relevant" to the FONSI means that Congestion Pricing is, in fact, significant (requiring a full evaluation of mitigation measures), no matter how non-committal Defendants remain to the term.

Indeed, Federal Defendants attempt to frame the lengthy EA as an EIS calling it the "functional equivalent," Fed. Opp. 26, and even include a chart to suggest that Defendants have effectively conducted an EIS.  *Id.* at 48.  Putting aside that the need to characterize and perform the analysis in this way effectively supports Congestion Pricing's "significance," there are clear differences between an EIS and EA, not cured by an EA no matter how many pages are appended to it.  Among other aspects, an EIS includes longer mandated comment periods and the earlier participation of the public in a formal scoping process that identifies issues to be explored and potential alternatives to be studied. 40 C.F.R. 1502 *et seq.*  These EIS components would have greatly benefited the Congestion Pricing process, where the Project Sponsors unilaterally imposed the scope of the issues and alternatives for review and refused reasonable extensions of time for the comment period.  Using an EA, a document that is supposed to briefly determine whether an

agency will conduct an EIS, and then layering dense pages of analysis to substitute for an EIS does not cure the fundamental procedural inadequacy of Defendants' short-circuited process.[24]

The lack of engagement on the question of "significance" is consistent with the FONSI itself. A FONSI must supply a "convincing statement of reasons to explain why [the] project's impacts are insignificant." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008); *Standing Rock Sioux Tribe v. U.S. Army Corp. of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) (requiring a "convincing case" in a FONSI). While the EA suggests that Congestion Pricing could have potentially disproportionately high and adverse effects, including on traffic congestion, low income drivers and on communities already suffering from pre-existing pollution and chronic diseases, the FONSI utterly fails to make a "convincing case" to explain why the impacts of Congestion Pricing will be insignificant.

## III.  Defendants' Mitigation Measures Have Not Been Fully Developed Or Evaluated

The FONSI for Congestion Pricing found that the program would have no significant impact on the human or natural environment, based on the findings in the EA "*including appropriate mitigation measures*" (emphasis added). It is the very definition of arbitrary to make a formal determination that the action will have no significant impacts based (at least in part) on mitigation measures that will ameliorate those impacts, yet, in many cases have no specific measures even proposed, let alone any evaluation or evidence of efficacy of those hypothetical measures. No factual basis exists for the determination that the "mitigation measures" ensure that Congestion Pricing will have no significant adverse impacts.

Plaintiffs' motion for summary judgment explained that the $155 million over five years that Defendants have committed to "mitigate" the adverse impact of Congestion Pricing was both

---

[24] Defendants largely fail to address, much less counter, the numerous examples provided in Plaintiffs' motion of far less impactful projects, including FHWA projects, that required an EIS. Pls. Mot. at 14. Among these EISs are several tolling projects in the past five years that required more comprehensive study. *Id.*

insufficient and inadequately evaluated under governing NEPA law. Pls. Mot. at 45-48. NEPA requires agencies to not simply list mitigation measures that could be implemented, but must discuss the extent to which adverse effects can be avoided in "sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson*, 490 U.S. at 352. Putting aside the relatively minor sum allocated to mitigation efforts over five years when compared with the need and billions in revenue to be received by MTA, the EA and FONSI are wholly deficient on evaluating how the mitigation measures will reduce the adverse environmental consequences of Congestion Pricing. The EA contains a list of "Regional and Place-Based Mitigation Measures" and a brief description of each of the mitigation measures to be considered. DOT_36214. Of the $155 million committed, $85 million are devoted to "placed-based mitigation" measures to be determined "after toll rates are set" in a non-specific "process that includes both additional analyses and community input." *E.g.*, DOT_36213. It is improper for FHWA to defer consideration of mitigation measures until a future date, since "NEPA requires consideration of the potential impact of an action *before* the action takes place." *City of Tenakee Springs v. Clough*, 915 F.3d 1308, 1313 (9th Cir. 2001) (emphasis added). An agency cannot simply leave mitigation measures as "TBD, relying on 'anticipated-but-unidentified' measures without further analysis." *Am Rivers v. FERC*, 895 F.3d 32, 54 (D.C. Cir. 2018). In fact, the record reflects that in meetings regarding mitigation between FHWA and MTA, FHWA made it clear that it had "*concern about mitigation that consists of a commitment to further study rather than a commitment to implementing a measure. They need to identify mitigation at the conclusion of NEPA, prior to the TBTA Board selecting a tolling schedule.*" DOT_44982.

Now, of course, FHWA has changed its tune and indicates that the "ultimate tolling structure" adopted by the TBTA "will determine the effects of the Project, and, in turn the mitigation necessary to ameliorate those effects. Fed. Opp. at 44 n.29. FHWA acknowledges that

"specific contours of mitigation for the project remain fluid" (Fed. Opp. at 45); MTA, for its part, acknowledges that future mitigation measures are part of an ongoing "adaptive management program," and remain in flux.  MTA Opp. at 51.  Indeed, in the New Jersey Congestion Pricing action, Defendants conceded that the mitigation measures would need to be "fine-tuned" after the program is implemented and that it was possible an entire category of mitigation for certain parts of New Jersey could emerge as part of a larger mitigation package.[25]

These arguments reinforce the unreasonableness of the FONSI and EA and the need to require Defendants to perform additional analysis.  NEPA mandates that a FONSI premised on mitigation "***shall*** state any enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts."  40 C.F.R. § 1501.6(c) (emphasis added).  A mitigated FONSI cannot have a menu of "to-be determined" mitigation measures, it must include a detailed explanation of how committed mitigation will be enforced in order to "convincingly establish[] that changes in the project have sufficiently minimized [adverse impacts]."  *See Md.-Nat'l Capital Park & Plan Comm. v. U.S. Postal Serv.*, 487 F.2d 1029, 1040 (D.C. Cir. 1973).  Providing "cursory detail" or a perfunctory list of mitigation measures without an analysis or evaluation as to how the measures serve to reduce the impacts to a less-than-significant level is fatal to an environmental assessment.  *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 234 (5th Cir. 2007).  As late as January 2023, EPA told the MTA that the "most important issue" in the EA is that it "does not commit to mitigation" and that there was a need for "binding commitments" from the Project Sponsors to mitigate or eliminate all potential environmental and health impacts. DOT_45088.  Defendants have not provided binding commitments, sufficient detail or evaluation to establish that the mitigation measures have sufficient minimized the significant adverse impacts.

---

[25] Ben Brachfeld, *Congestion Pricing: Oral Arguments Made in New Jersey's Federal Challenge to New York's Manhattan Toll Plan*, AMNY (Apr. 3, 2024), https://www.amny.com/transit/congestion-pricing-new-jersey-federal-challenge-tolls/.

Indeed, MTA's reliance on cases upholding "adaptive management" plans only serves to underscore the inadequacy of the mitigation measures here.  For example, in *Theodore Roosevelt Conservation P'ship v. Salazer*, 616 F.3d 497 (D.C. Cir. 2010), the court rejected a NEPA challenge to a broad Bureau of Land Management ("BLM") plan that relied on heavily adaptive management, yet one of the explicit reasons the court did so was because BLM had committed to supplementing its EIS with appropriate subsequent, site-specific full NEPA analysis subsequent to the review.  *See id*. 511-12.  That is plainly not the situation here; not only have MTA and FHWA not completed an EIS, they have no plans to conduct any further NEPA analysis with respect to mitigation measures.  Moreover, the adaptive management plan in *Salazar* included a detailed, *thirteen-page* list of specific protective measures to implement and benchmark metrics to consider for each drill site.  Here, Defendants pose a far more amorphous plan without studying the environmental impacts or mitigations measures through an EIS.  In a few sentences, the EA vaguely suggests that after the toll rates are set, "a process that includes additional analysis and community input will take place to determine the sites of the place-based mitigation."  (17D-80).  That is hardly the thirteen-page list of plans found appropriate for continued monitoring in *Salazar.*

Moreover, while *Salazar* suggests that adaptive management may be a proper tool as part of a comprehensive program to address future unanticipated impacts from complex longer-term projects, "more concrete tools than adaptive management must be employed to mitigate [] present effects" and the known environmental damage wrought by a project.  *Hells Canyon Preservation Council v. Connaughton,* No. 11-cv-00023-PK, 2012 WL 13047991, at *11 (D. Or. Aug. 12, 2012), *R.R. adopted as modified*, 2013 WL 665134 (D. Or. Feb. 22, 2013).  In *Salazar*, the monitoring of additional, committed protective measures was added to significant fixed mitigation measures that were accompanied "by discussion of environmental studies" of the measures in the EIS.  *Salazar,* 616 F.3d at 516.

The "adaptive management" plan in the EA that MTA relies upon is not part of a comprehensive mitigation program, it *is* the mitigation program.  FHWA indicates that it has made the decision to set out the basic parameters of the efficacy, timing and placement of mitigation efforts, "while leaving other details to be determined later."  Fed. Opp. at 45.  Even if the measures were sufficient—and they are not—the "details" to be determined later in the EA include the locations for (i) $10 million in electric truck charging infrastructure; (ii) $15 million in renovations to parks; (iii) $10 million in air filtration units for schools; (iv) $5 million for roadside vegetation, and (v) $25 million to a Bronx Asthma case management program.  And unlike in *Salazar,* an adaptive management plan is not needed because these are not "unanticipated" impacts, the effects are known.  The EA determined that Congestion Pricing would have a disproportionate and adverse impact on environmental justice communities and the "place-based" mitigation measures are meant to aid the most burdened communities.  Where these mitigations measures will be implemented is not a "detail" to be filled in; it is a necessary component to determining whether pollution and other adverse environmental impacts from Congestion Pricing are truly being mitigated in these areas.

While no longer advancing the position, FHWA understands the need for specificity with mitigation.  In a meeting with EPA and MTA to discuss mitigation on October 3, 2022, FHWA stated clearly that "*if we go straight to mitigation and are not tying it to locations and the rationale for doing the mitigation there, the mitigation does not make sense.  For instance, we need to explain the rationale for implementing mitigation in one location but not another.*"  DOT_405083.  FHWA had it right then, not now.  The mitigation measures in the EA were never tied to any particular location, nor is there any rationale for implementing in one location, but not another.  As FHWA put it, "the mitigation does not make sense."

Federal Defendants and MTA emphasize that the summary "mitigation" chart cross-references other analysis, but the analysis referenced is meager, at best, and only applies to a few of the proposed items in the mitigation package.  Much of the cross-references are to paragraphs that contain the exact same information extracted from the chart itself and some refer to an utterly amorphous process "after the toll rates are set" where "additional analysis" will be conducted with community input. *E.g.*, DOT_7328.  The more specific cross-referenced "explanation" Federal Defendants rely upon for an analysis of the "tools" that will be "used to identify mitigation locations" (Fed. Opp. at 44), is a cite and a footnote in the EA "Frequently Asked Questions" that that says that place-based mitigation locations were chosen for areas experiencing pre-existing pollutant *or* chronic disease burdens at the 90th percentile (as compared with the 80th and 66th percentiles also used for modeling).  DOT_3674.  Yet, all *38* communities identified in the "may need mitigation" chart in the Technical Memorandum have census tracts at or greater than the 90th percentile, DOT_7319, and only 13 are "communities identified for place-based mitigation." DOT_7439.  Even if this so-called explanation of the "tool" to be used to identify sites for mitigation were sufficient (and it is not), there is no substantive evaluation—nor have Defendants' pointed to any—as to how (or by how much) these sparse, specific place-based mitigation measures will reduce adverse impacts.

## IV.    Defendants Failed To Sufficiently Identify And Analyze Reasonable Alternatives To Congestion Pricing

The EA and FONSI should be held unlawful as arbitrary and capricious because FHWA failed to identify and analyze reasonable alternatives to the Congestion Pricing scheme. "Consideration of reasonable alternatives is the heart of the NEPA process," *Wilderness Soc'y, Ctr. For Native Ecosystems v. Wisely*, 524 F. Supp. 2d 1285, 1309 (D. Colo. 2007), and NEPA prohibits an agency from "narrowly defin[ing] [a project's] purpose and need so as to winnow down the alternatives until only the desire one survives." *Klamath-Siskiyou Wildlands Ctr. v.*

*Forest Serv.*, 373 F. Supp. 2d 1069, 1088 (E.D. Cal. 2004).  As set forth in Plaintiffs' motion for summary judgment (Pl. Mot. at 41-44), that is precisely what occurred here.

Defendants' motions misstate Plaintiffs' argument in claiming that "Plaintiffs argue that this revenue-generating motive was not a proper consideration for the FHWA."  Fed. Opp. at 39; *see also* MTA Opp. at 25.  Plaintiffs do not dispute that FHWA's goal of generating revenue is contained within the Traffic and Mobility Reform Act, but instead suggest that it cannot be the overwhelming goal considered.  It is well-established that "an agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action," or else the EA "would become a foreordained formality."  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).  The EA itself even defined multiple objectives,[26] stating that if "FHWA and the Project Sponsors determined that a preliminary alternative would not meet *one or more* of the three Project objectives," it was dismissed "from further consideration as an alternative that is not reasonable."  EA at 2-5.  Nevertheless, FHWA used revenue-generation as the sole deciding factor to swiftly dismiss 10 out of the eleven alternatives listed in the EA's Table 2-2 (Results of Preliminary Alternatives Screening), narrowing the purpose "so as to winnow down the alternatives until only the desired one survives."  *Klamath-Siskiyou Wildlands Ctr.*, 373 F. Supp. 2d at 1088.

Defendants insist that "alternatives not fully studied require only brief discussion" (Fed. Opp. at 40), but there are *no* alternatives fully studied and the "brief discussion" Defendants rely upon is a series of footnotes (DOT_36268) containing outdated studies from advocacy groups—*i.e.,* a NYC Traffic Mitigation from *2008*.  In no way did Defendants "rigorously explore

---

[26] As noted in Plaintiffs' Motion, FHWA and the Project Sponsors also identified reducing daily vehicle-miles travels (VMT) within the Manhattan CBD and reducing the number of vehicles entering the Manhattan CBD daily as objectives. *See* Pl. Mot. at 43; EA at 2-5.

and objectively evaluate all reasonable alternatives." *Idaho Conservation League v. Lannom*, 200 F. Supp. 3d 1077, 1091 (D. Idaho 2016), or provide reasonable explanations for why it did not consider eliminated alternatives, as NEPA mandates. *Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 891 (D. Mont. 2020).

Defendants further state that NEPA does not "require the FHWA to assess alternatives that would not meet the project goals," Fed. Opp. at 40, and emphasize the importance of revenue generation in FHWA's analysis. Fed. Opp. at 39 ("this criterion was *required* by the state law authorizing the Project such that no scenario that failed to generate sufficient revenue could be enacted by the TBTA") (emphasis in original). However, as the EA makes plain, FHWA only identified patently unreasonable alternative options that were intended to fail on this basis. For example, Federal Defendants themselves state that "no explanation is required to show that creating incentives for teleworking will not generate $1 billion per year." Fed. Opp. at 40. This raises a question: if it is so obvious to FHWA that this "reasonable alternative" plainly does not meet one of the Project's most important objectives, why entertain it in the EA at all? This process of setting up alternatives just to knock them down is a clear attempt by FHWA to position the EA to appear to satisfy NEPA's requirements while performing none of the thoughtful and reasoned analysis of alternatives required by the statute and its implementing regulations.[27]

Moreover, it is simply not an answer to excuse any consideration of alternatives by relying on the $15 billion set forth in the language of the Traffic Reform and Mobility Act. In evaluating

---

[27] EPA was also skeptical of FHWA's narrow view of the Project's goals and its treatment of alternatives to Congestion Pricing. "While EPA understands that the parameters for the proposed action were outlined in the MTA Traffic and Mobility Reform Act (2019), additional alternatives to address the law could have been considered and analyzed prior to selecting the proposed CBD Tolling Program." *See* March 10, 2022 letter from EPA's Environmental Review Team to the Project Sponsors commenting on the Pre-Draft Environmental Assessment for the CBD Tolling Program, DOT_44938. In the letter, EPA "request[ed] more information on why Alternative T02…is listed as 'depends'…without much more detail." *Id.* at DOT_44940.

the environmental impact of Congestion Pricing FHWA is not bound by that state law and the "mere fact that an alternative requires legislative implementation does not automatically establish it as beyond the domain of what is required for discussion." *NRDC v. Morton*, 458 F.2d 827, 837 (D.C. Cir. 1972).  In fact, FHWA had the duty under NEPA to exercise a healthy degree of "skepticism in dealing with self-serving statements from a prime beneficiary [the MTA] of the project." *Simmons v. U.S. Army Corps. of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997).

The record demonstrates that EPA also questioned whether FHWA had adequately analyzed alternatives to Congestion Pricing.  A summary of an October 3, 2022 meeting between Project Sponsors and EPA to discuss comments regarding the EA states that EPA "need[s] an explanation of what alternatives were not moved forward as some of them hit some criteria and not others" and that some components of alternatives that "might make suitable mitigation," or "might contribute to the Project's objectives if not fulling meeting them." DOT_45084.  EPA also suggested that some alternatives were left off the table entirely, noting that "[o]ther congestion reducing projects the City or State are working on should also be connected and noted."  *Id*. Defendants have not explained why no *combination* of alternatives was analyzed, even if any one particular alternative alone was insufficient to meet the stated revenue target.  Pls. Mot. at 16, 42.

It is even more obvious that Defendants set up alternatives in the EA to intentionally fail when considering the range of actual, reasonable alternatives that were not analyzed or even listed as a potential option in the EA.  FHWA and Project Sponsors are well-aware of dynamic tolling, but MTA claims it was dismissed as an alternative early in the process based on "concerns raised during early outreach" and because "it was felt that variable pricing, rather than dynamic (or surge) pricing, was an appropriate method for the CBDTP."[28] MTA Opp. at 28; DOT_7498.  Further, a

---

[28] MTA also points to several other of FHWA's responses to public comments regarding dynamic tolling, indicating that FHWA was well aware of it as a potential alternative before issuing the EA and FONSI. *See* DOT_7944, DOT_12909, DOT_22164.

phased-in approach would be essentially the same Congestion Pricing plan that FHWA proposes, but it would allow FHWA to study the impacts of the plan in real time, potentially leading to more targeted mitigation efforts a reduction in environmental harm.  Courts have repeatedly stated that, "[t]he existence of a viable but unexamined alternative renders an [EA] inadequate." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (citation omitted); *see also Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) ("A 'viable but unexamined alternative renders [the] environmental impact statement inadequate.'") (citation omitted)).  On this basis alone, the EA and FONSI should be held arbitrary and capricious in violation of NEPA.

Moreover, it is flatly disingenuous to suggest that these alternatives, including a phased-approach and dynamic pricing, were not presented for consideration during the comment process. Fed. Opp. at 41.  The EA itself, in a section entitled "Previous Studies and Concepts Considered," relies upon the 2018 Fix NYC Advisory Panel Report, which reviewed and supported dynamic pricing models and a phased-in approach.[29]  FHWA's own guidance on NEPA tolling projects explains both dynamic and variable approaches to tolling.[30]  The "tangible evidence" of the feasibility of these alternatives is explained by Defendants' own prior analyses.

Lastly, both Federal Defendants and MTA attempt to distract the Court from the substance of the arguments by claiming that Plaintiffs in this action forfeited objection to FHWA's inadequate analysis of alternatives by failing to raise particular alternatives during the

---

[29] Indeed, the Fix NYC Advisory Panel Report found that a "*phased approach is essential*" and advocated surcharges on taxi and FHV trips in the second phase of Congestion Pricing before all vehicles, recognizing that "app-based transportation companies…are now the most significant source of congestion."  *See* Fix NYC Advisory Panel Report, January 2018, at 13 (emphasis added).

[30] *NEPA Reviews of Tolling and Road Pricing Projects*, Case Studies (Feb. 2022), FHWA, https://www.environment.fhwa.dot.gov/Pubs_resources_tools/publications/case_studies/Introduction-NEPA_and_Tolling_Case_Studies.pdf.

administrative process.  *See* MTA Opp. at 23; Fed. Opp. at 41.[31]  The authority cited by Defendants

does not require Plaintiffs to identify the precise alternative options in order for their challenge on

NEPA grounds to stand.  In fact, in the sentence immediately following the quote from *Public*

*Citizen*, the Supreme Court emphasized that "the agency bears the primary responsibility to ensure

that it complies with NEPA," and acknowledged that "an EA's . . . flaws might be so obvious that

there is no need for a commentator to point them out specifically in order to preserve its ability to

challenge a proposed action."  *Pub. Citizen*, 541 U.S. at 765.

## V.     Defendants Failed to Consider And Mitigate Adverse Impacts On Communities With Environmental Justice Concerns

The purpose of an environmental justice analysis is to determine whether a project will

have a disproportionate adverse effect on these communities and to identify and address "high

adverse human health or environmental effects of its programs, policies and activities."  Exec.

Order No. 12,898, 3 C.F.R. § 859.  The FHWA is mandated by Executive Order to "make

achieving environmental justice part of [its] mission[]."  Exec. Order No. 14,008, 3 C.F.R. § 477

(2022).  When conducting an environmental justice analysis, an agency must "articulate a

satisfactory explanation for its action including a rationale connection between the facts found and

the choice made."  *Standing Rock*, 255 F. Supp. 3d at 121.

Adequately addressing the impact of Congestion Pricing on environmental justice

communities has been a core issue plaguing Project Sponsors and their sister agencies, such as

EPA, since the beginning of the project.  As early as March 22, 2022 EPA issued a letter to FHWA

and Project Sponsors on the pre-draft EA, indicating that while the pre-draft EA included an entire

---

[31] Defendants' motions overstate the authority on which they rely.  In *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004), respondents did not urge the agency to consider any alternatives in their public comments.  Similarly, in *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1062 (9th Cir. 2023), plaintiff did not raise any alternatives during the EA's public comment period, which plaintiff itself conceded.  Here, Plaintiffs' and other public comments highlighted deficiencies of the alternatives, and urged the agency to consider additional options.  *See* Klinger Supp. Decl. Ex. 1; Chan Supp. Decl. Ex. 1-9.

chapter dedicated to the communities with environmental justice concerns, the conclusion that Congestion Pricing would "produce no adverse impacts on [environmental justice] populations, seemed to be contradicted by the "adverse traffic effects" identified elsewhere in the analysis. DOT_44943.  In May 2022, FHWA expressed its own "concern" to MTA that "traffic diversions through environmental justice areas are not addressed adequately" and a further objection that modeling of environmental justice areas with only the "worst-case scenario is not adequate." DOT_44982.  Then in September, in its formal comment on the EA, EPA indicated that the EA "does not identify the disproportionate impact of the circumferential traffic diversion to roadways in communities with EJ concerns and its subsequent impact on air quality in particularly near road communities" and recommended that Defendants "clearly identif[y] these impacts and sufficient mitigation to be implemented that ensures these impacts are less than significant."  DOT_45029. EPA further requested a comparative analysis of potential air quality impacts between the general population and minority and low-income populations throughout the study area and noted that the "air quality evaluation was only conducted at a county level."  *Id.*  Because NEPA requires an assessment of the cumulative impacts, EPA recommended a "more robust analysis of impacts" that would clarify whether Congestion Pricing would "add to disproportionately high health effects." *Id.*

As Defendants concede, FHWA "undertook additional research to broaden the analysis" in response to EPA's criticisms, producing a Technical Memorandum. Fed. Opp. at 38.  But it is no answer to say that simply engaging in this analysis in the Technical Memorandum or "studying these impacts" satisfies NEPA, as Defendants suggest.  Fed. Opp. at 38.  A "cursory" or "barebones" environmental justice analysis is insufficient.  *See Standing Rock*, 255 F. Supp. 3d at 140.  Yet, a closer look at the Technical Memorandum that Defendants suggest cures the inadequacies in the initial review reveals that while it may have given a further explanation of the

impact of truck pollution on communities with pre-existing and chronic health conditions, it did not address EPA's core concerns.

In fact, while the Technical Memorandum does more to *identify* areas that have pre-existing pollutant or chronic diseases burdens and explain the effects of congestion and pollution, the additional analysis conducted was one highway truck diversion analysis within the 10-county environmental justice study area primarily for one tolling scenario, Tolling Scenario "E."  Yet, under *all* tolling scenarios, certain environmental justice communities will see an increase in dangerous criteria air pollutants in 2023, some until 2045 (DOT_36983), and it was Tolling Scenario "A", not Tolling Scenario "E", that was the scenario chosen to conduct the final analysis of air quality.  DOT_36828.  Defendants may argue that Tolling Scenario "E" was chosen because it had maximum truck diversion on a county-wide basis, but zooming out to the county-level, particularly when specific census tracts had already been identified in the analysis, defies logic. Thus, it is flatly wrong to suggest that Plaintiffs do not contend the chosen methodology caused it to overlook environmental justice communities.[32]  Air quality mitigation for Plaintiffs in the Lower East Side was not addressed (despite acknowledging the increased traffic on the FDR Drive), and no mitigation efforts were committed to New Jersey or Staten Island.  Despite identifying areas overburdened with the health impacts of poor air quality and acknowledging increased congestion, no further air quality testing was done to ascertain the cumulative impact of Congestion Pricing on areas already suffering, as was sought by EPA.  *See County of Suffolk v. Secretary of Interior*,

---

[32] Plaintiffs' motion argued that the EA's analysis of environmental justice communities using census data failed to utilize precise mapping tools available, such as the Mayor's Office of Environmental Justice map.  (Pls. Mot. at 34). Rather than explain the use of the ill-fitting statistics, Defendants fall back on agency deference (Fed. Opp. at 36) and suggest that Defendants did utilize a more tailored lens (MTA Opp. at 39).  Even if the Technical Memorandum reviewed more specific environmental justice census tracts, it did not analyze the cumulative impacts of Congestion Pricing on these communities, as required by NEPA, and as requested by EPA.

562 F.2d 1375 (2d Cir. 1977) (where evidence presented by another agency is "inadequately dealt with, serious questions may arise" about the adequacy of the review).

After conducting the truck analysis, Defendants were forced to concede that under Congestion Pricing "some EJ communities could experience additional traffic along with associated air pollutants." DOT_41529. That hardly captures the actual results of even the narrow study conducted. Under solely the Tolling Scenario "E" truck proximity analysis, the EA concluded that *38* environmental justice communities "*may need mitigation*" as a result of the change in daily truck volume. DOT_7319-20. Yet, in a corresponding chart entitled "Communities Identified for Place-Based Investment," only 13 areas are identified as ones that "could" merit place-based mitigation and none in particularly hard-hit places such as Staten Island and Lower Manhattan. (DOT_7439-40). Nor is there any explanation as to how the 13 census tracts were selected. The Technical Memorandum inexplicably and arbitrarily switches between analyzing census tracts experiencing 90th percentile in pollutants OR chronic disease burden (DOT_7319) and tracts experiencing 90th percentile in pollutants AND chronic disease burden (DOT_7439). To the extent Defendants adopted a more constrictive "AND" construction for the mitigation sites, that limited view was a specific criticism pointed out by EPA that was never addressed (DOT_45089) ("EPA encourages the MTA to be more inclusive of and less limiting in adopting an "or" methodology for determining census tracts that are factored into the analysis."). As a glaring microcosm of the inadequacy of the analysis and mitigation measures, Staten Island, one of the most polluted and health-burdened areas and a specifically identified location which will see both significant increases in dangerous pollutants and total VMT under *all* tolling scenarios, was not identified as a situs for any place-based mitigation measures. EPA recognized that traffic diversion would have a disproportionate and adverse impact on the community (DOT _45032); yet it somehow was not been identified for mitigation. DOT_41566.

It merits only briefly addressing that Plaintiffs are not precluded from raising the issue of the EA's treatment of environmental justice communities.  Plaintiff Chaim Katz lives in an environmental justice community in Lower Manhattan, Plaintiff Sean Carney lives in one in Bergen County, New Jersey, and Plaintiffs Chan, Ehrenpreis, Hoffman and Cheung live immediately adjacent to such communities in Lower Manhattan along the FDR Drive and Chinatown (less than two miles away), and travel regularly into environmental justice communities to attend medical appointments, visit relatives and to send their children to school.  *See* Katz Decl.; Carney Decl.; Ehrenpreis Decl.; Cheung Decl.; Hoffman Decl.  As discussed, *supra*, there is no requirement that Plaintiffs reside in an environmental justice area to be harmed by Congestion Pricing's failure to properly treat these communities.

## VI.    Defendants Failed To Adequately Analyze Battery Park City

Despite Defendants' repeated assertions that traffic will decrease in BPC under Congestion Pricing, the EA expressly states that (i) the Battery Park Underpass "offers an un-tolled connection between the FDR Drive and the West Side Highway/Route 9A around the southern edge of Manhattan," that (ii) the Westside Highway/Route 9 provides a "toll-free route around the Manhattan CBD to and from Brooklyn," and (iii) near and adjacent to the Manhattan CBD there would be increases in traffic volumes as vehicles divert to avoid the toll.  DOT_36370.  The EA also acknowledges that "diversions to other routes" include areas such as the FDR Drive, which will experience a "net increase," in traffic upwards of 26% between East 10th Street and the Brooklyn Bridge.  Highways and crossings were analyzed separately in the EA from local intersections and considered for additional mitigation measures precisely because of this diversion, but did not include BPC.  Defendants' siloed analysis extends to geography.  The Hugh L. Carey Tunnel, which directly feeds into BPC, is expected to have higher in-bound traffic volumes under at least four tolling scenarios, yet no further analysis was conducted of the nearby BPC community.

Defendants principally argue that BPC was not identified for additional analysis or diversion review because the total VMT for BPC would decrease under Congestion Pricing (according to the BPM).  *See* MTA Opp. at 35-36.  But a closer look at the statistics cited to support the assertion that traffic would decrease in BPC was a decrease in traffic along *the entire West Side Highway*.  MTA Opp. at 30 (citing DOT_26354, DOT_36360).  Defendants acknowledge that the EA describes increased demand to West Street and the FDR Drive (in its analysis of the Hugh L Carey Tunnel crossing) and says that there is "nothing inconsistent" about that increased traffic on West Street there, and the conclusion that VMT on the West Side Highway would decrease in every tolling scenario.  MTA Opp. at 37.  There may be "nothing inconsistent" with the two findings, but it improperly suggests that all segments of the West Side Highway are equal for purposes of Congestion Pricing.  The lower West Side Highway (given its potential for "around the horn" diversion) should not have been aggregated with the entire West Side Highway thoroughfare.  Moreover, notwithstanding the illogical finding that the lower FDR Drive would see an increase in traffic, but the lower West Side Highway would see an overall decrease, the EA shows increased demand to West Street and the FDR Drive for Tolling Scenarios "A" and "B," yet only Tolling Scenario "D" was selected for the intersectional analysis relied upon in lower Manhattan.

More broadly, Defendants' response ignores the reality of living in BPC.  BPC is a neighborhood, still experiencing the negative air quality impacts of 9/11, with over 20 schools, parks (including the 25-acre Battery Park) and families (with 25% of its residents owning a vehicle), yet it is analyzed and characterized in the EA as part of the "Commercial Business District."  In London (in addition to investing in mass transit *before* implementation), residents living within the zone receive a 90% discount; but here, BPC residents will pay $15 every time they travel outside the CBD.  Defendants claim that Plaintiffs "inaccurately describe[d] what

[section 5B] says" because this section "only discusses effects of the Project on *neighborhood character.*" Fed. Opp. at 32. That is precisely the point. The EA analyzes impact of Congestion Pricing on neighborhood character in Chapter 5B, yet lumps *all of Lower Manhattan* in its discussion of BPC.

It remains only to be said that though Defendants repeatedly herald the accuracy of their BPM model and data, aside from being pre-COVID information, the "No-Action" alternative as well as Scenarios "B," "C," "E," and "F," are all predicated on a cap imposed on for-hire-vehicles (which constitute between 40-50% of midtown traffic). That cap was eliminated after the issuance of the FONSI, calling into question the continuing viability of the analysis.

## VII. Plaintiffs' Claim That the Court Should Order A Supplemental Review Is Not Premature

Both Federal Defendants and MTA argue that Plaintiffs' failure to supplement claim is premature because FHWA has yet to complete its anticipated "re-evaluation" which will "determine whether the effects of the adopted toll rate schedule are consistent with those in the Final EA." MTA Opp. at 52; Fed. Opp. at 53. Federal Defendants argue "[t]here is nothing unusual or erroneous about the FHWA's intention to re-evaluate its environmental assessment here" because re-evaluations are contemplated by NEPA and CEQ regulations. Fed. Opp. at 51. A "re-evaluation," however, is not a supplementation. A "re-evaluation," as the FHWA's own guidance makes clear, is a non-public, abbreviated process entirely within the discretion of the agency in which affirming a FONSI may take the form of a simple "checklist, an email exchange between the agency and project sponsor" or even a verbal confirmation.[33] Plaintiffs are not asking that the Court rule on the adequacy of any re-evaluation, though the outcome may be easy to

---

[33] *NEPA Re-Evaluation Joint Guidance for Federal Highway Administration (FHWA), Federal Railroad Administration (FRA), & Federal Transit Administration (FTA)*, at 3 (Aug. 14, 2019), https://www.environment.fhwa.dot.gov/legislation/nepa/Reevaluation_guidance_08142019.aspx.

predict.  Rather, Plaintiffs seek a declaration from the Court that FHWA must reopen the NEPA process and conduct a full supplemental analysis of the environmental impacts of the actual Congestion Pricing tolling structure, replete with another public notice and comment period, as is required by NEPA.  23 C.F.R. § 771.130(d); *see Dine Citizens Against Ruining Our Env't v. Klein*, 676 F. Supp. 2d 1198 (D. Colo. 2009) (claim seeking declaration that federal defendants violated NEPA and the APA by failing to supplement was ripe in light of new information).[34]

Defendants' suggestion that re-evaluation is not unusual may be true, but inapplicable.  The "re-evaluation" cases cited involve minor modifications of existing final projects.  *E.g.*, *Price Road Neighborhood Ass'n, Inc. v. U.S Dep't of Transp.*, 113 F.3d 1505 (9th Cir. 1997) (changing loop ramps to tunnel ramps on a freeway project); *Potomac Heritage Trail Association, Inc. v. U.S. Dep't of Transp.*, Civ. No. DLB-22-2482, 2022 WL 7051160, at *4 (D. Md. Oct. 11, 2022) (updating a bridge design).  Here, the proposed re-evaluation does not make minor modifications to an already approved final program, it is the proposed program.

Furthermore, Plaintiffs' challenge to Defendants' failure to supplement the EA is not unripe.  A failure to supplement claim under NEPA is ripe for review "at the time the failure takes place."  *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1174 (11th Cir. 2006) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998)).  NEPA requires supplementation of an EA, which can occur at any time, when "new information" or "new circumstances" make substantial changes to a project not evaluated in an EA that are relevant to environmental concerns, even when the full environmental impact is unknown.  23 C.F.R. 771.130.  Supplemental review is required when changes in the final project not analyzed in the initial review pose new environmental issues that "could not be fairly anticipated" and "seriously dilute[]" the relevance

---

[34] Plaintiffs' Opposition to Defendants' Motions to Dismiss in the related action *Mulgrew v. Dep't of Transp.*, No. 24-cv-1644 (S.D.N.Y. April 5, 2024), provides additional authority on ripeness.  *See* ECF 62, at 28-34.

of the public comment period.  *California v. Block*, 690 F.2d 753, 772 (9th Cir. 1982); *Dubois v. U.S. Dep't of Agric.*, 102 F.2d 1273 (1st Cir. 1996).  That is precisely what occurred here, as the moment a tolling structure was adopted by MTA that differed materially from its hypothetical scenarios, new circumstances required FHWA to supplement the EA.  The failure to supplement and fully evaluate the environmental consequences is a present violation of NEPA.  Plaintiffs need not wait until FHWA's rubber-stamped decision confirming the FONSI to bring a claim.

Lastly, Defendants argue that FHWA's plan to re-evaluate is proper under NEPA regulations allowing agencies to "tier" later NEPA documents to earlier documents.  Fed. Opp. at 52; MTA Opp. at 53.  Critically, however, Defendants fail to note that "tiering" is done within an existing NEPA process, such as an EA or EIS, not within a "re-evaluation."  And there is a distinction between "tiering" and "supplementation" under NEPA.  Tiering refers to the incorporation by reference within a subsequent EISs or EAs, whereas supplementation refers to the process of updating a previous EIS in situations where the agency makes substantial changes to the proposed action, or there are significant new circumstances or information.  *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1090 (9th Cir. 2020); § 1502.9(c).

Here, Plaintiffs seek a full supplementation of the EA, as FHWA made "substantial changes to the proposed action" when the actual tolling structure was announced, which constitutes "significant new circumstances or information."  *Id*.  As "the tiering regulations generally assume that the subsequent site-specific action is consistent with the previously studied broad-scale plan," their application is not appropriate under these circumstances.  *Id.* at 1092.

## VIII.  Defendants Did Not Provide Sufficient Public Participation

As Defendants admit, the CEQ regulations required FHWA to "involve the public . . . to the extent practicable" while preparing an EA and to "make diligent efforts to involve the public"

in the NEPA process.  40 C.F.R. §§ 1501.5(e), 1506.6(a); *California v. Block*, 690 F.2d 753, 769 (9th Cir. 1982) ("Agencies are . . . obliged to adhere to the procedures mandated by NEPA.").

Defendants do not even attempt to explain why providing more than 44 days to review the 868-page EA and thousands of pages of appendices would be impracticable.  Fed. Opp. at 45-50; MTA Opp. at 20-23.[35]  Instead, Defendants contend that there is no minimum level of public comment and participation governing the EA and FONSI process, so long as it is not zero.  Fed. Opp. at 47 n.31 (citing *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 952 (9th Cir. 2008));[36] MTA Opp. at 20-21 (citing *Coal. for Healthy Ports v. U.S. Coast Guard*, No. 13 Civ. 5347, 2015 WL 7460018, at *15 (S.D.N.Y. Nov. 24, 2015)).[37]

An agency should provide for a longer comment period when its decision is of great controversy and requires the public to review specific materials from the agency.  *E.g.*, *Estate of Smith v. Bowen*, 656 F. Supp. 1093, 1097-98 (D. Colo. 1987) (60-day comment period inadequate where proposed regulation involved such "great numbers of interested persons and organizations . . . that a reasonable time [to comment] would include time for groups and organizations to go through their own bureaucratic processes to arrive at their comments.").  There is no question that this project involved "great numbers of interested persons and organizations" (resulting in nearly 70,000 comment letters) and thus required more time for participation in the NEPA process, not less.  *Id.* at 1098.

---

[35] What is truly impracticable is expecting the public to be able to digest, obtain any necessary technical assistance, and comment on thousands of pages of complex environmental and traffic analysis over just 44 days.

[36] In *Bering Strait*, 524 F.3d 938, the court explained that what constitutes adequate information "depend[s] on the circumstances," and "the regulations require that the public be given as much environmental information as is practicable, prior to completion of the EA, so that the public has a sufficient basis to address those subject areas that the agency must consider in preparing the EA."  *Id.* at 953 (quotation omitted).  Whether Defendants satisfied a non-existent minimum standard for public participation is not relevant: the question is whether they provided the public "as much information as [was] practicable."  *Ohio Valley Env'tl Coal. v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783, 810-11 (S.D. W.Va. 2009).  They did not.

[37] In *Coal. for Healthy Ports*, 2015 WL 7460018, at *15, the agency accepted comments for a period of sixty days on a draft EA that was *less than half as long* as Defendants' Draft EA (433 pages compared to 868 pages).

## **CONCLUSION**

For the foregoing reasons, and the reasons stated in Plaintiffs' Memorandum of Law in Support of Summary Judgment, Plaintiffs' Motion for Summary Judgment should be granted and Defendants' Cross-Motions for Summary Judgment should be denied.

Dated: New York, New York
      April 15, 2024

**STEPTOE LLP**

By:    */s/ Alan M. Klinger*

      Alan M. Klinger
      Dina Kolker
      David Kahne
      1114 Avenue of the Americas
      New York, New York 10036
      (212) 506-3900
      aklinger@steptoe.com

      *Counsel for Plaintiffs*