**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x
                                    :

ELIZABETH CHAN, *et al.*,          :

                       :

            Plaintiffs,    :

    -against-            :    Case No. 23 Civ. 10365 (LJL)

                       :

UNITED STATES DEPARTMENT OF    :
TRANSPORTATION, et al.,         :

                       :

            Defendants.    :
------------------------------------------------------------ X

**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT AND**
**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2728
Email:  zachary.bannon@usdoj.gov

ZACHARY BANNON
DOMINIKA TARCZYNSKA
Assistant United States Attorney
– Of Counsel –

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................iii

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ................................................................................................................2

    I.      The FHWA Was Not Required to Prepare an EIS....................................2

    II.     The Final EA Adequately Commits to and Describes Mitigation Measures.......... 6

    III.    The FHWA Considered a Reasonable Range of Project Alternatives.................. 11

    IV.    The Final EA Sufficiently Analyzes Environmental Justice Communities.......... 16

    V.     The FHWA Adequately Assessed the Project's Effects on Battery Park City ..... 19

    VI.    Plaintiffs' Failure-to-Supplement Claim Remains Unripe ................................... 22

    VII.   The FHWA's NEPA Process Ensured Adequate Public Participation................. 24

CONCLUSION............................................................................................................ 26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advocs. For Transportation Alternatives, Inc. v. U.S. Army Corps of Engineers,*
453 F. Supp. 2d 289, 304 (D. Mass. 2006) .................................................. 8

*Akiak Native Cmty. v. U.S. Postal Serv.,*
213 F.3d 1140, 1146 (9th Cir. 2000) ......................................................... 8

*Am. Rivers v. FERC,*
895 F.3d 32 (D.C. Cir. 2018) .................................................................... 9

*Becker v. Fed. Railroad Admin.,*
999 F. Supp. 240 (D. Conn. 1996) ............................................................. 8

*Brodsky v. United States NRC,*
704 F.3d 113 (2d Cir. 2013) ..................................................................... 24

*California Trout v. Schaefer,*
58 F.3d 469, 475 (9th Cir.1995) ................................................................ 8

*Center for Envt'l Law and Policy v. U.S. Bureau of Reclamation,*
655 F.3d 1000 (9th Cir. 2011) ................................................................... 20

*Citizens Against Burlington, Inc. v. Busey,*
938 F.2d 190 (D.C. Cir. 1991) .................................................................. 11

*Citizens for Smart Growth v. Peters,*
716 F. Supp. 2d 1215 (S.D. Fla. 2010) ....................................................... 12

*City of Alexandria, Va. v. Slater,*
198 F.3d 862 (D.C. Cir. 1999) .................................................................. 13

*City of Grapevine, Tex. v. Dep't of Transp.,*
17 F.3d 1502 (D.C. Cir. 1994) .................................................................. 11

*City of New York v. U.S. Dep't of Transp.,*
715 F.2d 732 (2d Cir. 1983) ..................................................................... 12

*Cmtys. Against Runway Expansion, Inc. v. FAA,*
355 F.3d 678 (D.C. Cir. 2004) .................................................................. 21

*Cnty. of Seneca v. Cheney,*
12 F.3d 8 (2d Cir. 1993) .......................................................................... 3

*Coal. for Healthy Ports v. U.S. Coast Guard*, No.,
   13 Civ. 5347 (RA), 2015 WL 7460018 (S.D.N.Y. Nov. 24, 2015) .................................... 5, 24

*Commonwealth of Massachusetts v. Andrus*,
   594 F.2d 872, 886 (1st Cir.1979) ......................................................................................... 8

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ............................................................................................................. 17

*Dep't of Transp. v. Public Citizen*,
   541 U.S. 752 (2004) ............................................................................................................. 14

*Duncan's Point Lot Owners Ass'n Inc. v. FERC*,
   522 F.3d 371 (D.C. Cir. 2008) ............................................................................................. 18

*E. 69th St. Owners Corp. v. Lahood*,
   797 F. Supp. 2d 326 (S.D.N.Y. 2011) .................................................................................. 24

*Envt'l Defense Ctr ("EDF") v. BOEM*,
   36 F.4th 850 (9th Cir. 2022).............................................................................................. 3, 5

*Estate of Smith v. Bowen*,
   656 F. Supp. 1093 (D. Colo. 1987) ...................................................................................... 23

*Food & Water Watch v. U.S. Dep't of Agriculture*,
   451 F. Supp. 3d 11 (D.D.C. 2020) ......................................................................................... 5

*Friends of Capital Crescent Trail v. FTA*,
   877 F.3d 1051 (D.C. Cir. 2017) ........................................................................................... 12

*Friends of Ompompanoosuc v. FERC*,
   968 F.2d 1549 (2d Cir. 1992).................................................................................................. 5

*Hillsdale Envt'l Loss Prevention, Inc. v. U.S. Army Corps of Engr's*,
   702 F.3d 1156 (10th Cir. 2012)......................................................................................... 9, 10

*Latin Americans for Social and Econ. Dev. v. Admin. of Fed. Highway Admin.*,
   756 F.3d 447 (6th Cir. 2014)................................................................................................ 14

*Lower Alloways Creek, Tp. v. Public Service Elec. & Gas Co.*,
   687 F.2d 732 (3rd Cir. 1982)................................................................................................ 25

*Marsh v. Oregon Natural Resources Council*,
   490 U.S. 360 (1989) ............................................................................................................. 24

iv

*Md. Chapter of Sierra Club v. Fed. Highway Admin.*,
No. 22-2597, 2024 WL 1194382 (D. Md. Mar. 20, 2024) ........................................ 4

*Myersville Citizens for a Rural Community, Inc. v. FERC*,
783 F.3d 1301 (D.C. Cir. 2015) ............................................................................. 13

*National Audubon Soc. v. Hoffman*,
132 F.3d 7 (2d Cir. 1997) ........................................................................................ 2

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) ................................................................................. 5

*Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*,
55 F. Supp. 3d 316 (E.D.N.Y. 2014) .................................................................. 3, 7

*NRDC v. Callaway*,
524 F.2d 79 (2d Cir. 1975) ............................................................................. 12, 14

*NRDC v. Morton*,
458 F.2d 827 (D.C. Cir. 1972) ........................................................................ 12, 13

*NRDC v. U.S. Army Corps of Engr's*,
457 F. Supp. 2d 198 (S.D.N.Y. 2006) ................................................................... 11

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
523 U.S. 726 (1998) ............................................................................................... 22

*Ohio Valley Envt'l Coal. v. Aracoma Coal Corp.*,
556 F.3d 177 (4th Cir. 2009) ................................................................................. 10

*O'Reilly v. U.S. Army Corps of Engr's*,
477 F.3d 225 (5th Cir. 2007) ................................................................................. 11

*Powder River Basin Res. Council v. U.S. Bureau of Land Mgmt.*,
37 F. Supp. 3d 59 (D.D.C. 2014) ............................................................................ 8

*Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urban Dev.*,
175 F.3d 132 (2d Cir. 1999) ................................................................................... 20

*Pub. Citizen v. Nuclear Regulatory Comm'n*,
845 F.2d 1105 (D.C. Cir. 1988) ............................................................................. 23

*Red Lake Band of Chippewa Indians v. U.S. Army Corps of Engr's*,
636 F. Supp. 3d 33 (D.D.C. 2022) .................................................................. 12, 17

v

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) ................................................................................................ 6

*Sierra Club v. Adams,*
578 F.2d 389 (D.C. Cir. 1978) ............................................................................... 17

*Sierra Club v. Van Antwerp,*
661 F.3d 1145 (D.C. Cir. 2011) .............................................................................. 5

*South Trenton Residents Against 29 v. Fed. Highway Admin.,*
176 F.3d 658 (3d Cir. 1999) .................................................................................. 22

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) .............................................................................................. 17

*Town of Fairview v. U.S. Dep't of Transp.,*
201 F. Supp. 2d 64 (D.D.C. 2002) ........................................................................ 22

*Vt. Pub. Interest Research Grp. v. U.S. Fish & Wildlife Serv.,*
247 F. Supp. 2d 495 (D. Vt. 2002) ......................................................................... 8

*Whitewater Draw v. Mayorkas,*
5 F.4th 997 (9th Cir. 2021) ................................................................................... 17

*WildEarth Guardians v. Bureau of Land Mgmt.,*
8 F. Supp. 3d 17 (D.D.C. 2014) ...................................................................... 17, 18

*WildEarth Guardians v. Jewell,*
738 F.3d 298 (D.C. Cir. 2013) .............................................................................. 17

*Wildearth Guardians v. U.S. Bureau of Land Mgmt.,*
457 F. Supp. 3d 880 (D. Mont. 2020) ................................................................... 15

**Regulations**

23 C.F.R. § 771.119 ..................................................................................................... 23

40 C.F.R. § 1501.5 ...................................................................................................... 24

40 C.F.R. § 1501.6 ........................................................................................................ 6

## PRELIMINARY STATEMENT

Plaintiffs[1] have failed to engage with the detailed record that firmly establishes that the FHWA considered the environmental effects of the Project in a manner that was neither arbitrary nor capricious.  NEPA is a procedural, environmental statute that requires certain steps to be taken; it does not demand that the government reach the same conclusions Plaintiffs would have reached. As explained in more detail below, nothing in Plaintiffs' opposition brief casts doubt on the propriety of the thorough environmental analysis conducted by the FHWA.

First, Plaintiffs fail to identify *any* effect of the Project that would render it "significant" such that an EIS would have needed to have been prepared.  Second, Plaintiffs' contention that the mitigation measures set forth in the Final EA should have been spelled out in more detail ignores both the detailed record as to mitigation and caselaw that consistently approves of providing for flexibility in the NEPA process.  Third, Plaintiffs' suggestion that, in assessing alternatives, the FHWA should have overridden New York State policy objectives mandated by state statute is antithetical to what NEPA requires and runs contrary to the federalism principles inherent in the FHWA's review of state-sponsored projects.  Fourth, Plaintiffs fail to establish that the detailed Technical Memorandum addressing the Project's effects on Environmental Justice communities was anything other than a "hard look" at issues that arose during the NEPA review process.  Fifth, Plaintiffs' argument that the lower West Side Highway should have been discussed in the Final EA's highway analysis ignores that the FHWA's detailed assessment of that area in the EA's intersection analysis.  Sixth, Plaintiffs' request that the FHWA supplement its Final EA asks the Court to improperly cut short the FHWA's ongoing re-evaluation of its Final EA; blackletter principles of administrative law favor permitting an agency to opine on a new issue in the first

[1] Unless otherwise noted, this brief utilizes the same defined terms as the Federal Defendants' opening brief.  *See* Dkt. No. 65 ("Fed. Def. Br.").

instance.  And seventh, Plaintiffs' public participation argument willfully ignores both the robust

public outreach process that the FHWA engaged in *apart from* public comment and the 70,000

comments that the public successfully submitted.

For the reasons outlined herein and in the Federal Defendants' opening brief, the

environmental analysis that led to the Final EA and FONSI was not arbitrary or capricious and

summary judgment should be granted in the Federal Defendants' favor.[2]

## ARGUMENT

### I.     The FHWA Was Not Required to Prepare an EIS

The FWHA acted well within its discretion in concluding that the Project, when accounting

for the mitigation measures reflected in the Final EA, would not cause significant impact on the

human or natural environment, and therefore that no EIS was required.  Plaintiffs' shifting

"significance" arguments to the contrary are without merit.  *See* Pls. Opp. Br. 18-21.  It is well-

established, that "whether a particular agency action will have a 'significant' effect on the

environment is a substantive question left to the informed discretion of the agency proposing the

action." *National Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).  The FHWA reasonably

exercised that discretion here.

Plaintiffs appear to have abandoned their meritless argument that an EIS was required due

to public opposition to the Project. *See* Pls. Opp. Br. 20; Fed. Defs.' Br. at 26-28, and now focus

on the size of the population and workforce of New York City and the CBD and the amount of

revenue that is expected to be generated by the Project as factors warranting preparation of an EIS.

*See* Pls. Opp. Br. at 19.  But neither the number of people in the CBD, nor the revenue-projections

for the Project, have anything to do with the significance of the *environmental impacts* of the

---

[2] Plaintiffs do not dispute that the EPA was not named as a defendant in their amended complaint and that it should accordingly be removed from the caption of the case.  *See* Fed. Def. Br. at 1 n.2.

Project. *Cf. Cnty. of Seneca v. Cheney*, 12 F.3d 8, 12 (2d Cir. 1993) ("As movant in the district court, Seneca bore the burden of showing that the [agency action] will significantly affect the physical environment as opposed to the economic health of the region.").[3]   The only concrete environmental impact that Plaintiffs point to is a passing reference to increased pollution in environmentally burdened communities of the Bronx, Richmond, Nassau, and Bergen Counties resulting from diversions of traffic.[4]   However, as discussed below, FWHA determined those impacts would be addressed through mitigation measures, which obviated any arguable need for further environmental study.

Similarly, Plaintiffs suggest, citing the Ninth Circuit's decision in *Envt'l Defense Ctr ("EDF") v. BOEM*, 36 F.4th 850, 878-79 (9th Cir. 2022), that an EIS was required because the Project was "novel."  Pls. Opp. Br. at 19.  Just as with their now-abandoned "controversy" argument, *see* Pls. Br. at 24-25, Fed. Def. Br. at 26-28, Plaintiffs' argument divorces the concept of "novelty" from the *environmental* consequences of the Project.  The Ninth Circuit's *EDF* case makes clear that novelty is about whether an "environmental threat is novel," *EDF*, 36 F.4th 850 at 879.  That is simply not the case here.  The NEPA analysis here was performed in conjunction with the Project's application for the VPPP, which was established in 1991 and "aims to

---

[3] Further to this point, Plaintiffs argue that "[b]y any of the regulatory factors refining the analysis, [the Project] is 'significant.'" Pls. Opp. Br. at 20.  But Plaintiffs do not attempt to tie any single regulatory factor to an environmental impact that the FHWA allegedly ignored.  This hasty argument fails to meet Plaintiffs' burden in challenging an agency's decision to issue a FONSI.  *See Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 55 F. Supp. 3d 316, 362 (E.D.N.Y. 2014) ("Plaintiff bears the burden of showing that the Project will significantly affect the physical environment and, thus, that the [agency's] decision to issue an EA and FONSI was arbitrary and capricious.")

[4] None of the Plaintiffs reside in the Bronx, Richmond, or Nassau counties.  *See* Am. Compl. ¶¶ 28-36.  Their complaint accordingly makes no mention of any impacts specific to those counties, or even Bergen County, where Plaintiff Carney reside, *see id.* ¶ 35.  Their complaint does mention emissions increases in Bronx County, *id.* ¶ 75, but only in service of complaints that mitigation measures were being provided in the Bronx but not being offered to Battery Park City residents and Lower Manhattan communities.  *See* Am. Compl ¶ 108.  Plaintiff Chan lodged a similar grievance in the comment she submitted during the availability period of the draft FONSI, complaining that the Bronx was being offered "millions of dollars in studies and plans terms of Asthmas related programs and HVACs for schools" but nothing similar was being provided to Battery Park City.  *See* Dkt. No. 54-9 at 3.

demonstrate whether and to what extent congestion pricing strategies can reduce congestion, while also exploring the effects of these strategies on 'driver behavior, traffic volumes, transit ridership, air quality and availability of funds for transportation programs.'"  DOT_37184, 37215.  As detailed on the FHWA's congestion pricing webpage, which is cited in the Final EA, "[t]here are currently 10 State-led programs participating in the VPPP: California, Connecticut, Florida, Maryland, Minnesota, Nevada, New York (State), Oregon, Texas, and Virginia. Many of these programs have multiple projects."  FHWA, *Value Pricing Pilot Program*, *available at* https://ops.fhwa.dot.gov/congestionpricing/value_pricing/index.htm.[5]  Although this may be the first time congestion pricing is applied to a city's central business district (*i.e.* "cordon pricing") in the United States, such projects have been successfully implemented in London, Stockholm, Singapore, and Milan,  DOT_37235, 37308, and information from some of those projects was used to inform the analysis conducted here. *See, e.g.,* DOT_37308, 37339, 37340, 37351, 37463, 37587, 37629.  And more broadly, the FHWA has significant expertise in assessing the impact of tolling on driving behavior, traffic volumes, transit ridership and air quality.  *See, e.g.*, *Md. Chapter of Sierra Club v. Fed. Highway Admin.*, No. 22-2597, 2024 WL 1194382 (D. Md. Mar. 20, 2024) (assessing impacts of construction of high-occupancy toll lanes).  Congestion pricing strategies are not novel and the impacts of such strategies on driving behavior, traffic volumes, transit ridership and air quality have been available for review for years.

Plaintiffs also seem to argue that the fact that the FONSI included mitigation measures is an admission that an EIS was required, *see* Pls. Opp. Br. at 20.  However, where mitigation measures will reduce expected environmental impacts below a level of significance, courts have

---

[5] For example, variable pricing has been used on I-15 in San Diego, California, and the Midpoint and Cape Coral toll bridges in Lee County, Florida, since 1998. *See* FWHA, *Congestion Pricing Examples Across the U.S.*, *available at* https://ops.fhwa.dot.gov/congestionpricing/resources/examples_us.htm.

found that no EIS is required. *See, e.g.*, *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1556-57 (2d Cir. 1992) ("[W]e conclude that FERC took the requisite "hard look" at the environmental impact of the Project . . . [including] propos[ing] measures to minimize certain unavoidable environmental impacts. Under these circumstances, and given that [the agency's] findings regarding the adequacy of mitigative measures are supported by substantial evidence, FERC has 'convincingly documented' its finding of no significant impact."); *Coal. for Healthy Ports v. U.S. Coast Guard*, No. 13 Civ. 5347 (RA), 2015 WL 7460018, at *20 (S.D.N.Y. Nov. 24, 2015) ("[U]pon determining that project impacts will be significant, an agency may consider the potential for mitigation measures to minimize those impacts such that it can forgo preparing an EIS").  Here, as discussed below and in the Federal Defendants' opening brief, the FONSI and Final EA detail a firm commitment to mitigation measures intended to minimize potential environmental impacts of the Project.  And Plaintiffs are similarly wrong that preparation of a FONSI shifts the burden of proof to the agency.  Pls. Opp. Br. at 19.  *See, e.g., Food & Water Watch v. U.S. Dep't of Agriculture*, 451 F. Supp. 3d 11, 26 (D.D.C. 2020) ("[R]eview of an agency's decision to forego preparation of an EIS must be deferential.").  Indeed, the D.C. Circuit has rejected the contention that courts must apply anything more than the deferential arbitrary and capricious standard of review to a decision to apply mitigation to reach a finding of no significant impact.  *See Sierra Club v. Van Antwerp*, 661 F.3d 1145, 1154 (D.C. Cir. 2011).[6]

---

[6] Even under the Ninth Circuit's "substantial questions" test cited by Plaintiffs, Pls. Opp. Br. at 19, which has not been adopted in the Second Circuit, the burden remains on the plaintiff.  *EDC*, 36 F.4th at 878-79.  Under that standard "it does not follow that the presence of some negative effects necessarily rises to the level of demonstrating a significant effect on the environment," and the Ninth Circuit has "decline[d] to interpret NEPA as requiring the preparation of an EIS any time that a federal agency discloses adverse impacts . . . or acknowledges information favorable to a party that would prefer a different outcome.  NEPA permits a federal agency to disclose such impacts without automatically triggering the 'substantial questions' threshold."  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005).

## II.      The Final EA Adequately Commits to and Describes Mitigation Measures

Plaintiffs' protestations that the Project Sponsors have insufficiently described or committed to mitigation measures ignores the detailed record at issue.  As explained further below, the Project Sponsors have explicitly committed to funding and implementing specific mitigation measures.  The process by which those measures will be finalized stands to *benefit* affected communities by ensuring that mitigation is appropriately tailored to local needs and feedback.  And the FHWA appropriate analyzed the efficacy of the measures that will be implemented.  The Project Sponsors' and the FHWA's process for implementing mitigation thus more than meets NEPA's procedural requirements, which permit flexibility in delineating mitigation plans.

To begin, the FONSI and Final EA repeatedly detail a firm commitment to mitigation.  The FONSI explains the Project Sponsors "will" implement various place-based mitigation measures. DOT_382; *see also* DOT_372 (mitigation commitment in form of monitoring for traffic effects); DOT_380-81 (financial mitigation for low-income drivers); DOT_382-83 (regional and place-based mitigation for environmental justice traffic effects).  And it states that "[t]he Project Sponsors *commit* to ongoing monitoring and reporting of potential effects of the Project, including, for example . . . air quality and emissions trends . . .  A formal report on the effects of the Project will be issued one year after implementation and then every two years."  DOT_382 (emphasis added).  These commitments meet NEPA's procedural requirements, given that the Supreme Court has explained that "it would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989); *see also* 40 C.F.R. § 1501.6(c).  Although certain mitigation measures must be developed further, the FONSI's monetary commitment to certain

measures, with a process for siting those measures responsive to community input, is an appropriate way for the NEPA process to have unfolded, particularly given the mitigation commitment includes "monitoring the efficacy of mitigation, stakeholder consultation, and adjustments as warranted."  DOT_37017; *see also Nat'l Audubon Soc'y* , 55 F. Supp. 3d at 365 ("Since the mitigation measures in the EA are nondiscretionary and include, *inter alia*, a program to monitor and ensure their effectiveness, they are supported by substantial evidence.").

Moreover, the record contradicts Plaintiffs' contention that FHWA "defer[red] consideration of mitigation measures until a future date."  Pls. Opp. Br. at 22.  Instead, and partly in response to input from agencies such as the EPA, the FHWA worked with the Project Sponsors to ensure the mitigation measures detailed in the Final EA were appropriately targeted to the anticipated effects of the Project.  Plaintiffs cite to correspondence from the FHWA and EPA indicating preliminary concerns about mitigation, *see* DOT_44982, 45088, but those communications were followed by a robust process for further delineating mitigation, including two meetings of the Environmental Justice Technical Advisory Group ("EJ TAG") which involved the solicitation of community input on mitigation and the development of certain measures.  *See* DOT_41528-29; DOT_41554-61; *see also* DOT_40514 (outreach to EJ TAG members requesting comments on sufficiency of certain funding commitments); DOT_37038-39.  Following that consultative process (which resulted in additional commitments to mitigation from the Project Sponsors), the EPA acknowledged the "improvements throughout the NEPA process," including "[i]mproved clarity regarding mitigation commitments to address disproportionately high and adverse impacts both within and outside the Central Business District" and "[p]laced-based mitigation to respond to the potential public health impacts in neighborhoods that may experience

an increase in vehicular traffic." DOT_45366. As such, Plaintiffs are incorrect that federal agencies viewed the ultimate mitigation commitment as insufficient.[7]

Plaintiffs are similarly wrong in claiming the mitigation package is entirely dependent on the final tolling schedule. Instead, "[t]he Project Sponsors [have] commit[ted] to [mitigation] measures, regardless of the tolling structure eventually adopted." DOT_37017. To that end, the Final EA outlines the *kinds* of mitigation that will be implemented in detail. *See* Fed. Def. Br. at 38 (summarizing some of the mitigation that will be implemented). And the commitment to finalize specific locations for mitigation was a reasonable response to the fact that "[t]he specific census tracts that would experience increased or decreased truck traffic change slightly depending on the tolling scenario." DOT_7325. This approach is entirely proper under NEPA. *See Vt. Pub. Interest Research Grp. v. U.S. Fish & Wildlife Serv.*, 247 F. Supp. 2d 495, 525 (D. Vt. 2002) ("There is no substantive requirement that a complete mitigation plan be actually formulated, finalized, adopted, or legally enforceable."); *Becker v. Fed. Railroad Admin.*, 999 F. Supp. 240, 250 (D. Conn. 1996) ("Implementation can properly be deferred until the [project] is further along and the actual impact can be more accurately assessed.").

Indeed, affected parties stand to *benefit* from deferred finalization of mitigation measures. DOT_382 (explaining that mitigation siting will be responsive to community input). The process outlined in the Final EA for siting mitigation measures will increase the effectiveness of mitigation by ensuring not only that mitigation is appropriately targeted to the communities most impacted by traffic diversion from the Project, but also that it is responsive to community concerns. *See*

---

[7] In any event, "NEPA requires only that the responsible agency 'consider [other] agencies' initial concerns, address[ ] them, and 'explain[ ] why it found them unpersuasive.' " *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1146 (9th Cir. 2000) (quoting *California Trout v. Schaefer*, 58 F.3d 469, 475 (9th Cir.1995)); *see also Commonwealth of Massachusetts v. Andrus,* 594 F.2d 872, 886 (1st Cir.1979) ("NEPA requires only that an agency respond adequately to EPA criticisms of a proposed action; the EPA view is not to be treated as controlling."); *Advocs. For Transportation Alternatives, Inc. v. U.S. Army Corps of Engineers*, 453 F. Supp. 2d 289, 304 (D. Mass. 2006) (same, and noting that the substantive issues that EPA raised were subsequently addressed in the NEPA process).

*Powder River Basin Res. Council v. U.S. Bureau of Land Mgmt.*, 37 F. Supp. 3d 59, 82 (D.D.C. 2014) (agency could "determine the appropriate mitigation measures to pursue based on evaluating the measurable performance standards" to "choose the best mitigation measures to use based on the feedback" it received).  By contrast, the primary authority on which Plaintiffs rely, *Am. Rivers v. FERC*, 895 F.3d 32, 54 (D.C. Cir. 2018), involved a mitigation plan that was entirely deferred. Here, while the specific tracts entitled to mitigation might change, the eligible communities and measures that will be utilized are fixed.  "Flexible mitigation plans are acceptable." *Hillsdale Envt'l Loss Prevention, Inc. v. U.S. Army Corps of Engr's*, 702 F.3d 1156, 1174 (10th Cir. 2012); *see also id.* (approving plan that would rely on monitoring period to determine the nature and extent of mitigation to be implemented).

Plaintiffs' criticism of the process to site the final mitigation measures is also without merit. The FONSI explains that "specific siting of place-based mitigation measures will require[] further coordination between the Project Sponsors, the Environmental Justice Community Group[,] . . . the relevant communities receiving the place-based mitigation, and relevant local and state implementing agencies."  DOT_382; *see also* DOT_390-91.  The Final EA, in turn, elaborates that following adoption of the final tolling schedule:

> a process that includes both additional analyses and community input will take place to determine the sites of the other five place-based mitigation measures (*e.g.*, in which schools to install air filtration units, or on what roadways to plant vegetation). This will require coordination between the Project Sponsors, the Environmental Justice Community Group (representing the 10-county environmental justice study area, and as described further in Table 17-18), the relevant communities receiving the place-based mitigation, and local implementing agencies, and will include needs assessments and feasibility screening to determine the range of possibilities.

DOT_37017; *see also* DOT_3570 ("The specific place-based mitigation sites will be made available to the public through the Project website, as well as direct emails to members of the

9

public who have signed up to receive information about the Project.").  The Final EA describes the process for siting specific measures in even more detail.  For example, as to school air filtration units, "[t]he Project Sponsors will work with relevant school authorities to assess needs and analyze feasibility of upgrading existing filtration systems in schools in census tracts within 300 meters of highways where truck traffic is projected to increase."  DOT_3570-71. "Factors will include the design and performance of existing HVAC systems, the facility's proximity to highways, and the area asthma rates, as well as scheduled capital projects." *Id.*  This process will ensure that mitigation is targeted to areas with the greatest need, responsive to community input.

Last, the Final EA includes an assessment of the effectiveness of the mitigation measures that will be implemented.  *See* DOT_3677, 7321-28; 37017-20 (discussing mitigation effectiveness).  For example, "[r]eplacement of polluting transport refrigeration units (TRUs) at the Hunts Point Produce Market could lead to as much as 21 tons of $NO_x$ and 2.5 tons of $PM_{2.5}$ reduction per year for every 100 TRUs."  DOT_7325.  Further, "[t]wo greening mitigation measures—the installation of roadside vegetation to improve near-road air quality and the renovation of parks and greenspaces—would help to improve community well-being and can have multiple other benefits such [as] reducing air temperatures, preventing stormwater runoff, and increasing social interaction."  *Id*.  And "[t]he installation of air filtration units in schools near highways with truck traffic increases would help to mitigate effects at schools, which are sensitive receptor sites.  Deployment would be modeled after . . .  upgrades at Lehman High School in the Bronx to reduce air quality impacts from proximity to the Hutchinson River Parkway."  DOT_7328.  These detailed discussions of each of the mitigation measures more than satisfies NEPA.  *See Ohio Valley Env't'l Coal. v. Aracoma Coal Corp.*, 556 F.3d 177, 205-06 (4th Cir. 2009) ("Because the mitigation measures reflect the [agency's] determinations of the most

appropriate and practicable means of compensating for anticipated impacts . . . we cannot say that the [agency's] conclusion that compensatory mitigation would offset the adverse effects of the [] activity was arbitrary [or] capricious.").

Plaintiffs again rely on *O'Reilly v. U.S. Army Corps of Engr's*, 477 F.3d 225, 234 (5th Cir. 2007), to argue that the Final EA's analysis of efficacy is only "perfunctory," Pls. Opp. Br. at 23, but that matter involved mitigation the court characterized as "cursory" and where the "feasibility of the mitigation measures [was] not self-evident." *Id.* Here, the FHWA noted mitigation was intended to "meaningfully address areas of concern," DOT_41536, and directly addressed the intended benefits. DOT_41557-60. No more is required. *See NRDC v. U.S. Army Corps of Engr's*, 457 F. Supp. 2d 198, 220 (S.D.N.Y. 2006) ("A proposed mitigation measure should be accompanied by some level of assurance as to its efficacy.").

### III.    The FHWA Considered a Reasonable Range of Project Alternatives.

As explained in the Federal Defendants' opening brief, the FHWA analyzed both the Project and a no-action alternative after determining that other options would not meet the MTA's statutory objectives. Fed Def. Br. at 39-42. Plaintiffs' arguments in opposition run contrary to governing law and rely on mischaracterizations of the record.

To begin, Plaintiffs are incorrect that the FHWA was required to consider alternatives that would not meet the Traffic Mobility Act's revenue-generation goals. Pls. Opp. Br. at 28-29. Instead, "where a federal agency is not the sponsor of a project, the Federal government's consideration of alternatives may accord substantial weight to the preferences of the . . . sponsor in the . . . design of the project." *City of Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) (quotation marks omitted); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) ("Congress did not expect agencies to determine for the

applicant what the goals of the applicant's proposal should be.").  This is particularly so given "the relationship of . . . [the] FHWA to [a government sponsor] should be one that is premised on the idea that the representatives of the community are best situated to make the decisions regarding transportation planning for their community." *Citizens for Smart Growth v. Peters*, 716 F. Supp. 2d 1215, 1224 (S.D. Fla. 2010).  And it applies all the more when the project sponsor is a government agency pursuing project objectives set by state law: "Statutory objectives provide a sensible compromise between unduly narrow objectives an agency might choose to identify to limit consideration of alternatives and hopelessly broad societal objectives that would unduly expand the range of relevant alternatives."  *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 743 (2d Cir. 1983); *see also NRDC v. Callaway*, 524 F.2d 79, 93 (2d Cir. 1975) ("[T]here is no need to consider . . . alternatives which could only be implemented after significant changes in governmental policy or legislation.").[8]

Acting within the confines of state legislative directives to raise revenue and reduce traffic congestion in the CBD, it is neither surprising nor problematic that the FHWA ultimately conducted an in-depth analysis of only two alternatives—the no-action alternative and the Project (which itself had seven variations analyzed, *see* DOT_36301).  When state administrative or legislative process leads to the selection of a specific project that then undergoes NEPA review, it is commonplace for only two alternatives to be considered.  *See, e.g.*, *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Engr's*, 636 F. Supp. 3d 33, 62 (D.D.C. 2022) (permitting consideration of only proposed project and no-action alternative because "[t]he Corps was not required to 'reinvent the wheel' by reviewing alternative routes in which [the project sponsor] was

---

[8] Plaintiffs cite *NRDC v. Morton*, 458 F.2d 827 (D.C. Cir. 1972), for the opposite proposition.  Pls. Opp. Br. at 29. However, the Second Circuit has expressly disagreed with the D.C. Circuit's analysis in that matter.  *See City of New York*, 715 F.2d at 743 n.11 (noting that the law in the Second Circuit is "at odds" with *Morton*).

not legally authorized to construct the [proposed project]," following siting decision by state regulatory commission); *Friends of Capital Crescent Trail v. FTA*, 877 F.3d 1051, 1056 (D.C. Cir. 2017) (noting that after "Maryland chose [a project] as its locally preferred alternative," the federal agencies' "ultimate decision was to decide whether or not to fund the preferred alternative," justifying consideration of only the project and a "no-build" option). Moreover, Plaintiffs' suggestion that the FHWA analyzed "no" alternatives, *see* Pls. Opp. Br. at 27, is completely inaccurate. The Final EA discusses eleven alternatives before moving on to discuss seven Project scenarios in greater detail. *See* DOT_36262-301. This was more than satisfactory, particularly given that "[a]n Environmental Assessment must include" only "a 'brief discussion' of reasonable alternatives to the proposed action." *Myersville Citizens for a Rural Community, Inc. v. FERC*, 783 F.3d 1301, 1323 (D.C. Cir. 2015) (quoting 40 C.F.R. § 1508.9(b)) (alterations omitted).

Nor was the FHWA required to consider alternatives that would fall short of the MTA's revenue-generation goals, as Plaintiffs suggest. Pls. Opp. Br. at 5, 27. Plaintiffs cite *NRDC v. Morton* for the proposition that alternatives may not be disregarded "merely because they do not [individually] offer a complete solution to the problem." Pls. Opp. Br. at 5 (citing 458 F.2d at 836). But the D.C. Circuit has since clarified that *Morton* holds true only when "other agencies might be able to provide the remainder of the solution." *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 869 (D.C. Cir. 1999). Nothing in Plaintiffs' brief claims that other agencies could step in to reduce congestion in the CBD or meet the Traffic Mobility Act's revenue generation requirements. "In this context, it is simply a *non sequitur* to call a proposal that does not 'offer a complete solution to the problem' a 'reasonable alternative.'" *Id.*

Plaintiffs also suggest that the FHWA should have analyzed "combination[s] of alternatives . . . even if any one particular alternative alone was insufficient to meet the stated

13

revenue target." Pls. Opp. Br. at 29. But of the eleven alternatives initially assessed by the FHWA, only half were revenue generating at all, and even fewer would generate revenue for the MTA, rather than the City of New York. DOT_36266-67. The FHWA was not obliged to consider alternatives that would require "significant changes in governmental policy," *Callaway*, 524 F.2d at 93, like a funding reallocation between the City and MTA, and Plaintiffs point to no "combination of alternatives" that could plausibly meet the Project's objectives. And again, the FHWA's need to evaluate alternatives that were not authorized by the Traffic Mobility Act was limited, given "it is not a violation of NEPA for an agency to decline to consider further an alternative if the agency is unlikely to secure required approval to move forward with that alternative." *Latin Americans for Social and Econ. Dev. v. Admin. of Fed. Highway Admin.*, 756 F.3d 447, 470 (6th Cir. 2014). Plaintiffs also note that the EPA commented that some considered alternatives "might make suitable mitigation" and that "[o]ther congestion-reducing projects the City or State are working on should also be connected and noted." DOT_45084. But the FHWA appropriately responded to the EPA's suggestions, noting that potential alternatives that "do not meet all of the Program's objectives," are "not mutually exclusive" with the Project "and, therefore, are not precluded from being implemented." DOT_7932.

Finally, Plaintiffs' suggestions that the FHWA should have further considered dynamic tolling regimes and phased-in project implementation are without merit. Pls. Opp. Br. at 29-31. As an initial matter, Plaintiffs mischaracterize the comments they cite in support of their claim that "phased-in implementation" was raised during the administrative process, *see* Dkt. No. 78-2 at 2. Those comments are not about phased-in implementation. Rather, both comments discuss the limited issue of providing a phased-out credit for low-income drivers. *See* DOT_7677-78; DOT_31317. Plaintiffs have thus forfeited their challenge on the issue, which is not "so obvious

that there is no need for a commentator to point [it] our specifically." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 765 (2004). But, in any event, even without phased-in implementation, the tolling scenarios analyzed by FHWA were projected to narrowly meet the MTA's revenue-generating objectives. *See* DOT_36301. Plaintiffs' suggestion that a phased-in approach would meet revenue-generating objectives and thus be a reasonable alternative is accordingly without support in the record.

Moreover, Plaintiffs now seem to acknowledge by omission that variable pricing *was considered*—indeed, it is a core feature of the Project. DOT_36298 (noting that "[t]he effect of variable tolling at different times of the day" was considered in each analyzed tolling scenario). As to "dynamic pricing," the FHWA repeatedly explained why it was rejected as an alternative, noting that it is important for people to know toll prices before they decide to enter the CBD and that there are difficulties with implementing dynamic pricing in a large and complex region like the CBD. DOT_7498, 7944. These descriptions were sufficient to meet the FHWA's NEPA obligations. An agency need only "briefly discuss why it chose to eliminate any alternative proposed, but not evaluated," even in the context of an EIS. *Wildearth Guardians v. U.S. Bureau of Land Mgmt.* 457 F. Supp. 3d 880, 890 (D. Mont. 2020). That is doubly so given that the Traffic Mobility Act *mandated* variable, rather than dynamic, tolling. *See* N.Y. Veh. & Traf. L. § 1704-a(1) ("[T]he Triborough bridge and tunnel authority shall have the power . . . to establish and charge variable tolls.").

In short, the FHWA's analysis of alternatives to the Project was sufficiently detailed, especially given the state legislative priorities underlying the Project.

**IV.     The Final EA Sufficiently Analyzes Environmental Justice Communities.**

Although Plaintiffs attempt to cast doubt on the sufficiency of the FHWA's analysis of the effects of the Project on environmental justice communities, the record reflects the agency engaged in a responsive and detailed assessment of the issue.

For example, Plaintiffs cast aspersions on the FHWA's analyses by focusing on comments that the EPA and the FHWA made on *drafts* of the EA in 2022, which pointed out that those early drafts identified "no adverse impacts" on environmental justice communities, that traffic diversions should be more thoroughly analyzed, that the Project Sponsors should commit to mitigate air quality impacts, and that air quality impacts should be more robustly analyzed.  Pls. Opp. Br. at 31 (citing DOT_44943, 44982, 45029).  But this feedback process is exactly how the NEPA process is meant to function.  As a result of this collaborative inter-agency effort, the Final EA, its added Technical Memorandum, and the FONSI *address each of these early suggestions*. *See, e.g.*, DOT_380-83 (identifying potential adverse effects to environmental justice communities and summarizing contemplated mitigation); DOT_7313-28 (discussing new air quality mitigation measures); DOT_7288-312 (further studying air quality).

Plaintiffs' characterization of the Technical Memorandum that resulted from the NEPA process as "cursory," Pls. Opp. Br. at 32, is barely credible; instead, that document is detailed,  88-page review of the effects of the Project on environmental justice communities, and one that Plaintiffs concede identifies "areas that have pre-existing pollutant or chronic disease[] burdens and explain[s] the effects of congestion and pollution."  Pls. Opp. Br. at 33; *see* DOT_7243-7330. Plaintiffs' arguments expose their failure to engage with the Technical Memorandum.  While they argue that "[a]ir quality mitigation for Plaintiffs in the Lower East Side was not addressed," Pls. Opp. Br. at 33, the Technical Memorandum explicitly addresses a mitigation measure designed to

avoid air quality impacts to the Lower East Side that "could be avoided by ensuring that any vehicle" taking a specific route "is tolled, thereby disincentivizing the" route, DOT_7323.   And Plaintiffs' criticism of the FHWA for utilizing Tolling Scenario "E" to model truck traffic increases, Pls. Opp. Br. at 33-34, also ignores the record.   Plaintiffs contend that modeling should have used the tolling scenario which showed the highest increases to truck traffic on a "census tract" rather than "county-wide" basis. *Id.* at 33.   *But that is exactly what the FHWA did.   See* DOT_7291 ("Tolling Scenario E has the maximum truck diversions by volume for all census tracts in the 10-county environmental justice study area.").

Finally, Plaintiffs take issue with the FHWA's identification of the communities eligible for place-based mitigation.   They argue that the FHWA failed to offer an "explanation as to how the 13 census tracts" eligible for mitigation were selected and that the agency's methodology improperly excluded certain Staten Island communities.   Pls.' Opp. Br. at 34.[9]   But the Technical Memorandum explains how the census tracts were selected.   First, a larger group of communities was identified "where individuals experience either pre-existing pollutant burdens or chronic-

---

[9] Plaintiffs' new focus on mitigation in Staten Island brings their standing problem into focus.   Even after submitting six new declarations, none of the Plaintiffs establish that they have any injuries related to the impact of the Project on Staten Island.   *See generally* Dkt. Nos. 78-4, -14, -15, -16, -17, -18.   Although Plaintiffs argue that even *one* Plaintiff establishing an injury with respect to *one* aspect of the Project is sufficient to confer standing for *all* Plaintiffs to assert *any* arguments, *See* Pls. Opp. Br. at 9-13, their position is at odds with standing jurisprudence which *always* requires that a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).   In other words, "a claim of procedural injury does not relieve [p]laintiffs of their burden . . . to demonstrate causation and redressability." *Whitewater Draw v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir. 2021).   The Supreme Court has made clear that "a plaintiff must demonstrate standing for each claim he seeks to press . . . [and] must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (internal citations omitted).   "Standing is not dispensed in gross." *Id.* at 353. Indeed, as the D.C. Circuit has noted, it is unclear whether *Sierra Club v. Adams*, 578 F.2d 389, 393 (D.C. Cir. 1978), on which Plaintiffs rely, remains viable following *DaimlerChrysler. See WildEarth Guardians v. Jewell*, 738 F.3d 298, 307–08 (D.C. Cir. 2013) ("[W]e express no opinion on whether the 'public interest' rationale [of *Adams*] remains cognizable in light of subsequent Supreme Court precedent."); *see also WildEarth Guardians v. Bureau of Land Mgmt.*, 8 F. Supp. 3d 17, 29-30 (D.D.C. 2014) (referring to the "derivative standing" theory articulated in *Adams* as "troubled waters").   Here, none of Plaintiffs' injuries were caused by any alleged failure of the FHWA to consider environmental impacts on Staten Island.   And none would be redressed if the Court ordered the FHWA to further assess those impacts.

disease burdens at or above the 90th percentile among all communities in the United States, and where the Project could increase exposure to truck traffic due to traffic diversions as well as related pollutants and associated health effects."  DOT_7318-20.  The Technical Memorandum commits $55 million to regional mitigation measures to reduce truck diversions and emissions to mitigate air quality effects on those communities.  DOT_7323.  But in addition, the FHWA identified a smaller group of even more environmentally burdened communities—a sub-group of "census tracts where individuals experience at least one pre-existing pollutant burden and at least one pre-existing chronic disease burden at or above the 90th percentile, nationally, and where truck proximity could increase as a result of the Project."  DOT_7324; *see also* DOT_7439-40 (noting specific tracts).  Because those groups experienced greater burdens, the Project Sponsors provided them with additional mitigation.  *See* DOT_7324-28.

The agency made the reasonable choice to focus finite resources on those communities with the highest burdens.  Thus, although Plaintiffs question why no Staten Island census tracts qualified for place-based mitigation, the Technical Memorandum makes clear that Richmond County was significantly less burdened than areas like Hunts Point that were selected for place-based mitigation.  DOT_7319.  In other words, place-based mitigation was reserved for areas with either the highest degree of pre-existing burdens or the highest anticipated increases to truck traffic.  DOT_7325.  By contrast, "[l]ocations with neither high pre-existing burdens, nor large increases in truck traffic, that may experience adverse effects from Project-related diversions will be addressed more broadly through regional mitigation."  *Id.*  This is a reasonable delineation.  *See Duncan's Point Lot Owners Ass'n Inc. v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008) ("The NEPA process involves an almost endless series of judgment calls, and [t]he line-drawing decisions

necessitated by [the NEPA process] are vested in the agencies, not the courts.") (citation and quotation omitted).

## V.   The FHWA Adequately Assessed the Project's Effects on Battery Park City

Plaintiffs' critiques of the Final EA's assessment of the effects of the Project on traffic conditions around Battery Park City all argue around the fact that the Final EA thoroughly analyzed four intersections along West Street, adjacent to Battery Park City, and found that the Project would *reduce* traffic in those locations.  Fed. Def. Br. at 15, 30-32.

First, Plaintiffs criticize the fact that the FHWA analyzed only "a handful of intersections adjacent to (not within) BPC and the entire West Side Highway."  Pls. Opp. Br. at 7.  But they ignore that these intersections were selected because they were identified as those "most likely [to] experience increases in traffic under the various tolling scenarios, as identified by the BPM." DOT_36475.  The FHWA's traffic modeling comports with basic intuition.  The four intersections studied along West Street adjacent to Battery Park City sit upon an exempted thoroughfare.  The intersections *within* Battery Park City, which can only be accessed if drivers pay the congestion toll and enter local roads, are plainly less likely to experience increased traffic, as the FHWA's traffic modeling confirms.

Second, Plaintiffs argue that West Street should have been afforded a highway analysis separate from the rest of the West Side Highway.  But West Street was not separately analyzed because it was not modeled as likely to experience traffic volume increases using the BPM.  *See* Fed. Def. Br. at 30-31 (citing DOT_46340, 36411).  But even so, Plaintiffs objections elevate form over substance.  West Steet *was* analyzed specifically.  The six intersections assessed along West Street—distributed from its southernmost to its northernmost points—were not expected to experience traffic increases under the Project.  *See* DOT_36476, 36489.  It is of no moment that

the analysis of West Street is found in a section titled "Intersection Impact Assessment" rather than "Highway Assessment." *See, e.g.*, *Center for Envt'l Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1009 (9th Cir. 2011) ("Although this evidence is not presented in the cumulative effects section of the EA, it would impermissibly elevate form over substance to hold that [the agency] must replicate its entire analysis under the heading of cumulative effects.").

Third, Plaintiffs continue to express confusion that the Final EA could simultaneously acknowledge increased traffic volume to the Hugh L. Carey Tunnel under some tolling scenarios, *see* Pls. Opp. Br. at 35 (citing DOT_36370), while finding decreased congestion at intersections analyzed along West Street. Fundamentally, Plaintiffs' concerns all derive from *analyses in the Final EA*. The fact that those analyses are present disproves Plaintiffs' theory that Battery Park City was inadequately analyzed. In any event, there is nothing contradictory about the Final EA's discussion of traffic from the Hugh L. Carey Tunnel and West Street. The Hugh L. Carey Tunnel connects to both West Street *and* the FDR Drive. And traffic enters West Street from locations other than the Hugh L. Carey Tunnel, like the Holland Tunnel. Nothing about an increase in traffic volume to the Hugh L. Carey Tunnel necessitates traffic increases along West Street.

Finally, Plaintiffs raise three challenges to the FHWA's modeling and data, arguing that the agency's analyses are incorrectly predicated on a cap imposed on for-hire vehicles, which has since been eliminated; that it should not have relied on pre-COVID traffic data on the manner that it did; and that it made improper use of "worst-case scenarios" in its analysis. Pls. Opp. Br. at 3-4, 37. First, Plaintiffs' arguments regarding the for-hire vehicle was not raised in their opening brief and should thus be disregarded. *See Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urban Dev.*, 175 F.3d 132, 140-41 (2d Cir. 1999) (holding argument to be forfeited where party failed to raise it until reply brief). In any event, Tolling Scenario D, which was used to

20

analyze traffic effects in intersections around Battery Park City, *did not* anticipate a cap imposed on for-hire vehicles.  *See* DOT_36293.  In other words, the tolling scenario utilized to analyze traffic effects matches the final tolling schedule in its treatment of for-hire vehicles.

Second, Plaintiffs' contention that the Final EA's reliance on pre-COVID data for its analysis was "inexplicable and unreasonable," Pls. Opp. Br. at 6, is similarly meritless.  The FHWA instead explained both in the Final EA and in response to comments that the use of pre-COVID data "reflects the return of traffic volumes and other conditions to pre-pandemic levels." DOT_3620, 36242.  Although at this point, traffic levels have only "largely returned," use of pre-COVID data has the added benefit that "[i]f traffic . . . levels do not fully rebound, then the use of pre-pandemic information for the baseline analysis results in predictions of larger negative effects as a result of the proposed CBD Tolling Alternative than would actually occur."  DOT_3620.  In other words, the FHWA's data methodology is *more conservative* than Plaintiffs' proposal.  And, in any event, an agency's "choice among reasonable analytical methodologies is entitled to deference." *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004).

And, third, Plaintiffs' other methodological challenge—that the FHWA should not have relied on a "worst-case scenario" analysis in assessing different modeled tolling scenarios, Pls. Opp. Br. at 3-4—provides no reason to second-guess the FHWA.  Courts have affirmed the use of similar methodologies.  *See, e.g.*, *Sierra Club v. Watkins*, 808 F. Supp. 852, 866 (D.D.C. 1991) (explaining agency appropriately "used bounding values for several variables that conservatively estimated the risks").  Indeed, an agency may "reasonably" "create[e] its models with the best information available when it beg[ins] its analysis and then check[] the assumptions of those models as new information became available." *Vill. of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 71 (D.C. Cir. 2006).  Here, the FHWA's methodology satisfied that standard and the

forthcoming re-evaluation will provide a check to ensure that the FHWA's analysis remains valid based on the final tolling schedule. The Final EA's approach also accounted for the fact that the TBTA's ultimate tolling schedule was required to be based, in part, on environmental impacts including air quality and emissions trends, like those assessed by the FHWA. DOT_4539. Thus, the FHWA's use of the worst-case scenario for each resource area, coupled with a re-evaluation that will consider the final tolling schedule, was a reasonable approach to solving the "'chicken or egg' conundrum" by "consider[ing] hypothetical situations that represented the spectrum of foreseeable results." *N. Alaska Envt'l Ctr. v. Kempthorne*, 457 F.3d 969, 976 (9th Cir. 2006).

## VI.  Plaintiffs' Failure-to-Supplement Claim Remains Unripe.

As explained in the Federal Defendants' opening brief, Plaintiffs' claim that the FHWA failed to supplement its Final EA in light of the tolling schedule adopted by the TBTA is unripe because Plaintiffs filed suit before the FHWA had the opportunity to re-evaluate its Final EA to account for the TBTA's action. Fed. Def. Br. at 50-52. Plaintiffs' opposition brief provides no reason to conclude otherwise.

To begin, Plaintiffs' contention that they seek supplementation rather than re-evaluation misunderstands the purpose of the FHWA's re-evaluation process. Pls. Opp. Br. at 37-38. Re-evaluation is a *pre-condition* to the FHWA's decision whether to supplement an EA. NEPA Re-Evaluation Joint Guidance at 1 (noting that the purpose of "re-evaluating environmental documents or decisions" is "to determine whether the original document or decision remains valid" in light of new information, or whether "a supplemental or new analysis (e.g., supplemental [EIS] or [EA] is needed"); *see also South Trenton Residents Against 29 v. Fed. Highway Admin.*, 176 F.3d 658, 661 (3d Cir. 1999) ("[T]he purpose of [a] Reevaluation [is] to determine whether . . .

[s]upplemental [NEPA review is] necessary.").  Until that re-evaluation is completed, the Court will have no record upon which to decide whether supplementation is required.

Furthermore, Plaintiffs suggest that their failure-to-supplement claim is ripe because the MTA adopted a tolling schedule that differs from the scenarios contemplated by the Final EA.  Pls. Opp. Br. at 38-39.  But the ripeness of a claim is dependent on analysis of three factors set forth in *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998), which require courts to consider: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with administrative action; and (3) whether the court would benefit from further factual developments.  Each factor counsels in favor of finding Plaintiffs' claim unripe.  As to the first, there is no risk that the Project will take effect before the FHWA completes its re-evaluation; instead NEPA review is a pre-condition to final federal approval of the Project under the VPPP.  DOT_36195.  As to the second, judicial intervention would interfere with the FHWA's own expert re-evaluation of the relationship between its Final EA and FONSI and the tolling schedule, which will involve the input of the final tolls into the traffic model used to predict effects in the Final EA to assess whether "the effects of the final tolling rates and structure are consistent with the effects disclosed in the Final EA."  DOT_394; *see also Town of Fairview v. U.S. Dep't of Transp.*, 201 F. Supp. 2d 64, 75 (D.D.C. 2002) (finding that judicial intervention while agency was "apply[ing] its expertise in addressing . . . environmental concerns . . . would constitute an inappropriate interference with the administrative responsibility that has been properly allocated to the" agency).  And as to the third, in the event Plaintiffs file a subsequent challenge to whatever decision the FHWA makes as to supplementation, the Court will benefit from the FHWA's analyses when assessing whether the tolling schedule would result in environmental effects significantly more adverse than the worst-

case scenarios assessed in the Final EA and FONSI.

Finally, Plaintiffs' brief all but admits the lack of justiciability of their failure-to-supplement claim.  They now acknowledge that their claim is dependent on information that came to exist at "the moment a tolling structure was adopted by MTA," well after their lawsuit was filed.  Pls. Opp. Br. at 39.  And they do not dispute the authority that "premature suits for review of agency decisions must be dismissed even when the passage of time supplies the item missing at the time of filing."  *Pub. Citizen v. Nuclear Regulatory Comm'n*, 845 F.2d 1105, 1107 (D.C. Cir. 1988).  Those two points alone are dispositive on this issue.

## VII.   The FHWA's NEPA Process Ensured Adequate Public Participation.

Having jettisoned the bulk of their original arguments on public participation, Plaintiffs now argue only that the "agency *should* [have] provide[d] for a longer comment period" than 44 days. Pls. Opp. Br. at 39 (emphasis added).[10]  Two points demonstrate this argument has no merit.

First, the amount of public participation afforded during the NEPA process met and exceeded legal requirements.  *See* 23 C.F.R. § 771.119(d) (providing for 30-day comment period); *see also* Fed Def. Br. at 48 ("[T]he FHWA provided EIS-level participation, going well beyond what was legally required (e.g., by holding 19 public hearings during the scoping process and by conducting meetings with state and local agency stakeholders at every stage of the process).").  Plaintiffs do not—and could not—dispute this.  The agency implements NEPA's goal of public participation through the lens of these legal requirements, and the fact the FHWA acted in accordance with its regulations makes its action reasonable.  *See 233 E. 69th St. Owners Corp. v. Lahood*, 797 F. Supp. 2d 326, 337 (S.D.N.Y. 2011) ("Although public participation and comment

---

[10] The sole case that Plaintiffs rely on, *Estate of Smith v. Bowen*, 656 F. Supp. 1093 (D. Colo. 1987), is not relevant. Rather than addressing NEPA's public participation requirements or environmental review, *Estate of Smith* concerned a U.S. Department of Health and Human Services rulemaking.

is one aim of NEPA, the 'spirit and intent' of a statute cannot trump its explicit requirements.").

And beyond these explicit requirements, regulations grant agencies discretion to determine the duration and scope of public engagement. *See* 40 C.F.R. § 1501.5(e); *see also Brodsky v. United States NRC*, 704 F.3d 113, 121 (2d Cir. 2013) (regulations "afford agencies considerable discretion to decide the extent to which such public involvement is practicable" (quotation marks omitted)). Here, the agency set forth a reasonable basis for the length of the comment period, noting that the period was extended "for good cause . . . due to the level of detail and analysis in the EA" and in response to "numerous requests for the comment period to be extended." DOT_3626.[11] This explanation is entitled to deference as it is grounded in reasoned judgment and consideration of the pertinent factors. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989) (describing this as the pertinent test for "arbitrary and capricious" review).

Further, a claim premised on the absence of public participation is "actionable only to the extent that it precludes an agency from taking a 'hard look.'" *Coal. for Healthy Ports*, 2015 WL 7460018, at *15;[12] *see also Brodsky*, 704 F.3d at 121 ("When the exercise of that discretion is challenged on appeal, the reviewing court properly considers whether the lack of public input prevented the agency from weighing all the factors essential to exercising its judgment [under NEPA] in a reasonable manner." (quotation marks omitted)). Although Plaintiffs argue the FHWA should have provided "more time for participation in the NEPA process" Pls. Opp. Br. at 40, they make no effort to establish a connection between the duration of the comment period and the

---

[11] The FHWA also noted that "[t]o be as responsive as possible, [responses to comments] includes substantive comments received *after* the formal close of the comment period, while the Project Sponsors were still preparing responses to comments." *See* DOT_3627 (emphasis added).

[12] For the reasons stated in Federal Defendants' brief and reiterated in this reply, Federal Defendants took a "hard look" at the relevant environmental concerns in the Final EA. Because the agency's analysis was sufficient, Plaintiffs' public participation claims must necessarily fail. *See Coal. for Healthy Ports*, 2015 WL 7460018, at *15.

analysis in the Final EA.  For example, they fail identify substantive issues overlooked by the agency because of the length of the comment period.  *See* Fed Def. Br. at 49 ("Plaintiffs do not identify any portion of the concerns raised in Ms. Chan's belated comment letter that was not otherwise addressed in thorough responses to comments. . .").

Plaintiffs' argument that duration of the comment period precluded community members from commenting on the draft EA lacks facial support in the record given that nearly 70,000 comment letters were submitted during the public review period. *See* Pls. Opp. Br. at 40.  Indeed, the FHWA provided for a response to *each* of those comments at Appendix 18C, which runs for nearly 30,000 pages. *See* DOT_7454-36141. Given that substantial effort to provide for and account for public participation, Plaintiffs "fail[] to demonstrate why a supposed mistake was of possible significance in the results."[13] *Lower Alloways Creek, Tp. v. Public Service Elec. & Gas Co.*, 687 F.2d 732, 743 (3rd Cir. 1982) (quotation marks omitted).

## CONCLUSION

For the reasons stated in the Federal Defendants' opening brief and herein, summary judgment should be denied to the Plaintiffs and granted in favor of the Federal Defendants.

Dated: April 22, 2024
   New York, New York

           DAMIAN WILLIAMS
           United States Attorney

      By:  /s/ Zachary Bannon
           ZACHARY BANNON
           DOMINIKA TARCZYNSKA
           Assistant United States Attorneys
           86 Chambers Street, Third Floor
           New York, New York 10007

---

[13] If Plaintiffs intend to suggest that the Court adopt a congruence standard by comparing the Final EA to the length of other, non-analogous NEPA documents, *see, e.g.*, Pls. Opp. Br. at 40 n. 37, no precedent mandates such an approach. Agencies are appropriately afforded discretion in designing public participation for the action in question beyond the minimum legal requirements.