UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELIZABETH CHAN, TAMARA HOFFMAN,
RACHEL EHRENPREIS, CHAIM KATZ,
WINNIE CHEUNG, MEIR EHRENPREIS,
JOHN BAILEY, SEAN CARNEY, LUIS DIAZ
AND FAMILIES FOR A BETTER PLAN FOR
CONGESTION,

        *Plaintiffs,*

        v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, FEDERAL HIGHWAY
ADMINISTRATION, THE METROPOLITAN
TRANSPORTATION AUTHORITY, THE
TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY, SHAILEN BHATT, in his
official capacity as Administrator of the Federal
Highway Administration, RICHARD J.
MARQUIS, in his official capacity as Division
Administrator of the New York Division of the
Federal Highway Administration, NICHOLAS
A. CHOUBAH, P.E. in his official capacity as
Chief Engineer for the New York State
Department of Transportation, WILLIAM J.
CARRY in his official capacity as Assistant
Commissioner for Policy for the New York
City Department of Transportation,

        *Defendants.*

Hon. Lewis J. Liman

Civ. No. 23-cv-10365-LJL

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF CROSS MOTION
FOR SUMMARY JUDGMENT BY DEFENDANTS THE METROPOLITAN
TRANSPORTATION AUTHORITY, THE TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY, AND THE NEW YORK CITY DEPARTMENT OF TRANSPORTATION**

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................... 4

    I.    The Newly Added Plaintiffs' NEPA Claims Are Untimely, and Plaintiffs Chan and
Hoffman Cannot Demonstrate Standing for Many of the Claims Alleged ................................. 4

        A.    The Newly Added Plaintiffs' NEPA Claims Are Untimely and Do Not Relate Back ... 5

        B.    Plaintiffs Chan and Hoffman Lack Standing to Raise NEPA Arguments Involving
Alleged Environmental Harms in Areas with Which They Have No Connection ................. 6

    II.    Plaintiffs' Sole Remaining Public Participation Challenge Fails ....................................... 8

    III.    The EA Considered Reasonable Alternatives ................................................................. 10

    IV.    FHWA's Issuance of a FONSI Was Not Arbitrary and Capricious ................................. 15

    V.    The EA Took a Hard Look at Potential Effects in Battery Park City ............................. 17

    VI.    The EA Took a Hard Look at Environmental Justice Communities and Adopted
Binding Enforceable Mitigation Measures That Fully Comport With NEPA ..........................22

        A.    Plaintiffs Misunderstand the Nature and Purpose of the Environmental Justice Study 22

        B.    The EA's Environmental Justice Analysis Satisfied the Executive Orders and NEPA 24

        C.    The Mitigation Package and Analysis Fully Comport with NEPA ............................. 26

    VII.  Plaintiffs' Demand that the Court Preemptively Order a Supplemental EA or EIS Is
Premature ................................................................................................................................ 33

CONCLUSION .......................................................................................................................... 34

**<u>TABLE OF AUTHORITIES</u>**

**CASE(S)**                                                                                                                    **PAGE(S)**

*Citizens Against Burlington, Inc. v. Busey*,
    938 F.2d 190 (D.C. Cir. 1991) .................................................................................11

*Citizens for Balanced Env't & Transp., Inc. v. Volpe*,
    650 F.2d 455 (2d Cir. 1981) ...................................................................................20

*City of Angoon v. Hodel*,
    803 F.2d 1016 (9th Cir. 1986) ...............................................................................13

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
    123 F.3d 1142 (9th Cir. 1997) ...............................................................................33

*City of N.Y. v. Slater*,
    145 F.3d 568 (2d Cir. 1998)...................................................................................15

*City of N.Y. v. U.S. Dep't of Transp.*,
    715 F.2d 732 (2d Cir. 1983)............................................................................11, 13

*City of Scottsdale v. F.A.A.*,
    37 F.4th 678 (D.C. Cir. 2022) .................................................................................6

*Coal. for Healthy Ports v. U.S. Coast Guard*,
    No. 13 Civ. 5347 (RA), 2015 WL 7460018 (S.D.N.Y. Nov. 24, 2015) ...........................32

*Communities Against Runway Expansion, Inc. v. F.A.A.*,
    355 F.3d 678 (D.C. Cir. 2004)...............................................................................21

*Connecticut Bar Ass'n v. United States*,
    620 F.3d 81 (2d Cir. 2010).....................................................................................25

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) ...................................................................................... *passim*

*Dine Citizens Against Ruining Our Environment v. Klein*,
    676 F. Supp. 2d 1198 (D. Colo. 2009)....................................................................34

*Environmental Defense Center v. Bureau of Ocean Energy Management*,
    36 F.4th 850 (9th Cir. 2022) ..................................................................................16

*Estate of Smith v. Bowen*,
    656 F. Supp. 1093 (D. Colo. 1987)......................................................................9, 10

*Fallon Paiute-Shoshone Tribe v. U.S. Dep't of the Interior*,
    21 Civ. 00512, 2022 WL 137069 (D. Nev. Jan. 14, 2022),
    *order aff'd, appeal dismissed*, No. 22 Civ. 15092,
    2022 WL 3031583 (9th Cir. Aug. 1, 2022)............................................................. *passim*

*Friends of Ompompanoosuc v. FERC*,
    968 F.2d 1549 (2d Cir. 1992)................................................................................15, 16

*Gunpowder Riverkeeper v. FERC*,
    807 F.3d 267 (D.C. Cir. 2015)......................................................................................8

*Hall v. U.S. Environmental Protection Agency*,
    273 F.3d 1146 (9th Cir. 2001) ................................................................................18, 19

*Havasupai Tribe v. Robertson*,
    943 F.2d 32 (9th Cir. 1991) .........................................................................................18

*Hells Canyon Pres. Council v. Connaughton*,
    No. 11 Civ. 00023, 2012 WL 13047991 (D. Or. Aug. 10, 2012),
    *R. & R. adopted as modified*, No. 11 Civ. 00023,
    2013 WL 665134 (D. Or. Feb. 22, 2013)....................................................................30

*Highway J Citizens Grp. v. Mineta*,
    349 F.3d 938 (7th Cir. 2003) .......................................................................................23

*Hogan v. Fischer*,
    738 F.3d 509 (2d Cir. 2013)...........................................................................................5

*Idaho Conservation League v. Lannom*,
    200 F. Supp. 3d 1077 (D. Idaho 2016) ........................................................................12

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976).....................................................................................................17

*Kootenai Tribe of Idaho v. Veneman*,
    313 F.3d 1094 (9th Cir. 2002) .....................................................................................10

*Lat. Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*,
    858 F. Supp. 2d 839 (E.D. Mich. 2012)................................................................16, 20

*Levy v. U.S. Gen. Acct. Off.*,
    175 F.3d 254 (2d Cir. 1999)...........................................................................................5

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).......................................................................................................7

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ..................................................................................3, 17

*Maryland-National Capital Park & Planning Commission v. U.S. Postal Service*,
    487 F.2d 1029 (D.C. Cir. 1973) .............................................................28

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ...............................................................................16

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*,
    675 F. Supp. 3d 28 (D. Mass. 2023) .....................................................17

*Nat'l Audubon Soc'y v. Hoffman*,
    132 F.3d 7 (2d Cir. 1997)......................................................................16

*Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*,
    55 F. Supp. 3d 316 (E.D.N.Y. 2014) ....................................................30

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001) ................................................................32

*Nat'l Post Off. Collaborate v. Donahoe*,
    No. 13 Civ. 1406, 2014 WL 6686691 (D. Conn. Nov. 26, 2014) ...................10

*Nev. v. Dep't of Energy*,
    457 F.3d 78 (D.C. Cir. 2006) ................................................................33

*O'Reilly v. U.S. Army Corps of Eng'rs*,
    477 F.3d 225 (5th Cir. 2007) ............................................................27, 28

*Ouachita Watch League v. Jacobs*,
    463 F.3d 1163 (11th Cir. 2006) ............................................................34

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*,
    693 F.3d 1084 (9th Cir. 2012) ..............................................................30

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)...............................................................................27

*St. Johns Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
    462 F. Supp. 3d 1256 (M.D. Fla. 2020).................................................15

*Seafreeze Shoreside, Inc. v. United States Dep't of the Interior*,
    No. 22 Civ. 11091-IT, 2023 WL 6691015 (D. Mass. Oct. 12, 2023)..................8

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017) ...................................................................22, 26

*Slockish v. FHWA*,
   No. 08 Civ. 1169, 2020 WL 8617636 (D. Or. Apr. 1, 2020),
   *R. & R. adopted in relevant part*, 2021 WL 683485 (D. Or. Feb. 21, 2021)....................18

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
   255 F. Supp. 3d 101 (D.D.C. 2017) .................................................................26

*Stewart Park & Reserve Coal., Inc. v. Slater*,
   352 F.3d 545 (2d Cir. 2003)............................................................................21

*Strycker's Bay Neighborhood Council, Inc. v. Karlen*,
   444 U.S. 223 (1980).......................................................................................15

*SSA Terminals v. Carrion*,
   821 F.3d 1168 (9th Cir. 2016) .......................................................................19

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   616 F.3d 497 (D.C. Cir. 2010) ...............................................................*passim*

*Tillamook Cnty. v. U.S. Army Corps of Eng'rs*,
   288 F.3d 1140 (9th Cir. 2002) .......................................................................29

*Trenton Threatened Skies, Inc. v. F.A.A.*,
   90 F.4th 122 (3d Cir. 2024) ...........................................................................22

*Vill. of Logan v. U.S. Dep't of Interior*,
   No. 12 Civ. 401, 2013 WL 12084730 (D.N.M. Jan. 14, 2013) ......................18

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978).......................................................................................13

*Vuksanovich v. Airbus Americas, Inc.*,
   608 F. Supp. 3d 92 (S.D.N.Y. 2022).................................................................5

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
   457 F. Supp. 3d 880 (D. Mont. 2020)..............................................................12

*Young v. Lepone*,
   305 F.3d 1 (1st Cir. 2002)................................................................................6

*Zorilla v. Carlson Restaurants, Inc.*,
   255 F. Supp. 3d 465 (S.D.N.Y. 2017)...............................................................6

## STATUTES

23 U.S.C. § 139(l)(1) ..................................................................................5

42 U.S.C. § 4332(C) ................................................................................22

42 U.S.C. § 7409(b)(1) ............................................................................23

Fed. R. Civ. P. 15(c)(1)(B) ......................................................................5

Fed. R. Civ. P. 15(c)(1)(C) ......................................................................5

N.Y. Tax Law § 1299-A ..........................................................................14

## OTHER AUTHORITIES

23 C.F.R. § 771.109(b)(1) ........................................................................28

23 C.F.R. § 771.119(e) ..............................................................................9

23 C.F.R. § 771.123(k) ............................................................................17

23 C.F.R. § 771.129 ................................................................................33

23 C.F.R. § 771.130 ................................................................................33

40 C.F.R. § 1500.3(b)(3) ..........................................................................8

40 C.F.R. § 1501.3(b) .................................................................3, 15, 17, 22

40 C.F.R. § 1501.5(c)(2) ..........................................................................11

40 C.F.R. § 1501.6(a)(2) ..........................................................................18

40 C.F.R. § 1501.6(c) ..........................................................................16, 28

40 C.F.R. § 1502.14(c) ............................................................................11

40 C.F.R. § 1506.11(d) ..............................................................................9

85 Fed. Reg. 43,318 (July 16, 2020) ........................................................8

85 Fed. Reg. 43,3304, 43322 (July 16, 2020) ........................................16

88 Fed. Reg. 41,998 (June 28, 2023) ........................................................3

## PRELIMINARY STATEMENT

Plaintiffs' reply/opposition brief abandons many of their original arguments and simply reiterates others without meaningfully addressing the fact-based responses and legal support in Defendants' papers.  While Plaintiffs purport to challenge the decision of the Federal Highway Administration ("FHWA") to issue a Finding of No Significant Impact ("FONSI") for the Central Business District Tolling Program (the "CBD Tolling Program" or "Project") under the National Environmental Policy Act ("NEPA"), and demand preparation of an Environmental Impact Statement ("EIS"), their ultimate aim is clear: Plaintiffs do not want to pay a toll.  Ironically, as residents of Battery Park City ("BPC"), the original (and only viable) Plaintiffs stand to see some of the most significant benefits from the Project, both in terms of reduced traffic congestion and improved air quality in their neighborhood, and because they will continue to be able to drive within the CBD *without paying a toll*.

Other Plaintiffs, whose claims are time barred, joined this lawsuit so that they may continue driving through environmental justice communities toll-free, contributing to air pollution and congestion, while claiming to advocate for environmental interests.  In any event, contrary to Plaintiffs' conclusory and unfounded assertions, the Final Environmental Assessment ("EA") and FONSI reflect FHWA's hard look at the environmental impacts of the Project, and the agency's independent, expert determination that such impacts will not be significant.  Plaintiffs fall far short of demonstrating, as they must in order to prevail, that the EA and FONSI are arbitrary and capricious.

Plaintiffs do not dispute that (1) the Newly Added Plaintiffs' claims were filed after the statute of limitations to challenge the FONSI had run, (2) their failure to add those claims in the original complaint was not due to any mistake, or (3) the Second Circuit requires a showing of mistake for the addition of new plaintiffs to relate back.  ECF No. 78 ("Pls. Reply Br.") 9–18.

1

While Plaintiffs would have the Court ignore the law of this Circuit, they cannot escape the fact that their Amended Complaint seeks to impermissibly expand the scope of this action to include new issues far beyond their initial pleading.  Further, while there is no dispute that Plaintiffs Chan and Hoffman have standing to assert procedural injuries related to their own environmental concerns, they do not have standing to assert claims based on environmental injuries that they assert will befall others.  And Chan and Hoffman's purported environmental concerns related to BPC have no basis in the record.

Ultimately, Plaintiffs fail to identify any aspect of the EA that fails the hard look standard, relying instead on mischaracterizations of the record, misstatements of the law, or policy disagreements that are not subject to judicial review.

*First*, Plaintiffs' sole unabandoned public participation argument is easily disposed of:  In response to requests from the public, FHWA extended the official public comment period to 44 days, nearly 50% beyond what the regulations required (30 days), and only one day shy of the period required for an EIS (45 days).  NEPA does not require more.

*Second*, Plaintiffs' claim that the EA did not consider reasonable alternatives is based on inaccuracies and ignores the deferential "rule of reason" that applies to review of agencies' consideration of alternatives.  Plaintiffs' claim that "no" alternatives were fully studied in the EA betrays a fundamental lack of understanding of the record and of NEPA.  After screening multiple potential alternatives that did not meet the Project's purpose and need, the EA studied two alternatives in detail:  the CBD Tolling Alternative and the No Action Alternative.  This approach is fully consistent with NEPA's requirements and has been upheld by numerous courts.  Moreover, the EA fully and adequately explained its treatment of alternatives, in responses to comments and in an entire appendix dedicated to the subject, as well as in the text of the EA itself.

*Third*, while Plaintiffs argue that FHWA was required to prepare an EIS just because the Project itself is "significant," "novel," and includes binding mitigation, that is not the law. NEPA requires an EIS only when the environmental *effects* of the proposed action are significant, taking account of mitigation, 40 C.F.R. § 1501.3(b), and that determination is a "classic example of a factual dispute the resolution of which implicates substantial agency expertise," *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376 (1989); *see also Fallon Paiute-Shoshone Tribe v. U.S. Dep't of the Interior*, No. 22 Civ. 15092, 2022 WL 3031583, at *3 (9th Cir. Aug. 1, 2022).

*Fourth*, Plaintiffs now concede that BPC and Lower Manhattan were not, in fact, "omitted" from the EA's studies. Nonetheless, Plaintiffs continue to challenge the adequacy of the EA's consideration of BPC, despite having waived these claims by failing to raise any of them during the public comment period on the Draft EA. Even if these claims were properly before the Court, Plaintiffs' unsupported speculation that the Project will worsen traffic and air quality in BPC is directly refuted by the record. Plaintiffs' conjecture and insistence cannot overcome the actual modeling or the deference owed to FHWA's expert technical analysis under NEPA. Plaintiffs have provided nothing but their own speculation as a basis for nullifying complex technical analyses.

*Fifth*, after abandoning most of their initial environmental justice ("EJ") challenges, Plaintiffs now claim to speak on behalf of the U.S. Environmental Protection Agency ("EPA"), asserting that the supplemental EJ analysis added to the EA in direct response to that agency's concerns "did not address EPA's core concerns." Pls. Reply Br. 32–33. But EPA expressed a strikingly different view. Likewise, Plaintiffs' two new methodological challenges to the EJ analysis (even if not waived) are directly refuted by the record and amount, at most, to a difference of opinion with FHWA, which does not give rise to a NEPA claim. Similarly, Plaintiffs'

challenges to the adequacy of the EA's definition of mitigation are wrong on the facts and the law. Plaintiffs' professed confusion regarding the EA's selection of locations for mitigation can be dispelled by simple reference to the explanation of this process in the EA's executive summary. Plaintiffs' subjective confusion aside, the EA reflects a clear and binding commitment to implementing mitigation measures, and a detailed explanation of the basis for choosing those measures and the locations where they will be deployed.

Finally, Plaintiffs continue to confuse NEPA reevaluation and supplementation as though they are mutually exclusive processes.  The reevaluation process that Plaintiffs seek to circumvent will determine whether the supplemental review they demand is necessary.   The governing regulations specifically contemplate project changes both before and after an agency's approval of a proposal (here, the Value Pricing Pilot Program Agreement ["VPPP"]), and the reevaluation process addresses those circumstances. Until that process has concluded, there is no final agency action for Plaintiffs to challenge, and their demand for supplementation is premature.

## ARGUMENT

### I.   The Newly Added Plaintiffs' NEPA Claims Are Untimely, and Plaintiffs Chan and Hoffman Cannot Demonstrate Standing for Many of the Claims Alleged

Plaintiffs' new declarations do not cure the fatal flaws in their pleading.  Plaintiffs all but concede that the Newly Added Plaintiffs' NEPA claims challenging the FONSI are untimely and do not relate back to the filing of the original complaint.  To circumvent this concession, Plaintiffs principally rely on Plaintiffs Chan and Hoffman to assert new claims based on alleged environmental impacts in areas with which they have not established any meaningful connection. Together, these conclusions yield a straightforward result: Plaintiffs' claims alleging environmental harms outside of BPC and Lower Manhattan are not properly part of this action.

### A.  The Newly Added Plaintiffs' NEPA Claims Are Untimely and Do Not Relate Back

Initially, Plaintiffs do not dispute that the Newly Added Plaintiffs' NEPA claims were filed after the statute of limitations to challenge the FONSI had run.  *See* 23 U.S.C. § 139(l)(1); 88 Fed. Reg. 41,998 (June 28, 2023) (notifying the public of the statute of limitations).  Instead, Plaintiffs argue that the Newly Added Plaintiffs' claims relate back under Federal Rule of Civil Procedure 15(c)(1)(B), ignoring the requirements of Rule 15(c)(1)(C).

As explained in Defendants' opening brief, most courts in the Second Circuit require that for a new plaintiff's claims to relate back under Rule 15(c)(1)(C), that plaintiff must demonstrate that, *inter alia*, the defendants knew or should have known that, *but for a mistake* concerning the new plaintiff's identity, the action would have been brought on that party's behalf.  *See Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013); *Levy v. U.S. Gen. Acct. Off.*, 175 F.3d 254, 255 (2d Cir. 1999); *Vuksanovich v. Airbus Americas, Inc.*, 608 F. Supp. 3d 92, 110 n.4 (S.D.N.Y. 2022). Because here there was no mistake, but rather the addition of new parties in a belated attempt to add new substantive claims, the Newly Added Plaintiffs' claims do not relate back.

Plaintiffs now argue something else—that original Plaintiffs *Chan and Hoffman* can assert these additional claims, and that they relate back because the issues arise out of the same transaction or occurrence as the original claims related—which related exclusively to BPC and Lower Manhattan.  To the extent that Plaintiffs attempt to argue that the Newly Added Plaintiffs' claims *also* relate back because they arise out of the same transaction or occurrence, this approach is not supported by Second Circuit law.  That would require the Court to apply a different rule adopted by the First and Ninth Circuits, and a small minority of district courts in this Circuit.  Pls. Reply Br. 18 n.22.

However, as Defendants previously explained, Defs. Br. 15 n.15, even under the minority rule, Plaintiffs still cannot establish that the Newly Added Plaintiffs' claims relate back, because

there is not "sufficient identity of interest between the new plaintiffs, old plaintiffs, and the respective claims so defendants could be said to have been given fair notice of the latecomers' claims[.]" *Zorilla v. Carlson Restaurants, Inc.*, 255 F. Supp. 3d 465, 476 (S.D.N.Y. 2017) (quoting *Young v. Lepone*, 305 F.3d 1, 14 (1st Cir. 2002)).  Plaintiffs admit that while the original complaint "primarily focused on BPC and Lower Manhattan," the Amended Complaint contained "expanded allegations concerning the Lower East Side, Chinatown, residential areas near the FDR Drive, [and] New Jersey."  Pls. Reply Br. 17.  While it is true that Plaintiffs' original complaint contained an off-hand reference to the Bronx in comparison to BPC, ECF 1 ¶¶ 58, 71–72, Plaintiffs cannot seriously dispute that the claimed environmental harms in the original complaint related to BPC, where Plaintiffs Chan and Hoffman reside.

The fact that the Newly Added Plaintiffs also raise procedural challenges, attack the EA and FONSI, and seek the same relief are of no moment.  Plaintiffs cannot avoid the fundamental problem that they are seeking to litigate new alleged deficiencies in the EA, involving new areas that were never the focus of their original pleading and of which Defendants were not given fair notice.  Under Plaintiffs' view, they could continue adding new plaintiffs with new NEPA claims for years after the limitations period had run, eviscerating the effect of the statute of limitations and its purpose of creating finality with respect to transportation projects.

## B. Plaintiffs Chan and Hoffman Lack Standing to Raise NEPA Arguments Involving Alleged Environmental Harms in Areas with Which They Have No Connection

Plaintiffs argue that because Plaintiffs Chan and Hoffman allege (contrary to the record)[1]

---

[1] Plaintiffs characterize as "self-serving" Defendants' pointing out the conclusions of the EA that both traffic and air quality are projected to improve in BPC and Lower Manhattan as a result of the Project.  Pls. Reply Br. 12; Defs. Br. 16–17.  But this is simply the result of the exhaustive environmental analysis reflected in the EA, which Plaintiffs do not refute with any facts.  *See City of Scottsdale v. F.A.A.*, 37 F.4th 678, 679–80 (D.C. Cir. 2022) (dismissing claim for lack of standing where plaintiff's "claim of injury is not only unsupported; it is also at least partly rebutted" by noise studies).

that they will face increased traffic and worse air quality in Lower Manhattan and "live in the vicinity" of the Project, they have standing to assert claims on behalf of others who they claim will face different injuries-in-fact in entirely different neighborhoods.  Pls. Reply Br. 9–15.  If such were the law, Plaintiffs would have had no reason to file an Amended Complaint that added eight new Plaintiffs who lived in different geographic regions and alleged different injuries.

Standing is an "irreducible constitutional minimum" that requires a plaintiff to have suffered an "injury in fact" which is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).  Plaintiffs rely heavily on the fact that NEPA is a procedural statute, but Defendants do not dispute that Plaintiffs Chan and Hoffman may allege procedural injuries stemming from the purported inadequacies of the environmental review.  What Chan and Hoffman may not do, however, is assert claims entirely related to alleged environmental harms to other people, in other places, without establishing their own injury-in-fact resulting from those alleged environmental conditions.

In an attempt to bolster their pleadings, Plaintiffs Chan and Hoffman submitted new declarations that describe their activities in neighborhoods outside of BPC and Lower Manhattan.  Far from establishing injury-in-fact based on any alleged *environmental* harms in those neighborhoods, these declarations mostly reflect Chan and Hoffman's continued interest in driving around the New York metropolitan region without paying a toll.  *See* ECF No. 78-4 ("Chan Supp. Decl.") ¶¶ 2–5 (alleging Plaintiff Chan regularly drives to hospitals around Manhattan), ¶ 6 (alleging Plaintiff Chan often drives to locations in New York City and New Jersey); ECF No. 78-18 ("Hoffman Supp. Decl.") ¶¶ 6–9 (alleging Plaintiff Hoffman regularly drives to locations in Manhattan and Brooklyn).  If anything, these declarations suggest that, by continuing to drive to

these neighborhoods, several of which contain EJ communities, Plaintiffs Chan and Hoffman wish to continue *contributing* to the very environmental harms of traffic and poor air quality that they allege (wrongly) the Project will cause, unencumbered by tolls.[2]

Contrary to Plaintiffs' assertions, Defendants do not rely on an "incredible assumption that Plaintiffs are siloed from the rest of New York City." Pls. Reply Br. 12. It is Plaintiffs' burden to prove standing, not Defendants'—nor must the Court assume something Plaintiffs do not allege.[3]

## II.    Plaintiffs' Sole Remaining Public Participation Challenge Fails

After raising several challenges in their moving papers, Pls. Br. 50–52, Plaintiffs have abandoned all but one of their arguments regarding public participation; now they only assert that the 44-day public comment period on the Draft EA was too short. Pls. Reply Br. 40.[4]

Contrary to Plaintiffs' argument, Defendants did not "contend that there is no minimum

---

[2] To be clear, Plaintiffs are free to continue to drive wherever they choose. However, like all drivers, they will be required to pay a toll each time they enter the CBD by vehicle, thereby incentivizing them to take alternative forms of transportation and reducing congestion. That is the design of the Project. While Plaintiffs clearly do not wish to pay the toll, their interest in continuing to drive in and out of the CBD for free does not establish standing to assert alleged environmental harms under NEPA, particularly when it is vehicular traffic they allege will cause those harms. *See, e.g.*, *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015). ("[T]he 'zone of interest' under NEPA encompasses environmental values, read, of course, very broadly, but does not encompass monetary interests alone." (internal quotation marks and citation omitted)); *see also Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, No. 22 Civ. 11091-IT, 2023 WL 6691015, at *15 (D. Mass. Oct. 12, 2023).

[3] Plaintiffs' standing argument includes a lengthy section on exhaustion. To be clear, Defendants never argued that Plaintiffs' failure to timely raise their objections deprived them of standing. However, as explained below, Plaintiffs' failure to timely raise issues during the public comment period on the Draft EA means that they have forfeited those arguments in litigation. Plaintiffs also argue that comments raised by others preserved the issues Plaintiffs chose not to communicate to FHWA when they had the opportunity. Pls. Reply Br. 13–14. But the currently applicable NEPA regulations require that parties rely on their own comments during a public comment period, and they further provide that unexhausted comments "shall be forfeited." 40 C.F.R. § 1500.3(b)(3); 85 Fed. Reg. 43,318 (July 16, 2020). Moreover, there was no public docket for comments on the Draft EA, so Plaintiffs could not have relied on other parties' comments of which they were unaware until publication of the Final EA—after the comment period had long expired. Indeed, Plaintiffs did not participate at all in the administrative process until the Final EA was issued in May 2023, and they offer no reason for that omission.

[4] *Amicus curiae* Municipal Labor Committee's principal argument in favor of requiring an EIS is that it will give the public more opportunities to participate, particularly through a scoping process. ECF No. 74 10. This is a strange position for a group that declined to participate at all in the administrative process for the EA. On the other hand, numerous other groups representing organized labor did participate, reflecting that the process considered their perspectives. *See, e.g.*, DOT_0021774; DOT_0029637; 28 DOT_0010144; DOT_0010845; DOT_0011619; DOT_0014591; DOT_0025873.

level of public comment" required.  *Id.* at 40.  The relevant regulations require a 30-day official public comment period.  23 C.F.R. § 771.119(e).  Here, after members of the public requested more time to comment, FHWA extended the period by two weeks (nearly 50% longer than the required time), thereby providing the equivalent of only one day short of the required public comment period that would have been required of an EIS (45 days).  40 C.F.R. § 1506.11(d).  Moreover, public engagement occurred well before the official comment period, 23 C.F.R. § 771.119(e): when the Draft EA was published in August 2022, FHWA and the Project Sponsors had already held 19 early outreach meetings and two regional transportation meetings; they began accepting comments on the Project in September 2021  (DOT_0039267–70, DOT_0041617–20, DOT_0041634–38, DOT_0037046–47); outreach continued after the official comment period; and comments submitted after the official comment period had ended were also considered and responded to in the Final EA.  (DOT_0003688–4155.)

The one case Plaintiffs cite to support their claim that the public comment period should have been longer is also inapposite.  The court in *Estate of Smith v. Bowen*, 656 F. Supp. 1093 (D. Colo. 1987), found the public comment period for a final rule insufficient for several reasons, none of which apply here.  First, the material for comment could only be obtained by specifically requesting a copy from the agency.  *Id.* at 1097.  Second, a key study sponsored by the agency, which the plaintiffs there claimed contradicted and demonstrated major flaws in the agency's findings, did not become available until after the public comment period had closed.  *Id.* at 1097–98.  Third, the agency refused all requests to extend the public comment period.  *Id.* at 1099.  Here, in contrast, FHWA and the Project Sponsors published the Draft EA online and at 62 repositories across the region.  (DOT_0037057–62.)  There was no missing key document that contradicted the EA.  And the public comment period was increased by almost 50% after members of the public

9

requested an extension—eliminating any viable claim challenging the sufficiency of a public comment period. (DOT_0036217.)  *See Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1118–19 (9th Cir. 2002) (holding that an extension of a public comment period just over 50% of the legally mandated minimum was sufficient to defeat a challenge based on the adequacy of the public comment period because "[w]hen the comment period . . . last[s] substantially longer than the minimum [] required, [an environmental review] ordinarily may not be challenged based on an allegedly inadequate comment period" (citations omitted)).  And finally, the proposed rule being challenged in *Bowen* would have applied nationwide and, therefore, to a much larger audience— not to a discrete geographical location.  *Bowen*, 656 F. Supp. at 1096.

The fact that tens of thousands of comments were submitted during the formal review period further belies Plaintiffs' claim that 44 days was an insufficient amount of time for members of the public to comment on the Draft EA.  (DOT_0003688–4506, DOT_0007452–36141.)  In sum, Plaintiffs fail to show that FHWA's extended comment period, almost half again as long as required by regulation, was too short.

### III.   The EA Considered Reasonable Alternatives

Plaintiffs misrepresent the EA's consideration of alternatives and ignore the deferential "rule of reason" standard of review afforded to the scope of alternatives.  *Nat'l Post Off. Collaborate v. Donahoe*, No. 13 Civ. 1406, 2014 WL 6686691, at *23 (D. Conn. Nov. 26, 2014).

Plaintiffs first posit that the Traffic Mobility Act's revenue generating goal cannot be the "overwhelming goal considered," Pls. Br. 27, and that FHWA was not bound by the Act's revenue requirements, *id.* 28–29.  These are red herrings, as congestion reduction was another primary purpose of the Project identified in the EA, and FHWA never asserted it was bound by the Traffic Mobility Act.  Plaintiffs' true complaint is that no alternative should have been rejected for failure to generate the significant revenue needed to maintain and improve transit service in the MTA's

service area, as envisioned by the Act.  Plaintiffs fail to cite a single case or legal authority to support such an assertion, while ignoring Second Circuit case law holding that where a project aims to meet statutory objectives, a court will give substantial weight to the legislative grant of power when deciding whether an agency should have considered additional alternatives.  Defs. Br. 26; *see City of N.Y. v. U.S. Dep't of Transp.*, 715 F.2d 732, 743 (2d Cir. 1983).  Plaintiffs also ignore the case law recognizing that it is appropriate to include a revenue goal in a project's defined objectives and to reject alternatives that would not meet that goal, including where it results in the agency only evaluating the preferred and no-action alternatives.  *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195–96 (D.C. Cir. 1991) and Defs. Br. 24.

Plaintiffs then claim that "*no* alternatives [were] fully studied" in the EA.  Pls. Reply Br. 21.  But this is false; two alternatives were studied in detail: (1) the No Action Alternative,[5] which would not implement a vehicular tolling program in the CBD; and (2) the CBD Tolling Alternative (the Action Alternative), the only alternative that met the Project's purpose and need and all three objectives.   (DOT_0036199, DOT_0036266–67, DOT_0036299–300.)   And as previously explained, where no other potential alternative would meet a project's stated objectives, an EA need assess in detail only the no-action alternative and one practical alternative.  Defs. Br. 23.

Plaintiffs next claim that the preliminary alternatives were not properly evaluated because they were solely discussed in footnotes or were rejected using "outdated studies."  Pls. Br. 27.  Such claims also lack merit.  As a threshold matter, 40 C.F.R. § 1501.5(c)(2) requires only that an EA "briefly discuss" the reasons why a preliminary alternative was eliminated.[6]  Further, although

---

[5] The No Action Alternative does not meet the Project's purpose and objectives (DOT_0036269, DOT_0036300), but it must still be evaluated as the baseline condition against which the potential effects are evaluated, 40 C.F.R § 1502.14(c).

[6] The cases Plaintiffs cite to argue that the EA failed to adequately discuss possible alternatives actually support the proposition that agencies need only "briefly discuss" their reasons for eliminating such alternatives from detailed study

there is no minimum page requirement for discussing rejected alternatives, here, the explanations were not limited to footnotes.  In addition to an entire appendix dedicated to discussing alternatives, the Final EA also explained why preliminary alternatives were rejected in multiple responses to comments.  (DOT_0003609, DOT_0003610, DOT_0003611, DOT_0003613, DOT_0007943, DOT_0022164, DOT_0036263–68, DOT_0004515–88.)  Plaintiffs' reliance on EPA's comments on the Draft EA to demonstrate that the alternatives analysis was insufficient is also unavailing, as EPA's concerns were addressed and obviated by additional information provided in the Final EA, including a more in-depth explanation of why Alternatives NTP-1, T-1, T-2, T-3, O-1, O-3, O-4, O-5, and O-6 were eliminated.  (DOT_0003609, DOT_0003610, DOT_0003611, DOT_0003613, DOT_0007943, DOT_0022164, DOT_0036201, DOT_0045366.)[7]

Plaintiffs focus on the supposed inadequacy of the EA's finding that preliminary Alternative T-2—the tolling of only City-owned East River bridges rather than all routes into the CBD, the only potential alternative that could generate significant revenue—could not meet the Project purpose and need.  T-2 is not contemplated by existing law and would require State legislation and/or complex agreements between the State and City to allow any toll revenues to be used for transit improvements.  (DOT_0036268, DOT_0007943.)  Contrary to Plaintiffs' claims, the need for State legislation and/or complex agreements is a sufficient reason to reject an

---

and that NEPA "do[es] not outline a numerical requirement to satisfy the alternatives requirement."  *Idaho Conservation League v. Lannom*, 200 F. Supp. 3d 1077, 1091 (D. Idaho 2016); *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 890 (D. Mont. 2020).

[7] In addition to providing additional information about why alternatives were eliminated, the EA also more thoroughly discussed the New York City Department of Transportation's parking study and other congestion reducing projects, as requested by EPA.  (DOT_0003672, DOT_0036681–83, DOT_0045366.)

alternative,[8] Pls. Reply Br. 28, and nothing prohibits an agency from relying on preexisting studies when assessing the viability of alternatives,[9] *id.* at 27.  Plaintiffs have not cited any authority demonstrating otherwise.  However, those were not the only reasons Alternative T-2 was rejected. In addition to not creating a funding source for MTA capital improvements (a primary purpose of the Project), Alternative T-2's toll rates would have to be higher than the highest rates studied in the EA in order to reach revenue needs without tolling all entry points to the CBD, which would cause greater diversions and burdens to low-income drivers than the CBD Tolling Alternative. (DOT_0007943.)[10]

Apparently conceding that the EA considered variable tolling (after all, the Project *is* a variable tolling project), Plaintiffs once again claim that the EA should have included "dynamic tolling" and a "phased-in approach" as Project alternatives.  Pls. Br. 29–30.[11]  Plaintiffs completely ignore the several explanations provided in the EA for why variable tolling was chosen over dynamic tolling, including the importance of people knowing the toll price before deciding to drive

---

[8] *C.f. City of N.Y. v. U.S. Dep't of Transp.*, 715 F.2d 732, 743–44 (2d Cir. 1983) ("We implicitly endorsed the pertinence of statutory objectives in ruling that an agency need not consider alternatives which could only be implemented after significant changes in government policy or legislation.") (internal quotation marks and citations omitted); *City of Angoon v. Hodel*, 803 F.2d 1016, 1021 n.2 (9th Cir. 1986).

[9] Plaintiffs take issue with the EA citing the 2008 New York City Traffic Congestion Mitigation Commission Study in explaining that T-2 was not a viable alternative because it would not toll trips that start and end within Manhattan, such as trips beginning or ending on the Upper East and West Sides.  (DOT_0036268, DOT_0007943, DOT_0003613.)  The age of the study in no way affects the accuracy of that explanation.

[10] Plaintiffs make a blanket statement that the EA should have considered a combination of alternatives, but they do not cite any legal authority demonstrating such a requirement.  Regardless, this overlooks the fact that the EA considers whether any alternatives evaluated that individually would not meet the Project's purpose, need, and goals could instead meet those objectives in combination.  (DOT_0003614).  However, the non-revenue generating alternatives, no matter the combination, could not achieve the purpose of raising funds for transit improvements.  Plaintiffs make no suggestion for such a magical combination.  Plaintiffs also never requested such a study during the public comment period, and they therefore failed to exhaust this claim.  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004)); *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553–54 (1978).

[11] As explained in the EA, dynamic pricing is a form of variable time of day pricing.  It has typically been applied to High Occupancy Tolled (HOT) lanes and has a real-time aspect as measurable volumes and speeds on specific highway segments can be monitored and used to alter pricing.  Consumers make the choice to incur a particular toll rate enroute. (DOT_0007944.)

to the CBD.  Defs. Br. 28, n.28.  Moreover, the only type of "phased-in approach" suggested by Plaintiffs, and not suggested until this litigation, is in fact what the Traffic Mobility Act required. Plaintiffs seemingly advocate for placing surcharges on taxi and for-hire vehicle ("FHV") trips in the first phase and on all other vehicles in the second phase of the Project.  Pls. Br. 30.  But New York State's taxi and FHV congestion surcharge, which went into effect on January 1, 2019, already imposes a surcharge on such vehicles for trips that start, end or pass through the designated congestion zone, which is south of 96th Street in Manhattan.[12]  N.Y. Tax Law § 1299-A.  Therefore, there was no reason to consider this as an alternative to the Project—as the first phase (a surcharge on taxis and FHV) is already an extant condition.  Third, any other form of "phased-in implementation"—such as gradually increasing tolls—would delay achievement of revenue goals, Defs. Br. 27, and this approach did not warrant additional study because simply delaying the roll-out of the full Project would not have changed its ultimate effects on the environment or the EA's conclusions regarding those effects.  It would simply delay them, including the Project's expected benefits.  Whether to delay the roll-out of the full Project is a policy choice, beyond the scope of the Court's review, that would not change the environmental issues studied in the EA or its conclusions.

Additionally, no one, including Plaintiffs, ever requested that a phased-in approach be studied as a separate alternative, which Plaintiffs do not deny.  Plaintiffs instead seek to invoke a narrow exception for errors "so obvious that there is no need for a commentator to point [it] out specifically in order to preserve its ability to challenge a proposed action." *Pub. Citizen*, 541 U.S. at 765.  This exception does not come close to applying here.  Out of 70,000 comments on the Draft EA, not a single one ever requested what Plaintiffs claim was an "obvious" alternative.  Pls. Reply Br. 30–31.  Courts have held that the "obviousness" exception does not apply in such

---

[12] *See* New York State's Congestion Surcharge, NYC Taxi and Limousine Commission, https://www.nyc.gov/site/tlc/ about/congestion-surcharge.page.

circumstances.  *See Pub. Citizen*, 541 U.S. at 765 (holding that challenge to alternatives analysis was not "obvious"); *St. Johns Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 462 F. Supp. 3d 1256, 1296 (M.D. Fla. 2020) (holding that plaintiff "would be hard-pressed" to make an obviousness argument when no commenter raised the issue).

## IV.  FHWA's Issuance of a FONSI Was Not Arbitrary and Capricious

"Judicial review of agency decisions regarding whether an EIS is needed is essentially procedural."  *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1556 (2d Cir. 1992) (citations omitted).  "The decision not to prepare an EIS is left to the informed discretion of the agency proposing the action."  *City of N.Y. v. Slater*, 145 F.3d 568, 571 (2d Cir. 1998) (citation omitted). "[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to ensure that the agency has considered the environmental consequences."  *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227 (1980) (per curiam).

None of Plaintiffs' arguments provide a basis to topple four years of public engagement and analysis.  Plaintiffs claim that the Project must have significant impacts because New York is a large city with many commuters and the Project will generate substantial revenue for the MTA's Capital Program.  Pls. Reply Br. 19.  But these arguments miss the point: The question of significance is a technical inquiry that requires an agency to "analyze the potentially affected environment and degree of the effects of the action," considering factors like the "beneficial and adverse effects" and "[e]ffects on public health and safety."  40 C.F.R. § 1501.3(b).  Plaintiffs mention the fact that traffic diversions could cause small, localized increases of certain air pollutants, Pls. Reply Br. 19, but they do not even attempt to refute the fact that the Project will reduce regional traffic and improve air quality for the region as a whole.  Nor do they challenge on any technical basis the sophisticated traffic and air quality analyses that concluded that the Project would not result in any significant adverse impacts on local air quality.  *See* Defs. Br. 29–

35.  Plaintiffs also claim that FHWA was required to prepare an EIS because the Project is "novel," but this is not the first highway project to involve tolling, and FHWA evaluated the Project using the same EPA-approved traffic and air quality modeling that it uses for other highway projects. (DOT_0036340.)[13]

Plaintiffs also claim that FHWA was required to prepare an EIS because the FONSI includes binding mitigation.  Pls. Reply Br. 20 ("Mitigation being 'relevant' to the FONSI means that Congestion Pricing is, in fact, significant . . ..").  That is the opposite of the law.  NEPA regulations and Second Circuit case law permit an agency to issue a FONSI that relies on mitigation to reduce potential impacts below the level of significance.  40 C.F.R. § 1501.6(c); *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997); *Friends of Ompompanoosuc*, 968 F.2d at 1557.  Plaintiffs' position is contrary to both regulation and precedent.  Nor can Plaintiffs credibly claim that the four years of environmental study, public engagement, and thousands of pages of technical analysis constitute a "short-circuited process."  Pls. Reply Br. 21.

At bottom, Plaintiffs' argument is that the Project will have a significant impact because they say it will.  But significance is not a "know it when you see it" assessment.  The question is not whether the Project itself is "significant" or "controversial,"[14] but whether the environmental

---

[13] Plaintiffs rely on *Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th 850, 879 (9th Cir. 2022), but the case does not support them.  The court's discussion about novelty in that case referred to whether the "*environmental threat* is novel."  *Id.* at 879 (9th Cir. 2022), citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 177 (2010) (Stevens, J., dissenting) (emphasis added).  But the potential impact of traffic diversions is not novel; it is a commonplace aspect of FHWA's environmental review of most highway projects under NEPA.  *See Lat. Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin*., 858 F. Supp. 2d 839, 855 (E.D. Mich. 2012) ("[T]he FHWA's technical methodologies, including its traffic projections, are entitled to substantial deference and are subject only to a reasonableness review.")

[14] Plaintiffs have abandoned their argument that an EIS was required because the Project is "highly controversial," conceding that the Council on Environmental Quality ("CEQ") regulation that used that phrase was repealed four years ago.  85 Fed. Reg. 43304, 43322 (July 16, 2020).  In any event, as Defendants previously explained, "[t]he term 'highly controversial' refers to instances in which a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use."  *Friends of Ompompanoosuc*, 968 F.2d at 1557 (citations omitted).

"*effects* of the proposed action are significant." 40 C.F.R. § 1501.3(b). That determination is a "classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh*, 490 U.S. at 376. Plaintiffs have not provided any basis to second guess FHWA's thoroughly articulated decision, much less one that overcomes the deference owed to the agency. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (noting a court may not "substitute its judgment for that of the agency as to the environmental consequences of its actions"); *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 675 F. Supp. 3d 28, 60 (D. Mass. 2023) (holding agency's assessment of available data "is entitled to deference, even if that data is not conclusive").[15]

## V.    The EA Took a Hard Look at Potential Effects in Battery Park City

On reply, Plaintiffs concede that BPC and Lower Manhattan were not "omitted" from the EA's regional transportation (DOT_0036340–92), local and highway traffic (DOT_0036394–505), air quality (DOT_0036827–28), and environmental justice (DOT_0036958–59) studies, as they initially claimed. Pls. Br. 5, 27–31; Defs. Br. 35–36. Plaintiffs waived their remaining claims by failing to comment, but in any event, their arguments are without merit.

Initially, Plaintiffs did not submit comments challenging the adequacy of the EA's consideration of effects in BPC during the public comment period on the Draft EA, and neither did any other commenter. *See* Klinger Supp. Decl., Ex. 1, ECF No. 78-2. Instead, Plaintiffs claim that comments submitted during the public *availability* period for the Final EA and Draft FONSI

---

[15] Contrary to Plaintiffs' weak arguments, the Final EA was the functional equivalent of an EIS. Defs. Br. 18 n.16 (collecting cases); Fed. Defs. Br. 29, 48. Plaintiffs do not really contest that the substance of the EA equated to the analyses an EIS would have contained. They note that the comment period was *one day* shorter than that provided for an EIS (23 C.F.R. § 771.123(k)), ignoring the fact that FHWA responded to comments submitted long after the end of the comment period (DOT_0003688–4506, DOT_0007452–36141, DOT_0037063). Plaintiffs also note the lack of a preliminary scoping process, but Plaintiffs did not participate in the administrative process during the multiple years of early outreach and chose not to engage until the eleventh hour; there is no reason to believe they would have participated in the scoping process that they now say was essential.

satisfy their obligation to exhaust administrative remedies. *See* Chan Supp. Decl. However, the public availability period was not a second public comment period reopening the opportunity to seek modifications in the original portions of the EA that were available for comment during the formal comment period. *See* 40 C.F.R. § 1501.6(a)(2). As FHWA explained, "[t]he purpose of the Comment Period is to solicit comments on the proposed action; whereas the 30-day public availability period provides the public an opportunity to review changes made as a result of the formal comment period conducted." (DOT_0040836; *see also* DOT_0040615.) The public availability period served that purpose here because the Final EA included additional analysis of environmental justice and mitigation, as well as new mitigation measures to avoid disproportionately high and adverse effects on EJ populations. BPC is not an EJ community, and the new material did not concern BPC.

All the issues that Plaintiffs raise with respect to BPC could (and therefore must) have been raised during the public comment period on the Draft EA to preserve them. Because Plaintiffs failed to do so, their belated objections are not properly before the Court. *See, e.g.*, *Slockish v. FHWA*, No. 08 Civ. 1169, 2020 WL 8617636, at *33 (D. Or. Apr. 1, 2020), *R. & R. adopted in relevant part*, 2021 WL 683485 (D. Or. Feb. 21, 2021) (holding comments "made after defendants issued the Revised EA and FONSI, 'may not form a basis for reversal of an agency decision'" [quoting *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991)]); *Vill. of Logan v. U.S. Dep't of Interior*, No. 12 Civ. 401, 2013 WL 12084730, at *3 (D.N.M. Jan. 14, 2013) (holding plaintiffs waived arguments that were apparent when draft EA was circulated for public comment).[16]

---

[16] Plaintiffs' reliance on *Hall v. U.S. Environmental Protection Agency*, 273 F.3d 1146, 1163 (9th Cir. 2001), and *SSA Terminals v. Carrion*, 821 F.3d 1168, 1174 (9th Cir. 2016), is misplaced. *Hall*, which involved the approval of a State Implementation Plan under the Clean Air Act, supports Defendants: the Ninth Circuit held that the agency was not

Even had Plaintiffs preserved their arguments, they fail to show any insufficiency in the EA's examination of effects in and around BPC.  Plaintiffs continue to speculate, contrary to the record, that the Project will worsen traffic and air quality in BPC.  Pls. Reply Br. 35–36.  The exact opposite is true:  The EA's data-driven analysis demonstrated that the Project would *improve* traffic and air quality in the CBD, which includes BPC.  (DOT_0036354, DOT_0036360, DOT_0036838–41, DOT_0036859–63.)  The EA also found that local traffic at the majority of the 15 intersections studied in Lower Manhattan would improve, and none—including the six intersections studied along West Street (adjacent to BPC)—would experience unmitigated adverse traffic effects.  (DOT_0036476–79, DOT_0036489, DOT_0036494–96.)  The EA also found that predicted traffic volumes at the analyzed intersections, which were selected as those "expected to demonstrate the largest changes in traffic due to the Project," fell below the applicable air quality screening thresholds, demonstrating that the Project would not have an adverse effect on air quality.  (DOT_0036859–63, DOT_0036868.)   The locations of the studied intersections are depicted in Appendix A and demonstrate that potential impacts in Lower Manhattan, including the locations along West Street adjacent to BPC about which Plaintiffs now express concern, were fully evaluated.  Indeed, neither during the administrative process nor now do Plaintiffs suggest any specific expansion of the analysis locations or any basis for doing so.

Plaintiffs also speculate that traffic and air quality will worsen in BPC because the West Side Highway is an exempt thoroughfare, but the EA found that daily vehicle miles traveled on the West Side Highway would *decrease by between 15.8% and 20.5%*.  (DOT_0036354,

---

required to accept a second round of comments on the final version of the implementation plan.  *See Hall,* 273 F.3d at 1163.  Meanwhile, *SSA Terminals* was a social security disability case involving a single claimant who raised an issue in his post-hearing brief, which the administrative law judge addressed in the decision document.  *SSA Terminals,* 821 F.3d at 1174.  Neither case holds that comments submitted eight months after the close of a public comment period for a NEPA document will preserve the issue for judicial review.

DOT_0036360.)   Plaintiffs argue that this finding is "improper[]" because it reflects traffic decreases along all of the West Side Highway, and speculate that traffic near BPC may worsen because of increased traffic through the Hugh L. Carey Tunnel.  Pls. Reply Br. 37.  But the EA studied this very issue and found that while there would be slight increases in vehicles using the Hugh L. Carey Tunnel, the effects "would be minimal" and did not exceed applicable thresholds for determining significance.  (DOT_0036469–70, DOT_0036424–33.)  In other words, the EA analyzed the same volumes Plaintiffs are concerned about and found them insignificant; the same small volume of additional traffic is not more likely to cause significant impacts as it leaves the tunnel and moves onto the highway.  Moreover, the EA's air quality section included a detailed analysis of "every highway link" in the region "under every scenario," and modeling showed that even the worst-case highway links would not experience exceedances of applicable air quality standards.  (DOT_0036863–65.)  The area that Plaintiffs are concerned about was not one of the worst highway links by any metric.  (DOT_0006844–46.)

Contrary to Plaintiffs' contention, there was nothing "siloed" about the analysis, Pls. Reply Br. 35; the EA studied the relevant "worst case" tolling scenario for each impact category to ensure that the potential impacts of the Project were fully evaluated.  Defs. Br. 30–35 (summarizing traffic and air quality analyses).  The fact that other areas may see greater impacts from the Project and so warranted localized analysis in no way undermines the EA's extensive analysis of Lower Manhattan and BPC.  Plaintiffs' speculation cannot overcome the deference owed to an expert agency's technical analysis under NEPA.  *See Lat. Ams. for Soc. & Econ. Dev.*, 858 F. Supp. 2d at 855; *see also Citizens for Balanced Env't & Transp., Inc. v. Volpe*, 650 F.2d 455, 462 (2d Cir.

1981) (courts do not sit as a super-agency to review expert agency judgements *de novo*).[17]

Plaintiffs assert that these technical studies "ignore[] the reality of living in BPC," complaining that Chapter 5B of the EA, on neighborhood character, mischaracterized BPC as part of a "Commercial Business District." Pls. Reply Br. 36. Initially, this quoted phrase does not appear in Chapter 5B or, for that matter, anywhere in the EA. Moreover, Chapter 5B specifically acknowledged the "notable increase in residential use" in "Lower Manhattan south of Chambers Street" and found that the Project's encouragement of pedestrian uses over automobile traffic would "reinforce the established patterns of land use . . . that are defining features of neighborhood character in the Manhattan CBD study area." (DOT_0036660–62, DOT_0036674.) And Plaintiffs could certainly have commented on this subject in a timely fashion—yet they did not. In turn, Plaintiffs have provided no basis to upend the EA's finding that the Project would not "notab[ly] change" neighborhood character. (DOT_0036674.) Once the Project is implemented, BPC will continue to exist across a highway from the rest of Lower Manhattan, but the highway will experience less traffic.

Finally, Plaintiffs argue that BPC residents should be exempt from tolls or pay reduced tolls, but this is a policy disagreement that cannot support a challenge based on NEPA's procedural requirements. *See Stewart Park & Reserve Coal., Inc. (SPARC) v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003) ("NEPA is a procedural statute that mandates a process rather than a particular result.").

---

[17] Plaintiffs object to using of Tolling Scenario D to evaluate highway and intersection traffic in Lower Manhattan, but as the EA explained, "Tolling Scenario D was selected for detailed traffic analysis because it has a higher number of potentially affected intersections in the critical Lower Manhattan Study Area." (DOT_0036404.) The Court should defer to FHWA's reasonable and adequately explained methodological choice. *Communities Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004). As Defendants previously explained, modeling indicated that Tolling Scenario D would result in larger increases in Manhattan-bound volumes through the Hugh L. Carey Tunnel than Scenarios A or B (although the minor changes fall below the applicable significance threshold). (DOT_0036370–71.) Finally, Plaintiffs' claim (Pls. Reply Br. 3) that studying the worst-case impacts from each scenario did not address the cumulative impacts of the Project makes no sense; if anything, the EA overstated the overall potential impacts by utilizing worst-case assessments.

Providing an exemption would only serve to reduce the benefits of the Project and make traffic worse than predicted in BPC without such an exemption.  Again, this point betrays Plaintiffs' true complaint, which has nothing to do with environmental concerns and everything to do with maintaining their ability to drive around Manhattan toll free and contribute to gridlock and air pollution.  It is truly ironic that Plaintiffs, apparently daily drivers, seek to upend the Project through speculation that *the Project* will increase traffic and air pollution in their neighborhood. The Project will reduce these concerns, while Plaintiffs seek to add to them.[18]

## VI.   The EA Took a Hard Look at Environmental Justice Communities and Adopted Binding, Enforceable Mitigation Measures That Fully Comport With NEPA

Plaintiffs' reply brief abandons many of their original challenges and raises several new ones.  Even assuming Plaintiffs' challenges are properly before the court, EPA and FHWA approved the EJ analysis and its accompanying mitigation package (DOT_0037025–27, DOT_0045366), and Plaintiffs have provided no basis to upset the agencies' expert judgment.  *See Sierra Club v. FERC*, 867 F.3d 1357, 1370 (D.C. Cir. 2017).

### A.   Plaintiffs Misunderstand the Nature and Purpose of the Environmental Justice Study

Plaintiffs' arguments reflect a basic misunderstanding about how and why the EJ analysis was undertaken.  NEPA, the federal statute on which Plaintiffs' claims are based, does not require agencies to consider EJ; instead, EJ is an overlay policy that stems from Executive Order 12,898 and its successors.  *See, e.g.*, *Trenton Threatened Skies, Inc. v. F.A.A.*, 90 F.4th 122, 138 (3d Cir. 2024).  Whereas NEPA requires agencies to consider "whether the effects of the *proposed action* are significant," 40 C.F.R. § 1501.3(b); *see also* 42 U.S.C. § 4332(C), the EJ analysis asks a

---

[18] The brief of *amici curiae* Environmental Defense Fund et al. (ECF No. 73) describes the variety of predicted benefits of the Project, including reduced air pollution and traffic within the CBD.  Notably, no environmental groups have joined in any of the multiple lawsuits challenging the NEPA review of the Project, while many have joined as amici in support.

different question: whether a project will have a "disproportionately high and adverse" effect on EJ communities (EO 12,898) that "face entrenched disparities" resulting from a "legacy" of "discriminatory land use decisions," including "the routing of highways and other transportation corridors" (EO 14,096).  Put differently, while NEPA is forward-looking and asks whether a *project's* impacts are *significant*, the EJ Executive Orders require agencies to study *preexisting burdens* and consider, regardless of the significance of the project's impacts, whether a proposed project will have a "disproportionately high and adverse" "effect" on EJ communities.  EO 12,898; *see also Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 954 n.3 (7th Cir. 2003) (explaining traditional NEPA review "requires agencies to take a 'hard look' at the environmental consequences *of their projects*," and "neither NEPA nor its implementing regulations require an agency to perform an EIS or to remedy a preexisting environmental problem") (citation omitted).  FHWA's Order 6640.23A, "FHWA Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," directs the agency to include "any relevant findings identified during the implementation of this directive … in the planning or NEPA documentation that is prepared for the appropriate program, policy, or activity."[19]

The EA's air quality and EJ analyses follow this framework.  Recall that the EA's air quality study—the methodology for which Plaintiffs have not challenged—found that the Project would not result in any significant adverse impacts on air quality using EPA's national ambient air quality standards, which are set with "an adequate margin of safety … to protect public health." 42 U.S.C. § 7409(b)(1); (DOT_0036866–68).  Despite the fact that the Project would have very small increases in emissions at some locations, the Project Sponsors undertook an additional analysis to address concerns that certain communities already bear disproportionate pollution and

---

[19] https://www.fhwa.dot.gov/legsregs/directives/orders/664023a.cfm.

chronic disease burdens due to *preexisting development patterns and highway locations*. (DOT_0036982, DOT_0007249–51, DOT_0007262–87.)  In other words, even though the Project will not cause exceedances of health-based air quality standards, the Project Sponsors committed to mitigation to address even minimal Project impacts in light of *preexisting* burdens. (DOT_0037016–20, DOT_0007322–26.)  Consistent with the EJ Executive Orders' focus on entrenched disparities, communities were identified as warranting regional mitigation if they suffered from high *preexisting* pollutant or chronic disease burdens (above the 90th percentile) and would see *any increase* in truck traffic.  (DOT_0007318–23).  Those communities with both pollutant and chronic disease burdens at high levels were identified for localized place-based mitigation.  (DOT_0007323–26.)[20]

## B.   The EA's Environmental Justice Analysis Satisfied the Executive Orders and NEPA

With this context in mind, Plaintiffs' challenges to the Final EA's EJ analysis fail.  Indeed, Plaintiffs have abandoned most of the arguments that they raised in their moving papers.  Plaintiffs no longer challenge the methodology for identifying EJ communities, Defs. Br. 45–46; they no longer claim that the supplemental analysis in Appendix 17D merely included "more precise maps," *id.* at 48; and they acknowledge that the EJ analysis was not done on a "county-wide basis," conceding that the EA studied over 3,000 individual census tracts, *id.* at 46–47.[21]

Having abandoned those arguments, Plaintiffs shift to quoting from EPA and FHWA's

---

[20] As the EA explained, the threshold used to identify communities warranting place-based mitigation—those above the 90th percentile for pollutant and chronic disease burdens—came from the latest CEQ guidance on directing federal investments in EJ communities.  (DOT_0007313.)

[21] As explained in Point I, *infra*, Plaintiffs lack standing to raise their EJ challenges in this litigation.  The only Plaintiffs that actually live in EJ communities did not file their claims in a timely manner, and Plaintiffs concede that Plaintiffs Chan and Hoffman (the original Plaintiffs) do not live in EJ communities.  Pls. Reply Br. 35.  Instead, Plaintiffs Chan and Hoffman base their standing on the fact that they drive into EJ communities.  *Id.*; *see also* Hoffman Supp. Decl. ¶ 4.  Again, Plaintiffs' attempt to demonstrate standing by claiming that they prefer to drive to EJ communities and add to the existing pollutant burdens in those communities is not only outside NEPA's zone of interests, but highly ironic.

comments on earlier drafts of the EA.  Pls. Reply Br. 31–33.  Here again, the comments that Plaintiffs recite were fully addressed to the agencies' satisfaction through a supplemental analysis that assessed potential localized impacts on over 3,000 census tracts, and described in detail an enforceable, $155 million mitigation package to benefit EJ communities with preexisting burdens that could see any increase in truck traffic from the Project.  (DOT_0036989–96, DOT_0006963–82, DOT_0007243–440.)  Plaintiffs now claim that the supplemental EJ analysis "did not address EPA's core concerns."  Pls. Reply Br. 32–33.  This is refuted by EPA's final comments, which "acknowledge[d] the improvements throughout the NEPA process," praised the supplemental analysis and mitigation program, and did not request any further analysis or mitigation.  (DOT_0045366).[22]

Next, Plaintiffs lodge two new methodological challenges for the first time on reply, arguing that the supplemental EJ study only "conducted . . . one highway truck diversion analysis" and that the EA improperly used Tolling Scenario E to assess potential impacts from truck traffic.  Pls. Reply Br. 33–34.  Initially, Plaintiffs waived these objections by not raising them until their reply brief.  *See Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010).  Regardless, both contentions are wrong.  First, the supplemental EJ analysis studied potential diversionary impacts from both truck and non-truck traffic, in each case using the tolling scenario modeled to produce the greatest diversionary effects to capture the worst-case scenario.  (DOT_0007291–303 (modeling truck traffic using Tolling Scenario E), DOT_0007303–12 (modeling non-truck traffic using Tolling Scenarios E and G).)  Second, contrary to Plaintiffs'

---

[22] Plaintiffs attempt to downplay EPA's last word as "muted."  Pls. Reply Br. 7.  In fact, EPA "acknowledge[d] the improvements throughout the NEPA process, specifically to address potential impacts of the proposed action on communities with environmental justice concerns" including identifying the "EJ Technical Memorandum," "improved clarity regarding mitigation commitments," "additional low-income driver mitigation," "place-based mitigation to respond to potential public health impacts in neighborhoods that may experience an increase in vehicular traffic," and "incorporating an adaptive management approach" to mitigation.  (DOT_0045366.)

contention, the Final EA evaluated truck traffic—which was of greater concern because diesel trucks emit greater amounts of pollutants—using Tolling Scenario E because it reflected "the maximum truck diversions by volume for all census tracts in the 10-county environmental justice study area." (DOT_0007291.)[23]  The basis for these decisions was "reasonable and adequately explained," and Plaintiffs' arguments reflect no more than a methodological difference of opinion, with no technical basis, which cannot support a NEPA claim.  *Sierra Club*, 867 F.3d at 1368–70.

Finally, Plaintiffs call the supplemental EJ analysis "cursory," "barebones," and "narrow," Pls. Reply Br. 32–33, a gross mischaracterization.  Described in greater detail in Defendants' moving papers at pages 39–44, the EJ chapter and appendices included hundreds of pages of analysis and detailed a $155 million mitigation package.  (DOT_0036989–96, DOT_0006963–82, DOT_0007243–440.).  This analysis does not remotely resemble that of *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d 101, 140 (D.D.C. 2017), in which the agency artificially limited the geographic scope of its analysis and did not adequately explain its methodology or conclusions.[24]

## C.  The Mitigation Package and Analysis Fully Comport with NEPA

Plaintiffs' claims related to mitigation follow a common but flawed theme: that the EA and FONSI lack sufficient information about mitigation and how it will yield environmental benefits.

---

[23] Plaintiffs suggest "that Tolling Scenario 'E' was chosen because it had maximum truck diversion on a county-wide basis, but zooming out to the county-level, particularly when specific census tracts had already been identified in the analysis, defies logic." Pls. Reply Br. 33.  Plaintiffs are mistaken.  Scenario E was used because modeling showed that it would produce the greater overall diversionary impacts at the *census tract level*.  (DOT_0007291 ("Tolling Scenario E has the maximum truck diversions by volume for all census tracts in the 10-county environmental justice study area.").)

[24] Although not in their brief, Plaintiffs submitted an attorney declaration with a list of schools in the same zip codes as exempted thoroughfares under the Project.  *See* Supp. Klinger Decl., Ex. 2, ECF No. 78-3.  In addition to the fact that this is not in the administrative record, it is irrelevant.  The mitigation funding committed to installing air filtration systems in schools is targeted for schools in census tracts with high preexisting burdens and that are located within 300 meters of highways where truck traffic is projected to increase, not all schools in the same zip code of a highway. (DOT_0037019.)  Again, the West Side Highway is predicted to have a reduction in traffic and air pollution with the Project.

Pls. Reply Br. 21–26.  Plaintiffs misstate the law and the facts.  On the law, Plaintiffs do not dispute that "proposed mitigation measures need not be laid out to the finest detail," *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 231 (5th Cir. 2007), and they agree that NEPA only requires agencies to discuss mitigation "in sufficient detail to ensure that environmental consequences have been fairly evaluated," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989). Plaintiffs also concede that "[t]he procedural requirements of NEPA do not force agencies to make detailed, unchangeable mitigation plans for long-term development projects." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010).  In addition, agencies are "not required to mitigate impacts to zero to justify a FONSI," and "mitigation need only be developed to a reasonable degree."  *Fallon Paiute-Shoshone Tribe*, 2022 WL 3031583, at *9 (internal quotation marks and citation omitted).

Without disputing these principles, Plaintiffs argue that the EA and FONSI contain a "menu of 'to-be-determined' mitigation measures" with "cursory" or "meager" details.  Pls. Reply Br. 22–25.  This is a blatant mischaracterization.  The EA contains a detailed description of each regional and place-based mitigation measure, how it will be implemented, how it will provide clear environmental benefits, and how the locations for certain mitigation measures were established through a screening process designed to target the areas beset with particularly high preexisting pollutant and chronic disease burdens.  (DOT_0007313–28, DOT_0037016–20.)  Indeed, while Plaintiffs claim that the EA does not explain "how the measures serve to reduce the impacts to a less-than-significant level," Pls. Reply Br. 23, Plaintiffs completely ignore the lengthy description in the EA and Defendants' briefs outlining each mitigation measure and its environmental benefits. Defs. Br. 50–51; Fed. Defs. Br. 41–43.  (DOT_0007321–28, DOT_0037016–18.)  Moreover, Plaintiffs' argument reflects the basic misunderstanding described above—the EJ mitigation

program was not adopted to reduce air quality impacts to a "non-significant" level; indeed, the EA's air quality analysis found that there would be no significant adverse impacts requiring mitigation.  (DOT_0007249–51, DOT_0007322–28.)   Rather, the EJ mitigation package is designed primarily to address *preexisting* burdens, where small impacts from the Project could add to them.[25]  Tellingly, Plaintiffs have not cited any case in which a court overturned an EJ mitigation package as insufficient or insufficiently explained.

Plaintiffs also assert that the mitigation package is not "binding," but this too is false.  Pls. Reply Br. 23.  Each of the measures laid out in the $155 mitigation package is fixed, regardless of the final tolling structure, and the incorporation of these measures into the FONSI makes the mitigation package enforceable.  *See* 40 C.F.R. § 1501.6(c) (simply requiring a FONSI to "state any enforceable mitigation requirements or commitments"); DOT_0000383 (outlining mitigation in the FONSI).  The EA and FONSI clearly announce that the Project Sponsors "will" implement the mitigation measures in no uncertain terms.  (DOT_0000382, DOT_0007321 [stating "the Project Sponsors commit" to implementing mitigation measures].)   In addition, FHWA's regulations require the Project Sponsors to implement the mitigation package subject to FHWA's "stewardship and oversight."  23 C.F.R. § 771.109(b)(1).  The notion that the mitigation package is "to-be-determined" or "amorphous" is simply not true.

The exact locations for some place-based mitigation measures have not been decided, but this does not negate the commitment to implement those measures.  As the EA explained, because the "specific census tracts that would experience increased or decreased traffic change slightly

---

[25] Plaintiffs continue to rely on *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225 (5th Cir. 2007), but as Defendants previously explained, the mitigation discussion in that case included no "data or analysis," relied on unspecified "Best Management Practices," and indicated that traffic impacts "may" be mitigated through changes in traffic control signs or signals.  *Id.* at 231–34.  Plaintiffs also cite *Maryland-National Capital Park & Planning Commission v. U.S. Postal Service*, 487 F.2d 1029, 1040–41 (D.C. Cir. 1973), but that case did not involve mitigation; rather, the agency in that case argued that the problem of run-off "cannot be" solved.

depending on the tolling scenario," (DOT_0036994), the Project Sponsors will apply the same traffic and air quality methodologies laid out in Appendix 17D to the adopted tolling structure to identify the specific census tracts that warrant place-based mitigation—*i.e.*, those that face high preexisting pollutant and chronic disease burdens that would also see *any* increase in truck traffic proximity.   (DOT_0007313–26.)   The Project Sponsors will then coordinate with the "Environmental Justice Community Group (representing the 10-county environmental justice study area), the relevant communities receiving the place-based mitigation, and local implementing agencies" to "prioritize and select the specific locations" based on a "needs assessment and feasibility screening."   (DOT_0007328.)   The EA also outlined the "specific feasibility factors and forms of engagement" that the Project Sponsors would use to identify specific locations for each place-based mitigation measure.   (DOT_0037019–20.)   Plaintiffs' mischaracterization of this approach as an "utterly amorphous process" is mere rhetoric.   Pls. Reply Br. 26.

Indeed, this approach is fully consistent with NEPA, which does not "force agencies to make detailed, unchangeable mitigation plans."   *Salazar*, 616 F.3d at 517; *see also Tillamook Cnty. v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002) (holding that mitigation in an EA must be developed "to a reasonable degree" but an agency is "not required to develop a complete mitigation plan detailing the precise nature of the mitigation measures").   The EA's approach, which forms part of an adaptive management plan that EPA recommended (DOT_0045366), fully comports with NEPA.   Courts have long held that "fixed mitigation measures and an adaptive management plan…amply fulfill NEPA's mandate to discuss mitigation

29

measures." *Salazar*, 616 F.3d at 517.  That is exactly what FHWA approved here.[26]

Plaintiffs do not dispute that courts have long approved adaptive management programs as consistent with NEPA.  *See, e.g.*, *Salazar*, 616 F.3d at 517; *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1104 (9th Cir. 2012); *Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 55 F. Supp. 3d 316, 365 (E.D.N.Y. 2014).  Instead, they argue that adaptive management is not appropriate here—even though FHWA and EPA explicitly recommended that such a program be implemented—because "the effects" of the Project "are known."  Pls. Reply Br. 24–25.  Plaintiffs cite a single district court decision, which criticized the much less defined mitigation proposal at issue there as "a plan to make a plan."[27]  Here, while the worst-case effects of the Project are predicted in the EA, FHWA (with EPA's concurrence) reasonably concluded that an adaptive management program would provide flexibility to implement mitigation based on consideration of the adopted tolling structure using the same analysis methodology, as well as community and local agency feedback on the most feasible and effective measures for particular communities.  This approach also comports with federal guidance that instructs agencies to engage with EJ communities to develop and implement mitigation.[28]  As the D.C. Circuit has explained:

---

[26] Plaintiffs claim that at oral argument in a related New Jersey action (*New Jersey v. U.S. Department of Transportation*, No. 23 Civ. 03885), "Defendants conceded . . . that it was possible an entire category of mitigation for certain parts of New Jersey could emerge as part of a larger mitigation package."  Pls. Reply Br. 23.  This is not accurate, and the only source Plaintiffs cite for support is a news article, not the transcript of that proceeding.

[27] *Hells Canyon Pres. Council v. Connaughton*, No. 11 Civ. 00023, 2012 WL 13047991, at *10 (D. Or. Aug. 10, 2012), *R. & R. adopted as modified*, No. 11 Civ. 00023, 2013 WL 665134 (D. Or. Feb. 22, 2013).  The case is easily distinguishable.  The mitigation measures that the agency relied on in *Hells Canyon* were "only recommendations for plans that had not yet been drafted."  *Id.*  That is a far cry from the extensive mitigation package here.  (DOT_0007313–28, DOT_0037016–20.)  In addition, in *Hells Canyon* the Forest Service reauthorized livestock grazing permits on federal lands under a categorical exclusion—*i.e.*, without even completing an EA.

[28] *See* DOT_0037034 ("Public engagement is a critical component of USDOT's and FHWA's policies and practices related to environmental justice."); USDOT Order 5610.2C (May 16, 2021), https://www.transportation.gov/sites/dot.gov/files/2021-08/Final-for-OST-C-210312-003-signed.pdf; FHWA, Guidance on Environmental Justice and NEPA (Dec. 16, 2011), https://www.environment.fhwa.dot.gov/env_topics/ej/guidance_ejustice-nepa.aspx (noting that EO 12898 "promotes meaningful opportunities for access to public information and for public participation in matters relating to minority and low-income communities and their environment").

"Allowing adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of environmental impacts, not a violation of NEPA.  It is certainly not arbitrary or capricious."  *Salazar*, 616 F.3d at 517.[29]

Plaintiffs further argue that the EA does not explain how areas were selected for place-based mitigation.  Pls. Reply Br. 34.  For context, the EA describes two types of mitigation designed to address preexisting burdens in EJ communities.  The first is a $55 million regional mitigation package that includes measures like reducing the overnight period toll rate and expanding the NYC Clean Trucks Program to directly reduce truck emissions, which will improve air quality for highway-adjacent communities throughout the region.  (DOT_0007322–23, DOT_0037016–19.)  The second is the $100 million place-based mitigation package that "will provide direct emissions reductions and air quality improvements" in the communities facing the greatest preexisting pollutant and disease burdens.  (DOT_0007323–28.)

With this in mind, Plaintiffs claim to be confused about two charts in the EA, which on even cursory review are quite clear.  The first chart identifies communities that "may need mitigation" as those with *either* high pollutant *or* chronic disease burdens.  (DOT_0007319–20.)  As the EA explained, these communities will benefit from regional mitigation.  (DOT_0007321–23; DOT_0036211.)  The second chart identifies the subset of communities with *both* high pollutant *and* chronic disease burdens (*i.e.*, burdens that that exceed the 90th percentile,

---

[29] Plaintiffs spend considerable effort in a failed attempt to distinguish *Salazar*.  *Salazar* involved the Bureau of Land Management's ("BLM") approval of a Record of Decision for the development of natural gas on "more than 270,000 acres of publicly and privately owned land in south-central Wyoming."  *Salazar*, 616 F.3d at 502.  Plaintiffs say that *Salazar* approved the adaptive management program "because BLM had committed to supplementing its EIS with" further site-specific reviews for individual drilling permits.  Pls. Reply Br. 24 (citing *Salazar*, 616 F.3d at 511–12).  The "tiered" environmental analysis described in *Salazar* had no bearing on the court's endorsement of the adaptive management program; this was an entirely separate portion of the court's decision.  Plaintiffs also point to the D.C. Circuit's nod to a "thirteen-page" list of protective measures to be applied to each drill plan.  *Salazar*, 616 F.3d at 516.  This factual point simply reflects the nature of the project under review in *Salazar* and the need to establish specific mitigation thresholds to govern future drilling permits.  It does not undermine the extensive, twenty-page discussion of mitigation in the EA for this Project.  (DOT_0007313–28, DOT_0037016–20.)

DOT_0007326); because these are the areas that suffer from the greatest preexisting burdens, they are also identified for place-based mitigation.  (DOT_0007321–28, DOT_0036211.)   This commonsense approach, which provides regional mitigation that will benefit the entire study area and then provides targeted, localized mitigation to the areas that face the highest preexisting pollutant and health burdens, cannot seriously be described as "inexplicable" or "arbitrary."  Pls. Reply Br. 34; *see also Fallon Paiute-Shoshone Tribe v. U.S. Dep't of the Interior*, No. 21 Civ. 00512, 2022 WL 137069, at *4 (D. Nev. Jan. 14, 2022), *order aff'd, appeal dismissed*, No. 22 Civ. 15092, 2022 WL 3031583 (9th Cir. Aug. 1, 2022) ("In evaluating the sufficiency of mitigation measures, the Court must consider whether the mitigation measures 'constitute an adequate buffer against the negative impacts that may result from the authorized activity.'  The agency is entitled to deference in making these types of determinations based on technical data." (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001)); *Coal. for Healthy Ports v. U.S. Coast Guard*, No. 13 Civ. 5347 (RA), 2015 WL 7460018, at *21 (S.D.N.Y. Nov. 24, 2015) (describing deferential standard of review for evaluating mitigation).

Finally, Plaintiffs heavily (and disingenuously) rely on EPA and FHWA's comments on earlier versions of the EJ analysis, in which the agencies pushed for greater clarity on mitigation. Critically, those comments were made on drafts prior to the inclusion of the binding mitigation package contained in the Final EA and that did not identify all communities with either high pollutant burdens or high chronic disease burdens.  Contrary to Plaintiffs' suggestion, the feedback that Plaintiffs cite was incorporated into the final analysis and mitigation package, which FHWA (with EPA's concurrence) ultimately approved.  (DOT_0037026, DOT_0045366).  If anything, these comments and the resulting analysis reflect the scrutiny that the Project received throughout its development, which resulted in the comprehensive Final EA and FONSI and its robust

mitigation package—epitomizing the value of the NEPA process.  *See City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1156 (9th Cir. 1997).[30]

### VII.  Plaintiffs' Demand that the Court Preemptively Order a Supplemental EA or EIS Is Premature

Plaintiffs once again confuse the NEPA process surrounding reevaluations and supplementation.  Plaintiffs request that the Court force FHWA and the Project Sponsors to skip the very process used to determine whether a supplemental review is needed.  Pls. Reply Br. 37.  As explained, reevaluations consider whether the environmental document in question "remains valid" following project changes or updates. Defs. Br. 53; 23 C.F.R. § 771.129.  Those project updates, contrary to Plaintiffs' claim, can occur before agency approval of a project. 23 C.F.R. § 771.130.[31]  Only if the document is no longer valid as a result of the changes is a supplemental review needed.  23 CFR § 771.130.  Indeed, the reevaluation process will directly answer Plaintiffs' premature questions regarding the consistency of the effects of the adopted tolling structure with those of the range of scenarios analyzed in the EA.  It is only after the reevaluation is completed that FHWA will decide whether to require a supplemental NEPA process or proceed to authorize tolling through a VPPP Agreement.  *Nev. v. Dep't of Energy*, 457 F.3d 78, 85 (D.C. Cir. 2006) ("[F]inal agency action pursuant to the [APA] is a crucial prerequisite to ripeness.") (internal quotations and citations omitted).  The cases Plaintiffs cite to support their arguments in

---

[30] The final mitigation package was also supported by the Environmental Justice Technical Advisory Group, made up of "community leaders, advocacy groups, industry groups, and community members from the regional study area with expertise in environmental justice considerations."  (DOT_0037037–39, DOT_0041535–61.).  Tellingly, one member of the Technical Advisory Group has joined the amicus brief in support of Defendants in this action.  ECF No. 73.

[31] See also NEPA Reevaluation Joint Guidance for Federal Highway Administration (FHWA), Federal Railroad Administration (FRA), and Federal Transit Administration (FTA) 2–3 (Aug. 14, 2019), https://www.environment.fhwa.dot.gov/legislation/nepa/reevaluation_guidance_08142019.pdf.

fact support the position that their demand for a supplemental review is premature.[32]   Thus, Plaintiffs' NEPA challenge to the adopted tolling structure will not ripen until after FHWA completes its reevaluation and determines whether supplementation is needed.  At this time, there is no record for the Court to review to evaluate the reasonableness of a decision yet to be made. Again, Plaintiffs assume a "know it when they see it" position, which has no basis in law, in demanding that the Court determine the need for a supplement based on Plaintiffs' say-so.  This Court well knows its role in this circumstance is not to direct agency action, but to review it *after* it occurs.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

---

[32] In *Dine Citizens Against Ruining Our Environment v. Klein*, the court held that where an action was still ongoing, plaintiff's request for supplementation was not ripe.  676 F. Supp. 2d 1198, 1214–15 (D. Colo. 2009) ("Completion of the administrative process with respect to these actions will also benefit the court, as a more complete record will allow a more confident assessment of whether either presents 'significant new circumstances or information relevant to environmental concerns' that may trigger an obligation to prepare a supplemental NEPA review document."). Additionally, in *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1174–75 (11th Cir. 2006), the court held that only "[w]hen an agency fails to satisfy [a] procedural duty, [is] a plaintiff's claim [] ripe for review."  Here, there has been no procedural violation, as FHWA is doing precisely what it is supposed to do—conduct a reevaluation to determine if a supplemental review is needed.

Dated: April 22, 2024

Respectfully submitted,

SYLVIA O. HINDS-RADIX
Corporation Counsel of the City of New York
By:   */s/ Nathan Taylor*
        Nathan Taylor
        Senior Counsel
        Environmental Law Division
        New York City Law Department
        100 Church Street
        New York, NY 10007
        (212) 356-2315
        ntaylor@law.nyc.gov

*Counsel for Defendant the New York City
Department of Transportation*

*/s/ Elizabeth Knauer*
Elizabeth Knauer
Mark A. Chertok
John F. Nelson
Amy Cassidy
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th Floor
New York, NY 10022
(212) 421-21501214-15
eknauer@sprlaw.com
mchertok@sprlaw.com
jnelson@sprlaw.com
acassidy@sprlaw.com

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan
Gabrielle E. Tenzer
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
rkaplan@kaplanhecker.com
gtenzer@kaplanhecker.com

Joshua A. Matz
Kate Harris (*pro hac vice* forthcoming)
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
jmatz@kaplanhecker.com
kharris@kaplanhecker.com

*Counsel for Defendants the Metropolitan
Transportation Authority and the
Triborough Bridge and Tunnel Authority*

# Appendix A



*Broadway & West 179th Street location is located north of illustrated map extent, though demonstrates *No Adverse Impact*

Source:  DOT_0036476