Alan Klinger
212 378 7677
aklinger@Steptoe.com

**Steptoe**

1114 Avenue of the Americas
New York, NY 10036

**VIA CM/ECF**                                               June 17, 2024

The Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *Chan v. U.S. Dep't of Transp.* ("*Chan*"), No. 23 Civ. 10365; *Mulgrew v. United States Dep't of Transp.* ("*Mulgrew*"), No. 24-cv-01644 (SDNY)

Dear Judge Liman:

We write on behalf of the *Chan* and *Mulgrew* Plaintiffs in the above-referenced matters in response to Your Honor's Order, dated June 10, 2024, requesting letters indicating whether any party believes the case is now moot or the motions no longer require decision.

As explained below, we do not believe it appropriate for the Court to decide the motions now, first, because the "re-evaluation" required by the National Environmental Policy Act ("NEPA") was released just this past Friday, many months after the tolling construct to be assessed was determined and where Plaintiffs can now only begin the review to assess whether leave should be sought to challenge it; and second, and more importantly, because New York Governor Kathy Hochul (the "Governor") has indefinitely paused the program "to continue studying [congestion pricing], consider[] our options, [and] hear[] from people …".  Given the fluid and uncertain nature of this ongoing process, we do not believe the case is moot, and request that the Court stay the actions for a period of 90 days, or until such time as a formal determination is made as to whether Defendants will proceed with Congestion Pricing at all, significantly modify the program which would call for a new environmental review, or alter the program in some respects for which Defendants would contend that they could rely on the same Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") at issue here.

On June 5, 2024, the Governor issued a now widely covered statement indefinitely halting the implementation of Congestion Pricing, explaining that "circumstances have changed" for a program that "was enacted in a pre-pandemic period where workers were in the office five days a week… ."  The Governor stated that implementing Congestion Pricing "risks too many unintended consequences," particularly to working and middle-class New Yorkers.[1]  The Governor stopped short of canceling the program altogether, but suggested in subsequent remarks that "to assume that the only funding source [for improvements to mass transit] has to be congestion pricing shows a lack of imagination" and that there are "other ways to deal with this."[2]  As has been widely

---

[1] *Video, Audio & Rush Transcript: Governor Hochul Addresses New Yorkers on Affordability and the Cost of Living*, NYS (June 5, 2024), https://www.governor.ny.gov/news/video-audio-rush-transcript-governor-hochul-addresses-new-yorkers-affordability-and-cost.

[2] *Hochul Still 'Committed' to MTA Improvements Despite Congestion Pricing Pause*, ABC7 NY (June 10, 2024), https://abc7ny.com/post/congestion-pricing-pause-hochul-committed-mta-improvements/14932184/.

reported, in the days after the Governor's initial statement, the Legislature and the Governor began looking for alternatives that would raise revenue for the MTA (alternatives, we have argued, that should have been explored *prior* to enacting a draconian toll on everyday New Yorkers). According to most press reports, while the legislative session has concluded, the process to identify additional sources of revenue for the MTA and other strategies for reducing congestion (without imposing a regressive tax) remains ongoing.

While, as the MTA suggests, the motions in *Chan* and *Mulgrew* are fully briefed and argued, any decision by the Court – without clarity as to whether the program will go forward – would at this time be based on a hypothetical and entirely advisory.  Despite the MTA's confidence that the program will be implemented as soon as the "current pause is lifted," the Governor has indefinitely halted the program, and its fate as a workable construct is far from certain.

Among the "oldest and most consistent threads in the federal law of justiciability is that federal courts will not give advisory opinions."  *In re Motors Liquidation Co.*, 829 F.3d 135, 167-68 (2d Cir. 2016) (quotation marks omitted).  No principle is more fundamental to the judiciary's role in our system of government than the constitutional limitation of federal court jurisdiction to hear concrete cases or controversies.  "Courts will not entertain a declaratory judgment action when any decree that the court might issue will become effective only upon the occurrence of a future event that may or may not come to pass."  *N.Y. Pub. Rsch. Grp, Inc. v. Carey*, 42 N.Y.2d 527, 529-30 (1977) (quotation omitted); *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406-407 (S.D.N.Y. 2002), *aff'd* 346 F.3d 357 (2d Cir. 2003) (same).

NEPA cases, too, recognize that when a federal project does not go forward, an order declaring the project illegal under NEPA would "accomplish nothing—amounting to exactly the type of advisory opinion that Article III prohibits."  *West v. Horner*, 810 F. Supp. 2d 228, 234 (D.D.C. 2011) (quotation marks omitted); *Catawba Riverkeeper Found. v. N.C. Dep't of Transp.*, 843 F.3d 583, 588 (4th Cir. 2016) (declining to reach a decision when agency counsel declared the project "defunct" and "no longer moving forward" because it faced barriers to construction).[3]

The Court's decision would become effective only upon the occurrence of a future event – the implementation of Congestion Pricing or some alternative program – that "may or may not come to pass."  To the extent Defendants suggest that Plaintiffs' first NEPA cause of action should be decided because Defendants intend to use the existing EA and FONSI for some future, undetermined project (when the pre-pandemic statistics used will be even more stale and detached from current reality), the argument is entirely speculative.  *See, e.g.*, *Catwaba Riverkeeper Found.*, 843 F.3d at 588-89 (declining to reach the merits of a defunct project even though the EIS could still be used if "shifting political priorities" revived the project).  The Court should not opine on the validity of the underlying EA and FONSI analysis, deficient or not, when it may never be used in the future – such an opinion would be the definition of advisory.  *E.g.*, *Long Island Lighting Co. v. Suffolk Cnty., N.Y.*, 604 F. Supp. 759, 764 (E.D.N.Y. 1985) (declining to reach a decision "requir[ing] the court to make a decision based on the uncertain occurrence of a future event").[4]

---

[3] When federal projects are formally abandoned in cases such as *West* and *Catawaba*, courts will dismiss them as moot.  The instant cases are not moot, as Congestion Pricing has not been formally abandoned, but the current posture of the matter does not foreclose that possibility.

[4] Defendants' cases in support of deciding the motions despite this uncertainty are readily distinguishable.  In *Saba v. Cuomo*, 535 F. Supp. 3d 282, 296 (S.D.N.Y. 2021), for example, plaintiffs challenged an existing DMV gender ID program for licenses that defendants promised would be, but had not yet been, discontinued.  There, unlike here, the

Further supporting the inappropriateness of a ruling now is that the NEPA review has only recently been completed.  Though the actual tolling construct was published on December 6 and adopted on March 27, the Federal Highway Administration ("FHWA") conveniently finished the required re-evaluation, at the behest of the MTA, last Friday.  Unsurprisingly, that "re-evaluation," conducted entirely outside public view, concluded that no further environmental analysis is warranted and the EA and FONSI remain valid despite the significant changes in the adopted toll from the hypothetical scenarios reviewed in the EA.  Yet while the FHWA "re-evaluation" concludes the adopted structure requires no further review, the present uncertainty means that the adopted scheme "re-evaluated" may not resemble the tolling scenario implemented.  Given the significant concerns expressed by the Governor, it is reasonable to assume that if congestion pricing goes forward at all, it would see significant changes in the construct.[5]

Relatedly, while Plaintiffs previously asserted that the failure to supplement NEPA claim was ripe, that cause of action was predicated on the "new information" that was at hand, *i.e.*, an altered, adopted tolling program not analyzed in the EA that required additional review.  At this stage, it is entirely unclear if the same "new information" will maintain or, indeed, what other new information may be part of any future plan.

Finally, at oral argument, the Court inquired about the timing of re-evaluation because of a concern Defendants would "be putting the Plaintiffs and the Court in a position where there's an application for a TRO and something like that."  Tr. 151:9.  While Plaintiffs can start to assess the mountain of material released late Friday, it would be unfair to force that process into an untenable timetable in the face of an imminent decision on the motions.  Moreover, it makes little sense to incur the time, expense and use of judicial resources to seek to amend the pleadings to assert a NEPA re-evaluation claim when the program may not proceed at all or may go forward in a very different configuration.  Should, however, the Court believe it appropriate to go forward with the litigation despite the current uncertainty, Plaintiffs would ask for adequate time to review the 175-page "re-evaluation," which at first blush seems to confirm the significance of the changes to the original tolling construct, and make the appropriate application before this Court.  Indeed, it seems more akin to a "supplementation" which would allow for public participation, completely absent from the re-evaluation process.

The status of Congestion Pricing – gleaned strictly at this point from news reports rather than agency action – remains opaque and in flux.  Defendants have not formally determined to go forward with the project, nor have they decided to abandon it.  As Defendants have decided to "pause" their decision on whether and how to go forward with Congestion Pricing, we believe it appropriate for the Court to similarly "pause" this litigation until further clarity is provided.

---

program was still injuring plaintiffs at the time of the decision; here Congestion Pricing has not been (and may never be) implemented.  Similarly, in *Dominion Cap. LLC v. Shiftpixy, Inc.*, No. 19 CIV 6704 (PGG), 2020 WL 114515 (S.D.N.Y. Jan. 10, 2020), the court was concerned that *defendants* attempted to moot the case by pausing the alleged breach of a securities agreement.  Here, the non-party Governor has decided to pause Congestion Pricing and, unlike in *Dominion Cap. LLC,* future action by defendants may not bear any resemblance to the initial proposal.

[5] The "re-evaluation," for example, like the EA, assumes for analyzing alternatives that the program should fund $1 billion in annual revenue, yet recent reports suggest that the Governor intends to find alternate funding for the MTA outside of Congestion Pricing, either during or before the budget process, and believes that Congestion Pricing will yield $400 million "if they hit that much" in revenues, not $1 billion.  Briella Tomassetti, *Hochul Justifies NYC Congestion Pricing Delay: 'Collective Sigh of Relief'*, Fox5 N.Y. (June 10, 2024, 8:46 AM), https://www.fox5ny.com/news/hochul-justifies-congestion-pricing-delay-there-collective-sigh-relief.

Respectfully submitted,

/s/

Alan M. Klinger

*Attorney for Plaintiffs*

4