UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

:

MICHAEL MULGREW, as President of the UNITED        :
FEDERATION OF TEACHERS, Local 2, American          :
Federation of Teachers, AFL-CIO, VITO J. FOSSELLA, :
individually and in his capacity as Staten Island Borough :
President, PAUL CAMINITI, TROY McGHIE,             :
MARTHA MAZIER, CARLY BIANCHINI, HANNAH             :
CHOI, FRANK GARCIA, LINDSEY LAMPF,                 :

:

                         Plaintiffs,               :

            -v-                                    :

:

UNITED STATES DEPARTMENT OF                        :
TRANSPORTATION, FEDERAL HIGHWAY                    :
ADMINISTRATION, SHAILEN BHATT, in his official     :
capacity as Administrator of the Federal Highway   :
Administration, RICHARD J. MARQUIS, in his official :
capacity as Division Administrator of the New York :
Division of the Federal Highway Administration, the :
METROPOLITAN TRANSIT AUTHORITY, the                :
TRIBOROUGH BRIDGE AND TUNNEL                       :
AUTHORITY, the NEW YORK STATE                      :
DEPARTMENT OF TRANSPORTATION, the NEW              :
YORK CITY DEPARTMENT OF TRANSPORTATION :

:

                         Defendants.               :

------------------------------------------------------------------ :

:

NEW YORKERS AGAINST CONGESTION                     :
PRICING TAX, DANNY BUZZETTA, DR. GREGOR            :
WINKEL, LEE BERMAN, MEREDITH LeVANDE,              :
RITA SUE SIEGEL, TOMMY LOEB, KATHRYN               :
FREED, TREVER HOLLAND, RICKY YANG, PAUL            :
ENG, BARUCH WEISS, ROBERT FRIEDRICH,               :
KEVIN FORRESTAL, WARREN SCHREIBER,                 :
CHRISTOPHER RYAN, BEN MASON, DENNIS                :
ROSARIO, RABBI Y.S. GINZBERG, JACOB                :
ENGLANDER, AARON GONZALEZ, HOWARD                  :
CHIN, ELAINE LA PENNA, THOMAS ANTHONY              :
SCARPACI, COUNCILMEMBER JOSEPH C.                  :
BORELLI, COUNCILMEMBER KRISTY                      :
MARMORATO, COUNCILMEMBER VICKIE                    :
PALADINO, COUNCILMEMBER JOANN ARIOLA,              :

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__6/20/2024__

24-cv-1644 (LJL)
24-cv-367 (LJL)
23-cv-10365 (LJL)

OPINION AND ORDER

COUNCILMEMBER SUSAN ZHUANG,                        :
COUNCILMEMBER KALMAN YEGER,                        :
COUNCILMEMBER INNA VERNIKOV,                       :
COUNCILMEMBER DAVID CARR,                          :
COUNCILMEMBER ROBERT F. HOLDEN, and                :
ASSEMBLYMEMBER DAVID WEPRIN, individually          :
and on behalf of all others similarly situated,    :
                                                   :
                    Plaintiffs,                    :
            -v-                                    :
                                                   :
                                                   :
UNITED STATES DEPARTMENT OF                        :
TRANSPORTATION, FEDERAL HIGHWAY                    :
ADMINISTRATION, SHAILEN BHATT, in his official     :
capacity as Administrator of the Federal Highway   :
Administration, RICHARD J. MARQUIS, in his official :
capacity as Division Administrator of the New York :
Division of the Federal Highway Administration,    :
METROPOLITAN TRANSPORTATION AUTHORITY, :
TRIBOROUGH BRIDGE AND TUNNEL                       :
AUTHORITY, NEW YORK STATE DEPARTMENT               :
OF TRANSPORTATION, NEW YORK CITY                   :
DEPARTMENT OF TRANSPORTATION and                   :
TRAFFIC MOBILITY REVIEW BOARD,                     :
                                                   :
                    Defendants.                    :
-------------------------------------------------------------------X
                                                   :
ELIZABETH CHAN, TAMARA HOFFMAN, and DOES :
1 through 200,                                     :
                                                   :
                    Plaintiffs,                    :
                                                   :
            -v-                                    :
                                                   :
UNITED STATES DEPARTMENT OF                        :
TRANSPORTATION, FEDERAL HIGHWAY                    :
ADMINISTRATION, SHAILEN BHATT, in his official     :
capacity as Administrator of the Federal Highway   :
Administration, RICHARD J. MARQUIS, in his official :
capacity as Division Administrator of the New York :
Division of the Federal Highway Administration, LISA :
GARCIA, in her official capacity, STEPHEN          :
GOODMAN, in his official capacity, ALLISON L.C. DE :
CERRENO Ph.D., in her official capacity, NICHOLAS  :
A. CHOUBAH, P.E., in his official capacity, WILLIAM :

J. CARRY, in his official capacity, and DOES 1 through      :
10.                                                          :
                                                             :
                        Defendants.                          :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

In *Mulgrew et al. v. U.S. Department of Transportation et al.* ("*Mulgrew*"), 24-cv-1644,

Defendant New York State Department of Transportation ("NYSDOT") moves, pursuant to

Federal Rule of Civil Procedure 12(b)(1), to dismiss the Amended Complaint for lack of

jurisdiction.  Dkt. No. 49.  Defendants U.S. Department of Transportation ("USDOT"), Federal

Highway Administration ("FHWA"), Shailen Bhatt in his official capacity as Administrator of

FHWA, and Richard J. Marquis in his official capacity as Division Administrator of the New

York Division of FHWA (together, the "Federal Defendants") and Defendants Metropolitan

Transportation Authority ("MTA"), New York City Department of Transportation

("NYCDOT"), and Triborough Bridge and Tunnel Authority ("TBTA," and together with the

MTA and NYCDOT, the "Municipal Defendants") move, pursuant to Federal Rules of Civil

12(b)(1) and 12(b)(6), to partially dismiss the Amended Complaint.  Dkt. Nos. 47, 52.  Plaintiffs

move for leave to file a Second Amended Complaint to substitute NYSDOT with Stephanie

Winkelhake in her official capacity as Chief Engineer of the NYSDOT.  Dkt. No. 63.

In *New Yorkers Against Congestion Pricing Tax et al. v. U.S. Department of

Transportation et al.* ("*New Yorkers*"), 24-cv-367, the NYSDOT moves, pursuant to Federal

Rule of Civil Procedure 12(b)(1), to dismiss the Amended Complaint for lack of jurisdiction.

Dkt. No. 59.  The Federal Defendants and Municipal Defendants[1] move, pursuant to Federal

---

[1] Although Plaintiffs in *New Yorkers* also named the Traffic Mobility Review Board ("TMRB")
as a defendant, Plaintiffs have abandoned their claims against TMRB by failing to respond to the
Municipal Defendants' argument that the claims against TMRB must be dismissed.  Dkt. No. 81
at 15; *see Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F. Supp. 3d 322, 346

Rules of Civil Procedure 12(b)(1) and 12(b)(6), to partially dismiss the Amended Complaint. Dkt. Nos. 57, 62.

In *Chan et al. v. U.S. Department of Transportation et al.* ("*Chan*"), 23-cv-10365, Winkelhake in her official capacity as Chief Engineer of the NYSDOT[2] moves, pursuant to Federal Rule of Civil Procedure 12(b)(1), to dismiss the Amended Complaint for lack of jurisdiction.  Dkt. No. 61.  Plaintiffs move, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment.  Dkt. No. 54.  The Federal Defendants and Municipal Defendants cross-move, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment.  Dkt. Nos. 64, 67.

Collectively, these three lawsuits challenge the Central Business District Tolling Program (better known as "Congestion Pricing").  The merits of congestion pricing have been hotly contested since the Columbia University economist and Nobel Laureate William S. Vickrey first developed the concept in 1952.  *See William Vickrey (1914-1996)*, Colum. Econ. (2018), https://econ.columbia.edu/faculty/in-memoriam/william-vickrey-1914-1996/.  In the decades that followed, policymakers repeatedly proposed congestion pricing plans for Manhattan, DOT 1582–85, 36242, yet those proposals failed to garner political support.  Despite recent momentum in favor of the policy, those disagreements remain:  The New York State Legislature enacted the MTA Reform and Traffic Mobility Act (the "Traffic Mobility Act" or "Act") on April 1, 2019, directing the TBTA to establish Congestion Pricing in the Manhattan Central Business District ("CBD").  DOT 1585, 36154.  But earlier this month, just weeks before

---

(S.D.N.Y. 2023).
[2] The Amended Complaint names the prior Chief Engineer for the NYSDOT, Nicholas A. Choubah, as a defendant; however, an "officer's successor is automatically substituted as a party."  Fed. R. Civ. P. 25(d).

Congestion Pricing was scheduled to go into effect, New York Governor Kathleen Hochul "directed the MTA to pause implementation" of Congestion Pricing, such that the policy's fate remains uncertain.  23-cv-10365, Dkt. No. 91.  Many have debated—and undoubtedly will continue to debate—the wisdom of the Legislature's and Governor's respective choices.  But that is not the question before this Court.

The question before the Court is whether federal regulatory power, not political choices, stands in the way of a novel public policy approach to a pressing public issue.  The parties dispute whether—notwithstanding the choices the New York Legislature, MTA, TBTA, NYSDOT, and NYCDOT might agree upon—the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, prevents New York from adopting Congestion Pricing.

"NEPA is a procedural statute that mandates a process rather than a particular result." *Stewart Park & Rsrv. Coal., Inc. (SPARC) v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003) (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1029 (2d Cir. 1983)).  Accordingly, "[t]he only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences."  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).  "The question is not whether [the court] 'would have reached the decision under review had [it] been [a] decisionmaker[] within the agency,' but rather whether the agency has presented a rational basis for the decision reached."  *Friends of Animals v. Romero*, 948 F.3d 579, 586 (2d Cir. 2020) (quoting *Sierra Club*, 701 F.2d at 1029).

According to Plaintiffs, the NEPA review process here—which spanned four years and yielded an administrative record of more than 45,000 pages—did not amount to a "hard look" at the environmental implications of Congestion Pricing.  In light of Defendants' meticulous analysis, the Court cannot agree.

## BACKGROUND

### I.      Prior Proposals

Vickrey first conceived of congestion pricing in 1952 as a solution for overcrowding on the New York City subways, whereby fares would increase during peak travel times in congested areas and decrease outside those times and places.  William S. Vickrey, *The Revision of the Rapid Transit Fare Structure of the City of New York* (1952).  By 1959, Vickrey began advocating for a similar policy to address street congestion.  *Transportation Plan for the National Capital Region: Hearing Before the Joint Comm. on Washington Metropolitan Problems*, 86th Cong. 466–77 (1959) (statement of William S. Vickrey); *see also* William S. Vickrey, *Pricing in Urban and Suburban Transport*, 53 Am. Econ. Rev. 452 (1963).

Vickrey's proposals caught the attention of policymakers in New York more than a decade later when, in 1973, New York Governor Nelson Rockefeller and New York City Mayor John Lindsay submitted a proposal to the U.S. Environmental Protection Agency ("EPA") to toll the bridges along the East and Harlem Rivers.  DOT 1582.  But the State and City withdrew the bridge tolling plan after the EPA concluded it was unnecessary in light of other traffic control measures the State and City planned to implement.  *Id.*

Mayor Michael Bloomberg revived the notion of congestion pricing in 2007 as part of his "PlaNYC," a long-term plan that included imposing congestion pricing in Manhattan south of 86th Street—except for the West Side Highway and Franklin D. Roosevelt ("FDR") Drive—and using the resulting revenue to fund capital investments in the City's transit network.  *Id.*  In response to PlaNYC, the State enacted legislation establishing the New York City Traffic Congestion Mitigation Commission, a body of seventeen members appointed by the Governor, to study approaches to reducing congestion in the busiest parts of Manhattan, including PlaNYC, and develop a comprehensive traffic congestion mitigation plan.  *Id.*  Specifically, the

Legislature required any proposal to reduce average vehicle miles traveled ("VMT") south of 86th Street by at least 6.3%.  *Id.*  After surveying a wide array of potential congestion-reducing measures, the Traffic Congestion Mitigation Commission conducted in-depth studies of five options that the Commission believed could achieve the Legislature's goal: congestion pricing, bridge tolling, pricing of parking and taxis, and license plate rationing.  DOT 1583.

Ultimately, in January 2008, the Traffic Congestion Mitigation Commission issued a report recommending a modified version of PlaNYC's congestion pricing plan.  *Id.*  The Commission proposed imposing a daily fee on passenger vehicles and trucks entering a tolling zone.  *Id.*  But instead of tolling vehicles entering Manhattan south of 86th Street, the Commission suggested establishing 60th Street as the tolling zone's northern boundary.  *Id.*  The Commission also proposed including the West Side Highway and FDR Drive within the zone. *Id.*  Vehicles that paid bridge or tunnel tolls to enter the CBD would receive a credit, reducing the congestion pricing fee, *id.*, and for-hire vehicles ("FHV") in the zone would be surcharged during certain hours, DOT 1584.  The Traffic Congestion Mitigation Commission concluded that its proposal would exceed the Legislature's 6.3% VMT reduction goal and raise $491 million per year for transportation investments.  *Id.*  Despite the Commission's findings, the proposal stalled in the Legislature and was not enacted into law.  *Id.*

While congestion pricing proposals languished in the United States, Vickrey's ideas took root in several major cities abroad.  Singapore was the first to embrace congestion pricing, establishing its program in 1975.  DOT 2337.  After decades of study, London also implemented congestion pricing in 2003.  *Id.*  Stockholm followed suit in 2006, *id.*, as did Milan in 2008, DOT 2338.

Frustrated with political inertia on congestion-reduction measures in New York City, an advocacy group called Move NY released its own congestion pricing proposal for the CBD in 2015.  DOT 1584.  The group's "Move NY Fair Plan" urged policymakers to levy new tolls on four East River bridges (the Brooklyn, Manhattan, Williamsburg, and Ed Koch Queensboro Bridges), toll vehicles that enter the Manhattan CBD by crossing 60th Street, and impose a surcharge on FHVs in the CBD in lieu of a CBD toll.  *Id.*

Although officials did not immediately take up Move NY's proposal, the Move NY Fair Plan informed a subsequent study by the Fix NYC Advisory Panel—a body of community representatives, government officials, and business leaders from across the New York City region.  *Id.*  Governor Andrew Cuomo created the Panel in October 2017 to develop a plan to reduce congestion in the Manhattan CBD and identify means of funding the region's transit system.  *Id.*  Based on a review of both the Move NY Fair Plan and foreign cities' congestion pricing policies, *id.*, the Panel recommended establishing a congestion pricing program in Manhattan south of 60th Street that exempted the FDR Drive and credited vehicles that used tolled tunnels to enter the CBD, DOT 1585.

With Governor Cuomo's support, the Panel's proposal attracted the interest of the State Legislature.  As part of the 2018 budget, the Legislature convened the Metropolitan Transportation Sustainability Advisory Workgroup, a body comprised of government officials, transportation professionals, and representatives of business and commuter groups.  *Id.*  The Workgroup issued a report in December 2018 endorsing the adoption of congesting pricing in the CBD.  *Id.*  The report stated that doing so would promote two critical goals: reducing congestion in New York City and generating new revenue to modernize the MTA's transit system.  *Id.*

II.     **Traffic Mobility Act**

Congestion pricing's newfound political momentum propelled Vickrey's half-century-old theory into law with the Legislature's enactment of the Traffic Mobility Act on April 1, 2019. DOT 1585.  *Id.*  The Act's legislative findings declare that ongoing failures with New York City's subway infrastructure "continue to have a deleterious impact on the health, safety, and livelihood of commuters, tourists, resident New Yorkers, as well as . . . the economy of the state of New York," such that "a long-term and sustainable solution is necessary in order to ensure stable and reliable funding to repair and revitalize this significantly important mass transit asset." DOT 38733.  Citing the views of the Fix NYC Advisory Panel and Metropolitan Transportation Sustainability Advisory Workgroup, the Act also declares that traffic in New York—which "ranks second worst among cities in the United States and third worst among cities in the world" and is estimated to cost the metropolitan economy more than "one hundred billion dollars over the next five years"—is "crippling . . . [for] residents, commuters, taxi and for-hire vehicle traffic, bus transit and emergency services" and "a significant contributor to decreased air quality."  *Id.*

To remedy New York City's ailing public transit infrastructure and exceptional traffic congestion, the Act directs the TBTA to establish Congestion Pricing in the CBD, defined as Manhattan south of 60th Street except for "the FDR Drive, and New York state route 9A otherwise known as the 'West Side highway' including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connection to West St."  DOT 38735. Accordingly, the Act empowered the TBTA to "make rules and regulations for the establishment and collection of central business district tolls, fees, and other charges," DOT 38737, subject to three parameters:  First, the TBTA must, "at minimum, ensure annual revenues and fees collected under such program, less costs of operation of the same, provide for sufficient revenues

. . . to fund fifteen billion dollars for capital projects for the 2020 to 2024 MTA capital program, and any additional revenues above that amount to be available for any successor programs." *Id.* Eighty percent of that revenue must go towards capital project costs within New York City— including improvements to the MTA's subway and bus service and the Staten Island Rapid Transit Operating Authority—while the remaining twenty percent must be evenly divided between the capital project costs of the Long Island Rail Road and Metro-North Commuter Railroad Company.  DOT 38740.  Second, passenger vehicles cannot be tolled "more than once per day for purposes of entering the central business district."  DOT 38737.  And third, the TBTA cannot toll a "qualifying authorized emergency vehicle" or "qualifying vehicle transporting a person with disability" for "enter[ing] or remain[ing] in the central business district."  *Id.*

The Legislature also created a new body, the TMRB, to assist the TBTA in the development of an appropriate tolling structure.  DOT 38741.  Under the Act, the TMRB must provide a formal recommendation to the TBTA regarding the "toll amounts to be established . . . , which shall include a variable pricing structure," as well as "credits, discounts, and/or exemptions for tolls paid on bridges and crossings . . . [and] for for-hire vehicles."[3]  *Id.* "[I]nform[ed]" by the TMRB's recommendation, DOT 38737, the TBTA must hold a public hearing and then vote on a final tolling structure, DOT 38738.

## III.    Application to the FHWA

Because Congestion Pricing would impose a toll on several federal-aid highways in Manhattan, *see* DOT 36244, the project cannot be implemented without approval from the federal government, *see* 23 U.S.C. § 301.  The NYSDOT, MTA, NYCDOT, and TBTA

---

[3] In April 2018, the State of New York imposed a separate congestion surcharge on taxis and FHV trips that begin in, end in, or pass through Manhattan south of 96th Street.  DOT 36272.

(together, the "Project Sponsors" or "Sponsors") therefore applied to the FHWA on June 17, 2019 for approval to establish Congestion Pricing under the Value Pricing Pilot Program ("VPPP"). DOT 38307. Congress established the VPPP in 1991 to enable state and local governments to explore congestion pricing strategies to reduce traffic and fund public transportation. DOT 36195. Crucially, before approving a VPPP application, the FHWA must review the environmental impacts of the proposal pursuant to NEPA. DOT 36195.

In their application, the Project Sponsors surveyed prior proposals for congestion pricing in Manhattan, detailed the costs of traffic in Manhattan and the need for additional revenue for public transit, and explained the effect of the Traffic Mobility Act. DOT 38308–09. The Sponsors also articulated the project's goals—namely, to reduce congestion in and around the Manhattan CBD; to improve air quality both regionally and in the CBD; to create a sustainable capital funding source for public transit; to increase public transit ridership; and to improve transit services for low-income residents, who overwhelmingly rely on public transportation. DOT 38312–13.

## IV. Draft EA

On October 24, 2019, the FHWA responded to the Project Sponsors' application. DOT 40969. Although the FHWA "recognize[d]" that the Project Sponsors sought "an expedited deployment schedule," the FHWA requested "a thorough traffic and revenue study" regarding the expected reduction in traffic, the variables that could affect toll amounts, the anticipated effects on driver behavior and transit ridership, and the intended use of toll revenues. DOT 40969–70. The Project Sponsors met with USDOT officials several times and, on January 27, 2020, submitted the traffic and revenue study to the FHWA. DOT 3869. On July 2, 2020, the Sponsors followed up with the FHWA to request a decision on their VPPP application. DOT 40964. The FHWA replied three months later, noting that shortly after the Sponsors submitted

the traffic and revenue study "the COVID-19 public health emergency resulted in an unprecedented situation that has created unforeseen circumstances across the country, and especially in New York City." *Id.* As a result, the FHWA requested "updated data on the COVID-19 impacts to current and anticipated traffic levels in the CBD and impacts to public transit ridership." *Id.* The Sponsors wrote back on October 13, 2020, acknowledging that both public transit ridership and roadway traffic had decreased significantly at the outset of the pandemic but observing that both were rapidly rebounding to pre-COVID-19 levels. DOT 40967–68.

The FHWA informed the Sponsors on March 30, 2021 that "[a]fter careful review of the relevant information" the FHWA had determined that the significance of Congestion Pricing's environmental impacts was sufficiently uncertain to warrant the preparation of an Environmental Assessment ("EA"). DOT 40973. The purpose of an EA is to determine whether a contemplated action "is likely to have a significant impact on the environment," in which case the agency must prepare a more detailed Environmental Impact Statement ("EIS"), or whether that action will not have a significant impact on the environment, in which case the agency can prepare a less involved Finding of No Significant Impact ("FONSI") and approve the proposed action. 23 C.F.R. §§ 771.119(g), 771.119(i). For Congestion Pricing, the FHWA determined that "as part of the preparation of the EA, there [must also] be enhanced coordination and public involvement that engages stakeholders from throughout all three States (New York, New Jersey, and Connecticut) in the commuting area of the CBD." DOT 40973.

Over the following months, the FHWA and Project Sponsors collaborated closely to "identify the content and methodology needed for the EA" and develop "a Coordination Plan that outlines the enhanced coordination and public involvement that will be part of the EA." DOT

41006.  They then put that plan into practice between August 2021 and August 2022.  The

FHWA and Project Sponsors convened an Interagency Consultation Group to provide technical

expertise on traffic and emission modeling, DOT 41604, and held meetings with other federal,

state, and local agencies, DOT 37042–44.  To engage the public, the FHWA and Sponsors

created a website for the project, disseminated short fact sheets on the project in nine different

languages,[4] posted information about the project on a variety of social media platforms, created a

contact list for members of the public interested in email updates on the project, and publicized

the information through traditional advertising channels.  DOT 37045–46.  They hosted ten

webinars in which individuals could provide input on the project, with each webinar prioritizing

the views and concerns of speakers from designated geographic areas within the greater

metropolitan region.  DOT 37046–47; *see also* DOT 39270.  The FHWA and Project Sponsors

then hosted nine additional webinars focused on environmental justice ("EJ") communities

throughout the region.  DOT 37046–47.  In total, more than 1,000 people attended, and 398

participants spoke at, the webinars.  DOT 37047–48.  For further input on EJ issues, the FHWA

and Sponsors created both an Environmental Justice Technical Advisory Group and an

Environmental Justice Stakeholder Working Group,[5] and met with each on multiple occasions.

DOT 37048–49.  As a result of their early outreach campaign, the FHWA and Project Sponsors

received 7,338 comments, all of which the FHWA and Sponsors collected, archived, and

considered.  DOT 37049.

---

[4] Those languages were English, Spanish, Chinese, Haitian Creole, Bengali, Korean, Russian, Italian, and Portuguese.  DOT 37043.

[5] The Project Sponsors invited 37 advocacy groups to participate in the Environmental Technical Advisory Group; 16 groups accepted the Sponsors' invitation.  DOT 37037.  For the Environmental Justice Stakeholder Working Group, the Project Sponsors invited any interested member of the public to join; 27 individuals signed up.  DOT 37039.

The FHWA and Project Sponsors' early efforts culminated in the publication on July 29, 2022 of an 868-page draft EA, accompanied by thousands of pages of appendices, for public comment.  DOT 37151.  Like the Traffic Mobility Act, the draft EA began by underscoring the severity of congestion in the Manhattan CBD[6] as well as the need for a faster, more accessible, and more reliable public transportation network for the wider region.  DOT 37214.  The draft EA stated the project's goals: to reduce daily VMT within the CBD, to reduce the number of vehicles entering the CBD each day, to create a funding source for capital improvements sufficient to raise $15 billion for the MTA Capital Program, and to establish a tolling program consistent with the Traffic Mobility Act.  DOT 37231.  Although the draft EA preliminarily considered twelve alternatives to Congestion Pricing and examined whether they would satisfy the Sponsors' VMT-reduction, vehicle-reduction, and revenue-generation goals, the FHWA determined that none of the alternatives would achieve those objectives.  DOT 37238. Accordingly, the EA evaluated only two courses of action: Congestion Pricing and the "No Action Alternative" required by NEPA regulations.  DOT 37240.

To account for the different tolling structures the TBTA might ultimately impose, the FHWA developed several "tolling scenarios" with varying toll amounts, exemptions and caps on the number of tolls charged per day for different kinds of vehicles, as well tolling hours and bridge and tunnel credits.  DOT 37262–63.  The draft EA then analyzed a wide array of impacts Congestion Pricing would have—including on traffic, public transit, parking, neighborhood character, economic conditions, parks, historical landmarks, air quality, noise, wetlands and wildlife, and EJ communities.  *E.g.*, DOT 37316, 37472, 37540, 37618, 37644, 37723, 37755,

---

[6] Indeed, the FHWA observed that since the passage of the Traffic Mobility Act, New York City had gained the dubious distinction of becoming the most congested urban area in the United States.  DOT 37214.

37769, 37823, 37835, 37886.  In assessing adverse effects, the FHWA generally considered the "worst-case tolling scenario" for the relevant impact as a conservative measure of potential harm. *E.g.*, DOT 37826.  Based on these analyses, the draft EA concluded that Congestion Pricing would result in "beneficial or no adverse effects" for most of the factors considered and that any adverse effects as to the remaining factors could be effectively mitigated, such that Congestion Pricing would not have a significant environmental impact.  DOT 37194.

The FHWA and Project Sponsors initially announced that members of the public could submit comments until September 9, 2022, after which the FHWA would issue its final statement of findings on the Congestion Pricing proposal.  DOT 37151.  However, based on public feedback, the FHWA and Sponsors extended the comment period to September 23, 2022.[7]  DOT 37057, 37063.  In addition to accepting comments via the MTA's website, email, mail, fax, and telephone, *id.*, the FHWA and Sponsors held six multi-hour, virtual hearings on the draft EA throughout August 2022, which nearly 1,800 individuals attended, DOT 37062.  During the public comment period, the FHWA and Sponsors met with the Environmental Justice Stakeholder Working Group and Environmental Justice Technical Advisory Group, as well as several federal, state, and local agencies.  DOT 36155, 37044, 37049.  Ultimately, the FHWA and Sponsors received approximately 70,000 submissions on the draft EA in the form of hearing testimony, letters, emails, voicemails, and online comments from residents, advocacy groups, businesses, and government agencies.  DOT 37063.

---

[7] Although the FHWA and Project Sponsors extended the comment period, they also "considered comments received after the formal close of [that] period" during the preparation of the final EA. DOT 37063.

V.      **Final EA and FONSI**

On May 5, 2023, the FHWA and Project Sponsors published the final EA.  DOT 36153.

Based on public input, the FHWA and Sponsors made many revisions and clarifications

throughout the final EA.  DOT 36155.  The final EA also included a new appendix that provided

both general responses to frequently received comments and specific responses to the individual

comments the FHWA and Sponsors received.  DOT 36156.  The most significant addition,

however, was another appendix: a technical memorandum examining "how environmental

justice communities with preexisting air pollution and health burdens could be affected by

Project-generated increases or decreases in highway traffic adjacent to these areas."  DOT

36156.  To address those negative effects, the Project Sponsors committed $155 million over five

years to a suite of both regional and place-based mitigation measures—including reducing

overnight tolls, developing electronic truck charging infrastructure, and establishing an asthma

case management program and center in the Bronx—which the Sponsors agreed to implement

"regardless of the tolling structure eventually adopted."  DOT 36211, 36213.  The final EA

explained that those mitigation measures would utilize an "adaptive management approach" of

"monitoring the efficacy of mitigation, stakeholder consultation, and adjustments as warranted."

DOT 36211.  With the benefit of these mitigation measures, the FHWA determined, Congestion

Pricing "would not result in a disproportionately high and adverse effect on environmental

justice communities."  *Id.*

In publishing the final EA, the FHWA also released a draft FONSI that formalized the

FHWA's conclusion that, if accompanied by the contemplated mitigation, Congestion Pricing

"will have no significant impact on the human or natural environment," such that "an

Environmental Impact Statement is not required."  DOT 40590.  The comparatively brief 31-

page draft FONSI expressly incorporated and relied upon the 958-page final EA to support the FHWA's finding. *Id.*

Pursuant to NEPA regulations, the final EA and FONSI stated that they would remain publicly available for thirty days before the FHWA would issue a final agency decision on Congestion Pricing.[8]  DOT 36152, 40590.  The FHWA further explained that once it published a notice in the Federal Register announcing that it had taken final action on the project, "claims seeking judicial review of [that] Federal agency action[] will be barred unless such claims are filed within 150 days after the date of publication of the notice."  DOT 40591.

The FHWA issued the final FONSI on June 23, 2023.  DOT 363.  While the FHWA and Project Sponsors did not solicit comments during the public availability period, they received, reviewed, and considered 550 additional submissions.  DOT 393.  Because the FHWA determined that those submissions did not raise any "new substantive issues" and that "[a]ll issues were previously addressed in the Final EA," the FHWA did not make any further changes to the final EA and reaffirmed its finding that Congestion Pricing would not have a significant environmental impact.  *Id.*  On June 28, 2023, the FHWA issued a notice in the Federal Register advising the public that its EA and FONSI constituted "final agency actions subject to 23 U.S.C. 139(l)(1)," so "[a] claim seeking judicial review of the Federal agency actions on the highway project will be barred unless the claim is filed on or before November 27, 2023."  Notice of Final Federal Agency Actions on the Central Business District Tolling Program, New York, New York, 88 Fed. Reg. 41998, 41998 (June 28, 2023).  The notice specified that this requirement applied to claims under NEPA and the executive order mandating EJ review.  *Id.* at 41998–99.

---

[8] The FHWA also published versions of the FONSI in Spanish, Chinese, Haitian Creole, Bengali, Korean, Russian, Italian, and Portuguese.  DOT 1–360.

## PROCEDURAL HISTORY

On November 22, 2023, Plaintiffs Elizabeth Chan, Tamara Hoffman, and Does 1 through 200 commenced *Chan*, 23-cv-10365, by filing a *pro se* complaint in the United States District Court for the Southern District of New York. Dkt. No. 1. On January 16, 2024, Chief Judge Swain ordered the *Chan* Plaintiffs to pay a filing fee to the Court's *Pro Se* Office. Dkt. No. 2. The *Chan* Plaintiffs did so on January 22, 2024. Meanwhile, the *New Yorkers* Plaintiffs filed suit in this District on January 18, 2024. 24-cv-367, Dkt. No. 1. *Chan* and *New Yorkers* were assigned to the undersigned as related cases on January 24, 2024.

The Court held a conference in both cases on February 12, 2024. *See* 23-cv-10365, Dkt. No. 8; 24-cv-367, Dkt. No. 25. During that conference, counsel for the MTA and TBTA also advised the Court that they intended to move for the transfer of a third lawsuit that had been filed in the Eastern District of New York on January 4, 2024—namely, *Mulgrew*—to the undersigned as another related case. *See* 23-cv-10365, Dkt. No. 23; 24-cv-367, Dkt. No. 41. On February 16, 2024, the *Mulgrew* Plaintiffs, Municipal Defendants, and NYSDOT filed a stipulation in in the Eastern District of New York, consenting to a transfer of the case to the Southern District of New York.[9] 24-cv-1644, Dkt. No. 40. Magistrate Judge Marutollo ordered the case to be transferred the following day. Dkt. No. 41. As a result, *Mulgrew* was transferred and reassigned to the undersigned.

The parties proposed—and Court adopted—a briefing schedule in which they agreed to litigate Plaintiffs' NEPA claims on an expedited basis, while deferring resolution of their state and federal constitutional claims. 23-cv-10365, Dkt. No. 31 at 1–2; 24-cv-367, Dkt. No. 45 at 1–2; 24-cv-1644, Dkt. No. 44 at 1–2.

---

[9] The Federal Defendants submitted a letter urging the Court to dismiss the case rather than transfer it. 24-cv-1644, Dkt. No. 38 at 1.

Now represented by counsel, the *Chan* Plaintiffs filed an Amended Complaint on February 23, 2024 that replaced the Doe Plaintiffs with several individuals and Families for a Better Plan for Congestion.[10]  23-cv-10365, Dkt. No. 39.  The Amended Complaint asserts five claims: (1) the EA and FONSI violated NEPA; (2) the failure to supplement the EA and FONSI based on the ultimate tolling scenario violated NEPA; (3) Congestion Pricing violates the dormant Commerce Clause; (4) Congestion Pricing violates the right to travel; and (5) Congestion Pricing violates the New York State Green Amendment.  *Id.* ¶¶ 144–210.  The Federal and Municipal Defendants[11] answered the Amended Complaint on February 27, 2024. Dkt. Nos. 40, 48–49.  That same day, the Federal Defendants provided a set of flash drives containing the Administrative Record to the Court and filed an accompanying notice on the docket.  Dkt. No. 41.  Plaintiffs filed a motion for partial summary judgment and supporting papers on March 18, 2024.  Dkt. No. 54.  On April 1, 2024, Winkelhake moved to dismiss for lack of jurisdiction, Dkt. Nos. 61–62, while the Federal and Municipal Defendants opposed Plaintiffs' motion and cross-moved for partial summary judgment, Dkt. Nos. 64–65, 67–68. With leave of the Court, the Environmental Defense Fund and other advocacy groups[12] filed an amicus brief in support of the Federal and Municipal Defendants' cross-motions for summary judgment, Dkt. Nos. 71, 73, and the New York City Municipal Labor Committee filed an amicus

---

[10] Though the *Chan* Plaintiffs attempted to file an amended complaint on February 21, 2024, that document was rejected due to a filing error.  23-cv-10365, Dkt. No. 35.

[11] While the Amended Complaint names William J. Carry in his official capacity as Assistant Commissioner for Policy for the NYCDOT as a defendant rather than the NYCDOT itself, the Court will refer to Carry as part of the Municipal Defendants for convenience.  *See generally Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007) ("An official capacity suit against a public servant is treated as one against the governmental entity itself.").

[12] Those groups are: New York League of Conservation Voters, Tri-State Transportation Campaign, Riders Alliance, Real Estate Board of New York, New York Lawyers for the Public Interest, WE ACT for Environmental Justice, StreetsPAC, and Transportation Alternatives.  23-cv-10365, Dkt. No. 73.

brief in support of Plaintiffs' motion for summary judgment, Dkt. Nos. 72, 74.  On April 15, 2024, Plaintiffs opposed Winkelhake's motion to dismiss, Dkt. No. 77, and filed a joint reply in support of their motion for summary judgment and opposition to the Federal and Municipal Defendants' cross-motions for summary judgment, Dkt. No. 78.  Defendants filed replies in support of their respective motions on April 22, 2024.  Dkt. Nos. 80–82.

In *New Yorkers*, Plaintiffs filed an Amended Complaint on February 27, 2024.  24-cv-367, Dkt. No. 54.  The Amended Complaint also asserts five claims: (1) the EA and FONSI violated NEPA; (2) the failure to supplement the EA and FONSI based on the ultimate tolling scenario violated NEPA; (3) the failure to prepare a socioeconomic assessment of Congestion Pricing violates the New York State Administrative Procedure Act ("SAPA"); (4) Defendants must monitor the health effects of Congestion Pricing; and (5) Congestion Pricing violates the New York State Green Amendment.  *Id.* ¶¶ 164–189.  On March 18, 2024, the Federal Defendants, NYSDOT, and Municipal Defendants moved for partial dismissal of the Amended Complaint.  Dkt. Nos. 57–64.  Plaintiffs filed an opposition to the Federal and Municipal Defendants' motions to dismiss on April 5, 2024.  Dkt. No. 74–75.  The Federal and Municipal Defendants filed replies in support of their motions on April 22, 2024, Dkt. No. 80–81, while the NYSDOT instead filed a letter noting that its motion to dismiss was "unopposed and ready for decision" since Plaintiffs' opposition "contains no argument against or other reference to the [NYSDOT's] motion," Dkt. No. 79 at 1.

The Plaintiffs in *Mulgrew* likewise filed an Amended Complaint asserting five claims: (1) the EA and FONSI violated NEPA; (2) the failure to supplement the EA and FONSI based on the ultimate tolling scenario violated NEPA; (3) Congestion Pricing violates the dormant Commerce Clause; (4) Congestion Pricing violates the right to travel; and (5) Congestion Pricing

violates the New York State Green Amendment.  24-cv-1644, Dkt. No. 19 ¶¶ 145–184.  The Federal Defendants, NYSDOT, and Municipal Defendants filed partial motions to dismiss on March 18, 2024.  Dkt. Nos. 47–54.  Plaintiffs opposed those motions on April 5, 2024, Dkt. No. 62, and filed a cross-motion for leave to file a Second Amended Complaint to substitute Winkelhake as a defendant in place of the NYSDOT, Dkt. No. 63.  The Federal and Municipal Defendants filed replies in support of their motions to dismiss the Amended Complaint, Dkt. Nos. 72–73, and the NYSDOT filed a combined reply in support of its motion to dismiss and opposition to Plaintiffs' motion for leave to amend, Dkt. No. 71.  Plaintiffs then filed a reply in support of their motion for leave to amend.  Dkt. No. 75.

On April 4, 2024, the MTA and TBTA filed a letter in *New Yorkers*, explaining that the TMRB had recommended a tolling structure to the TBTA on November 30, 2023 and that the TBTA had formally approved that structure on March 27, 2024.  24-cv-367, Dkt. No. 73.  The MTA and TBTA provided another update on April 26, 2024, notifying the Court that the MTA had announced that Congestion Pricing would take effect on June 30, 2024, subject to the outcome of the FHWA's reevaluation and the execution of a final agreement under the VPPP.  23-cv-10365, Dkt. No. 85; 24-cv-367, Dkt. No. 83; 24-cv-1644, Dkt. No. 74.

The Court heard oral argument on the instant motions on May 17, 2024.  *See* 23-cv-10365, Dkt. No. 87; 24-cv-367, Dkt. No. 84; 24-cv-1644, Dkt. No. 77.

On June 5, 2024, the MTA filed a letter informing the Court that Governor Hochul had directed to the MTA "to pause implementation" of Congestion Pricing and that, "[a]s a result, at this time, we no longer anticipate implementation of the Program on the prior expected implementation date of June 30, 2024."  23-cv-10365, Dkt. No. 91; 24-cv-367, Dkt. No. 85; 24-cv-1644, Dkt. No. 78.  The Court therefore directed the parties to file letters "indicating whether

any party believes the case is now moot or the motions no longer require decision."  23-cv-10365, Dkt. No. 92; 24-cv-367, Dkt. No. 86; 24-cv-1644, Dkt. No. 79.  The parties did so and unanimously agreed that the Governor's announcement did not render these cases moot.[13]  23-cv-10365, Dkt. Nos. 93–97; 24-cv-367, Dkt. Nos. 87–91; 24-cv-1644, Dkt. Nos. 80–84.

On June 14, 2024, the Federal Defendants informed the Court that the FHWA had "issued a re-evaluation finding that the conclusions in the Final EA remain valid in light of the final tolling schedule adopted by the MTA and thus that no further environmental review is warranted."  23-cv-10365, Dkt. No. 95; 24-cv-367, Dkt. No. 89; 24-cv-1644, Dkt. No. 82.  The *New Yorkers* Plaintiffs filed a letter on June 17, 2024, urging the Court to permit the parties to provide supplemental briefing on the reevaluation's legal significance.  24-cv-367, Dkt. No. 90 at 1.  On June 18, 2024, the Court ordered the parties to submit a proposed schedule "for supplemental briefing on how the FHWA's June 14, 2024 reevaluation affects the pending

---

[13] The Court agrees.  The Governor's announcement of a voluntary pause on Congestion Pricing did not alter the legal status of the EA and FONSI, let alone "completely and irrevocably eradicate[] the effects of the alleged violation[s]."  *Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 395 (2d Cir. 2022); *see also Winston v. City of Syracuse*, 887 F.3d 553, 558 n.3 (2d Cir. 2018).  Moreover, given the Governor's characterization of her action as a "pause" rather than an outright cancellation, 23-cv-10365, Dkt. No. 91, the Court is "unpersuaded that the [State] has committed to this course permanently."  *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 604 (2d Cir. 2016).

Plaintiffs nevertheless suggest that a ruling on any of the outstanding motions would constitute an improper advisory opinion.  23-cv-10365, Dkt. No. 96 at 2; 24-cv-367, Dkt. No. 90 at 2; 24-cv-1644, Dkt. No. 83 at 2.  But Defendants have not "rescinded" the EA and FONSI. *West v. Horner*, 810 F. Supp. 2d 228, 234 (D.D.C. 2011); *Indian River County v. Rogoff*, 254 F. Supp. 3d 15, 21 (D.D.C. 2017); *see also Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, 2021 WL 1198047, at *14 (D.D.C. Mar. 30, 2021).  Rather, the EA and FONSI "remain[] operative at present, [so] issuance of [a ruling] would not constitute 'an advisory opinion upon a hypothetical basis, but . . . an adjudication of present right upon established facts.'"  *Park Cnty. Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609, 615 (10th Cir. 1987) (quoting *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (per curiam)).  The Court's opinion thus relegates the question of Congestion Pricing to the political arena where it belongs and where political officials continue to debate the novel issues it raises.

motions regarding Count Two in each of the above-captioned cases."  23-cv-10365, Dkt. No. 98 at 3; 24-cv-367, Dkt. No. 92 at 3; 24-cv-1644, Dkt. No. 85 at 3.  Accordingly, the Court will defer ruling on the Federal and Municipal Defendants' motions to dismiss Count II in *New Yorkers* and *Mulgrew*, *see* 24-cv-367, Dkt. Nos. 57, 62; 24-cv-1644, Dkt. Nos. 47, 52, and the cross-motions for summary judgment on Count II in *Chan*, 23-cv-10365, Dkt. Nos. 54, 64, 67.

## LEGAL STANDARD

### I.      Motions to Dismiss

Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

A court properly dismisses a claim for lack of subject matter jurisdiction under Rule 12(b)(1) when it "lacks the statutory or constitutional power to adjudicate it."  *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 416–17 (2d Cir. 2015).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "A motion to dismiss for lack of subject matter jurisdiction may 'raise a facial challenge based on the pleadings, or a factual challenge based on extrinsic evidence.'"  *U.S. Airlines Pilots Ass'n ex rel. Cleary v. US Airways, Inc.*, 859 F. Supp. 2d 283, 296 (E.D.N.Y. 2012) (quoting *Guadagno v. Wallack Ader Levithan Assocs.*, 932 F. Supp. 94, 95 (S.D.N.Y. 1996)).  Where the defendant challenges the legal sufficiency of a complaint's allegations, the Court must treat all factual allegations as true and draw reasonable inferences in favor of the complaining party.  *See Robinson v. Gov't of Malay.*, 269 F.3d 133, 140 (2d Cir. 2001).  Where the jurisdictional challenge is fact-based, the defendant may "proffer[] evidence beyond the [p]leading," and the plaintiff "will need to come forward with evidence of their own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b) motion . . . reveal the existence of factual

problems' in the assertion of jurisdiction." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (quoting *Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)).  In that case, "no presumptive truthfulness attaches to the complaint's jurisdictional allegations," and "the burden is on the plaintiff to satisfy the Court, as fact-finder, of the jurisdictional facts." *Guadagno*, 932 F. Supp. at 95.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2006)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This "does not impose a probability requirement at the pleading stage" but rather "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).  That is, a complaint need not allege "detailed factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

In reviewing a motion to dismiss under Rule 12(b)(6), a court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## II.   Motions for Summary Judgment Under NEPA

Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment," reduce or eliminate environmental damage, and promote the understanding of ecological systems and natural resources. 42 U.S.C. § 4321. But "'NEPA itself does not mandate particular results' in order to accomplish these ends." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). Rather, "NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Id.* at 756–57; *see also Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 118 (2d Cir. 2013).

Under NEPA's procedural framework, a key "threshold question" is "[w]hether a particular proposed action significantly affects the environment, thus necessitating the preparation of an EIS." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 12 (2d Cir. 1997). The Council of Environmental Quality ("CEQ"), which was established by NEPA to oversee NEPA's implementation, has promulgated regulations to guide federal agencies in answering that question. *Pub. Citizen*, 541 U.S. at 757. CEQ regulations permit federal agencies to prepare an EA that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact" and "[b]riefly discuss[es] the purpose and need for the proposed action, alternatives as required by section

102(2)(E) of NEPA, and the environmental impacts of the proposed action and alternatives."  40

C.F.R. § 1501.5(c).  If the agency decides in its EA that the proposed action will not have a

significant environmental impact, the agency must issue a FONSI.  40 C.F.R. § 1501.6(a); *see*

*City of New York v. Slater*, 145 F.3d 568, 571 (2d Cir. 1998) (per curiam).

NEPA requires an agency to take "a 'hard look' at environmental consequences" before

issuing an EA and FONSI.  *Sierra Club*, 701 F.2d at 1029 (quoting *Kleppe*, 427 U.S. at 410

n.21); *see Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438, 453 (S.D.N.Y. 2010).  "An agency

takes a 'hard look' when it has 'adequately considered and disclosed the environmental impact of

its actions.'"  *Coal. for Healthy Ports v. U.S. Coast Guard*, 2015 WL 7460018, at *4 (S.D.N.Y.

Nov. 24, 2015) (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 98

(1983)).  In taking that hard look, if "it is a close call whether there will be a significant

environmental impact from a proposed action, an EIS should be prepared."  *Hoffman*, 132 F.3d

at 18.  However, NEPA does "not require agencies to elevate environmental concerns over other

appropriate considerations."  *Balt. Gas & Elec. Co.*, 462 U.S. at 97.  Thus, "[a]s long as the

agency adequately identifies and evaluates the adverse environmental effects of its action, it is

'not constrained by NEPA from deciding that other values outweigh the environmental costs.'"

*Friends of Animals*, 948 F.3d at 585 (quoting *Robertson*, 490 U.S. at 350); *see Nat. Res. Def.*

*Council, Inc. v. FAA*, 564 F.3d 549, 556 (2d Cir. 2009).

Because NEPA does not provide for judicial review, NEPA suits are governed by the

Administrative Procedure Act ("APA").  *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 375

(1989); *Brodsky*, 704 F.3d at 119.  The APA dictates that courts must "hold unlawful and set

aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  An agency's decision

is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Put differently, "so long as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action, even a decision that is not perfectly clear, provided the agency's path to its conclusion may reasonably be discerned." *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007). The Court may not substitute its judgment for that of the agency, *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), but must confine itself to determining whether the agency has engaged in "reasoned decisionmaking," *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). Additionally, "[a] court reviewing an agency decision is [generally] confined to the administrative record compiled by that agency when it made the decision." *Hoffman*, 132 F.3d at 14; *see Dep't of Com.*, 588 U.S. at 780; *see also Forest Watch v. U.S. Forest Serv.*, 410 F.3d 115, 119 (2d Cir. 2005) ("[T]his Court may not 'properly affirm an administrative action on grounds different from those considered by the agency.'" (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999))).

When parties move for summary judgment in an APA-based challenge to agency action, "the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Accordingly, "a district court's procedural decision to award summary judgment is generally appropriate." *Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020). Under Federal Rule of

Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v. Village of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009).

In sum, a court reviewing an agency's decision not to prepare an EIS must engage in a two-step analysis. *See E. Queens All., Inc. v. FAA*, 589 F. App'x 19, 20 (2d Cir. 2014) (summary order); *Coal. for Responsible Growth & Res. Conservation v. FERC*, 485 F. App'x 472, 474 (2d Cir. 2012) (summary order). "First, [the court] must consider whether the agency took a 'hard look' at the possible effects of the proposed action. Second, if the agency has taken a 'hard look,' we must ask whether the agency's decision was arbitrary or capricious." *Hoffman*, 132 F.3d at 14 (citations omitted).

## DISCUSSION

## I.     NYSDOT and Winkelhake's Motions to Dismiss

Because the NYSDOT's motions to dismiss in *New Yorkers*, 24-cv-367, Dkt No. 59, and *Mulgrew*, 24-cv-1644, Dkt. No. 49, the Plaintiffs' motion for leave to amend in *Mulgrew*, 24-cv-1644, Dkt. No. 63, and Winkelhake's motion to dismiss in *Chan*, 23-cv-10365, present common and discrete questions regarding this Court's subject matter jurisdiction, the Court addresses those motions first, *see Alvarado v. Sweetgreen, Inc.*, 2024 WL 182761, at *5 (S.D.N.Y. Jan. 17, 2024).

As an initial matter, the *New Yorkers* Plaintiffs do not oppose the NYSDOT's motion to dismiss. *See* 24-cv-367, Dkt. Nos. 74, 79. The *New Yorkers* Plaintiffs have therefore abandoned their claims against the NYSDOT. *See Wilkov v. Ameriprise Fin. Servs., Inc.*, 753 F. App'x 44,

47 n.1 (2d Cir. 2018) (summary order); *Rowe v. Old Dominion Freight Lines, Inc.*, 2022 WL

2181619, at *6 (S.D.N.Y. June 16, 2022) ("It is well-settled that the failure to oppose an

argument raised in a motion to dismiss is deemed a concession of the argument and

abandonment of the claims.").  Consequently, the Court dismisses the *New Yorkers* Plaintiffs'

claims against the NYSDOT.  *See Romeo v. Aid to the Developmentally Disabled, Inc.*, 2013 WL

1209098, at *8 (E.D.N.Y. Mar. 22, 2013); *Brandon v. City of New York*, 705 F. Supp. 2d 261,

268 (S.D.N.Y. 2010).

      Similarly, the Court dismisses the Green Amendment claim against the NYSDOT in

*Mulgrew*, 24-cv-1644, Dkt. No. 50 at 15, and against Winkelhake in *Chan*, 23-cv-10365, Dkt.

No. 62 at 14.  Neither set of Plaintiffs opposes the arguments in favor of dismissing those claims.

*See Frio Energy Partners*, 680 F. Supp. 3d at 346.  And the *Chan* Plaintiffs explicitly disclaim

any Green Amendment claim against Winkelhake.  23-cv-10365, Dkt. No. 77 at 2 n.2; *see Jingle

Kids USA, LLC v. In Colour Cap. Inc.*, 2023 WL 6392725, at *2 (S.D.N.Y. Oct. 2, 2023).  Thus,

the Court deems the Green Amendment claims against the NYSDOT and Winkelhake to be

abandoned and dismisses them accordingly.  *See Annam v. City of New York*, 2023 WL 35053, at

*1 (S.D.N.Y. Jan. 4, 2023); *Thomas v. Burmax Co.*, 2013 WL 6681616, at *1 n.1 (E.D.N.Y. Dec.

18, 2013) (Bianco, J.).

      Winkelhake contends that the remaining claims against her in *Chan*—namely, those

under the U.S. Constitution and NEPA—must be dismissed pursuant to the Eleventh

Amendment.  23-cv-10365, Dkt. No. 62 at 1.  In *Mulgrew*, the NYSDOT also argues that it is

immune under the Eleventh Amendment.  24-cv-1644, Dkt. No. 50 at 8.  Yet the *Mulgrew*

Plaintiffs retort that the Court should grant leave to file a Second Amended Complaint that

replaces the NYSDOT with Winkelhake in her official capacity, thereby mooting the

NYSDOT's motion to dismiss. Dkt. No. 62 at 7. Reiterating its arguments for dismissing the claims against Winkelhake in *Chan*, the NYSDOT urges the Court to deny the motion for leave to amend "as futile." Dkt. No. 71 at 4. Whether Winkelhake is immune from suit under the Eleventh Amendment is therefore dispositive for both the motion to dismiss in *Chan* and the motion for leave to amend in *Mulgrew*.

"The Eleventh Amendment bars suits in federal courts against states and state officials acting in their official capacities by their own citizens, citizens of another state, and foreign sovereigns." *Saba v. Cuomo*, 535 F. Supp. 3d 282, 299 (S.D.N.Y. 2021) (quoting *Doe v. Annucci*, 2015 WL 4393012, at *15 (S.D.N.Y. July 15, 2015)); *see also Williams v. Marinelli*, 987 F.3d 188, 197 n.13 (2d Cir. 2021) ("Ordinarily, a suit against a state official in her official capacity is deemed an action against the state itself, and Eleventh Amendment immunity applies."). "However, under *Ex parte Young*, 209 U.S. 123 (1908), there is 'a limited exception to the general principle of sovereign immunity [that] allows a suit for injunctive relief challenging the constitutionality of a state official's actions in enforcing state law.'" *Ford v. Reynolds*, 316 F.3d 351, 354–55 (2d Cir. 2003) (alteration in original) (quoting *CSX Transp. v. N.Y. State Off. of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir. 2002)). Plaintiffs in *Chan* and *Mulgrew* assert that the *Ex parte Young* exception applies to their claims against Winkelhake under both the U.S. Constitution and NEPA.

According to the NYSDOT and Winkelhake, Plaintiffs' federal claims against Winkelhake do not satisfy *Ex parte Young* because Winkelhake does not have a sufficient connection to the enforcement of Congestion Pricing. 23-cv-10365, Dkt. No. 62 at 13; 24-cv-1644, Dkt. No. 71 at 4. But *Ex parte Young* requires merely that the state officer have "'*some* connection with the enforcement of the act [or policy]' that is in continued violation of federal

law." *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 372–73 (2d Cir. 2005) (emphasis added) (quoting *Ex parte Young*, 209 U.S. at 157).  Otherwise, the Supreme Court explained, a plaintiff would "merely mak[e the official] a party as a representative of the state, and thereby attempt[] to make the state a party."[14] *Ex parte Young*, 209 U.S. at 157; *see also Chrysafis v. James*, 534 F. Supp. 3d 272, 288 (E.D.N.Y. 2021).  Since the purpose of the connection requirement is to prevent plaintiffs from suing state officials with broad executive powers as a means of circumventing the Eleventh Amendment, "*Ex parte Young* demands merely that the implicated state official have a relevant role that goes beyond a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision." *Mecinas v. Hobbs*, 30 F.4th 890, 903–04 (9th Cir. 2022) (Rakoff, J.) (internal quotation marks omitted); *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 43 (2021).

 Winkelhake's connection to Congestion Pricing satisfies *Ex parte Young*.  The NYSDOT owns numerous roadways in the CBD, such that its permission is essential for Congestion Pricing.  23-cv-10365, Dkt. No. 77 at 10.  Nor can the Project Sponsors impose Congestion Pricing without the FHWA-sanctioned mitigation measures, including NYSDOT's commitment to carry out a $20 million project to establish electric truck charging infrastructure.  DOT 36213–24.  And, within the NYSDOT, Winkelhake is an appropriate defendant because the Chief Engineer has exercised responsibility over Congestion Pricing throughout the project's development.  *See, e.g.*, DOT 37152.  The specific role of NYSDOT and its Chief Engineer in

---

[14] *See also Fitts v. McGhee*, 172 U.S. 516, 530 (1899) ("[T]he constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes.").

Congestion Pricing therefore goes beyond the general enforcement or supervisory powers that led the Supreme Court to establish a connection requirement. *See Summers v. Adams*, 669 F. Supp. 2d 637, 655 (D.S.C. 2009). Winkelhake contends that neither she nor any other NYSDOT official has a sufficient role in Congestion Pricing because the TBTA rather than the NYSDOT will charge the challenged tolls. 23-cv-10365, Dkt. No. 62 at 13. However, the Second Circuit rejected a similar argument in *CSX Transportation, Inc.*, 306 F.3d 87. The state officials there asserted that they lacked the requisite connection to purportedly unlawful tax assessments since they merely permitted local authorities to perform those assessments. *Id.* at 99. But the Circuit emphasized that the state agency had the power to prohibit the local assessments and concluded that the state officials were therefore amenable to suit under *Ex parte Young. Id.*; *see also In re Dairy Mart Convenience Stores*, 411 F.3d at 372 (holding state officials' authority to approve or deny claims that plaintiffs argued must be granted under federal law furnished a sufficient connection for *Ex parte Young*).

Winkelhake and the NYSDOT also argue that Plaintiffs cannot pursue their NEPA claims against Winkelhake under *Ex parte Young* for an independent reason: Plaintiffs have not alleged an "ongoing violation of federal law," *NAACP v. Merrill*, 939 F.3d 470, 475 (2d Cir. 2019) (quoting *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007)), since NEPA does not apply to non-federal actors, 23-cv-10365, Dkt. No. 62 at 11; 24-cv-1644, Dkt. No. 71 at 5–6. The Second Circuit, however, has stated otherwise. In *Biderman v. Morton*, the Circuit stated that if a non-federal project requires "prior approval of a federal agency" and the federal agency authorizes the project without issuing a necessary EIS, then "it is beyond cavil that the court may then enjoin the non-federal actors pending completion of that impact statement."[15]  497 F.2d

---

[15] But Judge Kaufman recognized that, absent a federal agency's involvement in or authorization

1141, 1147 (2d Cir. 1974).  Squarely rejecting the proposition that non-federal entities cannot act in violation of NEPA, Judge Kaufman wrote: "were such non-federal entities to act without the necessary federal approval, they obviously would be acting unlawfully and subject to injunction." *Id.*

According to Winkelhake, Judge Kaufman's remarks in *Biderman* are inapplicable here because Plaintiffs do not seek to enjoin Congestion Pricing.  23-cv-10365, Dkt. No. 80 at 11; 24-cv-1644, Dkt. No. 71 at 11.  But the pleadings refute that assertion.  In both *Chan* and *Mulgrew*, Plaintiffs seek injunctions "vacating and setting aside Defendants' FONSI and Final EA and compelling Defendants to complete a full and proper EIS for Congestion Pricing."  23-cv-10365, Dkt. No. 39 at 49; 24-cv-1644, Dkt. No. 63-1 at 58.  To the extent Winkelhake suggests the Project Sponsors could immediately implement Congestion Pricing notwithstanding the requested injunction, her interpretation of that relief is implausibly narrow.  *See United States v. Acquest Transit LLC*, 2010 WL 6350470, at *11 (W.D.N.Y. Aug. 9, 2010), *report and recommendation adopted*, 2011 WL 1167754 (W.D.N.Y. Mar. 29, 2011).

Additionally, Winkelhake urges the Court not to heed *Biderman* because Plaintiffs have sued the FHWA and TBTA and enjoining those defendants would redress Plaintiffs' alleged injuries, such that an injunction against Winkelhake is unnecessary.  23-cv-10365, Dkt. No. 80 at 12; 24-cv-1644, Dkt. No. 71 at 12.  Yet *Biderman*'s logic extends to cases in which a plaintiff also sues a federal defendant from whom she could obtain adequate injunctive relief.  For example, in *Dalsis v. Hills*, the plaintiffs sought an injunction to prevent the construction of a

---

of a project, one cannot sue non-federal actors under NEPA.  *See Biderman*, 497 F.2d at 1146–47 ("[A]ppellants do not contend that NEPA itself imposes a duty directly upon non-federal entities . . . to perform or cease to perform any particular activity.  This route has already been foreclosed by a number of appellate decisions.").

shopping mall, because the Department of Housing and Urban Development ("HUD") had not prepared an EIS for the project.  424 F. Supp. 784, 786 (W.D.N.Y. 1976).  Although the plaintiffs sued both the private developer and the Secretary of HUD, the district court applied *Biderman* and ruled that the developer could be enjoined under NEPA.  *Id.* at 787–88 ("Because HUD's approval was required to begin the project, [the developer] may be enjoined even though it is a non-federal entity and had commenced construction pursuant to HUD's authorization if it evolved that HUD had improperly determined that an e.i.s. was not necessary.").  So too here: Plaintiffs in *Chan* and *Mulgrew* can seek injunctive relief against Winkelhake under NEPA, even though Plaintiffs are also pursuing relief against the FHWA and TBTA.

The Court therefore concludes that the *Chan* Plaintiffs' claims under the U.S. Constitution and NEPA fall within the *Ex parte Young* exception to the Eleventh Amendment. Consequently, the Court denies Winkelhake's motion to dismiss those claims in *Chan* for lack of subject matter jurisdiction.  For those same reasons, it would not be futile for the *Mulgrew* Plaintiffs to amend their pleading to replace the NYSDOT with Winkelhake and pursue their claims under the U.S. Constitution and NEPA against her.  The Court accordingly grants the *Mulgrew* Plaintiffs' motion for leave to amend and denies the NYSDOT's motion to dismiss for lack of subject matter jurisdiction as moot.[16]

## II.    Motions to Dismiss the Non-Constitutional Claims in *New Yorkers* and *Mulgrew*

The Federal and Municipal Defendants move to dismiss all of the non-constitutional claims in *New Yorkers* and *Mulgrew*.  24-cv-367, Dkt. Nos. 57, 62; 24-cv-1644, Dkt. Nos. 47,

---

[16] Because the proposed amendments concern only the NYSDOT and Winkelhake, the Court deems the Federal and Municipal Defendants' motions to dismiss in *Mulgrew* ripe for resolution and addresses them here, notwithstanding the grant of leave to amend.  *See Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 349 (E.D.N.Y. 2008) ("When a plaintiff amends its complaint while a motion to dismiss is pending the court may deny the motion as moot or consider the merits of the motion in light of the amended complaint.").

52.  Because these motions present several overlapping questions of law, the Court addresses them together.

### A.      Count I in *New Yorkers* and *Mulgrew*

In Count I of *New Yorkers* and *Mulgrew*, Plaintiffs claim that the final EA and FONSI violated NEPA.  24-cv-367, Dkt. No. 54 ¶¶ 164–168; 24-cv-1644, Dkt. No. 63-1 ¶¶ 145–151. The Federal and Municipal Defendants contend that these claims share a fatal defect, as they are both time-barred.  24-cv-367, Dkt. Nos. 58 at 11, 63 at 7; 24-cv-1644, Dkt. Nos. 48 at 11, 53 at 7.

Federal law provides:

> [A] claim arising under Federal law seeking judicial review of a permit, license, or approval issued by a Federal agency for a highway or public transportation capital project shall be barred unless it is filed within 150 days after publication of a notice in the Federal Register announcing that the permit, license, or approval is final pursuant to the law under which the agency action is taken.

23 U.S.C. § 139(l)(1).  On June 28, 2023, the FHWA published a notice in the Federal Register announcing that it had issued a final EA and FONSI for Congestion Pricing.  88 Fed. Reg. at 41998.  The notice cited § 139(l)(1) and explained that "[a] claim seeking judicial review of the Federal agency actions on the highway project will be barred unless the claim is filed on or before November 27, 2023."  *Id.*  Despite that clear notice, the *New Yorkers* Plaintiffs filed suit on January 4, 2024, 24-cv-367, Dkt. No. 1, and the *Mulgrew* Plaintiffs filed suit on January 18, 2024, 24-cv-1644, Dkt. No. 1.  As a result, Defendants argue that their NEPA challenges to the EA and FONSI are straightforwardly untimely.

The *New Yorkers* Plaintiffs respond that § 139(l)(1) is inapplicable by its plain terms since Congestion Pricing is not "a highway or public transportation capital project."  24-cv-367, Dkt. No. 74 at 8.  According to the *New Yorkers* Plaintiffs, § 139(l)(1) governs only highway capital projects and public transportation capital projects.  *Id.*  Yet the remainder of § 139

demonstrates that the relevant distinction is between highway projects and public transportation

capital projects.  *See Gruber v. Gilbertson*, 647 F. Supp. 3d 100, 106 (S.D.N.Y. 2022) ("[C]ourts

should not read individual provisions of complex statutes as isolated words appearing on a blank

page divorced from statutory context.").  Critically, that provision defines a "project" as "any

*highway project*, public transportation capital project, or multimodal project that, if implemented

as proposed by the project sponsor, would require approval by any operating administration or

secretarial office within the Department of Transportation."  23 U.S.C. § 139(a)(9)(A) (emphasis

added); *see also Montlake Cmty. Club v. Mathis*, 2019 WL 3928732, at *5 (W.D. Wash. Aug.

20, 2019) (recognizing § 139(l)(1) applies to "federal highway project[s]").  Congress also

defined "highway" capaciously, as including any "road, street, and parkway."  23 U.S.C.

§ 101(a)(11)(A); *see Harrison v. Burlington N. R. Co.*, 965 F.2d 155, 159 (7th Cir. 1992).  Since

Congestion Pricing involves a plethora of roads, streets, and parkways and requires the approval

of the USDOT via the FHWA under the VPPP, *see* DOT 36243, Congestion Pricing is a highway

project subject to § 139(l)(1).[17]

Next, the *New Yorkers* and *Mulgrew* Plaintiffs argue that the EA and FONSI are not

subject to § 139(l)(1) because they were not "final" agency actions, as the FHWA needed to

conduct a reevaluation of the tolling structure ultimately adopted by the TBTA before

Defendants could implement Congestion Pricing.  24-cv-367, Dkt. No. 74 at 9; 24-cv-1644, Dkt.

No. 62 at 20.  But courts have consistently deemed NEPA determinations final, even though

those determinations were subject to reevaluation or required further steps before a project could

be implemented.  *See, e.g.*, *R.L. Vallee, Inc. v. Vt. Agency of Transp.*, 2021 WL 4238120, at *1

---

[17] Accordingly, the Court does not reach whether Congestion Pricing is also a public
transportation capital project for purposes of § 139(l)(1).

(2d Cir. Sept. 17, 2021) (summary order) (rejecting the argument that an FHWA decision not to prepare an EIS "did not constitute final agency action—and was therefore unreviewable— because the FHWA reevaluated [that] decision"); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 868 (9th Cir. 2022); *Cure Land, LLC v. United States Dep't of Agric.*, 833 F.3d 1223, 1231 (10th Cir. 2016); *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 815 (8th Cir. 2006); *Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 274 n.3 (6th Cir. 2001); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 188 (4th Cir. 1999). And the EA and FONSI here "mark the 'consummation' of the [FHWA's] decisionmaking process," as they are neither tentative nor interlocutory. *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). To the contrary, they represent the FHWA's firm conclusion that further environmental review is unnecessary, so long as the tolling structure falls within the assumptions of the examined tolling scenarios. That conclusion also "has direct and appreciable legal consequences." *Id.* For one, the EA and FONSI provided the Project Sponsors with the legal authority to engage in "final design activities, property acquisition, purchase of construction materials or rolling stock, or project construction." 23 C.F.R. § 771.113(a); *see Jersey Heights*, 174 F.3d at 188. Additionally, the FHWA permissibly relied upon the EA and FONSI when deciding whether the final tolling structure required further environmental review, instead of analyzing the question anew. *See R.L. Vallee*, 2021 WL 4238120, at *1. The Court therefore rejects Plaintiffs' argument that the EA and FONSI were nonfinal.

According to the *Mulgrew* Plaintiffs, the Federal and Municipal Defendants have invoked the wrong limitations period, as Count I properly falls under § 139(l)(2). 24-cv-1644, Dkt. No. 62. That provision states:

> The preparation of a supplemental environmental impact statement when required shall be considered a separate final agency action and the deadline for filing a claim

> for judicial review of such action shall be 150 days after the date of publication of
> a notice in the Federal Register announcing such action.

23 U.S.C. § 139(l)(2); *see also* 23 C.F.R. § 771.130 (dictating when a supplemental EIS is

required).  As a matter of plain language, § 139(l)(2) establishes a separate statute of limitations

that governs claims challenging the preparation of a supplemental EIS.  Indeed, the extended

limitations period applies only to "a claim for judicial review of *such action*," 23 U.S.C.

§ 139(l)(2) (emphasis added), and here "such action" clearly refers to the preparation of a

supplemental EIS, *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 766 (2023) ("The word 'such'

usually refers to something that has already been 'described'" (citation omitted)).  Section

139(l)(2) thus cannot revive Plaintiffs' time-barred challenge to the EA and FONSI.

    The *New Yorkers* Plaintiffs briefly argue that the Court should excuse Count I's

untimeliness based on the D.C. Circuit's "reopening doctrine."  24-cv-367, Dkt. No. 74 at 10.

Under that doctrine, "where an agency has re-opened a previously considered issue anew, the

reopening doctrine allows an otherwise stale challenge to proceed."  *Chenault v. McHugh*, 968 F.

Supp. 2d 268, 272 (D.D.C. 2013); *see Growth Energy v. EPA*, 5 F.4th 1, 21 (D.C. Cir. 2021) (per

curiam).  The *New Yorkers* Plaintiffs aver that the FHWA's reevaluation of Congestion Pricing

constitutes a reopening of the conclusions of the EA and FONSI, thereby curing the statute of

limitations issue.  However, the Second Circuit and Supreme Court have "never adopted" the

reopening doctrine, *Biden v. Texas*, 597 U.S. 785, 810 n.8 (2022), and this Court declines to do

so here.  In any event, even under the reopening doctrine, the reevaluation was not a "serious,

substantive reconsideration" of the EA and FONSI's conclusions, but rather took their prior

analysis "as a given."  *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 243 (5th Cir. 2023), *rev'd*

*on other grounds sub nom. FDA v. All. for Hippocratic Med.*, 2024 WL 2964140 (U.S. June 13,

2024).  Accordingly, the reopening doctrine cannot save Plaintiffs' NEPA challenge to the EA and FONSI.

Finally, the *Mulgrew* Plaintiffs invoke a distinct exception to the statute of limitations: equitable tolling.  24-cv-1644, Dkt. No. 62 at 27.  Equitable tolling provides that "'a statute of limitations does not run against a plaintiff who was justifiably ignorant of his cause of action,'" but the plaintiff must "show that his failure to timely file suit was not the result of his lack of diligence."  *Yorkshire Towers Co., L.P. v. U.S. Dep't of Transp.*, 2011 WL 6003959, at *4 (S.D.N.Y. Dec. 1, 2011) (quoting *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1316 (S.D.N.Y. 1997)); *see also Ctr. for Biological Diversity v. Salazar*, 2011 WL 13393265, at *7 (D.D.C. Sept. 15, 2011) (concluding "equitable tolling, in theory, may be applicable" to NEPA cases) (citing *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95–96 (1990)).  The *Mulgrew* Plaintiffs argue that they were justifiably ignorant of their NEPA cause of action because "the lack of any identifiable tolling structure stood in the way of mounting a meaningful challenge to the adequacy of the FONSI" and that they diligently filed suit once the TMRB recommended an actual tolling structure on November 30, 2023.  Dkt. No. 62 at 27–28.  But the premise that Plaintiffs were justifiably ignorant of their NEPA cause of action until the TMRB recommended a tolling schedule is untenable, since the alleged infirmities in Count I were apparent when the FHWA issued the EA and FONSI.  Specifically, in Count I, the *Mulgrew* Plaintiffs aver the EA and FONSI violated NEPA by: analyzing hypothetical tolling scenarios; deferring an assessment of the final tolling structure; offering inadequate opportunities for public participation; preparing an EA rather than an EIS; and failing to adequately consider the impacts of Congestion Pricing, the range of reasonable alternatives, and effective mitigation measures. Dkt. No. 63-1 ¶¶ 145–151.  None of these arguments rest on the tolling schedule recommended

by the TMRB.  As these arguments were available to the *Mulgrew* Plaintiffs during the 150-day limitations period, the Court concludes that their untimely NEPA challenge was the product of a lack of diligence, rather than justifiable ignorance.  *See Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 81 (2d Cir. 2003).

In sum, both Count I of *New Yorkers* and Count I of *Mulgrew* are untimely under 23 U.S.C. § 139(l)(1) because Plaintiffs failed to file their NEPA challenges to the EA and FONSI within 150 days of the FHWA's notice in the Federal Register.

### B.    Count III in *New Yorkers*

Count III of the *New Yorkers* Plaintiffs' Amended Complaint claims that the TBTA has violated SAPA by approving a tolling structure without performing "a socioeconomic assessment of Congestion Pricing's impact upon job retention and creation as well as economic impacts upon small businesses."  24-cv-367, Dkt. No. 54 ¶¶ 177–179.  The Municipal Defendants contend that Plaintiffs' SAPA challenge is premature because the tolling structure has not yet been made effective through its filing with the New York Secretary of State and publication in the State Register.  Dkt. No. 63 at 10–11.

"Where [a] claim has not yet accrued, the claim is not cognizable and the plaintiff may not bring an action."  *Smalls v. Collins*, 10 F.4th 117, 133 (2d Cir. 2021); *see also* 1 Am. Jur. 2d Abatement, Survival, and Revival § 4 ("An action cannot be maintained if it is commenced before the accrual of the cause of action on which it is based.").  Consequently, if a plaintiff brings a claim that has not accrued, the court must dismiss it without prejudice.  *See Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, 2012 WL 3542196, at *15 (S.D.N.Y. Aug. 15, 2012) (Nathan, J.); *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prod. Liab. Litig.*, 2023 WL 5725397, at *2 (D. Md. Sept. 5, 2023) ("[P]laintiffs' claims have not yet accrued and are therefore subject to dismissal without prejudice."); *Digesare Mech.*,

40

*Inc. v. U.W. Marx, Inc.*, 112 N.Y.S.3d 306, 309 (3d Dep't 2019) (explaining an action is "subject to dismissal as premature" if the plaintiff's claim has "not yet accrued").

    The accrual of Plaintiffs' SAPA claim "is governed by state law." *Pena v. Wilson*, 2007 WL 9719050, at *2 (E.D.N.Y. May 18, 2007); *see also Mertens v. Hewitt Assocs.*, 948 F.2d 607, 612 (9th Cir. 1991); *Murphy v. Commonwealth Land Title Ins. Co.*, 621 F. Supp. 3d 373, 377 (E.D.N.Y. 2022). SAPA's rulemaking provision states that "[a] proceeding may be commenced to contest a rule on the grounds of noncompliance with the procedural requirements of this section . . . , however, such proceeding must be commenced within four months from the effective date of such rule."[18] N.Y. A.P.A. Law § 202(8). Accordingly, a suit challenging a rule's compliance with SAPA's procedural strictures must be filed in the four months immediately after the rule's effective date. *See From*, Oxford English Dictionary (2023) ("Indicating a starting point in time, or the beginning of a period."). Indeed, SAPA's timing provision parallels the requirement that an Article 78 proceeding challenging an administrative action under New York law "must be commenced within four months after the determination to be reviewed becomes final and binding upon the petitioner." N.Y. C.P.L.R. 217(1). And New York courts have held that an Article 78 challenge "accrue[s], thereby triggering the four-month limitations period, when the challenged administrative action became final and binding upon petitioners." *Riverkeeper, Inc. v. Crotty*, 814 N.Y.S.2d 322, 325 (3d Dep't 2006); *see also Augustine v. Erie Cnty. Indus. Dev. Agency*, 668 N.Y.S.2d 516 (4th Dep't 1998) (explaining an "article 78 proceeding is premature" until the agency has "rendered a final determination").

---

[18] Plaintiffs suggest that their claim is timely because they "are not challenging a specific rule; they are challenging an administrative process." Dkt. No. 74 at 14. But § 202(8) expressly governs lawsuits contesting a rule's noncompliance with SAPA's "procedural requirements." N.Y. A.P.A. Law § 202(8).

Thus, just as an Article 78 challenge accrues when an action becomes final, so too does a SAPA challenge to a rulemaking accrue on the effective date of the resulting rule.  A SAPA challenge brought before that date therefore must be dismissed as premature.

"A rule or regulation is not effective until a notice of adoption is published in the State Register and the rule is filed with the Secretary of State."  *Isabella Geriatric Ctr., Inc. v. Novello*, 815 N.Y.S.2d 494, 2005 WL 3816962, at \*7 (Sup. Ct. 2005), *aff'd*, 833 N.Y.S.2d 5 (1st Dep't 2007).  The filing requirement derives from both SAPA, *see* N.Y. A.P.A. Law § 203(1) ("[N]o rule shall become effective until it is filed with the secretary of state and the notice of adoption is published in the state register."), and the New York State Constitution, *see* N.Y. Const. Art. 4, § 8 ("No rule or regulation made by any state department, board, bureau, officer, authority or commission . . . shall be effective until it is filed in the office of the department of state."); *see also People v. Walters*, 913 N.Y.S.2d 893, 900 (City Ct. 2010).

Because the final tolling structure adopted by the TBTA has not been filed with the Secretary of State or published in the State Register, that rule is not yet effective.  As a result, Plaintiffs' SAPA claim has not yet accrued, N.Y. A.P.A. Law § 202(8), so the Court dismisses it without prejudice as premature, *see In re Customs & Tax Admin. of Kingdom of Den. (SKAT) Tax Refund Litig.*, 2020 WL 3962066, at \*4 n.24 (S.D.N.Y. July 13, 2020).

C.     **Count IV in *New Yorkers***

As Count IV, the *New Yorkers* Plaintiffs claim that they are entitled to class-wide "equitable and declaratory relief," specifically the "performance of an EIS establishing health monitoring, proper evaluation upon residents of environmental justice communities, and proper evaluation through the SAPA procedure [of] impacts" on the Plaintiffs.  Dkt. No. 54 ¶¶ 183–184. The Municipal Defendants move to dismiss Count IV because it does not assert an independent

cause of action and thus is merely derivative of the *New Yorkers* Plaintiffs' other claims.  Dkt. No. 81 at 15; *see also* Dkt. No. 63 at 8–9.

"Declaratory judgments and injunctions are remedies, not causes of action."  *Manrique v. State Farm Mut. Auto. Ins. Co.*, 2021 WL 5745717, at *8 (S.D.N.Y. Dec. 2, 2021) (quoting *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406–07 (S.D.N.Y. 2010)); *see also Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 558 (S.D.N.Y. 2014); *Messinger v. JPMorgan Chase Bank, N.A.*, 2014 WL 904528, at *2 (S.D.N.Y. Mar. 7, 2014) (Nathan, J.); *KM Enters., Inc. v. McDonald*, 2012 WL 4472010, at *20 (E.D.N.Y. Sept. 25, 2012), *aff'd*, 518 F. App'x 12 (2d Cir. 2013).  Count IV is also duplicative of the *New Yorkers* Plaintiffs' other claims, as Count IV relies on Defendants' purported violations of NEPA and SAPA, Dkt. No. 54 ¶ 181; *see Monocoque Diversified Ints., LLC v. Aquila Air Cap. (Ir.) DAC*, 2024 WL 1312996, at *14 (S.D.N.Y. Mar. 27, 2024), and the relief requested in Count IV is already reflected in Plaintiffs' ad damnum clause, *id.* at 56–57; *cf. Chiste*, 756 F. Supp. 2d at 407.  Accordingly, the Municipal Defendants' motion to dismiss "is granted with respect to Count IV for both declaratory and injunctive relief."  *Manrique*, 2021 WL 5745717, at *8.

### D.    City Councilmembers in *Mulgrew*

Finally, the Federal Defendants move to dismiss the claims of the New York City Councilmember Plaintiffs in *Mulgrew*—namely, David Carr, Joseph Borelli, and Kamillah Hanks—to the extent those claims are brought in the City Councilmembers' official capacities. 24-cv-1644, Dkt. No. 48 at 1 n.1.  In response, the *Mulgrew* Plaintiffs note that "the Council members also assert claims in their individual capacity."  Dkt. No. 62 at 28 n.29.

The New York City Charter vests "exclusive responsibility for 'the law business of the city and its agencies'" in the City's Corporation Counsel and "unequivocally prohibits City officers and agencies from 'employ[ing] any attorney or counsel' except at their own expense in

a matter which 'may affect him or them individually.'" *Caruso v. N.Y.C. Police Dep't Pension Funds, Article 1 & Article 2*, 531 N.E.2d 1281, 1283 (N.Y. 1988) (quoting N.Y. City Charter §§ 394(a), 395). Consequently, absent formal approval from the Corporation Counsel or City Council, the City Councilmember Plaintiffs cannot "retain their own counsel," *id.*, to pursue claims "in [their] official capacity," *Lamberti v. Metro. Transp. Auth.*, 565 N.Y.S.2d 111, 111 (1st Dep't 1991). The City Councilmember Plaintiffs are not represented by the Corporation Counsel. Nor have they obtained the approvals necessary to retain a private attorney and pursue their claims here in their official capacities. Although Plaintiffs are correct that city councilmembers are free to pursue relief in their individual capacities, *see* N.Y. City Charter § 395, the Court dismisses the City Councilmember Plaintiffs' claims brought in their official capacities.

*     *     *

In sum, the Court grants the Federal and Municipal Defendants' partial motions to dismiss, 24-cv-367, Dkt. Nos. 57, 62; 24-cv-1644, Dkt. Nos. 47, 52, and dismisses Counts I, III, and IV in *New Yorkers* and Count I in *Mulgrew*.

## III.     Cross-Motions for Summary Judgment in *Chan*

Having resolved the jurisdictional questions in the NYSDOT's motions to dismiss and procedural problems in *New Yorkers* and *Mulgrew*, the Court must now address the heart of these challenges to Congestion Pricing: the cross-motions for partial summary judgment on Count I in *Chan*, 23-cv-10365, Dkt. Nos. 54, 64, 67. Those motions require the Court to decide whether the FHWA's EA and FONSI took the "hard look" at Congestion Pricing that NEPA demands. Based on the FHWA and Project Sponsors' painstaking examination of Congestion Pricing's environmental impacts, the Court concludes the FHWA "has made the careful consideration and

44

disclosure required by NEPA," *Balt. Gas & Elec. Co.*, 462 U.S. at 98, in a manner that was neither arbitrary nor capricious.

### A.      Scope of the Challenge

As a threshold matter, the parties dispute the range of issues properly before the Court in *Chan*.  According to Defendants, Plaintiffs lack standing to challenge aspects of the EA and FONSI that are unrelated to their personal interests.  Dkt. No. 65 at 34; Dkt. No. 68 at 17.  Additionally, Defendants contend that Plaintiffs can litigate only those issues that they personally raised in the NEPA comment process, because any other issues are unexhausted.  Dkt. No. 65 at 41; Dkt. No. 82 at 8 n.3.  Plaintiffs contest both arguments, retorting that they can challenge any aspect of the EA and FONSI that a commenter raised or the FHWA considered sua sponte.  Dkt. No. 78 at 9, 15.  The Court addresses standing first and then clarifies the appropriate standard for exhaustion.

#### 1.      Standing

The Municipal Defendants' standing argument proceeds in two steps:  First, Chan and Hoffman—the two original plaintiffs in *Chan*, both of whom reside in the Lower Manhattan neighborhood of Battery Park City ("BPC"), Dkt. Nos. 54-8, 78-4, 78-18—lack standing to challenge "environmental harm[s] outside of BPC."  Dkt. No. 68 at 14; *see also* Dkt. No. 65 at 35–36 (raising a similar argument as to EJ communities).  Second, the remaining Plaintiffs, whose interests extend beyond BPC, cannot expand the scope of justiciable issues because their claims were added after the statute of limitations had expired and those claims do not relate back to the original complaint.  *Id.* at 15.

The Municipal Defendants' argument fails at the first step.  Chan and Hoffman have Article III standing to bring a NEPA claim regarding the EA and FONSI.  Chan and Hoffman suffered a "procedural injury," as they "are seeking to enforce a procedural requirement the

disregard of which could impair a separate concrete interest of theirs." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571–72 (1992).  A failure to take a hard look at the environmental impacts of Congestion Pricing "present[s] a material risk of harm" to "the underlying concrete interest Congress sought to protect" in NEPA, *Crupar-Weinmann v. Paris Baguette Am., Inc.*, 861 F.3d 76, 81 (2d Cir. 2017), namely Chan and Hoffman's interest in residing in a safe and healthy environment, *see* 42 U.S.C. § 4321.  The Municipal Defendants contend that Chan and Hoffman have not shown a material risk of harm to that interest because Congestion Pricing is generally expected to improve traffic and air quality near BPC.  Dkt. No. 68 at 16.  Yet the EA projects that traffic will increase at the Hugh L. Carey Tunnel, which is adjacent to BPC.  DOT 36370 ("Manhattan-bound volumes in the Hugh L. Carey Tunnel would increase for all tolling scenarios.").  While that increase in traffic is not expected to have a significant impact on air quality, *see* DOT 36861, even a small increase in pollutants abutting Chan and Hoffman's neighborhood would provide the "identifiable trifle" standing doctrine requires, *see LaFleur v. Whitman*, 300 F.3d 256, 271 (2d Cir. 2002) ("Actual exposure to increased levels of $SO_2$ at one's workplace is certainly something more than an 'identifiable trifle,' even if the ambient level of air pollution does not exceed the [National Ambient Air Quality Standards ('NAAQS')]."); *see also Lujan*, 504 U.S. at 573 n.7 ("[O]ne *living adjacent* to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement." (emphasis added)).

Article III's causation requirement is also met since allowing Congestion Pricing to go forward based on the FHWA's purportedly invalid EA and FONSI would result in the increased traffic as a "predictable effect of Government action on the decisions of third parties." *Dep't of Com.*, 588 U.S. at 768; *see also Env't Def. Fund v. FERC*, 2 F.4th 953, 968 (D.C. Cir. 2021)

(explaining causation is met when "the substantive agency action that disregarded a procedural requirement created a demonstrable risk . . . of injury to the particularized interests of the plaintiff" (citation omitted)).  Likewise, Chan and Hoffman satisfy redressability because "there is some possibility that the requested relief [of vacating the EA and FONSI for further analysis] will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *see also Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002) ("A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered.  All that is necessary is to show that the procedural step was connected to the substantive result."); *Farm Sanctuary v. U.S. Dep't of Agric.*, 545 F. Supp. 3d 50, 71 (W.D.N.Y. 2021).

Because Chan and Hoffman have standing to bring their NEPA claim regarding the EA and FONSI, Article III does not limit the arguments they can marshal in support of that claim. *See WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1232 (10th Cir. 2017) ("[T]he legal theory and the standing injury need not be linked as long as redressability is met."). Chan and Hoffman's "injury follows from an inadequate [EA and FONSI] whether or not the inadequacy concerns the same environmental issue that causes their injury." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 307 (D.C. Cir. 2013); *see Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 919 (9th Cir. 2018).  Accordingly, their injuries "would be redressed by vacatur of [the EA or FONSI] on the basis of *any* defect."  *Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017) (emphasis in original); *see also Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 380 (5th Cir. 2021).  "The proof is in the pudding: if [the Court] were to vacate the [EA and FONSI] for violating NEPA, not only would

[Chan and Hoffman's] injuries be redressed, the remedy would also be 'limited to the inadequacy—here, a deficient [EA and FONSI]—that produced the injury in fact.'" *Sierra Club v. FERC*, 827 F.3d 36, 44 (D.C. Cir. 2016). Thus, despite Defendants' attempt to whittle Plaintiffs' claim down to an entirely local challenge, Article III does not constrain Chan and Hoffman to litigate only those environmental impacts that affect BPC.

As Chan and Hoffman have standing to litigate any NEPA deficiency in the EA and FONSI, the Court need not decide whether the newly added plaintiffs' claims relate back to the filing of the original complaint. Plaintiffs emphasized at oral argument that all of the *Chan* Plaintiffs raise "the same arguments" and seek "the same relief." Oral Arg. Tr. 18:7–8. And "[w]here, as here, multiple plaintiffs seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Barrows v. Becerra*, 24 F.4th 116, 127 (2d Cir. 2022) (quoting *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017)). Accordingly, Chan and Hoffman's standing ensures that Plaintiffs' NEPA claim—and all the arguments they offer in support of it—are justiciable under Article III.

### 2. Exhaustion

Defendants also argue that Plaintiffs are confined to litigating only the issues that they personally raised in their comments on the EA, as Plaintiffs forfeited all other arguments by failing to exhaust them before the FHWA. Dkt. No. 82 at 8 n.3; *see also* Dkt. No. 65 at 41. Plaintiffs respond that limiting a litigant to the contents of her comments would be an exercise in pointless and counterproductive formalism and that "all that is required for exhaustion is that the agency considered the issue." Dkt. No. 78 at 14.

Neither NEPA nor the APA "specifically requires issue exhaustion." *Vt. Pub. Int. Rsch. Grp. v. U.S. Fish & Wildlife Serv.*, 247 F. Supp. 2d 495, 516 (D. Vt. 2002); *see* Paul D.

Friedland, Comment, *The Exhaustion Doctrine and NEPA Claims*, 79 Colum. L. Rev. 385, 389

(1979).  However, the Supreme Court has imposed an exhaustion requirement, "as a prudential

judicial construct," under NEPA.  Jeffrey S. Lubbers, *Fail to Comment at Your Own Risk: Does

Issue Exhaustion Have a Place in Judicial Review of Rules?*, 70 Admin. L. Rev. 109, 110, 129

(2018).  In *Department of Transportation v. Public Citizen*, the Supreme Court held that the

plaintiffs had forfeited a NEPA challenge to the range of alternatives examined in an EA by

failing to exhaust that issue before the agency.  541 U.S. 752.  Writing for a unanimous Court,

Justice Thomas stated that "[p]ersons challenging an agency's compliance with NEPA must

'structure their participation so that it . . . alerts the agency to the [parties'] position and

contentions,' in order to allow the agency to give the issue meaningful consideration."  *Id.*

(alterations in original) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,

435 U.S. 519, 553 (1978)).  Yet "[n]one of the [plaintiffs had] identified in their comments any

rulemaking alternatives beyond those evaluated in the EA, and none [had] urged [the agency] to

consider alternatives."  *Id.*  As a result, the agency "was not given the opportunity to examine

any proposed alternatives to determine if they were reasonably available" and that issue was

unexhausted.  *Id.*  Although the Court acknowledged that "an EA's or an EIS' flaws might be so

obvious that there is no need for a commentator to point them out specifically in order to

preserve its ability to challenge a proposed action," the Court held that the pertinent alternatives

did not fall within that exception.  *Id.* at 765.

        The parties debate whether *Public Citizen* limits a NEPA litigant to only those issues she

personally raised before the agency.  *See* Dkt. Nos. 65 at 41, 68 at 23, 78 at 31.  At first blush,

the language of *Public Citizen* suggests the Court favored a personal exhaustion requirement, as

Justice Thomas emphasized that the plaintiffs had not objected to the agency's consideration of

alternatives "in *their* comments" on the EA.  *Pub. Citizen*, 541 U.S. at 764 (emphasis added).
But the Court's reasoning is also consistent with a less stringent approach, since the Court
deemed plaintiffs' failure to comment significant because it deprived the agency of "the
opportunity" to address concerns with the EA's discussion of alternatives.  *Id.*  Ultimately,
because the agency had not received *any* comments challenging the EA's treatment of
alternatives, the Court had no occasion to consider whether or not the exhaustion requirement is
personal.  Accordingly, attempting to divine the *Public Citizen* Court's view without even the
benefit of clear dicta is too perilous a form of augury to resolve the parties' dispute here.

       The Municipal Defendants contend that a recent NEPA regulation dispels any lingering
uncertainty.  Dkt. No. 82 at 8 n.3.  That CEQ rule provides:  "Comments or objections of any
kind not submitted, including those based on submitted alternatives, information, and analyses,
shall be forfeited as unexhausted."  40 C.F.R. § 1500.3(b)(3).  When promulgating the rule in
2020, the CEQ stated that it codified "the principle that parties may not raise claims based on
issues they themselves did not raise during the public comment period," which the CEQ
purported to derive from the Supreme Court's decision in *Public Citizen*.[19]  Update to the
Regulations Implementing the Procedural Provisions of the National Environmental Policy Act,
85 Fed. Reg. 43304, 43317 (July 16, 2020).  Both the CEQ's regulation and its informal
interpretation of that rule therefore rest on an unusual foundation—namely, the agency's
understanding of a prudential exhaustion doctrine created by the Supreme Court, rather than
statutory text or technical expertise.[20]  But "courts, rather than agencies, have expertise in

---

[19] Ironically, the CEQ regulation does not include the exception for obvious issues that the
Supreme Court articulated in *Public Citizen*.  *See* Kirsten Hite, Cong. Res. Serv., R47205,
*Judicial Review and the National Environmental Policy Act of 1969* at 8 (Aug. 5, 2022)
(observing the CEQ's regulation "may be in tension with the Supreme Court's dicta").
[20] To the extent Plaintiffs rely *solely* on the CEQ's informal statement—rather than its

interpreting case law." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 320 (2d Cir. 2005).

Consequently, the CEQ's view is not "entitled to deference." *Id.*; *see also SFPP, L.P. v. FERC*,

967 F.3d 788, 795 (D.C. Cir. 2020) ("[T]he Court gives no deference to an agency's

interpretation of judicial precedent."); *Owen v. Bristol Care, Inc.*, 702 F.3d 1050, 1054 (8th Cir.

2013); *NLRB v. U.S. Postal Serv.*, 660 F.3d 65, 68 (1st Cir. 2011).  Moreover, permitting an

executive agency to curtail the scope of judicial review without a clear grant of that authority

from Congress would raise separation of powers concerns.  *See Salinas v. U.S. R.R. Ret. Bd.*, 592

U.S. 188, 201 (2021) ("[T]he scope of judicial review is 'hardly the kind of question that the

Court presumes that Congress implicitly delegated to an agency.'" (quoting *Smith v. Berryhill*,

139 S. Ct. 1765, 1778 (2019))); *see also* George Cameron Coggins & Robert L. Glicksman,

*Public Natural Resources Law* § 17:74 (2d ed. 2024) (noting the CEQ exhaustion rule raises

separation of powers questions).

      Rather than reflexively deferring to the CEQ's interpretation of *Public Citizen*, this Court

must independently determine the contours of the prudential issue exhaustion requirement under

NEPA.  "The basic purpose of the exhaustion doctrine is to allow an administrative agency to

perform functions within its special competence—to make a factual record, to apply its expertise,

and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson*, 405 U.S.

34, 37 (1972); *see also USAir, Inc. v. Dep't of Transp.*, 969 F.2d 1256, 1260 (D.C. Cir. 1992)

("[L]itigants must not be encouraged to 'sandbag' agencies by withholding legal arguments for

tactical reasons until they reach the courts.").  To fulfil that purpose, an agency must have "the

opportunity" to address an issue during the NEPA review process.  *Pub. Citizen*, 541 U.S. at 764.

---

interpretation of the underlying regulation—the CEQ's view is eligible for, at most, *Skidmore*
deference.  *See Agyin v. Razmzan*, 986 F.3d 168, 186 (2d Cir. 2021).

But, as long as an issue is squarely presented to the agency, "there is no logical reason why exhaustion should turn on which party . . . brought the issue to the agency's attention . . . or, indeed, even if the agency raised it sua sponte." *Mazariegos-Paiz v. Holder*, 734 F.3d 57, 63 (1st Cir. 2013); *see Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1084 (D.C. Cir. 1996). The contrary rule would incentivize commenters to submit broad, repetitive, and boilerplate comments during an agency's NEPA review process to safeguard their ability to seek judicial review, thereby encouraging the very gamesmanship the exhaustion doctrine seeks to prevent. *See Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 553–54 ("[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then . . . seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'").

Thus, an issue is exhausted if it was included in a comment on the EA—regardless of who submitted the comment—or if the agency considered the issue sua sponte. *See Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1063 (9th Cir. 2023); *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1048 (10th Cir. 2015); *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 117 (D.C. Cir. 2006). Alternatively, an issue may be so obvious that the agency had constructive notice of it such that exhaustion is unnecessary. *See Pub. Citizen*, 541 U.S. at 765. Limiting Plaintiffs to litigating issues they personally raised in comments on the EA would greatly reduce the scope of their lawsuit, yet achieve little else for the administrative process. But, under the Supreme Court's prudential exhaustion doctrine, preventing parties from asserting their NEPA rights is not an end in itself.

## B.      Issuance of the FONSI

With the scope of the *Chan* Plaintiffs' NEPA challenge in sharper focus, the Court addresses their first substantive objection—namely, that several aspects of Congestion Pricing

and the EA and FONSI made the FHWA's decision to forgo an EIS per se arbitrary and capricious.  Dkt. No. 54-1 at 24.

First, Plaintiffs aver that the scale of public opposition to Congestion Pricing demonstrates that the project is "sufficiently 'controversial' to require an EIS."  *Id.*  Although CEQ regulations once treated controversy as an indicium of significance, the CEQ repealed that provision and explained that "[t]he controversial nature of a project is not relevant to assessing its significance" because "the extent to which effects may be controversial is subjective."  85 Fed. Reg. at 43322.  Moreover, prior to that repeal, the Second Circuit recognized the "difference between 'controversy' and 'opposition.'"  *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1557 (2d Cir. 1992).  In contrast to mere policy disagreement, controversy referred "to instances in which 'a substantial dispute exists as to the size, nature, or effect of the [proposed] action rather than to the existence of opposition to a use.'"  *Id.* (quoting *Town of Orangetown v. Gorsuch*, 718 F.2d 29, 35, 39 (2d Cir. 1983)).  Even if Plaintiffs could show that most people within the New York City metropolitan area opposed Congestion Pricing, that fact alone would not demonstrate significance under NEPA.  *See Friends of Pioneer St. Bridge Corp. v. FHWA*, 150 F. Supp. 2d 637, 653 (D. Vt. 2001) (holding plaintiffs had not demonstrated that a project was controversial despite "three advisory city-wide voter referenda, whose results indicated that a majority of the voting population" opposed the proposed action); *see also Hanly v. Kleindienst*, 471 F.2d 823, 830 (2d Cir. 1972) (rejecting "[t]he suggestion that 'controversial' must be equated with neighborhood opposition").  NEPA is not a substitute for the democratic process, so public opposition is irrelevant to its procedural dictates.  *See Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 777 (1983) ("The political process, and not NEPA, provides the appropriate forum in which to air policy disagreements.").

Next, Plaintiffs contend that the size and importance of New York City, particularly the CBD, renders Congestion Pricing inherently significant.  Dkt. No. 78 at 19.  But Plaintiffs' New York City exceptionalism focuses on the wrong facet: it is the scale of environmental impacts, not the scale of the project, that must be significant.  *See* 42 U.S.C. § 4332(C); 40 C.F.R. § 1501.3(b).  Consequently, "there is no categorical rule that sizable . . . undertakings always have a significant effect on the quality of the human environment."  *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 862 (D.C. Cir. 2006); *see also Decker v. U.S. Forest Serv.*, 780 F. Supp. 2d 1170, 1179 (D. Colo. 2011) (rejecting "the contention that an EIS is necessary when a project reaches a certain size").  Were the law otherwise, any project involving Manhattan would require an EIS, no matter how negligible its environmental impact.  Thus, neither the letter nor the spirit of NEPA obligated FHWA to prepare an EIS simply because Congestion Pricing affects New York City.

According to Plaintiffs, Congestion Pricing also warranted an EIS because it is "plainly novel, as it is the first Congestion Pricing program of its kind to be implemented in the United States."  Dkt. No. 78 at 19.  Yet Plaintiffs once again conflate Congestion Pricing with its environmental impacts.  There is a first time for every type of project.[21]  NEPA is not intended to halt all innovation in its tracks.  It is the environmental impacts and not the policy approach or

---

[21] As Justice Brandeis memorably warned:

> To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the nation.  It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.  This Court has the power to prevent an experiment. . . .  But, in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles.  If we would guide by the light of reason, we must let our minds be bold.

*New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

project that must be novel to necessitate an EIS.  *See Monsanto Co. v. Geertson Seed Farms*, 561

U.S. 139, 177 (2010) (Stevens, J., dissenting) (explaining an EIS is appropriate when "the

*environmental threat* is novel" (emphasis added)); *Env't Def. Ctr.*, 36 F.4th at 881 (holding an

EIS must be prepared before "introducing novel and toxic chemicals" into marine ecosystems).

While cities in the United States have not previously adopted CBD congestion pricing policies

like those in major cities abroad, the environmental consequences of Congestion Pricing are

ultimately familiar.  All tolls affect traffic patterns—diverting cars and trucks while incentivizing

the use of public transit—and thus can alter air quality and noise in the surrounding

communities.  Indeed, the FHWA's reliance on well-established modeling tools to analyze

Congestion Pricing's consequences confirms that its effects are typical for transportation

projects.  *See, e.g.*, DOT 36308–09.  Congestion Pricing therefore did not pose the kind of novel

environmental threat that inherently demands further study in an EIS.

   Finally, Plaintiffs argue that the EA and FONSI each demonstrate, on their face, that the

FHWA should have prepared an EIS.  Plaintiffs contend that the EA reveals that Congestion

Pricing will have a significant impact on the environment because the EA is lengthy.  *See* Dkt.

No. 54-1 at 25–26 ("The fact that it took 868-pages to describe the impact of Congestion Pricing

in the Draft EA proves the point.").  But courts have roundly rejected that facile argument.  *See*

*TOMAC*, 433 F.3d at 862 ("[T]he length of an EA has no bearing on the necessity of an EIS.");

*Heartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 434 (8th Cir. 2004); *Sierra Club v. Marsh*,

769 F.2d 868, 875 (1st Cir. 1985).  Given NEPA's goal of promoting informed decision making

on matters affecting the environment, it would be "perverse" to punish the FHWA for

exhaustively analyzing Congestion Pricing, *TOMAC*, 433 F.3d at 862, as doing so would

"encourage agencies to produce bare-bones EA[s]," *Heartwood, Inc.*, 380 F.3d at 434.

Plaintiffs' argument regarding the FONSI fares no better. They assert that the FONSI violates NEPA since it "relies on mitigation" to conclude that Congestion Pricing would not have a significant impact. Dkt. No. 78 at 20. In essence, Plaintiffs urge the Court to reject the use of "mitigated FONSIs"—whereby an agency concludes that mitigation measures ensure a project will not have significant environmental impacts—as contrary to NEPA. However, binding precedent forecloses that argument. The Second Circuit has held that "[w]hen the adequacy of proposed mitigation measures is supported by substantial evidence, the agency may use those measures as a mechanism to reduce environmental impacts below the level of significance that would require an EIS." *Hoffman*, 132 F.3d at 17; *see also Ompompanoosuc*, 968 F.2d at 1556–57; *Abenaki Nation of Mississquoi v. Hughes*, 805 F. Supp. 234, 245 (D. Vt. 1992), *aff'd*, 990 F.2d 729 (2d Cir. 1993). Likewise, the CEQ has issued guidance endorsing the use of mitigated FONSIs "to comply with NEPA's procedural requirements." Council on Env't Quality, *Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact* 2 (Jan. 14, 2011). Plaintiffs' categorical challenge to the FHWA's FONSI is therefore untenable.

## C.    Examination of Alternatives

In addition to their broad-brush objections to the issuance of a FONSI, Plaintiffs argue that specific aspects of the EA are invalid. For one, Plaintiffs contend that the FHWA erred at the EA's outset by "fail[ing] to identify and analyze reasonable alternatives to the Congestion Pricing scheme." Dkt. No. 54-1 at 41. Defendants respond that the EA's examination of alternatives amply satisfied NEPA. Dkt. Nos. 65 at 39; 68 at 23.

When preparing an EIS, an agency must "[e]valuate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination." 40 C.F.R. § 1502.14(a). Although an agency must

also evaluate reasonable alternatives when preparing an EA, "the range of alternatives an agency

must consider is narrower when . . . the agency has found that a project will not have a

significant environmental impact." *Nat'l Audubon Soc., Inc. v. U.S. Fish & Wildlife Serv.*, 55 F.

Supp. 3d 316, 359 (E.D.N.Y. 2014) (alteration in original) (quoting *Ompompanoosuc*, 968 F.2d

at 1558). By requiring agencies to examine alternatives to a proposed course of action, NEPA

ensures that agencies consider—and the public have an opportunity to learn—whether a project's

goals can be achieved through other policies that pose less risk to the environment. *See N.*

*Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006); *I-291 Why? Ass'n v. Burns*,

372 F. Supp. 223, 249 (D. Conn. 1974), *aff'd*, 517 F.2d 1077 (2d Cir. 1975).

"[T]he range of alternatives that must be discussed is a matter within an agency's

discretion." *Friends of Animals*, 948 F.3d at 591 (quoting *Nat. Res. Def. Council*, 564 F.3d at

558). "An agency's selection of alternatives, however, is not insulated from review. While an

agency is not obliged to consider every alternative to every aspect of a proposed action,

reviewing courts have insisted that the agency 'consider such alternatives to the proposed action

as may partially or completely meet the proposal's goal.'" *City of New York v. U.S. Dep't of*

*Transp.*, 715 F.2d 732, 742 (2d Cir. 1983) (citations omitted). Ultimately, an agency "must

follow a rule of reason, which governs both *which* alternatives the agency must discuss, and the

*extent* to which it must discuss them." *Knowles v. U.S. Coast Guard*, 1997 WL 151397, at *7

(S.D.N.Y. Mar. 31, 1997) (emphasis in original) (citations and internal quotation marks omitted);

*see Pogliani v. U.S. Army Corps of Eng'rs*, 2007 WL 983549, at *18 (N.D.N.Y. Mar. 28, 2007).

Here, the FHWA began its examination of alternatives in the EA by surveying prior

congestion pricing proposals in New York City. *See* DOT 36262–63 (discussing the 1973, 2007,

2008, 2015, and 2018 reports). Based in part on these previous studies, the FHWA and Project

Sponsors developed a set of twelve preliminary alternatives for reducing traffic congestion in the CBD. DOT 36264. Beyond the no-action alternative and Congestion Pricing, the FHWA and Project Sponsors considered: reforming the price of street parking, raising tolls at existing toll facilities, imposing new tolls on currently untolled East and Harlem River crossings into Manhattan, creating high-occupancy toll ("HOT") lanes leading into Manhattan, reducing the number of government-issued parking permits, providing additional taxi stands to reduce cruising, creating incentives for telework, rationing days in which cars can enter the CBD based on license plate number, mandating carpooling into the CBD, and restricting trucks to overnight deliveries. DOT 36265.

The EA then explained the quantitative benchmarks that the FHWA and Project Sponsors developed to assess whether an alternative would meet the Sponsors' goals: First, the Sponsors sought a daily VMT reduction in the CBD of at least five percent. DOT 36266. Second, the Sponsors sought a ten percent reduction in the number of vehicles entering the CBD per day. *Id.* Third, the Sponsors sought at least $1 billion in annual net revenue, as that amount could then be "invested or bonded to generate sufficient funds" to meet the Traffic Mobility Act's $15 billion goal. DOT 36301 n.2.

Using these benchmarks, the FHWA analyzed whether each of the preliminary alternatives would meet the Project Sponsors' goals and determined that Congestion Pricing was the only course of action that satisfied the criteria, since each of the other preliminary alternatives would fail to achieve one or more of the Sponsors' aims. DOT 36266. The FHWA also provided its reasoning for rejecting each of the other preliminary alternatives. Reforming the price of street parking would result in a VMT reduction of "substantially less than 1 percent," and "there is no law or agreement in place between the City of New York and MTA that would

direct the revenue generated from this alternative to MTA to support the Capital Program." DOT
36268.  Although increasing tolls at existing facilities would generate some revenue, the FHWA
determined it "would not be sufficient to fund $15 billion for capital projects for MTA's Capital
Program," because "with some crossings remaining untolled, traffic would divert to untolled
facilities, thereby reducing the revenue and not reducing traffic." *Id.*  A new toll on East and
Harlem River bridge crossings would generate significant revenue, but those tolls could not be
directed to the MTA absent a new law or agreement. *Id.*  Moreover, those tolls would negatively
impact "the South Bronx and Harlem/Washington Heights," both of which are EJ communities.
*Id.*  HOT lanes would not sufficiently reduce traffic or raise revenue, since cars would continue
to use "free lanes on the same highway." *Id.*  Limiting the number of government-issued parking
permits would lead to a minimal decrease in traffic, as prior studies found that measure would
reduce VMT below 86th Street by 0.1 to 0.3%. *Id.*  Nor would reducing the number of permits
generate the requisite revenue for the MTA. *Id.*  The construction of additional taxi stands would
not "broadly address VMT for all vehicles," "reduce the number of vehicles entering the
Manhattan CBD," or raise adequate funds. *Id.*  Incentives for telework would not yield a
sufficient reduction in traffic, as pre-COVID-19 studies demonstrate those incentives would
reduce New York City commutes by less than 2% and post-COVID-19 traffic rates had remained
high despite "many offices continuing to telework." *Id.*  Rationing days in which cars can enter
the CBD and mandatory carpooling would both meet the Sponsors' traffic reduction goals, but
neither would raise revenues for the MTA.  DOT 36267.  A prohibition on daytime truck
deliveries would potentially increase VMT and the number of vehicles in the CBD, as "large
trucks might instead send multiple small trucks," without generating public transit revenue.
DOT 36268.  By contrast, the FHWA determined that Congestion Pricing would reduce VMT by

between 7.1% and 9.2%, decrease the number of vehicles entering the CBD each day by between 15.4% and 19.9%, and raise annual net revenues of between $1.02 and $1.48 billion.  DOT 36300.  Consequently, the EA proceeded to evaluate the environmental impacts of two courses of action: Congestion Pricing and the mandatory no-action alternative.  DOT 36269.

Plaintiffs contend that the EA failed to adequately explain why the FHWA rejected the preliminary alternatives to Congestion Pricing.  Dkt. No. 54-1 at 43.  But a "discussion of alternatives need only be 'brief,'" *Nat'l Post Off. Collaborate v. Donahoe*, 2014 WL 6686691, at *8 (D. Conn. Nov. 26, 2014) (citation omitted); *see* 40 C.F.R. § 1502.14(a) (requiring an agency to "briefly discuss the reasons for [the] elimination" of alternatives), so the Court cannot invalidate the EA simply because the FHWA succinctly stated its reasons for rejecting the preliminary alternatives.  Additionally, the EA's brevity was entirely appropriate here since the preliminary alternatives' shortcomings were straightforward.  The FHWA did not need to consult an empirical study to reasonably conclude that rationing the days in which cars can enter the CBD and mandating carpooling would not generate $1 billion of net annual revenue for the MTA.  *See* DOT 36267.  That flaw was self-evident as neither measure would directly raise any revenue.  Likewise, though concisely stated, the FHWA's determination that tolled HOT lanes would not achieve a sufficient decrease in congestion or increase in revenue because drivers would continue to use "free lanes on the same highway," DOT 36268, provides a cogent and "satisfactory explanation" for rejecting that alternative, *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 65 (2d Cir. 2018) (quoting *Nat. Res. Def. Council*, 564 F.3d at 555).

Plaintiffs also seize on the fact that Congestion Pricing was the only measure that would satisfy the Sponsors' funding objective as evidence that the FHWA and Project Sponsors defined their goals so ambitiously that the preliminary alternatives were designed to fail.  Dkt. No. 54-1

at 42–43.  As then-Judge Thomas explained in *Citizens Against Burlington, Inc. v. Busey*, the task of defining a project's objectives presents an analytical quandary.  938 F.2d 190 (D.C. Cir. 1991).  On the one hand, if an agency could define the project's goals in an unreasonably narrow manner, then the NEPA analysis "would become a foreordained formality."  *Id.* at 196.  On the other hand, if an agency uses an unreasonably broad definition of the project's goals, then "an infinite number of alternatives would accomplish those goals and the project would collapse under the weight of the possibilities."  *Id.*  The way for courts to cut this Gordian knot, Judge Thomas wrote, is to look to "the needs and goals of the parties involved in the application" and, "[p]erhaps more importantly," the legislature's goals as reflected in relevant statutes.  *Id.*  The Second Circuit has similarly concluded that "[s]tatutory objectives provide a sensible compromise between unduly narrow objectives an agency might choose to identify to limit consideration of alternatives and hopelessly broad societal objectives that would unduly expand the range of relevant alternatives."  *City of New York*, 715 F.2d at 743.  Incorporating statutory goals into NEPA analyses also serves the separation of powers by respecting the democratic legitimacy of legislative judgments.  And where, as here, the project's sponsors are state and local entities, deferring to legislative judgments also promotes the balance of "federalism" by ensuring federal agencies do not pass judgment on the policy wisdom of state and local enactments.  *Hoosier Env't Council, Inc. v. U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953, 1002 (S.D. Ind. 2000).  Relying on statutory objectives is pragmatically sensible as well, since it ensures federal agencies do not expend resources examining alternatives that the project sponsors are not "legally authorized" to implement.  *Red Lake Band of Chippewa Indians v. United States Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 62 (D.D.C. 2022); *see also Nat. Res. Def. Council*, 564 F.3d at 557.

Thus, the FHWA and Project Sponsors permissibly relied on the New York State Legislature's revenue goal when screening preliminary alternatives.  By its very terms, the Traffic Mobility Act dictates that Congestion Pricing must generate "at minimum . . . fifteen billion dollars for capital projects for the 2020 to 2024 MTA capital program."  DOT 38737. The Project Sponsors included that revenue goal in their VPPP application to the FHWA.  DOT 38309.  And a sponsor's desire to generate revenue is a legitimate reason for rejecting an alternative under NEPA.  *See Nat'l Post Off. Collaborate*, 2014 WL 6686691, at *8 (upholding an agency's rejection of alternatives to selling a post office building because the U.S. Postal Service's goal was "to generate revenue").  Plaintiffs' suggestion that revenue generation is not a cognizable goal under NEPA because it is "not an environmental goal," Dkt. No. 54-1 at 43, ignores the elementary principle that NEPA "mandates a process rather than a particular result," *Brodsky*, 704 F.3d at 119; *see also Friends of Animals*, 948 F.3d at 585.  NEPA does not empower the Court to second-guess the New York State Legislature's revenue objective under the guise of a purely procedural NEPA review.  *See City of Alexandria, Va. v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999) ("By suggesting that the Administration violated NEPA because it did not sufficiently prioritize environmental goals, the district court subtly—and impermissibly— transformed a procedural statute into a substantive one.").

The EA's examination of alternatives was also incomplete, according to Plaintiffs, because the FHWA did not consider two specific alternatives: dynamic tolling and phased-in tolling.  Dkt. No. 54-1 at 43–44.  Dynamic tolling refers to a system in which the toll amount changes in real time to reflect the current congestion, in contrast to a variable tolling system in which the toll amount depends on factors set in advance (e.g., time of day, type of vehicle).  *See Congestion Pricing—A Primer: Overview*, U.S. Dep't Transp. (Mar. 25, 2021),

https://ops.fhwa.dot.gov/publications/fhwahop08039/cp_prim1_03.htm.  However, the FHWA

expressly considered dynamic tolling and rejected it.  DOT 7498.  As the FHWA explained in a

response to a public comment, appended to the final EA, the agency decided to use a variable

rather than dynamic tolling system due to "the size and complexity of the CBD and the broader

region, the concerns raised during early outreach [about dynamic tolling,] and [the] importance

of people knowing the pricing before they decide to enter or remain" in the CBD.  *Id.*  In short,

potential drivers must and should know the tolling consequences of entering the CBD *before*

they set out on a journey where they will end up in the CBD.  That brief yet clear basis for

rejecting dynamic tolling was neither arbitrary nor capricious, even though the FHWA included

it in an appendix rather than the discussion of preliminary alternatives.  *See Piedmont Heights*

*Civic Club, Inc. v. Moreland*, 637 F.2d 430, 436 (5th Cir. Unit B 1981) ("Although this

consideration may be made under a specific heading in the EIS, such a requirement will not be

imposed on the highway agency by this court.").

      Under a phased-in tolling system, the Project Sponsors would implement Congestion

Pricing gradually, imposing the toll on certain kinds of vehicles before extending the toll to

others.  *See* Dkt. No. 54-1 at 43.  Notably, the Fix NYC Advisory Panel recommended

implementing congestion pricing in phases—first for trucks, and then for all other vehicles.

DOT 2331.  Commenters on the draft EA similarly expressed support for a phased-in approach,

urging the FHWA and Project Sponsors to consider a "temporary, phased out discount for

residents of the CBD as an adjustment period."  DOT 7678; *see also* DOT 31316.  Yet the

FHWA's treatment of phased-in tolling demonstrates that the agency understood that a phased-in

approach was a potential feature of Congestion Pricing, rather than an alternative to it.  The

FHWA characterized the Fix NYC Advisory Panel's report as proposing a form of congestion

pricing. *See* DOT 4518, 36262. The FHWA also directed commenters who advocated for phased-in tolling to a frequently received comment response, DOT 7679, 31318, in which the FHWA explained that the "the actual toll schedule, including exemptions, discounts, and crossing credits, has not been finalized," DOT 3635. Treating the imposition of a phased-in congestion toll as a temporary exemption that could be integrated into Congestion Pricing instead of a distinct proposal was reasonable given the economic equivalence of phasing in a toll and phasing out exemptions to an immediately operative toll. Accordingly, since phased-in tolling merely postpones the full operation of Congestion Pricing, it "is simply not an alternative within the meaning of the NEPA regulations." *Shenandoah Valley Network v. Capka*, 2009 WL 2905564, at *11 (W.D. Va. Sept. 3, 2009); *cf. Adler v. Lewis*, 675 F.2d 1085, 1097 (9th Cir. 1982) (explaining "improvements to occur before construction" are "not an alternative to the project"). As such, the FHWA did not fatally err in omitting phased-in tolling from the EA's discussion of preliminary alternatives.

In a final challenge to the EA's examination of alternatives to Congestion Pricing, Plaintiffs aver that the FHWA failed to respond to two critical comments that the EPA submitted on the draft EA. Dkt. No. 78 at 28 n.27, 29. In those comments, the EPA urged the FHWA to consider combinations of the preliminary alternatives, provide a more detailed explanation for rejecting the imposition of tolls on the East and Harlem River bridges, DOT 44940–41, and address whether the rejected alternatives could nevertheless serve as mitigation measures, DOT 45084. Defendants retort that the FHWA considered each of those comments and adequately responded to them by either heeding the EPA's advice or articulating why the FHWA disagreed with it. Dkt. Nos. 81 at 14, 82 at 12.

When the EPA comments on a sister agency's NEPA document, the "lead agency does

not have to follow the EPA's comments slavishly—it just has to take them seriously." *Citizens*

*Against Burlington*, 938 F.2d at 201; *see also Nat. Res. Def. Council*, 564 F.3d at 560; *Tinicum*

*Twp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 295 (3d Cir. 2012) ("[T]he EPA's comments

do not carry the force of law and do not warrant *Chevron*-style deference.").  That duty requires

the lead agency to "consider and respond to EPA's comments," *Coal. for Healthy Ports*, 2015

WL 7460018, at *11 n.18, but "not necessarily . . . to defer to them when it disagrees," *Alabama*

*v. U.S. Army Corps of Eng'rs*, 2023 WL 7410054, at *48 (D.D.C. Nov. 9, 2023) (citation

omitted).

Although the EPA's critical comments on the draft EA's examination of alternatives are

"notable," *Nat'l Parks Conservation Ass'n v. United States*, 177 F. Supp. 3d 1, 34 (D.D.C.

2016), the FHWA adequately considered and responded to each of those comments.  First,

though the EPA proposed examining combinations of alternatives, the FHWA clarified that "the

alternatives combined would not generate adequate revenue" to satisfy the Project Sponsors' $15

billion net revenue objective and "[t]hus, while multiple alternatives in combination might serve

to reduce congestion sufficient to meet the Project objectives, they would still fail to meet the

Project's revenue goal."  DOT 3613.  That brief response was sufficient, since NEPA does not

"require agencies to analyze the environmental consequences of alternatives it has in good faith

rejected as . . . ineffective."  *Nat'l Post Off. Collaborate*, 2014 WL 6686691, at *8 (quoting

*Custer Cnty. Action Ass'n v. Garvey,* 256 F.3d 1024, 1039 (10th Cir. 2001)).  Second, the FHWA

followed the EPA's request for a more detailed rationale for rejecting tolling East and Harlem

River bridge crossings.  In the final EA, the FHWA explained that the 2008 New York City

Traffic Congestion Mitigation Commission Study had "identified a number of disadvantages to

this alternative," including that those tolls would adversely impact EJ communities in "the South Bronx and Harlem/Washington Heights" but fail to capture "trips that start and end within Manhattan."  DOT 36268.  Finally, the FHWA replied to the EPA's recommendation that the FHWA consider whether the preliminary alternatives could serve as effective mitigation measures by noting that "although the preliminary alternatives . . . do not meet all of the Program's objectives, they are not mutually exclusive and, therefore, are not precluded from being implemented."  DOT 7932.  These responses demonstrate that the FHWA amply considered the EPA's comments on alternatives to Congestion Pricing.

Although the FHWA ultimately analyzed the environmental impacts of just two courses of action—Congestion Pricing and the obligatory no-action alternative—the EA examined a series of alternative traffic-reduction measures yet reasonably concluded that none would satisfy the objectives of the Project Sponsors and New York State Legislature.  "The [FHWA] was not required to say more."  *Brodsky v. U.S. Nuclear Regul. Comm'n*, 507 F. App'x 48, 53 (2d Cir. 2013) (summary order).

### D.    Use of Tolling Scenarios

Plaintiffs contend that by moving forward with an analysis of Congestion Pricing and the no-action alternative, the FHWA entirely failed to consider an important aspect of the problem: namely, the actual tolling structure for Congestion Pricing.  Dkt. No. 54-1 at 49.  Because the TBTA had not yet adopted a final tolling schedule, the FHWA instead examined "a hypothetical series of potential plans."  *Id.*  Proceeding without specific tolls was arbitrary and capricious, Plaintiffs argue, as even the EA recognized that the toll amount would be the "*most important factor* in the magnitude and distribution of effects from the Project."  *Id.* at 6 (quoting DOT 36204).  Defendants respond that agencies can—and, for large-scale projects, often do—conduct programmatic NEPA analyses of environmental effects, subject to further consideration when a

sponsor finalizes the project's details.  Dkt. Nos. 65 at 52, 68 at 54.  By following that path here

and committing to reevaluate the final tolling structure adopted by the TBTA, the EA did not

ignore the importance of specific toll rates.  Rather, Defendants argue the EA examined the

impacts of several tolling scenarios to provide a conservative accounting of Congestion Pricing's

potential negative effects.  Dkt. Nos. 65 at 51–52, 68 at 9.

As the EA explains, "all tolling scenarios" that the FHWA analyzed "have some features

in common, including variable tolling, in which toll rates are higher during peak period when

congestion is greatest."  DOT 36290.  But the scenarios differ with respect to "the amount of the

toll for different types of vehicles, the times tolls would be imposed, exemptions from tolling,

crossing credits for tolls paid on other toll tunnels or bridges, and discounts in the form of 'caps'

on the number of tolls per 24-hour period to be applied to different types of vehicles."  DOT

36291.  Notwithstanding these differences, each tolling scenario had to satisfy the Project

Sponsors' objectives, including the Traffic Mobility Act's revenue goal.  *Id.*  Consequently,

"tolling scenarios that provide crossing credits, discounts, and/or exemptions have a higher toll

value that those without these elements."  *Id.*

Within these parameters, the FHWA considered seven scenarios[22]:  Tolling Scenario A

represented a streamlined structure without crossing credits or exemptions, and so with

correspondingly lower toll rates.  *Id.*  Tolling Scenario B added an exemption for buses and caps

on the number of times trucks could be tolled, and therefore had somewhat higher toll rates.

DOT 36293.  Tolling Scenario C provided crossing credits for cars entering the CBD through

tunnels, exempted taxis entirely, and capped the number of times FHVs can be tolled.  *Id.*

---

[22] At times, the EA considered modified versions of these tolling scenarios in order to isolate and
test specific impacts from Congestion Pricing.  *See* DOT 36295.

Tolling Scenario D resembled Scenario C by including tunnel crossing credits, but Scenario D omitted exemptions and caps.  *Id.*  By contrast, Tolling Scenario E modified Scenario C by also exempting transit buses.  DOT 36294.  Tolling Scenario F provided crossing credits to both bridges and tunnels into Manhattan, thereby eliminating the incentive for drivers to enter Manhattan through tunnels directly into the CBD.  *Id.*  Scenario F also deviated from the peak and off-peak timeframes utilized in the other scenarios.  *Id.*  Finally, Scenario G imposed a flat tolling rate on all kinds of vehicles, such that fewer trucks would divert to the Bronx and Staten Island to avoid the CBD.  DOT 36295.  Collectively, these scenarios reflected tolls ranging from approximately $9 to $23 during peak hours and $5 to $12 during off-peak hours.[23]

The EA's examination of tolling scenarios, prior to the TBTA's adoption of a final tolling structure, did not violate NEPA.  Multi-step NEPA reviews typically begin with broad EAs or EISs, followed by more granular assessments of whether specific aspects of a project fit within the prior analysis or require additional study.  *See Hoffman*, 132 F.3d at 13; *Vt. Pub. Int. Rsch. Grp.*, 247 F. Supp. 2d at 528.  Courts have upheld agencies' use of programmatic NEPA reviews when the details of a project remain unknown.  *See, e.g.*, *Fund for Animals v. Kempthorne*, 538 F.3d 124, 138 (2d Cir. 2008).  Likewise, CEQ regulations permit an iterative approach by allowing agencies to "tier their environmental impact statements and environmental assessments," 40 C.F.R. § 1501.11(a), through the preparation of "broader environmental impact statements or environmental assessments" followed by "subsequent narrower statements or environmental analyses . . . incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared," 40 C.F.R. § 1508.1(ff).

---

[23] Under Scenarios A through F, trucks would pay higher peak tolls, ranging from $12 to $82. DOT 36292.

Those regulations also note that tiering is "appropriate when it helps the lead agency to focus on the issues that are ripe for decision and exclude from consideration issues already decided or not yet ripe." 40 C.F.R. § 1501.11(c)(2). Such was the case here: The FHWA performed a broad analysis of potential tolling scenarios based on the information available at the time, including the Project Sponsors' objectives and statutory parameters, but left open the question of whether the final tolling structure would comport with those scenarios until it was "ripe for decision." *Id.*

Multi-step NEPA reviews are not only lawful, but also salutary. By examining potential tolling scenarios prior to the finalization of the tolling structure, the FHWA enabled the TMRB and TBTA to benefit from the federal government's environmental expertise in crafting a suitable tolling schedule. *See* DOT 36272 (noting "Traffic Mobility Review Board's recommendation would be informed by the results of this EA"). Indeed, the Traffic Mobility Act required the TMRB to consider several factors examined in the EA, specifically "traffic patterns, traffic mitigation measures . . . peak and off-peak rates and environmental impacts, including but not limited to air quality and emissions trends." DOT 38741. The use of tolling scenarios also provides the TBTA with flexibility going forward, as the TBTA can adjust the final tolling structure within the bounds of the EA's tolling scenarios—including by *reducing* toll rates— without restarting the arduous NEPA review process. By contrast, if the FHWA had considered only a single tolling structure, the TBTA would be confined to the initial schedule, unable to make changes without potentially going through a further environmental review.

Nor did the EA's use of tolling scenarios prevent the FHWA from taking a hard look at Congestion Pricing or considering important aspects of the problem. Throughout the EA, the FHWA accounted for uncertainty regarding the shape of the ultimate tolling structure by studying "the effects of the tolling scenario that would result in the greatest potential negative

effects for that particular topic of analysis." DOT 36306. This worst-case scenario approach is fundamentally conservative, as it "results in the most potential negative effects of the CBD Tolling Alternative, [whereas] other tolling scenarios would result in lesser or fewer negative effects." *Id.* Consistent with the clear logic of assessing worst-case scenarios, courts have endorsed worst-case scenario analyses as a reasonable means of confronting uncertainty under NEPA. *See Becker v. Fed. R.R. Admin.*, 999 F. Supp. 240, 247 (D. Conn. 1996), *aff'd sub nom. Rice v. Fed. R.R. Admin.*, 162 F.3d 1148 (2d Cir. 1998); *see also WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019); *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 2021 WL 2826751, at *8 (D. Utah July 7, 2021), *aff'd*, 72 F.4th 1166 (10th Cir. 2023).

While the EA properly examined tolling scenarios, a necessary consequence of the FHWA's approach is that the final tolling structure cannot deviate too much from the examined scenarios; otherwise, the EA's conclusion that Congestion Pricing will not have a significant impact may no longer hold true. But that is precisely the issue the FHWA sought to address in its recent reevaluation of whether the EA "remains valid" in light of the final tolling scenario. 23 C.F.R. § 771.129(c). As explained above, the Court will defer ruling on the merits of that reevaluation pending supplemental briefing from the parties.

### E.  Analysis of Battery Park City

A core gravamen of Plaintiffs' NEPA claim—indeed, the original impetus for Chan and Hoffman's lawsuit—is the EA's treatment of BPC. As Plaintiffs explain, BPC is a primarily residential community in Lower Manhattan, bounded by the Hudson River to the west and the lower portion of the West Side Highway, known as West Street, to the east. Dkt. No. 54-1 at 7. The area is home to many families with children as well as a relatively large elderly population. *Id.* at 20. Given BPC's proximity to major roadways, a significant number of residents own cars. *Id.* at 7. Plaintiffs contend that the EA overlooked the neighborhood's distinctive geography,

vulnerability to increases in traffic and pollution, and residential character.  Dkt. No. 54-1 at 27–

31.  In response, Defendants stress that the EA thoroughly examined the roadways surrounding

BPC, ensured that they would not experience any adverse traffic or pollution effects from

Congestion Pricing, and determined that Congestion Pricing would reinforce BPC's

neighborhood character.[24]  Dkt. Nos. 65 at 29–34, 68 at 35–38.

First, Plaintiffs argue that the FHWA's insufficient consideration is evident from "the

fact that 'Battery Park City' is only mentioned in the 958-page Final EA a total of *12 times*."

Dkt. No. 54-1 at 27 (emphasis in original).  But the FHWA was not required to refer to BPC *in*

*haec verba* in order to adequately analyze Congestion Pricing's impacts on the neighborhood.

Instead, the FHWA addressed BPC through the EA's analysis of Lower Manhattan (of which

BPC is a part), *e.g.*, DOT 36660, as well as its examination of impacts on landmarks adjacent to

BPC like West Street, *e.g.*, DOT 36861, Battery Park, *e.g.*, DOT 37088, and the Hugh L. Carey

Tunnel, *e.g.*, DOT 36324.  Because the Court looks to the EA's substance rather than its word

choice, the FHWA's failure to mention BPC "in so many words" as frequently as Plaintiffs may

have wished is insufficient to show that FHWA did not take a hard look at environmental

impacts on the neighborhood.  *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334,

347 (6th Cir. 2006).

Given that BPC is "penned in and separated from the rest of Manhattan" by the exempted

throughfare of West Street, Plaintiffs infer that BPC will experience increased traffic under

Congestion Pricing and contend that the EA impermissibly "ignored" this negative impact.  Dkt.

No. 54-1 at 27–28.  However, the EA's traffic analysis refutes Plaintiffs' concern.  To assess

---

[24] The Municipal Defendants also contend that Plaintiffs' objections to the analysis of BPC are
unexhausted.  Dkt. No. 82 at 3.  But because the Court determines that the FHWA considered
BPC sua sponte, those objections are justiciable.

Congestion Pricing's impact on traffic, the FHWA utilized the Best Practice Model ("BPM"), a "long-range travel forecasting model" that covers the 28-county "catchment area from trips to and from the Manhattan CBD."  DOT 36304.  Based on "data from the 2010 Census, traffic and transit ridership data, household surveys, and comprehensive projections of social and economic trends," DOT 36308, the BPM "simulates the number and types of journeys made on an average weekday in the region by each resident," DOT 36342.  The model also uses "employment and demographic data" to project a variety of transit-related decisions for the journeys, including their "mode, purpose, destination, frequency, location of intermediate stops, and time of day." *Id.*  For an average simulated weekday, the BPM generates more than 28.8 million journeys for the 8.2 million households within the 28-county region.  *Id.*  The roadway networks that the BPM simulates "contain more than 61,000 links that include local streets, interstates, and freeways."  *Id.*  Each link in the model reflects information on the roadway's number of lanes, functional class, speed, truck usage, and toll collection.  *Id.*  Government authorities in the New York City area rely on the BPM as "the primary tool . . . to analyze the effects of large-scale regional transportation projects including[] the New York metropolitan area's Federally recognized Regional Transportation Plan, PANYNJ Bus Terminal Redesign, and New NY Bridge Project."  DOT 36340.  Agencies also use the BPM to "model[] and document[] their region's compliance with the Clean Air Act."  DOT 36308; *see also* Oral Arg. Tr. 100:21–101:5.

The FHWA ran simulations on the BPM under the different tolling scenarios to identify the intersections in the 28-county region that "would most likely experience increases in traffic." DOT 36475.  That analysis yielded a list of 102 intersections, which the FHWA then aggregated into 15 study areas.  *Id.*  Five of the intersections were along BPC's West Street border.[25]  DOT

_____

[25] The five intersections were: the Hugh L. Carey Tunnel Entrance/Exit and West Street, the

36476.  The FHWA included those five intersections in the "Hugh L. Carey Tunnel and Holland

Tunnel–Lower Manhattan" study area.  DOT 36489.  For each study area, the FHWA

determined the peak hours for traffic within daily time periods.  DOT 36477.  The FHWA then

examined traffic effects at each of the 102 intersections during those peak hours under Tolling

Scenario D.[26]  DOT 36478.  The EA clarified:

> Tolling Scenario D was selected for detailed traffic analysis because it has a higher
> number of potentially affected intersections in the critical Lower Manhattan Study
> Area.  However, it should be noted that Tolling Scenarios D, E, and F are very
> similar and would be expected to have very similar potential traffic effects;
> therefore, Tolling Scenario D is considered to be the representative tolling scenario
> inclusive of Tolling Scenarios E and F.

DOT 36404.  In accordance with NYSDOT guidance, the FHWA set a threshold at which the

agency would find an adverse traffic effect.  DOT 36478.  Specifically, the FHWA determined

that an average delay equal to or greater than ten seconds at signalized intersections with an

average control delay of more than fifty-five seconds or at unsignalized intersections with an

average control delay of more than thirty-five seconds would constitute an adverse effect.  DOT

36478–79.

     Of the 102 intersections analyzed, the FHWA found that most would see reductions in

traffic, DOT 36494, while four intersections would experience adverse traffic effects, DOT

36488.  None of those four intersections were along West Street.  *Id.*  Indeed, the only negatively

impacted intersection in the Hugh L. Carey Tunnel and Holland Tunnel–Lower Manhattan study

area was Edgar Street and Trinity Place during the midday peak period.  DOT 36489.  Even for

---

Hugh L. Carey Tunnel Exit and West Street and West Thames Street, West Street and Albany
Street, West Street and Vesey Street, and West Street and Chambers Street.  DOT 36861.  While
the table at DOT 36861 provides the results of an air quality analysis, the FHWA examined
emissions at the same 102 intersections that it included the traffic study, as explained *infra*.
[26] However, "[t]he Downtown Brooklyn study area was also analyzed for Tolling Scenario C,
which was projected to have higher increases in traffic volumes than Tolling Scenario D."  DOT
36495.

the four impacted intersections, however, the FHWA found that any adverse traffic impacts could be completely mitigated through "[s]ignal timing improvements."  DOT 36488.

The intersection study demonstrates that Plaintiffs' traffic concerns are unfounded.  That analysis shows the five locations along BPC most likely to face greater traffic would not be adversely impacted.  *See* DOT 36489.  It follows that intersections within BPC, which the BPM found less likely to have traffic increases, would likewise not experience adverse traffic impacts. That logical implication also comports with common sense:  If the busiest intersections along the exempted West Side Highway would not be burdened by worse traffic under Congestion Pricing, then surely the tolled streets of BPC would not either.

But Plaintiffs contend that the intersection study was insufficient to conclude that BPC's West Street border would not be adversely impacted by traffic, since the FHWA failed to analyze the segments of West Street between these intersections.  Dkt. No. 78 at 35.  Plaintiffs stress that the EA examined ten different highway corridors in depth, yet did not include West Street in that study.  *Id.*; Dkt. No. 54-1 at 28.  Much like the intersection study, the highway corridor assessment examined the highway segments that the FHWA found were most likely to have greater traffic.  DOT 36411.  The FHWA identified those ten corridors "using the BPM, which showed traffic volume increases along these corridors for some scenarios."  *Id.*  Additionally, "[s]ubsequent BPM screening runs were made for all tolling scenarios to identify additional highway segments that are projected to have volume increases greater than 5 percent."  *Id.*  West Street's omission from the highway corridor study was therefore a telling finding, not a fatal oversight.  Because the initial BPM screening indicated that West Street would not experience an increase in traffic volume of more than five percent, West Street did not warrant further analysis. The FHWA also examined the daily VMT effects Congestion Pricing would have on major

highways considered in their entirety and found that the West Side Highway would see a decrease in traffic under every tolling scenario—ranging from a 13.2% reduction under Scenario B to a 22.8% reduction under Scenarios D and E.  DOT 36360.  Thus, the EA's highway analyses corroborate the intersection study's conclusion: that Congestion Pricing would not have an adverse traffic impact on West Street.

Plaintiffs object that this finding is inconsistent with the FHWA's statement elsewhere in the EA that "Manhattan-bound volumes in the Hugh L. Carey Tunnel would increase for all tolling scenarios."  DOT 36370; *see* Dkt. No. 78 at 35.  However, geography dispels any apparent tension.  Cars that enter Manhattan via the Hugh L. Carey Tunnel do not invariably take West Street; rather, cars can also exit the Hugh L. Carey Tunnel onto Edgar Street.  DOT 36410, 36779.  The projected increase in traffic at the intersection of Edgar Street and Trinity Place suggests that many cars would do so under Congestion Pricing.  DOT 36489, 36779.  Moreover, the EA's intersection study examined the two exits where cars traveling through the Hugh L. Carey Tunnel can turn onto West Street, either northbound or southbound, *see* DOT 36861 ("Hugh L. Carey Tunnel Entrance/Exit and West Street" and "Hugh L. Carey Tunnel Exit and West Street and West Thames Street"), yet found that neither would be adversely impacted by increased traffic, DOT 36489.  The EA therefore establishes that the FHWA adequately considered traffic effects along West Street and in BPC.  *See Stewart Park & Rsrv. Coal., Inc. (SPARC)*, 352 F.3d at 557.

Similarly, the EA belies Plaintiffs' assertion that the FHWA ignored the adverse impacts Congestion Pricing would have on air quality in BPC.  Dkt. No. 54-1 at 30.  After conducting a mesoscale analysis of emissions effects on the CBD and twelve surrounding counties, DOT 36827–28, the FHWA performed a microscale screening analysis of "[Carbon Monoxide

("CO")] and [Particulate Matter ("PM")]$_{2.5}$/PM$_{10}$ impacts" at the 102 intersections examined in the EA's traffic study under Tolling Scenario D,[27] DOT 36832, 36859.  Because traffic, particularly from trucks, results in harmful emissions, the FHWA concluded that those 102 intersections were the most likely to experience adverse air quality effects and that Scenario D represented the relevant worst-case scenario.  DOT 36832, 36859; *see also* DOT 7927 ("[Although] most intersections would have a net reduction in traffic . . . , in order to be conservative, all 102 intersections analyzed for potential traffic effects were included in the microscale air quality screening analysis regardless of the change, if any, in traffic volumes."). The FHWA therefore screened those intersections using NYSDOT emissions parameters to determine whether any intersection warranted further study.  DOT 36859–60.  To assess CO emissions, the FHWA examined whether intersections were burdened by delays and would have a ten percent or greater "increase in volume between the No Action Alternative and the CBD Tolling Alternative."  DOT 36860.  To screen for PM$_{2.5}$/PM$_{10}$, the FHWA analyzed whether intersections burdened by delays would have "[a] maximum hourly change in heavy-duty diesel vehicles [of] over 10 vehicles."  *Id.*  Because "all 102 analysis locations passed the NYSDOT CO and PM$_{2.5}$/PM$_{10}$ screening analysis," the FHWA decided that "no further analysis for CO or PM$_{2.5}$/PM$_{10}$ [was] warranted."  *Id.*; *see also* DOT 36861–63 (providing the results for each intersection analyzed).

Individuals had voiced concerns during early outreach about emissions along several highways in the region, so the FHWA also screened highway links throughout the study area to assess whether to include those links in "hot-spot analyses . . . [of] the Project's impact on

---

[27] Once again, the FHWA used Tolling Scenario C "for the midday period in Downtown Brooklyn," because that scenario "has the highest traffic volume increases on the local streets." DOT 36832.

localized air quality levels." DOT 36864. The FHWA recognized that each tolling scenario "affect[s] individual highway links differently," and therefore screened "every highway link under every scenario" to identify the sites with the highest annual average daily traffic and the highest increase in heavy-duty diesel trucks. *Id.* Based on the results of the screening, the FHWA chose three sites for hot-spot analyses: I-95 west of the George Washington Bridge under Tolling Scenario C, the Cross Bronx Expressway at Macombs Road under Tolling Scenario B, and the approach to the Robert F. Kennedy Bridge in Queens under Tolling Scenario E. DOT 36864. The FHWA then performed microscale analyses of $PM_{2.5}/PM_{10}$ at those three intersections under the pertinent tolling scenarios and concluded that none would exceed the NAAQS.[28] DOT 36865; *see Sierra Club v. FHWA*, 2018 WL 1610304, at *7 (D. Colo. Apr. 3, 2018) (quoting 42 U.S.C. § 7409(b)(1)). Because the FHWA screened every highway link under every tolling scenario and found that Congestion Pricing would not have adverse air quality effects on even those with the most traffic and greatest increases in heavy-duty diesel trucks, the FHWA concluded: "For all tolling scenarios, the changes in traffic volumes, including changes in truck trips, would not result in regional or localized exceedances of National Ambient Air Quality Standards, and there would be no adverse effects on air quality from implementation of the CBD Tolling Alternative." DOT 36942.

Through the EA's intersection and highway-link emission analyses, the FHWA adequately addressed air quality effects of Congestion Pricing on BPC. The FHWA reasonably concluded the 102 intersections most likely to experience greater traffic under the worst-case

---

[28] The FHWA also examined emissions effects on the FDR Drive near East 10th Street in response to community input, but found that "the Project would not increase traffic volumes or change other existing conditions to such a degree as to jeopardize attainment of the NAAQS for CO." DOT 36863. "Because the FDR Drive does not allow trucks, a microscale particulate matter screening or analysis was not warranted at that location." DOT 36833.

tolling scenario were also those with the highest risk of air quality issues.  And five of those intersections were on West Street along BPC's eastern border.  Yet the EA explained that none of those five intersections would have unsafe levels of CO or $PM_{2.5}$/$PM_{10}$.  DOT 36861.  *A fortiori*, intersections within BPC that are even less likely to see increased traffic will not experience unsafe emission levels.

Plaintiffs argue that the FHWA's intersection analysis was unsound because Tolling Scenarios A and B would result in greater traffic on West Street.  Dkt. No. 54-1 at 30.  To support their assertion, Plaintiffs cite a sentence in the EA remarking that Manhattan-bound volumes in the Hugh L. Carey Tunnel would increase under Tolling Scenario A and Tolling Scenario B due to "increased demand to West Street and the FDR Drive via the Battery Park Underpass."  DOT 36370.  However, the preceding sentence states that usage of the tunnel would increase "for *all* tolling scenarios," *id.* (emphasis added), and a table on the following page shows that Scenario D would result in approximately 10,000 more vehicles per average weekday than Scenarios A and B would, DOT 36371.  As a result, Plaintiffs' challenge to the intersection analysis is straightforwardly unavailing.[29]

Furthermore, as part of its highway link analysis, the FHWA screened every highway link adjacent to BPC under all seven tolling scenarios and determined that none had sufficient levels of daily or increased truck traffic to warrant a hot-spot analysis.  Given that the highway links with the worst daily and increased truck traffic would not exceed NAAQS, the FHWA reasonably determined that the same was true throughout the study area—including along BPC.

---

[29] To the extent Plaintiffs object to the traffic analysis on the same ground, *see* Dkt. No. 78 at 36, that argument is equally unpersuasive.

The EA's air quality analyses therefore provided a compelling basis for the FHWA's conclusion that Congestion Pricing would not adversely impact air quality in BPC.

In a final challenge to the EA's consideration of BPC, Plaintiffs aver that the FHWA improperly conflated BPC with its environs when assessing Congestion Pricing's effects on neighborhood character.  Dkt. No. 54-1 at 28–29.  The neighborhood character analysis considered a wide variety of "character-defining features"—including "traffic, transit, pedestrians and bicyclists, economic considerations, parklands, historic and cultural resources, visual resources, air quality, and noise"—to evaluate Congestion Pricing's effects on "the mix of the various elements that give neighborhoods their distinct personality, context, and feeling." DOT 36658.  Within the CBD, the FHWA analyzed those effects on three geographic areas: Lower Manhattan, Canal Street to 14th Street, and Midtown Manhattan north of 14th Street.  *Id.* The EA explained that Lower Manhattan encompasses "neighborhoods such as the Financial District, Battery Park City, Chinatown, Tribeca, and Civic Center."  DOT 36660.

According to Plaintiffs, the FHWA then provided an "overly broad mischaracterization" of Lower Manhattan that reveals "the FHWA failed to take a hard look at Battery Park City," Dkt. No. 54-1 at 29, because the FHWA stated:  "Land uses in the area include predominantly commercial and civic/government uses in the southernmost portions of Lower Manhattan." DOT 36660.  Yet, as Plaintiffs acknowledge and the Municipal Defendants stress, Dkt. Nos. 54-1 at 29, 68 at 36, the FHWA qualified that statement in the very next sentence:  "The area of Lower Manhattan south of Chambers Street has experienced a notable increase in residential use in recent decades."  DOT 36661.  The EA's clear recognition that many reside in the southern portions of Lower Manhattan refutes the argument that the FHWA overlooked BPC residents by grouping BPC with its surroundings when analyzing neighborhood character.

Indeed, the FHWA reasonably concluded that Congestion Pricing would not impair the character of Lower Manhattan, but rather reinforce it. The EA observed that Lower Manhattan is a distinctively dense portion of the CBD. *See* DOT 36662 ("[T]he defining features of neighborhood character for the Lower Manhattan portion of the Manhattan CBD study area include . . . its dominant patterns of commercial, civic/government, and residential uses . . . and the high density of development and intensity of use that characterize its neighborhoods."). Consequently, the FHWA found that Congestion Pricing would enhance that quality in Lower Manhattan, as well as the rest of the CBD, since "pedestrian traffic in this area would likely increase due to mode shift away from automobiles." DOT 36674. Congestion Pricing would therefore accentuate "the established patterns of land use, heavy mixing of uses, and the very high density of development and intensity of use that are defining features of neighborhood character in the Manhattan CBD study area." *Id.* Far from upsetting the character of BPC and other neighborhoods in the CBD, the EA concluded that Congestion Pricing "would *benefit* neighborhood character." DOT 36675 (emphasis added). That well-reasoned determination contradicts Plaintiffs' contention that the FHWA neglected the harmful effects Congestion Pricing would have on BPC's distinctive character.

The EA thus demonstrates that the FHWA did not ignore Congestion Pricing's impact on BPC. To the contrary, the FHWA thoroughly documented why Congestion Pricing would not adversely affect BPC, notwithstanding its unique position as a residential neighborhood along the southernmost portion of West Street, near the Hugh L. Carey Tunnel. Given the FHWA's endorsement of a policy with which the Plaintiffs who reside in BPC vehemently disagree, they may feel that the federal government did not address their concerns. But the FHWA rigorously considered their interests, and that is all NEPA demands.

F.    **Environmental Justice**

Plaintiffs widen their aperture beyond the confines of BPC to the entire New York City metropolitan region and argue that the FHWA's EJ analysis "failed to sufficiently study Congestion Pricing's inevitable impact on the [region's] most economically vulnerable communities."  Dkt. No. 54-1 at 31.  According to Plaintiffs, the defects in the EJ discussion were myriad: the FHWA utilized a flawed methodology, disregarded criticisms from the EPA, and relied on a technical memorandum that was never subject to public input.  *Id.* at 34–35, 39– 40.  Defendants contest each of these assertions and contend that the FHWA's examination of Congestion Pricing's impacts on EJ communities was a model of careful analysis and interagency collaboration.  Dkt. Nos. 65 at 35–39, 68 at 39–41, 45–48.

By executive order, federal agencies reviewing projects under NEPA must consider EJ impacts.[30]  *See Coal. for Healthy Ports*, 2015 WL 7460018, at *2 (citing Exec. Order No. 12898, 59 Fed. Reg. 7629 (Feb. 11, 1994)).  That order "requires that, '[t]o the greatest extent practicable and permitted by law, . . . each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations.'"  *Sur Contra La Contaminacion v. EPA*, 202 F.3d 443, 449 (1st Cir. 2000) (quoting 59 Fed. Reg. at 7629); *see also El Puente v. U.S. Army Corps of Eng'rs*, --- F.4th ----, 2024 WL 1945978, at *8 (D.C. Cir. May 3, 2024); *Trenton Threatened Skies, Inc v. FAA*, 90 F.4th 122, 138 (3d Cir. 2024).

---

[30] While that executive order "does not create a private right to judicial review, a [plaintiff] may challenge an agency's environmental justice analysis as arbitrary and capricious under NEPA and the APA."  *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021); *see also Coal. for Healthy Ports*, 2015 WL 7460018, at *26; *Senville v. Peters*, 327 F. Supp. 2d 335, 362 (D. Vt. 2004).

In addition to a regional EJ study on how Congestion Pricing would affect increased costs, trip times, and transit conditions throughout the twenty-eight-county area surrounding the CBD, the FHWA performed a local study on how "diverted trips and changes in traffic patterns" would impact "congestion, air emissions, and noise" in EJ communities.  DOT 36957, 36959. The FHWA conducted its local study on a ten-county area "consisting of New York City and the five adjacent counties where the greatest change in traffic volumes and vehicle miles travelled . . . are predicted to occur."[31]  DOT 36958.  The EA began by clarifying its definition of EJ communities for purposes of the local study.  DOT 36961.  Using data from the 2015–2019 census, DOT 36956, the FHWA deemed a census tract a "minority" community when either at least fifty percent of the census tract's population identified as minority, or the percentage of the census tract's population that identified as minority exceeded the percentage of the population that identified as minority in the county where the census tract is located.  DOT 36961.  The FHWA deemed a census tract a "low income" community when the percentage of individuals with household incomes below twice the federal poverty threshold in the census tract was higher than that percentage for the entire twenty-eight-county region.  *Id.*  As the EA explained, the FHWA and Project Sponsors doubled the federal poverty threshold as a conservative measure "to reflect local conditions and the cost of living in the study area."  *Id.*

Applying those definitions to the 2015–2019 census data, the FHWA designated more than seventy percent of the census tracts in the ten-county local study area—2,193 of the 3,106 total tracts—as EJ communities.  DOT 7251; *see* DOT 36965.  The FHWA proceeded to analyze several potential impacts on those EJ communities, including increased traffic congestion at

---

[31] Those counties were Bronx, Kings, New York, Queens, Richmond, and Nassau counties in New York and Bergen, Essex, Hudson, and Union counties in New Jersey.  DOT 36959.

intersections and on highway segments as well as traffic-related air quality effects.  DOT 36978.

Based on the intersection and highway-segment traffic studies described *supra*, the FHWA

determined that Congestion Pricing would not adversely affect traffic in any of the EJ

communities.  DOT 36979, 36981.  As for air quality, while the EA recognized "[s]ome counties

are predicated to show increases in pollutant emissions, while others would have decreases,"

DOT 36982; *see* DOT 36983, the FHWA reiterated its findings that Congestion Pricing would

not adversely affect air quality at any of the intersections or on any of the highway links the

agency examined, DOT 36982, 36984.  The EA also performed a comparative analysis of

expected VMT changes in EJ communities versus those in non-EJ communities under each

tolling scenario.  DOT 36984.  That analysis showed that non-EJ communities would see greater

VMT reductions in "areas of New York City outside but relatively close to the Manhattan CBD,"

whereas EJ communities would see greater VMT reductions in the CBD itself, portions of New

York City further from the CBD, as well as the counties north of New York City, on Long

Island, and in New Jersey.  *Id.*

In response to the EPA's comments on the draft EA and input from the Environmental

Justice Technical Advisory Group, the FHWA added a further air quality study to the final EA,

examining whether Congestion Pricing would worsen "pre-existing pollutant or chronic disease

burdens" in EJ communities.  DOT 36989–90; *see* DOT 7249.  The FHWA detailed the results

of that study in a technical memorandum, which the agency appended to the final EA.  DOT

7243.  The technical memorandum began by explaining how motor vehicles, and particularly

trucks, emit pollutants that can be particularly harmful for at-risk populations, such as those with

preexisting conditions.  DOT 7255.  Research has established that harmful effects from vehicle

emissions are particularly "severe near major roads that are heavily traveled or have substantial truck traffic."  DOT 7257.

Those burdens have not been evenly distributed in the New York City metropolitan region, the FHWA explained, as the highway network built in the mid-20th Century divided or isolated many neighborhoods, leading to "an exodus of residents who were replaced by new ethnic or economic groups" near those highways.  *Id.*  "Because many of these newly established residential populations were largely minority and/or low-income, today many neighborhoods adjacent to highways are identified as environmental justice communities."  *Id.*  Redlining further exacerbated this harmful legacy.  DOT 7259.  Although air quality in the New York City metropolitan region has significantly improved since 1990, *id.*, the FHWA recognized that "the region's history of land-use and transportation development is still felt today by residents living near roadway traffic," DOT 7262.

To evaluate whether Congestion Pricing would contribute to preexisting pollutant and health burdens in EJ communities within the ten-county local effects study area, the FHWA examined pollutant data from the EPA, DOT 7265 (explaining the data covered cancer and respiratory health risks as well as particulate matter), and chronic disease data from the CDC and state and local agencies, DOT 7270–71 (stating the data measured the prevalence of five conditions associated with exposure to diesel truck emissions).  The FHWA followed EPA and CDC guidance in setting the respective preexisting pollutant and chronic disease thresholds.  DOT 7283.  Under those thresholds, EJ census tracts with a pollutant burden above the 80th percentile for the United States or a chronic disease burden above the 66.66th percentile for the United States qualified for further study.  DOT 7284.  The FHWA then analyzed which of those already burdened tracts would see increases in truck traffic near the tracts' population centers.

DOT 7291.  The FHWA used Scenario E as the relevant worst-case scenario as it results in "the

maximum truck diversions by volume for all census tracts in the 10-county environmental justice

study area."  *Id.*  Although most EJ tracts with preexisting burdens would see either a decrease or

no change in truck traffic, 154 burdened EJ tracts would have increased truck traffic.  DOT 7303.

Accordingly, the FHWA concluded that these "[i]ncrease in truck traffic in currently

overburdened communities, relative to national percentiles, would constitute an adverse effect."

*Id.*  As discussed *infra*, the remainder of the technical memorandum details the measures to

which the Project Sponsors committed in order to mitigate that adverse effect on those

overburdened EJ communities.  *See* DOT 7313.

　　　　Plaintiffs contend that the FHWA's examination of EJ impacts was insufficient because

the agency used an unsound methodology.  Dkt. No. 54-1 at 34.  However, "[c]ourts accord

deference to agencies' choice of methodology as long as it is not arbitrary or without

foundation."  *Senville*, 327 F. Supp. 2d at 354 n.16; *see Sierra Club*, 867 F.3d at 1368;

*Massachusetts v. U.S. Nuclear Regul. Comm'n*, 708 F.3d 63, 76 (1st Cir. 2013).  And the

FHWA's choice of methodology here easily clears that low bar.

　　　　First, Plaintiffs contend that the FHWA erred in examining EJ impacts "on a *county-wide*

*basis*," since that "aggregate analysis . . . masks the particular cumulative impact on already

burdened environmental justice neighborhoods within the county."  Dkt. No. 54-1 at 34–35

(emphasis in original).  But the EA "soundly contradicts this assertion," *Pogliani*, 2007 WL

983549, at *17, by demonstrating that the FHWA also considered impacts on EJ populations at

the census-tract level,[32] *see, e.g.*, DOT 36965, 36986–88.

---

[32] Plaintiffs' related argument that the FHWA erred by analyzing four highway segments as a
substitute for all EJ communities fails for the same reason.  Dkt. No. 54-1 at 35.

Next, Plaintiffs challenge the FHWA's choice of data.  Plaintiffs aver that the FHWA's reliance on pre-COVID-19 traffic data was arbitrary and capricious, because it led the agency to overlook the dramatic changes the pandemic wrought on commuting patterns.  Dkt. No. 78 at 5; *see* Dkt. No. 54-1 at 39.  Yet the EA noted that following a precipitous decrease in traffic "during the height of the COVID-19 pandemic, volumes have nearly reached pre-pandemic levels."  DOT 36242; *see also* DOT 36254 ("While many office workers continue to work remotely, others have returned to offices or work locations on part-time or full-time schedules. . . . As activity is returning to pre-COVID-19 pandemic conditions, so is traffic congestion.").  As a result, the FHWA reasonably decided in the EA that "pre-COVID-19-pandemic baseline conditions" were an "appropriate" basis for forecasting "long-term condition[s] not biased by periodic disruptions."  DOT 36341.  The FHWA thus "adequately explain[ed] why it declined to rely on" post-pandemic data.  *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 160 (D.C. Cir. 2015).  In any event, even crediting Plaintiffs' assertion that COVID-19 has permanently reduced commuter traffic, the FHWA chose to examine "a more conservative data set" that overestimated the severity of traffic impacts and that choice "is exactly the sort that [courts] afford agencies discretion to make."  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 626 (9th Cir. 2014); *see also Save Strawberry Canyon v. DOE*, 830 F. Supp. 2d 737, 753–54 (N.D. Cal. 2011).

Plaintiffs similarly contend that, in lieu of 2015–2019 census data, the FHWA should have utilized data from the superior "Mayor's Office of Environmental Justice map."  Dkt. No. 54-1 at 34.  However, the FHWA explained that it chose the census data because it is "the most current full set of demographic information, including racial and ethnic characteristics and household income and poverty status, available."  DOT 36956.  While Plaintiffs may prefer the

Mayor's Office of Environmental Justice map, that tool "does not cover areas outside New York City," so it would not have served the FHWA's eminently reasonable interest in a comprehensive data set for the study area.  Dkt. No. 68 at 46 n.4.  Because Plaintiffs have not shown that the FHWA "acted irrationally," their "mere disagreement" with the FHWA's choice of data does not establish a NEPA violation.  *City of Williams v. Dombeck*, 151 F. Supp. 2d 9, 23 (D.D.C. 2001)

Plaintiffs further argue that the FHWA's definition of EJ communities was too restrictive, as it "unjustifiably and unreasonably excluded numerous census block groups" with preexisting pollution and health burdens, including those "in north Staten Island and parts of the Lower East Side."  Dkt. No. 54-1 at 34.  As an initial matter, the notion that the FHWA utilized an underinclusive definition of EJ communities is difficult to reconcile with the fact that more than seventy percent of the census tracts in the study area qualified as both minority and low income.  DOT 7251.  Indeed, the FHWA's explanation of its choice of thresholds confirms that the EJ tract definition was capacious, since the agency used both absolute and county-relative measures of minority tracts and doubled the federal poverty level in its definition of low-income tracts to account for the region's cost of living.  DOT 36961; *see also* DOT 6974.  Although Plaintiffs take issue with the FHWA's reliance on "income and minority status alone," Dkt. No. 54-1 at 34, the EJ executive order requires agencies to focus "on minority populations and low-income populations," 59 Fed. Reg. at 7629.  Adopting the executive order's dual criteria for EJ populations was neither arbitrary nor irrational.  *See Sierra Club*, 867 F.3d at 1368 & n.4.

In a final methodological objection, Plaintiffs contend that the technical memorandum erred in relying on a single analysis of "highway truck diversion[s]" under "one tolling scenario, Tolling Scenario 'E.'"  Dkt. No. 78 at 33.  Yet Plaintiffs once again mischaracterize the

administrative record.  While the FHWA provided the results of its study on increases in truck traffic in already burdened EJ communities using Scenario E,[33] the agency made clear that it had considered those impacts under every tolling scenario:  "Truck diversions would occur in every tolling scenario.  Tracts with pre-existing air pollutant and chronic disease burdens that would benefit from reduced traffic, and those affected by increased traffic would vary somewhat, but the identified communities remain largely the same across tolling scenarios."  DOT 7298.  Nor did the technical memorandum solely examine truck traffic in EJ communities with preexisting burdens.  Rather, the FHWA "ensure[d] that all potential effects [we]re identified," DOT 7303, by also examining non-truck traffic in overburdened EJ communities under Tolling Scenarios E and G, *see* DOT 7304–12.  Consequently, Plaintiffs' attempt to minimize the technical memorandum's traffic analyses does not withstand scrutiny.[34]

The crux of Plaintiffs' substantive challenge is their assertion that the FHWA ignored the EPA's critical comments on the EJ discussion in the draft EA.  Dkt. Nos. 54-1 at 39–40, 78 at 31–33.  Defendants retort that "Plaintiffs' reliance on EPA's comments is misplaced," since the FHWA considered those comments and revised the EA accordingly.  Dkt. No. 68 at 47; *see also* Dkt. No. 65 at 38–39.  Moreover, Defendants emphasize that the EPA "acknowledge[d] improvements throughout the NEPA process" in its comments on the final EA.  DOT 4366; *see* Dkt. Nos. 65 at 39, 82 at 25.

---

[33] Plaintiffs' suggestion that Tolling Scenario E was used because it resulted in "maximum truck diversion on a *county-wide basis*," Dkt. No. 78 at 33 (emphasis added), is similarly inaccurate as the FHWA explained that Scenario E yielded "maximum truck diversions by volume for all *census tracts*" in the study area, DOT 7291 (emphasis added).

[34] Accordingly, the technical memorandum resolved a concern the FHWA had expressed during the preparation of the draft EA—that "modeling only the worst-case scenario isn't adequate" to evaluate the impact of traffic diversions on EJ communities.  DOT 44982; *see* Dkt. No. 78 at 32 (reiterating the FHWA's concern).

Although Plaintiffs cite several pointed critiques that the EPA provided on the *draft* EA's treatment of EJ impacts, the *final* EA addressed each of those concerns through the technical memorandum.  The EPA's primary objection to the draft EA was its failure to "identify the disproportionate impact of the circumferential traffic diversions to roadways in communities with EJ concerns and its subsequent impact on the air quality in particularly near road communities."[35]  DOT 45029.  The EPA noted that those air quality effects could result in cumulative impacts on EJ communities "already experiencing adverse and disproportionately high human health effects."  DOT 45031.  Accordingly, the EPA urged the FHWA to study traffic effects in EJ communities at the local rather than county level.  DOT 45030.  Without an analysis of these potential adverse impacts, the EPA stated that it was "unable to confirm that impacts are less than significant without appropriate mitigation."  DOT 45024; *see also* DOT 44943.

The FHWA not only took those comments "seriously," but also "follow[ed]" the EPA's advice.  *Citizens Against Burlington*, 938 F.2d at 201.  At the outset of the technical memorandum appended to the final EA, the FHWA cited the EPA's critical comments on the draft EA and explained that the FHWA had prepared that memorandum "to more completely address comments from the USEPA and from members of the public relating to effects of traffic diversions, both increases and decreases, on environmental justice communities that are already burdened by pre-existing air pollution and associated health risks."  DOT 7248.  The technical memorandum therefore analyzed how traffic diversions from Congestion Pricing could have disproportionate and cumulative impacts on EJ communities already burdened by pollution or

---

[35] For an annotated version of the EPA's letter with responses from the FHWA, see DOT 7920–32.

chronic diseases.  *See* DOT 7248–49, 7303.  Based on an examination of census-level emissions

effects on those EJ communities, *see, e.g.*, DOT 7295–96, the FHWA concluded that increases in

truck traffic in EJ communities with preexisting pollution or chronic disease burdens "would

constitute an adverse effect," DOT 7303.  Consequently, the Project Sponsors committed to a

series of mitigation measures "to address the potential adverse effects to communities that are

already overburdened by pre-existing air pollution and chronic diseases."  DOT 7321–22.

As the technical memorandum demonstrates, the FHWA adopted each of the EPA's

purportedly overlooked proposals.  *See* Dkt. Nos. 54-1 at 39–40, 78 at 31–32.  The resulting EJ

analysis thoroughly evaluated the exact object of the EPA's concern: the disproportionate and

cumulative impacts that traffic diversions would have on overburdened EJ communities.  That

study led the FHWA to recognize an adverse effect from Congestion Pricing and prompted the

Project Sponsors to commit to a $155 million-dollar investment in the mitigation measures

discussed below.  Simply put, the NEPA process worked precisely as it should.  The EPA

brought its expertise to bear at an early phase of the FHWA's review, enabling the FHWA and

Project Sponsors to consider the EPA's concerns and benefit from its input.  *See* Michael C.

Blumm & Marla Nelson, *Pluralism and the Environment Revisited: The Role of Comment

Agencies in NEPA Litigation*, 37 Vt. L. Rev. 5, 9 (2012) (discussing how "interagency

pluralism" promotes NEPA's statutory purpose).

The duty to evaluate the environmental effects of large-scale transportation projects like

Congestion Pricing on EJ communities is a weighty one, given the noxious legacy of the mid-

20th century developments that fractured neighborhoods and exposed generations to harmful

pollution.  DOT 7258.  While the FHWA and Project Sponsors initially examined several

potential impacts on EJ communities, the EPA vigilantly determined that more analysis was

necessary.  To the credit of the FHWA and Sponsors, they did not dig into their original position,

but rather received the EPA's suggestions with open minds and reconsidered their conclusions.

They studied the EPA's areas of concern in order to determine whether traffic diversions from

Congestion Pricing would contribute to longstanding burdens on EJ neighborhoods.  And when

their research established what the EPA had feared—that increased truck traffic in certain EJ

communities would worsen preexisting pollution and health challenges—the FHWA and

Sponsors acknowledged the problem and developed mitigation measures to address it.  Far from

arbitrary disregard, the improvements to the EJ analysis displayed both careful consideration and

a deep commitment among the FHWA, EPA, and Project Sponsors alike not to repeat the dismal

chapters of New York City's transportation history.

### G.    Mitigation

In addition to challenging the EA's analysis of adverse EJ impacts, Plaintiffs contend that

the Project Sponsors' proposed EJ mitigation measures were insufficient for the FHWA to

conclude that Congestion Pricing would not have a significant environmental impact.  *See* Dkt.

No. 54-1 at 47.  First, according to Plaintiffs, those measures are inherently inadequate because

they are non-binding.  Dkt. No. 78 at 23.  Second, Plaintiffs assert the FHWA could not

reasonably credit the efficacy of those commitments because the Project Sponsors failed to

specify the locations for several place-based mitigation measures.  Dkt. No. 54-1 at 48 ("In fact,

all but two of the 'place-based' mitigation measures do not have a 'place.'").  Finally, Plaintiffs

argue that the FONSI's description of the Sponsors' mitigation measures was too sparse to

satisfy the APA or NEPA.  *Id.* at 46–47.

Defendants counter that Plaintiffs' first objection lacks merit because the Sponsors'

commitment to the examined mitigation measures is indeed binding.  Dkt. No. 82 at 28.  As for

the lack of specific sites for certain measures, Defendants state that the locations warranting

mitigation change slightly under different scenarios, so the FHWA and Sponsors reasonably

decided to select sites after the TBTA finalized the tolling schedule.  Dkt. Nos. 65 at 45, 68 at 51.

Defendants also contend that Plaintiffs' challenge to the FONSI's description of the mitigation

measures is misplaced, since the FONSI cross-references the EA's more detailed mitigation

analysis.  Dkt. No. 65 at 42–44.

"An agency may take into account attempts to mitigate an environmental impact when

determining that an environmental impact is small enough to not require an EIS, so long as the

effectiveness of the mitigation is demonstrated by substantial evidence."  *New York v. U.S.*

*Nuclear Regul. Comm'n*, 589 F.3d 551, 555 (2d Cir. 2009) (per curiam); *see also*

*Ompompanoosuc*, 968 F.2d at 1557; *Abenaki Nation*, 805 F. Supp. at 245 ("To require an EIS in

such circumstances would trivialize NEPA and would diminish its utility in providing useful

environmental analysis for major federal actions that truly affect the environment." (quoting

*Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982))).  "In practice,

mitigation measures have been found to be sufficiently supported . . . when they are likely to be

adequately policed."  *Hoffman*, 132 F.3d at 17; *see also Pogliani*, 2007 WL 983549, at *16.

The final EA contemplated mitigation measures to address a wide array of potential

impacts—from signal timing improvements to reduce traffic at specific intersections, DOT

36219, to increases to the speed of particular escalators at busy subway stations, DOT 36221.

However, the most significant set of measures served to address adverse EJ effects.  *See* DOT

36229.  In addition to policies designed to ease economic burdens on low-income drivers, FHVs,

and taxis, DOT 36227–28, the Project Sponsors committed to a series of measures to mitigate the

air quality effects from diverted traffic on EJ communities with preexisting air pollution of

chronic disease burdens, DOT 36229.

In the technical memorandum, the FHWA and Sponsors detailed the scope and rationale of those mitigation measures.  Using EJ methodology developed by the CEQ, the FHWA analyzed which EJ communities "in the 10-county environmental justice study area that are at or above the 90th percentile for either pre-existing pollutant or chronic disease burdens" would "experience increases in truck traffic proximity as a result of the Project" under Scenario E.[36] DOT 7313.  Although the FHWA emphasized that many overburdened EJ communities would benefit from decreased truck traffic, DOT 7316–17, the agency determined that others could see "increase[d] exposure to truck traffic due to traffic diversions as well as related pollutants and associated health effects," DOT 7318; *see* DOT 7319–20 (listing impacted EJ communities). The FHWA also noted that other overburdened EJ communities could have increases in non-truck traffic, with "the FDR Drive in Lower Manhattan and the Lower East Side [seeing] the largest in terms both of absolute and percentage increases in AADT."  DOT 7321.

To mitigate air quality impacts on those EJ communities with preexisting pollution and chronic disease burdens, the Sponsors committed to invest $155 million over five years in specific ameliorative projects, regardless of the ultimate tolling structure adopted by the TBTA. DOT 7321–22, 7322, 7324.  The Sponsors opted for a two-pronged approach: region-wide measures for the benefit of all overburdened EJ communities, and additional place-based mitigation for those EJ communities with particularly severe preexisting burdens.  *See* DOT 7322, 7324.  The former would alleviate air quality impacts in EJ census tracts "at or above the 90th percentile for *either* [a] pre-existing pollutant *or* [a] chronic disease burden[]," DOT 36993

---

[36] Notably, "the census tracts [in the study area] with burdens at or above the 90th percentile are the same as those either at or above the 80th percentile for one or more pre-existing pollutant burdens or above the 66.66th percentile for one or more pre-existing chronic-disease burden." DOT 7316.

(emphasis added), whereas the latter would provide further air quality assurances for EJ tracts with "at least one pre-existing pollutant burden *and* at least one pre-existing chronic disease burden at or above the 90th percentile," DOT 7324 (emphasis added).

For regional measures, the Project Sponsors committed $55 million to "reduce truck diversions, decrease emissions resulting from trucks, and reduce truck traffic during the day." DOT 7322.  Traffic modeling indicated that many truck diversions through EJ communities would occur overnight, despite a reduced toll during that time, so the Sponsors committed to further reducing truck tolls "to at or below 50 percent of the peak toll from at least 12:00 a.m. to 4:00 a.m., to decrease the incentiv[es] for trucks to bypass the Manhattan CBD by diverting elsewhere across the 10-county environmental justice study area."  *Id.*  That reduction in overnight truck tolling revenue would cost the TBTA approximately $30 million over the next five years.  DOT 7323.  Because some trucks would still divert to avoid the reduced overnight toll, the Sponsors agreed to invest $20 million into the "NYC Clean Trucks Program" to "fund[] the conversion of old, more polluting, trucks to newer electric, hybrid, or clean diesel vehicles." DOT 7322.  The Sponsors' investment "would allow for the conversion of approximately 500 . . . trucks that could yield reductions of roughly one ton of $PM_{2.5}$ and 30 tons of [Nitric Oxide ("NOx")] per year."  *Id.*  To further reduce truck emissions by shortening their travel times, the Sponsors decided to dedicate $5 million to expanding the "NYCDOT Off-Hours Delivery Program," DOT 7322–23, a "program that provides support for businesses that shift their deliveries to off-peak periods," DOT 36372.  The technical memorandum observed that off-hours deliveries significantly reduce truck emissions, as "a 2009 study found that the median off-hours delivery time in Manhattan was 25 minutes compared to over one hour for deliveries between 7:00 a.m. and 4:00 p.m."  DOT 7322.

As an initial place-based measure, while traffic modeling indicated that non-truck traffic would increase on the FDR Drive adjacent to EJ communities in Lower Manhattan and the Lower East Side, the FHWA's modeling also revealed that a single mitigation measure would prevent twenty-five to thirty-five percent of those increases: namely, "ensuring that vehicles traveling to Manhattan on the Brooklyn Bridge and then southbound on the FDR Drive by first going north, then exiting from the FDR Drive to East Houston Street, and then immediately turn left to head back south on the FDR Drive, would be tolled." DOT 7323.  The Sponsors therefore agreed to toll that particular maneuver. *Id.*

Next, the Sponsors committed to $100 million in place-based mitigation measures to address the effects of truck emissions on particularly overburdened EJ communities, with "at least one preexisting pollutant burden and at least one chronic disease burden at or above the 90th percentile, nationally." DOT 7323–24.  Under Scenario E, fifty-six census tracts would warrant place-based mitigation under that rubric.  DOT 7325; *see* DOT 7439–40 (listing each tract).  But many of these tracts fell within "the same neighborhoods and towns." DOT 7325. Accordingly, the FHWA identified eleven communities as those likely to merit place-based mitigation.[37]  DOT 7325–26.  Yet the Sponsors explained that they could not compile a definitive list of tracts that qualified for place-based mitigation because "[t]he specific census tracts that would experience increased or decreased truck traffic change slightly depending on the tolling scenario." DOT 7325.

---

[37] Those communities are: High Bridge–Morrisania and Crotona–Tremont, Hunts Point–Mott Haven/Pelham–Throgs Neck, Hunts Point–Mott Haven, Pelham–Throgs Neck, Northeast Bronx, East Harlem, Randall's Island, Downtown Brooklyn–Fort Greene, South Williamsburg, Orange–East Orange–Newark, and Fort Lee.  DOT 7326; *see also* DOT 7324.

Nevertheless, given the relatively high number of severely overburdened census tracts in the Hunts Point area of the Bronx, the Sponsors agreed to fund a $15 million replacement of polluting transport refrigeration units at the Hunts Point Produce Market.  DOT 7325, 7327. Replacing 100 TRUs could yield "as much as 21 tons of NOx and 2.5 tons of $PM_{2.5}$ reduction per year," so the benefits of that measure alone would be "greater in magnitude th[a]n the potential air quality impacts of the Project in the Bronx," though those benefits would be "geographically limited to the Hunts Point area."  DOT 7325.

Other place-based mitigation measures were not tethered to predetermined locations. First, the Sponsors agreed to spend $20 million to improve electric truck charging infrastructure in New York, enabling "zero-emissions vehicles to operate in communities already overburdened by pre-existing air pollution and chronic diseases." *Id.*  By establishing thirty-five new chargers for medium- and heavy-duty vehicles at three stations, the Sponsors found that they would accelerate the transition to zero-emissions vehicles in EJ communities and thereby reduce NOx and $PM_{2.5}$. *Id.*  Second, the Sponsors resolved to spend $10 million to install approximately 4,000 roadside trees and 40,000 roadside shrubs, and to invest $25 million in renovating two to five parks and greenspaces in eligible EJ communities.  DOT 7327.  In addition to improving community wellbeing, vegetation and greenspaces would reduce air temperatures, prevent runoff, and improve air quality through pollutant capture.  DOT 7325, 7327.  Third, the Sponsors committed $10 million to install air filtration units at approximately twenty-five to forty schools near highways with truck traffic increases, in order to remove air pollutants from classrooms. DOT 7327–28.  The implementation of that measure would follow the example of the New York City Department of Education's successful upgrades at Lehman High School in the Bronx to address emissions from the Hutchinson River Parkway.  DOT 7328.  Finally, to improve asthma

care in K-8 schools and impacted neighborhoods, the Sponsors devoted $20 million to funding the City's Asthma Case Management Program and establishing a new Bronx neighborhood asthma center modeled on the New York City Department of Health and Mental Hygiene's East Harlem Asthma Center of Excellence.[38]  DOT 7327–28, 36215.

Although the specific census tracts eligible for these place-based measures depended on the TBTA's yet-unannounced final tolling structure, the technical memorandum clarified that they would be sited in those communities "that have the highest pre-existing burdens or could experience the largest magnitude of diversions as the result of the Project."  DOT 7329.  Within those communities, the Sponsors would select precise locations according to measure-specific processes.  DOT 7328, DOT 36214–15.  For the electric truck charging infrastructure, the Sponsors would evaluate visual effects, traffic and noise impacts, and proximity to highways to minimize local road usage.  Additionally, the Sponsors would consult the New York Metropolitan Transportation Council's Clean Freight Corridor Study to "help identify priority locations," and confer with state and local officials as well as industry groups and community organizations "to provide feedback in the course of identifying appropriate locations."  DOT 36214.  The Sponsors would select roadside vegetation locations in dialogue with state and local agencies, community stakeholders, elected officials, and the Environmental Justice Community Group.  *Id.*  In addition to access and maintenance considerations, the Sponsors would seek to choose sites near "sensitive receptors," like "school schools, day care, senior or community

---

[38] The EA also observed that the MTA had independently decided to transition its bus fleet to zero-emission vehicles and, in response to public input on Congestion Pricing, to prioritize replacing the buses at the Kingsbridge and Gun Hill Depots, which are located in and primarily serve EJ communities in Upper Manhattan and the Bronx.  DOT 36217.  The FHWA explained that "[t]his independent effort by MTA is anticipated to provide [further] air quality benefits to the environmental justice communities in the Bronx."  *Id.*

centers, or outdoor recreational facilities." *Id.* To decide which parks and greenspaces to renovate, the Sponsors would again solicit input from state and local agencies, community stakeholders, local officials, and the Environmental Justice Community Group, and focus on enhancing parkland that would benefit from additional vegetation and amenities. *Id.* In deciding which schools to provide air filtration units, the Sponsors would examine which schools are closest to highways, evaluate the performance of existing HVAC systems, and consider schools' existing asthma rates. DOT 36214–15. The Sponsors will also consult with local school authorities, state and local agencies, and community members to identify the schools in greatest need of air quality upgrades. *Id.* For the Asthma Case Management Program expansion, the Sponsors would engage with the New York City Department of Health and Mental Hygiene as well as a school leadership, the Environmental Justice Community Group, and community members—particularly parents—to identify the highest priority locations and most effective strategies for contacting the families of children with asthma. DOT 36215. To select a location for the new Bronx asthma center, the Sponsors would examine asthma rates, population concertation, proximity to sensitive receptors, coverage from existing facilities, and accessibility via public transportation. *Id.* The Sponsors would also partner with the Department of Health and Mental Hygiene to solicit input from community stakeholders and devise programming and outreach strategies to most benefit people with asthma. *Id.*

To ensure the efficacy of their mitigation measures and evaluate the ongoing effects of Congestion Pricing, the Project Sponsors also committed to a robust monitoring system, "including for example, traffic entering the CBD, vehicle-miles traveled in the CBD; transit ridership from providers across the region; bus speeds within the CBD; air quality and emissions trends; parking; and Project revenue." DOT 36229. As part of air quality and emissions

monitoring, the Sponsors resolved to increase "the City's existing network of sensors to monitor priority locations, and supplement a smaller number of real-time $PM_{2.5}$ monitors to provide insight into time-of-day patterns to determine whether the changes in air pollution can be attributed to changes in traffic occurring after implementation of the Project." DOT 36233. The Sponsors agreed to examine air quality prior to Congestion Pricing to establish a baseline and to make data from the sensors publicly "available online continuously from the start of pre-implementation monitoring." *Id.*; *see also* DOT 36834 (describing the existing network of sensors). After an initial two-year period, the Sponsors would "assess the magnitude and variably of changes in air quality to determine whether more monitoring sites are necessary." DOT 36865. For traffic, the Sponsors committed to monitor the three highway segments most likely to experience adverse traffic effects, using data collection methods and evaluation rubrics established in NYSDOT guidance. DOT 36930. If a segment has an increase in average weekday peak-period delays of two-and-a-half minutes or more, then the Sponsors would implement transportation demand management measures, "such as ramp metering, motorist information, signage at all identified highway locations with adverse effects upon implementation of the Project." *Id.* And, in the event that those measures are unsuccessful, the Sponsors would modify toll rates, crossing credits, exemptions, or discounts within the parameters of the adopted toll schedule to eliminate adverse traffic effects. *Id.* The Sponsors pledged to spend $5 million on ongoing monitoring. DOT 7323. As the FHWA explained, the mitigation and monitoring measures together would form "[a]n adaptive management approach," which would enable the Sponsors to confirm "the efficacy of mitigation" and make ongoing "adjustments as warranted." DOT 36211.

The FONSI surveyed the Sponsors' mitigation and monitoring commitments in a series of tables.  DOT 371–91.  However, the FONSI clarified that it was "based on the Final EA," DOT 363, and that the tables merely "summarize[d] the potential effects of the Project as identified in the Final EA and the monitoring and mitigation commitments made by the Project Sponsors," DOT 370.  Yet the FONSI memorialized the FHWA's determination that, in light of the contemplated mitigation measures and monitoring system, Congestion Pricing "will result in no significant impacts" under NEPA.  *Id.*

Plaintiffs' first objection to the EJ mitigation measures is that the Sponsors "have not provided binding commitments."  Dkt. No. 78 at 23.  Both the FHWA and EPA voiced similar concerns prior to the preparation of the final EA and FONSI.  *See* DOT 44982 (FHWA's criticism that mitigation "consists of a commitment to further study rather than a commitment to implementing a measure"); DOT 45088 (EPA's observation that "community members and environmental justice advocates across New York have emphasized the need for binding commitments from the Project Sponsors to mitigate or eliminate all potential environmental and health impacts").  But the Project Sponsors responded to the FHWA and EPA's feedback by making a binding commitment of "$155 million over 5 years" to realize the mitigation measures described in the technical memorandum "regardless of the tolling structure eventually adopted." DOT 36211.  The EPA applauded this change, recognizing the Sponsors' "[i]mproved clarity regarding mitigation commitments to address disproportionately high and adverse impacts both within and outside the Central Business District."  DOT 45366.  And the Project Sponsors' mitigation commitments are enforceable, as the FHWA is empowered to pull funding, withhold further approvals, or "take such other action that [it] deems appropriate" if the Sponsors fail to implement the mitigation relied upon in the FONSI.  23 C.F.R. § 1.36.  Given the Sponsors'

clear and enforceable commitments, Plaintiffs' characterization of the EJ mitigation measures as non-binding and aspirational is unfounded.

Next, Plaintiffs contend that the EJ mitigation is too indefinite to support the FHWA's FONSI because the Sponsors did not specify locations for several of the place-based mitigation measures. Dkt. Nos. 54-1 at 48. Plaintiffs argue that without set locations for place-based mitigation measures, the FHWA could not evaluate their efficacy. *See* Dkt. No. 78 at 25 ("Where these mitigations measures will be implemented is not a 'detail' to be filled in; it is a necessary component to determining whether pollution and other adverse environmental impacts from Congestion Pricing are truly being mitigated in these areas.").

As an initial matter, two of the Sponsors' place-based mitigation measures have predetermined locations: namely, the tolling change on the FDR Drive at East Houston Street, DOT 7323, and the replacement of transport refrigeration units at the Hunts Point Produce Market in the Bronx, DOT 7325. Additionally, the FHWA's decision to identify appropriate locations for the remaining place-based measures after the finalization of the tolling schedule was consistent with the Sponsors' "adaptive management approach." DOT 7322. Under an adaptive management plan, an agency monitors the implementation of a project and then tailors its mitigation measures over time to fit effects as they unfold. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 516 (D.C. Cir. 2010). Courts have repeatedly rejected categorical challenges to the adaptive management plans on the grounds that they violate "NEPA's requirement to evaluate environmental impacts *before* actions are taken," *id.* at 517 (emphasis in original), or amount to a "shell game" that evades the hard look standard, *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 2011 WL 5830435, at *18 (D. Or. Nov. 15, 2011). Instead, the judiciary has endorsed the use of adaptive management strategies as "a responsible

decision in light of the inherent uncertainty of environmental impacts." *Theodore Roosevelt Conservation*, 616 F.3d at 517; *see also Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016); *Biodiversity Conservation All. v. Bureau of Land Mgmt.*, 2010 WL 3209444, at *13 (D. Wyo. June 10, 2010). Adaptive management approaches provide agencies with the flexibility to ensure their mitigation measures reflect the real effects of government action, rather than a rigid adherence to initial projections. *See Gov't of Province of Manitoba v. Zinke*, 273 F. Supp. 3d 145, 155 (D.D.C. 2017), *aff'd sub nom. Gov't of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019). That rationale plainly applies here. The Sponsors' decision to defer the siting process until they possessed sufficient information to determine where adverse effects would occur was entirely reasonable, since the "specific census tracts that would experience increased or decreased truck traffic change slightly depending on the tolling scenario." DOT 7325.

Plaintiffs retort that the concept of adaptive management is not a panacea, because the Sponsors' commitments are too vague as to the details of the siting process and the efficacy of the place-based measures to constitute a permissible adaptive management plan. Dkt. No. 78 at 24; *see* Dkt. No. 54-1 at 48. But the siting procedures are far from indefinite. To the contrary, the technical memorandum described the areas that would be eligible for place-based mitigation, namely "environmental justice census tracts where individuals experience at least one pre-existing pollutant burden and at least one pre-existing chronic disease burden at or above the 90th percentile, nationally, and where truck proximity could increase as a result of the Project."[39]

_____

[39] Plaintiffs' assertion that the technical memorandum inexplicably switches between analyzing tracts with a preexisting pollution burden *or* a preexisting chronic disease burden, and those with a preexisting pollution burden *and* a preexisting chronic disease burden reflects a misunderstanding. Dkt. No. 78 at 26. The Sponsors decided to address impacts on the former via region-wide measures and on the latter via place-based measures. *See* DOT 7324, 36993.

DOT 7324; *see also* DOT 7439.  The memorandum also listed both the fifty-six census tracts that would satisfy these criteria under Scenario E, DOT 7439–40, and the eleven communities that would most likely have tracts warranting place-based mitigation, DOT 7326.  The Sponsors clarified that, among eligible tracts, place-based mitigation "would be implemented in specific areas that have the highest pre-existing burdens or could experience the largest magnitude of diversions as the result of the Project."  DOT 7329.  Finally, for each place-based mitigation measure, the EA described the factors the Sponsors would consider as well as the stakeholders the Sponsors would consult in choosing precise locations.  DOT 36214–15.

Nor does the absence of sites for the place-based measures render their benefits impermissibly speculative.  The technical memorandum describes the place-based mitigation measures' salutary effects—in less detail when "self-evident" and greater detail when necessary.  *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 234 (5th Cir. 2007).  Expanding electric truck charging infrastructure in New York would allow companies to use zero-emissions trucks and therefore reduce NOx and $PM_{2.5}$, regardless of where the seven stations and their thirty-five new charges are ultimately located.  DOT 7325.  The FHWA observed that the installation of approximately 4,000 trees and 40,000 shrubs near roads in EJ communities would improve also improve air quality due to "pollutant capture" from the vegetation.  DOT 7327.  The two to five renovated parks and greenspaces would each enhance community wellbeing by encouraging healthy social activities.[40]  DOT 7325.  Air filtration units in twenty-five to forty schools near highways would "[r]emove[] air pollutants from [their] classrooms," which are particularly

---

The Sponsors' conclusion that tracts with both kinds of preexisting burdens raised greater concern and thus warranted place-based mitigation was reasonable.

[40] Notably, "[p]oor mental health" is one of the chronic diseases "associated in public health scholarship with exposure to pollutants that are generated by diesel trucks."  DOT 7270.

"sensitive receptor sites."  DOT 7327.  And the enlargement of the Asthma Case Management Program and establishment of a new Bronx neighborhood asthma center would alleviate asthma effects in impacted areas.  DOT 7328.  The technical memorandum also explained that the Bronx center would be modeled after the East Harlem Asthma Center of Excellence, which had demonstrated significant improvements for its patients—with a fifty percent reduction in hospitalization, fifty-six percent decrease in emergency department visits, material decreases in days and nights with asthma symptoms, and reductions in asthma-related school days among program participants.  *Id.*  Finally, the efficacy of the place-based mitigation measures will be ensured through the Sponsors' $5 million monitoring plan described above.

The mitigation plan detailed in the EA and technical memorandum therefore satisfies NEPA, notwithstanding the lack of specific locations for some of the place-based measures.  In *Hoffman*, the Second Circuit reasoned that had a challenged "mitigation measure . . . included a program to monitor and ensure its effectiveness, there would then have been substantial evidence to support it."  132 F.3d at 17.  Pursuant to that guidance, district courts within the Second Circuit have held that binding mitigation plans accompanied by monitoring suffice under NEPA.  *See Nat'l Audubon Soc.*, 55 F. Supp. 3d at 365 ("Since the mitigation measures in the EA are nondiscretionary and include, *inter alia*, a program to monitor and ensure their effectiveness, they are supported by substantial evidence."); *Pogliani*, 2007 WL 983549, at *17 (same); *accord Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1172 (10th Cir. 2012).  The Project Sponsors' plan to mitigate adverse effects from truck diversions on EJ communities fits comfortably within those precedents.

Although Plaintiffs analogize to the Fifth Circuit's decision in *O'Reilly v. U.S. Army Corps of Engineers*, the EA deemed inadequate there provided "only cursory detail as to what

those [mitigation] measures [we]re and how they serve[d] to reduce those impacts to a less-than-significant level" and the "the feasibility of the mitigation measures [was] not self-evident." 477 F.3d at 234.  Consequently, the Fifth Circuit held that the EA did "not provide a rational basis for determining that the [agency] ha[d] adequately complied with NEPA." *Id.*  By contrast, the technical memorandum here provides clear descriptions of each mitigation measure and articulates how they will benefit the relevant EJ communities, though the benefits in many cases are also self-evident.  The Project Sponsors' mitigation plan is therefore a far cry from the EA the Fifth Circuit confronted in *O'Reilly*.

In a final challenge to the adequacy of the Sponsors' mitigation measures, Plaintiffs argue that the FONSI was deficient because it "simply lists [those] mitigation measures without any analysis." Dkt. No. 54-1 at 46; *see also id.* at 47 ("[D]espite the MTA's public emphasis on extensive analysis and lengthy EA, the mitigation measures can be found in the FONSI in one concise list with barebones descriptions.").  But the FONSI expressly relied on the final EA's analysis and stated that it merely "summarize[d]" the relevant effects and mitigation measures. DOT 370; *see* DOT 363 ("FHWA has independently evaluated the Final EA and determined it to adequately and accurately document the purpose and need, environmental issues, and impact of the Proposed Action and appropriate mitigation measures.").  Because the FONSI did not purport to provide an exhaustive account of the Sponsors' mitigation commitments, Plaintiffs' argument amounts at bottom to a challenge to the practice of cross-referencing.  Yet CEQ regulations permit FONSIs to cross-reference materials in EAs.  40 C.F.R. § 1501.6(b) ("The finding of no significant impact shall include the environmental assessment or incorporate it by reference and shall note any other environmental documents related to it.").  Cross-referencing is particularly prudent when an agency relies on a lengthy EA, as repeating entire sections of an EA in a FONSI

would result in unhelpful duplication and make an already cumbersome NEPA record even more difficult for public commenters to navigate and comprehend.  To avoid such senseless repetition, courts have endorsed cross-references across multiple phases of tiered NEPA reviews.  *See Fund for Animals*, 538 F.3d at 138; *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1119 (9th Cir. 2018) ("[W]here an agency merely incorporates material 'by reference,' without impeding agency and public review of the action, the agency is not improperly tiering.").  The fact that an agency cross-references a document does not mean that the information in that second document was not considered by the agency.  Nor does the cross-reference frustrate the ability of a plaintiff to challenge a FONSI under the APA.  It simply requires the challenger to review both the FONSI and the EA, just as the agency did.  Thus, the FHWA's cross-references across documents within a single phase of NEPA review were permissible here.

Ultimately, Plaintiffs contrive a concerning portrait of non-binding EJ mitigation measures that will be sited without rhyme or reason and whose purposes are never stated, much less evaluated.  But that picture bears little resemblance to the reality of the Project Sponsors' commitments here.  To address the cumulative impact of emissions from diverted vehicles on EJ communities with preexisting pollution and chronic disease burdens, the Project Sponsors have agreed to devote $155 million to implement a suite of mitigation measures over the next five years.  Several of those measures will benefit the New York City metropolitan region as a whole; others will alleviate particular burdens on the Lower East Side of Manhattan and in Hunt's Point in the Bronx; and the remainder will go to the severely overburdened EJ communities "that have the highest pre-existing burdens or could experience the largest magnitude of diversions as the result of the Project," DOT 7329, through siting processes tailored to each measure's locational considerations and impacted stakeholders.  The EA demonstrates that Congestion Pricing will

not have an adverse impact but rather a salutary impact on most EJ communities even without mitigation. The EA and technical memorandum also explain how those regional and place-based measures will contribute to the health of those impacted EJ communities that otherwise would experience negative consequences from Congestion Pricing. And the Sponsors will "monitor[] the efficacy of mitigation," discuss their findings with community members and organizations, and make "adjustments as warranted." DOT 36211. Finally, the FHWA can hold the Project Sponsors to their word by taking remedial action in the event that they fail to live up to their mitigation commitments. Based on the mitigation plan described in the EA and technical memorandum, the Court is convinced that the Sponsors' commitments provided adequate support for the FONSI.

### H.  Public Participation

Plaintiffs' last objection to the EA and FONSI is that the FHWA and Project Sponsors offered insufficient opportunities for the public to comment on Congestion Pricing. Dkt. No. 54-1 at 50. Defendants counter that the extensive public participation throughout the NEPA review process far "exceeded legal requirements." Dkt. No. 65 at 46; *see* Dkt. No. 68 at 21–22.

By regulation, federal agencies must "[m]ake diligent efforts to involve the public in . . . implementing their NEPA procedures," 40 C.F.R. § 1506.6(a), and "involve the public . . . to the extent practicable in preparing environmental assessments," 40 C.F.R. § 1501.5(e). The Second Circuit has recognized that agencies have "considerable discretion to decide the extent to which such public involvement is 'practicable.'" *Brodsky*, 704 F.3d at 121. Accordingly, a "lack of public input" violates NEPA only if it "prevented the prevented the agency 'from weighing all the factors essential to exercising its judgment [under NEPA] in a reasonable manner.'" *Id.* (quoting *Ompompanoosuc*, 968 F.2d at 1557); *see also Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008) ("An agency, when

preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process.").  Put differently, "the absence of public participation is actionable only to the extent it precludes an agency from taking a 'hard look.'" *Coal. for Healthy Ports*, 2015 WL 7460018, at *15.

The FHWA and Project Sponsors' public engagement efforts began months before the publication of the draft EA.  They created an informational website on Congestion Pricing hosted by the MTA and compiled a contact list of approximately 2,300 email addresses to circulate updates on the project and advertise public meetings.  DOT 37045.  To further increase public awareness of the proposal, the Sponsors drafted a fact sheet summarizing the purpose and mechanics of Congestion Pricing as well as public input opportunities, translated the fact sheet into nine languages, and then disseminated those sheets online, via email, and through federal, state, and local agencies.  *Id.*  The Sponsors also used both traditional media—including advertisements in print and online outlets and over the radio—and social media to alert the public to commenting opportunities.  *Id.*  Through nineteen webinars, nine of which focused on EJ communities, the Sponsors encouraged public feedback on Congestion Pricing.  DOT 37046–47.  More than one thousand individuals attended those webinars.  DOT 37047.  Approximately four hundred people provided oral comments, while nearly eight hundred used the real-time question and answer function.  *Id.*  The FHWA and Sponsors convened an Environmental Justice Stakeholder Working Group whose membership was open to any interested member of the public.  DOT 37039.  Twenty-seven individuals ultimately served on the working group.  *Id.*  In total, the FHWA and Project Sponsors received 7,338 comments through their early outreach efforts prior to the public of the draft EA—via the project website, in webinars, and by mail,

email, and phone.  DOT 37049.  The FHWA and Sponsors considered each of them in developing the draft EA.  *Id.*

When the FHWA and Project Sponsors published the draft EA, they announced that they would accept public comments until September 9, 2022.  DOT 37151.  But, in response to public input, the FHWA and Sponsors extended the comment deadline to September 23, 2022.  DOT 37057, 37063.  Notwithstanding that extension, the FHWA and Sponsors also considered comments submitted after the deadline but prior to the publication of the final EA.  DOT 37063. Additionally, the FHWA and Sponsors hosted six virtual public hearings in which individuals could comment on the draft EA.  DOT 37062.  Approximately 1,800 people attended the hearings and 552 people provided oral comments.  *Id.*  By the close of the comment period, the FHWA and Sponsors had received nearly 70,000 public submissions on the draft EA, many of which included numerous comments.  DOT 37063.  The FHWA and Sponsors then reviewed and responded to those comments in the final EA.  DOT 37063–64.

The FHWA and Sponsors published both the final EA and draft FONSI and made them available for thirty days of public review prior to the FHWA's final decision on Congestion Pricing.  DOT 36152, 40590.  Unlike in the formal comment period for the draft EA, the FHWA and Project Sponsors did not solicit comments on the final EA and FONSI during the availability period.  DOT 393.  "Nevertheless, the Project Sponsors and FHWA considered information received during the public availability period to determine if any new substantive issues were raised that were not addressed in the Final EA."  *Id.*  The FHWA and Sponsors reviewed approximately 550 submissions from the public availability period, but "determined that no new substantive issues were raised."  *Id.*  Consequently, the FHWA issued the final FONSI on June 23, 2023.  DOT 363.

The FHWA and Sponsors' public engagement efforts ensured that interested individuals had numerous opportunities to comment on Congestion Pricing, across a wide range of media and over the course of each step in the development of the EA and FONSI.  Plaintiffs contend that those opportunities were nevertheless inadequate because the "Project Sponsors provided only a measly 44 days to comment on the highly complex 868-page Draft EA."  Dkt. No. 54-1 at 51.  But the FHWA and Sponsors voluntarily extended the comment period from the thirty days required under FHWA regulations, 23 C.F.R. § 771.119(e), to forty-four days in order to accommodate additional feedback on the draft EA.  As a result, the comment period on the draft EA was just one day short of the forty-five days required for a full EIS.  *See* 23 C.F.R. § 771.123(k).  With the benefit of an extended comment period, nearly 70,000 commenters provided their perspectives on the draft EA.  DOT 37063.  That "high level of public comment" demonstrates that the extended comment was not so paltry as to prevent the public from weighing in on the draft EA and informing the FHWA's decision-making process.  *Bering Strait Citizens*, 524 F.3d at 953.

Plaintiffs also argue that the public should have had the opportunity to comment on the final EA, including the accompanying technical memorandum, and the FONSI.  Dkt. No. 54-1 at 40, 46–47.  Neither CEQ nor FHWA regulations required the FHWA to subject the final EA and FONSI to public comment.  Yet the FHWA and Sponsors still considered public comments they received during the thirty-day availability period.  DOT 393.  Notably, that included a letter that Chan herself submitted on June 12, 2023, in which she "raised a litany of issues and concerns about the EA and FONSI."[41]  Dkt. No. 78-4 ¶ 7; *see* Dkt. No. 78-5.  In accepting and reviewing

---

[41] Chan declares that local officials, including the Chair of the Battery Park City Committee of the Community Board attempted to dissuade her from commenting on the EA and FONSI.  Dkt. No. 54-8.  But those attempts simply have no bearing on whether the FHWA fulfilled its

comments on the final EA and FONSI, the FHWA and Sponsors once again took pains to consider public input that exceeded regulatory requirements and amply satisfied NEPA.

In addition to challenging the breadth of public input opportunities, Plaintiffs assert that any chance to comment on the EA or FONSI was inherently deficient because neither analyzed the TBTA's actual tolling schedule. Dkt. No. 54-1 at 52. But that argument misconstrues the purpose of the EA and FONSI. Those documents evaluated whether Congestion Pricing would have a significant environmental impact if the tolling structure falls within the range of assumptions embodied in several potential tolling scenarios. *See* DOT 36290. The FHWA's answer to *that* question was subject to extensive public scrutiny and input. By contrast, whether the final tolling schedule adopted by the TBTA conforms to the EA and FONSI is a separate question that the FHWA sought to address in its recent reevaluation. *See id.* And, as explained above, the Court will defer ruling on the merits of the reevaluation pending supplemental briefing from the parties.

Defendants expended extraordinary time and resources to ensure that members of the public had ample opportunity to participate in the FHWA's NEPA review. Through their outreach efforts, the Sponsors solicited input from a variety of impacted communities. As a result, tens of thousands of commenters expressed their views on Congestion Pricing, and the FHWA considered each piece of feedback in reaching its conclusion. Far from shutting out public criticism, the FHWA and Sponsors sought it out so that the final EA addressed, if not assuaged, a wide array of concerns. That public engagement enabled the FHWA to "weigh[] all the factors essential to exercising its judgment [under NEPA] in a reasonable manner," *Brodsky*,

---

obligations under NEPA.

704 F.3d at 121 (quoting *Ompompanoosuc*, 968 F.2d at 1557), and thus easily satisfied both the APA and NEPA, *see Coal. for Healthy Ports*, 2015 WL 7460018, at *15.

*     *     *

Cognizant that "NEPA itself does not mandate particular results, but simply prescribes the necessary process," *Robertson*, 490 U.S. at 350, the Court has scoured the administrative record to determine whether Plaintiffs' assertions of procedural defects and arbitrary action have merit. But from the FHWA's thorough analysis and exhaustive review process, "it is abundantly clear that [the agency] took a hard look at the environmental consequences of the [Congestion Pricing]." *Friends of Animals*, 948 F.3d at 588. Shorn of its unavailing procedural objections, Plaintiffs' NEPA challenge to the EA and FONSI is at bottom a policy disagreement with the wisdom of Congestion Pricing. However, "NEPA is not a green Magna Carta, [and] federal judges are not the barons at Runnymede." *Citizens Against Burlington*, 938 F.2d at 194. As the Governor's recent announcement illustrates, Plaintiffs' concerns are "best left to the political branches," *Edmonds Inst. v. Babbitt*, 42 F. Supp. 2d 1, 20 n.12 (D.D.C. 1999), since this Court "cannot interject itself within the area of discretion of the executive [and legislature] as to the choice of the action to be taken," *Sierra Club*, 701 F.2d at 1029 (quoting *Kleppe*, 427 U.S. at 410 n.21).

**CONCLUSION**

NYSDOT's motion to dismiss in *Chan*, 23-cv-10365, Dkt. No. 61, is GRANTED IN PART and DENIED IN PART. NYSDOT's motion to dismiss in *New Yorkers*, 24-cv-367, Dkt. No. 59, is DENIED as moot. NYSDOT's motion to dismiss in *Mulgrew*, 24-cv-1644, Dkt. No. 49, is GRANTED IN PART and DENIED IN PART. The motion for leave to amend in *Mulgrew*, 24-cv-1644, Dkt. No. 63, is GRANTED.

112

The Federal and Municipal Defendants' motions to dismiss in *New Yorkers*, 24-cv-367, Dkt. Nos. 57 and 62, and *Mulgrew*, 24-cv-1644, Dkt. Nos. 47 and 52, are GRANTED except as to Count II.

In *Chan*, 23-cv-10365, Plaintiffs' motion for partial summary judgment, Dkt. No. 54, is DENIED except as to Count II, and the Federal and Municipal Defendants' cross-motions for partial summary judgment, Dkt. Nos. 64 and 67, are GRANTED except as to Count II.

The Court defers ruling on the Federal and Municipal Defendants' motions to dismiss Count II in *New Yorkers* and *Mulgrew* and the cross-motions for summary judgment on Count II in *Chan* pending supplemental briefing on the FHWA's June 14, 2024 reevaluation.

The Clerk of Court is respectfully directed to close: Dkt. No. 61 in *Chan*, 23-cv-10365; Dkt. No. 59 in *New Yorkers*, 24-cv-367; and Dkt. Nos. 49 and 63 in *Mulgrew*, 24-cv-1644.

SO ORDERED.

Dated: June 20, 2024
    New York, New York                         LEWIS J. LIMAN
                                              United States District Judge