# EXHIBIT 3

**TUESDAY, APRIL 30, 2019**                              **2:29 P.M.**

          ACTING SPEAKER AUBRY:  The House will come to order.

          Imam Abjulkadir Elmi will say a prayer.

          IMAM ABJULKADIR ELMI:  On behalf of all the religions that our State have, I am proud to open this Session, which is a Session that's one of those that our legislators do every day. Sessions that they come up with ideas and strive to make the lives of all New Yorkers better every day.  Sessions and legislations that they make and New York to be the best in the nation in so many aspects. I'm proud also to be a New Yorker whom my legislatives are enrolled with always in making this State great.  People call it the "Big Apple." I call it the "Great Apple."  Why I call it the Great Apple is because this State is leading in diversity, leading in progress, leading in

NYS ASSEMBLY                              APRIL 30, 2019

improving the lives of its residents.  People do good deeds, and we know good deeds are rewarding.  Nothing is more rewarding than discussing and debating matters that improve the lives of so many millions of our State.  Indeed, not only improving, but preserving the good things that New York has.  To discuss and debate matters of that magnitude are, to me, one of the most rewarding that anybody can involved in.  We really appreciate and applaud you, the everyday matters that you discuss which affects us.  And I would say keep on the good things that you are doing.  May God Almighty prosper and be on your side in working for us.

Thank you very much.

ACTING SPEAKER AUBRY:  Amen.

(Applause)

Visitors are invited to join the members in the Pledge of Allegiance.

(Whereupon, Acting Speaker Aubry led visitors and members in the Pledge of Allegiance.)

A quorum being present, the Clerk will read the Journal of Monday, April 29th.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, I move to dispense with the further reading of the Journal of Monday, April 29th, and that the same stand approved.

ACTING SPEAKER AUBRY:  Without objection, so ordered.

2

NYS ASSEMBLY                                    APRIL 30, 2019

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  This is the opportunity where I like to share with the guests in our Chambers, our colleagues, staff and all, a quote that is by Robert Louis Stevenson.  Mr. Stevenson, as most of you know, was a Scottish essayist, a poetrist, and an author of fiction and travel books.  His quote today, Mr. Speaker, is, "Don't judge each day by the harvest you reap, but by the seeds you plant."  Again, that one is from Mr. Robert Louis Stevenson.

Mr. Speaker, members do have on their desk a main Calendar, and after any introductions and/or housekeeping, we will have a brief Majority conference, and following that Majority conference, we will consent new bills on the main Calendar, beginning with No. 195 on page 17.  Our principal work for today, however, Mr. Speaker, will be our Earth Day package as we celebrate this great earth that was left to us by the Creator.

In addition, we will be calling the following committees off the floor:  Ways and Means, Housing and Racing and Wagering.  And for Majority members, there will be a need for an additional Majority conference after Session today.

Well, with that, Mr. Speaker, we'll certainly adhere to the needs of our colleagues on the other side.  And that's a general outline.  So, are there any introductions and housekeeping that we should take up?

ACTING SPEAKER AUBRY:  No housekeeping,

3

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

but introductions.

Ms. Fahy for the purposes of an introduction.

MS. FAHY:  Thank you, Mr. Speaker, for allowing me to interrupt the proceedings for an introduction today.  And I want to start -- I have a number of imams that are here, but I want to commend Imam Abjulkadir Elmi of Masjid As-Salam, the House of Peace here in Albany who did our welcoming, our opening prayer. And I also want to say while I introduce a number of others who are present with us that prior to the opening of Session today, we had a -- a beautiful luncheon in the Well of the Legislative Office Building. And I'm extraordinarily proud to have helped with a number of my colleagues.  This is the second time we have done a luncheon of this type to kick off the holy month of Ramadan.  And in so many ways, this year more than others, I think it was a well-timed one because we have seen so many attacks, horrific attacks in the last few weeks, and as recently again as Saturday night, on our -- Saturday morning on our faith-based community.  And it is a -- with the kickoff of Ramadan, the holy month of Ramadan, it is a good reminder that we all need to remember and embrace our faith-based community and remind ourselves of our common spirituality.

And with that, I have a number of others.  I am doing this -- I am doing this welcoming on behalf of a number of members in the Capital Region, along with a number of members who joined us at the luncheon this morning.  In the Capital Region it's myself, John McDonald, Angelo Santabarbara, Phil Steck, Carrie Woerner.  The

4

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

Speaker, Carl Heastie, also joined us this morning at the luncheon, along with a number of colleagues including Michael Blake, Catalina Cruz, Assemblymember Charles Fall, Felix Ortiz and Nader Sayegh and -- and Assemblyman Epstein as well.

Joining us in the back are a number of imams. I don't have all the names, but Imam Jafer Sebkaoui Al-Hidaya of the Islamic Community Center in Latham, New York - please forgive me for my pronunciations - Imam Abdul-Rahman Yaki of the Islamic Center of the Capital District in Schenectady, New York; Imam Mohamed Rabie of Al Arqam of the Center of Saratoga, Waterford -- in Waterford, New York. The person that spent months coordinating these efforts with us is Alione Mbodj, as well as Ilham Almahamid and Taynor Nakee. Again, forgive me on the pronunciations.

But Speaker, it was the warmest of luncheons today, and if you would please welcome our guests and grant them the cordialities of the House. Thank you.

ACTING SPEAKER AUBRY: Certainly. First, Imam Elmi, we thank you so very much for coming and offering prayer. *As-Salaam Alaikum*. We wish you a good life and a happy Ramadan.

And to all our guests who are here on behalf of Ms. Fahy, Mr. [sic] Cruz, Mr. Fall, Mr. McDonald, Mr. Ortiz, Mr. Santabarbara, Mr. Steck, Ms. Woerner, Mr. Blake and Mr. Epstein, the Speaker and all the members, we welcome you here to the New York State Assembly. We extend to you the privileges of the floor.

NYS ASSEMBLY                                    APRIL 30, 2019

This is the People's House.  You are always welcome here.  You grace

us with your presence.  Thank you so very much for being here.

(Applause)

For the purposes of an introduction, Ms. Lifton.

MS. LIFTON:  Thank you, Mr. Speaker.  It's my

honor today to introduce the Lansing Varsity Boys Soccer Team.  It's

getting to be a regular thing here.  They were here last year for an

introduction when they won the State Class C Boys Soccer

Championship, and here they are again with their second State title,

2008 [sic] Class C Boys Soccer Champions.  They tell me they're not

tired of winning yet, so maybe we'll see them back here for another

win.  Don't want to jinx it though, we won't jinx it.  They clearly have

some smart pols in the group, too, Mr. Speaker.  They've brought a

blue bow tie, our Sergeant-at-Arms is -- is wearing a new blue bow tie

for the Lansing colors.  They understand who controls this Chamber,

who runs the Chamber --

(Laughter)

And so we see some pols in the making there.  This

year's record was 21-1, led by Coach Benjamin Parks.  Twenty-eight

players on the team, as you see, Mr. Speaker, a full bench or two or

three.  And if you please, Mr. Speaker, would give them a welcome

and offer them the cordialities of the House, I would greatly

appreciate it.

ACTING SPEAKER AUBRY:  Certainly.  On behalf

of Ms. Lifton, the Speaker, all the members, Lansing Soccer Team,

NYS ASSEMBLY                                    APRIL 30, 2019

congratulations, well done.  We extend to you the privileges of the

floor, welcome you here to Albany as usual.  Hope that you will

appreciate our proceedings, but also that you are here on a day when

you understand the true diversity of New York State in just the guests

that have arrived to share with us as well as the members.  And so,

since soccer is an international sport, more than some of the

traditional American sports, we welcome you here under that

auspices, knowing that if you go on, you're going to compete against

the world.  Thank you so very much.  You are welcome here.

(Applause)

Mr. Jones for purposes of an introduction.

MR. JONES:  Thank you, Mr. Speaker.  And I don't

know if this group is sick of winning yet either, but I rise today to

acknowledge and congratulate the Plattsburgh State Women's Hockey

Team on winning the NCAA Division III National Championship.

Led by --

(Applause)

Led by Coach Kevin Houle and Assistant Coach

Danielle Blanchard, the Cardinals ended their season with a 29-2-0

record, tying their program record for most wins in a season.  The

Cardinals defeated Hamline University in a 4-0 victory in St. Paul,

Minnesota to win Plattsburgh's fifth title in six years, and now hold

the record with seven national championships in Division III women's

hockey.  Joining the team and coaches today are Athletic Director

Mike Howard and Sports Information Director Brian Savard.  On

7

NYS ASSEMBLY                                APRIL 30, 2019

behalf of their dedicated fan base and the entire Plattsburgh region and New York State, I want to say how proud we are of these young women.

Mr. Speaker, would you please extend all the cordialities of the floor to the team, their coaches and their directors. Thank you.

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Mr. Jones, the Speaker and all the members, congratulations, you have done it again.  An extraordinary group of young women who have learned truly how to compete and how to be successful, a great lesson for life.  To you and your coaches and your families, congratulations.  You do the State of New York proud.  Thank you. You are always welcome here.

(Applause)

Ms. Lupardo for the purposes of an introduction.

MS. LUPARDO:  Yes, thank you very much, Mr. Speaker.  Today is Student Press Day, and we have a group of students up in the Gallery who have been visiting with many of the members today from a variety of high schools across the State.  We have representatives from Corning-Painted Post; Curtis High School, my alma mater, on Staten Island; Francis Lewis High School in Queens; and Townsend Harris High School in Queens as well.  They are joined by Mike Simons and Katina Paron.  Katina is with Baruch College and the New York City High School Journalism Collaborative, and Mike is with Corning-Painted Post High School.

8

NYS ASSEMBLY                          APRIL 30, 2019

These journalists are here to discuss with us the importance of encouraging and supporting student reporters, because journalism is so important in these -- these days when they are under attack.  We are here to welcome them.  They had an amazing experience interacting with our colleagues today, talking about their issues and concerns.  And on behalf of Assemblyman Palmesano, the Staten Island contingent and -- and Ms. Rozic and others, we would wish you to offer them a welcome.

Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Ms. Lupardo, the Staten Island delegation, the Queens delegation, we welcome these budding journalists here to the New York State Assembly.  We extend to you the privileges of the floor.  We hope that your trip to Albany has been both instructive and beneficial to you.  We have an annual vote to seat the -- the journalists that provide coverage of the New York State Assembly, and usually they get booed.  However, we believe that you, a new generation, will change that to cheers.  Thank you so very much.  We're happy to have you.

(Applause)

Mr. Miller.

MR. M. MILLER:  Thank you, Mr. Speaker.  Today we are joined by members of the Sikh community of Richmond Hill.  On April 9th I introduced a resolution recognizing Baisakhi, which marks the Sikh's New Year.  It is one of the historically significant days of the year for Sikhs.  Today -- they are here today to be

9

NYS ASSEMBLY                              APRIL 30, 2019

recognized for their outstanding contributions to our community.
Sikh-Americans make rich contributions to the social, cultural and
economic vibrancy of the United States.  The State of New York is
greatly enriched by its large population of Sikh-Americans.  The
Legislative Body is proud to congratulate the Sikh community upon
the occasion of celebrating the 550th birthday of Guru Nanak Dev,
founder of Sikhism.  Sikhs have been living in the United States for
more than 100 years, and during the early 20th Century thousands of
Sikh-Americans worked on farms, lumber mills, mines and on the
Oregon, Pacific and Eastern railroads.  Sikhism in the fifth-largest
religion in the world today.  There are more than 30 million Sikhs
worldwide, and 500,000 Sikh-Americans, with the highest population
in New York.

               Today I would like to introduce, if I can, Karamjit
Singh, Mukhtiar Singh Ghuman, Kuldeep Singh Dhillon, Gurdev
Singh Kang, Sukhjinder Singh Nijjer, Gurmeet Singh from the Sikh
Cultural Historical Society.  They are joined by a priest from the
Cultural Center, Bhai Bhupinder Singh.  In addition, Sarbjit Singh
Samota, Surinder Singh Cheema from the Guru Nanak Darbar in
Albany.  And also, Daler Singh.

               On behalf of Assemblyman Weprin and myself and
everyone from Queens, could you please extend the cordialities of the
House, Mr. Speaker.

               ACTING SPEAKER AUBRY:  Certainly.  On behalf
of Mr. Miller, Ms. Titus, Mr. Weprin, Ms. Hyndman, myself, the

10

**NYS ASSEMBLY**                                         **APRIL 30, 2019**

Speaker and all the members, we welcome you here to the New York

State Assembly, extend to you the privileges of the floor, only to say

Happy New Year, glad that you have come to share this day with us.

Please know that you are always welcome here and always

appreciated in the State of New York.  Thank you so very much.

        (Applause)

        Mr. Englebright.

        MR. ENGLEBRIGHT:  Thank you, Mr. Speaker.  I'm

pleased to ask you to welcome the Board of Trustees of

Environmental Advocates, the environmental conscience of New

York State.  This is that organization's 50th anniversary, and their

Board of Trustees and certain key members of their staff are visiting

with us today, Earth Day.  How appropriate.  This includes John

Buttrick, the Chairman of the Board of Trustees; Carol Ash; Ernest

Tollerson; Douglas Bateson; Peter Lehner; Michael Kink; Alexis

Strongin; and the gentleman named Bob Sweeney, who is seated,

appropriately, back on the floor here, who we miss very much, my

predecessor.  In fact, a number of the people associated with this great

environmental organization are former distinguished officials in New

York State, including, of course, Carol Ash, the former Commissioner

of the New York State Office of Parks, Recreation and Historic

Preservation, and their CEO Peter Iwanowicz, who was with the

Attorney General's Office.  It is wonderful to have them here today to

be a part of our efforts to improve the quality of life and the quality of

the environment on this Earth Day.

11

I'd appreciate very much if you would welcome them and give them the privileges.

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Mr. Englebright, the Speaker and all the members, we welcome this distinguished group of New Yorkers here to the New York State Assembly.  We extend to you the privileges of the floor.  Understand that this is the People's House.  You are always welcome here.  Many of you have deep relationships in this House.  None more than Bob Sweeney.  You are a former member, you are always welcome here, you are always family.  It is so good to see you.  It doesn't look like you've aged a minute since you left us.

(Laughter)

That hasn't happened to all of us, Bob.  So, thank you again.

(Applause)

Mr. Palmesano for an introduction.

MR. PALMESANO:  Yes, thank you, Mr. Speaker and my -- my colleagues.  Up in the balcony to your left are some students from Watkins Glen High School and their teacher, Travis Durfee, if you guys would please rise.  They are heavily engaged on policy and issues.  They're involved in debate.  We met with them earlier to ask very important questions about issues we're facing in this House that affect their future.  They're -- they're very, very intelligent, smart, inquisitive, and each year they always make a trip up here to talk to us and come to see the interactions of the House.

12

NYS ASSEMBLY                                    APRIL 30, 2019

So, as you always do, if you could just please extend your warm and gracious greetings to the students of Watkins Glen High School, please.  Thank you.

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Mr. Palmesano, the Speaker and all the members, we welcome these students from Watkins Glen here to the New York State Assembly.  We extend to you the privileges of the floor, hope that your time here has been beneficial, and be assured that we are always watching racing at Watkins Glen.  You have already (inaudible) and I'm sure your government work will add to that and your interest in government adds to that.  Thank you so very much.

(Applause)

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, if we could just take a brief Conference, Majority Conference, for about 10, 15 minutes.  Thank you.

ACTING SPEAKER AUBRY:  Majority Conference, Speaker's Conference Room.  The House will stand at ease.

(Whereupon, the House stood at ease.)

*    *    *    *    *

ACTING SPEAKER AUBRY:  The House will come to order.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, we have two additional introductions; first one by Mr. McDonald.  I also have

13

**NYS ASSEMBLY**                               **APRIL 30, 2019**

one by myself.

ACTING SPEAKER AUBRY:  Certainly on behalf --
Mr. McDonald for the purposes of a [sic] introduction.

MR. MCDONALD:  Thank you, Mr. Speaker.  It's a
pleasure to interrupt our proceedings today.  We have guests here
today from the Leukemia and Lymphoma Society, known as LLS.
And they are here, of course, as you know, at -- as they are at the
forefront of the fight to cure cancer.  And Member Fahy and myself
are pleased to welcome them to the Chamber.  Today either survivors,
family members and LLS board members are here to educate
lawmakers about important treatments and breakthroughs in treating
blood cancers, as well as support LLS provides to blood cancer
patients in our community.  What you should also know, Mr. Speaker,
which is a welcome relief, is that they're not here to ask for anything,
just to say hello and thank you.

So, I am very pleased to just mention their names,
Maureen O'Brien-Thornton, who is the Executive Director; Mike
Miller; Laura Dorado; Bill Teeter; Bill Keneally; my hometown
favorites from Cohoes, Carolyn and Lucas Santoro; Tania and Rylyn
Swierzewski; and Kiki and Davon Wagner.  And I should also note for
the record that Rylyn, who is the Student of the Year for LLS, is also
the granddaughter of former Assemblyman from Rockland County,
Robert Connor.

So, Mr. Speaker, if you could please welcome this
fine group here to the Assembly, I would appreciate it.

14

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

ACTING SPEAKER AUBRY:  Certainly.  On behalf Mr. McDonald, Ms. Fahy, the Speaker and all the members, we welcome you here to the New York State Assembly.  We extend to you the privileges of the floor.  This is the People's House and we commend you on the work that you're doing to help others who are in need.  It is truly the best that we can do in life and you are doing that, and I hope you are going to be both successful in your endeavors, but also receive the joy it comes with helping other people.  Thank you so very much.  You are always welcome here.  Thank you.

(Applause)

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  I'm interrupting the proceedings to ask you to welcome one of our previous members, Ms. Naomi Rivera, as you know is the daughter of our own Josè Rivera.  Naomi served with us for four terms.  Since she's left us, she's now a grandma.  And so, if you could welcome her to the Chambers, Mr. Speaker, and provide her the cordialities of the floor, I would greatly appreciate it.

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Mrs. Peoples-Stokes, your father, missing in his chair, as usual, we -- he's hiding in the corner taking a picture.  I know that man. Welcome, Naomi, you're a member, you will always be a member, you always have the privileges of the floor.  Can't believe you're a grandma, but things happen, right.  And so, you're doing well with it. Thank you so very much.

15

(Applause)

MRS. PEOPLES-STOKES:  Mr. Speaker, if you could please call the Housing Committee to the Speaker's Conference Room for a Housing Committee meeting.

ACTING SPEAKER AUBRY:  Housing Committee, Speaker's Conference Room immediately.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  And then we will proceed to our Calendar, page 3, beginning with Assembly No. 317.

ACTING SPEAKER AUBRY:  The Clerk will read.

THE CLERK:  Assembly Resolution No. 317, Mr. Hevesi.  Legislative Resolution memorializing Governor Andrew M. Cuomo to proclaim April 30, 2019, as Adverse Childhood Experiences Awareness Day in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 318, Mr. Thiele.  Legislative Resolution memorializing Governor Andrew M. Cuomo to proclaim June 8, 2019, as Dragonfly Day in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 319, Ms. Buttenschon.  Legislative Resolution memorializing Governor

16

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

Andrew M. Cuomo to proclaim September 2019, as Brain Aneurism
Awareness Month in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution all
those in favor signify by saying aye; opposed, no.  The resolution is
adopted.

THE CLERK:  Assembly Resolution No. 320, Ms.
Simotas.  Legislative Resolution memorializing Governor Andrew M.
Cuomo to proclaim April 2019, as Arab-American Heritage Month in
the State of New York.

ACTING SPEAKER AUBRY:  Ms. Frontus.

MS. FRONTUS:  Thank you, Mr. Speaker.  As a
co-sponsor of the resolution commemorating April as Arab-American
Heritage Month, I am proud to stand today to say a few words about
the important contribution of Arab-Americans to our great State of
New York.  As the Assemblymember for the 46th Assembly District, I
am proud to represent a number of southern Brooklyn communities
with a significant representation of Arab-Americans, such as Coney
Island, Brighton Beach and Bay Ridge, in particular, which has one of
the largest Arab populations in the United States.  In New York City,
Bay Ridge is home to the largest number of Americans who speak
Arabic at home and is sometimes referred to as "Arab Central of New
York", while others call it "Little Palestine".

With immigrants who have emigrated from Lebanon,
Jordan, Palestine, Egypt, Somalia, Sudan, Algeria, Morocco, Iraq,
Yemen and Syria, Bay Ridge is indeed an enclave of pan-Arab culture

17

and identities, and boasts an array of civic groups and cultural institutions which are woven into the fabric of this very vibrant neighborhood.  In Bay Ridge, we have the Arab-American Association of New York, a non-profit organization founded by prominent community members whose mission is to support and empower the Arab immigrant community by providing services to help them adjust to the United States and become active members of society, such as ESL courses, immigration, legal services, mental health services, advocacy and civic engagement.  They're also heavily involved in fighting for social justice issues and host an annual solidarity march of peace for Dr. Martin Luther King's birthday.

We have also have the Yemeni-American Merchants Association, an organization working to help better the lives of Yemeni-Americans by providing trade and business deals between the Yemeni community and others, advocating on behalf of this immigrant group to empower them and educate the community through programs and workshops.  We also have the Moroccan-American House Association, a community organization based on -- dedicated to help the Moroccan immigrants with any problems or concern.  According to the President of this Association, whether it be the death of a person, someone who is sick or lost a job, the organization's mission is very clear.  They want to coordinate with other communities in Brooklyn and have a better Moroccan community.

We have, in Bay Ridge, the Islamic Center of Bay

**NYS ASSEMBLY**                                            **APRIL 30, 2019**

Ridge, a neighborhood mosque serving between 600 and 700 worshipers during Friday prayers.  The Islamic Center is so popular that it often fills to capacity during prayer service, leaving latecomers to pray outside on the sidewalk.  The mosque also serves as a community center offering ESL classes, tutoring for students and even opening their doors for town hall meetings.

On the political front, the Arab community in Bay Ridge is on the move.  We have Yalla Brooklyn, meaning "hurry up" or "let's go" in Arabic, a political group which was born in Bay Ridge which seeks to build the power of Arab and Muslim voters and expand the electorate in southern Brooklyn.  They were particularly active in getting out the Arab vote for the November 2018 election. We also have the Arab Women's Voice, a new Women- and Minority-Owned political consulting firm founded by two Bay Ridge activists, and their mission is to help candidates who are committed to the Arab-American community connect with this previously taken-for-granted demographic of Arab voters.

Mr. Speaker, I could go on, but the point is that whether it's the small business owners on Coney Island who hail from Yemen or Syria, or the many activists and community leaders in Bay Ridge, the Arab-American immigrants across the 46th District are making great strides and leaving a legacy behind for the next generation.  They are creating the institutions they need to respond to the needs of their community and looking out for one another, even as they experience discrimination and worry about the security of their

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

families.

While most Arabs in the US are Christian, the majority of Arabs in my district are Muslim, which means that since 9-11, they have experienced racial profiling and discrimination in one form or another.  Just days ago, a group of Yemeni-American bodega owners launched a boycott of the *New York Post* due to what they perceived to be consistently racist portrayals of Muslims by that newspaper.  Today's recognition of Arab-American Heritage Month takes on special meaning, in light of the constant barrage of prejudice, racial profiling and blatant discrimination which Arab-Americans continue to face.  I am proud to represent such a large concentration of Arab-Americans, and I'm happy to join my colleagues today in celebrating their rich culture and heritage.  To all of my Arab-American friends and neighbors working hard to make the 46th Assembly District a better place, I want to say to all of you, *shukran*.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 321, Ms. McMahon.  Legislative Resolution memorializing Governor Andrew M. Cuomo to proclaim April 2019, as Esophageal Cancer Awareness Month in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; those opposed.  The resolution is adopted.

20

NYS ASSEMBLY                                    APRIL 30, 2019

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, if we could now go to Calendar No. 61, it's on page 8 [sic], and following that, Mr. Speaker, we'll go to Calendar No. 180, which is on page 15.

ACTING SPEAKER AUBRY:  The Clerk will read.

THE CLERK:  Assembly No. A02501-A, Calendar No. 61, Englebright, Thiele, Colton, Galef, L. Rosenthal, Fahy, Abinanti, Otis, Pichardo, Gottfried, Glick, D'Urso, Fernandez, Weprin.  An act to amend the Environmental Conservation Law, in relation to the reduction of mercury in mercury-added lamps.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote.

(The Clerk recorded the vote.)

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  This is our first vote of today, Mr. Speaker.  I know we've been here for a while and we've gotten a lot accomplished, but now it's time to accomplish the important work, take the vote.  So, please, if you're in and around the Chamber, please cast your vote ASAP.  Thank you.

ACTING SPEAKER AUBRY:  First vote of the day, members.  If you are in your chairs, please vote now.  If you're in the sound of our voice, please come to the Chamber and cast your vote. Thank you.

21

**NYS ASSEMBLY**                              **APRIL 30, 2019**

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, I understand that the Housing Committee has completed its work.  If you could please call on Mr. Pretlow and the Racing and Wagering Committee to head to the Speaker's Conference Room.

ACTING SPEAKER AUBRY:  Racing and Wagering, Speaker's Conference Room, Mr. Pretlow awaits.  Thank you.

The Clerk will read.

THE CLERK:  Assembly No. A01779, Calendar No. 180, Peoples-Stokes, L. Rosenthal, Colton, Otis, Galef, Mosley, Hunter, Gottfried, Thiele, De La Rosa, Williams, Weprin, Glick, D'Urso, Crespo, Fahy, Fernandez, Reyes.  An act to amend the Environmental Conversation Law, in relation to high local environmental impact communities.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes, an explanation is requested.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The purpose of this legislation is to -- to have the Department of Environmental Conservation to put together a list that identifies where there are local environmental impact zones.  And it will provide for these zones to be made -- zones that have negative

22

NYS ASSEMBLY                                        APRIL 30, 2019

impacts on people's lives to be made available publicly.

                    ACTING SPEAKER AUBRY:  Mr. Ra.

                    MR. RA:  Thank you, Mr. Speaker.  Will the

Majority Leader yield?

                    ACTING SPEAKER AUBRY:  Will you yield, Mrs.

Peoples-Stokes?

                    MRS. PEOPLES-STOKES:  Of course I would.

                    ACTING SPEAKER AUBRY:  The sponsor yields.

                    MR. RA:  Thank you.  So, just a couple of questions

on this.  I know that we have passed this bill in the past, so one of the

issues was that this bill many years ago had been vetoed by Governor

Patterson.  Is this bill identical to that bill and do we feel that any --

any of the concerns addressed in that veto message are taken care of at

this point?

                    MRS. PEOPLES-STOKES:  I -- if I can remember

the veto message from 2010, Mr. Ra, I believe the former Governor

was concerned that there would not be the availability of resources to

add additional staff to keep track of these records.  Quite honestly, I

don't believe in 2010 that it called for the need to add additional staff,

but I certainly don't believe that in 2019 it calls for additional staff.  I

think it calls for a higher level of technology, which I believe we have

upgraded that equipment in the Department of Environmental

Conservation more than once.

                    MR. RA:  Sure.  So --

                    MRS. PEOPLES-STOKES:  So nothing has

                                        23

changed --

MR. RA:  Okay.

MRS. PEOPLES-STOKES:  -- in spite of the veto message.

MR. RA:  So, just in terms of putting together this information, this -- this requires this list to be put together.  Does it require or is it contemplated that what then would be done with this information other than making it publicly available?  Would it, you know, direct the Department to -- to do anything further with the list in terms of remediating or making sure different types of, you know, environmentally sensitive types of activities don't take place in these areas?

MRS. PEOPLES-STOKES:  No, I think it actually -- if, in fact, the Department already has access to this information, which in some cases I personally believe that it does, it should be alerting citizens that live in and around those environmental conditions as to the potential impact on their health.  But it certainly could be used as a planning strategy to figure out where either development should go and/or where additional business should go, et cetera.

MR. RA:  Okay.  Thank you very much.

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, Mr. Ra.

MR. RA:  Briefly on this, there have been some concerns raised, you know, certainly in terms of compiling the

information, but -- but also in the impact it could have on some of these areas.  You know, I think that the DEC has several programs and we do have some laws in place to try to make sure that when decisions are being made that impact the local community, that environmental impacts are considered and are -- and are mitigated and addressed, whether it's through our SEQR process, certainly the DEC has Policy 29, which, you know, is a general policy promoting environmental justice through -- through their permitting process and their programs and regulations.  And there are other initiatives under -- underway and that have been taking place within the DEC, both from the direction of this Legislature and otherwise.

But also, there -- there's a concern and -- and I think there's been a few negative votes on this in the past with the concern that perhaps the more this information is -- is put out public that it could have a negative impact on those communities in terms of the values of -- of property, whether it be for the individual homeowner, whether it be for a business that might be seeking to locate themselves within a particular place that might be -- might be flagged as being, you know, a [sic] environmentally, you know, hazardous area.  But -- but I do think that it's important that we work to address areas that -- that have been impacted by environmental concerns and, certainly, you know, the general policy of -- of trying to help those areas recover and flourish both for the, you know, property owners and homeowners there and our local businesses is a positive thing for our State.

So, thank you.

25

NYS ASSEMBLY                                APRIL 30, 2019

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote.

(The Clerk recorded the vote.)

Mrs. Peoples-Stokes to explain her vote.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker, for the opportunity to explain my vote.  I actually started my interest into the world of organizing and -- around both policy issues and politics around environmental issues.  There was an attempt to put a medical waste incinerator literally on top of a residential community at a hospital that would burn all of the medical waste for the entire region's hospitals.  My neighbors and I organized and we stopped that. And there are a number of other issues.  There was a playground in the City of Buffalo that was built on top of a company that made arsenic products.  People who worked in that playground and played in that playground ended up with cancer and died.  There's also the issue of the GM plant that left the area, knew they left PCBs, gave the DEC resources to clean up, they never did a thing, never said a thing. People get sick from that.  There's also the issue of an expressway that literally goes right through the middle of a residential community where the levels of asthma are high, children are sicker, adults are sicker, people die earlier.

The environment has an impact on the quality of people's life and the quality of the conditions in which they live.  If the

26

**NYS ASSEMBLY**                          **APRIL 30, 2019**

DE -- Department of Environmental Conservation is in place to serve the people, then I say it has to serve all of the people all of the time, not some of the people when it's convenient for business or convenient for folks to feel comfortable.  We need to be trying to save all of the people and so I would ask my colleagues to join me in supporting this legislation once again and ask the DEC to do what they've been charged to do, take care of all of the people all of the time.  This list will help us begin to move that process forward.  And, Mr. Speaker, I thank you for the opportunity and vote in the affirmative.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, if we could now go to page 15 take and take up Calendar No. 181, and page 16 [sic] and take up Calendar No. 183.

ACTING SPEAKER AUBRY:  The Clerk will read.

THE CLERK:  Assembly No. A02064, Calendar No. 181, Englebright, Gottfried, Santabarbara, Ortiz, Dinowitz, Colton, Lifton, Glick, Fahy, Abinanti, Otis, Jean-Pierre, Lavine, Mosley, Simon, Galef, Jaffee, Cook, Rivera, D'Urso, Hunter, Steck, Peoples-Stokes, Williams, Bichotte, Ramos, Weprin, Titus, Hyndman, Seawright, Lupardo, L. Rosenthal, Barron, Walker, Carroll, Barrett,

27

**NYS ASSEMBLY**                                        **APRIL 30, 2019**

De La Rosa, Cahill, Thiele, Reyes, Gunther, Davila, Epstein.

Concurrent Resolution of the Senate and Assembly proposing an

amendment to Article I of the Constitution, in relation to the right to

clean air and water and a healthful environment.

ACTING SPEAKER AUBRY:  An explanation is

requested, Mr. Englebright.

MR. ENGLEBRIGHT:  Thank you, Mr. Speaker.

This proposed Constitutional amendment would enable the presence

in our Constitution of what is clearly something that everyone should

be aware is a right, the right to clean air, clean water and a healthful

environment.  This proposal is beautiful by its simplicity, not

complicated, no curve balls, it is what it says:  The right that every

citizen of our great State should have to know that they can bring their

families to our State and grow them in the context of a healthful

environment.

ACTING SPEAKER AUBRY:  Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  Would

the sponsor yield?

MR. ENGLEBRIGHT:  I yield.

ACTING SPEAKER AUBRY:  Mr. Englebright

yields.

MR. GOODELL:  Thank you, Mr. Englebright.  And

I certainly appreciate your desire that I think all of us share that we

have clean air and water and a healthy environment.  A lot of times we

look at Constitutional amendments because either the Legislature

28

NYS ASSEMBLY                                    APRIL 30, 2019

doesn't have the authority or we need to change restrictions that may

apply.  Under the current Constitutional provision, are there any

restrictions on the Legislature's ability to enact appropriate legislation

to ensure clean air, clean water or a healthy environment?

MR. ENGLEBRIGHT:  No.

MR. GOODELL:  And, of course, we have the

Department of Environmental Conservation, we provide substantial

funding to them every year, we appropriate $300 million on average

every year to the Environmental Protection Fund.  Is there any

restrictions on the delegation of authority that we give them for them

to do their work in protecting our air and our water?

MR. ENGLEBRIGHT:  No.

MR. GOODELL:  As you know, our New York State

Constitution already includes provisions dealing specifically with the

environment, I'm referencing Article 14.  How is this different than

the broad language contained in Article 14 of the Constitution that

already exists?

MR. ENGLEBRIGHT:  Well, it compliments and

supplements the expectation.  It does not in any way conflict with

Article 14, but it does certainly add the additional assurance that is the

very simple statement that every person shall have the right to clean

air and water and a healthful environment.  That clarification in these

troubled times particularly is useful.  It reinforces our mission to

protect the people who sent us.  It also reinforces the mission of the

Department of Environmental Conservation.  Within that context,

NYS ASSEMBLY                                APRIL 30, 2019

placing this plain language expectation before our voters is in the Bill of Rights of the State is, I believe, a timely and useful thing to do.

MR. GOODELL:  Well, as we've already discussed a little bit today, this Legislature has very broad power to enact laws to ensure clean air and water and a healthy environment.  We've given our regulatory agencies a great deal of discretionary authority to pursue clean air and clean water through regulations.  We have a number of statutory provisions, of course, we have enacted over the years, including SEQR and a number of others.  But right now, it seems that the responsibility under our current State Constitution to develop appropriate laws and appropriate regulations starts with the Legislature.  If we enact this as a Constitutional amendment, then it will be the courts, not the Legislature, that decide whether or not someone's individual right to clean air and clean water or a healthy environment is being violated.  Why would we want to transfer authority from this Legislature and our environmental experts in the DEC and the Department of Health and elsewhere to the court system?

MR. ENGLEBRIGHT:  Well, I appreciate your perspective, but I respectfully disagree that we will be transferring anything or losing anything.  This is -- if you want to think of all of the environmental protections that each of the units of government, including ourselves, might be able to provide as the composition of a painting, this is the frame for that painting.

MR. GOODELL:  I -- I don't have that painting on

30

**NYS ASSEMBLY**                                **APRIL 30, 2019**

my wall yet, Mr. Englebright --

        MR. ENGLEBRIGHT:  I -- I wondered whether you had that painting in your mind, but I hope that you would give it some thought, because it certainly frames the expectation of our citizens that all parts of government, including the Legislature, including the Judiciary, including the agency, all are working in concert with one another for a composition that will result in better protection for their -- their families, for their communities, for the environment.

        MR. GOODELL:  Thank you for explaining that metaphor, right.  And I appreciate that.  Under the current framework that we have, if a business or industry is complying with all the regulatory requirements and all the statutory requirements, they know that they're operating lawfully and can continue to operate with their manufacturing or their employment operations or whatever.  Does this Constitutional amendment create uncertainty with a business in the sense that somebody might claim that the regulations or the statutory provisions are not strict enough?

        MR. ENGLEBRIGHT:  No, I don't believe there is anything negative about this at all.  It offers no uncertainty, but rather a more clear expectation for all of our citizens, all of our -- our legally operating businesses.

        MR. GOODELL:  Is there any --

        MR. ENGLEBRIGHT:  We have not seen anything in the six other states that have adopted a similar provision in their Constitution that would suggest that there's any negative effect upon

business whatsoever.

MR. GOODELL:  Well, actually, as you know there was a similar Constitutional provision in Pennsylvania, our neighboring state to the south, and there were a lot of problems with that implementation and a lot of court cases.  Are you familiar with those court cases and how the Pennsylvania Supreme Court wrestled with those issues?

MR. ENGLEBRIGHT:  Well, any new law will certainly have a period of time when it is going to be tested.  We have not observed, however, that any of those tests have resulted in any dislocation of business productivity or the well-being of business or the environment.

MR. GOODELL:  Is there any --

MR. ENGLEBRIGHT:  They seem -- they seem to me to be both important.  I'm -- I'm sure you would agree with that.  This will not interrupt either business or the environment.

MR. GOODELL:  Well, actually, as an attorney, I -- I am very uneasy because if our current regulations in our current statute provide a safe harbor, if you will, for business entities and employers throughout our State in having a reasonable comfort level that they won't be sued or brought into court, then this language would add nothing.  If this language does add something, then that means that a business or an industry that's complying with all of our current statutory regulatory provisions could still be subjected to lawsuits from somebody claiming that even though they're complying in every

NYS ASSEMBLY                              APRIL 30, 2019

respect, they are creating air or water that's not "clean".  Is there anything in this language at all that gives a safe harbor for individuals or businesses from lawsuits or -- or being dragged into court if they're complying with all statutory and regulatory provisions?

MR. ENGLEBRIGHT:  Today, any citizen can bring a lawsuit, as you know.  I think you referred to this earlier, obliquely.  There is nothing to prevent someone from bringing an action in court now.  After this passes, that will still be the case.

MR. GOODELL:  Well, actually --

MR. ENGLEBRIGHT:  This doesn't give --

MR. GOODELL:  -- I mean there's standing issues -- I mean under current law, there's standing issues that limit a person's access, there's statute of limitations, there's specific procedures under SEQR, for example, all of which --

MR. ENGLEBRIGHT:  This doesn't --

MR. GOODELL:  -- is denying --

MR. ENGLEBRIGHT:  -- change any of that.  All it does is reassure all participants within the context and, again, this is a context setting initiative, within the context of expectation that if you are a citizen of this State, that you have the right to know that you can grow your family and yourself and stay in our State and contribute to its destiny by knowing that the environment is expected to be healthful for you and your loved ones.

MR. GOODELL:  Well, you started out your comments, and I appreciated the fact that you noted that this language

33

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

is simplicity in its beauty, or beauty in its simplicity, right?

MR. ENGLEBRIGHT:  It is.

MR. GOODELL:  Which is unique in some respects from a lot of things that we do here.  As you know, many of our environmental laws and regulations are extraordinarily voluminous and extraordinarily detailed.

MR. ENGLEBRIGHT:  Yes.

MR. GOODELL:  And, in fact, we just dealt with an amendment to the law that set very, very specific standards for mercury, as an example.

MR. ENGLEBRIGHT:  Mm-hmm.

MR. GOODELL:  The flip side of language that has no definition, if you will, or no detail is that it doesn't have any detail. So, this language says that everyone has an individual right to clean air and water.  Does "clean" mean that the water that's supplied under the public water system doesn't have any additive -- any chemicals added to it?

MR. ENGLEBRIGHT:  I'm glad you asked the question.  Again --

MR. GOODELL:  My question is, what's "clean"? Surely, we don't mean "distilled".

MR. ENGLEBRIGHT:  I understand your question.  I believe that the intent is very clear, that you should be able to consume water through your public water supply without any harm. That doesn't mean that the water is distilled.  We know that some of

NYS ASSEMBLY                                  APRIL 30, 2019

the best tasting water is because there are parts of what you're tasting

that is not H20.  If you drank distilled water, you would have no taste

at all.  That would be less than satisfying.  Let's be clear:  The real

difference between distilled water and what is appropriate and

desirable for a public water supply involves other chemicals, other

substances.  But they should not harm you.  They should not do injury

to your young children, to your wife or to your family in any way.

That's what this means.

            MR. GOODELL:  So, it's your view that the word

"clean" means not harmful?

            ACTING SPEAKER AUBRY:  One minute.  We

have --

            MR. ENGLEBRIGHT:  Clean --

            ACTING SPEAKER AUBRY:  We have a lot of

background noise.  Members are having problems hearing the debate.

So if we will please end all the side conversations, the aisle

conversations so that we can concentrate on the speakers.

            Please proceed.

            MR. ENGLEBRIGHT:  "Clean" means healthful to

human beings, healthful to our fellow creatures in the environment.

"Healthful" means that it will do no harm to consume that water.

            MR. GOODELL:  Am I correct to assume that

clean -- this Constitutional language for clean air and water could be

violated by odors?  Smell?

            MR. ENGLEBRIGHT:  Look, if you want to get to

35

**NYS ASSEMBLY**                                **APRIL 30, 2019**

hypotheticals regarding your nose and my nose, I don't smell very

well, maybe you do, I wouldn't measure --

       MR. GOODELL:  I don't smell badly.

       (Laughter)

       MR. ENGLEBRIGHT:  I wouldn't -- I wouldn't

measure based on smell in the first place as to whether or not a clean

and healthful environment is something that we might both be looking

at.  I do know that if there was any injury to either yourself or your

loved ones or myself, or my constituents, or my -- my family, that that

would be outside of the bounds of expectation that should be part of

the guarantee that you have as being a citizen of this great State.

       MR. GOODELL:  So, your thought is that if the odor

were significant enough to affect property values, for example, or

health, then it would be within the ambit of this language?

       MR. ENGLEBRIGHT:  You're asking me a very

general question, my answer will be general.  I believe that the words

"a clean and healthful environment" is something that each of us

would know when we experience it, unless we get sick afterwards.  In

which case we knew -- we would know that we had been exposed to

something --

       MR. GOODELL:  Is that one of those things --

       MR. ENGLEBRIGHT:  -- in that environment.

       MR. GOODELL: -- we would know and smell if we

saw it or heard it or smelled it?  Yeah.

       If I can, what about things like dust?

NYS ASSEMBLY                                APRIL 30, 2019

MR. ENGLEBRIGHT:  A clean and healthful environment would include clean air.  Knowledge that you can bring your children up without the risk of them being subjected to asthma, being subjected to excessive fumes from internal combustion engine exhaust --

MR. GOODELL:  And would a health --

MR. ENGLEBRIGHT:  -- being able to grow up in any part of our State and breathe deeply and know that you're not injuring your lungs.

MR. GOODELL:  And would a healthfully -- healthful environment also include issues like food safety?  GMOs, for example?  Pesticide use on agricultural products?  Or other food safety issues?

MR. ENGLEBRIGHT:  I don't think there's any doubt that all of these are part and parcel of what it means to grow up in a healthful environment.  If you able to buy fresh produce and the produce is without contamination in the way that nature intended it to be consumed, it will be healthful.  If it is something that poisons you, that causes disease or convulsion, that is the opposite.  We're looking for the former, not the latter to be the norm in this State.

MR. GOODELL:  Thank you very much, Mr. Englebright, I know we're out of time.  We may talk later.  But thank you so much for your comments.

MR. ENGLEBRIGHT:  My pleasure.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes.

37

**NYS ASSEMBLY**                              **APRIL 30, 2019**

MRS. PEOPLES-STOKES:  Mr. Speaker, if we could interrupt the debate for just a few minutes to ask you to call the Ways and Means Committee to the Speaker's Conference Room, Member Weinstein is awaiting.

ACTING SPEAKER AUBRY:  Ways and Means, Speaker's Conference Room, Ms. Weinstein awaits.

Mr. Manktelow.

MR. MANKTELOW:  Thank you, Mr. Speaker.  Will the sponsor yield?

MR. ENGLEBRIGHT:  I yield.

ACTING SPEAKER AUBRY:  Mr. Englebright yields.

MR. MANKTELOW:  Thank you Assemblyman, just a couple of quick questions.  From an Ag side, we have a lot of general Ag practices that we do.  Would agricultural practices be exempt from this?

MR. ENGLEBRIGHT:  There is no specific provision addressing any of the activities of agriculture or business, or industry.  They're not specifically addressed here.  I will say to you that I grew up on a farm.  I have great regard for people like, no doubt, your constituents, because I -- I have a large family still in the midwest in the -- in the farm belt of our nation that brought me up -- many of the values that I hold today are derivatives of having grown up in a -- in a farm family environment.  So I -- I respect the concern that you bring.

38

MR. MANKTELOW:  Okay.  So, as -- as a farmer myself, harvesting wheat, harvesting soy beans, it has to be dry, very dusty operation.  Also in the springtime when the land gets dry, a lot of dust is being put into the air.  So, those -- those types of practices would not be exempt?

MR. ENGLEBRIGHT:  There are no specific exemptions or rules.  It is a -- again, it is the role of the Legislature on a very small, granular level to try to make sure that activities such as industry or -- or commerce might carry out are not going to harm our citizens on a very situation by situation specific basis.  The general frame of this composition, though, is that it is the right of every citizen of this State to grow and prosper in a clean and healthful general environment.

MR. MANKTELOW:  And also from the agricultural side, we have the freedom -- the Right to Farm Act that gives us the opportunity to farm and a lot of that stuff is covered in there.  I'm just very concerned that by putting this in here anybody, any citizen could say, *I'm being harmed by the dust, I'm being harmed by the smell*, anything like that.  I just have grave concern for our industry, for our Ag industry.

MR. ENGLEBRIGHT:  I -- I don't think you're wrong to raise the question.  I think -- I do think, though, that it's important for you to know that you should sleep well tonight because this isn't going to change anything that isn't already on the books.  If somebody is doing something truly egregious to their neighbors, causing harm,

NYS ASSEMBLY                                APRIL 30, 2019

throwing dust into the air, carrying out inappropriate agricultural

practices that allow drift onto their neighbors' property, that's already

covered in law. This doesn't change anything in that regard. There

are no new rights of inappropriate expectation that are built into this.

Quite the opposite. It simply frames the overall environment of our

State as being something that should be healthful to its residents.

MR. MANKTELOW: Okay. So, one other question.

Is odor considered a clean air? Is that part of clean air?

MR. ENGLEBRIGHT: I didn't hear the question.

MR. MANKTELOW: I'm sorry. Is -- can we have

odor -- odor in that clean air part of it?

MR. ENGLEBRIGHT: Is there order in it?

MR. MANKTELOW: Odor.

MR. ENGLEBRIGHT: Oh, odor. I'm sorry. Yes.

That is -- if it's harmful, if it can cause a disease or cause someone to

have biological harm to their person, yes, that would probably fall

outside of the expectations of this initiative. We want odors -- we --

we -- that's why we have noses, basically, to enjoy and in some cases

to be warned. So all of that is -- is normal. This bill doesn't cause

anything to be abnormal.

MR. MANKTELOW: Okay. The -- the reason I ask

is, up in our area in our district we have two very large landfills and

we have a lot of -- we have the trash train, as it's called, coming

through our district. And the smell's been an issue. The landfill smell

is an issue.

**NYS ASSEMBLY**                              **APRIL 30, 2019**

MR. ENGLEBRIGHT:  Yeah.

MR. MANKTELOW:  It never seems to stop.  So, are those individuals that have those issues with the smell, are they going to have the opportunity to have that addressed through this change?

MR. ENGLEBRIGHT:  They already have that right.

MR. MANKTELOW:  Okay.

MR. ENGLEBRIGHT:  And so, this does not alter their right, either proactively or in a regressive way.  This does, however, and I'm glad you raised this particular example, it illustrates that municipalities also would have to really be more conscious and self-conscious and aware of the expectation of their citizens for municipal activities, such as a landfill, to make sure that that landfill is not intruding upon the -- what would, if this becomes law after being voted upon by the people of the State, be a new expectation.  General, yes, but for many of our citizens, they would look at a landfill such as the one you described which is harming people in the community and they would say, *We have a right and our government is not living up to its obligation*.

MR. MANKTELOW:  Okay.  I thank you for your time and I have nothing else.

MR. ENGLEBRIGHT:  My pleasure.  Thank you for your questions.

ACTING SPEAKER PICHARDO:  Mr. Daniel Stec.

MR. STEC:  Thank you, Mr. Speaker.

On the bill.

41

**NYS ASSEMBLY**                              **APRIL 30, 2019**

ACTING SPEAKER PICHARDO:  On the bill, sir.

MR. STEC:  All right.  Thank you.  Certainly, I even got fewer examples of a motherhood and apple pie kind of idea as this.  I don't think there's anyone in this Chamber or anyone in the State that would argue that they don't want clean and healthful environment.  And I've been listening to the debate and I appreciated the -- the back and forth between my colleagues as they -- they touched on some of these issues, but I -- as -- as -- as silly a notion would be that anyone would say they don't want a healthful or clean environment, I think it's equally as ridiculous to suggest that New York State does not already have ample, in fact, voluminous regulations, an army of people in the DEC and the Department of Health that are working to ensure that we have clean -- and the bill almost suggests that we've done nothing in these last 200 years. Whereas, I think there's lots of evidence that, in fact, we may in fact lead the nation in our efforts as a State to address our -- our healthful and clean issues with the environment.

So, the question that I -- I get to in this is, well, what are we trying to accomplish?  What does this very simple, clean, short statement about clean and healthful mean?  And certainly, at the end of the day, a lot of these issues are going to boil down to dollars and cents.  If went to eliminate crime, we can do that.  The flip side is we will live in a very expensive police state.  If we want to eliminate fire hazards, that's it, we build everything out of asbestos and we have a fire truck on every street corner.  Very expensive.  And the asbestos

part isn't very healthful.  So, it's always a balancing act.

And what are we trying to get to?  Certainly, though, if money becomes part of the solution here, part of the equation, part of the final analysis in what we're trying to accomplish, you have to -- you have to wonder what are we waiting for?  We've got report after report that says that we need to make investment in tens of billions of dollars in water and wastewater infrastructure in the State that we're aware of already.  So, if we want to put our money where our mouth is as a Legislature, instead of, you know, the high minded and -- and lofty words, and we can certainly at budget time be pushing to do more for water and wastewater and that -- but that's going to include a significant capital expenditure.

Now, one of the points that came out on debate was "clean and healthful".  You know, I mean, it's one of those things, I know -- I know what it is when I see it, but as sure as God made little green apples, and there's 150 of us in here, there's going to be 150 different ideas of what clean is and what healthful is.  And there's going to be people that are going to say that *Clean to me means pure. Clean to me means pristine.  Clean means without contamination. Distilled.*  Now, I think that's silly.  I'm encouraged that the sponsor agrees that - I don't want to put words in his mouth, he didn't say "silly", but that is not his intent, I know his heart on this, that is not his intent.  His intent I think is he's -- he's aiming for a good goal, but words matter and we are in the business of putting down what's going to be enacted as law.  And one of the other concerns that came up on

43

the debate that caught my attention is that we -- absent of words that define clean and healthful and given the litigious nature of our society, we -- one, we will expand standing to everyone in the -- the State has cause for action anywhere in the State, that is not currently the law, but they will -- they will be arguing over what clean and healthful is and we will be burdening ourselves, our businesses, and our sub municipalities, our counties, our towns, our cities and villages with more litigation exposure because they're the ones that are supposed to be delivering clean water.  And the businesses are supposed to be delivering clean air.

Now one word that we didn't talk about the definition of is "environment".  Many of my constituents would say that they think that they have -- they should have Constitutional guarantee of economically healthy environment.  A tax climate healthy environment.  A politically clean environment.  So, there are other sides to this issue of what are we trying do that we have to factor in when we start talking about what we mean for our environment.

The last point that I'd like to make and I -- as I often do on these bills, the Business Council, the Farm Bureau, these are two significantly sized lots of -- tens of thousands of New Yorkers belong to them or are affected by them.  The words that they use, their concern:  "Uncertainty", "duplicative", "litigation", "unclear", "ambiguous", "negative impacts", "the potential for an increase in litigation and duplicative litigation as a result of this proposed provision may discourage economic development in the State."  So,

NYS ASSEMBLY                              APRIL 30, 2019

these are some of the concerns I have and I think it all goes back to the debate that I've heard so far, is the -- while there's -- there's something to be said about short and sweet and simple, that absent of firm definition of what exactly we are trying to accomplish, we are opening a very ill-defined, but potentially large and expensive, can of worms here.

So while I appreciate the sponsor's goals and intentions, again, I'll go back, I'll close with we all want something that's clean and healthful, we also want to know that we're not walking into or creating more problems by not doing it right the first time in this Chamber.  So, for that reason, I would caution my colleagues and I'll be voting against this -- the resolution.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. GOODELL:  I appreciate all the comments from my colleagues.  What's been clear in this debate, first of all, is that there's no need for this Constitutional amendment.  This Legislature and our regulatory organizations have ample Constitutional authority to ensure that all reasonable steps are taken for clear air, clean water and a healthy environment.  And the bills we're passing today are simply small examples of the Legislative history of this State dealing with those issues.

So, if we don't need it, is there a harm?  Well, if this

45

simple language does nothing more than what we've already done, then we don't need to pass it.  But what we've been assured is it will do more than what we've done.  What's that mean?  That means if you're complying with every law and every regulation in your business you could still be sued.  It means if you're doing farming operations and you create dust as part of the normal operation -- and, by the way, just a little tip from the countryside, don't buy a vacation house downstream from a manure field from a dairy farm.  You'll find it's unpleasant during certain times of the year.  We know that there are critical operations that are essential for New York State to be successful.  Everyone appreciates that when we flush the toilet, things disappear, but they reappear at a sewer treatment plant, and no one wants to live next to it.  We appreciate that the lights come on when turn on the switch, but nobody wants to live next to a power plant. And that's why we have Article X in the Public Service Law so that we can balance those competing needs and reach an appropriate solution.

          This would no longer allow us to give any safe harbor, no safe harbor for any employer, no safe harbor for any manufacturer.  Our municipalities would be at risk for a private lawsuit dealing with their sewer treatment plants or their landfills or putting salt on the roads or adding chloride or chlorine to the water system or whatever it is that some individual thinks is contrary to their concept of clean air, clean water or a healthy environment.  Now, when I grew up, I had four brothers and it turned out from time to time

46

NYS ASSEMBLY                                    APRIL 30, 2019

that the five boys, my brothers and I, had a different concept of what
was clean than my mother.  It was a source of some minor friction.
This would convert that differences in our concept of what's clean into
a Constitutional right that will flood our courts.

Now, some of you, in fact, I would guess almost all
of us here like the consent of green energy.  But I will tell you in my
county there's been a tremendous amount of controversy over the
addition of windmills because of flicker, because of low frequency
sound, because of the impact on migratory birds, including protected
species.  This legislation would give all of the neighbors the right to
bring a private lawsuit claiming that their Constitutional rights to a
clean and healthy environment are being adversely impacted.

New York leads the nation on environmental
regulations.  We lead the nation in taxes.  We lead the nation on
out-migration.  The last thing we need to do is lead the nation on
environmental uncertainty that pulls the rug out from all of our
employers, all of your friends and neighbors and leaves us all
wondering whether our neighbor has the same concept as we do when
it comes to clean and healthy.  So while I certainly appreciate the
desire to have clean air and clean water and a healthy environment
objectives I support, I believe that this Legislative Body and our
environmental experts are the best ones capable of addressing those
competing issues and making sure we have an appropriate balance.
Thank you, Mr. Speaker.  And again, thank you to my colleagues.

ACTING SPEAKER AUBRY:  Read the last section.

47

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote.

(The Clerk recorded the vote.)

Hold on one minute.  On a motion by Mr. Englebright, the Senate Bill is before the House.  The Senate Bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote.

(The Clerk recorded the vote.)

Mr. Epstein to explain his vote.

MR. EPSTEIN:  Thank you, Mr. Speaker, I rise to explain my vote.  I just want to thank the sponsor of this bill.  The reality is that we know that our environment is slowly deteriorating and the issues of climate change have serious impact on all of us.  Issues of clean water, air is such a fundamental right to have them folded in our Constitution will really take us forward.  I want to encourage everyone to think about this as our future as generations come, what we leave behind, what does the air, the water and our environment look like.  I encourage us to vote in favor of this bill and I'll be voting in the affirmative.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Epstein in the affirmative.

Mr. Englebright to explain his vote.

48

**NYS ASSEMBLY**                    **APRIL 30, 2019**

MR. ENGLEBRIGHT:  Thank you, Mr. Speaker.  So, this is an historic moment, first passage of a Constitutional amendment that should be part of the basic citizenship of every citizen of this great State.  As you can see, it has passed in the Senate.  Our passage of it here today is just moments away.  I think that this is an expression of optimism that is good news in a -- in a time when our State is assaulted by climate change, by storms that should come once in a century that arrive every three or four years, by the invasion of the southern pine beetle, by all of the ravages of change, people need to know and be assured that we, in the Legislature, are not going to be conceited to think that only we should manage the environment, but that, in fact, citizens have a participatory expectation and right.

I'm very pleased that we are about to pass this bill.  This proposal is based on the premise that the right to clean air and a -- and clean water and a healthful environment is an elementary part of living in this great State.  I am pleased to vote yes and recommend to my -- my colleagues that they also support this measure.  Thank you, Mr. Speaker.

Mr. Englebright in the affirmative.

Mr. DiPietro.

MR. DIPIETRO:  Thank you, Mr. Speaker, I rise to explain my vote.  What this bill does, it says we failed.  We failed here in the Assembly, we failed at the Governor's desk and we failed in every issue and DEC, EPA, because if we're saying now that we have to have the right to a healthful environment and clean air and clean

49

water, then I would call on the Governor to immediately look at every institution, starting with the DEC and turn it upsidedown because they're not doing their job.  The EPA is not doing their job.  A number of issues and us in this Chamber are not doing our job because we're not protecting our citizens.  So, if we have to pass this legislation when we already have every law on the book -- books for clean air, clean water, which we're all for, but it's just not going far enough, then we have all failed and it's time that this Chamber and get the Senate and get the Governor and start looking at every single institution that we have in New York State that provides for our safety and they should be turned upsidedown and find out what's wrong because we have to now tell our citizens that we're not doing our job, we have to pass this because there's a problem.  So, I'll be voting in the negative.  Thank you.

ACTING SPEAKER AUBRY:  Mr. DiPietro in the negative.

Mr. Lavine.

MR. LAVINE:  Thanks, Mr. Speaker.  So, this has been a real good example of the difference in philosophies and political philosophies.  Some who oppose this Constitutional amendment to guarantee our children and succeeding generations clean air and water delight in the fact that the United States Government is so now led by a radical climate change denier who believes that climate change is a hoax perpetrated by China.  We are led by a nation in which we have successive EPA administrators

50

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

whose careers have been spent attacking environmental protection. We are led by people who want to increase fossil fuel use, and view environmental regulations, as has been described here on the floor, as business impediments.  We have been removed from the Paris Climate Accords and we follow an American -- America First Energy Plan that relies more on combustible fossil fuel -- fuels and repeals the Climate Action Plan.  There will be more drilling in our national parks and offshore, and this same philosophy limits the EPA's mission of protecting air and quality.

I am not a follower of that political philosophy; in fact, quite the opposite.  These are the words on which I would rely:  *The Earth will not continue to offer its harvest except with faithful stewardship.  We cannot say we love the land and then take steps to destroy it from use by future generations.*  Those are words of Pope John Paul II.

I want to thank the sponsor of this and everyone else who fights to protect our land and the State of New York.  And the State of New York must, again, have the responsibility of leading the way and by voting for this we will -- we will take that step.  I am delighted to vote in the affirmative and appreciate the opportunity to speak on this subject.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Lavine in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

**NYS ASSEMBLY**                                   **APRIL 30, 2019**

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, if we could go now to Calendar No. 183, it's on page 16 [sic], by Ms. Hunter.

ACTING SPEAKER AUBRY:  The Clerk will read.

THE CLERK:  Assembly No. A02286, Calendar No. 183, Hunter, Colton, Thiele, L. Rosenthal, Rozic, Quart, Lifton, Dinowitz, Lupardo, Zebrowski, Paulin, Gottfried, Mosley, Galef, Jean-Pierre, Ortiz, Steck, Abinanti, De La Rosa, Weprin, Carroll, Solages, Glick, Lavine, Seawright, Epstein, Peoples-Stokes, Rodriguez, D'Urso.  An act to amend the Environmental Conservation Law, in relation to water saving performance standards.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect January 1st, 2022.

ACTING SPEAKER AUBRY:  The Clerk will record the vote.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs.  Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, if we could now go to page 20 and take up Calendar No. 207 by Mr. Englebright, and Calendar No. 209 by Mr. Englebright, as well.

52

**NYS ASSEMBLY**                              **APRIL 30, 2019**

ACTING SPEAKER AUBRY:  The Clerk will read.

THE CLERK:  Assembly No. A06296-A, Calendar No. 207, Englebright, Gottfried, Dinowitz, D'Urso, Fernandez, Carroll, Griffin, Quart, Colton, L. Rosenthal, Otis, Galef, Ortiz, Stern, Thiele, Jaffee, Romeo, Lifton, Reyes.  An act to amend the Environmental Conservation Law, in relation to regulation of toxic chemicals in children's products.

ACTING SPEAKER AUBRY:  Mr. Englebright, an explanation is requested, sir.

MR. ENGLEBRIGHT:  Yes, thank you, Mr. Speaker. This measure would help to protect the children of our State in their formative years.  Children are much more vulnerable to exposure of harmful chemicals than they are in their later years.  So, between the time of birth and the age of 12, this bill would address harmful chemicals and products that are sold for use by children and require the Department of Environmental Conservation to prepare two lists; the first being to post a list of chemicals of concern; and secondly, a list of dangerous chemicals, chemicals more dangerous than just of concern.  And this would be placed on its public website within 180 days passage.  And they would also consult with the Department of Health, and periodically review such lists.

ACTING SPEAKER AUBRY:  Mr. Goodell.

Oh.  Mr. Stec.

MR. STEC:  Thank you, Mr. Speaker.  Would the sponsor yield, please?

53

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

ACTING SPEAKER AUBRY:  Would you yield, Mr. Englebright?

MR. ENGLEBRIGHT:  I yield.

MR. STEC:  All right.  Thank you.  Thank you, Mr. Speaker, thank you, Chairman.  We've -- we've debated this bill in the past, and like many other bills, you know, I -- I've got some concerns as to New York State going it alone.  Do you know -- I assume that there'll be a cost, right?  There'll be more work for the Department of Environmental Conservation if they're going to start duplicating and replicating the level of efforts that the Federal government does in keeping us safe with chemical -- from chemicals.  Do you have an idea of what that financial impact to the State's budget and the Department of Environmental Conservation may be?

MR. ENGLEBRIGHT:  Manufacturers would be required to report as a fundamental expectation of this as law.  They would pay for that.  This would not be paid for by the taxpayers.

MR. STEC:  So, this -- there will be no cost to the taxpayers to enforce, to collate and create a database and send people to verify and audit and -- and then bring to task anyone that's not following the law?  There'll be no cost?

MR. ENGLEBRIGHT:  There is no new costs imposed.  Just like the drug take-back program, enforcement will result in fines being paid.  There needs to be personnel within the agencies who do their normal jobs.  But, do we have to create a whole new bureaucracy?  No.  And the reports are paid for by the industry.

54

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

MR. STEC:  All right.  I could've sworn that in 2016 on debate, Mr. Goodell had asked you about the cost, and you had talked about that there's a -- a small fee.  In fact, you were almost apologetic in mentioning it because it was admittedly pretty small that -- that producers would pay into this.  But I don't recall a discussion that we didn't anticipate any cost to the taxpayers.  Is there -- is this bill the same as it was in 2016?

MR. ENGLEBRIGHT:  Your memory is quite excellent.  We --

MR. STEC:  Can I get a note -- can I get a note to that effect for my wife?

MR. ENGLEBRIGHT:  Yes.  I'd be happy to give you a hall pass, also.

MR. STEC:  Thank you.

(Laughter)

MR. ENGLEBRIGHT:  I'd be...

MR. STEC:  Whoa.

(Laughter)

MR. ENGLEBRIGHT:  All joking aside, your memory is excellent, and you do remember correctly.  We have changed the bill, based in part upon the concerns you raised in that earlier debate.  The new bill has been amended to more clearly conform to chemicals listed in other states and streamlined the list of dangerous chemicals.  And we've also removed antimony and cobalt, modified the initial dangerous chemicals that are subject to the sales

NYS ASSEMBLY                              APRIL 30, 2019

prohibition.  And importantly to your specific concern, modified the
fee structure to specify the fees must cover the reasonable costs of
administration and enforcement by the DEC.  Among other changes
that are consistent with what I've just stated.

        MR. STEC:  So, thank you for that.  All right.  So, we
aren't anticipating any additional cost to the taxpayer [sic].  Would it
surprise you to learn that the Federal budget for chemical management
is over $200 million annually?  I mean, I -- I would think if they're
expending $200 million to do this, would -- would that cost us more --

        MR. ENGLEBRIGHT:  I -- I would not be surprised
to learn that at the Federal level that there is direct cost of
management.  That's not what this is.

        MR. STEC:  Right.

        MR. ENGLEBRIGHT:  This is informational and
regulatory, but it is not a product management initiative, per se.

        MR. STEC:  And -- and again, just so that I'm crystal
clear.  So, you do not anticipate DEC requiring any additional funding
or specifically staff to enforce, to track, to collate and organize all the
-- I mean, there's -- there's tens of thousands of chemicals that --

        MR. ENGLEBRIGHT:  As you know, each year, my
first question to the Commissioner is, do you need more staff?

        MR. STEC:  I love that question.

        MR. ENGLEBRIGHT:  And I -- I think you will
recall that the Commissioner says he does not need any more staff.
You and I both have spoken privately about whether that is a credible

**NYS ASSEMBLY**                                **APRIL 30, 2019**

response --

        MR. STEC:  It's a job security --

        MR. ENGLEBRIGHT:  It is a job security response, no doubt.

        MR. STEC:  And I kid the Commissioner about that. But I understand the position we put him in when we ask him that question.

        MR. ENGLEBRIGHT:  But we -- we have found it very difficult to get any other response, no matter who the Commissioner is, and no matter who the Governor is.  This just seems to be part of some sort of... of a question and answer... convention at this point, a conventional-type of response.  I would like to see, as I suspect you on the need -- days also would like to see the agency made more robust and more capable --

        MR. STEC:  Well, we agree there.

        MR. ENGLEBRIGHT:  But when the Commissioner says no, I don't need any more help, we have in the past tried to put money in the budget to -- to give additional support to the possibility of people being hired.  And what has happened is that we get laughed at by the Division of Budget, they just take the money and lay it aside, and we do not see the agency gain in -- in its number of positions or its effectiveness.  It's a frustration that both you and I and many of the other members here experience, not just with this department, but in the -- the general dance that we call the budget.

        MR. STEC:  I know that the last time we debated this

on the floor was 2016.  But the bill, I believe, is approximately ten years old.  It's --

MR. ENGLEBRIGHT:  I believe it is, yes.

MR. STEC:  Have -- have any of the Assembly one-House budgets included funding in the past to -- I mean, I won't ask you ten years ago, but the last -- this year's one-House budget -- or last year's one-House budget, did the Assembly try to set aside any funding to implement this?

MR. ENGLEBRIGHT:  Well, I don't think that we have anticipated any costs, for the reason I stated a moment ago.

MR. STEC:  Fair enough.

MR. ENGLEBRIGHT:  But I would also note that the Governor had a version of this bill in his proposed Executive Budget.  He did not associate any additional expenditures with that proposal that he had put into the budget.

MR. STEC:  All right.  Thank you.  Thank you very much, Chairman.

MR. ENGLEBRIGHT:  You're welcome.

MR. STEC:  On the bill.

ACTING SPEAKER AUBRY:  On the bill.

MR. STEC:  Thank you, Chairman -- or thank you, Mr. Speaker.  As I mentioned in previous debate a couple bills ago on the -- regarding the amendment similarly, there isn't a soul in New York State that doesn't want child products to be safe.  The children that are in contact with things that their parents or adult care providers

NYS ASSEMBLY                                    APRIL 30, 2019

are giving them on a daily basis to keep them safe, sleep in, eat, play

with, we -- we want those products to be safe.  I mean, hopefully, that

goes without saying.  I don't think there's anyone in this Chamber,

certainly, that would disagree with that.  Flip side, however, it is,

again, to suggest that New York State and the Federal government has

been derelict in its duties -- I mean, the EPA and the Consumer

Product Safety Commission, these are robust entities tasked with this,

given the technical expertise, the staffing, the budget resources to

chase us down and set us -- notwithstanding the argument that there's

a lot of value in being consistent from coast to coast within our nation

as to what products can use what chemicals where.  I mean, can you

imagine a manufacturer of a crib or a -- or a -- or a bottle or a toy that

has to shut down and shift over because now we've got to make the --

the New York version of this product, and then we got to make the

California because California's got to be one better than New York, so

we've got to make the California version.  And then who's going to

pay for those changeovers, that cost?  The consumers will pay for that.

So, I hope we all agree that we want products to be safe and hopefully

we all agree that we already have a pretty robust system in place for

that.

                   With that said, New York does not have the -- a good

reputation for business climate, for the cost of doing business, the

certainty of doing business, knowing that the rules aren't going to

change, the football isn't going to be yanked away, you know, like

Lucy and -- and Charlie Brown right before -- and this is big dollars

NYS ASSEMBLY                                    APRIL 30, 2019

and this is tens of thousands of jobs.  One of the biggest employment

sectors in manufacturing in New York has been the chemical -- the

chemical sector, and we went from fifth to eighth in the country.  We

are losing ground.  We are losing share.  We are not producing.  Why?

Is it because all of a sudden Americans aren't consuming these

products?  No.  They're being -- companies are selecting to make them

elsewhere.  So, are we now encouraging manufacturers that might be

in New York to say let's leave New York, let's go set up shop where

there's less oversight and there's less hassle and less cost, and maybe

also with that comes less safety.  I'm concerned with our State's ability

to enforce this at no cost to the taxpayer.  I am concerned as to

whether or not we will really achieve any added safety.  I'm not aware

of data that says that there is a chemical safety problem that's rampant

in our country that the Federal government has ignored for decades

and that New York is going to ride to the rescue and correct it all by

itself.  So, like I said, while I certainly appreciate the sponsors' and

supporters' opinions on -- on the importance of child product safety,

again, I think if there's an analysis done on this as to bang for the

buck, is this -- get the job done?  Does this make any children safer

versus the cost of that?  The analysis involved merely identifying a

chemical versus what is the actual risk or hazard associated with the

chemical being in that product.  What happens to the product if we

remove that chemical and all -- and substitute an alternate that isn't on

a list somewhere?  Maybe in some ways now that chem -- that product

is less safe or much more expensive.  So, again, for these reasons I

NYS ASSEMBLY                              APRIL 30, 2019

think that there's a reason why this bill didn't get out of the Senate in the past.  I suspect that that may change this year.  But, with that said, those are my concerns, and I will be voting against this bill.  Thank you.

ACTING SPEAKER AUBRY:  Thank you, Mr. Stec. And your prognostication is true.

On a motion by Mr. Englebright, the Senate bill is before the House.  The Senate bill is advanced.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  Would the sponsor yield?

ACTING SPEAKER AUBRY:  Mr. Englebright, will you yield?

MR. ENGLEBRIGHT:  I yield.

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. GOODELL:  Thank you, Mr. Englebright. Other states have adopted similar language, the European Union has similar provisions under their REACH program, but many of those other programs have exceptions for de minimis amounts of chemical. Does this bill have an exception for de minimis amounts of a chemical?

MR. ENGLEBRIGHT:  We're aware of the trace contaminant conundrum in terms of how to define boundaries and standards and -- and defying standards.  We are not done with this issue simply by passing it here today.  In days to come we are working

61

NYS ASSEMBLY                              APRIL 30, 2019

on an amendment that will specifically address trace amounts of contaminants, and it will compliment this measure that we're about to vote on here today.

MR. GOODELL:  And I appreciate that initiative and I think it's a valuable initiative to -- to pursue, excluding trace elements or de minimis amounts, as most of the other states, and certainly the European Union have already done.

Another question:  Does this bill exclude components that are inaccessible?  As you know, the outside of a toy is obviously very accessible, but many toys also have components within the toy that are inaccessible to a child.  Does this exclude any chemicals that are inside the toy that are inaccessible to a consumer?

MR. ENGLEBRIGHT:  It does not specifically address what you are asking about.  But, then again, children are little geniuses sometimes -- often actually, and can unexpectedly defeat the safety mechanisms. For example, some toys in the past had magnets in them and were supposedly embedded in such a way that they were completely inaccessible.  And after several children managed to extract the magnets and swallow them, and in some cases die from their ingenuity, it became clear that putting magnets in children's toys was not a great idea.  Similarly, we do not have exclusions here because we believe that our children are ingenious and unpredictable. And so we caution thinking that we can outsmart them, and instead, anticipate that there is a need to be safe rather than sorry.

MR. GOODELL:  Isn't there a TV show like that, *Are*

NYS ASSEMBLY                                        APRIL 30, 2019

*You Smarter Than a... whatever child?*  But, getting back to this bill. Am I correct, though, that other State Legislatures have moved in this direction have excluded components?

MR. ENGLEBRIGHT:  Some have.  There are a number of states that have adopted similar - I'm glad you brought this up - have adopted similar laws.  I would point out that those states are prospering.  California comes to mind, has passed a similar law, has not suffered a collapse of its business activities.

MR. GOODELL:  Did they have de minimis --  did they have --

MR. ENGLEBRIGHT:  -- State of Washington, the State of Connecticut, Minnesota and Maine also have passed similar measures.

MR. GOODELL:  But those -- those states did have broader list of exceptions, right?  I meant, all those states had broader lists of exceptions.  Correct?

MR. ENGLEBRIGHT:  I am not a student of all of those other states' laws in great detail.  I understand that they vary from state to state.  I don't know that we have the ability to compare other states, but I am reminded from previous debates with yourself that it is not something that we wish to reference in our own State law here in New York.  So, I'm learning and --

MR. GOODELL:  And I appreciate that.

MR. ENGLEBRIGHT:  -- sometimes I acknowledge you are a very good teacher.

63

NYS ASSEMBLY                                APRIL 30, 2019

MR. GOODELL:  I looked specifically for that in this legislation and appreciate that you've made some of those changes.

One other question I think -- and that is, there are, of course, a number of Federal statutory provisions that relate to this: The Lautenberg Chemical Safety for the 21st Century Act, the Toxic Substances Control Act, Consumer Product Safety Improvement Act, to list a few.  Of course, our own DEC has broad statutory authority. Is it your position that neither the DEC nor the Federal government with their multiple statutory frameworks and the $200 million budget are adequately protecting the children of this nation?  And in particular, our children?

MR. ENGLEBRIGHT:  Well, the first thing to note is that we are not preempted by the Federal government.  The Federal government that we have currently seems to be trying to return to a time when there was less protection for the public.  And it does fall to the states, in particularly to this great State as a leader in our nation to act to protect the people of New York, and by example, other states as well.  The -- the measures that you mention in particular, please note that the Federal government under the TSCA, the Toxic Substances Control Act, did not ban any chemicals, not even asbestos.  Asbestos, as I'm sure you know, is very harmful, has created a great deal of -- of harm in body products, such as talcum powder causing ovarian cancer.  Having that in -- just give this example, in toys, is something that we certainly don't want our children chewing on or being exposed to the dust of -- if the -- if the asbestos is, for example, contained in an

64

NYS ASSEMBLY                              APRIL 30, 2019

adhesive that is holding together some of the parts of a toy.  So --

MR. GOODELL:  But there are multiple Federal statutes.  And so the fact that it might not have been precluded under the Toxic Substance [sic] Act doesn't mean it wasn't addressed in a Consumer Product Safety Act or in any of the other provisions.  I mean, it's not lawful --

MR. ENGLEBRIGHT:  We don't have any bans --

MR. GOODELL:  -- to have asbestos --

MR. ENGLEBRIGHT:  We don't have anything --

MR. GOODELL:  -- viable asbestos toys --

MR. ENGLEBRIGHT:  -- satisfactory.  And I would also point out that when we're dealing with our children, if we are redundant, redundancy is good pedagogy.  Redundancy is good public safety.

MR. GOODELL:  Now, I note that there are some components of children's toys that are expressly excluded, and there's a whole category of potential children toys that are excluded from this legislation.  For example, all the batteries, which are filled with toxic material, they're excluded.  And all electronic consumer electronic products are excluded.  All of which are probably the source of the largest amount of toxic materials in any children's toys.  Why is it we exclude from coverage all the most obvious toxins that are readily available in batteries and consumer electronic products?

MR. ENGLEBRIGHT:  Because no single measure can be complete and perfect.  But the search for the perfect should not

65

NYS ASSEMBLY                                    APRIL 30, 2019

work against our efforts to produce the good.  I believe that we can produce good law here today and return in the fine grain need as we go forward of amending this law and adding to it to cover those topics that it may, in its initial passage, not be able to include.

MR. GOODELL:  Now, I appreciate very much your comment that there are amendments coming.  Would you recommend we table this until those amendments are available?

MR. ENGLEBRIGHT:  No, I would recommend that we proceed; that we pass this today, as the Senate has already done; that we then return to a conversation as to adequacy, which is the thrust of your concerns.  And I -- I respect those concerns.  And we'll continue to work on this going forward until we get it right in every way.

MR. GOODELL:  Thank you so much, Mr. Englebright.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, Mr. Goodell.

MR. GOODELL:  I certainly appreciate my colleague's comments.  And we all, of course, want safe toys for our children, which is why children's toys are so extensively regulated on the Federal level and even on the State level.  And I very much appreciate my colleague's comments that amendments are forthcoming to make this bill more reasonable by excluding de minimis quantities or trace quantities, which are very important to --

66

NYS ASSEMBLY                    APRIL 30, 2019

to exclude, because they don't pose any harm.  I would hope that
future amendments also consider inaccessible parts so that our
exclusions are similar in scope and quantity as all of our other states,
so that we, once again, do not distinguish ourselves as having the most
onerous regulations that other states have changed when they realized
there was a problem with.  We should follow their lead and -- and I
look forward to those amendments.  Although my normal instinct
would be to make a motion to table, I don't want to slow us down
from our rush to pass legislation that we anticipate we'll need to
amend.  I anticipate, with a little luck, I'll be supporting the
amendments, but until it's amended, I will not be supporting this bill
and urge my colleagues to vote against it.  Thank you very much, Mr.
Speaker.

    ACTING SPEAKER AUBRY:  Read the last section.

    THE CLERK:  This act shall take effect March 1st,
2020.

    ACTING SPEAKER AUBRY:  The Clerk will record
the vote.

    (The Clerk recorded the vote.)

    Mr. Ortiz to explain his vote.

    MR. ORTIZ:  Thank you, Mr. Speaker, for allowing
me to explain my vote.  I would like to really congratulate the sponsor
of this bill.  This bill has been around for a while.  It's about time that
we protect our children and we give our children the opportunity to be
safe and to buy toys and equipment that will be free from toxic

NYS ASSEMBLY                                    APRIL 30, 2019

chemical.  I think they -- finally the day has come where we have a

helping hand on the other side of the aisle in the Senate where they

already have moved this bill forward.  I know we will be waiting for

an amendment, Mr. Speaker, but I would like to also thank the

Speaker and all those who have managed to work, all those advocate

that year after year have come to Albany to advocate on behalf of this

particular piece of legislation which I have been managed to be part of

it.  So, today's a great day for the State of New York join other six

states.  So, I hope that we continue to do what is right on behalf of our

children and to make sure that we continue to protect our children that

anything that they touch, that anything go to their mouth is safe

without toxics and chemical.  Therefore, Mr. Speaker, I am

withdrawing and I will be voting in the affirmative.

        ACTING SPEAKER AUBRY:  Mr. Ortiz in the

affirmative.

        Mr. Englebright.

        MR. ENGLEBRIGHT:  Mr. Speaker, rarely do we

get an opportunity to take such a definitive step to protect the most

precious asset of our State, our children.  They are the future.  They

are our hope for everything in our lives and to have them exposed to

poisons, substances, to harmful materials as they -- as they play is a

sin.  We have a measure before us that as Mr. Ortiz has already

indicated, we have worked on as a Conference for many years.  We're

about to take the step because I see that it has passed in the Senate, the

step to send this to the Governor's desk and thereby better protect the

NYS ASSEMBLY                                    APRIL 30, 2019

next generation and the future of our State.  I very proudly vote yes.

ACTING SPEAKER AUBRY:  Mr. Englebright in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A06600, Calendar No. 209, Englebright, Gottfried, Fahy, D'Urso, Ortiz, Simon, Zebrowski, Weprin, Glick, Lifton, Otis, Griffin, Epstein, Colton, L. Rosenthal. An act to amend the Environmental Conservation Law, in relation to designating certain species as vulnerable species and prohibiting the sale of articles made from such vulnerable species; and to require the Department of Environmental Conservation to designate the giraffe as a vulnerable species.

ACTING SPEAKER AUBRY:  Mr. Goodell.

MR. GOODELL:  Would the sponsor yield for some questions?

ACTING SPEAKER AUBRY:  Mr. Englebright, will you yield?

MR. ENGLEBRIGHT:  I yield.

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. GOODELL:  Thank you, Mr. Englebright.  I note that this bill sets up a New York State Vulnerable Species Provision that makes it illegal to sell or possess with the intent to sell of certain vulnerable species, correct, or components of them?

69

NYS ASSEMBLY                                APRIL 30, 2019

MR. ENGLEBRIGHT:  That is correct.

MR. GOODELL:  And, of course, the components would all be whatever by-products or trophies or something made of the animal after it's no longer alive.

MR. ENGLEBRIGHT:  Any parts of these species or the entire animal unit or plant unit would be covered.

MR. GOODELL:  And this would apply even though the animal was killed in a different country?

MR. ENGLEBRIGHT:  Yes.

MR. GOODELL:  And even though it may be lawfully hunted in the other country?

MR. ENGLEBRIGHT:  That is correct, but it --

MR. GOODELL:  So New York State is saying that we don't care what the foreign country believes is appropriate, you can't hunt in that foreign country and bring it back if you have an intent to sell or possess --

MR. ENGLEBRIGHT:  Our reach is only within our own State.

MR. GOODELL:  Correct.

MR. ENGLEBRIGHT:  It deals only with the -- the possession in this State of -- along with the intent to sell or trade on that item.

MR. GOODELL:  Now, I note that there are certain exceptions for articles that involve protected species, correct?

MR. ENGLEBRIGHT:  There are restrictions.

70

NYS ASSEMBLY                                  APRIL 30, 2019

MR. GOODELL:  But there's also exceptions.

MR. ENGLEBRIGHT:  There are exceptions.  I would like, for example, to revisit this measure and explore the appropriateness in the future after doing some more consultation with experts in the field, but I believe that certain fish, certain shellfish and crustacea may warrant inclusion in the future.  We're going to study that.

MR. GOODELL:  One of the questions I had on the exception, you exclude, of course, antiques, but you define "antiques" as those that were created prior to 1919.

MR. ENGLEBRIGHT:  Correct.

MR. GOODELL:  A hundred years old.  Most antiques don't come with a date stamp, so I'm not quite sure how we establish that, but -- but stepping aside from that technical issue for a minute, not all species have been in limited number throughout their history and, in fact, this specifically references a precipitous decline in the number of species over a ten-year period as one of the qualifying aspects, right, to be identified as a protected species?

MR. ENGLEBRIGHT:  That's -- that's correct, but regarding --

MR. GOODELL:  So my question is --

MR. ENGLEBRIGHT:  -- the -- the question of antiquity, part of our reach in this bill is to include provenance --

MR. GOODELL:  I'm --

MR. ENGLEBRIGHT:  Provenance; site of

71

NYS ASSEMBLY                                    APRIL 30, 2019

origination, if you will.  So, knowledge about where this originates

gives us a handle on how old a particular artifact may be.  Also, the

measure specifically authorizes bona fide museums that are certified,

not -- not sales outlets on the side of the street that call themselves

"the Main Street Museum" or something, but, in fact, bona fide

museum institutions.

MR. GOODELL:  Now, I note that -- I guess my

question before I leave the "exception".  If a species was plentiful ten

years ago and is now vulnerable because of a 30 percent drop in

population, why should it be illegal to sell or possess with the intent to

sell products from that species when that was -- that was created

lawfully under both the laws of New York, the Federal laws, the home

country laws, at a time when the species was plentiful.  Shouldn't the

exception kick in only when the species is no longer plentiful or when

it's at risk of becoming vulnerable?

MR. ENGLEBRIGHT:  We have as our model

legislation now law that we passed relating to ivory.  We don't want to

wait until the particular species is so far depleted that it, in fact, is

eligible to be listed as endangered.  This is intended, in fact, to

anticipate and notice patterns of population decline or excessive

market interest in the parts and skins and horns and teeth of -- of these

animals.  We would note that worldwide, most major vertebrates have

undergone between a 40 and 60 percent decline in their populations.

In some cases, this is because they are being poached.  Again, it's

outside of the reach of New York State to be able to dictate to these

NYS ASSEMBLY                                    APRIL 30, 2019

other parts of the world how they should manage their wildlife populations, but in this State, we believe it is important not to accelerate the marketability of, for example, giraffe skins from giraffes that have been machine-gunned.

MR. GOODELL:  Now, I note that we specifically exclude articles that are for a museum.

MR. ENGLEBRIGHT:  I'm sorry?

MR. GOODELL:  We exclude articles that are for museum.

MR. ENGLEBRIGHT:  Yes.

MR. GOODELL:  But we don't explicitly exclude zoos.  Is there a reason why we list museums and not zoos?

MR. ENGLEBRIGHT:  Well, zoos, that's covered under other law, trade and living organisms is not part of the -- of the reach of this bill.  We do not try to dictate to the zoos and botanical gardens and aquaria of this State through this measure.  I would point out, however, that the Environmental Protection Fund does fund the bona fide zoos, botanical gardens, aquaria and nature preserves of the State and this year we have $16 million in the Budget for these great institutions, which I am so pleased to say are all around our State, our Upstate areas from the Watertown Zoo, to the Bronx Zoo.  We have professionals and we are maintaining high levels of professionalism that set the standard for the world here in New York State.

So, I'm not as worried about the bona fide zoos, the botanical gardens and aquaria and nature preserves as I am about the

73

NYS ASSEMBLY                                      APRIL 30, 2019

trade of body parts that otherwise, for animals that are undergoing

significant population depletion should be on the watch list and should

be something that our Department of Environmental Conservation

attends to.

MR. GOODELL:  Thank you very much, Mr.

Englebright.

MR. ENGLEBRIGHT:  You're -- you're quite

welcome.

MR. GOODELL:  On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the bill, Mr.

Goodell.

MR. GOODELL:  I appreciate the comments of my

colleagues and the desire to reduce the trade in articles that are made

from animals that are endangered or are suffering a substantial loss in

population.  I think it's a laudable goal and one -- a goal I certainly

support.  I would suggest, however, that the more appropriate

response would be to have a bill that applies prospectively from the

date we adopt it or from some designated date rather than apply it

retroactively back a hundred years.  And the problem is when you

apply it retroactively back a hundred years, there are people within our

State that may have valuable -- I mean, very, very valuable items that

were articles that included species that are now endangered, but were

not in any way endangered at the time the article was created.

And so, we certainly want to play a positive role in

discouraging and cutting back on poaching or efforts to kill any

74

endangered species going forward, but there are Constitutional issues on due process and taking of property when we are, in effect, passing a law retroactive that goes back a hundred years and says even though you have a valuable item that you acquired lawfully at a time when the species was not endangered, unless you did so a hundred years ago, which would make me even older than I am now, you cannot sell it in New York State.  So, I -- I support the sponsor's desire as it relates to moving forward, but I think the law, for Constitutional reasons and otherwise, should be prospective and not retroactive going back an entire century.

    Thank you so much, sir.

    ACTING SPEAKER AUBRY:  On a motion by Mr. Englebright, the Senate bill is before the House.  The Senate bill is advanced.

    Mr. Daniel Stec.

    MR. STEC:  Thank you, Mr. Speaker.  Would the sponsor yield, please?

    ACTING SPEAKER AUBRY:  Mr. Englebright, will you yield?

    MR. ENGLEBRIGHT:  I yield.

    MR. STEC:  Thank you, Mr. Chairman.  Cost to DEC to implement this; any idea?  This is law enforcement.  There's got to be a cost here somewhere.

    MR. ENGLEBRIGHT:  We don't anticipate any significant or even measurable new cost because the Department

NYS ASSEMBLY                                   APRIL 30, 2019

already regulates threatened and endangered species.  So, vulnerable

species, those in, if you will, in the run-up to becoming threatened or

endangered, would just be a natural addendum to lists that are already

maintained.

           MR. STEC:  All right.  Thank you.  Now, again, I

notice the Federal government has, for decades, done a good job

enforcing endangered species and threatened species list,

management, laws.  New York State has found additional wisdom and

we're going to go an extra step and now we are going to take it on

ourselves to empower the DEC and create a new list, a vulnerable list?

           MR. ENGLEBRIGHT:  Well, actually, I respectfully

decline to accept that the Federal government has done a terrific job.

           MR. STEC:  All right.

           MR. ENGLEBRIGHT:  If they had done a terrific

job, the great elephants of Earth would not have become as

endangered as they are; it would not have necessitated this Body to act

earlier to protect them.  We don't want to see that same lack of Federal

effectiveness visited upon other great species that grace our planet and

so we are, in a manner similar to what has previously been done for

elephants and ivory, we are putting forward this measure to hopefully

prevent.  This is a bill to prevent extinction and prevent the loss of

these species.

           MR. STEC:  Do you disagree that this is duplication

of efforts in many ways, that the Federal government is doing?

           MR. ENGLEBRIGHT:  No; no, not at all.  This is

NYS ASSEMBLY                                    APRIL 30, 2019

something that I wish the Federal government had done.  I wish all of

the other states -- I wish we were last in taking this issue on, but the

great Port of New York and the great border to the north of our -- of

our State with the Nation of Canada are both vulnerable to trade in

animal parts and plant segments that if we do not act to prevent them

from being part of the market that New York is with our great

population, we are likely to see many more species become actually

listed as endangered and threatened.  Once they are endangered, for

many of these species the point of no return has been crossed.  The

thrust of this measure is to prevent us from being at the threshold of

extinction.

             MR. STEC:  Would you agree, though, that, you

know, certainly a population of 19 million versus a population of 320

million, that certainly efforts in this regard would have a -- move the

needle more significantly if they were done at the Federal level as

opposed to how -- how big an impact on the giraffe population is this

law going to have only in New York?

             MR. ENGLEBRIGHT:  I believe that New York

always is noticed when it does responsible law, that it is emulated,

that it stimulates conversations within the law enforcement

community that lead to a wider acceptance of their potential, very

effective role in protecting wildlife.  I believe that this is well beyond

just symbolic.  I know that we can't directly address China, I think that

may be the nation you were referring to, but we can set a new

expectation and new international standard simply because we are the

Empire State.  We are the great State of New York and we do set national standards and global expectations.

MR. STEC:  The statistics in the memos and in the research on the giraffe is alarming.  From 1985 to 2015, the giraffe population declined 36 to 40 percent; that is truly alarming.  Is it fair to say that this is the -- the main thrust of the bill or the -- the first or the largest or most concerning species, and the follow-up question to that would be how many other species are likely to be on this list in its early stages?

MR. ENGLEBRIGHT:  All of the major mammal species of Earth have undergone precipitous decline in the last decade.  I only wish that we could say that this is going to be a short list.  The giraffes are only emblematic, they only suggest the beginning of what we really need to -- to confront.  But I can't tell you, because we -- we at this moment only really have a couple of international lists that we're working off of, they no doubt will be refined going forward.

MR. STEC:  Now in the past years, I can think of two examples where this Chamber and I believe the entire Legislature considered and passed legislation specific to species, namely sharks and shark fin, and then ivory, elephant ivory as stand-alone pieces of legislation.

MR. ENGLEBRIGHT:  Right.

MR. STEC:  Now -- so I guess my question here would be, why would we, as a Legislature, want to empower the DEC to generate the list, whereas we've had no problems coming up with

NYS ASSEMBLY                                    APRIL 30, 2019

our own as needed.  We identify, we control its destiny and -- because I'll forewarn you, my follow-up question is if we can't -- if we need an all-encompassing bill for these prospective lists that we might have, then why, in God's name, do every June we sit down and do dozens of fish bills?  Why don't we let DEC handle those?

MR. ENGLEBRIGHT:  You've asked several questions, let me first address the question of why are we putting forward a measure that empowers the Department to use best available information to protect numerous species.  And the reason is because the crisis is so severe that if we, as a Legislature, tried to do that on a species-by-species basis, it would leave us no time for anything else.  That's how serious this issue is.

MR. STEC:  We could make that time up on these non-controversial annual fish bills that we --

MR. ENGLEBRIGHT:  But the fish bills -- the second part of your question, the fish bills are direct species of our State within our territorial waters of New York State that we manage and we need to make sure that our management oversight is as complete as possible, because the fate of our fishing industries and many jobs and the well-being of many of our coastal communities depend upon our efficient oversight.  So, our oversight function of species native to New York that are commercially, by definition, commercially fished, is very different from species that have no commercial purpose except for exploitation of their body parts.  It's very different and they're not part of -- in many cases, not part of the

79

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

natural ecosystem of New York.

MR. STEC:  Well, I appreciate your answers.  I don't have a big issue with this bill, but I wanted to make this point about the fish bills versus -- I respectfully don't share the same conclusion as you.  I think that because the fish bills are noncontroversial, they don't get debate and they do clog up -- I mean, there are dozens of them every year, that I have no problem doing them as an omnibus; we do many other things like that around here, and that would still be us.  I mean, you know, we could do those as an omnibus, it would be our control.  I just -- it struck me the difference of our willingness to let DEC generate this other list by themselves in comparison to how we do the fish bills here.  I thought it warranted making a remark on.  I'm not losing sleep over it, but maybe it's something to consider.  But, on the bill itself, I'm not -- I'm not overly concerned, I just wanted to ask those questions.

Thank you, Mr. Chairman.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

80

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

MRS. PEOPLES-STOKES:  Mr. Speaker, if we could now complete our work today on the Earth Day projects with Calendar No. 186, it actually is located on page 16.

ACTING SPEAKER AUBRY:  The Clerk will read.

THE CLERK:  Assembly No. A02477-B, Calendar No. 186, Englebright, Gottfried, Glick, Lifton, Peoples-Stokes, Jaffee, Thiele, D'Urso, Cahill, Galef, Lavine, Zebrowski, Steck, Seawright, Mosley, Simon, Rivera, Santabarbara, Pichardo, Otis, Fahy, Colton, Rozic, Weprin, Abinanti, L. Rosenthal, Simotas, Ortiz, Epstein, Reyes, Griffin, Carroll, Dinowitz.  An act to amend the Environmental Conservation Law, in relation to prohibiting the use of chlorpyrifos; and providing for the repeal of such provisions upon expiration thereof.

ACTING SPEAKER AUBRY:  On a motion by Mr. -- Mr. Englebright, the Senate bill is before the House.  The Senate bill is advanced.

Mr. Goodell?

An explanation is requested, Mr. Englebright.

MR. ENGLEBRIGHT:  Thank you, Mr. Speaker. This is an initiative to remove a dangerous poisonous substance from the environment that is causing harm to children, to pollinators, to everyone who comes in contact with this chemical.  The chemical is a derivative of -- it's called chlorpyrifos, it's a derivative of organic phosphate family of poisons which were originally developed to kill people in World War II.  This chemical entered our environment in

81

NYS ASSEMBLY                                    APRIL 30, 2019

1965.  There seems to be a strong correlation between its widespread
use and the incidents of declining IQ's among children, and a dramatic
drop in pollinators, which threaten our food supply.

              ACTING SPEAKER AUBRY:  Mr. Miller.

              MR. B. MILLER:  Will the Chairman yield?

              ACTING SPEAKER AUBRY:  Mr. Englebright, will
you yield?

              MR. ENGLEBRIGHT:  I yield.

              ACTING SPEAKER AUBRY:  Certainly.  Mr.
Miller, give us some base voice, there.  Thank you.

              MR. B. MILLER:  Thank you, Mr. Englebright.  I
know we've had many discussions on this organal phosphate; I'm not
going to try to say the chemical name, because I'll probably say it
wrong 12 times, but, you know, I was a -- I was an applicator, I was
an apple grower for many years and I understand this -- this pesticide
very well, being -- using it.  But, you know, I have a few questions
here.  Do we have an opinion from the DEC on the prohibition of -- of
this use?

              MR. ENGLEBRIGHT:  To the best of my
knowledge, no.

              MR. B. MILLER:  Is there any reason why the DEC
hasn't stepped in and gave us an opinion on it?

              MR. ENGLEBRIGHT:  Well, you're asking me to
speculate.  I can only say with certainty that no standards have been
set by the State, even though there is a clear scientific demonstration

82

of a need to address this.  It has been banned at the Federal level from use inside of homes, that goes back to 2000-2001 timeframe, and it was recommended to be banned by the last Administration in Washington.  This current Administration has a long history, in fact, of efforts by advocates to bring this to a decision at the Federal level that would exclude it from contacting our children.  There appears to be a lot of really good scientific basis for -- for that effort.  We were disappointed when Secretary of -- Secretary Scott Pruitt declined to follow the advice of the scientists of the Environmental Protection Agency.

So, again, it falls to the states to protect its citizens when the Federal government fails.  That redundancy in government is sometimes a source of frustration because of our levels of government being so numerous and expensive, I recognize that, but it is a failsafe; call it an insurance policy for the most fundamental part of being a citizen, which is to have good health.

MR. B. MILLER:  Okay.  With the -- with the prohibition -- prohibition of use indoors, we're talking about our children, our children being exposed to -- to this pesticide.

MR. ENGLEBRIGHT:  Chlorpyrifos, yes.

MR. B. MILLER:  Chlorpyrifos.  The exposure would be by drift, correct?

MR. ENGLEBRIGHT:  Exposure can be through any number of vectors.  Drift, as you rightly point out, is a real problem in farm country within the State, but so is exposure through food.  Most

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

of the exposure to children, in fact, other than farm families, is
through food.  Scientists have essentially warned that this is also
exceedingly dangerous.  This is a neurotoxin.  It basically affects the
IQ of developing brains in young children, in particular.  Even contact
with food such as oranges that have been treated with chlorpyrifos,
even if you take the skin off, sometimes the chlorpyrifos can be found
in the meat of the orange.  So, if you're a child and you're exposed to
this, it has a devastating effect.  We do not have any acceptable level
that has been able to be identified for human consumption.

And in the environment itself, you may appreciate
this as a member of the -- previous member, or perhaps current, of the
agricultural community, that there's a precipitous drop in pollinators.
One of the correlations that appears to be quite worrisome is the
presence in the environment since 1965 of a widespread use - it's only
that far back - and a correlating drop in European honey bee and other
pollinators that our farm communities depend upon for pollinating the
crops.  I know that that's a contradiction because farmers are not
unwise, but the use of this chemical appears to be unwise.  I should
also point out that in the farm communities of our State, there are
many, almost 200 farms that are organic and the organic produce, that
is to say unless they are next to a farm that causes drift to come over
and contaminate their product, the organic farms are in high demand.
And farmers from organic farms throughout the State support this ban.

MR. B. MILLER:  Okay.  We can talk about
pollinators, the organic phosphate, chlorpyrifos, is used before bloom

NYS ASSEMBLY                                    APRIL 30, 2019

and in the apple industry, it's used with a horticultural oil before half
inch green, okay. So, you know, the argument with harm of
pollinators, the agricultural community doesn't -- doesn't want the
extinction of pollinators, either. So, you know, we use this product
per label used as directed. But there's usually a -- but I guess, how do
you expect this bill to decrease the exposure of this pesticide? If this
is -- is voted on and passed and banned here in New York State, there
isn't any other state or country who ships produce or whatever to us.
You know, this is used on soybeans, this is used on apples, this is used
on just about any -- any produce out there, or any fruit. But if New
York State bans this, the only other state that has a ban on this is
Hawaii.

So, wouldn't we be putting our -- our agricultural
community at a severe disadvantage? Because we're talking about a
2021 ban on -- on applying this -- this pesticide. And, you know, and
the EPA is going to look at this again in 2022, on October -- October
1st.

MR. ENGLEBRIGHT: Well, they're required by law
at the EPA to revisit this at that date. Certainly, Scott Pruitt should
have acted differently. He had no scientific basis, none of the
recommendations that came out of the scientific community or his
own agency's scientists would have suggested that he should have
acted the way he did. That notwithstanding, again, it falls to the
states. Many of the states, you mentioned Hawaii, that have been
watching this and not trusting the Federal government to do the right

85

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

thing have acted independently already.  Hawaii, as you mentioned --

        MR. B. MILLER:  Hawaii is the only state.

        MR. ENGLEBRIGHT:  -- has a huge pineapple industry and other tropical fruits, and California has severely restricted this.  But many of the other states, including this one, have waited. We knew that the evidence was accumulating that should have led to a decision at the Federal level which would have applied to all of the states; that didn't happen for reasons that we can only speculate.  They seem to be unwholesome reasons rather than wholesome ones, but we would have to have a separate debate about that.

        MR. B. MILLER:  Well, that's an opinion.

        MR. ENGLEBRIGHT:  What is clear is that it's time for New York to act, and we are trying to act in a responsible manner. Apple trees, for example, in the way that we have this crafted, would be able to -- they can't spray after 2021, they would have to apply to probably by brush to the trunks of the trees.  That, however, is a measure that still is not satisfactory.  We believe that this extraordinarily water soluble and toxic chemical will still find its way into produce.

        So, this is a first step, an important step.  What's at stake is really a choice between the health of our children, particularly the youngest among us, and the continued convenience of a -- of use of a chemical that is relatively new to the market, 1965 wasn't so long ago.  So, we've had all of the benefits of apple production and other fruits and vegetable production for many years in this State for several

NYS ASSEMBLY                                    APRIL 30, 2019

centuries that did not rely upon the use of chlorpyrifos.

MR. B. MILLER:  Well, it's not just an apple product. You know, we talk about how to apply this to the trunks of the trees. It's sprayed on and it's not just applied to the trunks of the trees, it's applied to the whole tree.

MR. ENGLEBRIGHT:  It's not an aerial spraying.

MR. B. MILLER:  It isn't?  Well, it's not a --

MR. ENGLEBRIGHT:  It shouldn't be.

MR. B. MILLER:  Well, it's not a helicopter, it's an air blast sprayer pulled behind your tractor, so it is an aerial spray.

MR. ENGLEBRIGHT:  Well, in which case I question what you inferred a moment ago, which was that there would be no damage to pollinators.

MR. B. MILLER:  Well, if you --

MR. ENGLEBRIGHT:  So, it was my understanding and thank you for giving me more information --

MR. B. MILLER:  But it's not used --

MR. ENGLEBRIGHT:  -- but it was my understanding that this would be very neatly applied by brush to the tree trunks.  You're telling me that it's still a spray device and I know that that will affect pollinators.

MR. B. MILLER:  Well, this is put on pre-bloom, okay, when we talk about bud development --

MR. ENGLEBRIGHT:  Bees are active almost all year unless it's so cold that they can't get out of the hive.

87

**NYS ASSEMBLY**                    **APRIL 30, 2019**

MR. B. MILLER:  I was a beekeeper, I understand --

MR. ENGLEBRIGHT:  My chief-of-staff is a beekeeper.

MR. B. MILLER:  Okay.  But we can debate that all day -- all day long.

MR. ENGLEBRIGHT:  A bee colony is kept literally across the street from my office --

MR. B. MILLER:  Okay, but, this is applied before the flowers come out on the tree.

MR. ENGLEBRIGHT:  -- so I follow the reality that the bees are necessary for farming, are necessary for agriculture, and that they are having a population decline.  This neurological poison is weakening their defense against mites, weakening their defense against other diseases and is the likely main culprit for the decline nationwide of the pollinators that we depend upon for our food crops.

MR. B. MILLER:  Okay.  Well, if the honey industry was absolutely sure that this was the decline of all the pollinators, I'm sure that this -- this wouldn't even be a debate here if they could pinpoint that.

MR. ENGLEBRIGHT:  Most of the studies have focused on children.  It still shouldn't be a point of great debate.  When you're talking about children, you're talking about the future of our State.  Why should we subject our children when they eat food to chlorpyrifos?  That is absurd.  There is no reason that this chemical should be in our children.  That shouldn't be a point of debate.

88

NYS ASSEMBLY                                                APRIL 30, 2019

MR. B. MILLER:  When the pesticides are applied, there's a day of application to a day of harvest and then they start breaking down.  Now, the test that we're looking at was the Columbia University test?

MR. ENGLEBRIGHT:  Columbia University did a very detailed scientific study, yes.

MR. B. MILLER:  No, that was used -- no, that was used -- the scientific study was used on insect --

MR. ENGLEBRIGHT:  They indicated in that study that some of our children are exposed to up to --

MR. B. MILLER:  -- on indoor applications?

ACTING SPEAKER AUBRY:  Gentlemen, gentlemen, gentlemen; let us be civil.

MR. B. MILLER:  Okay.

MR. ENGLEBRIGHT:  I am trying to be civil, sir.

ACTING SPEAKER AUBRY:  I understand, but we need to let a question and an answer, a question and an answer and not cross each other.  Thank you.

MR. B.  MILLER:  So, whose turn is it, mine now?

MR. ENGLEBRIGHT:  Well, I'd be happy to do that.

ACTING SPEAKER AUBRY:  You've been back and forth so much, why don't you take it?

MR. B. MILLER:  I'll start.  So, the Columbia University study was done on inside application, correct?

MR. ENGLEBRIGHT:  I believe so, yes.

89

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

MR. B. MILLER:  And it was done --

MR. ENGLEBRIGHT:  Did it also go outside?  It's hard to know.  It was an examination of human health assessment for all food exposures, so that would not necessarily -- I believe it was mostly in an urban setting, though.

MR. B. MILLER:  It was in an urban setting, it was in the Bronx and some other place down in the City.  So, that didn't take in effect, you know, some of the arguments we're talking about here with -- with drift, with exposure to water.  It was -- it was done on a specific test subject, test site, indoor applications for cockroaches, I don't know what it was -- what it was for.  But, you know, all tests that I've seen is, you know, the EPA is not using the same test as -- as Columbia University did.  They were using it on the metabolites, which is the breakdown of the pesticide and it found -- found that to be safe.  And, of course, I -- we all want our children to be -- to be safe.

MR. ENGLEBRIGHT:  I respect that you are, from your own experience, able to say that this is an effective chemical for reducing pests on crops.  What I am equally sensitive to, though, is the fact that it is not a poison that is targeted, that if it is on the produce, then it goes to market and then it's in the bodies of our children.  If given a choice between protecting --

ACTING SPEAKER AUBRY:  Mr. Miller's time is up, by the way.  You can finish your statement, but your time is up.  You have another 15 available to you, but we do have other

90

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

individuals.

      MR. B. MILLER:  On the bill.

      ACTING SPEAKER AUBRY:  No, sir.  You'll have
to come back.

      MR. B. MILLER:  Okay.  I'll come back.

      ACTING SPEAKER AUBRY:  Mr. Manktelow.

      MR. ENGLEBRIGHT:  Okay.  Hopefully we'll have
a chance to finish.

      MR. MANKTELOW:  Thank you, Mr. Speaker.  Will
the sponsor yield?

      MR. ENGLEBRIGHT:  I yield.

      ACTING SPEAKER AUBRY:  Mr. Englebright
yields.

      MR. MANKTELOW:  This was debated last year and
one of the questions I had -- (inaudible/mic off).

      MR. ENGLEBRIGHT:  One of the questions you had
is what?  Your mic doesn't work.

      MR. MANKTELOW:  I'm sorry.  So, for the last 15
minutes we've been debating this bill.  So, one of the questions I have
is moving forward as an agricultural producer, making sure our
agricultural producers have things to -- to use in this State.  If this -- if
this bill does pass, what's the plan of action for our -- for our
producers at that point?

      MR. ENGLEBRIGHT:  What is the plan of action?

      MR. MANKTELOW:  Yes.

NYS ASSEMBLY                                    APRIL 30, 2019

MR. ENGLEBRIGHT:  We would have a phaseout of the use of this chemical.

MR. MANKTELOW:  And how long will that phaseout be?

MR. ENGLEBRIGHT:  We would also, I anticipate, use alternatives.  There are alternatives.

MR. MANKTELOW:  What -- what are some of those alternatives?

MR. ENGLEBRIGHT:  Whatever was in use prior to 1965 other than DDT.  There are a number of rotational -- you can rotate crops.  You can have a more efficient way of -- of managing the -- the crop production in a manner similar to what your organic farmers throughout the State are already doing.  We have almost 200 such major farms.  It depends upon how you plant, how you manage your crop and whether or not you use crop rotation and such techniques as planting later in the season and missing certain of the population explosions of the unwanted pests.

MR. MANKTELOW:  Well -- well, in fruit production, a lot of our fruit growers, they put the tree in the ground and the tree's there for 15 to 20 years.  You cannot rotate that crop through, whether it be stone fruit, apples.  Once -- once that tree's in the ground, at a great expense, you've got to keep it there.

MR. ENGLEBRIGHT:  Well, it's my understanding that there are alternatives, that those alternatives are well-known and in widespread use among organic farmers.  So, I would urge you to

92

speak with those who have successfully been able to use techniques such as rotating crops and making sure that -- that you do not kill off the natural predators of some of the -- of the target pests because this is an indiscriminate poison.  It kills off both the predators and the prey.

I should also point out there was a study that I'm aware of in New York that found no difference in fruit damage between blocks -- squares, if you will, of orchards that were treated with reduced west -- excuse me, reduced-risk pesticides and blocks treated with standard chlorpyrifos types of pesticides and organic phosphate-based poisons.  The result in the blocks that were treated with chlorpyrifos, they had clean fruit between 93 and 96 percent of the time, and in the blocks that were treated with reduced-risk pesticides, they had clean fruit up to 96 percent of the time, as well.  Not a very significant difference, and I can get you the reference for that, that's in Angelo et. al:  Reduced Risk Pest Management Programs for Eastern U.S. Apple and Peach Orchards, a four-year regional project published in 2009.

MR. MANKTELOW:  Do you know if those blocks were side-by-side trials?

MR. ENGLEBRIGHT:  I -- I believe that they were separated only to prevent contamination.  So, they weren't -- they weren't far apart.

MR. MANKTELOW:  Okay.  So -- so probably seeing a lot of trials over my many years --

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

MR. ENGLEBRIGHT:  You're speculating, I'm not going to confirm a speculation.

MR. MANKTELOW:  I'm not speculating, sir.  I've seen the trials firsthand, I've seen what happens.  I'm definitely not speculating.

MR. ENGLEBRIGHT:  So, you're -- you're suggesting that the clean fruit in the reduced pesticide areas was because of contamination; you're helping to make my point.  This is a pretty insidious substance if you accept, and I do not, accept the premise that we're seeing drift or other contamination.  I wouldn't expect that a published study would be so careless.

MR. MANKTELOW:  Okay.  So, you're talking about using new products, new different types of chemicals to take --

MR. ENGLEBRIGHT:  Not really new, not necessarily, let me say --

MR. MANKTELOW:  Okay.

MR. ENGLEBRIGHT:  -- do they have to be new. This chemical has only been in the market since 1965.  So, we've had apples for a long time.  We've had apples, we've been competitive and, in fact, since 1965, we have a new demand for organic fruit and vegetables that is the cause of a development of whole new distribution and sales outlets.  They're in my district --

MR. MANKTELOW:  They're -- they're all over the place.

MR. ENGLEBRIGHT:  -- where they specialize in

94

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

selling organic fruits and vegetables and other wholesome,

uncontaminated food.

               MR. MANKTELOW:  Okay.  So -- so, we're not

going to change the landscape of our agricultural producers overnight,

but we're definitely not all going to go to organic, that's impossible.  It

can't be done.

               MR. ENGLEBRIGHT:  Well, you should -- you

should ask the farmers who are, in fact --

               MR. MANKTELOW:  I have.

               MR. ENGLEBRIGHT:  -- doing that because they're

succeeding, and I have --

               MR. MANKTELOW:  Absolutely, at a small scale, at

a very small scale.

               MR. ENGLEBRIGHT:  It may be small scale, but we

count approximately 188 such farms in the State and they're producing

-- they're producing successfully for the market.

               MR. MANKTELOW:  Okay.  So, talking to some of

our producers, there are better products that are on the market coming

through.  One of the deterrents in New York State is they'll be --

they'll be passed outside of New York State and when they get to New

York State, they've got to go through another range of checks and

balances to make sure they're going to work in New York State.  And

some of the -- some of the manufactures of these chemicals will not

bring them to New York State because it takes too long, too costly to

do business in New York.  What we're going to hurt are producers,

NYS ASSEMBLY                                    APRIL 30, 2019

and it's not just apples.  It's our onions, it's our vegetables, our broccoli, our cauliflower; many different vegetables and fruits.  And I'm just so concerned that once this product is gone, what are we going to do in the short-term?

MR. ENGLEBRIGHT:  Well, your question parallels similar questions about the use of DDT.  DDT has been banned in this country.  It's still sold internationally, sadly, to devastating ecological effects, but great profitability to our US manufacturers.

MR. MANKTELOW:  Do you think some of those products make their way into -- into New York?

MR. ENGLEBRIGHT:  You know, I wouldn't be astonished, but I know that what we're discussing today is chlorpyrifos, which is used in this State.  And so, rather than speculate about international trade patterns, all I can say is that your questioning about whether or not agriculture is going to be damaged in New York if, for example, we stop the use in New York of DDT or chlorpyrifos, the arguments that I'm hearing from you are similar.  Nothing collapsed when we banned DDT in New York State.

MR. MANKTELOW:  And all I'm trying to say to you, sir, is if we're going to ban this, we need to make it easier for our producers to get the products that are used outside of the State of New York throughout the United States, but cannot come into the State of New York because of the way we do business.

MR. ENGLEBRIGHT:  That's a separate --

MR. MANKTELOW:  I understand.

96

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

MR. ENGLEBRIGHT:  -- but relevant conversation --

MR. MANKTELOW:  Yes.

MR. ENGLEBRIGHT:  -- that I would welcome and that I would be happy to participate with you on.  We're not trying to harm anyone, we are trying to prevent harm to our children and that is really the bottom line on this bill.  Chlorpyrifos has been measured just from food exposure at 143 times the allowable level of -- of one part per billion.  We don't even know that the one part per billion is safe.  There seems to be no safe exposure at any level and the developmental problems, the neurological problems, the possibility that this is one of the causes of autism, all has yet to be finally determined.  But we do know that there is a devastating impact upon young developing neurological systems of children less than seven years old.

MR. MANKTELOW:  So is there anything that we're doing -- once -- once we're out of production or if people stop growing things because we cannot use this, and these fruits and vegetables are still going to be coming into New York State, what are we doing as New York State to stop those pieces of apples, of cabbage coming into the State?  How are we going to check them?  If we're going to hold our producers at such a high level and then our competitors outside of the State are allowed to do -- to use this product at a lower cost and then also allow to ship it into New York State, what are we going to do to help our producers?

97

NYS ASSEMBLY                              APRIL 30, 2019

MR. ENGLEBRIGHT:  I believe that New York continues to be a beacon of inspiration for consumers and for people who care about what happens to their children and the environment.  I anticipate that the alternatives, as we've discussed, that have been tested in the -- in the apple groves of New York State don't really show a great difference in outcome at the end of the season when the crop is harvested.  I point out again, this is a relatively new entry into the marketplace, only since 1965, and we've had apples in this State for centuries.

MR. MANKTELOW:  I'm sorry.  I can't hear half of what you're saying, it's just the background noise I can't --

MR. ENGLEBRIGHT:  I would just point out that we are going to be able to implement this effectively.  I don't think there's any cause for undue alarm.  We've given a lead time of two years for implementation for apples, in particular.

MR. MANKTELOW:  Well, according to the amendment that I'm looking at here, this is going to take effect -- some of it will take effect January 1st, 2020; that's just a few months away.

MR. ENGLEBRIGHT:  For that section of the -- of the activities that this law would cover that involve spraying, that is true.  But for other -- in particular, for apples, there is no final closure on this until December of 2021.

MR. MANKTELOW:  January 1, 2021; that's correct.

MR. ENGLEBRIGHT:  January in 2021 is the limit

98

**NYS ASSEMBLY**                    **APRIL 30, 2019**

on apples, but the activity would be allowable through the end of that growing season until December of 2021.

MR. MANKTELOW:  Okay.  So, but on the rest of the crops that we're growing that we're using that, that's going to take effect 2020, correct?

MR. ENGLEBRIGHT:  For spring, it would be earlier, yes.

MR. MANKTELOW:  So how on Earth are we going to make this happen for our producers in a few short months?

MR. ENGLEBRIGHT:  They would use alternate --

MR. MANKTELOW:  Pardon me?

MR. ENGLEBRIGHT:  They would have to use alternate techniques.  There's no doubt that there would have to be some adjustment.

MR. MANKTELOW:  How and what are those adjustments?

MR. ENGLEBRIGHT:  I would -- I would point you toward those other states that we have discussed; Hawaii, California, both restricted aerial spraying.  The first part of the implementation of this proposed new law is aerial spraying.  It didn't collapse the agriculture in those other states, I don't anticipate that it will here, either.

MR. MANKTELOW:  Well, that's not what I'm hearing from the producers.

MR. ENGLEBRIGHT:  I'm sure that you are hearing

99

NYS ASSEMBLY                              APRIL 30, 2019

from people who don't want any change in the convenience of using

this neurological poison that has no -- no specific target capability.

Widespread use has, in fact, been demonstrated to be harmful, harmful

to our children.  That is really kind of the bottom line here.  Do you

want to have our children neurologically damaged, to lose their IQ

capability?  That's what the Columbia study said.

             MR. MANKTELOW:  Okay.

             MR. ENGLEBRIGHT:  Severe damage to the

cognitive functioning of -- of children.

             MR. MANKTELOW:  I don't disagree with that study

or wherever that came from, but if we're so concerned about our

young people, then we had better come up with a solution of stopping

the fruits and vegetables coming into the State from throughout the

rest of the United States because what's going to happen is some of

our producers are going to go out of business.  They cannot afford to

do this in short-term time.  And those products are going to be coming

into New York State and without having a plan of action to take care

of that and making sure that doesn't happen, we're only hurting our

producers and allowing the people that we -- that we compete against

outside the State to have a leg up on us.

             Thank you.  Thank you for your time.

             MR. ENGLEBRIGHT:  You're quite welcome.

             ACTING SPEAKER AUBRY:  Ms. Woerner.

             MS. WOERNER:  Thank you, Mr. Speaker.

             On the bill.

**NYS ASSEMBLY**                                      **APRIL 30, 2019**

ACTING SPEAKER AUBRY:  On the bill, ma'am.

MS. WOERNER:  There are good bugs and there are bad bugs.  Good bugs are pollinators; bad bugs are the ones that come in every year from different places, typically on wooden pallets brought in from far flung places.  New York, which is the leading producer of fruit and vegetable crops in the Eastern part of our country, our approach to managing bugs is an integrated one.  We try to eliminate the bad bugs while allowing the good bugs to do the helpful work that they do.  Chlorpyrifos has been a key part of the State's integrated pest management approach for four decades.  It is heavily regulated by the State's Department of Environmental Conservation which limits where it can be used, how it can be used, how much can be used and when it can be used.  For example, they don't allow you to apply it once the tree has flowered because that impacts the pollinators.

Cabbages, onions, cherries, peaches, sweet corn and apples are all important crops in New York.  These farms depend upon chlorpyrifos to defend against bad bugs while not harming the good bugs.  Because the chemical degrades quickly on the foliage, it does not impact the fruit or vegetable itself or the ultimate consumer of the fruit and vegetable.  The same cannot be said of the three-chemical cocktail which is the alternative.  Neonic, one of the three, is one of the leading causes of colony collapse in honey bees, for example.  I'm really pleased to see that the bill has been amended to allow the apple farmers time to shift to an alternative, but there are

101

other commodities that will be impacted right away:  Cabbages, onions, cherries, peaches, sweet corn.  And the alternative cocktail is problematic.

So, as I said, chlorpyrifos has been used for four decades.  More than 4,000 studies and reports have been done to evaluate its safe use.  It is authorized in nearly 100 countries.  It is labeled for use on more than 50 agricultural crops.

New York State is one of only a handful of states that has its own regulatory agency to oversee environmental impacts.  That agency is given the authority to approve or disapprove the use of chemicals in agricultural settings.  So in this discussion, I find myself asking two questions.  First, if you accept the premise that the chemical remains on the fruit, and the agricultural community is confident that it does not, and we pass the bill, then if New York's vegetable and fruit farmers are unsuccessful at fighting off bad bugs that destroy crops, and now your local grocery stores are sourcing its onions, its cabbages, its peaches, its cherries, its sweet corn from Pennsylvania, say, have we really done anything to make New Yorkers healthier?  And then secondly, I ask myself - and I have to say, I take great pride in the diversity of backgrounds that sit in this room - but what is the point of having DEC if we, as legislators, and I don't believe there are any chemists or chemical engineers or environmental engineers in this room, if we're going to substitute our judgment for theirs, what is the point of having this agency to begin with.

NYS ASSEMBLY                                    APRIL 30, 2019

I'll be voting no on this bill and I would urge my colleagues to take a close look at all of the information about chlorpyrifos and vote with the agricultural community in opposition to this.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. GOODELL:  There have been a number of studies -- well, two in particular, that have identified a correlation between prenatal exposure to this chemical and adverse implications to a newborn.  Both studies examine the impact of the exposure of this chemical, and the cohorts that they examined, the people that were examined were pregnant women in the late 90's who lived in northern Manhattan or the southern part of the Bronx.  The study that's been referenced repeatedly here as a basis for banning this chemical, the Columbia study, did not examine women who were outside of Manhattan and the Bronx.  And the study focused on women who were pregnant in 1998 and 1999.

Why is that relevant?  Because in 2000, the US EPA and the State of New York banned this chemical from use for insect control inside.  And prior to 2000, this was the most common chemical used to treat cockroaches, ants and other insect infestations inside.  So when we're told that there's a correlation between the use of this chemical and serious impacts on developing children, that is

103

exactly why this chemical has been banned for 18 years from use inside.  Does that mean that we should therefore ban the use in the agricultural context, even though our own environmental scientists in the DEC, they say it's okay to use it in the agricultural context.  And so does the US EPA.  And as my colleague noted, so do a hundred other developed countries based on 4,000 studies that indicate if it's used outside in a limited manner in an agricultural context, it can be used safely.

My friends, over the last five years, just in the last five years, New York State has lost over 7 percent of its farms.  In my county, it's gone from over 1,500 to less than 1,250.  This chemical is not applied to the fruit.  It's not applied to the vegetable.  It's applied to the tree trunk.  It's applied before the trees even blossom.  It's applied to the vines that produce our grapes.  These are trees that take years, if not decades, to mature before they can produce fruit.

Over the years, every few years this chemical is examined, the application rates are examined, the -- we've moved as a State toward integrated pest management.  We lead the nation in that regard.  So we should not take an urban study that was based on how it was used in the 1990's that has been banned for 18 years and use that study to justify hurting our farmers throughout our State by depriving them of one of the most effective, safe chemicals that is designed to protect their trees and their vines and their plants with no demonstrated adverse impact on any of us, recognizing if we put more of our farmers out of business, you and I and our children will still be

NYS ASSEMBLY                                    APRIL 30, 2019

consuming vegetables, won't we, and fruit, that have all been treated

with the same chemical because it's approved in 49 other states,

except for Hawaii, but it won't be produced in New York State

anymore.

It's time to recognize that we need to honor and

respect the scientists that we employ ourselves in the New York State

DEC and reflect on the fact that maybe the scientists are employed by

the EPA and the hundred other countries around this world know

more about the toxicity of this chemical and how it can be applied

safely than even 150 Assemblymembers, with all due respect to my

colleagues who are all experts in this field.

Thank you, sir.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 365th

day.

ACTING SPEAKER AUBRY:  The Clerk will record

the vote.

(The Clerk recorded the vote.)

To explain her vote, Ms. Niou.

MS. NIOU:  Thank you, Mr. Speaker, for allowing

me to explain my vote.  I want to thank the sponsor for this bill.  My

dad is a chemist and it's really -- it really sucked, actually, because I

used to write a lot on my own arm and, you know, with pen ink, and

so, he actually got the ink tested in the lab and he found out that there

was all kinds of chemicals that were in it that were soaking into my

105

skin.  And your skin is your largest organ.  I ended up, you know,

never writing on myself again, but my -- my father's words still ring

true to this day, and what he told me was, you know, when I was a

kid, we used to play with mercury.  And now we know that there's no

level of mercury that is acceptable, and that exposure can actually

harm.

CPS is actually an organic phosphate that actually is a

pesticide that we all know used on crops, animals, buildings, et cetera,

but it acts on the nervous system directly of insects and other things.

And so that's why we know that it actually has harmful effects and

that's why it actually kills insects.  But it kills good and bad insects

including bees and worms.  And we all know, as we were brought up

as kids, that bees and worms are farmers best friends.

And the other thing is that there are many

alternatives.  One of the most effective insecticides is actually a

natural one.  It's called Neem and it was an Indian plant that is

far-reaching and very well-used and when we were organic farming

on our school college farm, it was one of the most effective ways that

bees and worms were not harmed while aphids and certain beetles

were harmed and, you know, they are also -- it's more of a repellant.

And so, it's actually very, very effective.

In the market, we also know that before we had a lot

of different things that were being used, but, for example, California

has moved to having a more organic farming method and actually has

increased their farmers' market share, and it also has increased the

way and changed the way that we eat and -- and -- and shop for

vegetables and fruits, and I think that that is, in a way, that's going to

be good for New York.  So, I wanted to thank the sponsor and I

wanted to put on these points.  Thank you.  And I vote in the

affirmative.

ACTING SPEAKER AUBRY:  Ms. Niou in the

affirmative.

Mr. Englebright to explain his vote.

MR. ENGLEBRIGHT:  Thank you, Mr. Speaker.

You know, the several studies that have been referenced here are

worth repeating.  One of them, in particular, has been referenced

several times, which is the study by Columbia University.  By all

accounts, it was an objective, independent study.  And the quote from

that study is included in the support letter from the New York State

United Teachers.  They are the individuals in our society who, in

many cases, have to try to overcome the negative effects of IQ loss

and damage to our children.  So, the concluding part of the NYSUT

memo I think is worth adding to the record.  *NYSUT feels that the*

*years of testing and research that led to the ban of chlorpyrifos is*

*sound.  And we, therefore, support its continued ban under this bill as*

*the safety of our citizens is of -- and children is of utmost support --*

*importance.  And for the above reasons, New York State United*

*Teachers strongly supports passage of this legislation.*

So, we're not acting in a vacuum at all.  This is a

choice between the health of our children and the convenience of the

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

marketplace.  I will always, in such a circumstance, come down on the safety of our children.  I urge my colleagues to do the same.  Thank you, Mr. Speaker.  I vote yes.

ACTING SPEAKER AUBRY:  Mr. Englebright in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, could you please call on Mr. Otis for an announcement?

ACTING SPEAKER AUBRY:  Mr. Otis for the purpose of a [sic] announcement.

MR. OTIS:  There will be a meeting of the Democratic Conference immediately following the conclusion of Session tonight.  Thank you.

ACTING SPEAKER AUBRY:  Democratic Conference following Session.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, do you have any further housekeeping or resolutions?

ACTING SPEAKER AUBRY:  No housekeeping, but resolutions we will take up with one vote.  On the resolutions, all those in favor signify by saying aye; opposed, no.  The resolutions are adopted.

**NYS ASSEMBLY**                                    **APRIL 30, 2019**

(Whereupon, Assembly Resolution Nos. 322-324 and 326-329 were unanimously approved.)

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  I now move that the Assembly stand adjourned until 10:30 a.m., Wednesday, May the 1st, tomorrow being a Session day.

ACTING SPEAKER AUBRY:  The Assembly will stand adjourned.

(Whereupon, at 6:28 p.m., the Assembly stood adjourned until Wednesday, May 1st at 10:30 a.m., Wednesday being a Session day.)