**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELIZABETH CHAN, *et al.*,

                  *Plaintiffs*,

      v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                  *Defendants*.

MICHAEL MULGREW, *et al.*,

                  *Plaintiffs*,

      v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                  *Defendants*.

NEW YORKERS AGAINST
CONGESTION PRICING TAX, *et al.*,

                  *Plaintiffs*,

      v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                  *Defendants*.

Case No. 1:23-cv-10365 (LJL)
Case No. 1:24-cv-01644 (LJL)
Case No. 1:24-cv-00367 (LJL)
Case No. 1:24-cv-04111 (LJL)

TRUCKING ASSOCIATION OF NEW
YORK,

<em>Plaintiff</em>,

v.

METROPOLITAN TRANSPORTATION
AUTHORITY, <em>et al.</em>,

<em>Defendants</em>.

**DECLARATION OF ALLISON L. C. DE CERREÑO, PH.D.**

I, Allison L. C. de Cerreño, Ph.D., hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Chief Operating Officer of the Triborough Bridge and Tunnel Authority ("TBTA"), an affiliate of the Metropolitan Transportation Authority (the "MTA").  In that capacity and in my prior positions with the MTA, I have acted as the project lead for the Central Business District Tolling Program (the "CBD Tolling Program" or the "Program"), a New York State legislatively mandated program pursuant to which TBTA, the New York State Department of Transportation ("NYSDOT") and the New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") plan to introduce congestion pricing to Manhattan's Central Business District (the "CBD").  The Program will reduce congestion and provide a stable source of revenue to improve subway, bus and commuter rail systems in the MTA's 2020-2024 Capital Plan and successor plans.

**A.  The Current Status of the Program**

2.      Because the Program will impose tolls on highways that have received federal aid, "the project cannot be implemented without approval from the federal government."  *Mulgrew v. U.S. Dep't of Transp.*, 2024 WL 3251732, at *4 (S.D.N.Y. June 20, 2024) (Liman, J.).  As relevant here, authority to implement tolls on federal-aid highways may be conferred through the Value Pricing Pilot Program ("VPPP").  *See* FHWA, U.S. Dep't of Transp., *Value Pricing Pilot Program*, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (last accessed Dec. 1, 2024).

3.      In June 2019, an Expression of Interest to seek approval under the VPPP to implement a variable tolling program aimed at reducing congestion (i.e., a congestion pricing program) in the Manhattan CBD was submitted to the Federal Highway Administration ("FHWA") by New York State through the New York State Department of Transportation ("NYSDOT"); TBTA; and the New York City Department of Transportation ("NYCDOT").  A lengthy environmental review process under NEPA ensued, culminating in the April 2023 Final Environmental Assessment ("EA") and the June 2023 Finding of No Significant Impact ("FONSI").  Because the final tolling structure had not yet been defined, for the purpose of evaluating the potential environmental impacts of various tolling options, the EA analyzed seven tolling scenarios.

4.      In March 2024, the TBTA Board adopted a toll rate schedule for the Program, with an implementation date in or about June 2024.  The Project Sponsors prepared a reevaluation document consistent with FHWA's regulations, and as contemplated by the FONSI, to assess the effects of the March 2024 adopted toll structure and determine whether the FONSI was still valid.  On June 14, 2024, FHWA confirmed that the reevaluation was consistent with FHWA's regulations and determined that the FONSI remained valid.

5.      On June 5, 2024, the Governor announced a pause in implementation of the Program, which at that point had been scheduled to begin on June 30, 2024.

6.      On November 14, 2024, the Governor announced a proposal to proceed with the Program, but with the toll structure and rates that had been adopted by the TBTA Board in March 2024 being phased-in gradually over several years.  On November 18, 2024, the TBTA Board adopted the phase-in feature of the toll rate schedule that it had approved in March (the "Phase-In Approach").

7.      Under the Phase-In Approach, subject to certain tunnel crossing credits, from 2025 to 2027, the peak-period E-ZPass entry toll rate charged for passenger vehicles will be $9; for motorcycles, $4.50; for larger vehicles including transit and commuter buses and trucks, $14.40 or $21.60, depending on their size; for taxis, $0.75 per trip; and for "for hire vehicles" ("FHVs"), $1.50 per trip.  The toll rates later increase proportionally for each vehicle category, once in 2028 then again in 2031, as set forth in the toll rate schedule.

8.      Contrary to the claims of some plaintiffs, taxis and FHVs are not exempt from tolls under the Program toll rate schedule.  The toll rate applicable to taxis and FHVs is set on a per-ride basis consistent with taxis and FHVs passing the toll on to their customers in accordance with existing regulations.  In turn, the TBTA will collect the aggregate toll receipts from the taxi/FHV companies.

9.      The Project Sponsors prepared a second reevaluation consistent with FHWA's regulations to assess the effects of the Phase-in Approach of the March 2024 adopted toll structure. The second reevaluation concluded that the effects of the Program were consistent with those disclosed in the final EA, the mitigation set forth in the FONSI (and the June 2024 Reevaluation) remained appropriate, and the FONSI remained valid.

4

10.    On November 21, 2024, FHWA confirmed that the second reevaluation was consistent with FHWA's regulations and determined that the FONSI remained valid. That same day, FHWA and the Project Sponsors signed an agreement under the VPPP authorizing the Program's collection of tolls.

**B. Plaintiffs Will Not Suffer Irreparable Harm by Paying the Program's Tolls**

11.    There are mechanisms that will allow the TBTA to fully refund Plaintiffs and any other toll payers in the unlikely event that Plaintiffs prevail in these actions.

12.    All eligible vehicles entering the CBD will be charged, and will pay, the applicable toll rate using one of two mechanisms. Toll payers with an E-ZPass account will be able to pay the toll using their E-ZPass account. If the vehicle is not associated with an E-ZPass account, the registered owner of the vehicle will receive a toll bill in the mail. No matter the method of payment used, the identity of the toll payer and the amount paid by that toll payer is recorded. Because the Program uses these cashless methods of collection no one would pay with cash at a toll booth — an outdated method of collection that TBTA replaced at its bridge and tunnel facilities years ago.

13.    Between ninety-two percent (92%) and ninety-five percent (95%) of toll payers on current TBTA tolling facilities that enter into Manhattan use E-ZPass, and it is anticipated that a significant majority of drivers would also use E-ZPass for the Program once it goes into effect. If required for toll payers with a New York E-ZPass account, TBTA is able to refund any tolls paid by crediting such E-ZPass accounts. Toll payers who pay the toll through a non-New York E-ZPass account will be traceable by their respective state tolling agencies, and their payments will also be traceable by those agencies. Consistent with TBTA's prior practice when issuing refunds to toll payers who use a non-New York E-ZPass account, any such refunds can be issued to the respective state tolling agency, which would then reimburse the toll payer. For example, someone

driving into the CBD from Delaware with a Delaware E-ZPass account would pay the toll amount to the Delaware state tolling agency.  This agency would have sent the toll amount, on the toll payer's behalf, to TBTA.  In turn, if required, TBTA can refund the Delaware state tolling agency, which in turn could then credit the toll payer's account.  Where warranted, TBTA already routinely reconciles New York E-ZPass accounts and non-New York E-ZPass accounts in the ordinary course of business in this manner for bridge and tunnel facilities; Program toll reconciliation would be no different.

14.    The few remaining toll payers who don't use E-ZPass are also recorded and can be refunded by the same mechanism that they use to pay their bill.  Toll payers without E-ZPass will receive a bill in the mail with a unique identifying bill number.  These toll payers will then have the option of paying that bill through credit card, cash at an authorized payment facility, or by mailing in a check.  If a toll payer has paid their bill, and thus paid the toll, TBTA can refund the toll payer by reversing the charges if they used a credit card, or by issuing a refund check if the toll payer paid by cash or check.

## C.  No Irreparable Environmental Impacts

15.    The Program would have little, if any, environmental impact on the *Chan*, *Mulgrew* or *New Yorkers* Plaintiffs (it is my understanding that the Plaintiff in the *TANY* case does not claim environmental harm).  It is my understanding that this Court found that the Final EA and FONSI were adequate and consistent with NEPA.  The FONSI found that the Program, with mitigation, would have no significant impact on the environment.  Because the November 2024 tolling structure phases in the Program, and the November 2024 reevaluation found that the effects of the Phase-In Approach are within the range of effects disclosed in the EA and affirmed in the FONSI, it follows that the environmental impacts, as found by the FONSI affirmed by this Court, would

not be significant.  Further, any alleged environmental effects would be temporary in nature, as they would occur only for the time after the Program commenced operation until the Court made its final decision on the lawsuits.  Consequently, the limited, if any, potential environmental effects would not cause irreparable injury.

**D.  Government Resources Lost if Program is Not Permitted to Begin**

16.     Should the Program be enjoined from commencement until a final decision on the merits, TBTA would incur substantial additional expenses.

17.     Initially, TBTA budgeted over $500 Million to establish the Program, and much of the budget has been expended.  These expenditures included developing the methodological approach; conducting the assessment and extensive outreach and developing the final documentation for the environmental review process under NEPA; design, development, implementation and testing of the roadway infrastructure and system; design, development, implementation and testing of the Back Office System; additional extensive outreach for the State administrative review process; staff costs, including new staff for the Program; and consulting costs.

18.     If the Program is temporarily enjoined, TBTA would incur roughly $12 Million in additional expenditures per month, most of which would be related to a combination of the operations and maintenance of the roadside tolling system, the operations of the back-office system and Customer Contact Center, and consultant costs.  This figure does not include the costs related to additional staff that were brought on specifically for the Program nor other costs, such as those related to outreach and advertising and assessments to be undertaken for the Program. These costs cannot be deferred even if start-up of the tolling is delayed.  Further, these costs could not be paid

by Program revenues, as there would be none during this period.  These funds would be lost as a result of a preliminary injunction.

19.    Furthermore, an injunction would cause the TBTA the loss of estimated monthly revenues from the first phase of the Program of over $40 million, based on projected net annual revenues of roughly $500 million in the first phase.

20.    These public dollars could never be recouped, even if the Program is restarted, as those months of tolling revenues would be lost forever.

**E.  The Public Interest Militates Against Injunctive Relief**

21.    Stoppage of the Program would prevent MTA, the recipient of Program revenues, from proceeding with vitally important work under the MTA's 2020-2024 Capital Program ("Capital Program"), which is intended to ensure that improvements put in place will be sustainable for years to come.  The Capital Program identifies $52 billion of critical investments in the region's subways, buses and commuter railroad, nearly one-third of which would be supported by the Program.  Key tenets of the Capital Program, which would be delayed by an injunction halting Program tolling revenues, include such undertakings as adding accessibility to numerous subway stations consistent with the Americans with Disability Act, improving outdated signaling and other improvements to system reliability, improving safety and customer service through technology, and extending public transit to under-served areas.  *See generally* MTA, 2020–2024 Capital Program: Exec. Summary (Oct. 1, 2019), https://files.mta.info/s3fs-public/2019-09/MTA%202020-2024%20Capital%20Program%20-%20Executive%20Summary.pdf        (last accessed Dec. 2, 2024).

22.    In addition, because work on the Program would be halted, with only limited exceptions, TBTA could not advance the mitigation for environmental justice communities.

23.    Finally, delaying implementation of the Program means the unabated continuation of the severe congestion in the CBD, with its concomitant economic and environmental costs to businesses, residents, commuters, workers, and visitors in this area.  As noted above, congestion in the CBD has been a $20 billion annual drag on the region's, and thus the country's, economy. EA at 1-12.  And as the most congested urban area in the country, travel times – including for public buses and emergency vehicles – are extraordinarily slow.  EA at 1-1.  Delay of the Program would mean the continuation of these conditions, and harm to the public, while allowing the Program to proceed would cause no harm to the Plaintiffs.

Dated:    New York, New York
          December 2, 2024                         _____
                                                  Allison L. C. de Cerreño, Ph.D.

# C. de Cerreño Declaration

**Final Audit Report** 2024-12-03

| | |
|---|---|
| Created: | 2024-12-03 |
| By: | Brandon Trice (btrice@kaplanmartin.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAASEWFwNjTG_Wb9ALNvKufbUrKCMctc-ks |

# History

📄 Document created by Brandon Trice (btrice@kaplanmartin.com)
2024-12-03 - 3:53:03 AM GMT

📧 Document emailed to allison.cdecerreno@mtahq.org for signature
2024-12-03 - 3:53:29 AM GMT

📄 Email viewed by allison.cdecerreno@mtahq.org
2024-12-03 - 3:54:47 AM GMT

🖊 Signer allison.cdecerreno@mtahq.org entered name at signing as Allison L. C. de Cerreño
2024-12-03 - 3:58:47 AM GMT

🖊 Document e-signed by Allison L. C. de Cerreño (allison.cdecerreno@mtahq.org)
Signature Date: 2024-12-03 - 3:58:49 AM GMT - Time Source: server

✅ Agreement completed.
2024-12-03 - 3:58:49 AM GMT

**Adobe Acrobat Sign**