**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELIZABETH CHAN, *et al.*, | |
| Plaintiffs, | |
| v. | No. 23 Civ. 10365 (LJL) |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | |
| Defendants. | |
| MICHAEL MULGREW, *et al.*, | |
| Plaintiffs, | |
| v. | No. 24 Civ. 1644 (LJL) |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | |
| Defendants. | |

**REPLY MEMORANDUM IN SUPPORT OF THE FEDERAL DEFENDANTS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

EDWARD Y. KIM
Acting United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2728
Email: zachary.bannon@usdoj.gov

ZACHARY BANNON
DOMINIKA TARCZYNSKA
Assistant United States Attorneys
– Of Counsel –

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... iii

ARGUMENT ................................................................................................................... 2

    I.     No New Circumstances Require an Update to the FHWA's Alternatives
          Analysis.......................................................................................................... 2

          A.     The MTA's Revenue Objective Does Not Invalidate the FHWA's
                 Alternatives Analysis. ................................................................... 3

          B.     The Phase-In Approach Does Not Invalidate the FHWA's
                 Alternatives Analysis. ................................................................... 7

    II.    Changed "Economic Conditions" Do Not Require a Supplemental EA. ............... 9

    III.   The FHWA Reasonably Concluded that Limited Increases to Air Pollution
          Did Not Require Supplemental Environmental Review. ..................................... 12

    IV.   The FHWA Reasonably Concluded that the Adopted FHV Tolling
          Structure Does Not Require a Supplement to the Final EA................................. 13

    V.    The FHWA's Conclusion that the Mitigation in the Final EA Remains
          Valid Was Not Arbitrary or Capricious. ............................................................ 15

CONCLUSION................................................................................................................ 18

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adler v. Lewis,*
675 F.2d 1085 (9th Cir. 1982) ................................................... 8

*Beyond Nuclear v. U.S. Dep't of Energy,*
233 F. Supp. 3d 40 (D.D.C. 2017) ............................................. 14

*Citizens for Balanced Env't and Transp., Inc. v. Volpe,*
650 F.2d 455 (2d Cir. 1981).................................................... 15

*Coal. for Advancement of Reg. Transp. v. FHWA,*
959 F. Supp. 2d 982 (W.D. Ky. 2013) ....................................... 4

*Colorado Rail Passenger Ass'n v. Fed. Transit Admin.,*
843 F. Supp. 2d 1150 (D. Colo. 2011)...................................... 6

*County of Seneca v. Cheney,*
12 F.3d 8 (2d Cir. 1993)................................................... 11, 17

*Friends of Capital Crescent Trail v. Federal Transit Admin.,*
877 F.3d 1051 (D.C. Cir. 2017) .............................................. 12

*Friends of Del Norte v. Cal. Dep't of Transp.,*
No. 18 Civ. 129, 2023 WL 2351649 (N.D. Cal. Mar. 3, 2023) ................. 2

*Latin Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.,*
858 F. Supp. 2d 839 (E.D. Mich. 2012)..................................... 14

*Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.,*
823 F.3d 184 (3d Cir. 2016)................................................. 12

*Marsh v. Oregon Natural Resources Council,*
490 U.S. 360 (1989)....................................................... 1, 12

*Metropolitan Edison Co. v. People Against Nuclear Energy,*
460 U.S. 766 (1983)......................................................... 10

*No Mid-Currituck Bridge-Concerned Citizens v. North Carolina Dep't of Transp.,*
60 F.4th 794 (4th Cir. 2023) .............................................. 2, 3, 9

*North Carolina Alliance for Transp. Reform, Inc. v. U.S. DOT,*
151 F. Supp. 2d 661 (M.D.N.C. 2001) ....................................... 6

*National Wildlife Federation v. National Marine Fisheries Service*,
  235 F. Supp. 2d 1143 (W.D. Wash. 2002) ................................................................. 7

*NRDC v. Forest Service*,
  421 F.3d 797 (9th Cir. 2005) ................................................................................... 7

*Price Road Neighborhood Ass'n, Inc. v. U.S. DOT*,
  113 F.3d 1505 (9th Cir. 1997) ................................................................................. 5

*Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*,
  687 F. Supp. 2d 381 (S.D.N.Y. 2010) .................................................................. 14

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ............................................................................................ 3, 4

*Save Our Heritage, Inc. v. F.A.A.*,
  269 F.3d 49 (1st Cir. 2001) .............................................................................. 13, 14

*Save Our Sound OBX, Inc. v. North Carolina Dep't of Transp.*,
  324 F. Supp. 3d 597 (E.D.N.C. 2018) ..................................................................... 5

*Shenandoah Valley Network v. Capka*,
  No. 07 Civ. 66, 2009 WL 2905564 (W.D. Va. Sept. 3, 2009) ................................. 8

*Shrader v. CSX Transp., Inc.*,
  70 F.3d 255 (2d Cir. 1995) ...................................................................................... 8

*Sierra Club v. Watkins*,
  808 F. Supp. 852 (D.D.C. 1991) ............................................................................. 6

*South Louisiana Environmental Council, Inc. v. Sand*,
  629 F.2d 1005 (5th Cir. 1980) ................................................................................ 7

*South Trenton Residents Against 29 v. FHWA*,
  176 F.3d 658 (3d Cir. 1999) ................................................................................... 9

*Town of Stratford, Conn. v. FAA*,
  285 F.3d 84 (D.C. Cir. 2002) .................................................................... 12, 15, 18

*United States v. Quintieri*,
  306 F.3d 1217 (2d Cir. 2002) ............................................................................... 15

*Vine Street Concerned Citizens, Inc. v. Dole*,
  630 F. Supp. 24 (E.D. Pa. 1985) .......................................................................... 12

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978).................................................................................................. 1

*Young v. General Servs. Admin.*,
   99 F. Supp. 2d 59 (D.D.C. 2000) ......................................................................... 12

**Regulations**

23 C.F.R. § 771.130 ...................................................................................... *passim*

## PRELIMINARY STATEMENT

Plaintiffs' reply illustrates how far afield their current claims are from the core environmental purposes of NEPA. Rather than contest the environmental effects analyzed in the *Re-Evaluation* and *Re-Evaluation* 2, they instead take issue with the larger policy goals of the Congestion Pricing Project and voice concerns regarding the economic effects of the Project. But NEPA is not a tool for Plaintiffs to press economic concerns or achieve their desired policy outcomes.  Nor is it a means for Plaintiffs to override duly enacted state legislation.

Instead, NEPA is designed "to insure a fully informed and well-considered decision" through the examination of potential environmental impacts of a proposed agency action. *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). That happened here. The Final EA[1] contained what this Court described as a "meticulous analysis" of the potential environmental effects of the MTA's proposed Congestion Pricing Project. The *Re-Evaluation* and the *Re-Evaluation 2* subsequently ensured that the projected environmental effects of the tolling structure adopted by the MTA earlier this year fell within the bounds of the worst-case scenarios studied in the Final EA. After performing those analyses, the FHWA determined that no "changes to the proposed action" or "new information or circumstances relevant to environmental concerns bearing on the proposed action" had come to light since the Final EA was published that "would result in significant environmental impacts not evaluated" previously.  23 C.F.R. § 771.130(a). That conclusion—which the Supreme Court has described as "a classic example of a factual dispute the resolution of which implicates substantial agency expertise," *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373 (1989)—was neither arbitrary nor capricious.  Accordingly, the Court should grant summary judgment to Federal Defendants.

---

[1] Unless otherwise noted, this brief uses the same defined terms as the Federal Defendants' opening brief, *see* Dkt. No. 146 ("Fed. Def. Br."), and refers to the docket entries of Case No. 23 Civ. 10365 (LJL) (S.D.N.Y.).

## ARGUMENT

In their reply, Plaintiffs argue that the FHWA should have supplemented the Final EA to: (1) update the agency's analysis of alternatives for the Congestion Pricing Project, *see* Dkt No. 154 ("Pls. Reply") at 5-12; (2) account for changed economic conditions, *id.* at 12-13; (3) further analyze the adopted tolling structure's effects on air quality, *id.* at 13; (4) further analyze the effects of the adopted for-hire-vehicle tolling structure, *id.* at 13-16; and (5) re-assess the MTA's commitments to mitigation, *id.* at 16-20. As explained below, these arguments are meritless.[2]

## I.    No New Circumstances Require an Update to the FHWA's Alternatives Analysis.

There have been no changes to the Project that would require the FHWA to supplement the Final EA to analyze additional alternatives. Although "[m]any changes may affect an agency's choice among alternatives," NEPA "only requires a supplemental [environmental review] for those that paint a seriously different picture of the environmental impact of the project." *No Mid-Currituck Bridge-Concerned Citizens v. North Carolina Dep't of Transp.*, 60 F.4th 794, 802 (4th Cir. 2023) (emphasis and quotation marks omitted); *see also id.* (rejecting argument that new alternatives should have been considered because a "changed traffic picture . . . relevant to environmental concerns . . . affects the [project's] attractiveness relative to alternatives" on the ground that there is "no limiting principle to this standard"). Contrary to Plaintiffs' claims, the MTA's revised annual revenue projections for the Project did not require an update to the Final EA's alternatives analysis, Pls. Reply at 5-8, 10-12. Nor is there any merit to Plaintiffs' argument,

---

[2] Throughout their reply, Plaintiffs vaguely argue that the *Re-Evaluation* did not serve NEPA's purposes because it was performed without public participation. However, as the Federal Defendants already explained (and Plaintiffs themselves acknowledge, *see* Pls. Reply at 3), an agency's decision as to whether supplementation is necessary is not a decision that requires public involvement. Fed. Def. Br. at 17 n.12; *see also Friends of Del Norte v. Cal. Dep't of Transp.*, No. 18 Civ. 129, 2023 WL 2351649, at *7 (N.D. Cal. Mar. 3, 2023) (explaining that the FHWA's regulations do not require public comment for re-evaluations). In any event, the Federal Defendants *did* involve the public in the *Re-Evaluation*. Fed. Def. Br. at 17 n.12.

already rejected once, that the Final EA failed to consider a phase-in tolling approach as an alternative, *id.* at 8-9.

A.     The MTA's Revenue Objective Does Not Invalidate the FHWA's Alternatives Analysis.

By way of background, the scope of alternatives considered by the FHWA in the Final EA was circumscribed by the legislation that gave rise to the Project, which required the MTA to implement a Congestion Pricing toll that would meet certain revenue-generation and traffic-reduction goals. DOT_2400. Thus, one of the objectives by which the FWHA assessed alternatives was whether they would "generate sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program." DOT_36266; *see also* DOT_36271 (noting that the Project "would be sufficient to support a $15 billion investment").

The Court has already explained why this approach was appropriate. It "serves the separation of powers by respecting the democratic legitimacy of legislative judgments." Op. at 61. It "promotes the balance of 'federalism' by ensuring that federal agencies do not pass judgment on the policy wisdom of state and local enactments." *Id.* And it "is pragmatically sensible as well, since it ensures federal agencies do not expend resources examining alternatives that the project sponsors are not legally authorized to implement." *Id.* (quotation marks omitted). This is in keeping with the Supreme Court's direction that "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

Against those conclusions, Plaintiffs now argue that modest changes to the MTA's revenue projections (*i.e.*, a phase-in to the final tolling structure) requires the FHWA to consider new (but still yet unidentified) alternatives. Pls. Reply at 5-8, 10-12. There is no basis to do so. As this Court recognized, "NEPA does not empower the Court to second-guess the New York State Legislature's revenue objective under the guise of a purely procedural NEPA review." Op. at 62. Plaintiffs'

argument is far afield of NEPA's purpose of ensuring that federal decisionmaking and the public are informed by appropriate environmental considerations.

Nor are Plaintiffs correct that the FHWA has altered the purpose and need for the Project. Instead, the agency's assessment of the Project has appropriately changed over time as the underlying facts have evolved. The Final EA acknowledged that "[t]he net revenue needed to fund $15 billion depends on a number of economic factors, including but not limited to interest rates and term." DOT_36300.  Accordingly, the Final EA utilized a model that "assume[d] the Project should provide at least $1 billion annually in total net revenue, which would be invested or bonded to generate sufficient funds." *Id.*; *see also* DOT_36301 (noting revenue generation projections for range of tolling scenarios). By the time of issuance of the *Re-Evaluation*, however, the "MTA's Chief Financial Officer had determined that annual net revenues in the range of $0.9 billion should be sufficient to meet the Project's need to fund $15 billion of capital projects . . . ." DOT_45449. Thus, the FHWA determined that the adopted tolling structure (with a peak auto toll of $15) met the purpose and need of the Project. *Id*. Thereafter, in the *Re-Evaluation 2*, the FHWA further explained that "MTA's CFO has determined that the expected revenues to be collected under the Phase-In Approach would in combination still achieve the objective of funding $15 billion in capital projects to allow their completion on the same timeline as projected for the March 2024 Adopted Toll Structure."  DOT_47537. Those conclusions are entitled to deference and the Court should reject Plaintiffs' request that it police the MTA's financial forecasting or that the FHWA should have overridden the MTA's projections of the revenue necessary to meet the requirements of New York law.  *See Coal. for Advancement of Reg. Transp. v. FHWA*, 959 F. Supp. 2d 982, 1006-07 (W.D. Ky. 2013) (deferring to "financial data and reasoning" in NEPA document in

support of conclusion that "there remains a significant need for toll-based revenue to fund the [p]roject," even after cost estimates had changed).[3]

The core of Plaintiffs' argument boils down to one flimsy premise: if $500 million in annual revenue, ramping up to $900 million by 2031, is sufficient to meet the MTA's revenue-generation goal, then the FHWA should have considered additional alternatives to Congestion Pricing in its environmental review. But Plaintiffs have not identified any previously rejected alternatives that could meet the purpose and need for the Project even with a lower annual revenue threshold. As explained in the Federal Defendants' opening brief, none of the rejected alternatives discussed in the Final EA that meet the MTA's *non-revenue* goals generate *any* revenue for the MTA. Fed. Def. Br. at 24 & n.14; *see also Save Our Sound OBX, Inc. v. North Carolina Dep't of Transp.*, 324 F. Supp. 3d 597, 620 (E.D.N.C. 2018) (rejecting challenge to alternatives where the litigants failed to "embrace all the reasons that the [a]gencies' deemed [an alternative] inadequate to meet the needs of the . . . project"). To that end, while Plaintiffs flag raising tolls at existing facilities as "one alternative proposed that only failed the revenue requirement," Pls. Reply at 8-9, they misstate the record. That alternative failed to meet *every objective* of the Project. DOT_36267. As the FHWA explained, "this alternative would not target congestion in the Manhattan CBD, given that a number of free entry points to the Manhattan CBD would remain available." DOT_36268.

While Plaintiffs also suggest that a "combination of alternatives" could meet the project objectives, they notably fail to explain *which* combination and *how* that combination would do so.

---

[3] Plaintiffs also challenge the MTA's financial projections through a footnote in which they speculate about municipal bond rates and the fluidity of interest rate fluctuations. Pls. Reply at 6 n.3. But even if Plaintiffs' contentions were supported by more than speculation, courts "have consistently rejected . . . attempts" to turn the NEPA process into "a battle of the experts." *Price Road Neighborhood Ass'n, Inc. v. U.S. DOT*, 113 F.3d 1505, 1511 (9th Cir. 1997). "[W]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* (quotation marks omitted).

Pls. Reply at 9. Most revenue-generating alternatives would not generate revenue *for the MTA* and the FHWA was not required to consider alternatives that would require a change in state law. *See Colorado Rail Passenger Ass'n v. Fed. Transit Admin.*, 843 F. Supp. 2d 1150, 1168 (D. Colo. 2011) ("it was not an abuse of discretion to eliminate alternatives" where the "lack of current funding and the uncertainty of any future funding" rendered them too speculative); *see also* DOT_36267-68; Op. at 61. And even if some hodgepodge of tolling and non-tolling options could hypothetically meet the Project's purpose and need, the New York State Legislature authorized *Congestion Pricing*. NEPA does not require the FHWA to second-guess that legitimate decision by insisting upon a makeshift patchwork of alternatives which the MTA has determined to be contrary to the clear goals of the MTA Reform and Traffic Mobility Act. *See Sierra Club v. Watkins*, 808 F. Supp. 852, 873 n.39 (D.D.C. 1991) (courts "are less likely to require the consideration of" alternatives that require "drastic shifts in the manner by which policy goals are achieved"). It would not serve NEPA's procedural and environmental purpose for the FHWA to make a federal decision with respect to Congestion Pricing (which will have no significant environmental effects, after mitigation) on the basis that it would not generate enough revenue for the MTA, despite the MTA's conclusion otherwise.

The remainder of Plaintiffs' argument on this issue catalogues cases from a line of authority inapposite to the matter at hand. As discussed in the Federal Defendants' opening brief, *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437 (4th Cir. 1996), involved an error in evaluating economic benefits that were weighed against significant environmental costs, which resulted in "distort[ion]" of the agencies' "fair consideration" of the project at issue. Fed. Def. Br. at 24-25. Here, the Project will result in *no* significant environmental effects, such that, even if there were errors in the MTA's financial projections, the calculus on the FHWA's decision would

remain the same. *Cf. North Carolina Alliance for Transp. Reform, Inc. v. U.S. DOT*, 151 F. Supp. 2d 661, 693 (M.D.N.C. 2001) ("In the current case, even under the least favorable discount rate assumptions, the alternatives detailed in the cost-benefit analysis had positive benefit/cost ratios. Therefore, it appears that the cost-benefit analysis did not play a decisive role in the decision of whether to undertake the proposed project."). *NRDC v. Forest Service*, too, involved an error that could have led the Forest Service to select "an alternative with less adverse environmental impact, in less environmentally-sensitive areas." 421 F.3d 797, 812 (9th Cir. 2005). Plaintiffs, here, do not even try to offer up alternatives with fewer environmental consequences. And *National Wildlife Federation v. National Marine Fisheries Service* did not invalidate an alternatives analysis at all—there, the court deferred to the agency's economic analysis, as the Court should do here. 235 F. Supp. 2d 1143, 1158 (W.D. Wash. 2002).

As the line of cases Plaintiffs rely on recognize, "[i]t is not for the courts, under the authority of NEPA, to review every economic calculation which an agency puts into its environmental impact statement." *South Louisiana Environmental Council, Inc. v. Sand*, 629 F.2d 1005, 1015 (5th Cir. 1980). Rather, courts may "evaluate the economic justification only if it has become so flawed that it grossly distorts the environmental considerations." *Id.* As described above, Plaintiffs have not shown that the FHWA's analysis of the benefits of Congestion Pricing was "grossly distort[ed]." The *Re-Evaluation* and *Re-Evaluation 2* ensured that the Project objectives were met with the tolling structure ultimately adopted.

B.    The Phase-In Approach Does Not Invalidate the FHWA's Alternatives Analysis.

Plaintiffs also renew their argument, already rejected by the Court in June, that the FHWA's alternatives analysis was defective because it did not consider a phase-in of the Project. Pls. Reply at 8, 9. Brushing aside the Court's opinion as "initial analysis," Plaintiffs insist that the

phase-in approach assessed in *Re-Evaluation 2* should have been part of the FHWA's alternatives analysis from the beginning because it the phase in is not a "pilot program" that "merely postpones the full operation of Congestion Pricing." *Id.*[4]

As an initial matter, Plaintiffs' argument is an effort to seek reconsideration of the Court's prior order without meeting the demanding standards that reconsideration requires. *See Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) ("The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked."). This Court has already clearly ruled that "the FHWA did not fatally err in omitting phased-in tolling from the EA's discussion of preliminary alternatives," because "[t]reating the imposition of a phased-in congestion toll as a temporary exemption that could be integrated into Congestion Pricing instead of a distinct proposal was reasonable" and "since phased-in tolling merely postpones the full operation of Congestion Pricing, it 'is simply not an alternative within the meaning of the NEPA regulations.'" Op. at 64 (quoting *Shenandoah Valley Network v. Capka*, No. 07 Civ. 66, 2009 WL 2905564, at *11 (W.D. Va. Sept. 3, 2009)). That resolves this issue.

In any event, Plaintiffs are wrong to suggest that the Court misunderstood *Shenandoah Valley*. Both that case and *Adler v. Lewis*, also relied upon in the Court's June opinion, rejected claims that "alternatives" should have been studied where those "alternatives" did not substantively change the project at issue, but merely "postpone[d]" the projects or offered "improvements to occur before construction" began on them. *Id.*; *Adler v. Lewis*, 675 F.2d 1085, 1097 (9th Cir. 1982). As this Court recognized in June, a phased-in approach to the Project "merely postpones the full operation of Congestion Pricing." Op. at 64. That is even more obviously true

---

[4] Plaintiffs cite the Federal Defendants' brief for the phrase "merely postpones the full operation of Congestion Pricing," but omit that the brief quotes directly from this Court's opinion.

now than then. After Phase 1 and Phase 2, the phased-in approach adopted by the MTA results in exactly the tolling structure that the MTA adopted in March (and assessed in the *Re-Evaluation*). The Court should not accept Plaintiffs' invitation to second-guess its judgment.

Moreover, the FHWA *did* consider whether the environmental effects of a phase-in would differ significantly from the scenarios analyzed in the Final EA. By Phase 3 of the phase-in, the *Re-Evaluation 2* notes that "the effects [of the Project] would be those identified for the March 2024 adopted toll structure in the June 2024 reevaluation." Fed Def. Br. at 18 (quoting DOT_47539). And "[d]uring Phases 1 and 2, the structure would be the same [as in Phase 3] but the tolls would be lower (but within the range of scenarios analyzed in the EA)." *Id.* at 19 (quoting DOT_47539). As is self-evident—but nevertheless also explained in the *Re-Evaluation 2*—during Phase 1 and 2, "some effects . . . would be definition be reduced as compared to Phase 3," when the toll is in full operation. *Id.* at 19 (quoting DOT_47539). Under the FHWA's regulations, supplemental NEPA documents need not be prepared "where . . . changes to the proposed action . . . result in a lessening of adverse environmental impacts" already evaluated. 23 C.F.R. § 771.130(b)(1); *see also South Trenton Residents Against 29 v. FHWA*, 176 F.3d 658, 665 (3d Cir. 1999) (rejecting failure-to-supplement claim where re-evaluation showed that "the four-lane alternative, if anything, would mitigate any environmental impacts associated with the originally approved six-lane highway design"); *No Mid-Currituck Bridge-Concerned Citizens*, 60 F.4th at 802 ("It's thus unclear why reduced traffic over the bridge—which would seem to decrease the bridge's environmental footprint—would require a supplemental EIS.").

## II.    Changed "Economic Conditions" Do Not Require a Supplemental EA.

Next, Plaintiffs challenge the FHWA's assessment of economic conditions, arguing: (1) that the FHWA did not adequately consider economic conditions in the Final EA, (2) that the

FHWA did not adequately update that analysis in the *Re-Evaluation*, and (3) that economic circumstances have changed since the Final EA, separate from the analyses of the Final EA and *Re-Evaluation*. Pls. Reply at 12-13. These arguments are without legal merit and are unsupported by the factual record.

Plaintiffs' first two points can be quickly dispensed with. Plaintiffs already unsuccessfully challenged the Final EA, which included a thorough discussion of the Project's anticipated effects on economic conditions. *See* DOT_36684-767. Even if Plaintiffs had not lost on those arguments, their claim that the Final EA and *Re-Evaluation* did not address the "affordability of the toll" or "the impacts on small businesses" is simply wrong. *See, e.g.*, DOT_36695-96, 36749 (Final EA, effect on small businesses); DOT_45527-28 (*Re-Evaluation*, same); DOT_37003-08 (Final EA, effect on low-income drivers); DOT_45569-70 (*Re-Evaluation*, same). And the *Re-Evaluation* updated the Final EA's economic-condition analysis to account for the adopted tolling structure. DOT_45523-32.

Plaintiffs' claim of *changed* economic conditions fares no better. As explained in the Federal Defendants' opening brief, changed *economic* conditions do not provide cognizable grounds to require supplementation of an *environmental* review absent an indication those conditions will change the environmental effects of a project. Fed. Def. Br. at 26. Plaintiffs' claim that information "need not be strictly environmental," to warrant supplementation relies on two *sui generis* decisions that contradict the regulations that govern the FHWA's NEPA review and the overwhelming weight of authority, including Supreme Court and Second Circuit precedent. *See* 23 C.F.R. § 771.130 ("new information" must be "relevant to environmental concerns" and "result in significant environmental impacts" for supplementation to be required); *see also Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983) ("NEPA

does not require the agency to assess *every* impact or effect of its proposed action, but only the impacts or effects on the environment." (emphasis in original)); *County of Seneca v. Cheney*, 12 F.3d 8, 12 (2d Cir. 1993) ("Seneca failed to meet this burden because it has made no showing of threatened environmental damage as opposed to economic effects").

Even if the law were different, the Governor's statements about economic conditions in New York would not require the FHWA to prepare a supplemental EA. When she announced a pause of the Project, the Governor spoke of economic circumstances that had changed *since 2019* (when the statute authorizing the Project was enacted), not 2023 (when the Final EA and FONSI were published). *See* New York State, *Governor Hochul Addresses New Yorkers on Affordability and the Cost of Living* (June 5, 2024), *available at* https://www.governor.ny.gov/news/video-audio -rush-transcript-governor-hochul-addresses-new-yorkers-affordability-and-cost. These changes— like the occurrence of a pandemic and the rising cost of living, *id.*—were discussed in the Final EA. *See, e.g.*, DOT_36242 (discussing effect of pandemic on traffic); DOT_36656 (noting that the toll would cause "[n]o notable changes in . . . cost of living"). Indeed, this Court has already found that the FHWA's use of pre-pandemic data in the Final EA was adequately explained. Op. at 86. Plaintiffs simply have not substantiated their claim that economic conditions have changed since the issuance of the Final EA and FONSI in a manner that would necessitate a supplemental EA.

Plaintiffs' argument about changed economic circumstances only serves to highlight how their NEPA claims simply function as a pretext to challenge a policy they disagree with, rather than asserting good-faith concerns about environmental effects. Months ago, Plaintiffs argued that the years-long environmental review that led to issuance of the Final EA and FONSI was insufficiently thorough. *See generally* Dkt. No. 54-1. They now argue that—less than a year after the FONSI issued—economic conditions have changed so drastically that a new EA is required,

relying only on the Governor's generic (and extra-record) statements to support their claim. Pls. Reply at 12. But NEPA "cannot be used as a handy stick by a party with no interest in protecting against an environmental injury to attack a defendant." *Town of Stratford, Conn. v. FAA*, 285 F.3d 84, 88 (D.C. Cir. 2002). "To accept NEPA litigants whose interests accidently overlap with the statute's intended purpose would not only create a class of plaintiffs far larger than Congress originally intended, it also would serve to distort the effect of NEPA itself." *Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 194 (3d Cir. 2016).

## III. The FHWA Reasonably Concluded that Limited Increases to Air Pollution Did Not Require Supplemental Environmental Review.

Next, Plaintiffs vaguely suggest that changes to air quality in the Bronx, Richmond, and Bergen counties require the FHWA to supplement the Final EA (although they provide no real explanation for why this is the case). Pls. Reply at 13. The *Re-Evaluation* acknowledges these changes, noting that they are "small," generally "less than 1 percent" more than those determined the Final EA, and fit with in the broader context of emissions that are "reduce[d]" by "the same or more than the amounts identified in the Final EA." DOT_45550-51. The FHWA's conclusion that these changes did not "present[] a *seriously* different picture of the environmental landscape" so as to require a supplemental EA was neither arbitrary, nor capricious. *Friends of Capital Crescent Trail v. Federal Transit Admin.*, 877 F.3d 1051, 1055-56 (D.C. Cir. 2017) (emphasis in original, quotation marks omitted); *see also Young v. General Servs. Admin.*, 99 F. Supp. 2d 59, 86 (D.D.C. 2000) (finding that a "five percent to about eight percent" change in a resource area "does not present a seriously different picture"). This is doubly so given the deference owed to the FHWA's determination of whether changed circumstances are "significant." *Vine Street Concerned Citizens, Inc. v. Dole*, 630 F. Supp. 24, 28 (E.D. Pa. 1985) ("[E]valuation of 'significant impacts' is, in the absence of extraordinary circumstances, a factual matter."); *see also Marsh*, 490 U.S. at

376 ("The question presented for review in this case is a classic example of a factual dispute the resolution of which implicates substantial agency expertise."). Plaintiffs cite no authority to support a different conclusion.

## IV.   The FHWA Reasonably Concluded that the Adopted FHV Tolling Structure Does Not Require a Supplement to the Final EA.

After taking aim at every aspect of the tolling structure in their opening brief, Plaintiffs' reply focuses on just one aspect—the way that FHVs will be tolled. Pls. Reply at 13-16.[5] But in doing so, Plaintiffs ignore that the *Re-Evaluation* assessed the adopted tolling structure *as a whole* to determine that its environmental effects fell within the range analyzed within the Final EA. DOT_45476 ("For each analysis topic, they considered the effects of the adopted toll structure in comparison to the effects for the seven tolling scenarios evaluated in the Final EA."). Plaintiffs have shown no error in that overarching analysis. *See Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49, 60 (1st Cir. 2001) ("Gauzy generalizations and pin-prick criticisms, in the face of specific findings and a plausible result, are not even a start at a serious assault" under NEPA).

On the specific issue of FHVs, Plaintiffs willfully ignore the record, arguing that a per-ride charge for FHVs relied on "back-of-the-envelope" calculations that were "unlikely to meaningfully relieve traffic congestion." Pls. Br. at 13-14. But the *Re-Evaluation* squarely addressed the effect of the FHV tolling structure, concluding that it would likely reduce FHV trips in the Manhattan CBD by 0.3%, well within the range of scenarios modeled in the Final EA, that ranged from a 16.8% reduction to a 4.6% *increase*. DOT_45527. In any event, the stated objective of the Project is *not* merely to reduce FHV trips in the Manhattan CBD (as Plaintiffs misleadingly

---

[5] With respect to other aspects of the tolling structure, Plaintiffs simply continue with their now-tired assertion that it was improper for the FHWA to rely on the BPM model to analyze the toll. Pls. Reply at 16. This Court has already rejected these arguments. *See Op.* at 55 ("[T]he FHWA's reliance on well-established modeling tools to analyze Congestion Pricing's consequences confirms that its effects are typical for transportation projects.").

suggest, *see* Pls. Reply at 16), but to reduce *overall* vehicle entries and vehicle-miles traveled. DOT_45475. The adopted tolling structure, including the FHV tolling structure, comfortably meets those stated Project objectives. *Id.*

Unwilling to grapple with this straightforward analysis, Plaintiffs argue that adopting a per-ride charge required a *qualitative* change to the assessment of "how the new passenger charge might impact congestion." Pls. Reply at 14-15. But the Final EA assessed a broad range of FHV charging structures, all using the BPM. DOT_36203. That modeling has been approved by this Court, *see* Op. at 55, and is specifically designed to assess the effects of tolls (and provide for meaningful comparisons) on different classes of vehicles, including taxis and other FHVs, DOT_36340-43; *see also Latin Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 858 F. Supp. 2d 839, 855 (E.D. Mich. 2012) ("[T]he FHWA's technical methodologies, including its traffic projections, are entitled to substantial deference and are subject only to a reasonableness review."). Against that, Plaintiffs offer extra-record argument in the form of the limited critiques of two *economists* who: (1) claim no expertise in traffic modeling; (2) *by their own admission* (and unlike the FHWA), rely on "back-of-the-envelope calculations" in their critique; and (3) make no arguments about the environmental effects of the FHV tolling structure. *See* Pls. Reply at 15 n.4 (citing Michael Ostrovsky & Frank Yang, Working Paper No. 4228, *Effective and Equitable Congestion Pricing: New York City and Beyond* at 6).[6] NEPA does not permit the Court to eschew the FHWA's expert traffic modeling analysis in favor of the guesswork of two economists in a

---

[6] The Court should not consider this paper, which was published after the *Re-Evaluation* and which is not part of the administrative record. "[C]ourts only permit . . . additional extra-record evidence in three unusual circumstances," and Plaintiffs have set forth no argument that any of those circumstances apply here. *Beyond Nuclear v. U.S. Dep't of Energy*, 233 F. Supp. 3d 40, 48 (D.D.C. 2017). Moreover, the Court should not consider this paper because it was offered for the first time in Plaintiffs' reply brief. *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010) ("It is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion.").

working paper, particularly one published *after* the FHWA evaluated the MTA's adopted tolling structure and which is not part of the record in this case. *See Citizens for Balanced Env't and Transp., Inc. v. Volpe*, 650 F.2d 455, 462 (2d Cir. 1981) (noting that a court is not "required, equipped nor inclined to resolve the fervid disagreements between the parties over technical analyses forming the basis for the Highway Department's recommendation [that the project] is the most viable solution to projected traffic needs in the future.").

In any event, the *kinds* of changes advocated by Plaintiffs—modifications to the FHV charge, such as using per-mile rather than per-ride charges—appear to be late-arriving challenges to the *type* of toll charged on FHVs, an issue that was fully considered in the Final EA. DOT_36203 (discussing full exemption, one-a-day, three-a-day, and per-ride FHV charges). Plaintiffs' challenges to that document come too late and the Court has already approved of the range of alternatives considered in it. Op. at 56-66; *see also id.* at 112 ("[F]rom the FHWA's thorough analysis and exhaustive review process, it is abundantly clear that the agency took a hard look at the environmental consequences of the Congestion Pricing." (quotation marks and alterations omitted)). Plaintiffs should not be permitted a second challenge to the Final EA. *See, e.g.*, *United States v. Quintieri*, 306 F.3d 1217, 1232 (2d Cir. 2002) ("[H]aving had both opportunity and incentive to mount this challenge the first time around and having failed to do so, [the appellant] cannot do so now.").

## V.    The FHWA's Conclusion that the Mitigation in the Final EA Remains Valid Was Not Arbitrary or Capricious.

Finally, the FHWA reasonably concluded that the mitigation measures described in the Final EA, the *Re-Evaluation*, and the *Re-Evaluation 2* will remain effective even with the adoption of a phase-in period. As the FHWA noted, mitigation measures are *even more* effective under the phase-in approach—"[w]hile some effects of the interim phases would by definition be reduced as

compared to Phase 3 (such as effects on low-income drivers), the mitigation set forth in the EA and the June 2024 reevaluation would be implemented as previously contemplated – and would not be deferred until the March 2024 toll structure is fully implemented." DOT_47539. Plaintiffs have not identified any features of the phase-in approach that would cast doubt on the continuing validity of the MTA's mitigation commitments. Pls. Reply at 16-20.

To begin, Plaintiffs criticize the FHWA and MTA for failing to specifically site mitigation measures, such as by identifying which specific schools will receive air filtration units. Pls. Br. at 17. But the *Re-Evaluation* allocates proportional funding for place-based mitigation in affected communities based on population and explains in great detail how the measures themselves will be sited—existing conditions will be analyzed; stakeholders will be consulted; relevant agencies will identify specific potential sites; the analysis will be refined to ensure equitable distribution amongst potential sites; a mitigation plan will be drafted and presented to relevant stakeholders; then a mitigation plan will be finalized. DOT_45609-11. Thereafter, robust monitoring will ensure the mitigation measures' efficacy. DOT_45564. The Court has already held that "binding mitigation plans accompanied by monitoring suffice under NEPA," Op at 104, and that holding is all the more correct now that the mitigation commitments detailed in the *Re-Evaluation* and *Re-Evaluation 2* have become more concrete.[7]

Along with criticizing the FHWA and MTA for not having already sited place-based mitigation measures, Plaintiffs contend that the mitigation measures are no longer valid because they will be sited within five years, before the final toll is fully phased in. Pls. Reply at 18 ("The

---

[7] Plaintiffs' argument that Richmond County and the lower FDR Drive have been ignored in the MTA's mitigation commitments, Pls. Reply at 17, is counterfactual. Richmond County will benefit from the approximately $150 million in contemplated regional mitigation measures, *see* DOT_45607, and the lower FDR Drive is receiving specific place-based mitigation, *see* DOT_45606.

mitigation plan needed to be restructured to account for the fact that the biggest impact will only become evident well after the five-year commitment."). But this is a positive feature of the mitigation plan given that the "salutary" effects of both place-based and regional mitigation measures will be felt long before any adverse effects of the Project are fully realized. Op. at 103; DOT_47539. Moreover, it is not as though the benefits of mitigation measures like electric charging infrastructure and air filtration units will disappear after five years—their effects will continue after implementation.[8] And should any modest modifications be needed to account for unforeseen effects, the MTA's commitment to ongoing monitoring will ensure efficacy. DOT_45564.

Finally, Plaintiffs argue that with the adoption of the phased-in approach, certain monitoring commitments will no longer be effective, as they will end before the tolling structure is fully implemented—*i.e.*, an initial assessment of air quality after two years (Pls. Reply at 18), a study on parking after eighteen months (*id.*), adjustments to toll prices and credits within one year of implementation (*id.* at 19), and a three-month evaluation of traffic patterns on the FDR Drive (*id.*). But Plaintiffs mistake these specific monitoring benchmarks for the overall *ongoing* monitoring that the MTA has committed to over the life of the Project. As both the Final EA and *Re-Evaluation* make clear (and as Plaintiffs ignore, despite it being highlighted in the Federal Defendants' opening brief, *see* Fed. Def. Br. at 7), the MTA has "commit[ed] to ongoing monitoring and reporting of potential effects of the Project, including for example, traffic entering the CBD, vehicle-miles traveled in the CBD; transit ridership from providers across the region; bus speeds within the CBD; air quality and emissions trends; parking; and Project revenue."

---

[8] Plaintiffs also criticize the fact that the low-income discount is time-limited to five years and argue that the "impact of that cliff" should be further studied. Pls. Reply at 19 (citing DOT_45614). But that feature has been in place since the Final EA, DOT_37022-23, and cannot now constitute "changed circumstances" or "new information" that would warrant a supplemental EA under 23 C.F.R. § 771.130.

DOT_36237, DOT_45468. Plaintiffs ignore that MTA will be obligated to issue reports on a biannual basis through the life of the Project and make data and analyses available to the public on a reporting website. *Id.* The "data will also be used to support an adaptive management approach to monitoring the efficacy of mitigation and adjustments as warranted." *Id.*

As this Court has already recognized, "the judiciary has endorsed the use of adaptive management strategies as a responsible decision in light of the inherent uncertainty of environmental impacts." Op. at 101-02 (quotation marks omitted). "Adaptive management approaches provide agencies with the flexibility to ensure their mitigation measures reflect the real effects of government action, rather than a rigid adherence to initial projections." *Id.* at 102. The MTA has committed to ongoing and transparent monitoring, which will ensure that its mitigation remains effective through each phase of the tolling structures implementation.

## CONCLUSION

For the reasons stated in the Federal Defendants' opening brief and herein, Plaintiffs' motion for summary judgment should be denied and the Federal Defendants' cross-motion for summary judgment should be granted.

Dated: December 18, 2024
      New York, New York

                       EDWARD Y. KIM
                       Acting United States Attorney
                       Southern District of New York

By:    */s/ Zachary Bannon*
             ZACHARY BANNON
             DOMINIKA TARCZYNSKA
             Assistant United States Attorneys
             86 Chambers Street, Third Floor
             New York, New York 10007
             Tel.: (212) 637-2728