UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__4/17/2025__

ELIZABETH CHAN, *et al.*,

                          Plaintiffs,

          -v-

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                          Defendants.

MICHAEL MULGREW, *et al.*,

                          Plaintiffs,

          -v-

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                          Defendants.

NEW YORKERS AGAINST CONGESTION
PRICING TAX, *et al.*,

                          Plaintiffs,

          -v-

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                          Defendants.

TRUCKING ASSOCIATION OF NEW YORK,

                          Plaintiff,

          -v-

METROPOLITAN TRANSPORTATION
AUTHORITY, *et al.*,

                          Defendants.

23-cv-10365 (LJL)
24-cv-01644 (LJL)
24-cv-00367 (LJL)
24-cv-04111 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Before the Court are motions in four related cases: *Chan et al. v. U.S. Department of Transportation et al.* ("*Chan*"), 23-cv-10365; *Mulgrew et al. v. U.S. Department of Transportation et al.* ("*Mulgrew*"), 24-cv-1644; *New Yorkers Against Congestion Pricing Tax et al. v. U.S. Department of Transportation et al.* ("*New Yorkers*"), 24-cv-367; and *Trucking Association of New York v. Metropolitan Transportation Authority et al.* ("*Trucking*"), 24-cv-4111.[1]

For the reasons that follow, Defendants' motions to dismiss and motions for partial summary judgment are GRANTED. Plaintiffs' motions for partial summary judgment are DENIED.

## PROCEDURAL HISTORY

The procedural history of the *Chan*, *Mulgrew*, *New Yorkers*, and *Trucking* cases is detailed in *Chan v. U.S. Dep't of Transp.*, 2024 WL 5199945, at *1–4 (S.D.N.Y. Dec. 23, 2024).

In short, the defendants in *Chan* are the Federal Highway Administration ("FHWA"), Gloria M. Shepherd, in her official capacity as Acting Deputy Administrator of the FHWA[2], Richard J. Marquis in his official capacity as Division Administrator of the New York Division of the FHWA, Stephanie Winkelhake, P.E., in her official capacity as Chief Engineer for the New York State Department of Transportation ("NYSDOT"), the Metropolitan Transportation Authority ("MTA"), the Triborough Bridge and Tunnel Authority ("TBTA"), the United States Department of Transportation ("USDOT"), and William J. Carry in his official capacity as Assistant Commissioner for Policy for the New York City Department of Transportation

---

[1] Two additional related cases are before this Court but are not relevant to the instant motions: *Metropolitan Transportation Authority et al v. Duffy et al.*, 25-cv-1413, and *Blumencranz v. Hochul et al.*, 25-cv-1787.

[2] Shepherd was automatically substituted for the previous administrator of the FHWA, Shailen Bhatt, pursuant to Federal Rule of Civil Procedure 25(d).

("NYCDOT"). *Chan*, Dkt. No. 124. The second amended complaint, the operative complaint in *Chan* ("*Chan* Complaint"), asserts the following causes of action: (Count I) violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, through arbitrary and capricious conduct; (Count II) violation of NEPA through failure to supplement; (Count III) violation of NEPA through insufficient reevaluation; (Count IV) violation of the Commerce Clause, U.S. Const. art. I, § 8, cl. 3; (Count V) violation of the right to travel; and (Count VI) violation of the Green Amendment, N.Y. Const. art. I, § 19. *Id.* Winkelhake moved to dismiss the federal constitutional claims on September 30, 2024. *Chan*, Dkt. No. 115. The MTA, the TBTA, Carry, and the Traffic Mobility Review Board ("TMRB")[3] (collectively, the "Municipal Defendants") separately moved to dismiss all the constitutional claims on September 30, 2024. *Chan*, Dkt. No. 117. The motions to dismiss are now fully briefed. *Chan*, Dkt. Nos. 116, 118, 130, 135, 137. Plaintiffs moved for summary judgment on December 2, 2024. *Chan*, Dkt. No. 136. On December 9, 2025, the USDOT, FHWA, Bhatt, and Marquis (the "Federal Defendants") cross-moved for summary judgment. *Chan*, Dkt. No. 145. On December 9, 2025, the Municipal Defendants separately cross-moved for summary judgment. *Chan*, Dkt. No. 147. On December 9, 2025, Winkelhake joined the Municipal Defendants' motion for summary judgment. *Chan*, Dkt. No. 149. The motions for summary judgment are now fully briefed. *Chan*, Dkt. Nos. 136-1, 146, 148, 154, 160–161.

The defendants in *Mulgrew* are the USDOT, Shepherd in her official capacity, the FHWA, Marquis in his official capacity, Winkelhake, the MTA, the TBTA, the NYSDOT, and the NYCDOT. *Mulgrew*, Dkt. No. 112. The second amended complaint, the operative complaint in

---

[3] The TMRB is not named as a defendant in *Chan* but joined the omnibus motion to dismiss in its capacity as a defendant in *New Yorkers* and *Trucking*.

*Mulgrew* ("*Mulgrew* Complaint"), asserts the following causes of action: (Count I) violation of NEPA and the APA through arbitrary and capricious conduct; (Count II) violation of NEPA through failure to supplement; (Count III) violation of NEPA through insufficient reevaluation; (Count IV) violation of the Commerce Clause; (Count V) violation of the right to travel; and (Count VI) violation of the Green Amendment.  *Id.*  Winkelhake moved to dismiss the federal constitutional claims on September 30, 2024.  *Mulgrew*, Dkt. No. 102.  The Municipal Defendants separately moved to dismiss all the constitutional claims on September 30, 2024.  *Mulgrew*, Dkt. No. 104.  The motions to dismiss are now fully briefed.  *Mulgrew*, Dkt. Nos. 103, 105, 118, 123, 125.  Plaintiffs moved for summary judgment on December 2, 2024.  *Mulgrew*, Dkt. No. 124.  On December 9, 2024, the Federal Defendants cross-moved for summary judgment.  *Mulgrew*, Dkt. No. 131.  On December 9, 2025, the Municipal Defendants separately cross-moved for summary judgment.  *Mulgrew*, Dkt. No. 133.  On December 9, 2025, Winkelhake joined the Municipal Defendants' motion for summary judgment.  *Mulgrew*, Dkt. No. 135.  The motions for summary judgment are now fully briefed.  *Mulgrew*, Dkt. Nos. 124-1, 132, 134, 140, 146–147.

The defendants in *New Yorkers* are the USDOT, the FHWA, Sheperd in her official capacity, Marquis in his official capacity, the MTA, the TBTA, the NYSDOT, the NYCDOT, and the TMRB.  *New Yorkers*, Dkt. No. 54.  The first amended complaint, the operative complaint in *New Yorkers* ("*New Yorkers* Complaint"), asserts the following claims: (Count I) violation of NEPA and the APA through arbitrary and capricious conduct; (Count II) violation of NEPA through failure to supplement; (Count III) violation of the State Administrative Procedure Act ("SAPA"), N.Y. A.P.A. Law §§ 100 *et seq.*; (Count IV) declaratory and equitable relief; and (Count V) violation of the Green Amendment.  *Id.*  On November 30, 2024, the Municipal Defendants moved to dismiss the constitutional claims.  *New Yorkers*, Dkt. No. 105.  On December

9, 2024, the Municipal Defendants moved to dismiss the whole of the first amended complaint. *Mulgrew*, Dkt. No. 128. The motions to dismiss are now fully briefed. *Mulgrew*, Dkt. Nos. 106, 112, 123, 133, 139.

Plaintiff in *Trucking* is the Trucking Association of New York ("TANY"). *Trucking*, Dkt. No 14. The defendants in *Trucking* are the MTA and the TBTA. *Id.* Letitia James in her official capacity as New York State Attorney General ("NYAG") is an intervenor. *Trucking*, Dkt. No. 58. The complaint in *Trucking* ("*Trucking* Complaint") asserts the following causes of action: (Count I) violation of the Commerce Clause; (Count II) violation of the right to travel; and (Count III) violation of the Supremacy Clause, U.S. Const. art. VI, cl. 2. *Trucking*, Dkt. No. 14. On November 30, 2024, the NYAG moved to dismiss the complaint. *Trucking*, Dkt. No. 60. On November 30, 2024, the Municipal Defendants separately moved to dismiss the complaint. *Trucking*, Dkt. No. 62. The motions to dismiss are now fully briefed. *Trucking*, Dkt. Nos. 61, 63, 76, 79–80, 88.

On June 20, 2024, the Court granted and denied in part Defendants' motions seeking dismissal and/or partial summary judgment in *Chan*, *Mulgrew*, and *New Yorkers*. *See generally Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171 (S.D.N.Y. 2024). In particular, the Court denied Plaintiffs' motion for partial summary judgment in *Chan*, except as to Count II and granted Defendants' motion for partial summary judgment except as to Count II. *Id.* at 249. The Court deferred ruling on Defendants' motions to dismiss Count II in *New Yorkers* and *Mulgrew* and the cross-motions for summary judgment on Count II in *Chan* pending supplemental briefing on the FHWA's June 14, 2024 reevaluation. *Id.*

On December 23, 2024, the Court denied Plaintiffs' motions for a preliminary injunction in *Chan*, *Mulgrew*, *New Yorkers*, and *Trucking*. *See generally Chan*, 2024 WL 5199945.

## BACKGROUND

The Court refers to its prior Opinions and Orders in *Mulgrew*, 750 F. Supp. 3d 171, and *Chan*, 2024 WL 5199945, for the relevant background of the Central Business District Tolling Program ("Tolling Program").

For purposes of the motions to dismiss in each of *Chan*, *Mulgrew*, *New Yorkers*, and *Trucking*, the Court accepts the factual allegations in each respective complaint as true and recounts the relevant allegations below as necessary. For purposes of the parties' motions for summary judgment, the Court refers to the factual record and construes those facts in favor of the non-moving party. The Court briefly relates the facts leading up to the original environmental assessment and its contents. It then discusses the relevant subsequent events.

## I.    The Original Environmental Assessment

On April 1, 2019, the New York State Legislature enacted the Traffic Mobility Act ("Act") to address the severe congestion in New York City. N.Y. Veh. & Traf. Law §§ 1701 *et seq.* The Act directed that the TBTA, TMRB and NYCDOT establish a tolling program for vehicles entering or remaining in the Manhattan Central Business District ("CBD"). N.Y. Veh. & Traf. Law § 1704(2).[4] In addition to reducing congestion, the Legislature directed that the tolling program should provide for "sufficient revenues into the central business district tolling capital lockbox fund . . . necessary to fund fifteen billion dollars for capital projects for the 2020 to 2024 MTA capital program." N.Y. Veh. & Traf. Law § 1704-a(1).

---

[4] The Traffic Mobility Act defines the CBD as "the geographic area in the borough of Manhattan south of and inclusive of sixtieth street to the extent practicable," excluding the Franklin D. Roosevelt Drive, and New York state route 9A including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street. N.Y. Veh. & Traf. Law § 1704(2).

Over the course of several years, the NYSDOT, NYCDOT, and TBTA (together, the "Project Sponsors"), along with the FHWA, undertook an environmental review process in accordance with NEPA to determine the expected impacts of such a tolling program on the human environment.[5]  The environmental review process included significant project modeling, location study, and public participation.  DOT37149[6]; *see also Mulgrew*, 2024 WL 3251732, at *4–7; *Chan*, 2024 WL 5199945, at *5.  The FHWA published a draft environmental assessment on July 29, 2022.  DOT37149.  The FHWA and Project Sponsors invited further public comment on the draft environmental assessment and incorporated the feedback received and further study performed into the final environmental assessment ("Final EA"), which was published on May 5, 2023.  DOT36150, 36152.

Based on prior New York City congestion pricing proposals and studies, the FHWA and Project Sponsors preliminarily considered twelve alternative projects aimed at reducing congestion in the CBD and raising revenues for the MTA Capital Program.  DOT36262–64; *Mulgrew*, 750 F. Supp. 3d at 218.  Those preliminary alternatives were winnowed down to just one category of projects—establishing a zone-based vehicle toll within the CBD—that the FHWA and Project Sponsors determined could satisfy the project's objectives.  DOT36267–68.  Within that category,

---

[5] "NEPA requires a federal agency to prepare an [environmental impact statement ('EIS')] before taking any major action 'significantly affecting the quality of the human environment.'"  *Nat. Res. Def. Council, Inc. v. F.A.A.*, 564 F.3d 549, 556 (2d Cir. 2009) (quoting 42 U.S.C. § 4332(2)(C)).  "An [environmental assessment ('EA')] is 'a concise document that briefly discusses the relevant issues and either reaches a conclusion that preparation of [an] EIS is necessary or concludes with a finding of no significant impact [('FONSI')], in which case preparation of an EIS is unnecessary.'"  *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 12 (2d Cir. 1997) (quoting *Sierra Club v. Espy*, 38 F.3d 792, 796 (5th Cir. 1994) (citing 40 C.F.R. § 1508.9(a)).  In simple terms, an EA is the mechanism by which the agency shows its work in assessing the subject project's anticipated effects on the environment.  Based on the EA, the agency then determines whether the project will or will not have significant environmental impacts and accordingly decides whether to issue either an EIS or else a FONSI.  *See id.*
[6] Citations to "DOT" refer to the administrative record lodged by the FHWA.

7

the Final EA did not analyze a single tolling structure.  Instead, it recognized that the Act required the TMRB to "recommend to the TBTA Board the toll amounts and toll structure, such as crossing credits, discounts, and/or exemptions for existing tolls paid on bridges and tunnels."  DOT36272; *see* N.Y. Veh. & Traf. Law § 1704-a.  "The variable pricing structure could vary by time of day, day of week, and day of year and could be different for different types of vehicles."  DOT36272. The Final EA noted that the TMRB's recommendation "would be informed by the results of this EA, which includes a traffic study, and would consider such factors as traffic patterns, operating costs, public impact, and environmental impacts, including, but not limited to, air quality and emissions trends."  *Id.* (punctuation omitted).  Accordingly, to provide the TMRB with more information to assist the recommendation-making process, the Final EA considered "a range of tolling scenarios with different attributes to identify the range of effects that may occur."  *Id.*; *see Mulgrew*, 750 F. Supp. 3d at 224 & n.22 (summarizing the tolling scenarios and noting that "[a]t times, the EA considered modified versions of these tolling scenarios in order to isolate and test specific impacts from Congestion Pricing"); DOT36203, 36295–99 (similar).  It additionally analyzed a "No Action Alternative" which stood for the outcomes predicted to occur if no vehicular tolling program was implemented in the CBD.  DOT36199.

The seven considered scenarios ("Tolling Scenarios") all imposed a toll on vehicles entering the CBD[7] but varied in terms of the fare amounts for different vehicle classes, caps upon the daily tolls, availability and amount of river-crossing credits, and time-of-day considerations. DOT2455–56, 36203.  All of the tolling scenarios contemplated a three-tier system that charged

---

[7] Entry includes not only trips originating outside of the CBD, but also unique trips beginning within the CBD.  For example, the Final EA explained that a car that drives into the CBD on Monday and then parks until it departs on Wednesday would be charged for entry on Monday and Wednesday, but not Tuesday.  DOT36202.

variable tolls based on the time of day: "Peak Period" (highest toll), "Off Peak Period" (mid-level toll), and "Overnight Period" (lowest toll). DOT36203. Tolling Scenarios A–F contemplated that cars, motorcycles, and commercial vans would be subject to the same peak tolling rate, ranging from \$5–23, while trucks would pay higher tolls ranging from \$12–82. DOT2455–58, 36203. Under Tolling Scenario G, trucks would be subject to the same tolling rate as cars, motorcycles, and commercial vans. *Id.* None of the Tolling Scenarios took into account the vehicle's origin, destination, or state of registration. *Id.*

Tolling Scenario A (base plan) represented a streamlined structure without crossing credits or exemptions, and so imposed correspondingly lower toll rates ranging from \$5 (Overnight) to \$9 (Peak) for cars, motorcycles, and commercial vans. DOT2455–56, 36203. It capped the toll on cars, motorcycles, and commercial vans at once per day, but did not cap the toll on other vehicle classifications. *Id.* Tolling Scenario B (base plan with caps and exemptions) added an exemption for buses and caps on the number of times trucks could be tolled, and therefore had somewhat higher toll rates ranging from \$5 (Overnight) to \$10 (Peak). *Id.* Tolling Scenario C (low crossing credits for vehicles using tunnels to access the CBD, with some caps and exemptions) provided crossing credits for cars entering the CBD through tunnels but not bridges, exempted taxis entirely, and capped the number of times for-hire vehicles ("FHVs") could be tolled. *Id.* The auto tolling rate under Tolling Scenario C ranged from \$7 (Overnight) to \$14 (Peak). Tolling Scenario D (high crossing credits for vehicles using tunnels to access the CBD) resembled Tolling Scenario C by including tunnel crossing credits, but it omitted the exemptions and caps contemplated by Tolling Scenario C other than the once-per-day cap on cars, motorcycles, and commercial vans entering the CBD. *Id.* Tolling Scenario D imposed an auto tolling rate of \$10 (Overnight) to \$19 (Peak). By contrast, Tolling Scenario E (high crossing credits for vehicles using tunnels to access the CBD,

with some caps and exemptions) modified Tolling Scenario C by also exempting transit buses.  *Id.*  It imposed an auto tolling rate of $12 (Overnight) to $23 (Peak).  *Id.*  Tolling Scenario F (high crossing credits for vehicles using Manhattan bridges and tunnels to access the CBD, with some caps and exemptions) imposed the same auto tolling rate as Scenario E and provided crossing credits to both bridges and tunnels into Manhattan, thereby eliminating the incentive for drivers to enter Manhattan through tunnels directly into the CBD.  *Id.*  Tolling Scenario F eliminated all tolling caps and exempted only buses from the toll.  *Id.*  It also deviated from the peak and off-peak timeframes utilized in the other scenarios.  *Id.*  Finally, Tolling Scenario G capped the toll on cars, motorcycles, and commercial vans at once per day, and imposed a toll of $7 (Overnight) to $12 (Peak) on all vehicles regardless of classification.  *Id.*  The Final EA used the scenarios to evaluate the predicted effects on *inter alia*, transit, air quality, noise, and environmental justice.  DOT36218–29.

Based on the Final EA, on June 22, 2023, the FHWA issued a Finding of No Significant Impact stating that the FHWA "has determined that the Proposed Action (the CBD Tolling Alternative), described in the Final EA . . . will have no significant impact on the human or natural environment."  DOT363.  The FHWA's finding that the Tolling Program would not significantly impact the human environment was based, in part, upon the mitigation efforts to which the Project Sponsors committed.  DOT363, 370–91.

The Final EA noted that selection of the ultimate tolling structure would follow publication, as "[t]he Traffic Mobility Review Board's recommendation would be informed by the results of this EA."  DOT36272; *see also* DOT393 (the FONSI stated that the next steps would include a recommendation by the Traffic Mobility Review Board to the TBTA Board concerning "the toll amounts and toll structure, such as crossing credits, discounts, and/or exemptions for

existing tolls paid on bridges and tunnels" whereupon, "[i]nformed by the Traffic Mobility Review Board's recommendation, the TBTA Board will approve and adopt a final toll structure").

## II.     The March 2024 Tolling Structure

The Traffic Mobility Review Board released its recommendation in November 2023, and on March 27, 2024, the TBTA adopted the proposed toll rate schedule ("March 2024 Tolling Structure") with an implementation date in or about June 2024.  *See Chan*, 2024 WL 5199945, at *10–11; DOT45450.

Under the March 2024 Tolling Structure, passenger vehicles and passenger-type vehicles such as sedans, sport utility vehicles, station wagons, hearses, limousines, and certain pickup trucks and vans would be charged a single fee per day that they enter the CBD, regardless of the number of times they enter that day.  DOT45471.  The fee would be $15.00 per day for passenger vehicles that enter the CBD from 5 a.m.–9 p.m. on weekdays and 9 a.m.–9 p.m. on weekends ("Peak Period").  *Id.*  Passenger vehicles that enter the CBD outside of those hours (during the "Overnight Period") would pay a single fee of $3.75.  *Id.*  The fees would be indifferent to the point of origin or destination.  *Id.*

Single-unit trucks, multi-unit trucks, buses, and motorcycles, by contrast, would be charged a separate fee each time they enter the CBD even if they enter multiple times during a day.  *Id.*  The toll also would be indifferent to point of origin or destination.  *Id.*

For entry during the Peak Period, single-unit trucks would pay $24.00 per entry, and for entry during the Overnight Period, single-unit trucks would pay $6.00 per entry.  *Id.*  For entry during the Peak Period, multi-unit trucks would pay $36.00, and for entry during the Overnight Period, multi-unit trucks would pay $9.00.  *Id.*  Buses other than licensed sightseeing buses  would be charged $24.00 for entry during the Peak Period, and $6.00 for entry during the Overnight Period.  *Id.*  Licensed sightseeing buses would pay $36.00 for entry during the Peak Period and

$9.00 for entry during the Overnight Period.  *Id.*  The per-entry rate for motorcycles would be lower than that for other classes of vehicle: $7.50 per Peak Period entry and $1.75 per Overnight Period entry.  *Id.*

Yet another tolling frequency would apply to taxis, green cabs, and for-hire vehicles on trips.  DOT45472.  They would be charged $1.25 per trip into, within, or out of, the CBD.  *Id.*; *see Chan*, 2024 WL 5199945, at *19 ("for example, a taxi dropping off a rider in the CBD, picking up and dropping off a second rider within the CBD, and then transporting a third rider out of the CBD will incur three charges despite only entering the CBD once"), and the toll would paid by the passenger, rather than the driver, *see* 50 N.Y. Reg. 12, 81–82 (citing Rules of City of NY Taxi & Limousine Comm'n §§ 58-26(f), 59A-23(b), 59D-17(c)).  For-hire vehicles on trips dispatched by high-volume for-hire services, such as Lyft, Uber, or Via would also pass the fee through to the rider, but it would be a slightly higher fee of $2.50 per trip.  DOT45472.

The toll would also be variable depending on the method of payment.  Vehicles that paid the toll using payment mechanisms other than E-ZPass would pay higher tolls representing approximately 150% of the toll amounts stated above.  DOT45471–72.  In addition, the TBTA reserved the right to charge all vehicles a 25% higher toll during "Gridlock Alert Days," including when the UN General Assembly is in session and days throughout the holiday season when heavy traffic is expected in Manhattan.  *Id.*

The March 2024 Tolling Structure also included Tunnel Crossing Credits for certain vehicles using E-ZPass to enter the CBD during the Peak Period as part of a trip that utilizes one of four river crossings.  DOT45471.  Passenger vehicles, single-unit trucks, multi-unit trucks, buses, and motorcycles would be eligible for a Tunnel Crossing Credit if they enter the CBD through the Lincoln Tunnel or Holland Tunnel from New Jersey or if they enter or exit the CBD

via the Queens-Midtown Tunnel (from Queens) or Hugh L. Carey Tunnel (from Brooklyn).  *Id.*

Vehicles receive a higher Tunnel Credit for entry through the Lincoln Tunnel or Holland Tunnel,

both of which connect Manhattan to New Jersey.  *Id.*  Vehicles would receive a comparatively

lower Tunnel Credit for entering or exiting the CBD through the Queens-Midtown Tunnel or the

Hugh L. Carey Tunnel, both of which connect Manhattan and other New York City boroughs.  *Id.*

For all bridges, the amount of the Tunnel Crossing Credit would depend upon vehicle

classification, with motorcycles receiving the lowest credit ($1.25 for travel including the Queens-

Midtown Tunnel or the Hugh L. Carey Tunnel, and $2.50 for travel including the Lincoln Tunnel

or Holland Tunnel), and sightseeing buses and multi-unit trucks receiving the highest credit

($10.00 for travel including the Queens-Midtown Tunnel or the Hugh L. Carey Tunnel, and $20.00

for travel including the Lincoln Tunnel or Holland Tunnel).  *Id.*  The Tunnel Crossing Credits

would be available per-trip, though passenger vehicles would only be able to claim a maximum

daily credit of $5.00.

Eligible low-income motorists would also receive a discount for certain trips.  *Id.*  Instead

of $15.00, participants in the Low-Income Discount Plan would pay $7.50 for tolled Peak Period

entry to the CBD after completing ten trips in that same calendar month.  *Id.*  As part of the original

enactment, the New York Legislature also created a tax credit for CBD residents whose New York

State adjusted gross income is under $60,000.  *See* 2019 Sess. Law News of N.Y. Ch. 59.  Such

individuals may claim a credit in the amount of tolls paid that were not claimed as business

expenses.  *See* N.Y. Tax Law § 606(jjj).

The following vehicles would be exempt under the March 2024 Tolling Structure: school

buses contracted with the New York City Department of Education, commuter vans licensed with

the New York City Taxi and Limousine Commission, buses providing scheduled commuter

services open to the public, publicly owned vehicles specifically designed to perform public works other than general transportation and directly engaged in a core agency purpose, and qualifying authorized emergency vehicles as defined in N.Y. Veh. & Traf. Law § 101. DOT45471.

### III.   The Pause

On June 5, 2024, Governor Hochul directed the MTA to pause implementation of the Tolling Program. *Chan*, Dkt. No. 91; *Mulgrew*, Dkt. No. 78. The Governor stated in a press release that "circumstances have changed" and . . . I have come to the difficult decision that implementing the planned congestion pricing system risks too many unintended consequences for New Yorkers at this time." Press Release, Governor Kathy Hochul, *Governor Hochul Addresses New Yorkers on Affordability and the Cost of Living*, (June 5, 2024), https://www.governor.ny.gov/news/video-audio-rush-transcript-governor-hochul-addresses-new-yorkers-affordability-and-cost ("June 5, 2024 Press Release") (cited by *Chan*, Dkt. No. 136-1 at 10 & n.7; *Mulgrew*, Dkt. No. 124-1 at 10 & n.7).

### IV.   Reevaluation 1

On June 14, 2024, while the pause was still in effect, the FHWA released its first reevaluation ("Reevaluation 1") of the March 2024 Tolling Structure's environmental impacts. DOT45430. Reevaluation 1 explained that "[t]he purpose of this reevaluation is to make sure that the effects of MTA's adopted toll structure are consistent with the effects disclosed in the Final EA, and that the mitigation identified in FHWA's Finding of No Significant Impact [] remains valid." DOT45437, 45450. To that end, it noted that "[t]he parameters of the adopted toll structure fall within the range of tolling scenarios evaluated in the Final EA." DOT45438–40, 45469–72. Reevaluation 1 used the same methodologies as those used for the analyses in the Final EA and, for each analyzed topic, it considered the effects of the adopted toll structure in comparison to the effects for the seven tolling scenarios evaluated in the Final EA. DOT 45476. Areas of analysis

included the Tolling Program's predicted effects on air quality, noise, environmental justice, regional transportation effects, and economic conditions.  DOT45477–622.  Based on its analyses, Reevaluation 1 determined that "the effects associated with the adopted toll structure fall within the range of effects and analysis presented in the Final EA/FONSI" except for certain "very minor" variations.  DOT45624.  Ultimately, Reevaluation 1 concluded that:

> FHWA's reevaluation confirms that the adopted toll structure is within the analysis conducted in the Final Environmental Assessment and does not require additional analysis under the National Environmental Policy Act [].  The Finding of No Significant Impact [] remains valid.

DOT45437.

## V.    The Phase-In Tolling Structure

On November 14, 2024, Governor Hochul announced an end to the pause and adoption of the "Phase-In Tolling Structure."  *Chan*, Dkt. No. 125; *Mulgrew*, Dkt. No. 113.  On November 18, 2024, the TBTA Board adopted the Governor's proposed phase-in approach.  *See* Triborough Bridge and Tunnel Authority Central Business District (CBD) Charges, https://new.mta.info/document/138931.

 The Phase-In Tolling Structure is nearly identical to the March 2024 Tolling Structure except that the tolls are gradually "phased-in" over the course of six years by starting with proportionately lower tolls that subsequently increase.  From 2025–2027 ("Phase 1"), motorists will pay 60% of the previously-approved fare.  DOT47531.  From 2028–2030 ("Phase 2"), they will pay 80%.  *Id.*  Finally, starting in 2031 ("Phase 3"), they will pay 100%.  *Id.*  The Phase-In Tolling Structure similarly phases-in the Tunnel Crossing Credits at proportionate, gradually increasing amounts.  DOT47533.

The Phase-In Tolling Structure also increased the amount of certain discounts designed to alleviate the financial burden of the Tolling Program.  Under the Phase-In Tolling Structure, the

Low-Income Discount Plan is available to vehicle owners with a reported federal adjusted gross income for the previous calendar year of $50,000 or less, or who are enrolled receive government assistance through the Supplemental Nutrition Assistance Program, the Special Nutrition Assistance Program for Women, Infants, and Children, or the Temporary Aid to Needy Families Program. *See* Low-Income Discount Plan, https://www.mta.info/fares-tolls/tolls/congestion-relief-zone/discounts-exemptions/low-income-discount-plan. A person does not need to be a New York resident to participate in the Low-Income Discount Plan. *Id.* Participating motorists will receive a 50% discount on tolled Peak Period entry to the CBD after completing ten trips in the same calendar month. *Id.* Vehicles registered to persons with disabilities that prevent them from using public transit, or vehicles registered to such a person's caretaker, may be exempted from the Tolling Program through participation in the Individual Disability Exemption Plan. *See* Individual Disability Exemption Plan, https://www.mta.info/fares-tolls/tolls/congestion-relief-zone/discounts-exemptions/idep. The exemption is indifferent to the participant's state of residence. New York residents and non-residents are equally eligible to participate in the Individual Disability Exemption Plan. *Id.*

## VI.    Reevaluation 2

The Project Sponsors published the second reevaluation of the Tolling Program ("Reevaluation 2") on November 20, 2024. DOT47522–23. It reevaluated the CBD Tolling Program in its configuration as the Phase-In Tolling Structure to determine if the FONSI was still valid. DOT47531. Reevaluation 2 determined that "as the implementation progresses through each phase, the effects of the CBD Tolling Program may have minor variations but would be within the range of effects studied in the EA and the June 2024 reevaluation." DOT47539. "[T]he Phase 1 and 2 peak tolling rates would fall within the ranges studied in the Final EA" and "[b]y Phase 3, the effects would be those identified for the March 2024 adopted toll structure in the June

2024 reevaluation." *Id.*  Moreover, the traffic and air quality monitoring commitments and the mitigation efforts would be implemented on the same time frame that was analyzed in the Final EA and Reevaluation 1.  *Id.*; *see also* DOT47531 (notwithstanding the phased-in fares, the Project Sponsors announced that they "would comply with all of the mitigation commitments set forth in the EA and FONSI within the same timeframes as contemplated in those documents and the reevaluation prepared for the March 2024 adopted toll structure").

The FHWA stated that "Re-Evaluation 2 was prepared consistent with 23 C.F.R. §771.129 and assessed the effects of a phase-in approach of the tolling structure adopted by the Triborough Bridge and Tunnel Authority Board to determine whether the effects are consistent with those disclosed in the April 2023 Final Environmental Assessment and whether the mitigation set forth in the June 2023 Finding of No Significant Impact is still valid."  DOT 47520.  It concluded that "Re-Evaluation 2 confirms that the phase-in of the adopted toll structure and impacts associated with it was analyzed and mitigated accordingly" and that "no additional environmental analysis is warranted" because "[t]he conclusions in the Final Environmental Assessment and Finding of No Significant Impact remain[] valid."  DOT47520–21.

## LEGAL STANDARD

### I.    Motions to Dismiss

On a 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff.  *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002), *cert. denied*, 537 U.S. 1089 (2002).  This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 46 (2011).

## II.    Motions for Summary Judgment Under NEPA

When parties move for summary judgment in an APA-based challenge to agency action, "the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The 'entire case' on review is a question of law." *Id.* Accordingly, "a district court's procedural decision to award summary judgment is generally appropriate." *Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020). Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v. Village of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009).

"NEPA requires a federal agency to prepare an EIS before taking any major action 'significantly affecting the quality of the human environment.'" *Stewart Park & Rsrv. Coal., Inc. (SPARC) v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003) (quoting 42 U.S.C. § 4332(2)(C)). Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment," reduce or eliminate environmental damage, and promote the understanding of ecological systems and natural resources. 42 U.S.C. § 4321. But "'NEPA itself does not mandate particular results' in order to accomplish these ends." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). Rather, "NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Id.* at 756–57; *see also Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 118 (2d Cir. 2013).

Under NEPA's procedural framework, a key "threshold question" is "[w]hether a particular proposed action significantly affects the environment, thus necessitating the preparation of an EIS." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 12 (2d Cir. 1997). The Council of Environmental Quality ("CEQ"), which was established by NEPA to oversee NEPA's implementation, has promulgated regulations to guide federal agencies in answering that question. *Pub. Citizen*, 541 U.S. at 757. CEQ regulations permit federal agencies to prepare an environmental assessment that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact" and "[b]riefly discuss[es] the purpose and need for the proposed action, alternatives as required by section 102(2)(E) of NEPA, and the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1501.5(c). If the agency decides in its EA that the proposed action will

not have a significant environmental impact, the agency must issue a finding of no significant impact. 40 C.F.R. § 1501.6(a); *see City of New York v. Slater*, 145 F.3d 568, 571 (2d Cir. 1998) (per curiam).

NEPA requires an agency to take "a 'hard look' at environmental consequences" before issuing an EA and FONSI. *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1029 (2d Cir. 1983) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)); *see Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438, 453 (S.D.N.Y. 2010). "An agency takes a 'hard look' when it has 'adequately considered and disclosed the environmental impact of its actions.'" *Coal. for Healthy Ports v. U.S. Coast Guard*, 2015 WL 7460018, at *4 (S.D.N.Y. Nov. 24, 2015) (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 98 (1983)). In taking that hard look, if "it is a close call whether there will be a significant environmental impact from a proposed action, an EIS should be prepared." *Hoffman*, 132 F.3d at 18. However, NEPA does "not require agencies to elevate environmental concerns over other appropriate considerations." *Balt. Gas & Elec.*, 462 U.S. at 97. Thus, "[a]s long as the agency adequately identifies and evaluates the adverse environmental effects of its action, it is 'not constrained by NEPA from deciding that other values outweigh the environmental costs.'" *Friends of Animals v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020) (quoting *Robertson*, 490 U.S. at 350); *see FAA*, 564 F.3d at 556.

Because NEPA does not independently provide for judicial review, NEPA is enforced through lawsuits filed under the APA. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 375 (1989); *Brodsky*, 704 F.3d at 119. The APA dictates that courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). An agency's decision is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed

to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Put differently, "so long as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action, even a decision that is not perfectly clear, provided the agency's path to its conclusion may reasonably be discerned." *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007).  The Court may not substitute its judgment for that of the agency, *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), but must confine itself to determining whether the agency has engaged in "reasoned decisionmaking," *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).

Additionally, "[a] court reviewing an agency decision is [generally] confined to the administrative record compiled by that agency when it made the decision." *Hoffman*, 132 F.3d at 14; *see Dep't of Com.*, 588 U.S. at 780; *see also Forest Watch v. U.S. Forest Serv.*, 410 F.3d 115, 119 (2d Cir. 2005) ("[T]his Court may not 'properly affirm an administrative action on grounds different from those considered by the agency.'" (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999))).

## DISCUSSION

## I.     Previously-Dismissed Claims

Certain of Plaintiffs' claims have previously been dismissed or may be summarily dismissed on the basis of the Court's prior rulings.  For the sake of clarity, the Court recounts them here:

A.    *Chan*

In the Court's prior Opinion and Order on the motions to dismiss and for partial summary judgment, the Court granted Defendants' motions for partial summary judgment with respect to Count I, violation of NEPA and the APA through arbitrary and capricious conduct.  *See Mulgrew*, 750 F. Supp. 3d at 211–49.  The *Chan* Complaint acknowledges that "[t]he Court dismissed Count I on June 20, 2024" and explains that although the claim reappears in the Second Amended Complaint, "Plaintiffs are not re-raising this claim here, but instead include the claim for preservation of appeal and for simplicity of numbering."  *Chan*, Dkt. No. 124 at 47 n.26.  Count I thus may be dismissed.

Count VI, violation of New York's Green Amendment, may also be dismissed for failure to state a claim to relief for the reasons expressed in the Court's Opinion and Order on the motions for injunctive relief.  *See Chan*, 2024 WL 5199945, at *37–40.  The Court additionally dismissed Plaintiffs' Green Amendment claim against Winkelhake as abandoned in its Opinion and Order on the motions to dismiss and for partial summary judgment.  *See Mulgrew*, 750 F. Supp. 3d at 202.

B.    *Mulgrew*

Count I in *Mulgrew* is nearly identical to Count I in *Chan*, for which the Court previously granted judgment for the Defendants.  *Compare Mulgrew*, Dkt. No. 112 ¶¶ 185–191 (alleging that "Defendants failed to (1) analyze the actual tolling proposal; (2) prepare an EIS, (3) consider the full extent of the direct, indirect, and cumulative effects of Congestion Pricing, (4) fully mitigate the air, noise, and traffic effects on New York and New Jersey residents, (5) fully consider Congestion Pricing's impact on and sufficiently consult with communities with environmental concerns, (6) consider a reasonable range of alternatives, and (7) provide adequate public participation in a process that failed to present the actual tolling structure and lasted but 44 days")

*with Mulgrew*, 750 F. Supp. 3d at 215–50 (addressing those arguments with respect to the motion for partial summary judgment on Count I in *Chan*).  The parties in *Mulgrew* do not raise any argument with respect to Count I in the briefing on the motions to dismiss or motions for summary judgment.  *Mulgrew*, Dkt. Nos. 103, 105, 118, 123, 124-1, 125, 132, 134, 140, 146–147.  The *Mulgrew* Plaintiffs indicate that they are abandoning this claim, stating in the Second Amended Complaint that "[t]he Court dismissed Count I on June 20, 2024" and "Plaintiffs are not re-raising this claim here, but instead include the claim for preservation of appeal and for simplicity of numbering."  *Mulgrew*, Dkt. No. 112 at 60 n.39.

Count VI, violation of New York's Green Amendment, may be dismissed for failure to state a claim to relief for the reasons expressed in the Court's Opinion and Order on the motions for injunctive relief.  *See Chan*, 2024 WL 5199945, at *37–40.  The Court additionally dismissed Plaintiffs' Green Amendment claim against NYSDOT as abandoned in its Opinion and Order on the motions to dismiss and for partial summary judgment.  *See Mulgrew*, 750 F. Supp. 3d at 202.

## C.    *New Yorkers*

The Court dismissed Count IV in its prior Opinion and Order on the motions to dismiss and for partial summary judgment.  *See Mulgrew*, 750 F. Supp. 3d at 210 ("Declaratory judgments and injunctions are remedies, not causes of action." (quoting *Manrique v. State Farm Mut. Auto. Ins. Co.*, 2021 WL 5745717, at *8 (S.D.N.Y. Dec. 2, 2021))).

Plaintiffs in *New Yorkers* have abandoned their second cause of action, which was for violation of NEPA through failure to supplement.  In the Court's prior Opinion and Order on the motions to dismiss and for partial summary judgment, the Court deferred ruling on Count II.  *See id*.  Subsequently, the Court endorsed a briefing schedule that required Plaintiffs to submit any supplemental briefing concerning their NEPA and SAPA claims no later than December 2, 2024.  *New Yorkers*, Dkt. No. 119.  On December 2, 2024, Plaintiffs submitted a brief in support of their

SAPA claims, but the brief did not respond to Defendants' arguments concerning the NEPA failure to supplement claims. *New Yorkers*, Dkt. No. 121. On December 13, 2024, the Court ordered Plaintiffs to show cause by December 18, 2024, why their second cause of action should not be deemed abandoned and the claim dismissed. *New Yorkers*, Dkt. No. 136. Plaintiffs did not respond. Accordingly, Count II is dismissed.

Counts III and V, violation of SAPA and violation of New York's Green Amendment, are dismissed for failure to state a claim for relief for the reasons expressed in the Court's Opinion and Order on the motions for injunctive relief. *See Chan*, 2024 WL 5199945, at *37–42.

### D.    *Trucking*

TANY has abandoned its claim that the Tolling Program violates the constitutional right to travel. Defendants' motions to dismiss argued that TANY failed to state a claim, *Trucking*, Dkt. No. 61 at 13–14; Dkt. No. 63 at 14–18, but TANY chose not to address the issue in its memorandum of law in opposition to the motions to dismiss, Dkt. No. 76. "It is well-settled that the failure to oppose an argument raised in a motion to dismiss is deemed a concession of the argument and abandonment of the claims." *McGriff v. Keyser*, 2019 WL 6033421, at *12 n.9 (S.D.N.Y. Nov. 13, 2019) (collecting cases); *see Poulard v. Delphin*, 2024 WL 217766, at *5 (S.D.N.Y. Jan. 19, 2024) (collecting cases). Count II is therefore dismissed. Regardless, for the reasons stated below, even if TANY had not abandoned its right-to-travel claim, TANY fails to state a claim for relief.

The Court's prior Opinion and Order on the motion for injunctive relief held that "because the Tolling Program does not significantly relate to the rate, route, or service of motor carriers, TANY has not demonstrated a likelihood of success on the merits with respect to its claim that the Tolling Program is preempted by the [Federal Aviation Administration Authorization Act of 1994 ('FAAAA')]." *Chan*, 2024 WL 5199945, at *27–35. Although the Court made certain references

to the factual record in reaching that determination, the legal conclusion that the FAAAA does not preempt the Tolling Program stands independently. *See id.* at *32 ("The Tolling Program does not require that motor carriers charge any particular price for any particular service. It does not bar newcomers to the industry or constrain the prices at which a motor carrier may offer its services. It is not aimed at impacting prices. . . . [E]ven if TANY did offer evidence that the Tolling Program would increase the costs of its members doing business in the CBD, the Tolling Program does not prescribe or proscribe any specific price, route or service."). Reviewing the structure of the Tolling Program as alleged in the *Trucking* Complaint and judicially noticeable materials, the Court reaches the same conclusion. "The Tolling Program is not aimed at the customer-carrier relationship" because it "does not require trucks to participate in any particular pricing scheme that would impede the ability of market forces to inform carrier prices; instead it only impacts the resource input—the price of trucks' use of certain roadways." *Id.* "The Tolling Program does not 'mandate or prohibit certain routes, or tell motor carriers what services that they may or may not provide.'" *Id.* at *33 (quoting *Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1083 (9th Cir. 2020)); *see Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364 (2008). And it "does not impermissibly threaten a 'patchwork of service-determining laws, rules, and regulations' that requires motor carriers to alter their conduct as they move from jurisdiction to jurisdiction." *Chan*, 2024 WL 5199945, at *34 (quoting *City of New York v. FedEx Ground Package Sys., Inc.*, 2017 WL 740067, at *8 (S.D.N.Y. Feb. 21, 2017)); *see Cal. Trucking Ass'n v. Su*, 903 F.3d 953 (9th Cir. 2018).

TANY alleges nothing about the Tolling Program, as applied, that could permit a different outcome. For example, the Court's prior Opinion and Order noted that TANY's declarations in support of the motion for injunctive relief "acknowledged that other considerations (such as customer needs and workforce constraints) will require the trucks to maintain their current routes

and pick-up and delivery hours" but also that TANY alleged the same thing in its complaint.  *Id.* (quoting *Trucking* Dkt. No. 5 ¶¶ 29–30, 35, 37, 40; Dkt. No. 6 ¶¶ 22, 25; Dkt. No. 7 ¶¶ 21–26; Dkt. No. 8 ¶ 27; Dkt. No. 14 ¶¶ 49, 54, 59); *see Trucking*, Dkt. No. 14 ¶ 49 (TANY alleged in the *Trucking* Complaint that "TANY members have no alternative means of operating their businesses and making deliveries in Manhattan other than to subject their fleets to charges imposed by the Tolling Program.").  Count III is therefore dismissed.

## II.      Dormant Commerce Clause and the Right to Travel

The Commerce Clause "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce."  *Or. Waste Sys., Inc. b. Dep't of Envt'l Quality of State of  Or.*, 511 U.S. 93, 98 (1994); *see Chan*, 2024 WL 5199945, at *12 (citing *E. Profit Corp. Ltd. v. Strategic Vision US LLC*, 2021 WL 2554631, at *22 (S.D.N.Y. June 22, 2021)); *see also United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) ("Although the Constitution does not in terms limit the power of States to regulate commerce, we have long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute.").  "[T]wo primary principles . . . mark the boundaries of a State's authority to regulate interstate commerce."  *South Dakota v. Wayfair*, 585 U.S. 162, 173 (2018).  "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce."  *Id.*  The Commerce Clause curbs state protectionism by barring state policies that promote their own citizens' commercial interests at the expense of other states' citizens.  *See Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 516 (2019); *see also Granholm v. Heald*, 544 U.S. 460, 472 (2005) ("States should not be compelled to negotiate with each other regarding favored or disfavored status for their own citizens.").  It does not give federal judges "a roving license . . . to decide what activities are appropriate for state and

local government to undertake." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 380 (2023) (plurality op.) (quoting *United Haulers*, 550 U.S. at 343); *see also id.* at 395, (Roberts, C.J., concurring in part and dissenting in part) (the Commerce Clause does not permit "freewheeling judicial weight of benefits and burdens").

The right to travel is also not expressly stated in the Constitution, and its precise textual source "has proved elusive." *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902 & n.2 (1986); *see also id.* ("[W]e have not felt impelled to locate this right definitively in any particular constitutional provision."). Nonetheless, the right to travel is "firmly embedded" in the Supreme Court's jurisprudence, and encompasses (1) "the right of a citizen of one State to enter and to leave another State," (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State," and (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 498, 500 (1999); *see also United States v. Guest*, 383 U.S. 745, 757 (1966). However, it is far from an absolute right to travel unimpeded throughout the county; "travelers do not have a constitutional right to the most convenient form of travel, and minor restrictions on travel simply do not amount to the denial of a fundamental right." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (quotation omitted).

Where, as here, the government act at issue takes the form of a "user fee" in that it is "a charge designed as compensation for Government-supplied services, facilities, or benefits," courts apply the so-called *Evansville/Northwest Airlines* test to determine whether the fee violates the dormant Commerce Clause. *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363, (1998) (defining user fee); *see also VIZIO, Inc. v. Klee*, 886 F.3d 249, 257–58 (2d Cir. 2018) (explaining that "the *Evansville* rubric applies 'only to charges imposed by the State for the use of state-owned or state-

provided transportation or other facilities and services.'" (cleaned up) (quoting *Or. Waste Sys.*, 511 U.S. at 103 n.6)).[8]  Under the *Evansville/Northwest Airlines* test, a government entity may institute a user fee "if it (1) is based on some fair approximation of the facilities' use, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Nw. Airlines, Inc. v. Cnty. of Kent, Mich.*, 510 U.S. 355, 369 (1994) (citing *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 716–17 (1972)); *accord Selevan v. N.Y. Thruway Auth.* ("*Selevan I*"), 584 F.3d 82, 96 (2d Cir. 2009).  Courts apply the same test to determine whether a user fee unconstitutionally interferes with the right to travel.  *See Chan*, 2024 WL 5199945, at *25; *Selevan I*, 584 F.3d at 102.  The Court therefore reviews together Plaintiff's claims pursuant to the dormant Commerce Clause and the right to travel.

As a threshold matter, Plaintiffs in *Chan* and *Mulgrew* argue that the fact-intensive nature of the test provides sufficient basis to deny the motions to dismiss.  *Chan*, Dkt. No. 130 at 8; *Mulgrew*, Dkt. No. 118 at 8.  They claim that "[o]n a motion to dismiss, . . . the court 'need only consider whether the complaint alleges a plausible claim that the regulation violates the Commerce Clause'" and that "'[w]hether [the toll] is a burden on interstate commerce is a question left for later proceedings.'"  *Chan*, Dkt. No. 130 at 8 (quoting *Selevan I*, 584 F.3d at 92); *Mulgrew*, Dkt. No. 118 at 8 (quoting same).  However, it is not enough for a complaint to merely invoke the dormant Commerce Clause.  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "[W]here the well-pleaded facts do not permit the court to infer

---

[8] Although Winkelhake argues that the Tolling Program is not a user fee, *Chan*, Dkt. No. 116 at 9–10; *Mulgrew*, Dkt. No. 103 at 9–10, the Court rejected that argument in *Chan*, 2024 WL 5199945, at *13–14.

more than the mere possibility of misconduct, the complaint . . . has not shown . . . that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quotation omitted). Accordingly, to be entitled to discovery and to survive past the pleading stage, Plaintiffs still "must plead facts 'plausibly' suggesting a substantial harm to interstate commerce; facts that render that outcome a 'speculative' possibility are not enough." *Nat'l Pork Producers*, 598 U.S. at 385 (quoting *Twombly*, 550 U.S. at 555, 557).

Notably, although Plaintiffs quote *Selevan I* for their argument that the Court need not delve into their dormant Commerce Clause claims on the motion to dismiss, in that case the Circuit itself dismissed on the pleadings allegations that a toll discriminated against interstate commerce. *See Selevan I*, 584 F.3d at 94–98. The portion of the opinion quoted by the *Chan* and *Mulgrew* Plaintiffs discussed prudential standing, not whether the complaint stated a claim for relief. *See Selevan I*, 584 F.3d at 92.[9] And, after concluding that the plaintiffs had standing to pursue their dormant Commerce Clause claim, the Circuit in *Selevan I* went on to conduct a detailed analysis of the alleged facts to "consider whether plaintiffs have stated a claim under the Commerce Clause" rather than remanding the issue with instructions to wait for summary judgment. *See id.* at 94–98.

This Circuit's caselaw thus does not support the proposition that merely by reciting the phrases "dormant Commerce Clause" and "right to travel," a plaintiff has stated a claim for relief or that complaints alleging violations of those constitutional provisions can be resolved only after discovery. *See id.*; *see also, e.g.*, *Am. Trucking Assocs., Inc. v. N.Y. State Thruway Auth.*, 886 F.3d 238, 248 (2d Cir. 2018) (holding that the district court "correctly granted defendants' motion to

---

[9] Plaintiffs notably omitted the word "actually" from the quoted portion of *Selevan I* which more accurately states: "Whether the 75–cent toll is *actually* a burden on interstate commerce is a question left for later proceedings." *Id.* (emphasis added).

dismiss" plaintiff's dormant Commerce Clause claim); *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 168 (2d Cir. 2005) (partially affirming and partially reversing dismissal of dormant Commerce Clause challenge for failure to state a claim to relief); *Weisshaus v. Port Auth. of N.Y. & N.J*, 497 F. App'x 102, 104 (2d Cir. 2012) (summary order) (affirming dismissal of challenge to tolls based on the right to travel).

### A.    Discrimination Against Interstate Commerce

In *Selevan I*, the Second Circuit began with the third factor of the *Evansville/Northwest Airlines* test—discrimination against interstate commerce—noting that courts should determine, "as a threshold inquiry . . . if the toll policy discriminates against interstate commerce because, if it does, it is 'virtually invalid *per se*,' and if it does not, it will have a comparatively easier time passing constitutional muster." *Selevan I*, 584 F.3d at 94 (quoting *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004)). The "antidiscrimination principle lies at the 'very core' of [the Supreme Court's] dormant Commerce Clause jurisprudence." *Nat'l Pork Producers*, 598 U.S. at 369–70 (quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997)). "'[D]iscrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys.*, 511 U.S. at 99; *accord C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994). This portion of the Court's inquiry is directed "to determining whether [the challenged policy] is basically a protectionist measure, or whether it can fairly be viewed as a [policy] directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546, 561 (S.D.N.Y. 2014) (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978)). "[A] state regulation 'discriminates' against interstate commerce only if it 'impose[s] commercial barriers or discriminate[s] against an article of commerce by reason of its origin or destination out of State.'" *Selevan I*, 584 F.2d at 95. "[A]

plaintiff must 'identify an[ ] in-state commercial interest that is favored, directly or indirectly, by the challenged statutes at the expense of out-of-state competitors.'" *Id.* (quoting *Grand River Enters.*, 425 F.3d at 169). "Both an in-state interest and an out-of-state competitor are necessary because 'laws that draw distinctions between entities that are not competitors do not "discriminate" for purposes of the dormant Commerce Clause.'" *Id.* (quoting *Town of Southold*, 477 F.3d at 49).

Plaintiffs in *Chan*, *Mulgrew*, and *Trucking* do not identify any in-state commercial interest that the Tolling Program favors at the expense of out-of-state competitors.[10] They do not allege, for example, that in-state and out-of-state drivers are charged any different toll. The Tolling Program does not treat in-state and out-of-state interests differently. As discussed above, the Tolling Program is indifferent to the origin of the person entering the CBD or whether such person is engaged in interstate or intrastate business. A passenger car that enters the CBD having begun its trip in New Jersey is charged the same single daily fee as a car that enters from the Upper West Side of Manhattan. Trucks that enter the CBD are charged the same per-entry fee regardless whether they are engaged in purely intrastate business or are engaged in interstate business. The mass transit system does not distinguish between riders who enter the system having begun their trip in New Jersey or Connecticut, riders who live in one of the five boroughs of New York City, or riders hailing from one of New York's other counties.

The closest the *Chan* and *Mulgrew* Complaints come to identifying discrimination is the claim that the Tolling Program discriminates "by excluding the George Washington Bridge and New Jersey commuters from the proposed discounts." *Chan*, Dkt. No. 124 ¶ 236; *Mulgrew*, Dkt. No. 112 ¶ 219. The *Mulgrew* Complaint references the fact that "[t]he TMRB Report provided no

---

[10] TANY advances arguments only with respect to the other two elements of the *Evansville/Northwest Airlines* test. *Trucking*, Dkt. No. 76 at 14–21.

credit to drivers already paying tolls on the Verrazzano-Narrows Bridge (Staten Island) or the George Washington Bridge (New Jersey)." *Mulgrew*, Dkt. No. 112 ¶ 136. The *Chan* Complaint does not itself allege what discounts the New York Legislature chose not to extend to George Washington Bridge commuters. Neither complaint suffices to show discrimination.

Merely labeling such practices "discriminatory" does not satisfy Plaintiffs' pleading requirement. The Second Circuit has noted that where plaintiffs "asserted, without elaboration, that the tolls 'discriminate to the disadvantage of out-of-state buyers and sellers of goods and services, and to the advantage of certain in-state buyers and sellers of goods and services, including, but not limited to, labor services, and place burdens on interstate commerce that exceed any local benefit that allegedly may be derived from them[,]' . . . [s]uch conclusory allegations, . . . are an insufficient basis upon which to sustain a claim of discrimination against interstate commerce." *Selevan v. N.Y. Thruway Auth.* ("*Selevan II*"), 711 F.3d 253, 261 (2d Cir. 2013) (citing *Iqbal*, 556 U.S. at 678).

The Phase-In Tolling Structure provides a discount in the form of lower charges for motorists who enter the CBD from New Jersey by driving through the Lincoln Tunnel or Holland Tunnel and for those motorists who enter or exit the CBD from Queens by driving through the Queens-Midtown Tunnel or from Brooklyn by driving through the Hugh L. Carey Tunnel. *Chan*, Dkt. No. 138-1.[11] The discount is higher for the New York–New Jersey tunnels than it is for the

---

[11] The Court may take judicial notice of the Phase-In Tolling Structure which sets forth the tolling rates as well as certain discounts. *See Knauer*, 635 F. Supp. 2d at 206 n.2 (courts may take judicial notice of an administrative agency's rules and regulations) (collecting cases); *see, e.g.*, *Baltas v. Maiga*, 119 F.4th 255, 265 n.4 (2d Cir. 2024) (taking judicial notice of administrative directives outside the record). The Court may also take judicial notice of the tunnels' start and end points. *See United States v. Hernandez-Fundora*, 58 F.3d 802, 811 (2d Cir. 1995) ("Geography has long been peculiarly susceptible to judicial notice for the obvious reason that geographic locations are facts which are not generally controversial." (quotation omitted)).

New York–New York tunnels. Dkt. No. 138-1. The Phase-In Tolling Structure does not provide a discount in the form of a tolling fee adjustment for motorists who enter or exit the CBD having arrived in Manhattan from New Jersey by driving over the George Washington Bridge. *Id.* However, the fact that drivers who enter the CBD having crossed into Manhattan by utilizing the George Washington Bridge do not receive a crossing credit does not mean that the program discriminates against interstate commerce or out-of-state interests. Plaintiffs do not allege facts that would suggest that the Project Sponsors excluded the George Washington Bridge from a discount by reason of the fact that it connects with New Jersey. Indeed, of the four crossings that afford lower tolls to motorists entering the CBD, two connect New York to New Jersey (the Lincoln Tunnel and the Holland Tunnel) and two are internal to New York (the Queens-Midtown Tunnel and the Hugh L. Carey Tunnel). And none of the other bridges that are internal to New York are eligible for crossing credits. *See Mulgrew*, Dkt. No. 112 ¶ 136 (noting that crossing credits are not available for motorists who traverse the Verrazano-Narrows Bridge between Manhattan and Staten Island). "To be sure, that in-state residents are disadvantaged by the policies along with outsiders does not foreclose a finding of discrimination against interstate commerce." *Janes v. Triborough Bridge & Tunnel Auth.*, 977 F. Supp. 2d 320, 338 (S.D.N.Y. 2013), *aff'd*, 774 F.3d 1052 ("*Janes II*") (2d Cir. 2014). "But it supplies a valuable gauge of the policies' overall effect, and strongly undermines any claim that they are driven by 'economic protectionism.'" *Id.* The *Chan* and *Mulgrew* Plaintiffs do not allege any in-state commercial interest that benefits from the differential bridge and tunnel tolls in a manner that could disadvantage any out-of-state commercial interest. *See Town of Southold*, 477 F.3d at 49; *Jones v. Schneiderman*, 974 F. Supp. 2d 322, 350 (S.D.N.Y. 2013).

The references in the *Chan* and *Mulgrew* Complaints to discounts unavailable to New Jersey commuters appear to refer to the tax credit the New York Legislature created for low-income New Yorkers residing within the CBD. *See* N.Y. Tax Law § 606(jjj).[12]  But those discounts also do not discriminate against interstate commerce.  The *Chan* and *Mulgrew* Plaintiffs fail to identify any in-state or out-of-state commercial interest implicated by the tax credits for New York residents.  The tolling structure at issue here parallels the one implemented in *Selevan I*, where motorists crossing the Grand Island Bridges were tolled 75 cents per crossing but residents of Grand Island received discounted toll rates of as little as 9 cents per crossing.  *Selevan I*, 584 F.3d at 87.  There, the Second Circuit held that the "plaintiffs have failed to identify any specific interests," implicated by the tax credit and thus that "plaintiffs have not alleged that [the] toll policy 'discriminates' against interstate commerce."  *Id.* at 95.  *See also Chan*, 2024 WL 5199945, at *19–20 (explaining that policy-based discounts to user fees do not violate the dormant Commerce Clause).  Here too, some residents of the CBD may receive a tax credit to offset the fee, but absent an out-of-state comparator, that benefit to certain low-income residents does not inherently convey discrimination against interstate commerce.  *See Janes*, 977 F. Supp. 2d at 340 ("[U]nder the Dormant Commerce Clause, it is reasonable . . . to enact a differential toll policy where doing so creates incentives for individuals and families to live in areas that are underserved by mass transit and are in locations that are at the edge of the rest of the city, and alleviates the burdens on frequent users." (quotation omitted)).

---

[12] The tax credit is the only "discount" with a residency requirement.  The Low-Income Discount Plan and the Individual Disability Exemption Plan are available to New York residents and nonresidents alike.  *See* Low-Income Discount Plan, https://www.mta.info/fares-tolls/tolls/congestion-relief-zone/discounts-exemptions/low-income-discount-plan; Individual Disability Exemption Plan, https://www.mta.info/fares-tolls/tolls/congestion-relief-zone/discounts-exemptions/idep.

B.        **Fair Approximation**

Next, the *Evansville/Northwest Airlines* test requires courts to assess whether the toll is "based on some fair approximation of use of the facilities." *Nw. Airlines*, 510 U.S. at 369. For example, the Supreme Court has struck down as violative of the dormant Commerce Clause an unapportioned annual flat tax imposed on vehicles using a State's roadways because the tax did "not vary directly with miles traveled or some other proxy for value obtained from the State." *Am. Trucking Assocs., Inc. v. Scheiner*, 483 U.S. 266, 291–92 (1987) (quotation omitted). The *Scheiner* Court concluded: "[w]hen the measure of a tax bears no relationship to the taxpayers' presence or activities in a State, a court may properly conclude . . . that the State is imposing an undue burden on interstate commerce." *Id.* The Court quoted approvingly Justice Frankfurter's dissent in *Capitol Greyhound Lines v. Brice*:

> So long as a State bases its tax on a relevant measure of actual road use, obviously both interstate and intrastate carriers pay according to the facilities in fact provided by the State. But a tax levied for the privilege of using roads, and not their actual use, may, in the normal course of operations and not as a fanciful hypothesis, involve an undue burden on interstate carriers. While the privilege extended by a State is unlimited in form, and thus theoretically the same for all vehicles, whether interstate or intrastate, the intrastate vehicle can and will exercise the privilege whenever it is in operation, while the interstate vehicle must necessarily forego the privilege some of the time simply because of its interstate character, i.e., because it operates in other States as well. In the general average of instances, the privilege is not as valuable to the interstate as to the intrastate carrier.

339 U.S. 542, 557 (1950) (Frankfurter, J., dissenting), *quoted approvingly by Scheiner*, 483 U.S. at 291. The dormant Commerce Clause does not prescribe the type of value obtained from the state that the tax must capture nor prescribe a precise method for measuring it. "Toll rates will satisfy the fair approximation requirement 'even though some other formula might reflect more exactly the relative use of the state facilities by individual users.'" *Angus*, 52 F. Supp. 3d at 567 (quoting *Evansville*, 405 U.S. at 717).

The fair approximation test also looks to the use to which the state puts the revenues it collects from out-of-state businesses in exchange for the use of the state's instrumentalities or arteries of interstate commerce. A state or local government may, of course, impose a tax for the cost of the use of its roadways on "interstate and domestic users alike" without any requirement that it show a compelling state interest. *Evansville*, 405 U.S. at 714. When a state or local government provides support for a facility of interstate commerce, it "aids rather than hinders the right to travel" and the creation of a national market. *Id.* However, absent congressional authorization, *see infra*, a state cannot impose a tax on the use of its roadways for wholly extraneous purposes, such as to fund its "school or welfare expenses." *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 86 (2d Cir. 2009). In such circumstances, where the fee "is not a fair approximation of the use of the facilities supported by the fee," it threatens to become a tax solely on the right to engage in interstate commerce. *Id.* There need not be "a perfect fit between the use of the facilities and the support of those facilities by the fee." *Id.* (citing *United States v. Sperry Corp.*, 493 U.S. 52, 60 (1989) ("This Court has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services.")). Instead, "all that is required is a 'functional relationship' between the toll and the facilities used by the toll's payers." *Id.* at 87; *accord Auto. Club of N. Y., Inc. v. Port Auth. of N.Y. & N.J.* ("*Auto. Club II*"), 887 F.2d 417, 421 (2d Cir. 1989); *Molinari v. N.Y. Triborough Bridge & Tunnel Auth.*, 838 F. Supp. 718, 726 (E.D.N.Y. 1993); *Janes*, 977 F. Supp. 2d at 341.

### 1. *Chan* and *Mulgrew*

Plaintiffs in *Chan* and *Mulgrew* argue that there is not a functional relationship between the toll and the facilities used by the toll's payers. *Chan*, Dkt. No. 130 at 9–13; *Mulgrew*, Dkt. No. 118 at 9–13. They assert that the Tolling Program fails the "fair approximation" test because the toll is not used for roadway upkeep but rather for public transit capital projects. *Chan*, Dkt.

No. 124 ¶¶ 2, 69; *Chan*, Dkt. No. 130 at 9–13; *Mulgrew*, Dkt. No. 112 ¶¶ 9, 12, 63, 88; *Mulgrew*, Dkt. No. 118 at 9–13.  The Municipal Defendants argue that those Plaintiffs' "version of the facts blink[s] reality" and that there is a functional relationship between the toll and the "integrated transportation system" which includes both the roadways in the CBD and the public transit systems that are to receive funding as a result of the Tolling Program.  *Chan*, Dkt. No. 137 at 10–13; *Mulgrew*, Dkt. No. 125 at 10–13.

The argument of the *Chan* and *Mulgrew* Plaintiffs is based on a faulty predicate.  As the Court noted in its prior Opinion and Order on Plaintiffs' motions for injunctive relief, "[c]ourts in this Circuit have long held that certain bridges, tunnels, roadways, public transit systems and commuter railways may 'form an integrated, interdependent transportation'" system such that components of the integrated system bear a functional relationship to tolls charged in connection with other components."  *Chan*, 2024 WL 5199945, at *13 (quoting *Auto. Club II*, 887 F.2d at 418) (collecting cases).  The fact that the toll imposed on users of the streets within the CBD is used to benefit users of the public transportation system in the CBD thus does not establish a violation of the dormant Commerce Clause.  *See id.*  The cars and trucks that enter the CBD,  the public buses that traverse it, and the underground subways that take people to and from the CBD are all interrelated.  The public subsidization of one of the specific modes of transportation, *e.g.*, the maintenance of subway tracks or public buses, provides value to the users of other modes of transportation, *e.g.*, passengers cars or trucks.  If the subways or public buses were to stop running, the roads would invariably be crowded with even more cars and trucks and those persons who travel by car would suffer from the increased traffic.  To the extent that the subways and public buses are subsidized and provide an alternative to traveling into and within the CBD, then it is the drivers of cars and trucks, as much or more so than the users of public transportation, who benefit.

They will have reduced traffic time and easier means of transit. That, at least, is the conceit of the Tolling Program, and the *Chan* and *Mulgrew* Plaintiffs allege no facts that call it into question. All who use the integrated transportation system covering the CBD benefit when any component of that system benefits. As Judge Korman held over thirty years ago, in comparable circumstances, "the provision of the commuter rail facilities that serve the eastern and northern suburbs of New York City, along with the subways and buses in New York City, effectively reduce traffic on the same arteries, river crossings and streets that are used by commuters from Staten Island who use the Verrazano-Narrows Bridge." *Molinari*, 838 F. Supp. at 726.

The Court recognizes that its prior Opinion and Order relied upon the factual record to reach the conclusion that New York operates an integrated transportation system that includes its roadways, river crossings, public transit, and commuter rail systems, *see id.* at *14, and that the question now is presented on a motion to dismiss. But that is a distinction that does not make a difference. On a motion to dismiss, the Court need not limit itself to the precise facts alleged in a complaint and thereby require the Court to blind itself to what is plainly visible to the eye; the Court may also consider "documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." *Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation omitted). And "[g]eography has long been peculiarly susceptible to judicial notice." *Hernandez-Fundora*, 58 F.3d at 811; *see Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) ("We may, of course, take judicial notice of geography." (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 344 (1952) (Jackson, J., dissenting))); *see, e.g.*, *Cent. Green Co. v. United States*, 531 U.S. 425, 434 (2001) (taking judicial notice of geographic layout of flood control

project).[13]  As the Second Circuit has held, public transit maps and networks are precisely the type

of information that is not subject to reasonable dispute and that are both generally known within

the territorial jurisdiction of the trial court and are capable of accurate and ready determination by

resort to sources whose accuracy cannot reasonably be questioned.  *See Brooklyn Ctr. for Indep.

of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55, 65 (2d Cir. 2021) ("[P]ublicly available maps

of New York City bus routes—of which we take judicial notice—illustrate the extensive and

ramified bus system." (quotations omitted)); *see also Fu v. ConEd Co. of N.Y., Inc.*, 2018 WL

4373995, at *6 (S.D.N.Y. Sept. 13, 2018) (taking judicial notice of the fact that "there is frequent

train service into Manhattan and Brooklyn from New Hyde Park and other, nearby stations"); *Baez

v. N.Y.C. Dep't of Transp.*, 2015 WL 3763878, at *3 (S.D.N.Y. June 15, 2015) (taking judicial

notice of bus routes); *Stone v. Eggleston*, 2005 WL 2503853, at *4 (E.D.N.Y. Oct. 11, 2005)

(taking judicial notice of the plaintiff's ability to travel to a certain location using public transit).[14]

---

[13] "Under Federal Rule of Evidence 201, 'a court may take judicial notice, whether requested or
not, of a fact that is not subject to reasonable dispute in that it is either (1) generally known within
the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by
resort to sources whose accuracy cannot reasonably be questioned.'"  *Rein v. Esper*, 2018 WL
10561521, at *4 (S.D.N.Y. Feb. 27, 2018) (quoting *United States v. Bari*, 599 F.3d 176, 180 (2d
Cir. 2010)); Fed. R. Evid. 201(b)–(c).  "More generally, the traditional textbook treatment of
Rule 201 has included two categories for judicial notice: matters of common knowledge and facts
capable of verification."  *Bari*, 599 F.3d at 180.  Geographical facts fit into both these categories.
They may, for example, be determined by reference to maps whose accuracy cannot be reasonably
questioned.  *See, e.g.*, *Kennedy v. Supreme Forest Prods., Inc.*, 761 F. App'x 72, 75 (2d Cir. 2019)
(summary order); *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691–
92 (S.D.N.Y. 2011).  And the Second Circuit has held that the geography of a region may also be
common knowledge susceptible to judicial notice.  *See, e.g.*, *United States v. Magda*, 547 F.2d
756, 764 n.16 (2d Cir. 1976) (Motley, J., dissenting) ("This court takes judicial notice of a fact of
common knowledge among people living in Manhattan: approximately the same distance to the
east [of a specified location] is the New York Times office building."); *Kennedy*, 761 F. App'x at
75 (noting that "[a] local jury . . . would not even have needed a map").
[14] As Judge Haight once noted, "as a long-time resident New Yorker who daily rides the New York
City subway to work, I take judicial notice of the layout and physical characteristics of the system
with which I have become fully familiar."  *Penthouse Int'l, Ltd. v. Koch*, 599 F. Supp. 1338, 1346

The Court accordingly takes judicial notice of the existence of the roadways, bridges, tunnels, subways, commuter trains, buses, and bike paths that comprise New York City's transportation network.  Many of those transit options are generally interchangeable for travel into, through, and out of the CBD and thus incur spillover effects.  For example, the Second Circuit has recognized that the George Washington Bridge, the Lincoln Tunnel, and the Holland Tunnel "serve the same purpose [of] providing vehicular access between New Jersey and Manhattan."  *Auto. Club of N.Y., Inc. v. Cox*, 592 F.2d 658, 669 (2d Cir. 1979); *see also id.* at 670 ("Staten Island crossings in conjunction with the Verrazano Narrows Bridge afford an alternative means of access between New Jersey and Brooklyn and other parts of Long Island for vehicles that would otherwise have used the Holland (or perhaps even the Lincoln) Tunnel and New York City bridges or tunnels between Manhattan and Long Island.").  It is a matter of common knowledge and may also be ascertained from any map of the area that individuals wishing to travel into, through, or out of, the CBD can choose between the many interconnecting transit options—with every decision to choose one mode inherently relieving traffic on the others.  Indeed, a long and unbroken line of cases have reached the unexceptional conclusion that New York City operates a single integrated transportation system.  *See, e.g.*, *Janes II*, 774 F.3d at 1055 & n.6; *Auto. Club II*, 887 F.2d at 423; *Bridgeport*, 567 F.3d at 87; *Wallach v. Brezenoff*, 930 F.2d 1070, 1071 (3d Cir. 1991); *Angus Partners*, 52 F. Supp. 3d at 566; *Janes I*, 977 F. Supp. 2d at 324–25, 341; *Molinari*, 838 F. Supp.

---

(S.D.N.Y. 1984).  And over a century ago, the Second Circuit noted that "[t]his court must take judicial notice, from daily experience, of the practical operation of the trains of the elevated railway, . . . We all know that in the rush hours of the day there is a continual line of prospective passengers on the platform."  *Lauterer v. Manhattan Ry. Co.*, 128 F. 540, 546 (2d Cir. 1904) (per curiam).  The point is an application of the general proposition that courts may take judicial notice of matters of public record.  *See Byrd v. City of New York*, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005) ("[M]aterial that is a matter of public record may be considered in a motion to dismiss."); *see also Casey v. Odwalla, Inc.*, 338 F. Supp. 3d 284, 294 (S.D.N.Y. 2018).

at 726; *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.* ("*Auto. Club I*"), 706 F. Supp. 264,

269 (S.D.N.Y. 1989); *Chan*, 2024 WL 5199945, at *14.

Plaintiffs do not really challenge this conclusion.  They first counter that although the MTA

controls the subways and the public bus system, it does not control the toll roads.  *Chan*, Dkt.

No. 130 at 10–11; *Mulgrew*, Dkt. No. 118 at 10–11.  That argument is non-responsive.  As this

Court previously recognized, "operatorship need not be common for modes of transportation to

bear a functional relationship with one another."  *Chan*, 2024 WL 5199945, at *14 (citing *Angus*

*Partners*, 52 F. Supp. 3d at 566).  "The fact that a state may subdivide its transportation apparatus

among multiple agencies is of no constitutional importance where smooth operation of the whole

system is dependent upon its constituent parts operating in tandem."  *Id.*  Because the MTA's

transit systems and the CBD roadways form a single integrated system, the fact that revenues are

being used for capital projects improving one part of the system does not mean that the tolls are

not a fair approximation of motorists' use of another component of the system.  *See Molinari*, 838

F. Supp. 718, 725 ("Simply stated, it is just and reasonable for those who use a bridge to pay a toll

that may be used to subsidize the system-wide operation of other transit facilities from which they

benefit.").  The New York Legislature designed the Tolling Program to have involve this cross-

agency implementation.  The Act directs that the TBTA shall establish the and collect CBD tolls

but that tolling revenues shall be used to fund the MTA capital program.  *See* N.Y. Veh. & Traf.

Law §§ 1704–1705.  The Act further directs the TBTA to enter into a memorandum of

understanding with the NYCDOT and to implement the toll based on recommendations from the

TMRB.  *See* N.Y. Veh. & Traf. Law §§ 1704–1704-a.  Though several agencies are involved in

ownership and implementation of various aspects of the Tolling Program, it operates as a unified

program.

Plaintiffs in *Chan* and *Mulgrew* alternatively attempt to argue that "Congestion Pricing is akin to the tolls rejected as unconstitutional by the Second Circuit in Bridgeport," where the Second Circuit rejected a port authority's use of tolls levied on ferry passengers to support the authority's entire operating budget, including services that did not benefit the ferry passengers, as exceeding the limits of a fair approximation of use. *Chan*, Dkt. No. 130 at 12 (citing *Bridgeport*, 567 F.3d at 87); *Mulgrew*, Dkt. No. 118 at 12 (citing same). Plaintiffs' invocation of *Bridgeport* is unavailing. The *Bridgeport* court acknowledged that the Second Circuit had previously recognized "that a 'functional relationship' existed between the Port Authority's cross-river PATH train and its bridges and tunnels (Lincoln Tunnel and Holland Tunnel)." *Bridgeport*, 567 F.3d at 87 (citing *Auto. Club II*, 887 F.2d at 421). However, the question before the Second Circuit did not concern the authority's use of tolling revenues to support aspects of the integrated transportation system. Instead, the Circuit found that the passenger ferries at issue in that case were not connected to such activities as development projects on nearby lands, creation of a high-speed ferry for a different route, development of a container shipping system, operation of a foreign trade zone in the city of Bridgeport, trademark registration costs, and the purchase of season tickets to local minor league teams. *See id.* Here, Plaintiffs do not allege that any of the tolling revenue is being allocated to uses that are not associated with New York City's integrated transportation system. The *Chan* and *Mulgrew* Plaintiffs therefore fail to show that the Tolling Program is not a fair approximation of use.

## 2. *Trucking*

TANY advances a different argument with respect to the fair approximation prong. In addition to measuring the relationship between the fee and the support of the facility, the fair approximation prong looks to whether the "policy at issue reflects rational distinctions among different classes of motorists." *Selevan I*, 584 F.3d at 98 (quotation omitted); *see Selevan II*, 711

F.3d at 259.  "The standard is a lenient one, and public facility fees will be found to be fairly approximated so long as they are not 'wholly unreasonable.'"  *Chan*, 2024 WL 5199945, at *17 (quoting *Evansville*, 405 U.S. at 718) (citing *Am. Trucking Assocs, Inc. v. R.I. Tpk. & Bridge Auth.*, 123 F.4th 27, 50 (1st Cir. 2024)).  "'[S]o long as a State bases its tax on a relevant measure of actual road use, obviously both interstate and intrastate [drivers] pay according to the facilities in fact provided by the State,' and the program places no undue burden on interstate commerce."  *Doran v. Mass. Tpk. Auth.*, 348 F.3d 315, 320 (1st Cir. 2003) (quoting *Scheiner*, 483 U.S. at 291).  In other words, the government need not tax every user of a public facility in order to tax any.  It must just act rationally.

TANY argues that the Tolling Program irrationally distinguishes between classes of vehicles because the Tolling Program charges trucks a high toll per entry into the Manhattan CBD whereas certain other vehicle classes are charged lower amounts and only once per day.  *Trucking*, Dkt. No. 14 ¶¶ 6–7; *Trucking*, Dkt. No. 76 at 15–19.  However, TANY does not advance any factual allegations that would support a conclusion that such distinctions between passenger cars and trucks are wholly unreasonable.  *See Selevan I*, 584 F.3d at 98.  As the Court previously explained, the Project Sponsors could have readily and rationally concluded that trucks, on the whole, would impose greater costs on the integrated transportation system within the CBD and thus would derive more benefit from improvements to it in the form of more efficient and quicker transit.  Bigger vehicles, *e.g.*, trucks, take up more space on the roads and in parking lanes than smaller vehicles, *e.g.*, passenger cars and motorcycles.  *Cf. R.I. Tpk.*, 123 F.4th at 49 ("At the most basic level, it does not strike us as wholly unreasonable to presume that bigger trucks will cause more damage to bridges, and smaller trucks, less.").  It is not irrational for the Project Sponsors to determine that cars and other small vehicles should not have to pay as much as trucks.  The *Chan*

and *Mulgrew* Plaintiffs do not allege any facts that would call into question the rationality of the Project Sponsors' decisions. *Trucking*, Dkt. No. 14 ¶ 1 (alleging that one of the Tolling Program's "mandates" is "to reduce congestion in the Central Business District of Manhattan").

The Project Sponsors also could have readily and rationally concluded that it would be unfair and inefficient to impose the same flat one-day fee on those trucks that enter and leave the CBD many times a day and those that enter only once—i.e., that those that enter only once should pay proportionately less than those that are repeat users. According to TANY, the fact that the Tolling Program charges trucks per entry rather than once per day, "penalizes trucks for making repeated trips into the [CBD.]" *Id.* at 16.[15] TANY argues that "[t]he Tolling Program functions in the exact opposite manner as the Grand Island Bridge toll" that the Second Circuit considered in *Selevan II*. *Trucking*, Dkt. No. 76 at 16. In *Selevan II*, the Second Circuit evaluated the Grand Island Bridge toll that charged a general passenger rate of $1 per trip, a commuter rate of 28 cents per trip, and a Grand Island resident rate of 9 cents per trip. *Id.* at 15–16 (citing *Selevan II*, 711 F.3d at 255–56).[16] The Second Circuit upheld the toll as constitutional, noting that the "resident discount is meant to alleviate both the severe geographic isolation faced by Grand Island residents and the residuary effects of nearly 25 million non-resident travelers bisecting the island annually." *Selevan II*, 711 F.3d at 259 (quotation omitted). The court noted that those factors were "'not [a] wholly unreasonable' basis upon which to draw a distinction between Grand Island residents, who, because of the small size and isolation of Grand Island, may need to use the bridge and pay the toll

---

[15] The Court notes that it might be more accurate to state that the Tolling Program tolls those trucks that enter the CBD repeatedly more than those trucks that enter the CBD only once. The more precise description of the manner in which the Tolling Program functions demonstrates the fallacy of TANY's argument.

[16] Sharp-eyed readers will notice the passenger and commuter rates increased between *Selevan I* and *Selevan II*. *See Selevan II*, 711 F.3d at 255 n.4.

several times a day, and other motorists using the bridge." *Id.* (quoting *Evansville*, 405 U.S. at 718). TANY argues that "[t]he Tolling Program functions in the exact opposite manner as the Grand Island Bridge toll." *Trucking*, Dkt. No. 76 at 16. "Where the Grand Island Bridge toll offered a lower rate to those vehicles most likely to make multiple trips over the bridge (local residents and commuters), here the Tolling Program penalizes trucks for making repeated trips into the [CBD], all while charging them a higher entry fee." *Id.*

There are numerous flaws in this argument. As a preliminary matter, it presumes what is not alleged—that there is something inherent in the nature of trucks that would have them enter the CBD more times a day than cars, taxis, personal buses, or motorcycles. It is hardly self-evident that trucks are the vehicles most likely to make multiple daily trips into the CBD. In *Selevan II*, the Second Circuit identified residents and commuters, rather than large commercial vehicles, as the presumptively most frequent travelers. *See Selevan II*, 711 F.3d at 259. Whereas the residents of Grand Island had to use the bridge many times a day because of the small size and isolated nature of the island upon which they lived, there is nothing about the nature of the CBD or of the trucking industry that would require trucks, more than other vehicle classes, to have to enter the CBD many times a day. Some trucks may enter only once a day, carrying in a single trip the full load that they need to deliver within the CBD. Conversely, some trucks may operate with particular needs that require them to make more than one trip into the CBD. TANY's Complaint does not provide any basis for the Court to infer that the latter occurs with such frequency as to swamp the daily incidence of residents and commuters driving passenger cars into the CBD.

More importantly, in *Selevan II*, in holding that the Grand Island toll's distinctions did not rest upon "wholly unreasonable" bases, the Second Circuit disavowed the proposition that frequency-based discounts were obligatory. It expressly stated that "[w]hile the usage of the Grand

Island Bridge might be one rational basis upon which to draw distinctions among different classes of motorists, it need not be the only one." *Id.* at 259 n.5. Indeed, the Supreme Court has been clear that legislatures have a tremendous amount of discretion to give policy-based exemptions or discount rates. In *Evansville*, the Supreme Court upheld exemptions to a user fee imposed upon commercial airline passengers that exempted "in whole or part a majority of the actual number of persons who use facilities of the airports involved." *Evansville*, 405 U.S. at 717–18 & n.7. Such exemptions included active members of the military and temporary layovers, but not frequent fliers. *Id.* Other courts have similarly endorsed a wide variety of policy-based discounts and exemptions. *See Chan*, 2024 WL 5199945, at *20 (discussing *R.I. Tpk.*, 123 F.4th at 49; *Janes I*, 977 F. Supp. 2d at 340). In sum, the Tolling Program's dissimilarity to the Grand Island Bridge toll does not indicate that the toll is not a fair approximation of toll payers' use of the facility.[17]

Next, TANY alleges that "[d]espite making up only 4% of all traffic in the [CBD], commercial trucks . . . bear by far the biggest burden under the Tolling Program, while other classes of vehicle that make up more than half of all traffic in the [CBD] are fully exempt." *Trucking*, Dkt. No. 14 ¶¶ 9, 35.[18] TANY cites the District of Rhode Island's holding in *Am. Trucking Assocs., Inc. v. Alviti*, 630 F. Supp. 3d 357, 366 (D.R.I. 2022), holding certain Rhode

---

[17] TANY additionally argues that trucks "have no alternative to entering the [CBD] to make necessary deliveries" and that it is thus unfair for them to be tolled per-trip. *Trucking*, Dkt. No. 76 at 17–19. But that argument just posits, through different words, TANY's flawed and previously-rejected argument that the benefits provided by the Tolling Program do not "fairly approximate" the costs imposed on the truckers if the revenues are not directed toward road maintenance. Even if the trucks have no alternative route, they may benefit from the fact that others do have the ability to take advantage of alternative routes in the form of reduced congestion and quicker transit through the CBD.

[18] Although TANY describes taxis and for-hire vehicles as being "fully exempt," *id.* ¶ 6, those vehicles are actually charged per-trip into, through, or out of the CBD with the passenger, rather than the driver, paying the charge, *Trucking*, Dkt. No. 81-1; Rules of City of NY Taxi & Limousine Comm'n §§ 58-26(f), 59A-23(b), 59D-17(c).

Island bridge tolls to be violative of the dormant Commerce Clause. *Trucking*, Dkt. No. 76 at 17–18. There, the court noted that "large commercial vehicles only account for approximately 3% of the total vehicle traffic on those bridges" but bore the full brunt of the tolling burden. *Alviti*, 630 F. Supp. 3d at 366. However, after briefing on the instant motion to dismiss concluded, the First Circuit reversed the district court's decision, holding that it was not "'wholly unreasonable' for Rhode Island to rely on a vehicle's relative contribution to pavement damage as a proxy for estimating relative damage to the paved bridges." *R.I Tpk.*, 123 F.4th at 47. The First Circuit held that "[t]he fee is levied only on vehicles that Rhode Island regards as inflicting the most damage to the bridges they use" and "[n]othing in *Bridgeport* suggests that this allocation scheme is impermissible under the fair-approximation test." *Id.* at 51; *see also Chan*, 2024 WL 5199945, at *20 (discussing *R.I Tpk.*). So too here, the Project Sponsors could rationally have concluded that each truck takes up more space on the road—and thus "uses" the facility and contributes more to congestion—than a smaller passenger car, that trucks would benefit disproportionately from reduced traffic in the CBD, and that therefore passenger cars, taxis, and motorcycles should not be charged at the same rate and in the same form as trucks. *See Chan*, 2024 WL 5199945, at *17–21. As the Court previously recognized, "percentage use is not the lynchpin when determining whether differing rates represent a fair approximation of use for different classes of motorists." *Id.* at *19 (citing *Selevan I*, 584 F.3d at 97).

Ultimately, Plaintiffs fail to allege that the Tolling Program does not represent a fair approximation of motorists' use.

## C.    Excessive Burden

The last remaining element of the *Evansville/Northwest Airlines* test is whether the tolls are "excessive in comparison with the governmental benefit conferred." *Evansville*, 405 U.S. at 717.

Here is where Plaintiffs' dormant Commerce Clause and right to travel claims diverge. Once Congress permits the states to regulate an aspect of interstate commerce, "any action taken by a State within the scope of the congressional authorization is rendered invulnerable to Commerce Clause challenge." *W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 652–53 (1981); *see also White v. Mass Council of Const. Emps., Inc.*, 460 U.S. 204, 213 (1983) ("Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce."); *Chan*, 2024 WL 5199945, at *15.  As the Court has previously explained, Congress "expressly authorize[d] states to allocate toll revenue toward other government services" when it enacted the Intermodal Surface Transportation Efficiency Act ("ISTEA"), 23 U.S.C. § 129(a)(3)(A).  *Chan*, 2024 WL 5199945, at *16; *see also N.Y. State Thruway Auth.*, 886 F.3d at 246; *Owner Operator Indep. Drivers Ass'n, Inc. v. Penn. Tpk. Comm'n*, 934 F.3d 283, 292 (3d Cir. 2019).  "By permitting tolling revenues to exceed costs, Congress has indicated that the burden on interstate commerce imposed by a toll may exceed the precise benefit the toll conveys to the facility's users."  *Chan*, 2024 WL 5199945, at *17.  Because Congress has statutorily displaced the excessiveness component of the dormant Commerce Clause inquiry for toll facilities such as the Tolling Program, and because Plaintiffs' allegations do not satisfy either the discrimination or fair approximation inquiries, the dormant Commerce Clause claims in *Chan*, *Mulgrew*, and *Trucking* are dismissed.

The ISTEA, however, is not dispositive of Plaintiffs' right to travel claim.  Congress may not effectively authorize states to impede the right to travel.  *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 277 n.7 (1993); *Chan*, 2024 WL 5199945, at *25.  The Court therefore must analyze the final prong of the *Evansville/Northwest Airlines* test in connection with Plaintiffs' claims that the Tolling Program violates the right to travel.  Plaintiffs argue that they "have also

sufficiently alleged that Congestion Pricing fees are excessive compared to the benefits accrued by the users." *Chan*, Dkt. No 130 at 13–14; *Mulgrew*, Dkt. No. 118 at 13–14; *see also Trucking*, Dkt. No. 76 at 15 ("[T]he charges on the trucking industry are grossly excessive in relation to the benefits conferred.").  To determine whether Plaintiffs have adequately alleged that the tolls are excessive in comparison with the governmental benefit conferred, the Court reviews the focus of the excessiveness inquiry.

The *Evansville* Court noted that the inquiry was derived from the Supreme Court's prior holding in *Hendrick v. Maryland*, where a District of Columbia resident who had been convicted of driving in Maryland without paying the fee charged to help defray the costs of road construction and repair, "challenged his conviction on the ground that the fee burdened interstate commerce in violation of the rights of citizens to travel into and through the State."  *Evansville*, 405 U.S. at 712–13 (citing *Hendrick v. Maryland*, 235 U.S. 610 (1915)).  The Supreme Court held in *Hendrick* that:

> In view of the many decisions of this court there can be no serious doubt that where a state at its own expense furnishes special facilities for the use of those engaged in commerce, interstate as well as domestic, it may exact compensation therefor.  The amount of the charges and the method of collection are primarily for determination by the state itself; and so long as they are reasonable and are fixed according to some uniform, fair, and practical standard, they constitute no burden on interstate commerce.

*Hendrick*, 235 U.S. at 623–24; *see also id.* at 624 (distinguishing the facts in *Hendrick* from a case in which "a direct tax was laid upon the passenger for the privilege of leaving the state" because "here the statute at most attempts to regulate the operation of dangerous machines on the highways, and to charge for the use of valuable facilities"); *Evansville*, 405 U.S. at 712–13.  The *Evansville* Court accordingly held it to be "settled that a charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance may constitutionally be imposed on interstate and domestic users alike."  *Evansville*, 405 U.S. at 714.  Where the use fee is levied to offset the cost of providing the pro-travel facility,

the state does not infringe the right to travel. *See id.* ("A permissible charge to help defray the cost of the facility is therefore not a burden in the constitutional sense."). Conversely, however, where the government profits from the user fee in excess of the facility's costs, the fee is no longer promoting travel.

Accordingly, the Court in *Evansville* evaluated excessiveness by looking to the "costs incurred by the taxing authorities." *Id.* at 719. It noted that the costs of capital improvements for the facility in question were greater than the revenues generated and that the fees charged did not exceed that delta. *Id.* at 719–20. It therefore held that the appellants "failed to offer proof of excessiveness." *Id.* Following *Evansville*, the First Circuit has noted that "the overwhelming thrust" of the excessive burden factor "is toward a comparison of the tax with costs incurred in connection with construction of facilities." *Am. Airlines, Inc. v. Mass. Port Auth.*, 560 F.2d 1036, 1038 (1st Cir. 1977); *see Industria Y Distribucion De Alimentos v. Trailer Bridge*, 797 F.3d 141, 146 (1st Cir. 2015); *New Eng. Legal Found. v. Mass. Port Auth.*, 883 F.2d 157, 162 (1st Cir. 1989). "This is consistent with the approach taken in other cases which focus on whether the revenue raised by the fee roughly approximates the cost of providing the facilities and services." *Am. Airlines*, 560 F.2d at 1038 (collecting Supreme Court cases). In *Northwest Airlines*, the Supreme Court noted that the airport charged airlines "the break-even costs for the areas they use" and that the Court therefore "cannot conclude that the [a]irlines were charged fees 'excessive in comparison with the governmental benefit conferred.'" *Nw. Airlines*, 510 U.S. at 370 (citing *Evansville*, 405 U.S. at 719); *see also id.* at 371 (noting that "the [a]irlines are charged only for the costs of benefits they receive" and any surplus received by the airport "is generated from fees charged to concessions, and the amounts of those fees are not at issue"). In *Selevan II*, the Second Circuit agreed with the district court's determination "that the [New York Thruway Authority] had not

been collecting excess revenues from its Grand Island tolls" and "that any revenues collected did not exceed proper margins, given the [New York Thruway Authority's] public safety responsibilities and its expenses for construction and maintenance." 711 F.3d at 260. The Circuit accordingly affirmed the district court's holding that the toll was not excessive in relation to the benefits conferred. *Id.*

The excessiveness prong looks to the costs of provision rather than a subjective measure of how much each user regards the benefit they receive. As the Second Circuit held in *Selevan I*:

> [T]he size of the burden on an individual plaintiff is irrelevant. . . . [W]hether a state policy violates the dormant Commerce Clause does not depend on the extent of its impact on an individual plaintiff. Rather, a state policy that is challenged under the dormant Commerce Clause must be judged by its overall economic impact on *interstate commerce* in relation to the putative local benefits conferred.

584 F.3d at 96 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). In *Am. Airlines*, the plaintiffs argued that *Evansville's* language that "a tax may not be 'excessive in comparison with the governmental benefit conferred' . . . [entitled them] to have discovery and to make the effort to prove that the [user fee on airline landings], is not productive of any commensurate benefit to them." *Am. Airlines*, 560 F.2d at 1038 (quoting *Evansville*, 405 U.S. at 716–17). The First Circuit rejected that approach as unworkable, stating "we cannot see how a federal system, recognizing state sovereignty, could work on a basis of customer judgments of benefits received." *Id.* It explained:

> A state could supply facilities which would be of critical importance to some users, of moderate convenience to others, and of marginal use to the remainder. If such taxes as landing fees were to be subject to attack from each user, depending upon the particular utility, their imposition could be a matter of endless and shifting controversy. Such an approach would subject every taxing authority to the judgments of courts as to the wisdom, the foresight, and the efficiency of its plans from the viewpoint of each affected customer.
>
> Not only would the airports be subject to uncertainty, in effect having to aim their tax plans at a moving target, but the courts would find themselves involved in long trials attempting to adjudicate the quantum of benefit received by an airline, the

> normative ratio between benefit and tax, and the amount of reasonable cost which could be properly allocated to the users. We do not think that states are held to such a punctilio of proof.

*Id.* at 1038–39.

The excessiveness prong thus demands more from plaintiffs than mere allegations that the benefits received are less than the burden imposed. As the Supreme Court has held, "[t]he state is not required to compute with mathematical precision the cost to it of the services." *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 599, (1939). "If the fees charged do not appear to be manifestly disproportionate to the services rendered, we cannot say from our own knowledge or experience that they are excessive." *Id.* Instead, *Evansville*'s language regarding the benefit to users ensures that a tax ostensibly meant to support the provision of pro-travel facilities is not in fact instated to burden use of those facilities while actually supporting extraneous services from which the fee-payers do not benefit. *See Sperry*, 493 U.S. at 53 ("The amount of a user fee need not be precisely calibrated to the use that a party makes of governmental services, and, on the facts of this case, the [charge at issue] is not so clearly excessive as to belie its purported character as a user fee."); *see also Bridgeport*, 567 F.3d at 86–88. As the Second Circuit noted in *Bridgeport*, "the 'fair approximation' and the 'excessiveness' criteria substantially overlap." *Bridgeport*, 567 F.3d at 86.

The Second Circuit has emphasized, moreover, that "there need not be a perfect fit between the use of the [facility] and the support of the [facility] by the toll." *Selevan I*, 584 F.3d at 98 (quoting *Bridgeport*, 567 F.3d at 86); *see also Selevan II*, 711 F.3d at 260. All that is required is that the budget of the governmental unit that operates the facilities bears at least a functional relationship to the facilities used by the fee payers. *See Bridgeport*, 567 F.3d at 87 (citing *Auto. Club II*, 887 F.2d at 421). As stated above and in the Court's prior Opinion and Order on the motion for injunctive relief, New York's integrated transportation system is functionally connected

to the tolled CBD roadways utilized by Plaintiffs.  *See supra*; *Chan*, 2024 WL 5199945, at *14, 25–27.  The Court thus looks to whether Plaintiffs have alleged that the Tolling Program extracts fees that are not at least roughly approximate to the costs associated with the integrated system. They have not.  Although each of the *Chan*, *Mulgrew*, and *Trucking* Complaints state in conclusory terms that the Tolling Program's burden outweighs its local benefits, none allege any fact with respect to the costs of the relevant provision of services.  *Chan*, Dkt. No. 124 ¶¶ 235–236, 238; *Mulgrew*, Dkt. No. 112 ¶¶ 218–219, 221; *Trucking*, Dkt. No. 14 ¶¶ 82, 90.

Because Plaintiffs do not plead that the Tolling Program violates any element of the *Evansville/Northwest Airlines* test, Defendants' motions to dismiss Plaintiffs' claims that the Tolling Program violates the dormant Commerce Clause and the right to travel are granted.

## III.    NEPA

Plaintiffs also allege that Defendants violated NEPA by failing to prepare a supplemental EIS discussing the Tolling Program's environmental impacts or to perform more thorough reevaluations.

NEPA requires agencies proposing "major Federal actions significantly affecting the quality of the human environment" to create an EIS (or FONSI) setting forth, among other items, the action's reasonably foreseeable environmental effects and a reasonable range of alternatives to the proposed agency action.  42 U.S.C. § 4332.  Rather than demanding any particular substantive outcome, NEPA is an "action-forcing" statute, enacted to ensure that federal agencies contemplating major projects consider the effects of their projects on the human environment and thus whether they reflect the environmental goals set forth by Congress.  *See Kleppe*, 427 U.S. at 409 ("By requiring [a]n impact statement Congress intended to assure such consideration during the development of a proposal."); *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*,

435 U.S. 519, 558 (1978) ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural.").

"An agency's obligations under NEPA do not end with the preparation of an EIS." *Nat. Res. Def. Council, Inc. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 2d 198, 217 (S.D.N.Y. 2006). Events following publication of an EIS may necessitate preparation of a supplemental EIS or FONSI. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 72 (2004) ("Often an initial EIS is sufficient, but in certain circumstances an EIS must be supplemented."). The Supreme Court has noted that "[t]he subject of postdecision supplemental environmental impact statements is not expressly addressed in NEPA." *Marsh*, 490 U.S. at 370. "Preparation of such statements, however, is at times necessary to satisfy the Act's 'action-forcing' purpose" if, for example, changes to the action are contemplated or new information comes to light. *Id.*; *see Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 959 (7th Cir. 2003) ("NEPA and its regulations require agencies to take a 'hard look' at the 'significance' of the consequences of their actions before issuing an EA/FONSI, but also contemplate the reality that, after the formal issuance of an EIS or EA/FONSI, it is often the case that new information comes to light or the project changes." (citation omitted)).

Drawing on the CEQ regulations, the Supreme Court arrived at a "rule of reason" to determine when an agency must prepare a supplemental EIS: "[i]f there remains major Federal action to occur, and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Id.* at 374 (quotation and alterations omitted); *see also Norton*, 542 U.S. at 72; *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 188 n.34

(1978).[19]  Conversely, where the agency determines that the agency action yet to be taken is not reasonably anticipated to significantly impact the environment or to cause significantly unconsidered impacts, supplementation is not required.  The "significance" of the environmental impact is to be "defined in terms of both context and intensity."  *County of Seneca v. Cheney*, 12 F.3d 8, 12 (2d Cir. 1993).  The significance of a project's environmental impacts are determined by the agency in the first instance and then, if challenged, evaluated by the court under the arbitrary and capricious standard of review.  *See Hoffman*, 132 F.3d at 14 ("We have consistently held that whether a particular agency action will have a 'significant' effect on the environment is a substantive question left to the informed discretion of the agency proposing the action.") (collecting cases); *Village of Grand View v. Skinner*, 947 F.2d 651, 657 (2d Cir. 1991).

Courts "review the agency's decision not to prepare a supplemental EIS in two parts, asking (1) whether the agency took the 'hard look' that the new circumstances required and, if so, (2) whether the agency's decision, based on what it learned, was arbitrary or capricious."  *F.A.A.*, 564 F.3d at561 (citing *Skinner*, 947 F.2d at 657); *see also Balt. Gas & Elec.*, 462 U.S. at 97–98 ("The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.").[20]  The Court thus first evaluates whether the Reevaluations represent sufficiently "hard looks" at the March 2024 Tolling Structure and Phase-In Tolling Structure's anticipated environmental effects

---

[19] Here, the federal action yet to occur was FHWA's execution of a cooperative agreement with the NYSDOT, TBTA, and NYCDOT under the Value Pricing Pilot Program, 23 U.S.C. § 149. FHWA executed such an agreement on November 21, 2024, following both Reevaluations. *Chan*, Dkt. No. 138-2; *Mulgrew*, Dkt. No. 126-2.

[20] The Supreme Court's overall approach to challenges based on the APA insists that the agency "examine the relevant data and articulate a satisfactory explanation for its action." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

and then turns to whether the FHWA's decision not to supplement the FONSI was arbitrary or capricious based on the Reevaluations.

Plaintiffs argue that the Reevaluations fail to provide sufficient support for the FHWA's determination that no further review of the Tolling Program or supplementation was necessary. *Chan*, Dkt. No. 136-1 at 23–29; *Mulgrew*, Dkt. No. 124-1 at 23–29. The Second Circuit has held "that NEPA does not require [agencies] to make a 'crystal ball' inquiry, and that an EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible." *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 88 (2d Cir. 1975) (citing *Indian Lookout All. v. Volpe*, 484 F.2d 11 (8th Cir. 1973); *Nat. Resources Defense Council Inc. v. Morton*, 458 F.2d 827, 837 (D.C. Cir. 1972)). However, "[i]f the district judge finds that the agency did not make a reasonably adequate compilation of relevant information and that the EIS sets forth statements that are materially false or inaccurate, [the court] may properly find that the EIS does not satisfy the requirements of NEPA, in that it cannot provide the basis for an informed evaluation or a reasoned decision." *Sierra Club*, 701 F.2d at 1030.

### A.    Reevaluation 1

Plaintiffs argue that the structure of the Tolling Program materially changed between May 2023, when the Final EA was published, and June 2024, when Reevaluation 1 was published. The Court first reviews Reevaluation 1's treatment of the changed structure and then turns to Plaintiffs' argument that Reevaluation 1 was "designed to avoid engaging the public or any thorough analysis of the likely environmental and financial burden of the toll." *Chan*, Dkt. No. 136-1 at 2; *Mulgrew*, Dkt. No. 124-1 at 2.

The Final EA analyzed a set of tolling scenarios rather than any single tolling structure in order to provide information and guidance to the TMRB in choosing a tolling structure to recommend.  *See Mulgrew*, 750 F. Supp. 3d at 224 & n.22; DOT393, 2455–58, 36203, 36272, 36295–99.  It is apparent that the March 2024 Tolling Structure does not correspond identically to any one of the Tolling Scenarios measured in the Final EA.  This does not on its own not suggest a NEPA violation.  *See Mulgrew*, 750 F. Supp. 3d at 224 ("The EA's examination of tolling scenarios, prior to the TBTA's adoption of a final tolling structure, did not violate NEPA.").  It is typical for a NEPA review to begin with "broad EAs or EISs, followed by more granular assessments of whether specific aspects of a project fit within the prior analysis or require additional study."  *Id.*; *see also Fund for Animals v. Kempthorne*, 538 F.3d 124, 138 (2d Cir. 2008) ("In the absence of any certain site-specific action, then, it was sufficient for the [agency] here to prepare only a programmatic EIS.").  The CEQ regulations recommend that "[a]gencies generally should tier their environmental impact statements and environmental assessments when it would eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided."  40 C.F.R. § 1501.11(b).

NEPA thus explicitly permits an agency to perform its environmental impact analysis on a number of potential alternatives without binding it to "start the environmental assessment process anew with every change in a project."  *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509 (9th Cir. 1997).  As the Court previously held, such "[m]ulti-step NEPA reviews are not only lawful, but also salutary."  *Mulgrew*, 750 F. Supp. 3d at 225.  Conducting the review at the outset before a final decision is made may allow the implementing agency to tailor the project based on the findings of the earlier environmental assessment.  *See Mulgrew*, 750 F. Supp. 3d at 225.  Multi-step NEPA reviews also serve the interests of efficiency.  Where an agency

chooses to employ such an iterative approach, subsequent assessments may "avoid duplication and focus on issues, effects, or alternatives not fully addressed in a programmatic environmental document, environmental impact statement, or environmental assessment prepared at an earlier phase or stage." 40 C.F.R. § 1501.11(b); *see also* 23 C.F.R. § 771.130. "The necessity and economy of such a method of amending and supplementing EIS's in light of proposal changes or EIS deficiencies without redrafting or recirculating a whole new document is obvious." *Callaway*, 524 F.2d at 92.

Plaintiffs argue that there were "substantial changes between the hypothetical scenarios in the EA and the actual tolling structure" that was the subject of Reevaluation 1. *Chan*, Dkt. No. 136-1 at 11; *Mulgrew*, Dkt. No. 124-1 at 11. They point to the raw number of pages, suggesting that because the reevaluation was exhaustive, it necessarily reflected substantial changes. *See Chan*, Dkt. No. 136-1 at 11 (arguing that "[t]he reevaluation, excluding appendices (and including the Executive Summary), was 175 pages, evidencing significant change to the tolling program."); *Mulgrew*, Dkt. No. 124-1 at 11 (same); *see also Chan*, Dkt. No. 136-1 at 16–17 ("It took 175-pages of analysis in the June 2024 Reevaluation to detail the impact of the adopted tolling structure, as compared with the seven scenarios previously reviewed in the Final EA. That alone suggests that the altered tolling structure materially differs from the hypothetical tolls analyzed in the EA."); *Mulgrew*, Dkt. No. 124-1 at 16–17 (same). However, the Court has previously rejected Plaintiffs' argument that the length of an environmental assessment is reflective of the subject program's environmental impacts. The argument is facile. *See Mulgrew*, 750 F. Supp. 3d at 224; *see also Taxpayers of Mich. Against Casinos v. Norton* ("*TOMAC*"), 433 F.3d 852, 862 (D.C. Cir. 2006) ("The simple point here is that the length of an EA has no bearing on the necessity of an EIS."); *Sierra Club v. Marsh*, 769 F.2d 868, 875 (1st Cir. 1985) ("EA

length[] [and] complexity . . . do not by themselves show that the EAs' conclusion—'no significant impact'—is correct, nor do they show it is incorrect."). "What ultimately determines whether an EIS rather than an EA is required is the scope of the project itself, not the length of the agency's report." *Heartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 434 (8th Cir. 2004).

Plaintiffs more concretely point to the following changes: (1) the "never-before analyzed price of $15 as the base toll," (2) "the final tolling structure extends peak hour pricing by an additional two hours every weekday (5:00am-9:00pm)" compared to the weekday Peak Period of 6am to 8pm that was analyzed in Tolling Scenarios A–E and G, (3) a three-level structure for charging different tolls depending upon the time of day—peak, non-peak and overnight—was changed to two levels—only peak and overnight[;]" (4) the river crossing credits for passenger vehicles were lowered; and (5) the Final EA analyzed tolls imposed on taxi and FHV drivers rather than passengers. *Chan*, Dkt. No. 136-1 at 12–13, 17–18; *Mulgrew*, Dkt. No. 124-1 at 12–13, 17–18. Plaintiffs argue that these changes necessitated supplementation and more thorough reevaluation either because the public should have been afforded an opportunity to weigh in or because they create significant environmental impacts. *See Chan*, Dkt. No. 136-1 at 12–13, 17–20, 26–29; *Mulgrew*, Dkt. No. 124-1 at 12–13, 17–20, 26–29; *Chan*, Dkt. No. 154 at 16; *Mulgrew*, Dkt. No. 140 at 16.

### 1.    Public Participation

According to Plaintiffs, "[t]he combination of new elements in the adopted tolling structure deviates too much from the examined scenarios, requiring not only review in the form of a reevaluation, but a transparent process with the public's participation." *See Chan*, Dkt. No. 136-1 at 2–5, 15, 17; *Mulgrew*, Dkt. No. 124-1 at 2–5, 15, 17; *Chan*, Dkt. No. 154 at 3; *Mulgrew*, Dkt. No. 140 at 3. Defendants respond that no public participation is required for a reevaluation. *See*

*Chan*, Dkt. No. 146 at 17 n.12; *Mulgrew*, Dkt. No. 132 at 17 n.12; *Chan*, Dkt. No. 148 at 11–12; *Mulgrew*, Dkt. No. 134 at 11–12.

FHWA invited significant public participation in connection with its development of the Final EA and FONSI.  In preparing the Final EA, the FHWA and Project Sponsors created a website, disseminated fact sheets, posted information about the project on several social media platforms, hosted webinars, established and participated in working groups, sent email updates to interested members of the public, coordinated with stakeholders, and utilized traditional advertising channels.  DOT37045–49.  The FHWA and Project Sponsors received 7,338 comments, including comments submitted through an online form, emails, comments made at webinars, letters, and voicemail messages, all of which the FHWA and Project Sponsors collected, archived, and considered.  DOT37049.  The Final EA incorporated many revisions in response to the feedback received.  DOT36155.  Following publication of the Final EA, the FHWA presented the Final EA, accompanied by a draft FONSI, to the public for a thirty-day public availability period.  DOT393.  The FHWA and project sponsors reviewed approximately 550 new comments and determined that no new substantive issues were raised that needed to be addressed.  *Id.*

The FHWA and Project Sponsors did not solicit the same magnitude of public feedback when preparing Reevaluation 1, but did continue to inform and engage with the public even after publication of the Final EA.  The Project Sponsors established a small business working group to share information about implementation of the Tolling Project and findings from evaluating the effects of the Tolling Program and to solicit ongoing input on how small businesses are being affected.  DOT45617.  That group has been meeting since January 2024.  *Id.*  The Project Sponsors also established an EJ community group to share updated data and analysis and hear about potential environmental justice-related concerns, which has been meeting quarterly since February 2024.

DOT45618–19.  The TBTA and MTA conducted outreach efforts including staffing a table at the NYC International Auto Show and holding multiple weekly in-person engagement events at transit centers across New York City.  DOT45620.  The Project Sponsors held targeted meetings with members of the public related to construction activities, impacts to business operations, and potential aesthetic changes to the infrastructure.  DOT45620.  Upon invitation, they also participated in public meetings where representatives provided an overview of the Project and answered questions from event organizers and attendees.  DOT45621.

The purpose of a reevaluation is to determine whether a previously-issued EIS or FONSI remains valid or whether it must be supplemented.  *See S. Trenton Residents Against 29 v. Fed. Highway Admin.*, 176 F.3d 658, 661 (3d Cir. 1999); *Senville*, 327 F. Supp. 2d at 350.  Plaintiffs argue that "[o]ne key difference between supplementation and reevaluation is that supplementation provides for public input and comment, something Plaintiffs and the public have been deprived of entirely with regard to either 'final' version of the tolling program."  *See Chan*, Dkt. No. 136-1 at 3; *Mulgrew*, Dkt. No. 124-1 at 3; *see also Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1292 (1st Cir. 1996) (noting that issuing a supplemental EIS "would give the public an opportunity to comment on" a new project plan that appeared for the first time in the final EIS).

Plaintiffs are correct that agencies are required to invite public participation before finalizing an EIS or FONSI.  The Second Circuit has acknowledged that "NEPA itself does not assign the public any particular role in the [initial environmental assessment or EIS] processes."  *Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 120 (2d Cir. 2013) (citing *Hanly v. Kleindienst*, 471 F.2d 823, 835 (2d Cir. 1972)).  However, the CEQ's implementing regulations state that "[a]ccurate scientific analysis, expert agency comments, and *public scrutiny* are essential to implementing NEPA."  40 C.F.R.  § 1500.1(b) (emphasis added); *see also* 23 C.F.R.

§§ 771.119(d)–(f), 771.123(g)-(i) (FHWA's NEPA regulations require notice and comment procedures for both EAs and EISs). The Supreme Court has held that NEPA's action-forcing design "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349. Inviting public participation thus provides an avenue to increase public buy-in to the program and provides the agency with more information to consider when reaching its decision. *See Marsh*, 490 U.S. at 371 ("[T]he broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time.").

Accordingly, where a supplemental EIS is required because "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or there emerge "substantial new circumstances or information about the significance of adverse effects that bear on the analysis," a second opportunity for public comment is also required. 40 C.F.R. § 1502.9(d); *see State of California v. Block*, 690 F.2d 753, 772 (9th Cir. 1982) ("[W]e conclude that the Proposed Action differed sufficiently from the alternatives canvassed in the draft EIS to warrant the circulation for public comment of a draft supplement describing the Proposed Action."); *Dubois*, 102 F.3d at 1292–93 (holding that agency violated NEPA where the adopted project "entails substantial changes from the previously proposed actions that are relevant to environmental concerns, and . . . the Forest Service did not present those changes to the public . . . for review and comment").

However, courts have held that while agencies may be required "to allow the public to participate in the preparation of an SEIS, there is no such requirement for the decision *whether* to prepare an SEIS." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000); *accord No Mid-Currituck Bridge-Concerned Citizens v. N. Carolina Dep't of Transp.*, 60 F.4th 794, 799, 805 (4th Cir. 2023); *Northwoods Wilderness Recovery, Inc. v. U.S. Dep't of Agric. Forest Serv.*, 192 F. App'x 369, 371 (6th Cir. 2006); *California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 797 (9th Cir. 2014); *233 E. 69th St. Owners Corp. v. LaHood*, 797 F. Supp. 2d 326, 337 (S.D.N.Y. 2011).  The reevaluation process need not include public participation because its very purpose is to determine whether a further EA and FONSI or EIS is necessary along with the public participation that such documents would require.  "Were [the court] to hold otherwise, the threshold decision not to supplement an EIS would become as burdensome as preparing the supplemental EIS itself, and the continuing duty to gather and evaluate new information[] could prolong NEPA review beyond reasonable limits." *State of California ex rel. Brown v. Watt*, 683 F.2d 1253, 1268 (9th Cir. 1982), *rev'd on other grounds sub nom. Sec'y of the Interior v. California*, 464 U.S. 312 (1984); *see also Marsh*, 490 U.S. at 373 ("[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized[] [because] [t]o require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made.").  Any departure from an EIS would require a lengthy period for public comment with the result that all development would be halted.  Instead, the rule of reason governs, and it is only after an agency determines that the agency action will "affect the quality of the human environment in a significant manner or to a significant extent not already considered, [that] a

supplemental EIS must be prepared" and submitted to the public to invite comment. *Marsh*, 490 U.S. at 374.

This is not to say that an agency may issue a final EIS for one project plan and thereafter adopt an entirely new plan, evading public review by simply classing the new plan as a continuation of its predecessor. *See Mulgrew*, 750 F. Supp. 3d at 225 ("While the EA properly examined tolling scenarios, a necessary consequence of the FHWA's approach is that the final tolling structure cannot deviate too much from the examined scenarios; otherwise, the EA's conclusion that Congestion Pricing will not have a significant impact may no longer hold true."). Several circuits have held, based on now-ineffective guidance from the CEQ, that "an additional alternative that has not been disseminated previously in a draft EIS may be adopted in a final EIS, without further public comment, only if it is 'qualitatively within the spectrum of alternatives that were discussed' in the prior draft; otherwise a supplemental draft is needed." *Dubois*, 102 F.3d at 1292 (quoting Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18026, 18035 (1981)); *accord In re Operation of Mo. River Sys. Litig.*, 516 F.3d 688, 693 (8th Cir. 2008); *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 705 (10th Cir. 2009). The relevant question is whether the earlier EIS's deficiencies "are significant enough to undermine informed public comment and informed decisionmaking." *Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017) (quotation omitted).

Contrariwise, if the ultimately selected course of action was "within the range of alternatives the public could have reasonably anticipated the [agency] to be considering," supplementation is not required. *Russell Country Sportsmen*, 668 F.3d at 1045. For example, a decision to build 5,000 housing units would be within the scope of an EIS analyzing the effects of

plans to build 2,000, 4,000 or 6,000 units and would not require a supplement. *See Richardson*, 565 F.3d at 707; *see also Vt. Pub. Int. Rsch. Grp. v. U.S. Fish & Wildlife Serv.*, 247 F. Supp. 2d 495, 529 (D. Vt. 2002) (holding that where an EIS contemplated that variable concentrations and quantities of lampricide would be used to control lamprey populations, further supplementation was not required to study the specific lampricide use that fell within the previously analyzed concentrations and quantities). "[A] SEIS must be prepared only where new information "provides a *seriously* different picture of the environmental landscape." *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1060 (D.C. Cir. 2017).

It was not arbitrary and capricious for the FHWA to determine that the tolling structure adopted in Reevaluation 1 is qualitatively within the spectrum of tolling alternatives discussed in the Final EA and FONSI. None of the changes represent significant deviations such that the March 2024 Tolling Structure should be viewed as a new project. The Final EA and FONSI considered Tolling Scenarios with Peak Period base tolls ranging from $9–23. DOT2455–56, 36203. The $15 Peak Period base toll is within that range. If the tolls spanning that range created no significant environmental impact, it is not arbitrary and capricious to conclude that a Peak Period base toll within the range would not give rise to a significant environmental impact. The two-tier peak pricing schedule includes the same length overnight period as was modeled in the Final EA. DOT45439. Plaintiffs complain that "the crossing credits for passenger vehicles entering the Lincoln Tunnel, Holland Tunnel, Hugh Carey and Queens-Midtown now range from $1.50 to $5.00, which are significantly lower than the $13.10 studied in the EA." *Chan*, Dkt. No. 136-1 at 17; *Mulgrew*, Dkt. No. 124-1 at 17. But that is not an accurate statement of the previously-analyzed credits; the Final EA analyzed credits ranging from $0 to $13.10, DOT2455, and the ultimately-adopted credits are within that range. Finally, the pass-through mechanism for taxis

and FHVs does not change the actual toll levied.  As Reevaluation 1 stated, "[t]he per-trip tolls for taxis and FHVs in the adopted toll structure would be equivalent to the auto peak rate of $15" which was discussed in the Final EA.  DOT45440.  Reevaluation 1 explained that it reached that determination "based on NYC Taxi and Limousine Commission analysis of trips made by TLC-licensed vehicles in May 2023: for taxis the average number of trips with passengers to/from/within the CBD is 12, and for FHVs it is 6." *Id.*  The pass-through method merely acts to distribute the toll ratably among the taxi's many trips.  Notably, the FHWA did receive and respond to public comments concerning pass-through per-ride tolls on Taxis and FHVs.  *See e.g.*, DOT9409–16.  The model is consistent with the Project Sponsors' commitment in the Final EA that the "TBTA will ensure that New York City taxis and FHVs are not tolled more than once per day in the adopted CBD toll structure."  DOT36209.  It is also consistent with the Final EA's note that even if the toll was levied upon taxis and FHVs once per day, "the cost would be spread across multiple trips and passengers during the day."  DOT36390.

By contrast, the cases Plaintiffs cite in which courts have found that a new or supplemental EIS was required involved much greater changes to the project.  In *Dubois*, the Forest Service issued a draft EIS that set forth five alternatives to allow a ski resort owner to meet the perceived demand for additional alpine skiing.  102 F.3d at 1378.  In the final EA, the Forest Service adopted a sixth alternative that "entail[ed] a different configuration of activities and locations, not merely a reduced version of a previously-considered alternative." *Id.* at 1292.  The First Circuit held that supplementation was required because whereas the most similar previously-measured alternative proposed expanding the ski area primarily on land outside the permitted area, the adopted new alternative "squeezes much of its expansion into that current permit area" by "widen[ing] existing trails so as to eliminate buffers that currently separate the trails, . . . envision[ing] a 28,500–square–

foot base lodge facility within the existing permit area[,] . . . [and] develop[ing] ski trails, access roads and lifts on land that the prior alternatives had left as a woodland buffer between the old ski area and the proposed expansion area." *Id.* In *New Mexico ex rel. Richardson v. Bureau of Land Management*, the Tenth Circuit held that the Bureau of Land Management's shift from a qualitative restriction on development (development could disturb only the surfaces of the Chihuahuan Desert grassland near existing roads such that they would remain contiguous rather than scattering across the landscape) to a quantitative restriction on development (disturbances could occupy only five percent of the area at any one time such that scattering was permitted) was a significant change requiring supplementation because "[d]isturbances on the same total surface acreage may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them." 565 F.3d 683, 706 (10th Cir. 2009).[21]

Because the March 2024 Tolling Structure fell within the Final EA and EIS's discussion of alternatives, the magnitude of the changes to the program did not demand supplementation or further opportunities for public participation.

### 2.    Analysis of Environmental Effects

Plaintiffs next take issue with Reevaluation 1's analysis of the predicted environmental impacts of the March 2024 Tolling Structure. They argue that Reevaluation 1 failed to account

---

[21] Plaintiffs also cite a case involving new information rather than changes to the project design. In *City of Port Isabel v. FERC*, the Federal Energy Regulatory Commission was found to have violated NEPA by preparing a deficient EIS that examined environmental justice impacts within only a two-mile radius of the proposed projects. *See* 111 F.4th 1198, 1205–07 (D.C. Cir. 2024). Based on the court's order, the Commission conducted a much-expanded analysis with a thirty-one-mile radius. *See id.* at 1207. The D.C. Circuit held that "the updated demographic and environmental data submitted by the developers, as well as the Commission's entirely new analysis and interpretation of that data, which are substantially different from the previously conducted environmental justice analysis in the final EIS . . . 'provide[] a seriously different picture of the environmental landscape' and require a supplemental EIS." *Id.* at 1207 (quoting *Stand Up for Cal.! v. U.S. Dep't of the Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021)).

for many of the environmental impacts of the alterations to the tolling structure.  *Chan*, Dkt.
No. 136-1 at 17–18; *Mulgrew*, Dkt. No. 124-1 at 17–18.  Defendants respond that Reevaluation 1
thoroughly addressed the environmental impacts.  *Chan*, Dkt. No. 146 at 17; *Mulgrew*, Dkt.
No. 132 at 17; *Chan*, Dkt. No. 148 at 12–18; *Mulgrew*, Dkt. No. 134 at 12–18.  The Court first
discusses Reevaluation 1's environmental analysis and then turns to Defendants' specific
objections.

Even minor changes to the configuration of the program at issue may necessitate a
supplemental EIS if they will have significant new environmental impacts.  "When confronting a
design change in a project that has already been the subject of an EIS, the sponsoring agency must
consider whether the change will affect the quality of the human environment in a significant
manner or to a significant extent not already considered in previous studies."  *Skinner*, 947 F.2d at
657 (citing *Marsh*, 490 U.S. at 374); *see also Price Rd. Neighborhood*, 113 F.3d at 1510 ("Finding
that there are no discernible differences in the level of environmental impacts when comparing the
original configuration with the revised configuration, the FHWA concluded that supplemental
documentation was not necessary.  At that point, the FHWA was in full compliance with NEPA
and was not required to conduct a supplemental EA." (punctuation omitted)); *Senville v. Peters*,
327 F. Supp. 2d 335, 356 (D. Vt. 2004) ("The change from a four-lane highway to a two-lane
highway with an unknown completion date is substantial . . . The question, however, is whether
the phased construction has or will result in significant impacts that have not been studied.").
Where an agency that has already issued an EIS or FONSI alters the program in a way that gives
rise to new environmental impacts that would have required disclosure in the original EIS or
FONSI, a supplemental EIS or FONSI may be required.  *See Marsh*, 490 U.S at 372–75; *S. Trenton
Residents Against 29 v. Fed. Highway Admin.*, 176 F.3d 658, 663 (3d Cir. 1999) ("[T]he key to

whether a Supplemental Environmental Impact Statement is necessary is not whether the area has undergone significant change, but whether the proposed roadwork will have a significant impact on the environment in a manner not previously evaluated and considered."); *see also* 40 C.F.R. § 1502.9(d) (CEQ regulations require a supplemental EIS if "[t]he agency makes substantial changes to the proposed action *that are relevant to environmental concerns*" or "[t]here are substantial new circumstances or information *about the significance of adverse effects* that bear on the analysis" (emphases added)).

The question is thus whether the FHWA adequately considered whether the changes to the tolling structure would affect the environment in a significant manner or to a significant extent not already considered. *See Skinner*, 947 F.2d at 657; *see also Callaway*, 524 F.2d at 91–92. Based on the record, that question must be answered in the affirmative. FHWA's consideration was more than adequate.

The Final EA "utilized the Best Practice Model ('BPM'), a long-range travel forecasting model that covers the 28-county catchment area from trips to and from the Manhattan CBD," to assess the March 2024 Tolling Structure's effects on traffic and the associated environmental outcomes. *Mulgrew*, 750 F. Supp. 3d at 226 (quotations omitted); DOT36304–09. The BPM "is the primary tool used to analyze the effects of large-scale regional transportation projects including[] the New York metropolitan area's Federally recognized Regional Transportation Plan, PANYNJ Bus Terminal Redesign, and New NY Bridge Project," as well as the New York Metropolitan Transportation Council's regional planning analyses and Clean Air Act compliance efforts. DOT36308, 36340. Reevaluation 1 "[m]odeled the adopted toll structure using the same

version of the BPM as was used for the Final EA." DOT45477–78.[22] It then "[p]rovided BPM

results for the adopted toll structure for use in the reevaluation of the full range of topics from the

Final EA" to permit comparison of the results for the adopted toll structure to the results presented

in each analysis included in the Final EA. *Id.* Reevaluation 1 thus did not merely rely upon the

notion that the March 2024 Tolling Structure was generally within the range of alternatives

considered by the Tolling Scenarios. It fully evaluated the predicted environmental effects anew

to determine whether the predicted environmental impacts for the March 2024 Tolling Structure

differed from the impacts predicted for the Tolling Scenarios.

Based on that analysis, Reevaluation 1 determined that the traffic-related effects would be

within the ranges anticipated by the Final EA. The Tolling Scenarios "were predicted to reduce

the number of daily vehicles entering the Manhattan CBD by approximately 15 to 20 percent"

while Reevaluation 1 predicted the March 2024 Tolling Structure would "reduce the number of

vehicles entering the CBD by approximately 17 percent." DOT45478–79. Whereas the

"[p]redicted reduction of [vehicle miles traveled ('VMT')] for the tolling scenarios in the Final EA

ranged from approximately 7.1 to 9.2 percent," Reevaluation 1 predicted the March 2024 Tolling

Structure would reduce VMT in the CBD by approximately 8.9 percent. *Id.* Traffic impacts

outside of the CBD were also consistent with the Final EA's predictions. The Tolling Scenarios

predicted that daily VMT in the rest of New York City would decrease 0.2 to 1 percent.

DOT45479. Reevaluation 1 predicted a 0.4 percent decrease. *Id.* Daily VMT were expected to

increase up on 0.1 percent in Long Island, up to 2 percent in New Jersey, and up to 0 percent in

Connecticut. *Id.* Reevaluation 1 predicted no increase in Long Island, a 0.1 percent increase in

---

[22] The version of the BPM the FHWA and Project Sponsors used for the Final EA and Reevaluation 1 was developed for NYMTC's 2017 Regional Transportation Plan and Federal air quality conformity determination. DOT36340, 45477–78.

New Jersey, and a 0.3 percent decrease in Connecticut. *Id.* With regards to highways, Reevaluation 1 found that "potential adverse effects would occur on the same three highway segments as identified in the Final EA, but the forecasted traffic volumes at those locations under the adopted toll structure would be lower than the volumes evaluated in the Final EA." DOT45482–87. And Reevaluation 1 identified only one local intersection that it predicted would experience adverse effects compared to the four identified in the Final EA. DOT45483–87.[23] The Final EA predicted that the intersection between East 125th Street and Second Avenue, near the Robert F. Kennedy Bridge, would experience a delay of 20.4 seconds during the PM Peak Period. The Final EA had predicted that that intersection would experience increased delays of up to 52.2 seconds during both the AM and PM Peak Periods. DOT36492–93, 45482–87.

To evaluate the March 2024 Tolling Structure's impacts on air quality, Reevaluation 1 utilized MOVES3.1, the current emission model of the United States Environmental Protection Agency, to perform mesoscale analyses of the same air pollutants analyzed in the Final EA. DOT45535–38. Reevaluation 1 conducted the analysis for the same 12-county study area that the Final EA had evaluated. *Id.* Reevaluation 1 found that compared to the No Action Alternative, the March 2024 Tolling Structure would decrease pollutants across the entire study area. DOT45538–41. On a county-level basis, (1) all pollutants were expected to decrease in Manhattan (including the Manhattan CBD), Nassau, Westchester, Rockland, Putnam and Hudson Counties;

---

[23] Reevaluation 1 noted that based on its methodology for evaluation of local intersections, 14 of the 102 intersections studied were initially anticipated to experience higher incremental VMT than identified in the Final EA. DOT45483. The Project Sponsors reevaluated the nine study areas in which those 14 intersections were located. Further analysis of the nine study areas "demonstrated that only one of these intersections would have a potential adverse effect under the adopted toll structure, where the worst-case condition evaluated in the Final EA under Tolling Scenario D had four locations with potential adverse effects." *Id.* Thus, Reevaluation 1 noted that the "Final EA, using the worst-case condition of Tolling Scenario D, . . . identified adverse effects at three additional intersections that would no longer occur under the adopted toll structure." *Id.*

(2) Queens, Bronx, and Kings Counties were expected to have mixed results, with some pollutants increasing slightly and some pollutant burdens decreasing; and (3) Richmond, Suffolk, and Bergen Counties were estimated to experience increases in all pollutants.   DOT45540, 45542–43. Reevaluation 1 predicted fewer increases under the adopted toll structure than had been predicted to result from Tolling Scenario A.  DOT45550–51.[24]  The greatest increases were expected in Richmond, New York, ranging from 0.94 percent to 2.70 percent, and Bergen, New Jersey, ranging from 0.45 percent to 1.11 percent.  *Id.*  Reevaluation 1 noted that "[t]he overall increase of pollutants in these counties is small and the difference between Tolling Scenario A and the adopted toll structure is even smaller, less than 1 percent."  *Id.*  The Project Sponsors also conducted microscreening analysis for pollutants of concern at the 102 intersections studied in the Final EA. DOT45536–38.  For both the Final EA and Reevaluation 1, all 102 local intersections passed the screening analysis.  DOT45544–48, 45551.

Reevaluation 1 used the BPM to evaluate the March 2024 Tolling Structure's potential effects on noise levels near bridge and tunnel crossings into the Manhattan CBD and at local intersections where traffic volumes were predicted to increase.  DOT4563.  It "concluded that, similar to the Final EA, the adopted toll structure would not result in perceptible noise level increases at bridge and tunnel crossings or local intersections because the noise increase would not exceed the perceptible level of 3.0 dB(A)."  DOT45559–63.

To assess the March 2024 Tolling Structure's potential for disproportionately high and adverse effects to environmental justice ("EJ") populations, Reevaluation 1 utilized the same

---

[24] Consistent with the Final EA's practice of evaluating the worst-case scenario, the Final EA and FONSI used Tolling Scenario A for the county-level emissions analysis for criteria pollutants, because it reduced VMT the least and would represent the highest level of emissions of all the scenarios.  DOT36828, 45539.

methodologies as the Final EA.  DOT45568.  It evaluated the effects on neighborhoods from

changes in traffic patterns and the resulting effects in terms of traffic congestion, air emissions,

and noise utilizing the methodologies previously discussed, and then assessed whether any such

effects would occur disproportionately to environmental justice populations.  *Id.*  Reevaluation 1

found that in sixteen of the twenty areas of analysis it considered with respect to EJ communities,

the March 2024 Tolling Structure would benefit the communities or create no adverse effects: "the

regional transportation system, parking, social conditions (in terms of population, neighborhood

character, public policy), economic conditions, energy, parks and recreational resources, historic

and cultural resources, visual resources; air quality; noise; natural resources; hazardous

waste/contaminated materials; and construction effects."  DOT45442.[25]  Four areas of analysis

found "some potential adverse effects: highways and intersections; transit; pedestrian and

bicycles."  *Id.*; *but see* DOT45437 ("In every category, the effects are consistent with those

predicated in the Final EA; importantly, some of the adverse effects no longer occur and many are

on the lower end of those disclosed in the Final EA.").  Those results were consistent with the

Final EA's findings.  DOT37011.

To address those potential adverse effects, the Project Sponsors committed "$330 million

in measures to mitigate the impact that the toll might have on low-income residents and

---

[25] Reevaluation 1 also determined that the March 2024 Tolling Structure would reduce the impact of truck traffic diversions on EJ communities compared to the Final EA.  DOT0045574–86.  "For the adopted toll structure, the number of census tracts affected by an increase in truck traffic proximity would be slightly higher (209 tracts rather than 205 tracts), but the results would be more evenly distributed between non-environmental justice-designated tracts (47 percent rather than 41 percent) and environmental justice-designated tracts (49 percent rather than 50 percent) and the number of affected environmental justice-designated tracts would be lower than with the Final EA (151 rather than 154).  DOT45576–77.  The March 2024 Tolling Structure would also have lower intensities of truck-traffic proximity increases in EJ-designated census tracts. DOT45577–97.  No new communities with potential non-truck traffic increases but without truck-traffic increases were identified in the reevaluation.  DOT45598.

communities across the region, with a special focus on environmental justice communities."
DOT45442.  The Final EA and Reevaluation 1 both incorporated the modeled effects of the same
regional and place-based mitigation measures.  Regional measures included further reducing the
overnight toll, expanding the Off-Hours Delivery Program to minimize truck diversions, and
expanding the NYC Clean Trucks Program to reduce emissions.  DOT37018, 45606.  Place-based
mitigation efforts included electric truck charging infrastructure, roadside vegetation, parks and
greenspace, air filtration units in schools near highways, and an asthma case management program.
*Id*.  The Project Sponsors also committed to engaging in adaptive management by monitoring the
effects of congestion pricing as it is implemented.  *Id.*[26]; *see Mulgrew*, 750 F. Supp. 3d at 243
("[T]he judiciary has endorsed the use of adaptive management strategies as 'a responsible
decision in light of the inherent uncertainty of environmental impacts.'" (quoting *Theodore
Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010))).  Reevaluation 1
determined that those mitigation efforts would adequately address the potential adverse effects.
DOT45541–48, 45605–616; *see New York v. U.S. Nuclear Regul. Comm'n*, 589 F.3d 551, 555 (2d
Cir. 2009) (per curiam) ("An agency may take into account attempts to mitigate an environmental
impact when determining that an environmental impact is small enough to not require an EIS, so
long as the effectiveness of the mitigation is demonstrated by substantial evidence."); *accord
Mulgrew*, 750 F. Supp. 3d at 238 (collecting cases).

Reevaluation 1 additionally studied the program's anticipated economic effects by using
the BPM to identify potential changes to workforce movement, non-work-related trips such as
tourism, the taxi and FHV industry, movement of goods and services and related effects on small

---

[26] Reevaluation 1 notes that "[a]s part of adaptive management, the toll schedule adopted by the
TBTA Board allows for a percentage increase/decrease of up to 10 percent on CBD tolls and
credits to respond to monitoring results if appropriate."  DOT45575.

businesses, and neighborhood-level effects near the 60th Street CBD boundary. DOT45523–32. Like the Final EA, Reevaluation 1 relied upon data from the U.S. Census, U.S. Department of Labor, and other sources with information on economic activities in the CBD and the 28-county regional study area. DOT45523. Reevaluation 1 determined that "the conclusions of the Final EA remain valid." DOT45530; *see Chan*, 2024 WL 5199945, at *6–9 (detailing the Final EA's conclusions that the Tolling Program would result in beneficial regional economic effects including greater productivity, fewer auto collisions, greater foot traffic, improvements to tourism, an increase in the number of paid trips taxis could complete, and reduced uncertainty concerning delivery timing).

This Court has already determined that the FHWA's use of all of these methodologies to conduct a "painstaking examination of Congestion Pricing's environmental impacts" satisfies NEPA's requirement that FHWA take a "hard look." *Mulgrew*, 750 F. Supp. 3d at 211, 225–31 (citing *Balt. Gas & Elec.*, 462 U.S. at 98). Courts have consistently held that FHWA's use of similar methodologies is consistent with the agency's obligations under NEPA. *See, e.g.*, *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 473–74 (6th Cir. 2014) (holding FHWA properly considered traffic forecasts); *Price Rd. Neighborhood*, 113 F.3d at 1511 (holding FHWA satisfactorily evaluated the projects impacts on, *inter alia*, traffic congestion, air quality, and noise); *Comm. to Pres. Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1556 (10th Cir. 1993) (holding FHWA properly evaluated the possibility the project would increase noise pollution); *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1544 (11th Cir. 1990) (holding that the FHWA's choice of methodology for projecting traffic complied with NEPA because it had "a rational basis and was consistently applied in an objective manner"); *Renew 81 for All by Fowler v. Fed. Highway Admin.*, 2024 WL 3488407, at *9 (N.D.N.Y. July 19,

2024) (FHWA satisfied NEPA's "hard look" requirement by undertaking "a thorough, area-wide air quality analysis, bolstered by voluntary microscale testing at several locations of particular interest to the community"); *Senville*, 327 F. Supp. 2d at 358 (holding that the FHWA's mesoscale air quality modeling based on its traffic analysis was "based upon reason" and satisfied NEPA).

Plaintiffs do not challenge the FHWA's methodologies, but do take issue with some of the underlying data. They argue that "[f]or the transportation analysis, the reevaluation modeled the adopted toll structure using the same version of the BPM as was used for Final EA, as a comparator, but made no effort to update the statistics" and that "[t]o evaluate 'economic conditions,' the Final EA used U.S. Census Bureau data from as far back as 2012 and from 2015 to 2019; the June 14 reevaluation used the same outmoded data and tables and simply overlaid the outdated BPM modeling." *Chan*, Dkt. No. 136-1 at 11–12, 27–28 (quotation omitted); *Mulgrew*, Dkt. No. 124-1 at 11–12, 27–28 (quotation omitted); *see also Mulgrew*, 750 F. Supp. 3d at 234 (noting Plaintiffs' argument that FHWA's "reliance on pre-COVID-19 traffic data was arbitrary and capricious, because it led the agency to overlook the dramatic changes the pandemic wrought on commuting patterns"). However, Plaintiffs offer no new arguments as to why FHWA's reliance on such data undermined the reliability of Reevaluation 1's findings. And Plaintiffs do not argue that any event transpired after publication of the Final EA that would make the data unrepresentative in any new way. The Final EA explained that "pre-COVID-19-pandemic baseline conditions" were an "appropriate" basis for forecasting "long-term condition[s] not biased by periodic disruptions." DOT36341. The Court once again holds that FHWA has "adequately explain[ed] why it declined to rely on" the data set it chose, and its selection "is exactly the sort that [courts] afford agencies discretion to make." *Mulgrew*, 750 F.Supp.3d at 234–35 (first quoting

*Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 160 (D.C. Cir. 2015) and then quoting *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 626 (9th Cir. 2014)).

Plaintiffs primarily argue that Reevaluation 1 was faulty because it omitted to consider what Plaintiffs claim are certain relevant environmental effects. An agency may violate NEPA "by failing to adequately consider all relevant environmental factors prior to making its finding of no significant impact." *Hoffman*, 132 F.3d at 17; *see also Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (holding that a court's "role in reviewing an agency's decision not to prepare an EIS is a limited one, designed primarily to ensure that no arguably significant consequences have been ignored." (quotation omitted)); *cf. Paradise Ridge Def. Coal. v. Hartman*, 757 F. App'x 536, 538 (9th Cir. 2018) (holding that the FHWA complied with NEPA where the plaintiff failed to "argue that the FHWA should have used an alternative methodology"). Plaintiffs identify three supposed omissions in the form of FHWA's purported failure to properly account for: (1) the changed toll on taxis and FHVs; (2) the changed Peak Period structure; and (3) the economic impacts mentioned by Governor Hochul when she announced a pause of the Tolling Program. *Chan*, Dkt. No. 136-1 at 12–13, 18; *Mulgrew*, Dkt. No. 124-1 at 12–13, 18. Plaintiffs additionally argue that Reevaluation 1 inappropriately considered the Project Sponsors' mitigation commitments. *Chan*, Dkt. No. 136-1 at 11; *Mulgrew*, Dkt. No. 124-1 at 11; *Chan*, Dkt. No. 154 at 17; *Mulgrew*, Dkt. No. 140 at 17.

First, Plaintiffs claim that "[t]he reevaluation did not fully appreciate the impact of the changed toll on taxis and for-hire-vehicles, given that taxis and FHV have little reason to be deterred from continuing to drive throughout the CBD." *Chan*, Dkt. No. 136-1 at 12; *Mulgrew*, Dkt. No. 124-1 at 12. According to Plaintiffs, the newly-adopted pass-through model for taxis and FHVs permits taxi and FHV drivers to "drive as many miles as desired throughout the CBD—and

create a great deal of congestion—without being charged any toll" while the passengers pay a "negligible fee." *Chan*, Dkt. No. 136-1 at 12, 18; *Mulgrew*, Dkt. No. 124-1 at 12, 18. However, Plaintiffs' assertion is not consistent with Reevaluation 1, which specifically analyzed the impact of the pass-through tolling structure through traffic modeling, and predicted that the March 2024 Tolling Structure would result in a 0.3 percent reduction in taxi and FHV VMT within the Manhattan CBD. DOT45526. Plaintiffs fail to offer any evidence that would call that conclusion into doubt or that would suggest that the pass-through tolling structure would result in increased congestion or worse environmental outcomes. As a matter of logic, it is not apparent that charging passengers instead of drivers would encourage car travel in the CBD. The TMRB based the pass-through model on the fact that "[u]ltimately, it is passengers—not drivers—who make the choice to add to vehicle congestion in the CBD . . . [a]nd it is passengers whose travel patterns must be influenced to fight congestion in the CBD." Traffic Mobility Review Board, *Congestion Pricing in New York*, 22 (2023). Simply because a taxi driver may drive through the CBD at no personal expense does not mean that they will do so when the passengers for whom they drive would request a less costly route.

Plaintiffs also argue that "taxis and FHVs are a single mode in the BPM and therefore cannot be presented separately, yet separate tolls are assigned for each type of vehicle." *Chan*, Dkt. No. 136-1 at 12; *Mulgrew*, Dkt. No. 124-1 at 12. However, the Final EA explained that it modeled differential treatment of taxis and FHVs through weighted averaging. DOT4594–95 ("The BPM mode choice parameters were updated to match taxi and FHV travel characteristics from the New York City Taxi and Limousine Commission October 2017 data."), 36344.

In their reply memoranda of law, Plaintiffs cite a working paper published in November 2024 as evidence that the pass-through model merited further consideration. *Chan*, Dkt. No. 154

at 15; *Mulgrew*, Dkt. No. 140 at 15.  "It is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion." *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010).  Furthermore, when reviewing an agency decision, courts are generally "confined to the administrative record compiled by that agency when it made the decision." *Hoffman*, 132 F.3d at 14 (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  Despite this "record rule," "consideration of extra-record evidence may be appropriate in the NEPA context to enable a reviewing court to determine that the information available to the decisionmaker included a complete discussion of environmental effects and alternatives." *Id.*  Here, however, the working paper would not have been available to the FHWA prior to the adoption of the pass-through model, and Plaintiffs do not demonstrate that the paper undermines the FHWA's discussion of environmental effects and alternatives.  Plaintiffs focus on the authors' policy recommendations (including that the Project Sponsors should charge a higher toll to taxis and FHVs and should calculate the toll on a per-mile rather than per-trip basis), but they do not identify a single fact in the working paper sufficient to show that the Tolling Program would impact the environment "in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374; *see also id.* at 385 (holding that "[e]ven if another decisionmaker might have reached a contrary result, it was surely not 'a clear error of judgment' for the [agency] to have found that the new and accurate information contained in the documents was not significant and that the significant information was not new and accurate").

Second, Plaintiffs assert that "[b]eyond re-rerunning the BPM with the new $15 toll, the reevaluation did not analyze the impact of the change in peak and overnight hours." *Chan*, Dkt. No. 136-1 at 12–13; *Mulgrew*, Dkt. No. 124-1 at 12–13.  That assertion misstates the record.

Reevaluation 1 acknowledged that "[t]he adopted toll structure has a simplified two-time-period structure (i.e., peak and overnight) on weekdays, as opposed to the three-time-period (i.e., peak, off-peak, and overnight) weekday structures studied in the Final EA" and that "[a]s there is no longer an off-peak period on weekdays, the weekday peak and overnight periods are longer than those studied in the Final EA."    DOT45440.    Reevaluation 1 accordingly stated that "[t]he transportation modeling conducted for the adopted toll structure accounts for this change in the peak and offpeak periods and thus the model results reflect this change."    *Id.*    In other words, Reevaluation 1 considered whether the change in peak and overnight hours would result in significant unanticipated economic impacts and concluded it would not.

Third, Plaintiffs take issue with the fact that "[t]he June 14 Reevaluation . . . completely failed to analyze the economic issues raised by the Governor in her June assessment."    *Chan*, Dkt. No. 136-1 at 28; *Mulgrew*, Dkt. No. 124-1 at 28; *Chan*, Dkt. No. 154 at 12; *Mulgrew*, Dkt. No. 140 at 12; *see also Chan*, Dkt. No. 136-1 at 11, 28 (noting that Reevaluation 1 "made no mention of the 'pause' of Congestion Pricing or any of the reasons for the pause implemented just days earlier"); *Mulgrew*, Dkt. No. 124-1 at 11, 28 (same).    In pausing the program, the Governor stated: "[A] $15 charge may not mean a lot to someone who has the means, but it can break the budget of a working- or middle-class household . . . [a]nd given these financial pressures, I cannot add another burden to working- and middle-class New Yorkers—or create another obstacle to continued recovery."    June 5, 2024 Press Release (cited by *Chan*, Dkt. No. 136-1 at 10 & n.7; *Mulgrew*, Dkt. No. 124-1 at 10 & n.7).    But NEPA is concerned with impacts to the human environment, not purely economic interests.    *See Cellular Phone Taskforce v. F.C.C.*, 205 F.3d 82, 95 (2d Cir. 2000) ("NEPA only requires agencies to consider environmental effects, i.e., alterations to the environment that have a proximate effect on human health." (citing *Metro. Edison Co. v.*

*People Against Nuclear Energy*, 460 U.S. 766, 774 (1983) ("Neither the language nor the history of NEPA suggest that it was intended to give citizens a general opportunity to air their policy objections to proposed federal actions."))); *Cheney*, 12 F.3d at 12 (to state a NEPA claim, the plaintiff "bore the burden of showing that the [agency action] will significantly affect the physical environment as opposed to the economic health of the region"); *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."). Both the Final EA and Reevaluation 1 *did* evaluate the economic effects of the adopted tolling structure. *See supra*; DOT45523–32.[27]  But, even if Defendants had declined to measure the economic effects of the Tolling Program, Plaintiffs do not point to any authority stating that such analysis was required. Thus, such omission would not have violated NEPA.

Finally, Plaintiffs argue that Reevaluation 1 does not develop the mitigation efforts "with any specificity." *Chan*, Dkt. No. 136-1 at 11; *Mulgrew*, Dkt. No. 124-1 at 11; *see also Chan*, Dkt. No. 154 at 17; *Mulgrew*, Dkt. No. 140 at 17. Reevaluation 1 detailed place-based mitigation measures such as electric truck charging infrastructure, roadside vegetation, parks and greenspace, air filtration units in schools near highways, and an asthma case management program (all of which had been stated in the Final EA). DOT45606. Reevaluation 1 explained that such measures would be implemented along the FDR Drive in lower Manhattan, in the Lower East Side, and in so-called "90 and 90" census tracks which Reevaluation 1 defined as EJ census tracts "where individuals

---

[27] Plaintiffs' complaint instead seems to be that the FHWA did not pay specific attention to the economic issues raised by Governor Hochul in explaining her reasoning for a stay. *Chan*, Dkt. No. 136-1 at 11, 28; *Mulgrew*, Dkt. No. 124-1 at 11, 28; *Chan*, Dkt. No. 154 at 12; *Mulgrew*, Dkt. No. 140 at 12. But a politician's oration has no special significance to NEPA compliance. And neither the Governor nor Plaintiffs pointed to any evidence that the Tolling Program would have economic impacts outside the range of the impacts anticipated by the Final EA.

experience at least one pre-existing pollutant burden and at least one pre-existing chronic disease burden at or above the 90th percentile, nationally, and where truck proximity could increase" as a result of the Tolling Program. DOT45576, 45606. The Project Sponsors allocated the $100 million pledged to those mitigation efforts across the affected census tracts based on population share such that impacted tracts with higher populations received a greater share of the funds. DOT45608–09.[28]

According to Plaintiffs, Reevaluation 1 lacked sufficient information about the mitigation efforts for their positive environmental impacts to be taken into account including because Reevaluation 1 did not specify "what schools will receive air filtration units near highways, what parks will be renovated and where parks and greenspaces will be renovated." *Chan*, Dkt. No. 136-1 at 11; *Mulgrew*, Dkt. No. 124-1 at 11; *see also Chan*, Dkt. No. 154 at 17; *Mulgrew*, Dkt. No. 140 at 17. Reevaluation 1 stated that "[a]ll communities are eligible for . . . installation of roadside vegetation, renovation of parks and greenspace, and installation of air filtration units in schools near highways, pending the identification of feasible sites." DOT45610. "[T]he Project Sponsors will engage with the Environmental Justice Community Group [], and relevant communities that warrant place-based mitigation, based on the data in this reevaluation." *Id.* "Local implementing agencies will also help determine which of the specific place-based mitigation measures as described above are appropriate for each community within the allocated funds and exactly where

---

[28] Reevaluation 1 also detailed more financially-focused mitigation efforts to reduce the economic burden on low-income drivers including a deeper discount for low income drivers, a tax credit for low-income CBD residents, elimination of the $10 E-ZPass tag deposit fee for customers without a credit card backup, and outreach and education efforts regarding discounted transit options. DOT45569–70. The pass-through toll on taxis and FHVs would reduce adverse effects on minority drivers, an identified EJ community, and the Tolling Program could actually produce beneficial effects for such drivers by permitting them to obtain more fares due to the lower congestion. DOT37004–05, 45571–73.

they should be sited." *Id.*  Reevaluation 1 described a siting process that was to involve further data collection, engagement of community groups, engagement with relevant agencies to refine the suitability analysis and identify potential sites, the mapping of potential sites to ensure an equitable distribution of mitigation measures, developing and presenting a mitigation plan to relevant agencies, officials, and community stakeholders, and then finalization of the mitigation plan.  DOT45610–11.  The funds have been set aside for the mitigation efforts; all that awaits is a determination of which sites will best fulfil the mitigation objectives.  The Second Circuit has held that such to-be-determined mitigation measures can be sufficient to support a FONSI.  *See Hoffman*, 132 F.3d at 17 (discussing *Abenaki Nation of Missisquoi v. Hughes*, 805 F. Supp. 234, 245 (D.Vt.1992) (Parker, J.), *aff'd*, 990 F.2d 729 (2d Cir. 1993) (per curiam)).  In the approvingly-cited *Abenaki*, the agency conditioned authorization of the project upon commitments to certain mitigation measures to preserve wetlands.  805 F. Supp. at 239 n.9.  The mandatory conditions included a two-year monitoring period followed by the development and submission of a site design for review, and approval of a site to implement any needed manipulation or flooding to create compensating wetlands.  *Id.*  The district court found that those mitigation measures could be properly considered in determining the significance of the environmental impact, and the Second Circuit affirmed on the same grounds.  *See id.* at 245; 990 F.2d at 730.  So too here, the fact that the precise mitigation sites remain to be chosen does not preclude the FHWA's consideration of the Project Sponsors' mitigation commitments in connection with the decision not to file a supplemental EIS/FONSI.

With respect to Reevaluation 1, Plaintiffs fail to raise a genuine dispute of material fact as to whether the FHWA "conducted a reasoned evaluation of the relevant information" concerning the environmental ramifications of the adopted toll structure.  *Marsh*, 490 U.S. at 385.  "Given the

role of the EIS and the narrow scope of permissible judicial review, the court may not rule an EIS inadequate if the agency has made an adequate compilation of relevant information, has analyzed it reasonably, has not ignored pertinent data, and has made disclosures to the public." *Sierra Club*, 701 F.2d at 1029.  Here, the record shows that the FHWA "examine[d] the relevant data," *Fox Television*, 556 U.S. at 513, and was not arbitrary or capricious in considering, or failing to consider, the data that it did.

### B.    Reevaluation 2

Plaintiffs fault Reevaluation 2 for failing to consider the environmental ramifications of the Phase-In Tolling Structure and for revealing a shift in priorities that they claim required reconsideration of previously-rejected alternatives.

### 1.    Analysis of Environmental Effects

Plaintiffs argue that Reevaluation 2 is deficient because it does not include new analysis of the environmental effects of the Phase-In Tolling Structure: "There is no environmental review of the phased-in toll; there is no air quality analysis or appendices, there are no statistics regarding the impact on congestion or trips to or within Manhattan over time as the toll is phased-in; and there is no consideration of the toll's impact on environmental justice communities or how the timing of the phase-in will impact the timeline of air quality monitoring and needed mitigation efforts." *Chan*, Dkt. No. 136-1 at 24–25; *Mulgrew*, Dkt. No. 124-1 at 24–25; *see also Chan*, Dkt. No. 136-1 at 18 ("[N]o evaluation has meaningfully addressed the effects of laddering the toll price."); *Mulgrew*, Dkt. No. 124-1 at 18 (same).[29]  "None of the models were re-run; none of the

---

[29] Plaintiffs state at one and the same time that the length of Reevaluation 1 demonstrates the need for supplementation, and that the brevity of Reevaluation 2 demonstrates its insufficiency.  *Chan*, Dkt. No. 136-1 at 11, 16–17, 24–25; *Mulgrew*, Dkt. No. 124-1 at 11, 16–17, 24–25.  Plaintiffs cannot have it either way. As stated, the Court looks to the content of the Reevaluations, not the page counts.  *See supra*.

mitigation was re-evaluated or timed with the varying tolls." *Chan*, Dkt. No. 136-1 at 14; *Mulgrew*, Dkt. No. 124-1 at 14.

Defendants do not dispute that Reevaluation 2 did not include any unique review of the Phase-In Tolling Structure. *Chan*, Dkt. No. 148 at 23–24; *Mulgrew*, Dkt. No. 134-1 at 23–24. Instead, they argue that all potentially relevant analysis was already performed in connection the Final EA and Reevaluation 1. Reevaluation 2 explains that the tolling structure "would be the same" as the one analyzed in Reevaluation 1, but during Phases 1 and 2, "the tolls would be lower (but within the range of scenarios analyzed in the EA)." DOT47539. Therefore, "[t]he only difference would be proportional reductions in all toll rates and credits for the first six years of implementation." *Id.* Because drivers are at least somewhat price sensitive, higher toll rates lead to reduced traffic in the CBD and increased traffic diversions to alternative routes while lower toll rates lead to increased traffic in the CBD and decreased traffic diversions to alternative routes. DOT36204. It thus was not arbitrary and capricious for the FHWA to conclude that Phases 1 and 2, with their proportionately lower tolls, would have less of an impact on traffic—and its attendant environmental effects—than Phase 3, whose environmental effects had already been analyzed in Reevaluation 1 in the form of the March 2024 Tolling Structure. *See also Mulgrew*, 750 F. Supp. 3d at 222 (stating that "phased-in tolling merely postpones the full operation of Congestion Pricing").

Plaintiffs also take issue with the new non-alignment of the Tolling Program and the Project Sponsors' mitigation efforts. Although the tolls will now increase in three phases, Reevaluation 2 explains that the mitigation efforts will not be phased in. They will be implemented as originally planned in the EA and FONSI: "Notwithstanding the phasing in of tolls, the Project Sponsors would comply with all of the mitigation commitments set forth in the EA and FONSI

within the same timeframes as contemplated in those documents and the reevaluation prepared for the March 2024 adopted toll structure." DOT47531. Thus, Plaintiffs argue, while the mitigation is on a five-year track, the Tolling Program's biggest impact will become evident only after the mitigation funds have already been spent. *Chan*, Dkt. No. 154 at 18; *Mulgrew*, Dkt. No. 140 at 18. However, as Defendants respond, the Final EA did not contemplate adjusting allocations for mitigation efforts based on initial *monitoring* of effects, and instead the place-based mitigation program "was always intended to be implemented based on the *predicted* effects of the adopted toll structure and stakeholder consultation." *Chan*, Dkt. No. 161 at 2 (emphasis added); *Mulgrew*, Dkt. No. 147 at 2 (emphasis added); DOT45610–11. Because the mitigation efforts as set forth in the final EA and FONSI are based on the a priori predicted impacts rather than the post hoc measured effects, Plaintiffs fail to show that the phase-in nature of the Tolling Program alters the validity of the FHWA's previous determinations that the mitigation measures would offset the eventual adverse effects.

Plaintiffs offer no evidence or reason to conclude that the phase-in nature of the Tolling Program would affect the quality of the human environment to a significant extent not already considered and thus fail to identify any "significant new information" that the FHWA should have considered in deciding whether to issue a supplemental EIS or SEIS. *See Marsh*, 490 U.S. at 370.[30]

---

[30] Plaintiffs cite a statement made during oral argument by counsel for the MTA that a phase-in approach was not a reasonable alternative to the proposed program because "if you only phase in part of a program, that doesn't tell you the impact of the next phase when you[] look[] at in the aggregate, as the EA did." *Chan*, Dkt. No. 154 at 5 (quoting Dkt. No. 89 at 128:11–13); *Mulgrew*, Dkt. No. 140 at 5 (quoting same). However, that statement is taken out of context. During the oral argument, Defendants rebutted the argument that the Tolling Program needed to be phased in to permit the Project Sponsors to figure out what would happen in later stages. *See* Dkt. No. 89 at 128:8–10) ("The notion that you need to phase it in to figure out what's going to happen is incorrect for several reasons."). Thus, counsel for the MTA explained that it was not necessary to implement a single, early phase of the program to predict the impact of potential later phases; the EA could predict the short-term and long-term impacts of the program. *See id.* at 128:8–13.

2.        Consideration of Alternatives

Plaintiffs argue that the adoption of the Phase-In Tolling reveals a change in the Project Sponsors' priorities that warranted analysis of a greater range of alternative actions.  *Chan*, Dkt. No. 136-1 at 21–23; *Mulgrew*, Dkt. No. 124-1 at 21–23; *Chan*, Dkt. No. 154 at 5–10; *Mulgrew*, Dkt. No. 140 at 5–10.  Because early phases of the Tolling Program are projected to raise less than $1 billion in annual revenues, Plaintiffs argue that the FHWA was obligated to examine alternative congestion-mitigation projects that were previously rejected for raising less than $1 billion in annual revenues.

"The purpose of an EIS is to 'provide full and fair discussion of significant environmental impacts and [to] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.'"  *F.A.A.*, 564 F.3d at 556 (quoting 40 C.F.R. § 1502.1).   Accordingly, NEPA demands "a detailed statement" on "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(C)(iii).  "It is well-settled that under NEPA the range of alternatives that must be discussed is a matter within an agency's discretion."  *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1558 (2d Cir. 1992) (citing *Vt. Yankee*, 435 U.S. at 551–52).   Furthermore, "the range of alternatives an agency must consider is narrower when, as here, the agency has found that a project will not have a significant environmental impact." *Id.* (citing *City of New York v. U.S. Dept. of Transp.*, 715 F.2d 732, 743 n.11, 745 (2d Cir. 1983), *cert. denied*, 465 U.S. 1055 (1984)).

An agency may be required to reconsider alternatives in light of changed evaluation parameters.  Courts have held that "where changed circumstances affect the factors relevant to the development and evaluation of alternatives, the [agency] must account for such change in the alternatives it considers." *Nat. Res. Def. Council v. U.S. Forest Serv.* ("*NRDC*"), 421 F.3d 797,

809, 813 (9th Cir. 2005) (citing *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 730 (9th Cir. 1995)).  For example, where the United States Forest Service evaluated project alternatives based on market demand projections that were later proved to be faulty, the Ninth Circuit held that the EIS's evaluation of alternatives was inadequate because the agency was required to reevaluate the alternatives under the correct market demand scenarios.  *NRDC*, 421 F.3d at 813–14.  The Ninth Circuit held that the mischaracterization of the alternatives' economic viability had deprived the public of information necessary to permit informed participation and deprived the agency of information crucial to its NEPA-mandated review.  *See id.* ("[T]he Forest Service violated NEPA's procedural requirement to present complete and accurate information to decision makers and to the public to allow an informed comparison of the alternatives considered in the EIS." (citing *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1439 (9th Cir. 1988); *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446 (4th Cir. 1996))).

The FHWA identified twelve preliminary alternatives for reducing congestion in the CBD based on prior New York City congestion pricing proposals and studies.  DOT36262–64; *Mulgrew*, 750 F. Supp. 3d at 218.  Those alternatives included the No Action Alternative, one non-toll pricing alternative, four toll alternatives using different types of tolling mechanisms, and six other alternatives using methods other than pricing or tolling to reduce congestion.  DOT36265.  The non-toll pricing alternative would take one or more of several forms, including "elimination of the resident exemption for the parking tax or raising of the tax, increased rates for metered on-street parking, and/or introduction of an overnight on-street parking fee." *Id.*  The four toll alternatives included: (1) raising tolls or implementing variable tolls on existing toll facilities, (2) tolling the East and Harlem River bridges, (3) increasing high-occupancy toll lanes on major crossing into Manhattan and on highways leading to the Manhattan CBD, and (4) imposing the ultimately-

adopted CBD tolling program.  *Id.*  The six other alternatives included (1) reducing the number of permits that provide free on-street parking for government employees commuting to jobs in Manhattan, (2) providing additional taxi stands to reduce cruising, (3) creating incentives for teleworking, (4) prohibiting vehicles from entering the Manhattan CBD on certain days based on license plate number, (5) mandating carpooling by prohibiting single-occupant vehicles from entering Manhattan south of 60th Street at certain times, and (6) restricting trucks to overnight deliveries.  *Id.*

The Final EA then used the project purpose, need, and three objectives to conduct a screening evaluation of the preliminary alternatives, so as to establish a reasonable range of alternatives for further study.  DOT36266.  The first objective was to reduce daily VMT within the Manhattan CBD by at least 5% compared to the No Action Alternative.  *Id.*  The second objective was to reduce the number of vehicles entering the Manhattan CBD daily by at least 10% compared to the No Action Alternative.  *Id.*  The third objective—and the one now at issue—was to create a funding source for capital improvements and generate sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program.  *Id.*  This objective was derived from the Traffic Mobility Act, which states:

> For purposes of establishing a central business district toll or tolls the board shall, at minimum, ensure annual revenues and fees collected under such program, less costs of operation of the same, provide for sufficient revenues into the central business district tolling capital lockbox fund, established pursuant to section five hundred fifty-three-j of the public authorities law necessary to fund fifteen billion dollars for capital projects for the 2020 to 2024 MTA capital program . . .

N.Y. Veh. & Traf. Law § 1704-a(1).  The Final EA noted that "[t]he net revenue needed to fund $15 billion depends on a number of economic factors, including but not limited to interest rates and term."  DOT36301 n.2.  Therefore, the modeling used in the Final EA, assumed that the project "should provide at least $1 billion annually in total net revenue, which would be invested or

bonded to generate sufficient funds." *Id.* Out of the preliminary alternatives, only the CBD tolling program met all three objectives. DOT36267–68. Three of the preliminary alternatives met the first two objectives but not the third: (1) tolling the East and Harlem River bridges, (2) implementing license-plate-based entry rationing, and (3) mandating carpooling. Because only the CBD Tolling alternative satisfied all three objectives, the Final EA evaluated only the No Action Alternative and the CBD Tolling Alternative. DOT36266, 36269. The Final EA determined that the Tolling Scenarios would yield annual revenues between $830 million (Tolling Scenario B)[31] and $1.48 billion (Tolling Scenario E). DOT36301.

The Court's prior Opinion and Order held that the Final EA's succinct treatment of the preliminary alternatives was "entirely appropriate . . . since the preliminary alternatives' shortcomings were straightforward." *Mulgrew*, 750 F. Supp. 3d at 220. It explained that "[t]he FHWA did not need to consult an empirical study to reasonably conclude that rationing the days in which cars can enter the CBD and mandating carpooling would not generate $1 billion of net annual revenue for the MTA." *Id.* (citing DOT36267). "That flaw was self-evident as neither measure would directly raise any revenue." *Id.* The Court also rejected Plaintiffs' argument that "the FHWA and Project Sponsors defined their goals so ambitiously that the preliminary alternatives were designed to fail," holding that "the FHWA and Project Sponsors permissibly relied on the New York State Legislature's revenue goal when screening preliminary alternatives." *Id.* at 220–21. It recognized that "NEPA does not empower the Court to second-guess the New

---

[31] The Final EA noted that "[a]lthough Tolling Scenario B would not meet Objective 3 with the toll rates identified and assessed in this EA, additional analysis was conducted to demonstrate that it would meet this objective with a slightly higher toll rate and the resulting VMT reduction and revenue for that modified scenario would fall within the range of the other scenarios presented." DOT36301 n.1.

York State Legislature's revenue objective under the guise of a purely procedural NEPA review." *Id.* (citing *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999))

Under the Phase-In Tolling Structure, however, Reevaluation 2 projects that "Phases 1 and 2 would not raise as much annual revenue as the tolling scenarios studied in the EA or the March 2024 adopted tolling scenario (Phase 3)." DOT47537. It predicts that Phase 1 will raise $0.5 billion annually, Phase 2 would raise $0.7 billion annually, and Phase 3 would raise $0.9 billion annually. *Id.* Nonetheless, Reevaluation 2 states that "over time, the Program would still meet the Act's mandate to raise sufficient revenues to fund $15 billion for capital projects for the MTA Capital Program." DOT47537–38. It explains that "[f]ollowing completion of the Final EA, based on current interest rates and expected timing of projects, MTA's Chief Financial Officer [] determined that annual net revenues in the range of $0.9 billion should be sufficient to meet the Project's need to fund $15 billion of capital projects for the MTA Capital Program." DOT47537 n.2.[32]

Plaintiffs argue that Reevaluation 2 revealed that "the requirement that Congestion Pricing must achieve $1 billion in annual revenues, a figure that Defendants used as a threshold screening criterion in its EA analysis, is now abandoned." *Chan*, Dkt. No. 136-1 at 21–23; *Mulgrew*, Dkt. No. 124-1 at 21–23; *Chan*, Dkt. No. 154 at 5–10; *Mulgrew*, Dkt. No. 140 at 5–10. Defendants

---

[32] The Project Sponsors also offered a policy-based explanation for switching to the Phase-In Tolling Structure. Reevaluation 2 stated:

> The Project Sponsors have reached a consensus that an incremental start would have the benefit of helping drivers adapt more easily to the Program, while monitoring data regarding implementation and effects. For example, drivers would have the time to adjust transportation modes, and continued improvements to mass transit—partly funded by revenues derived from the initial phases of the Program— would incentivize drivers to switch from autos to transit as the toll increased. The Project Sponsors have determined that these benefits outweigh more immediate revenues.

DOT47538.

respond that "raising $1 billion annually has never been the single talismanic requirement of the Program." *Chan*, Dkt. No. 148 at 28; *Mulgrew*, Dkt. No. 134 at 28. Instead, the focus has been the cumulative $15 billion goal and the Final EA cited the $1 billion annual figure as a mere proxy. DOT36301 n.2. But it is not enough to say that the Phase-In Tolling Structure still meets the $15 billion revenue requirement. If the Final EA failed to consider preliminary alternatives because they did not satisfy the $1 billion proxy, which now appears to be a higher threshold than necessary or ultimately applied, then the FHWA may have failed to adequately consider appropriate alternatives including by permitting informed public input. *See NRDC*, 421 F.3d at 813–14.

However, the record demonstrates that none of the rejected preliminary alternatives necessitated further study in light of the lower revenue threshold. The EA did not fail to consider any preliminary alternative simply because it did not satisfy the $1 billion proxy, but rather rejected each alternative for other reasons that are still applicable in the absence of such proxy. The majority were rejected for failing to meet the congestion-mitigation objections, DOT36267, and the three that were rejected solely for failing to meet the revenue requirement still would not raise $15 billion for the MTA Capital Program—even in light of the updated estimate that annual revenues less than $1 billion could suffice. Neither rationing the days on which cars could enter the CBD nor mandating carpooling would generate any funds. *See Mulgrew*, 750 F. Supp. 3d at 220. And the option of tolling the East and Harlem River bridges was not rejected because of a strict $1 billion annual revenue cutoff. The Final EA noted that "[e]arlier studies showed this alternative would reduce congestion and could raise toll revenues equivalent to Project objectives." DOT36268 n.4. However, the tolling revenue would not go the MTA Capital Program because "there is no law or agreement in place between the City of New York and MTA that would direct

the revenue to MTA to support the Capital Program." *Id.*; *see City of New York*, 715 F.2d at 743

("[A]n agency need not consider 'alternatives which could only be implemented after significant

changes in government policy or legislation.'" (quoting *Callaway*, 524 F.2d at 93)); *Red Lake*

*Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 62 (D.D.C. 2022)

(holding that the agency "was not required to 'reinvent the wheel' by reviewing alternative routes

in which [permit recipient] was not legally authorized to construct the replacement pipeline"

(citing *Hoosier Env't Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir.

2013))).[33]  And while the Environmental Protection Agency ("EPA") submitted comments on the

draft EA suggesting that the FHWA should consider a combination of the preliminary alternatives,

the FHWA did not use the $1 billion proxy as a basis for rejection, but instead noted that "the

alternatives combined would not generate adequate revenue to meet the need to generate sufficient

annual net revenues to fund $15 billion for capital projects for MTA's Capital Program."

DOT3613–14; *see also Mulgrew*, 750 F. Supp. 3d at 222–23 (holding that the FHWA adequately

considered the EPA's comment).

Plaintiffs identify no other alternatives before the FHWA that would have satisfied the

three objectives but were determined to be nonviable because of an artificial $1 billion per year

threshold.[34]  It thus was not arbitrary and capricious for the FHWA to determine that the relaxation

---

[33] The Final EA additionally noted that "the 2008 New York City Traffic Congestion Mitigation
Commission Study identified a number of disadvantages to this alternative, including that this
alternative would not address trips that start and end within Manhattan, such as trips beginning or
ending on the Upper East Side and Upper West Side; and that this alternative would adversely
affect local trips between the South Bronx and Harlem/Washington Heights, which could result in
a local adverse economic impact in two environmental justice communities."  DOT36268 n.4; *see*
*Mulgrew*, 750 F. Supp. 3d at 219.

[34] Plaintiffs point to an article in which Governor Hochul is quoted as stating "[t]o assume that the
only funding source [for improvements to mass transit] had to be congestion pricing shows a lack
of imagination."  *Chan*, Dkt. No. 136-1 at 10 & n.8, 16 (quoting *Hochul still 'committed' to MTA*

of the revenue requirement on a per year basis did not require supplementation to permit further evaluation of the still nonviable preliminary alternatives.

Plaintiffs alternatively argue that the "use of inflated economic benefits . . . may result in approval of a project that otherwise would not have been approved because of its adverse environmental effects." *Chan*, Dkt. No. 136-1 at 27 n.15 (citing *Glickman*, 81 F.3d at 446); *Mulgrew*, Dkt. No. 124-1 at 27 n.15. In *Glickman*, the Fourth Circuit noted that "NEPA requires agencies to balance a project's economic benefits against its adverse environmental effects" and thus held that "[m]isleading economic assumptions can defeat the first function of an EIS by impairing the agency's consideration of the adverse environmental effects of a proposed project." 81 F.3d at 446. Thus, where an agency determines that the project's adverse environmental effects are outweighed by its economic benefits, the subsequent revelation that it overestimated the economic benefits may show that the prior economic assumptions "were so distorted as to impair fair consideration" of the project's adverse environmental effects. *Id.* (quoting *S. La. Envtl. Council, Inc. v. Sand*, 629 F.2d 1005, 1011 (5th Cir. 1980)). However, the FHWA determined that the Tolling Program would have *no* significant environment impact—not just that its adverse effects were "worth it" in light of the revenues to be generated. DOT363. Furthermore, the record does not show that the FHWA overestimated the Tolling Program's revenues. Instead, it appears that the FHWA overestimated the amount of tolling revenue needed to reach the New York

---

*improvements despite congestion pricing pause*, ABC7 (June 10, 2024) https://abc7ny.com/post/congestion-pricing-pause-hochul-committed-mta-improvements/14932184/); *Mulgrew*, Dkt. No. 124-1 at 10 & n.8, 16 (quoting same). The Governor's nonspecific reference to the possible existence of other viable alternatives does not satisfy Plaintiff's burden of showing the FHWA "acted arbitrarily and capriciously by failing to consider feasible alternatives to the proposed action." *Knowles v. U.S. Coast Guard*, 1997 WL 151397, at *7 (S.D.N.Y. Mar. 31, 1997). And Plaintiffs demonstrate no more imagination than the FHWA, as they do not identify any other alternatives that the FHWA should have, but did not, consider in the Final EA.

Legislature's $15 billion goal—effectively undervaluing the Tolling Program's economic benefit. Nothing about the lower annual revenues needed to reach that goal indicates that economic considerations blinded the FHWA to the Tolling Program's true environmental effects. *See N.C. All. for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 151 F. Supp. 2d 661, 693 (M.D.N.C. 2001) (distinguishing *Glickman* and finding that "even under the least favorable discount rate assumptions, the alternatives detailed in the cost-benefit analysis had positive benefit/cost ratios. Therefore, it appears that the cost-benefit analysis did not play a decisive role in the decision of whether to undertake the proposed project." (citation omitted)).

Ultimately, Plaintiffs fail to demonstrate that the shift to the Phase-In Tolling Structure caused significant uncontemplated environmental impacts or necessitated reconsideration of project alternatives.

### C.    Decision Not To Supplement

The Second Circuit has "consistently held that whether a particular agency action will have a 'significant' effect on the environment is a substantive question left to the informed discretion of the agency proposing the action." *Hoffman*, 132 F.3d at 14 (collecting cases). Nonetheless, "in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Marsh*, 490 U.S. at 378. "In conducting this review, the district court is 'relegated to affirming the agency's decision so long as a rational basis is presented for the decision reached.'" *Coal. for Healthy Ports*, 2015 WL 7460018, at *4 (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1050 (2d Cir. 1985)). To determine whether the agency's decision was arbitrary and capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether

there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  In particular, the "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43.

The above examination of the administrative record relied upon by the FHWA and the FHWA's findings as published in the Final EA and Reevaluation 1, reveals that the FHWA considered the relevant data, investigated the relevant environmental concerns, and concisely documented the evidence supporting its conclusion that the FONSI remained valid in light of the March 2024 Tolling Structure and the Phase-In Tolling Structure such that supplementation was not required.  "Since the challenged findings are supported by substantial evidence, are not arbitrary and capricious, and do not represent an abuse of discretion, it is not within the competence of this court to overrule the agency's determination." *Town of Orangetown v. Gorsuch*, 718 F.2d 29, 39 (2d Cir. 1983) (collecting cases); *see also Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992) ("Once we are satisfied that an agency's exercise of discretion is truly informed, we must defer to th[at] informed discretion. (quotation omitted)); *Fox Television*, 556 U.S. at 513.

## CONCLUSION

Defendants' motions to dismiss and motions for partial summary judgment are GRANTED.  Plaintiffs' motions for partial summary judgment are DENIED.

"Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, '[a] court should freely give leave [to amend] when justice so requires.'" *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (quoting Fed. R. Civ. P. 15); *see also Sacerdote v. N.Y.U.*, 9 F.4th 95, 115 (2d Cir. 2021) ("This is a 'liberal' and 'permissive' standard." (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015))).  However, "leave to amend need not be

granted when amendment would be futile." *Terry v. Inc. Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016). Thus, where a claim is waived or is dismissed due to substantive issues rather than inartful pleading, the Court may dismiss the claim with prejudice. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (where the problem with the plaintiff's causes of action is substantive and better pleading will not cure it, "[s]uch a futile request to replead should be denied"); *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 2024 WL 246367, at *2 (S.D.N.Y. Jan. 23, 2024) ("Amending a pleading to assert a waived claim or defense is futile.").

The following causes of action are dismissed without prejudice:

- *Chan et al. v. U.S. Department of Transportation et al.*, 23-cv-10365, Counts Four and Five;

- *Mulgrew et al. v. U.S. Department of Transportation et al.*, 24-cv-1644, Counts Four and Five; and

- *Trucking Association of New York v. Metropolitan Transportation Authority et al.*, 24-cv-4111, Counts One and Three.

Plaintiffs in each case may file an amended complaint no later than thirty days after the date of this Opinion and Order.

The following causes of action are dismissed with prejudice:

- *Chan et al. v. U.S. Department of Transportation et al.*, 23-cv-10365, Count Six;

- *Mulgrew et al. v. U.S. Department of Transportation et al.*, 24-cv-1644, Count Six;

- *New Yorkers Against Congestion Pricing Tax et al. v. U.S. Department of Transportation et al.*, 24-cv-367, Counts Two, Three, Four, and Five; and

- *Trucking Association of New York v. Metropolitan Transportation Authority et al.*, 24-cv-4111, Count Two.

Summary judgement is entered in favor of Defendants with respect to the following causes of action:

- *Chan et al. v. U.S. Department of Transportation et al.*, 23-cv-10365, Counts Two and Three; and

- *Mulgrew et al. v. U.S. Department of Transportation et al.*, 24-cv-1644, Counts Two and Three.

The Clerk of Court is respectfully directed to close the following motions:

- *Chan et al. v. U.S. Department of Transportation et al.*, 23-cv-10365, Dkt. Nos. 115, 117, 136, 145, 147;

- *Mulgrew et al. v. U.S. Department of Transportation et al.*, 24-cv-1644, Dkt. Nos. 102, 104, 124, 131, 133;

- *New Yorkers Against Congestion Pricing Tax et al. v. U.S. Department of Transportation et al.*, 24-cv-367, Dkt. Nos. 105, 128; and

- *Trucking Association of New York v. Metropolitan Transportation Authority et al.*, 24-cv-4111, Dkt. Nos. 60, 62.

SO ORDERED.

Dated: April 17, 2025
New York, New York

_____
LEWIS J. LIMAN
United States District Judge